ACCEPTED
15-25-00084-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
10/3/2025 3:01 PM
CHRISTOPHER A. PRINE
CLERK

**No. 15-25-00084-CV**

IN THE FIFTEENTH DISTRICT COURT OF APPEALS
AUSTIN, TEXAS

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
10/3/2025 3:01:36 PM
CHRISTOPHER A. PRINE
Clerk

TEXAS COMMISSION ON ENVIRONMENTAL QUALITY,
*Appellant,*

v.

WILBARGER CREEK CONSERVATION ALLIANCE, MARILYN
KELINSKE, ANNE BROCKENBROUGH, and JONATHAN BEALL,
*Appellees.*

On Appeal from the 126th District Court of Travis County, Texas
Cause No. D-1-GN-23-004031

## BRIEF OF APPELLANT TCEQ

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney
General

AUSTIN KINGHORN
Deputy Attorney General for Civil
Litigation

KELLIE E. BILLINGS-RAY
Chief, Environmental Protection
Division

**October 3, 2025**

AMANDA ATKINSON CAGLE
Assistant Attorney General
State Bar No. 00783569
Amanda.Cagle@oag.texas.gov

SARA J. FERRIS
Assistant Attorney General
State Bar No. 50511915
Sara.Ferris@oag.texas.gov

OFFICE OF THE ATTORNEY
GENERAL OF TEXAS
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
(512) 975-1582 | Fax: (512) 320-0911

***Attorneys for the Texas
Commission on Environmental
Quality***

**Oral Argument Requested**

# IDENTITY OF PARTIES AND COUNSEL

| **Appellant:** | **Counsel:** |
| --- | --- |
| Texas Commission on Environmental Quality | Amanda Atkinson Cagle<br>Sara J. Ferris<br>OFFICE OF THE ATTORNEY GENERAL OF TEXAS<br>Environmental Protection Division<br>P.O. Box 12548, MC-066<br>Austin, Texas 78711-2548<br>(512) 975-1582 | Fax: (512) 320-0911 |

| **Appellees:** | **Counsel:** |
| --- | --- |
| Wilbarger Creek Conservation Alliance, Marilyn Kelinske, Anne Brockenbrough, and Jonathan Beall | Christopher D. Smith<br>Becky L. Jolin<br>SMITH JOLIN PLLC<br>901 S. Mopac Expressway<br>Building 1 Suite 300<br>Austin, Texas 78746<br>(512) 659-6912 |

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ...................................................... i

INDEX OF AUTHORITIES ........................................................................ iv

GLOSSARY OF ACRONYMS AND TECHNICAL TERMS ......................... viii

STATEMENT OF THE CASE ...................................................................... 1

STATEMENT REGARDING ORAL ARGUMENT .......................................... 2

ISSUE PRESENTED ................................................................................. 2

STATEMENT OF FACTS ........................................................................... 3

    A.    Legal Background: Contested case hearings—the highest level of participatory process afforded in a permitting proceeding—are limited to "affected persons" ................................................................................. 3

    B.    Regulatory Background: The Commission's permitting process includes careful consideration of both the technical aspects of the proposed permit and public comments ................................................................. 4

        1.    Commission experts independently analyzed and modeled the likely effects of the proposed discharge ............................................................... 5

        2.    Appellees participated in this process by filing comments that the Commission considered ................... 8

        3.    The Commission considered Appellees' hearing requests in light of the record, including its staff's assessment of the likely impact of the permit on the creek and the ED's analysis and opinions ................................................... 10

SUMMARY OF THE ARGUMENT ............................................................. 14

STANDARD OF REVIEW ........................................................................ 16

ARGUMENT .......................................................................................... 18

    I.    Texas law requires the Commission to weigh specific information and find requestors likely to be impacted before it may grant a hearing request ...................................... 18

A. The affected person standard reflects the administrative forum by empowering the Commission to utilize its specialized expertise and data when evaluating the required factors.............. 19

B. The standard to be met, as well as specific factors and materials to be considered are set forth by statutes and regulations ................... 21

C. The burden to establish affectedness rests on the requestor. ...............................................24

II. Substantial evidence supports the Commission's hearing denial because Appellees are not likely to be affected by this permit ........................................... 25

A. Appellees' concerns about "contamination" do not establish them as affected persons ..........................26

B. Appellees' concerns about plant failures do not establish them as affected persons................................29

C. Appellees' concerns about algae and low dissolved oxygen do not establish them as affected persons ..........................................30

D. Appellees' distance from the plant and the nature of their allegations further support that they are not likely to be impacted in a manner different from the general public ...................................34

CONCLUSION AND PRAYER ................................................ 37

CERTIFICATE OF SERVICE.................................................39

CERTIFICATE OF COMPLIANCE............................................40

INDEX OF APPENDIX ITEMS (attached)................................. 41

# INDEX OF AUTHORITIES

**Cases**

*Boerne to Bergheim Coal. for Clean Env't,*
657 S.W.3d 382 (Tex. App.—El Paso 2022, no pet.) .............................. 16

*City of El Paso v. Pub. Util. Comm'n,*
883 S.W.2d 179 (Tex. 1994)...................................................................17

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983) ................................................................................28

*City of Waco v. Tex. Comm'n on Envtl. Quality,*
346 S.W.3d 781 (Tex. App.—Austin 2011)............................................ 19

*Collins v. Tex. Nat. Res. Conservation Comm'n,*
94 S.W.3d 876 (Tex. App.—Austin 2002, no pet.) ........................... 24, 29

*Dyer v. Tex. Comm'n on Envtl. Quality,*
639 S.W.3d 721 (Tex. App.—Austin 2019)
*aff'd,* 646 S.W.3d 498 (Tex. 2022) .........................................................17

*Garcia v. City of Willis,*
593 S.W.3d 201 (Tex. 2019)...................................................................29

*Heat Energy Advanced Tech., Inc. v. W. Dall. Coal. for Envtl. Justice,*
962 S.W.2d 288 (Tex. App.—Austin 1998, pet. denied)..........................24

*Heckman v. Williamson Cnty.,*
369 S.W.3d 137 (Tex. 2012)................................................................... 19

*Kaup v. Tex. Workforce Comm'n,*
456 S.W.3d 289 (Tex. App.—Houston [1st Dist.] 2014, no pet.)..............17

*Mathews v. Eldridge,*
424 U.S. 319 (1976)...............................................................................20

*Mireles v. Tex. Dep't of Public Safety,*
9 S.W.3d 128 (Tex. 1999)...................................................................... 18

*Save Our Springs Alliance, Inc. v. Tex. Comm'n on Envtl. Quality,*
713 S.W.3d 308 (Tex. 2025) .................................................................. 18

*Shrimpers & Fishermen of RGV v. Tex. Comm'n on Envtl. Quality,*
  968 F.3d 419 (5th Cir. 2020)........................................................20, 23, 29

*Tex. Comm'n on Envtl. Quality v. City of Aledo,*
  No. 03-13-00113-CV, 2015 WL 4196408
  (Tex. App.—Austin July 8, 2015, no pet.)................................................ 25

*Tex. Comm'n on Envtl. Quality v. City of Waco,*
  413 S.W.3d 409 (Tex. 2013) .....................................................passim

*Tex. Comm'n on Envtl. Quality v. San Antonio Bay Estuarine*
  *Waterkeeper,*
  714 S.W.3d 270 (Tex. App.—[15th Dist.] 2025, pet. filed).................. 24, 25

*Tex. Comm'n on Envtl. Quality v. Sierra Club,*
  455 S.W.3d 228 (Tex. App.—Austin 2014, pet. denied) ......... 16, 21, 23, 30

*Tex. Health Facilities Comm'n v. Charter Medical-Dallas, Inc.,*
  665 S.W.2d 446 (Tex. 1984) ........................................................17

**Constitutional Provisions & Statutes**

Tex. Gov't Code § 2001.171.......................................................... 16

Tex. Gov't Code § 2001.174 ..........................................................17

Tex. Water Code § 5.115...........................................................passim

Tex. Water Code § 5.115(a)........................................................passim

Tex. Water Code § 5.115(a-1) ................................................ 4, 20, 37

Tex. Water Code § 5.115(a-1)(1)(A)-(E) ...................................15, 22

Tex. Water Code § 5.115(a-1)(1)(B)...................................... 19, 24

Tex. Water Code § 5.115(a-1)(2)(B) ...................................... 14

Tex. Water Code § 5.115(b)........................................................ 37

Tex. Water Code § 5.221 ............................................................ viii

Tex. Water Code § 5.222 ............................................................ viii

Tex. Water Code § 5.351 ............................................................ 16

Tex. Water Code § 5.556.................................................................... 4, 20, 25

Tex. Water Code § 5.556(c) ........................................................4, 18, 30, 37

Tex. Water Code Ch. 26 ........................................................................4

Tex. Water Code § 26.003 ....................................................................4

Tex. Water Code § 26.121 ....................................................................4

**Rules & Regulations**

30 Tex. Admin. Code § 39.419.......................................................... viii

30 Tex. Admin. Code § 39.551 ............................................................9

30 Tex. Admin. Code § 50.117(f) .........................................................3

30 Tex. Admin. Code § 55.156 .............................................................9

30 Tex. Admin. Code § 55.201(c)(3)-(5) ............................................ 13

30 Tex. Admin. Code § 55.201(d)....................................................... 13

30 Tex. Admin. Code § 55.201(d)(2) ..................................................24

30 Tex. Admin. Code § 55.203(c)................................................... 23, 25

30 Tex. Admin. Code § 55.203(c)(2) ..................................................24

30 Tex. Admin. Code § 55.203(c)(4)-(5) ............................................24

30 Tex. Admin. Code § 55.205 ........................................................... 13

30 Tex. Admin. Code § 55.209 ........................................................... 12

30 Tex. Admin. Code § 305.44(b) ........................................................5

30 Tex. Admin. Code § 305.45(a)(6)....................................................5

30 Tex. Admin. Code § 305.45(a)(8)....................................................5

30 Tex. Admin. Code Ch. 307.......................................................... 4, 11

30 Tex. Admin. Code § 307.10 .........................................................6, 31

30 Tex. Admin. Code § 307.2(e).................................................................. 35

30 Tex. Admin. Code § 307.4(d) ................................................................ 29

30 Tex. Admin. Code Ch. 309 ..................................................................... 4

30 Tex. Admin. Code § 321.34(b)................................................................. 5

30 Tex. Admin. Code § 321.34(f).................................................................. 5

# GLOSSARY OF ACRONYMS AND TECHNICAL TERMS

**Appellees** – Wilbarger Creek Conservation Alliance (WCCA), its President, Jon Beall, its Vice President, Anne Brockenbrough, and its Board Member Marilyn Kelinske, (referenced collectively as WCCA).

**Applicant** – SWWC Utilities, Inc.

**AR** – Administrative Record.

**CBOD** – Combined Biological Oxygen Demand.

**Commission or TCEQ** – Texas Commission on Environmental Quality, Appellant in this suit.

**CFU – Colony-Forming Unit** – Measure of the number of viable bacteria in a sample.

**Discharge Point** or **Outfall** – The location where water, run-off, or effluent enters a watercourse (such as a creek or river).

**Executive Director** or **ED** – TCEQ's Executive Director – Oversees the day-to-day operations of the agency, including processing applications for wastewater treatment permits and preparing draft permits and recommendations for the Commission. *See* Tex. Water Code §§ 5.221-5.222; 30 Tex. Admin. Code § 39.419.

**Final Order** – Final Order of the Texas Commission on Environmental Quality, signed on May 2, 2023, in TCEQ Docket No. 2023-0370-MWD, concerning the application by SWWC Utilities, Inc. for a new Texas Pollutant Discharge Elimination System Permit No. WQ0016022001.

**OPIC** – Office of Public Interest Counsel.

**SWQM/SWQMIS** – Texas Surface Water Quality Monitoring/Texas Surface Water Quality Monitoring Information System or Texas Surface Water Quality Monitoring System.

## STATEMENT OF THE CASE

Nature of the Case: This is an appeal of a final order in a suit for judicial review of a state agency order. In that order, the Texas Commission on Environmental Quality denied Appellees' requests for a contested case hearing and issued a permit for a new domestic wastewater treatment plant.[1]

Trial Court: 126th Judicial District Court, Travis County
The Honorable Laurie Eiserloh,
presiding by assignment

Trial Court Disposition: The district court reversed the Commission Order, vacated the permit, and remanded to the Commission.

---

[1] The <u>District Court Order</u>, the <u>Commission's Final Order</u> [RR.AR.31], and the <u>Permit</u> [RR.AR.29] are Appendix Items 1, 2, and 3.

The <u>Clerk's Record</u> (CR) is cited as "CR at (page)." The <u>Reporter's Record</u> (RR) is cited as "RR at (page)." The <u>Administrative Record</u> (AR) of the Commission proceeding is cited as "RR.AR.(Item) at (page)" with identifying information in brackets. Items in the <u>Appendix</u> are initially cited with complete information, with subsequent citations referencing the Appendix Item number. The AR was tendered and admitted by the district court as three exhibits: Joint Exhibit 1 (AR Items 1-35); Joint Exhibit 2 (AR Item 46); Defendant's Exhibit 1 (AR Items 36-45). RR at 5-6, 11.

## STATEMENT REGARDING ORAL ARGUMENT

The Commission respectfully requests oral argument. This case involves a complex regulatory permitting process. Oral argument may help clarify and explain the administrative record and regulatory scheme supporting the Commission's Order.

## ISSUE PRESENTED

Was it an abuse of discretion for the Commission to evaluate Appellees' hearing requests in light of the materials before it—including its expert staff's assessment of the creek, their assessment of the likely impacts of this discharge on the creek, and the analysis and opinions of its Executive Director (ED) that this discharge would not impact Appellees in a manner different from the general public—and to find that Appellees were not entitled to a contested case hearing?

**STATEMENT OF FACTS**

This case concerns the Commission's denial of requests for a contested case hearing and issuance of a permit to construct and operate a new domestic wastewater treatment plant for a subdivision in the Manor area of Travis County. Appx.2 [Commission Final Order].

**A.  Legal Background: Contested case hearings—the highest level of participatory process afforded in a permitting proceeding—are limited to "affected persons"**

Contested case hearings are the highest level of participatory process available under Texas law in a permitting proceeding. But they are resource-intensive for applicants, agencies, and protestants; and can also greatly increase the overall timeline for important infrastructure projects throughout the State. *Tex. Comm'n on Envtl. Quality v. City of Waco*, 413 S.W.3d 409, 410 (Tex. 2013) (*City of Waco*). Accordingly, the Legislature has not made this level of process available to everyone.

The process available to everyone is the comment process. The Commission **must** consider all comments. 30 Tex. Admin. Code § 50.117(f). But contested case hearings are only available to "affected persons." Tex. Water Code § 5.115. The Legislature has specifically enumerated the factors—and the materials—the Commission is to consider in determining whether a requestor is an "affected person." The Legislature made the Commission the

3

gatekeeper. It gave the Commission the authority—and the discretion—to evaluate the specified materials and to determine whether or not a requestor has met this threshold. Tex. Water Code §§ 5.556, 5.115(a), (a-1).

**B.** **Regulatory Background: The Commission's permitting process includes careful consideration of both the technical aspects of the proposed permit and public comments**

The Commission is charged to protect water quality while also providing for wastewater needs and the use and enjoyment of Texas waters by all Texans. Tex. Water Code Ch. 26; 30 Tex. Admin. Code Ch. 307 and 309. Under Texas Water Code § 26.121, no person may discharge wastewater into water in the state except as authorized by a Commission Texas Pollutant Discharge Elimination System (TPDES) permit. The Commission reviews potential TPDES permits and their possible effects on receiving waters as part of its charge to protect those waters **for the general public**. Tex. Water Code § 26.003; *see also* Tex. Water Code Ch. 26, §§ 5.556(c), 5.115; 30 Tex. Admin. Code Ch. 307 and 309. As part of that process, the Commission evaluates potential impacts holistically, with a careful eye to cumulative effects that might be caused when there are multiple discharges into a waterway. *See, e.g.* RR.AR.9 at 1 [Water Quality Modeling Memo]; RR.AR.36 at 5-6, 10-11 [Water Quality Modeling Memo Working Papers].[2] This is

---

[2] The Water Quality Modeling Memo and Water Quality Modeling Memo Working Papers are Appendix Items 13 and 14.

different from what requestors are required to establish to obtain a contested case hearing, which is that a permit will harm **them in particular**, that they have "a **personal** justiciable interest related to a legal right" "affected by" the permit that is not "common to members of the general public." Tex. Water Code § 5.115(a).

### 1. Commission experts independently analyzed and modeled the likely effects of the proposed discharge

The application process includes a thorough review by Commission staff and requires detailed information be provided by the applicant. *See* Form TCEQ-10053—*Domestic Wastewater Permit Application* (May 5, 2021). A permit application "amounts to an affidavit with expert reports attached." *City of Waco,* 413 S.W.3d at 421; *see also* 30 Tex. Admin. Code §§ 305.44(b), 321.34(b) (affidavit required); *id.* §§ 305.45(a)(6), (8), 321.34(f) (maps and technical reports must be prepared by a licensed professional engineer, a licensed professional geoscientist, or other qualified person).

The application in this case consisted of over 100 pages of information, and included both the requisite affidavit as well as a detailed engineering report sealed by a professional engineer that provided plans and specifications for the proposed specific technology-based treatment methods

and showed that the treated effluent would meet the proposed limitations. RR.AR.1 at 75, 83 [Permit App.].

Commission staff scrutinize and analyze the technical aspects of the application, utilizing not only data provided by the applicant, but also data from the Commission's own extensive water quality monitoring and permitting databases, including the Texas Surface Water Quality Monitoring Information System (or SWQMIS), a constantly-updated database of water quality sample results from across the state. RR.AR.20, at 8-9 [Executive Director's Response to Comments];[3] RR.AR.44 [Surface Water Quality Monitoring System Map].[4] SWQMIS data is compiled into the Texas Integrated Report of Surface Water Quality (Integrated Report), which assesses surface water quality and assigns each waterway to a "use category" based on that data as compared to water quality standards.[5] RR.AR.42-43 [Integrated Reports 2020, 2022 (excerpts)].[6] Wilbarger Creek supports High aquatic life and Colorado River Segment 1434 (into which it flows) supports Exceptional aquatic life. 30 Tex. Admin. Code § 307.10, Appendices A, C, D (excerpts) at 3, 7 [Texas Surface Water Quality Standards: Site-

---

[3] The Executive Director's Response to Comments is Appendix Item 6.
[4] The Surface Water Quality Monitoring System Map is Appendix Item 15.
[5] So if a waterway is assigned to a "high" use category, that means that the sample data results correspond to "high" water quality standards.
[6] The Integrated Reports are Appendix Items 16 and 17.

Specific Uses and Criteria];[7] *see also* Appx.16, 17 [Integrated Report 2020, 2022 (excerpts)].

Dr. M. A. Wallace, PhD, of the Water Quality Assessment Standards Implementation Team, analyzed this permit application in light of data about the receiving waters and applicable standards. Her report concluded that the proposed limits on nutrients such as Total Phosphorus (associated with algae) and on *E. coli* bacteria (which meets EPA requirements for swimming) would be sufficiently protective to maintain the high quality of the water in Wilbarger Creek. RR.AR.7 [Standards Implementation Memo]; RR.AR.37 at 1-2 [Standards Implementation Memo Working Papers]; Appx.3 at 3 [Permit]; RR.AR.39 at 24 [Implementation Procedures].[8]

Josi Robertson, of the Commission's Water Quality Assessment Team, evaluated the in-stream effects of the proposed discharge across the entire receiving water to assess and prevent potential bio-accumulation harms. The model she developed included inputs from every permitted facility that discharges into Wilbarger Creek, and assessed impacts on each and every section of the creek by "reaches," which are defined segments of the creek that extend all the way to the Colorado River. Appx.13 at 1 [Water Quality

---

[7] The excerpted Texas Surface Water Standards is Appendix Item 18. (Clearer version available at: Secretary of State's website).

[8] The Standards Implementation Memo, Standards Implementation Memo Working Papers, and Implementation Procedures are Appendix Items 10-12.

7

Modeling Memo]; Appx.14 at 5-6, 10-11 [Water Quality Modeling Memo Working Papers]. Her analysis found that the proposed permit effluent limits for all flow phases of the proposed permit would ensure that in-stream dissolved oxygen levels in Wilbarger Creek would continue to support high level aquatic life. Appx.13 at 1 [Water Quality Modeling Memo].

This process took time—agency staff spent almost a year evaluating and analyzing these factors before the Executive Director issued her preliminary decision recommending the draft permit. *See*, RR-AR.1 at 1 [Permit App.]; RR-AR.12 at 7 [Executive Director's Technical Summary and Preliminary Decision].[9] The draft permit reflected the Executive Director's independent determination that the proposed permitted discharge will meet all applicable water quality standards—in this case—that the discharge will not degrade the water quality in Wilbarger Creek or the Colorado River and that "[e]xisting uses will be maintained and protected." RR.AR.12 at 4.

### 2. Appellees participated in this process by filing comments that the Commission considered

Texas's permitting process includes provisions for public participation and for multiple rounds of notices to the public prior to a contested case determination: the first when the Executive Director finds the application to

---

[9] The Executive Director's Technical Summary and Preliminary Decision is Appendix Item 5.

be administratively complete; and the second, after technical review, when the Executive Director issues a preliminary decision on whether to issue the draft permit. 30 Tex. Admin. Code § 39.551.

After the Commission's Executive Director (ED) determined that the application was administratively complete, SWWC posted the first notice and published it in area newspapers on December 16 and 17, 2021. RR.AR.14-15. The First Notice informed persons in the area of basic details about the application, that the Commission's ED would be conducting a technical review of the application, and could prepare a draft permit and issue a preliminary decision, and gave instructions for how to submit public comments, request a public meeting, and request a contested case hearing. RR.AR.15 at 6; *see also* 30 Tex. Admin. Code § 55.156.

Since the ED's technical review, discussed above, found the application met statutory requirements for issuance, the ED issued a preliminary decision and statement of basis/technical summary, along with a draft permit, on May 9, 2022. Appx.5. This triggered the second round of public notice, the Notice of Application and Preliminary Decision, which was posted and also published in area newspapers on June 30 and July 1, 2022. RR.AR.19.

Only three people, the three individual Appellees here, filed public comments. They did so individually and on behalf of the Wilbarger Creek Conservation Alliance (WCCA), of which they are all board members. RR.AR.34 at 10, 14 [Public Comments].[10] Together, they asserted their interests as owners of property located approximately 5 miles downstream of the outfall. *Id.* at 11. They contended their interests would be harmed because:

- The creek is already "impaired" by algae and bacteria and low oxygen levels caused by discharges from other permitted facilities; such that they fear to swim in or let their livestock drink from the creek and they hear fewer frogs than they used to; and

- Any additional discharge will make those conditions worse; and

- "All plants fail at some point" so this plant will fail and discharge untreated effluent.

*See id.* at 7, 11, 14, 33, 34-35, 37. Appellees provided two photographs to support their algae impairment claims. RR.AR.46 [Requestors' Photos].

### 3. The Commission considered Appellees' hearing requests in light of the record, including its staff's assessment of the likely impact of the permit on the creek and the ED's analysis and opinions

The ED responded to the public comments, addressing each of Appellees' concerns with detailed analysis and opinions, supported by

---

[10] The Public Comments, which in this case also contain Appellees' Hearing Requests, are Appendix Item 8. Requestors' Photos are Appendix Item 9.

references to Commission data. Appx.6 [ED's Resp to Comments]. She disputed WCCA's contentions that the creek is impaired by other permitted discharges, and supported her opinion by reference to the fact that the Integrated Report does not show Wilbarger Creek as impaired. *Id.* at 8. She further explained that the Commission conducts an "updated assessment" of the creek "every two years, comparing observed water quality from sampling data against various applicable water quality criteria," and that the Commission has data collected "at an active SWQM Station approximately 2.25 miles downstream" of the proposed plant—a location upstream of Appellees and between them and the plant—as well as other active stations "further upstream and downstream on Wilbarger Creek, in which current water quality data is being collected." *Id.* at 8-9; *see also* Appx.15 [SWQM Map (Wilbarger Creek is 1434D)]. She also noted that the Texas Surface Water Quality Standards, which are based on the Integrated Report, show Wilbarger Creek as having High Aquatic Life Use with a dissolved oxygen level that supports that high aquatic life use. *Id.* at 6, 8-9; Appx.18 [Texas Surface Water Quality Standards].

The ED also addressed Appellees' concerns that this permit would make the water worse, explaining that the standards in the proposed permit were developed to protect aquatic life and human health and "established to

be protective." *Id.* at 5. She further noted that "The effluent limits in the draft permit are set to maintain and protect the existing instream uses," referencing limits on both bacteria and algae-related nutrients. *Id.* at 6, 3. She also discussed the analysis and reviews conducted by Dr. Wallace and the modeling done by Ms. Richardson, including a site-specific nutrient screening to address algae-related concerns, as well as the Tier 1 and Tier 2 antidegradation reviews, and that the reports concluded that "Existing uses will be maintained and protected." *Id.* at 6. She further observed that the proposed facility has safeguards in place, including alternate power sources and standby generators, to prevent the discharge of untreated waste during electrical power failures, and that the any discharge of untreated waste would be a violation of the permit. *Id.* at 9.

Commission regulations provide for the ED to separately analyze requests for contested case hearings after the public comment period expires. 30 Tex. Admin. Code § 55.209. In her Response to Appellees' hearing requests, the ED integrated the requisite information from Appellees regarding their location and distance relative to the proposed facility, with the analysis and opinions of Commission staff, the application process, and the Response to Comments, and offered her opinion on the likelihood that Appellees would be affected by the proposed permit. RR-AR.38 [ED's

12

Response to Hearing Requests].[11] She analyzed the regulatory factors such as whether a reasonable relationship exists between the interest claimed and the permit at issue, the likely impact of the permit on the health and safety of each requestor and the likely impact of the permit on each requestor's use of their property or of the creek. *See e.g.* 30 Tex. Admin. Code §§ 55.201(c)(3)-(5), (d), 55.205. The ED observed that as to all Appellees, the intervening distance between the outfall and their property made it unlikely that they would be impacted by the permit in any way different from the general public. RR-AR.38 at 7. The Office of Public Interest Counsel (OPIC), a statutorily-created office within the agency whose role is to protect the public interest in all agency matters, concurred, explaining that the distance "diminishes any likelihood that the regulated activity will impact [Appellees'] health, safety, or use of property." RR.AR.24 at 6-7 [OPIC's Response to Requests for Hearing].

The Commission considers requests for contested case hearings during open meetings and did so in this case on April 26, 2023. Appx.2 at 1 [Comm'n Final Order]. At that meeting, the Commissioners discussed and addressed Appellees' representations that they would be harmed, and explained why they did not find them convincing in the specific factual context of this

---

[11] The ED's Response to Hearing Requests is Appendix Item 7.

proposed permit. RR.AR.35 [Recording of Open Meeting].[12] On May 2, 2023, the Commission issued a written Order denying Appellees' hearing requests, adopting the ED's response to comments, and issuing the permit. Appx.2 [Comm'n Order], Appx.6 [ED's Resp to Comments]. Appellees' subsequent motion for rehearing and amended and restated motion for rehearing were denied by operation of law. RR.AR.32, 33. This suit followed.

## SUMMARY OF THE ARGUMENT

Opposing SWWC's permit application, Appellees filed public comments, which the Commission considered and responded to. But Appellees also sought a contested case hearing, which the Commission denied, because it did not find Appellees likely to be affected by this permit. The Commission did exactly what the Legislature has charged it to do—not hold a hearing unless the requestor is an affected person. Tex. Water Code § 5.115(a-1)(2)(B). A contested case hearing is a statutorily-created process; and access to one is similarly statutorily-defined. The Water Code sets forth in detail that the Commission is to weigh and evaluate specific materials and factors in order to determine whether a requestor is likely to be impacted by a permit in a manner different from the general public.

---

[12] CR 190-193. An unofficial but sworn <u>Transcript</u> of RR-AR.35 [Recording of Open Meeting] is Appendix Item 4.

14

The Commission is charged to use its particular expertise when it evaluates whether a requestor is affected, and to do so in light of the application review process that has already taken place. By statute, the Commission considers not only the application and associated supporting materials, but also whether the application meets the statutory requirements for issuance, as well as, specifically, the opinions and analysis of the Executive Director, and any other expert reports, opinions, or data submitted to the Commission by the ED or others (including requestors). Tex. Water Code §§ 5.115(a), (a-1)(1)(A)-(E).

The Commission considered these materials when determining if the statutory factors—which include the likelihood that Appellees' property, their use of their property, or their use of Wilbarger Creek, would be impacted by this permit in a manner different from the general public—and found that the factors were not satisfied. Appellees asserted that Wilbarger Creek was impaired and contaminated by existing permitted discharges, and that this was injuring them and that they would necessarily be harmed more by this new permit. But their assertions were contravened by other data, which showed that Wilbarger Creek is neither contaminated nor impaired. The Commission weighed and evaluated Appellees' locations, 3-5 miles downstream, in light of information about the creek, other discharges'

impacts on the creek, and its expert evaluation of this particular permit's likely impact on the creek. Moreover, the Executive Director provided the Commission with her analysis and opinion that Appellees would not be impacted by this permit in any manner different from the general public. Appellees' likely injury assertions were simply not credible to the Commission—which is the fact-finder charged to weigh the materials before it and to make this determination. The Commission's determination is reasonable and supported by substantial evidence and should be affirmed.

## STANDARD OF REVIEW

Courts review a "TCEQ determination regarding affected-person status for an abuse of discretion." *Tex. Comm'n on Envtl. Quality v. Sierra Club*, 455 S.W.3d 228, 235 (Tex. App.—Austin 2014, pet. denied) (*Sierra Club*); *see also City of Waco*, 413 S.W.3d at 411, 420, 424. Even when, as here, the Commission's decision was not made in an adjudicatory, contested-case format, the standard of review is substantial evidence. Tex. Water Code § 5.351; Tex. Gov't Code § 2001.171; *Boerne to Bergheim Coal. for Clean Env't*, 657 S.W.3d 382, 390 (Tex. App.—El Paso 2022, no pet.); *City of Waco*, 413 S.W.3d at 424-425. Under this standard, "a court may not substitute its judgment for that of the agency" but:

(1) may affirm the agency decision in whole or in part; and

16

(2) shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
  (A) in violation of a constitutional or statutory provision;
  (B) in excess of the agency's statutory authority;
  (C) made through unlawful procedure;
  (D) affected by other error of law;
  (E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or
  (F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex. Gov't Code § 2001.174. The Commission's order is presumed to be valid and supported by substantial evidence and Appellees bear the burden of proving otherwise. *Dyer v. Tex. Comm'n on Envtl. Quality*, 639 S.W.3d 721, 731 (Tex. App.—Austin 2019), *aff'd*, 646 S.W.3d 498 (Tex. 2022).

> Under the substantial evidence rule, the burden is on … the party who seeks to set aside the [agency] ruling—to demonstrate that less than substantial evidence supports the decision.

*Kaup v. Texas Workforce Comm'n*, 456 S.W.3d 289, 294 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

The question before the Court is not whether the Commission reached the correct conclusions, but "whether some reasonable basis exists in the record for the action taken by the agency." *Tex. Health Facilities Comm'n v. Charter Medical-Dallas, Inc.*, 665 S.W.2d 446, 452-453 (Tex. 1984); *see also City of El Paso v. Pub. Util. Comm'n*, 883 S.W.2d 179, 185 (Tex. 1994). A

reviewing court is not bound by the reasons given by an agency in its order, provided there is a valid basis for the action taken by the agency. *Id.*

So long as the agency's findings are supported by more than a mere scintilla of evidence in the record as a whole, even when the evidence is conflicting, or preponderates against the agency's decision, the agency decision must be upheld. *Mireles v. Tex. Dep't of Public Safety*, 9 S.W.3d 128, 131 (Tex. 1999). Under the APA, a reviewing court "may not substitute its judgment for the judgment of the state agency on the weight of the evidence" — the court may **not** reweigh the evidence. *Save Our Springs Alliance, Inc. v. Texas Comm'n on Envtl. Quality,* 713 S.W.3d 308, 320 (Tex. 2025) (internal citations omitted).

## ARGUMENT

**I.  Texas law requires the Commission to weigh specific information and find requestors likely to be impacted before it may grant a hearing request**

The Legislature has prohibited the Commission from granting a contested case hearing unless it has first determined that the requestor is an "affected person" as defined by statute. "The commission may not grant a request for a contested-case hearing unless the commission determines that the request was filed by an affected person as defined by Section 5.115." Tex. Water Code § 5.556(c). In determining whether a person is an "affected

18

person," defined as someone "who has a personal justiciable interest …

affected by the administrative hearing," the Commission considers and

weighs factors such as whether the permit meets requirements for issuance,

the materials in the administrative record, and the Executive Director's

opinions and analysis when it evaluates "the likely impact of regulated

activity on the health, safety, and use of the property of the hearing

requestor." Tex. Water Code §§ 5.115(a), 5.115(a-1)(1)(B).

## A. The affected person standard reflects the administrative forum by empowering the Commission to utilize its specialized expertise and data when evaluating the required factors

The "affected person" standard draws upon jurisprudential standing

principles. It requires "a concrete injury to the plaintiff and a real controversy

between the parties that will be resolved" by the decision-maker. *See*

*Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 154 (Tex. 2012). A requestor

must establish: an 'injury in fact;' that is 'fairly traceable' to the issuance of

the permit as proposed (and not attributable to causes unrelated to the

permit); and it must be likely that the injury will be redressed by a favorable

decision regarding the proposed permit. *City of Waco v. Texas Comm'n on*

*Envtl. Quality*, 346 S.W.3d 781, 802 (Tex. App.—Austin 2011) *reversed on*

*other grounds*, *City of Waco*, 413 S.W.3d 409 (Tex. 2013).

19

But although the affected person factors for entitlement to an administrative contested case hearing are based on standing principles, "there are also key differences" in the process and in the factors for making this determination. *Shrimpers & Fishermen of RGV v. Tex. Comm'n on Envtl. Quality,* 968 F.3d 419, 422 (5th Cir. 2020). This is because:

> The ultimate balance involves a determination as to when, under our constitutional system, judicial-type procedures must be imposed upon administrative action to assure fairness ... differences in the origin and function of administrative agencies preclude wholesale transplantation of the rules of procedure, trial and review which have evolved from the history and experience of courts.

*Mathews v. Eldridge,* 424 U.S. 319, 348–49 (1976) (emphasis added). The administrative action at issue here is statutorily-created—a permitting proceeding—and requestors must establish that they are affected persons under the statutory standard to establish their entitlement to the judicial-type procedure of a contested case. *See* Tex. Water Code §§ 5.556, 5.115.

In 2015, the Texas Legislature amended the Water Code to sharply distinguish how the Commission determines affectedness for the purpose of entitlement to a contested case hearing on a proposed permit from how a court determines standing to maintain a case in court. *See* Tex. Water Code § 5.115(a-1); *Shrimpers & Fishermen of RGV v. Tex. Comm'n on Envtl. Quality,* 968 F.3d at 422. In particular, it added new language that

20

authorized the Commission to consider factors and materials that would not ordinarily be considered by a court determining standing. The Commission is charged to rely upon not only the materials in the administrative record, but also its Executive Director's opinions based on those materials. Indeed, Water Code § 5.115(a-1) specifically authorizes the Commission to consider:

- the merits of the underlying application, including whether or not the application meets the requirements for permit issuance;

- the analysis and opinions of the ED; and

- any other expert reports, opinions, or data submitted to the Commission by the ED or others, including hearing requestors.

"In making a decision regarding affected-person status, TCEQ enjoys the discretion to weigh and resolve matters that may go to the merits of the underlying application, including the likely impact the regulated activity … will have." *Sierra Club,* 455 S.W.3d at 235.

## B. The standard to be met, as well as specific factors and materials to be considered are set forth by statutes and regulations

The Water Code makes clear that the Commission is to utilize its environmental subject matter expertise when it determines whether or not a requestor is an affected person. The Legislature expressly directed the Commission to adopt required factors for determining whether persons are

affected, and at the same time, enumerated materials and other considerations upon which the Commission may rely:

> (A) the merits of the underlying application, including whether the application meets the requirements for permit issuance;
>
> (B) the likely impact of regulated activity on the health, safety, and use of the property of the hearing requestor;
>
> (C) the administrative record, including the permit application and any supporting documentation;
>
> (D) the analysis and opinions of the executive director; and
>
> (E) any other expert reports, affidavits, opinions, or data submitted on or before any applicable deadline to the commission by the ED, the applicant, or a hearing requestor.

Tex. Water Code § 5.115(a-1)(1)(A)-(E).

The Commission has promulgated rules that delineate the factors relevant to an affected person determination:

> (1) whether the interest claimed is one protected by the law under which the application will be considered;
>
> (2) distance restrictions or other limitations imposed by law on the affected interest;
>
> (3) whether a reasonable relationship exists between the interest claimed and the activity regulated;
>
> (4) likely impact of the regulated activity on the health and safety of the person, and on the use of property of the person; and
>
> (5) likely impact of the regulated activity on use of the impacted natural resource by the person.

30 Tex. Admin. Code § 55.203(c). Thus, the Commission determines whether or not a permitted discharge is likely to impact a requestor's interest (health, safety, use of property, use of the natural resource) by considering the requestor's expressed basis for affectedness in light of information gathered through the application process, including the requestor's location, staff experts' analysis and opinions of the discharge's likely effects on the receiving waters, and whether the proposed permit meets statutory standards, as well as the separately identified "analysis and opinions of the executive director." Tex. Water Code § 5.115; *Shrimpers & Fishermen of RGV*, 968 F.3d at 422. Courts have noted that this means the Commission may weigh and resolve facts, even including facts that "may go to the merits of the underlying application," when it decides whether requestors are affected persons. *Sierra Club,* 455 S.W.3d at 235. The Commission evaluates a requestor's asserted interest and injuries in light of such materials and considerations.

There is no presumption that a permitted discharge will harm requestors. Indeed, the opposite is true. As one court observed "[w]hile the environmental damage and nuisance that Collins *predicts* would surely deprive him of his valuable property rights, we note that the permit does not authorize such failures." *Collins v. Tex. Nat. Res. Conservation Comm'n*, 94

S.W.3d 876, 883 (Tex. App.—Austin 2002, no pet.) (emphasis in original). It affirmed the Commission's decision to not grant Collins a contested case hearing despite his assertions of harm. *Id.* When making an affected person determination, the Commission must presume the facility will be operated in compliance with permit terms. *Id.*; *see also* Tex. Water Code § 5.115(a-1)(1)(B) (Commission must consider likely impact of the *regulated activity*); 30 Tex. Admin. Code § 55.203(c)(4)-(5).

**C.    The burden to establish affectedness rests on the requestor.**

Persons seeking a contested case hearing must provide their location and distance relative to the proposed facility, identify their personal justiciable interest, and explain how that interest will be adversely affected in a manner not common to the general public. 30 Tex. Admin. Code § 55.201(d)(2); *see also* § 55.203(c)(2). The requestor "must show that a concrete, particularized, actual or imminent injury faces him or her due to the decision; a hypothetical or speculative injury is not enough." *Tex. Comm'n on Envtl. Quality v. San Antonio Bay Estuarine Waterkeeper*, 714 S.W.3d 270, 284 (Tex. App.—[15th Dist.] 2025, pet. filed) (*SA Bay*); *see also Heat Energy Advanced Tech., Inc. v. W. Dall. Coal. for Envtl. Justice*, 962 S.W.2d 288, 295 (Tex. App.—Austin 1998, pet. denied).

"A person seeking to be admitted as a party has the burden." *SA Bay,* 714 S.W.3d at 284; *see also Texas Comm'n on Envtl. Quality v. City of Aledo*, No. 03-13-00113-CV, 2015 WL 4196408, at *4 (Tex. App.—Austin July 8, 2015, no pet.) ("applicable Commission rules and Water Code sections squarely place[] that burden of a showing on the requesting person"). Requestors bear the burden to establish that they will be injured in a matter different from the general public; it is not anyone else's burden to establish requestors will not be.

## II. Substantial evidence supports the Commission's hearing denial because Appellees are not likely to be affected by this permit

The Legislature gave the Commission the tools and discretion to evaluate the materials and factual assertions before it in order to determine whether requestors have articulated a personal justiciable interest that is likely to be impacted such that they are "affected persons" entitled to the process of a contested case hearing on a permit. Tex. Water Code §§ 5.556, 5.115. The Commission exercised that discretion here using the materials at hand. It evaluated Appellees' contentions that their interests were likely to be impacted by the permitted discharge in light of the other materials before it in accordance with Tex. Water Code § 5.115 and 30 Tex. Admin. Code § 55.203(c).

25

The rules require the Commission to consider the **likely** impact of the regulated activity on Appellees. This includes of course, impacts to Appellees' property, their use of their property, and their use of the creek. Appellees asserted injuries to their property interests as owners of land 3-5 miles downstream from the outfall, making what was essentially an injury *per se* argument—one that didn't focus on the permit at issue in particular—but instead generally alleged that the water quality in the creek was bad, which they attributed to other permitted discharges—and that therefore *this* permitted discharge would *necessarily* harm them. The problem, though, is that the Commission is charged to weigh the materials before it—not to take Appellees' contentions as true—and many of the materials before it not only contravened Appellees' contentions, they also indicated that there is no reasonable relationship between the harms Appellees asserted and the permitted discharge.

### A. Appellees' concerns about "contamination" do not establish them as affected persons

Appellees articulated a variety of concerns related to the purported contamination of the creek, including that they fear to swim in the creek and that they do not let their livestock drink from it because of their concerns that the creek is contaminated and unsafe for those activities. RR-AR.34 at 10, 33-35. Appellees' only rationale for this supposed contamination was that the

creek used to be intermittently dry, but now runs year-round and so is "100% effluent." But this does not establish an injury. The creek indisputably contains treated wastewater, but it is *treated*. Indeed, the whole purpose of the Commission's careful analysis of any permit application, including this one, is to ensure that existing uses of the waterway are protected.

Appellees' allegations attempted to supplant evidence (sample results and Commission assessments) with assumptions about treated effluent. But the Commission had before it the Texas Surface Water Quality Monitoring Standards—Site-Specific Uses and Criteria, and its Integrated Reports from both 2020 and 2022, which are based on actual sample results from the Commission's Surface Water Quality Monitoring System. Appx.10 at 1 [Standards Implementation Memo]; Appx.11 at 1 [Standards Implementation Memo Working Papers]; Appx.17 [Texas Surface Water Quality Standards]. That data shows that Wilbarger Creek supports high aquatic life use and is by no means "impaired" or contaminated. Appx.16 [Integrated Report 2020]; Appx.17 [Integrated Report 2022]; Appx.17 at 3, 7 [Texas Surface Water Quality Standards].

Moreover, the ED's staff analyses verify that the treatment limits required by this permit ensure both that existing uses would be maintained, and that those high-quality waters would not be degraded. Appx.10 at 1

[Standards Implementation Memo]; Appx.11 at 1 [Standards Implementation Memo Working Papers]; Appx.13 at 1 [Water Quality Modeling Memo]; Appx.14 at 1 [Water Quality Modeling Memo Working Papers]. And since Wilbarger Creek discharges into Colorado River Segment 1434, the permit's limits are designed to meet even higher standards, those applicable to water that supports exceptional aquatic life uses. Appx.10 at 1 [Standards Implementation Memo]. Indeed, the permit's limit for *E. coli* bacteria is 126 CFUs, which meets EPA requirements for swimming. Appx.3 at 3 [Permit]; Appx.12 at 24 [Standards Implementation Procedures]. Appellees' fears are subjective and contravened by scientific data and the ED's analysis. Their fear does not establish affectedness. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 107 & n.8 (1983) (Subjective apprehensions are not sufficient to establish standing).

Evaluating this information, along with Appellees' locations, approximately three to five miles downstream, the Executive Director concluded that Appellees are **not** likely to be impacted by the permit. Appx.7 at 6-8 [ED's Resp to Hrg Req]; *id.* at 14 [map showing relative locations]. In short, the Commission properly determined, based on the evidence before it, that Appellees' contamination fears failed to meet the threshold for affectedness.

28

## B. Appellees' concerns about plant failures do not establish them as affected persons

Appellees also alleged that treatment plant malfunctions would occur because of power outages and mechanical failures and that this would cause the plant to exceed its permit limits. Appx.8 at 7 [Comments]. But these are all hypothetical events. They are not actual or certainly impending, nor are they traceable to the proposed permit, which does not authorize operating in that manner. Appx.3 [Permit]; Appx.6 at 9 [ED's Resp to Comments]. Both the permit and the Commission's rules prohibit untreated discharges and toxic conditions. *See* 30 Tex. Admin. Code § 307.4(d); Appx.6 at 7 [ED's Resp to Comments]; Appx.3 at 5 [Permit].

Appellees' assumption that the permittee will violate its permit is the opposite of the legal standard. Speculative events not authorized by a permit do not establish affectedness because the standard presumes activities will be conducted **within the law**. *Garcia v. City of Willis*, 593 S.W.3d 201, 207 (Tex. 2019); *Collins*, 94 S.W.3d at 883. In addition, Appellees' "what if the plant fails" concerns are purely conjectural. They do not meet the standard because injury for affected person status must be concrete and particularized, not conjectural, contingent, or hypothetical. *Shrimpers & Fishermen of RGV*, 968 F.3d at 424.

In addition, the Commission had before it competent evidence that the engineers who designed the plant had already addressed such concerns. The Application's engineering report details features for overflow prevention. RR.AR.1 at 83 [Permit Application]. These include an emergency generator, set to "start automatically in the event of a failure," and an automatic alarm dialer system that notifies the operator and others in the event of "a power outage, chlorine leak, or lift station high water level." *Id.*; *see also* Appx.3 at 12 [Permit] (requiring operations in accordance with Application). And the Applicant's compliance history is Satisfactory, with a rating of 5.37 on a scale where 0 is best and 55 is worst. RR.AR 26 at 1 [Compliance History Report]; RR.AR.45 at 2 [Compliance History Basics].

Appellees' concerns about possible future violations were not "certainly impending," or even reasonably related to this permit and were contravened by substantial evidence. The Commission's denial of the hearing request was reasonable because Appellees failed to satisfy the applicable factors under 30 Tex. Admin. Code § 55.203(a). *See* Tex. Water Code § 5.556(c); *Sierra Club*, 455 S.W.3d at 240.

## C. Appellees' concerns about algae and low dissolved oxygen do not establish them as affected persons

Appellees also alleged concerns related to algae, referencing an algae bloom that purportedly occurred in 2022, and complaining that the creek is

30

generally cloudy. Appx.8 at 11, 14, 34 [Comments]; Appx.9 [Photos]. Similarly, they alleged that a youth group had, at some point, tested the water in the creek and told them that the water's dissolved oxygen levels were low and that this meant the creek is impaired. Appx.8 at 13-14; 28-29.

But the Commission had contravening evidence before it (not to mention that a second-hand account of a youth's verbal assessment of the creek as impaired at an unknown point in time lacked credibility). The Commission evaluates waterways based on test results from samples and has, based on those samples, found that Wilbarger Creek supports high aquatic life use, has a 5.0 mg/L dissolved oxygen level, and is by no means "impaired." Appx.16,17 [Integrated Report 2020, 2022 (excerpts)]; Appx.18 at 3, 7 [Texas Surface Water Quality Standards].

Moreover, Dr. Wallace's and Ms. Robertson's reports indicate that the treatment limits required by this permit would ensure that existing uses would be maintained—and that the high and exceptional quality waters of Wilbarger Creek and the Colorado River would not be degraded. Indeed, Dr. Wallace's report specifically addressed concerns regarding "eutrophication," which is the process in which a water body becomes overly enriched with nutrients leading to a harmful increase in the production of algae.[13] She

---

[13] U.S. Geological Survey definition, https://www.usgs.gov/centers/wetland-and-aquatic-research-center/science/science-topics/eutrophication.

31

performed a site-specific nutrient screening to ensure the permit protects the high quality of the receiving waters and confirmed that the permit's limits, in light of the size of the discharge, would be sufficiently protective to address those concerns. Appx.11 at 1-2 [Standards Implementation Memo Working Papers].

Additionally, data in the Integrated Reports shows nutrient levels in Wilbarger Creek decreased from 2020 to 2022, further supporting that the limits on elements related to eutrophication contained in the Colorado River Watershed Protection Rules (which this permit complies with) are not likely to encourage an algae bloom at all, much less one that might impact Appellees. Appx.16, 17 [Integrated Report 2020, 2022 (excerpts)]; Appx.11 at 1, 2 [Standards Implementation Memo Working Papers].

Further, dissolved oxygen modeling and evaluation of the likely impact of the proposed discharge was also before the Commission; modeling that included inputs from **every** permitted facility that discharges into Wilbarger Creek, and assessed potential impacts on each and every section of the creek by "reaches," which are defined segments of the creek that extend all the way to the Colorado River. Appx.13 at 1 [Water Quality Modeling Memo]; Appx.14 at 5-6, 10-11 [Water Quality Modeling Memo Working Papers]. This analysis indicated that the proposed permit effluent limits would ensure that

in-stream dissolved oxygen levels in Wilbarger Creek would remain suitable for high aquatic life.

The Commission had significant evidence before it that contravened Appellees' allegations that they were likely to be injured by this permit with regard to algae and low dissolved oxygen. In addition, the Executive Director offered her opinion that Appellees were not likely to be impacted by the permit because of the distance between them and the outfall. The ED and OPIC both explained that Appellees' allegations were not particularized or individual in nature, but, rather, were shared in common with the general public, and that therefore, Appellees had not established themselves to be affected persons under the regulatory and statutory criteria. Appx.7 at 6-8 [ED's Resp to Hrg Req]; *see also id*. at 14 [map showing relative locations]; *see also* RR.AR.24 at 6-9 [OPIC's Response to Req for Hrg]. The Commission considered all of Appellees' support for their hearing requests, and the other materials allowed by statute, and reasonably and properly determined that Appellees were not likely to be injured, and reasonably rejected Appellees' request for a contested case hearing.

**D.** **Appellees' distance from the plant and the nature of their allegations further support that they are not likely to be impacted in a manner different from the general public**

Finally, there is the factor of Appellees' distance from the permit's outfall point. Ms. Kelinske's and Ms. Brockenbrough's addresses relative to the plant are 2.89 and 3.21 miles respectively. Appx.7 at 14 [ED's Resp to Hrg Req]. Mr. Beall provided an Austin address, but also stated he owned land approximately "5 miles downstream" of the plant (Appx.8 at 9) "adjacent to Ms. Brockenbrough" (RR.AR.27 at 1). The Commission had this information before it when it determined whether Appellees were likely to be impacted by the plant. Appx.7 at 14 [ED's Resp to Hrg Req].

As Chairman Niermann explained, "there is no 'bright line' test" because each discharge (and each watercourse) is unique, so the Commission weighs the evidence of the different factors at issue in each case to determine whether the specific requestor is likely to be affected by the specific permit at issue. Appx.4 at 191 [Open Meeting Transcript]; *see also* Tex. Water Code § 5.115. "[P]roximity is a factor," and "none of the requestors own property within two and a half miles of the discharge point." Appx.4 at 191. Appellees are a significant distance downstream as the crow flies—considerably further as the creek meanders (a.k.a. "stream miles"). Appx.7 at 14 [ED's Resp to Hrg Req].

34



AR Item 38, Page 014

Distance is a factor in evaluating impacts. The Commission implements Texas's water quality standards by reference to the EPA-Approved Standards Implementation Procedures, or IPs: 243 pages of instructions, tables, values, schematics, and formulas that provide detailed information and instructions for how to evaluate environmental impacts for compliance with water quality standards and the Commission's water quality rules. 30 Tex. Admin. Code § 307.2(e). The IPs make clear that distance is not only a factor, it is a factor that interacts with other factors, such as whether the water is still or moving, and that those are relevant to assessing impacts downstream of a given discharge. Appx.12 at 17, 47-51, 111-112 [Implementation Procedures]. This is further demonstrated by the IPs use of

"stream miles" for calculation of distances when evaluating possible impacts. *Id.* at 47.

In addition, the Commission had before it the ED's independent analysis of the likelihood of Appellees being affected by the permitted discharge and her opinion that their distance from the proposed outfall made that unlikely. Appx.7 at 6-8 [ED's Resp to Hrg Req]. It also had the Office of Public Interest Counsel's assessment that the intervening distance between the outfall and Appellees "diminishes any likelihood that the regulated activity will impact [their] health, safety, or use of property." RR.AR.24 at 6-7 [OPIC's Response to Requests for Hearing].

Moreover, none of Appellees' contentions establish personal justiciable interests with a causal nexus to **this** permit. Appellees' dissatisfaction with how the Commission does the job the Legislature has charged it to do and questions about the reliability of the agency's data are not a "personal justiciable interest" distinct from the general public, nor do they pertain to this specific permit, and so fail to establish affectedness. Tex. Water Code § 5.115(a). Similarly, Appellees' statements that they do not swim in the creek or allow their livestock to drink from it because they fear contamination, in addition to being subjective, are free-floating, and not tied to this permit, which hadn't even been issued when they made those statements. *See* Tex.

Water Code § 5.115. They also fail the redressability test; since they reveal that the denial of this permit would not redress these injuries. *See City of Waco,* 346 S.W.3d at 802. Appellees' allegations fail to establish affectedness. Tex. Water Code §§ 5.115(a), (a-1), (b). The Commission properly denied Appellees' request for a hearing because Appellees failed to establish a "personal justiciable interest" likely to be harmed by this permit and thus didn't merit a "trial-like proceeding with attendant expense and delay." *City of Waco*, 413 S.W.3d 409, 415; *see also* Tex. Water Code §§ 5.556(c), 5.115.

## CONCLUSION AND PRAYER

The Commission thoughtfully and carefully considered the materials before it, both those provided by Appellees and those provided by the Executive Director, Staff and others. Its decision to deny the hearing requests was reasonable and supported by those materials. For these reasons, the Court should reverse the district court order and render judgment affirming the Commission's Final Order denying Appellees' request for a contested case hearing and granting the permit.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

37

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil
Litigation

KELLIE E. BILLINGS-RAY
Chief, Environmental Protection Division

*/s/ Amanda Atkinson Cagle*
AMANDA ATKINSON CAGLE
Assistant Attorney General
Texas State Bar No. 00783569
Amanda.Cagle@oag.texas.gov

SARA J. FERRIS
Assistant Attorney General
Texas State Bar No. 50511915
Sara.Ferris@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL
ENVIRONMENTAL PROTECTION DIVISION
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
Tel. 512-475-4002
Fax: 512-320-0911

**ATTORNEYS FOR THE TEXAS
COMMISSION ON
ENVIRONMENTAL QUALITY**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing ***Brief of Appellant TCEQ*** was served upon the following counsel of record on October 3, 2025 via electronic service:

Christopher D. Smith
Becky L. Jolin
SMITH JOLIN PLLC
901 S. Mopac Expressway
Building 1, Suite 300
Austin, Texas 78746
chris.smith@smithjolin.com
becky.jolin@smithjolin.com

***Attorneys for Appellees***

*/s/ Amanda Atkinson Cagle*
AMANDA ATKINSON CAGLE

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing *Brief of Appellant TCEQ* contains 7,451 words and therefore complies with the word limit found in Tex. R. App. P. 9.4(i)(2)(B).

/s/ Amanda Atkinson Cagle
AMANDA ATKINSON CAGLE
Assistant Attorney General

# INDEX OF APPENDIX ITEMS (attached)

| Item No. | Description |
|:---:|:---|
| 1 | District Court Final Order |
| 2 | Commission's Final Order, RR.AR.31 |
| 3 | TPDES Permit No. WQ0016022001, RR.AR.29 |
| 4 | Commission's Open Meeting (RR.AR.35) Transcript, CR 190-193 |
| 5 | Executive Director's Technical Summary and Preliminary Decision, RR.AR.12 |
| 6 | Executive Director's Response to Public Comments, RR.AR.20 |
| 7 | Executive Director's Response to Hearing Requests (color copy), RR.AR.38 |
| 8 | Requestors' Comments and Hearing Requests, RR.AR.34 |
| 9 | Requestors' Photos, RR.AR.46 |
| 10 | Standards Implementation Memo, RR.AR.7 |
| 11 | Standards Implementation Memo Working Papers, RR.AR.37 |
| 12 | Implementation Procedures, Procedures to Implement the Texas Surface Water Quality Standards, RR.AR.39 |
| 13 | Water Quality Modeling Memo, RR.AR.9 |
| 14 | Water Quality Modeling Memo Working Papers, RR.AR.36 |
| 15 | TCEQ's Surface Water Quality Monitoring System Map (excerpts), RR.AR.44 |
| 16 | Integrated Report 2020 (excerpts), RR.AR.42 |
| 17 | Integrated Report 2022 (excerpts), RR.AR.43 |
| 18 | Texas Surface Water Quality Standards: Site Specific Uses and Criteria (excerpts), 30 Tex. Admin. Code § 301.10, Appendices A-D, CR 182-188 |

# Appendix Item 1

CAUSE NO. D-1-GN-23-004031

| | | |
|---|---|---|
| WILBARGER CREEK CONSERVATION ALLIANCE, MARILYN KELINSKE, ANNE BROCKENBROUGH, AND JONATHAN BEALL, *PLAINTIFFS* | § § § § § | IN THE DISTRICT COURT |
| | § | 126th JUDICIAL DISTRICT |
| V. | § § | |
| TEXAS COMMISSION ON ENVIRONMENTAL QUALITY, *DEFENDANT* | § § § | TRAVIS COUNTY, TEXAS |

**ORDER ON PETITION FOR JUDICIAL REVIEW**

On March 3, 2025, the Court heard this matter on the merits. After considering the briefs, the evidence including the administrative record, and the arguments of counsel, the Court **FINDS**:

1. The Commission improperly determined Plaintiffs are not affected persons.

2. "An affected person is one who has a personal justiciable interest related to a legal right, duty, privilege, power, or economic interest affect by the application. An interest that is common to members of the general public does not qualify as a personal justiciable interest. This standard does not require parties to show that they will ultimately prevail on the merits; it simply requires them to show that they will potentially suffer harm or have a justiciable interest that will be affected." *United Copper Indus., Inc. v. Grissom,* 17 S.W.3d 797, 802–03 (Tex. App.—Austin 2000, pet. dism'd) (cleaned up).

3. Plaintiffs have the burden to make a minimum jurisdictional showing of a justiciable interest. *See* TEX. WATER CODE § 5.115(a); 30 TEX. ADMIN CODE § 55.203(a), (b); *Heat Energy Advanced Tech., Inc. v. W. Dallas Coal. For Envtl. Justice,* 962 S.W.2d 288, 295 (Tex. App.—Austin 1998, pet. denied). Plaintiffs met their burden by submitting hearing requests under 30 Texas Administrative Code § 55.201, which included the statutorily required information and explained how Plaintiffs would be harmed by the proposed permit, including evidence of harms they have experienced from prior allowances of wastewater discharge into Wilbarger Creek.

4. The Commission denied Plaintiffs affected-person status because of the distance between their property and the proposed discharge point. The denial did not reference any data showing the proposed permit would have no effect on Plaintiffs because of distance, and the Commission's argument and evidence in this case do not explain why Plaintiffs are too far away to be impacted. The Commission's attempts in this case to

show that Plaintiffs would not be affected to a sufficient degree "confuse[] the preliminary question of whether an individual has standing as an affected person to request a contested-case hearing with the ultimate question of whether that person will prevail in a contested-case hearing on the merits." *See Grissom*, 17 S.W.3d at 803.

5. Plaintiffs WCCA, Kelinske, Brockenbrough, and Beall are affected persons entitled to a contested case hearing on the SWWC permit application and the Executive Director's draft permit.

The Court therefore **GRANTS** Plaintiffs' Petition, **REVERSES** the Commission's May 2, 2023 Order in Docket No. 2023-0370-MWD, **VACATES** the Commission's May 2, 2023 issuance of TPDES Permit No. WQ0016022001, and **REMANDS** this case to the Commission to determine the number and scope of the specific factual issues to be referred to SOAH.

Date: April 4, 2025

THE HONORABLE LAURIE EISERLOH
455th District Court

# Appendix Item 2

# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY



**AN ORDER** concerning the application by SWWC Utilities, Inc. for new Texas Pollutant Discharge Elimination System Permit No. WQ0016022001; TCEQ Docket No. 2023-0370-MWD.

On April 26, 2023, the Texas Commission on Environmental Quality (Commission) considered during its open meeting requests for hearing filed by Jon Beall, Anne Brockenbrough, Marilyn Kelinske, and the Wilbarger Creek Conservation Alliance concerning the application by SWWC Utilities, Inc. (Applicant) for new Texas Pollutant Discharge Elimination System Permit No. WQ0016022001. The proposed permit would authorize the discharge of treated domestic wastewater at a daily average flow not to exceed 800,000 gallons per day in the Final Phase at a site located approximately 0.42 miles southwest of the intersection of Bella Parkway and Old Texas Highway 20, in Travis County, Texas. The requests for hearing were evaluated under the requirements in the applicable statutes and Commission rules, including 30 Texas Administrative Code (TAC) Chapter 55. The Commission also considered the responses to the hearing request filed by the Executive Director and the Office of Public Interest Counsel; replies to responses, all timely public comment; and the Executive Director's Response to Comment.

After evaluation of all relevant filings, the Commission denied the hearing requests. The Commission also adopted the Executive Director's Response to Public Comment and approved

1

new Texas Pollutant Discharge Elimination System Permit No. WQ0016022001 to SWWC Utilities, Inc., as recommended by the Executive Director.

NOW, THEREFORE, BE IT ORDERED BY THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY that:

1.  All hearing requests are hereby DENIED;

2.  The new Texas Pollutant Discharge Elimination System Permit No. WQ0016022001 is hereby ISSUED to SWWC Utilities, Inc., as recommended by the Executive Director;

3.  The Executive Director's Response to Public Comment is hereby ADOPTED; and

4.  If any provision, sentence, clause or phrase of this Order is for any reason held to be invalid, the invalidity of any portion shall not affect the validity of the remaining portions of the Order.

TEXAS COMMISSION ON
ENVIRONMENTAL QUALITY

_____
Jon Niermann, Chairman

_____
5/2/23
Date Signed

2

# Appendix Item 3



TPDES PERMIT NO. WQ0016022001
*[For TCEQ office use only - EPA I.D.
No. TX0141569]*

# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
P.O. Box 13087
Austin, Texas 78711-3087

## PERMIT TO DISCHARGE WASTES
under provisions of
Section 402 of the Clean Water Act
and Chapter 26 of the Texas Water Code

SWWC Utilities, Inc.

whose mailing address is

12535 Reed Road
Sugar Land, Texas 77478

is authorized to treat and discharge wastes from the Majestic Manor Wastewater Treatment Facility,
SIC Code 4952

located approximately 0.42 miles southwest of the intersection of Bella Parkway and Old Texas
Highway 20, in Travis County, Texas 78653

via pipe to Wilbarger Creek, thence to Colorado River Above La Grange in Segment No. 1434 of the
Colorado River Basin

only according to effluent limitations, monitoring requirements, and other conditions set forth in this
permit, as well as the rules of the Texas Commission on Environmental Quality (TCEQ), the laws of the
State of Texas, and other orders of the TCEQ. The issuance of this permit does not grant to the
permittee the right to use private or public property for conveyance of wastewater along the discharge
route described in this permit. This includes, but is not limited to, property belonging to any individual,
partnership, corporation, or other entity. Neither does this permit authorize any invasion of personal
rights nor any violation of federal, state, or local laws or regulations. It is the responsibility of the
permittee to acquire property rights as may be necessary to use the discharge route.

This permit shall expire at midnight, **five years from the date of issuance.**

ISSUED DATE: May 2nd, 2023

_____
For the Commission

INTERIM I EFFLUENT LIMITATIONS AND MONITORING REQUIREMENTS

Outfall Number 001

1.  During the period beginning upon the date of issuance and lasting through completion of expansion to the 0.50 million gallons per day (MGD) facility, the permittee is authorized to discharge subject to the following effluent limitations:

    The daily average flow of effluent shall not exceed 0.20 MGD, nor shall the average discharge during any two-hour period (2-hour peak) exceed 556 gallons per minute.

| Effluent Characteristic | Discharge Limitations | | | | Min. Self-Monitoring Requirements | |
| --- | --- | --- | --- | --- | --- | --- |
| | Daily Avg mg/l (lbs/day) | 7-day Avg mg/l | Daily Max mg/l | Single Grab mg/l | Report Daily Avg. & Max. Single Grab | |
| | | | | | Measurement Frequency | Sample Type |
| Flow, MGD | Report | N/A | Report | N/A | Continuous | Totalizing Meter |
| Carbonaceous Biochemical Oxygen Demand (5-day) | 5 (8.3) | 10 | 20 | 30 | One/week | Grab |
| Total Suspended Solids | 5 (8.3) | 10 | 20 | 30 | One/week | Grab |
| Ammonia Nitrogen | 2 (3.3) | 5 | 10 | 15 | One/week | Grab |
| Total Phosphorus | 1 (1.7) | 2 | 4 | 6 | One/week | Grab |
| *E. coli*, colony-forming units or most probable number per 100 ml | 126 | N/A | N/A | 399 | One/month | Grab |

2.  The effluent shall contain a total chlorine residual of at least 1.0 mg/l and shall not exceed a total chlorine residual of 4.0 mg/l after a detention time of at least 20 minutes (based on peak flow) and shall be monitored five times per week by grab sample. An equivalent method of disinfection may be substituted only with prior approval of the Executive Director.

3.  The pH shall not be less than 6.0 standard units nor greater than 9.0 standard units and shall be monitored once per month by grab sample.

4.  There shall be no discharge of floating solids or visible foam in other than trace amounts and no discharge of visible oil.

5.  Effluent monitoring samples shall be taken at the following location(s): Following the final treatment unit.

6.  The effluent shall contain a minimum dissolved oxygen of 4.0 mg/l and shall be monitored once per week by grab sample.

Page 2

<u>INTERIM II EFFLUENT LIMITATIONS AND MONITORING REQUIREMENTS</u>                    <u>Outfall Number 001</u>

1.  During the period beginning upon the completion of expansion to the 0.50 million gallons per day (MGD) facility and lasting through the completion of expansion to the 0.80 MGD facility, the permittee is authorized to discharge subject to the following effluent limitations:

    The daily average flow of effluent shall not exceed 0.50 MGD, nor shall the average discharge during any two-hour period (2-hour peak) exceed 1,389 gallons per minute.

| Effluent Characteristic | Discharge Limitations | | | | Min. Self-Monitoring Requirements | |
| --- | --- | --- | --- | --- | --- | --- |
| | Daily Avg | 7-day Avg | Daily Max | Single Grab | Report Daily Avg. & Daily Max. | |
| | mg/l (lbs/day) | mg/l | mg/l | mg/l | Measurement Frequency | Sample Type |
| Flow, MGD | Report | N/A | Report | N/A | Continuous | Totalizing Meter |
| Carbonaceous Biochemical Oxygen Demand (5-day) | 5 (21) | 10 | 20 | 30 | One/week | Composite |
| Total Suspended Solids | 5 (21) | 10 | 20 | 30 | One/week | Composite |
| Ammonia Nitrogen | 2 (8.3) | 5 | 10 | 15 | One/week | Composite |
| Total Phosphorus | 1 (4.2) | 2 | 4 | 6 | One/week | Composite |
| *E. coli*, colony-forming units or most probable number per 100 ml | 126 | N/A | 399 | N/A | One/month | Grab |

2.  The effluent shall contain a total chlorine residual of at least 1.0 mg/l after a detention time of at least 20 minutes (based on peak flow) and shall be monitored daily by grab sample. The permittee shall dechlorinate the chlorinated effluent to less than 0.1 mg/l total chlorine residual and shall monitor total chlorine residual daily by grab sample after the dechlorination process. An equivalent method of disinfection may be substituted only with prior approval of the Executive Director.

3.  The pH shall not be less than 6.0 standard units nor greater than 9.0 standard units and shall be monitored twice per month by grab sample.

4.  There shall be no discharge of floating solids or visible foam in other than trace amounts and no discharge of visible oil.

5.  Effluent monitoring samples shall be taken at the following location(s): Following the final treatment unit.

6.  The effluent shall contain a minimum dissolved oxygen of 4.0 mg/l and shall be monitored once per week by grab sample.

<u>FINAL EFFLUENT LIMITATIONS AND MONITORING REQUIREMENTS</u>                    <u>Outfall Number 001</u>

1.  During the period beginning upon the completion of expansion to the 0.80 million gallons per day (MGD) facility and lasting through the date of expiration, the permittee is authorized to discharge subject to the following effluent limitations:

    The daily average flow of effluent shall not exceed 0.80 MGD, nor shall the average discharge during any two-hour period (2-hour peak) exceed 2,222 gallons per minute.

| Effluent Characteristic | Discharge Limitations | | | | Min. Self-Monitoring Requirements | |
|---|---|---|---|---|---|---|
| | Daily Avg mg/l (lbs/day) | 7-day Avg mg/l | Daily Max mg/l | Single Grab mg/l | Report Daily Avg. & Daily Max. Measurement Frequency | Sample Type |
| Flow, MGD | Report | N/A | Report | N/A | Continuous | Totalizing Meter |
| Carbonaceous Biochemical Oxygen Demand (5-day) | 5 (33) | 10 | 20 | 30 | One/week | Composite |
| Total Suspended Solids | 5 (33) | 10 | 20 | 30 | One/week | Composite |
| Ammonia Nitrogen | 2 (13) | 5 | 10 | 15 | One/week | Composite |
| Total Phosphorus | 1 (6.7) | 2 | 4 | 6 | One/week | Composite |
| *E. coli*, colony-forming units or most probable number per 100 ml | 126 | N/A | 399 | N/A | Two/month | Grab |

2.  The effluent shall contain a total chlorine residual of at least 1.0 mg/l after a detention time of at least 20 minutes (based on peak flow) and shall be monitored daily by grab sample. The permittee shall dechlorinate the chlorinated effluent to less than 0.1 mg/l total chlorine residual and shall monitor total chlorine residual daily by grab sample after the dechlorination process. An equivalent method of disinfection may be substituted only with prior approval of the Executive Director.

3.  The pH shall not be less than 6.0 standard units nor greater than 9.0 standard units and shall be monitored twice per month by grab sample.

4.  There shall be no discharge of floating solids or visible foam in other than trace amounts and no discharge of visible oil.

5.  Effluent monitoring samples shall be taken at the following location(s): Following the final treatment unit.

6.  The effluent shall contain a minimum dissolved oxygen of 4.0 mg/l and shall be monitored once per week by grab sample.

## DEFINITIONS AND STANDARD PERMIT CONDITIONS

As required by Title 30 Texas Administrative Code (TAC) Chapter 305, certain regulations appear as standard conditions in waste discharge permits. 30 TAC § 305.121 - 305.129 (relating to Permit Characteristics and Conditions) as promulgated under the Texas Water Code (TWC) §§ 5.103 and 5.105, and the Texas Health and Safety Code (THSC) §§ 361.017 and 361.024(a), establish the characteristics and standards for waste discharge permits, including sewage sludge, and those sections of 40 Code of Federal Regulations (CFR) Part 122 adopted by reference by the Commission. The following text includes these conditions and incorporates them into this permit. All definitions in TWC § 26.001 and 30 TAC Chapter 305 shall apply to this permit and are incorporated by reference. Some specific definitions of words or phrases used in this permit are as follows:

1.  Flow Measurements

    a.  Annual average flow - the arithmetic average of all daily flow determinations taken within the preceding 12 consecutive calendar months. The annual average flow determination shall consist of daily flow volume determinations made by a totalizing meter, charted on a chart recorder and limited to major domestic wastewater discharge facilities with one million gallons per day or greater permitted flow.

    b.  Daily average flow - the arithmetic average of all determinations of the daily flow within a period of one calendar month. The daily average flow determination shall consist of determinations made on at least four separate days. If instantaneous measurements are used to determine the daily flow, the determination shall be the arithmetic average of all instantaneous measurements taken during that month. Daily average flow determination for intermittent discharges shall consist of a minimum of three flow determinations on days of discharge.

    c.  Daily maximum flow - the highest total flow for any 24-hour period in a calendar month.

    d.  Instantaneous flow - the measured flow during the minimum time required to interpret the flow measuring device.

    e.  2-hour peak flow (domestic wastewater treatment plants) - the maximum flow sustained for a two-hour period during the period of daily discharge. The average of multiple measurements of instantaneous maximum flow within a two-hour period may be used to calculate the 2-hour peak flow.

    f.  Maximum 2-hour peak flow (domestic wastewater treatment plants) - the highest 2-hour peak flow for any 24-hour period in a calendar month.

2.  Concentration Measurements

    a.  Daily average concentration - the arithmetic average of all effluent samples, composite or grab as required by this permit, within a period of one calendar month, consisting of at least four separate representative measurements.

        i.  For domestic wastewater treatment plants - When four samples are not available in a calendar month, the arithmetic average (weighted by flow) of all values in the previous four consecutive month period consisting of at least four measurements shall be utilized as the daily average concentration.

ii. For all other wastewater treatment plants - When four samples are not available in a calendar month, the arithmetic average (weighted by flow) of all values taken during the month shall be utilized as the daily average concentration.

b.  7-day average concentration - the arithmetic average of all effluent samples, composite or grab as required by this permit, within a period of one calendar week, Sunday through Saturday.

c.  Daily maximum concentration - the maximum concentration measured on a single day, by the sample type specified in the permit, within a period of one calendar month.

d.  Daily discharge - the discharge of a pollutant measured during a calendar day or any 24-hour period that reasonably represents the calendar day for purposes of sampling. For pollutants with limitations expressed in terms of mass, the daily discharge is calculated as the total mass of the pollutant discharged over the sampling day. For pollutants with limitations expressed in other units of measurement, the daily discharge is calculated as the average measurement of the pollutant over the sampling day.

The daily discharge determination of concentration made using a composite sample shall be the concentration of the composite sample. When grab samples are used, the daily discharge determination of concentration shall be the arithmetic average (weighted by flow value) of all samples collected during that day.

e.  Bacteria concentration (*E. coli* or Enterococci) - Colony Forming Units (CFU) or Most Probable Number (MPN) of bacteria per 100 milliliters effluent. The daily average bacteria concentration is a geometric mean of the values for the effluent samples collected in a calendar month. The geometric mean shall be determined by calculating the nth root of the product of all measurements made in a calendar month, where n equals the number of measurements made; or, computed as the antilogarithm of the arithmetic mean of the logarithms of all measurements made in a calendar month. For any measurement of bacteria equaling zero, a substituted value of one shall be made for input into either computation method. If specified, the 7-day average for bacteria is the geometric mean of the values for all effluent samples collected during a calendar week.

f.  Daily average loading (lbs/day) - the arithmetic average of all daily discharge loading calculations during a period of one calendar month. These calculations must be made for each day of the month that a parameter is analyzed. The daily discharge, in terms of mass (lbs/day), is calculated as (Flow, MGD x Concentration, mg/l x 8.34).

g.  Daily maximum loading (lbs/day) - the highest daily discharge, in terms of mass (lbs/day), within a period of one calendar month.

3.  Sample Type

a.  Composite sample - For domestic wastewater, a composite sample is a sample made up of a minimum of three effluent portions collected in a continuous 24-hour period or during the period of daily discharge if less than 24 hours, and combined in volumes proportional to flow, and collected at the intervals required by 30 TAC § 319.9 (a). For industrial wastewater, a composite sample is a sample made up of a minimum of three effluent portions collected in a continuous 24-hour period or during the period of daily discharge if less than 24 hours, and combined in volumes proportional to flow, and collected at the intervals required by 30 TAC § 319.9 (b).

b.  Grab sample - an individual sample collected in less than 15 minutes.

4.  Treatment Facility (facility) - wastewater facilities used in the conveyance, storage, treatment, recycling, reclamation and/or disposal of domestic sewage, industrial wastes, agricultural wastes, recreational wastes, or other wastes including sludge handling or disposal facilities under the jurisdiction of the Commission.

5.  The term "sewage sludge" is defined as solid, semi-solid, or liquid residue generated during the treatment of domestic sewage in 30 TAC Chapter 312. This includes the solids that have not been classified as hazardous waste separated from wastewater by unit processes.

6.  The term "biosolids" is defined as sewage sludge that has been tested or processed to meet Class A, Class AB, or Class B pathogen standards in 30 TAC Chapter 312 for beneficial use.

7.  Bypass - the intentional diversion of a waste stream from any portion of a treatment facility.

**MONITORING AND REPORTING REQUIREMENTS**

1.  Self-Reporting

    Monitoring results shall be provided at the intervals specified in the permit. Unless otherwise specified in this permit or otherwise ordered by the Commission, the permittee shall conduct effluent sampling and reporting in accordance with 30 TAC §§ 319.4 - 319.12. Unless otherwise specified, effluent monitoring data shall be submitted each month, to the Compliance Monitoring Team of the Enforcement Division (MC 224), by the 20th day of the following month for each discharge which is described by this permit whether or not a discharge is made for that month. Monitoring results must be submitted online using the NetDMR reporting system available through the TCEQ website unless the permittee requests and obtains an electronic reporting waiver. Monitoring results must be signed and certified as required by Monitoring and Reporting Requirements No. 10.

    As provided by state law, the permittee is subject to administrative, civil and criminal penalties, as applicable, for negligently or knowingly violating the Clean Water Act (CWA); TWC §§ 26, 27, and 28; and THSC § 361, including but not limited to knowingly making any false statement, representation, or certification on any report, record, or other document submitted or required to be maintained under this permit, including monitoring reports or reports of compliance or noncompliance, or falsifying, tampering with or knowingly rendering inaccurate any monitoring device or method required by this permit or violating any other requirement imposed by state or federal regulations.

2.  Test Procedures

    a.  Unless otherwise specified in this permit, test procedures for the analysis of pollutants shall comply with procedures specified in 30 TAC §§ 319.11 - 319.12. Measurements, tests, and calculations shall be accurately accomplished in a representative manner.

    b.  All laboratory tests submitted to demonstrate compliance with this permit must meet the requirements of 30 TAC § 25, Environmental Testing Laboratory Accreditation and Certification.

3.  Records of Results

    a.  Monitoring samples and measurements shall be taken at times and in a manner so as to be representative of the monitored activity.

b. Except for records of monitoring information required by this permit related to the permittee's sewage sludge use or biosolids and disposal activities, which shall be retained for a period
of at least five years (or longer as required by 40 CFR Part 503), monitoring and reporting records, including strip charts and records of calibration and maintenance, copies of all records required by this permit, records of all data used to complete the application for this permit, and the certification required by 40 CFR § 264.73(b)(9) shall be retained at the facility site, or shall be readily available for review by a TCEQ representative for a period of three years from the date of the record or sample, measurement, report, application or certification. This period shall be extended at the request of the Executive Director.

c. Records of monitoring activities shall include the following:

   i.   date, time and place of sample or measurement;

   ii.  identity of individual who collected the sample or made the measurement.

   iii. date and time of analysis;

   iv.  identity of the individual and laboratory who performed the analysis;

   v.   the technique or method of analysis; and

   vi.  the results of the analysis or measurement and quality assurance/quality control records.

   The period during which records are required to be kept shall be automatically extended to the date of the final disposition of any administrative or judicial enforcement action that may be instituted against the permittee.

4. Additional Monitoring by Permittee

   If the permittee monitors any pollutant at the location(s) designated herein more frequently than required by this permit using approved analytical methods as specified above, all results of such monitoring shall be included in the calculation and reporting of the values submitted on the approved self-report form. Increased frequency of sampling shall be indicated on the self-report form.

5. Calibration of Instruments

   All automatic flow measuring or recording devices and all totalizing meters for measuring flows shall be accurately calibrated by a trained person at plant start-up and as often thereafter as necessary to ensure accuracy, but not less often than annually unless authorized by the Executive Director for a longer period. Such person shall verify in writing that the device is operating properly and giving accurate results. Copies of the verification shall be retained at the facility site and/or shall be readily available for review by a TCEQ representative for a period of three years.

6. Compliance Schedule Reports

   Reports of compliance or noncompliance with, or any progress reports on, interim and final requirements contained in any compliance schedule of the permit shall be submitted no later than 14 days following each schedule date to the Regional Office and the Compliance Monitoring Team of the Enforcement Division (MC 224).

7. Noncompliance Notification

   a.  In accordance with 30 TAC § 305.125(9) any noncompliance which may endanger human health or safety, or the environment shall be reported by the permittee to the TCEQ. Except as allowed by 30 TAC § 305.132, report of such information shall be provided orally or by facsimile transmission (FAX) to the Regional Office within 24 hours of becoming aware of the noncompliance. A written submission of such information shall also be provided by the permittee to the Regional Office and the Compliance Monitoring Team of the Enforcement Division (MC 224) within five working days of becoming aware of the noncompliance. For Publicly Owned Treatment Works (POTWs), effective December 21, 2025, the permittee must submit the written report for unauthorized discharges and unanticipated bypasses that exceed any effluent limit in the permit using the online electronic reporting system available through the TCEQ website unless the permittee requests and obtains an electronic reporting waiver. The written submission shall contain a description of the noncompliance and its cause; the potential danger to human health or safety, or the environment; the period of noncompliance, including exact dates and times; if the noncompliance has not been corrected, the time it is expected to continue; and steps taken or planned to reduce, eliminate, and prevent recurrence of the noncompliance, and to mitigate its adverse effects.

   b.  The following violations shall be reported under Monitoring and Reporting Requirement 7.a.:

      i.  Unauthorized discharges as defined in Permit Condition 2(g).

      ii.  Any unanticipated bypass that exceeds any effluent limitation in the permit.

      iii.  Violation of a permitted maximum daily discharge limitation for pollutants listed specifically in the Other Requirements section of an Industrial TPDES permit.

   c.  In addition to the above, any effluent violation which deviates from the permitted effluent limitation by more than 40% shall be reported by the permittee in writing to the Regional Office and the Compliance Monitoring Team of the Enforcement Division (MC 224) within 5 working days of becoming aware of the noncompliance.

   d.  Any noncompliance other than that specified in this section, or any required information not submitted or submitted incorrectly, shall be reported to the Compliance Monitoring Team of the Enforcement Division (MC 224) as promptly as possible. For effluent limitation violations, noncompliances shall be reported on the approved self-report form.

8. In accordance with the procedures described in 30 TAC §§ 35.301 - 35.303 (relating to Water Quality Emergency and Temporary Orders) if the permittee knows in advance of the need for a bypass, it shall submit prior notice by applying for such authorization.

9. Changes in Discharges of Toxic Substances

All existing manufacturing, commercial, mining, and silvicultural permittees shall notify the Regional Office, orally or by facsimile transmission within 24 hours, and both the Regional Office and the Compliance Monitoring Team of the Enforcement Division (MC 224) in writing within five (5) working days, after becoming aware of or having reason to believe:

a.  That any activity has occurred or will occur which would result in the discharge, on a routine or frequent basis, of any toxic pollutant listed at 40 CFR Part 122, Appendix D, Tables II and III (excluding Total Phenols) which is not limited in the permit, if that discharge will exceed the highest of the following "notification levels":

    i.  One hundred micrograms per liter (100 µg/L);

    ii.  Two hundred micrograms per liter (200 µg/L) for acrolein and acrylonitrile; five hundred micrograms per liter (500 µg/L) for 2,4-dinitrophenol and for 2-methyl-4,6-dinitrophenol; and one milligram per liter (1 mg/L) for antimony;

    iii.  Five (5) times the maximum concentration value reported for that pollutant in the permit application; or

    iv.  The level established by the TCEQ.

b.  That any activity has occurred or will occur which would result in any discharge, on a nonroutine or infrequent basis, of a toxic pollutant which is not limited in the permit, if that discharge will exceed the highest of the following "notification levels":

    i.  Five hundred micrograms per liter (500 µg/L);

    ii.  One milligram per liter (1 mg/L) for antimony;

    iii.  Ten (10) times the maximum concentration value reported for that pollutant in the permit application; or

    iv.  The level established by the TCEQ.

10. Signatories to Reports

All reports and other information requested by the Executive Director shall be signed by the person and in the manner required by 30 TAC § 305.128 (relating to Signatories to Reports).

11. All POTWs must provide adequate notice to the Executive Director of the following:

a.  Any new introduction of pollutants into the POTW from an indirect discharger which would be subject to CWA § 301 or § 306 if it were directly discharging those pollutants;

b.  Any substantial change in the volume or character of pollutants being introduced into that POTW by a source introducing pollutants into the POTW at the time of issuance of the permit; and

c.  For the purpose of this paragraph, adequate notice shall include information on:

    i.  The quality and quantity of effluent introduced into the POTW; and

    ii.  Any anticipated impact of the change on the quantity or quality of effluent to be discharged from the POTW.

**PERMIT CONDITIONS**

1. General

    a. When the permittee becomes aware that it failed to submit any relevant facts in a permit application, r submitted incorrect information in an application or in any report to the Executive Director, it shall promptly submit such facts or information.

    b. This permit is granted on the basis of the information supplied and representations made by the permittee during action on an application and relying upon the accuracy and completeness of that information and those representations. After notice and opportunity for a hearing, this permit may be modified, suspended, or revoked, in whole or in part, in accordance with 30 TAC Chapter 305, Subchapter D, during its term for good cause including, but not limited to, the following:

        i. Violation of any terms or conditions of this permit;

        ii. Obtaining this permit by misrepresentation or failure to disclose fully all relevant facts; or

        iii. A change in any condition that requires either a temporary or permanent reduction or elimination of the authorized discharge.

    c. The permittee shall furnish to the Executive Director, upon request and within a reasonable time, any information to determine whether cause exists for amending, revoking, suspending or terminating the permit. The permittee shall also furnish to the Executive Director, upon request, copies of records required to be kept by the permit.

2. Compliance

    a. Acceptance of the permit by the person to whom it is issued constitutes acknowledgment and agreement that such person will comply with all the terms and conditions embodied in the permit, and the rules and other orders of the Commission.

    b. The permittee has a duty to comply with all conditions of the permit. Failure to comply with any permit condition constitutes a violation of the permit and the Texas Water Code or the Texas Health and Safety Code, and is grounds for enforcement action, for permit amendment, revocation, or suspension, or for denial of a permit renewal application or an application for a permit for another facility.

    c. It shall not be a defense for a permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of the permit.

    d. The permittee shall take all reasonable steps to minimize or prevent any discharge or sludge use or disposal or other permit violation that has a reasonable likelihood of adversely affecting human health or the environment.

    e. Authorization from the Commission is required before beginning any change in the permitted facility or activity that may result in noncompliance with any permit requirements.

f.  A permit may be amended, suspended and reissued, or revoked for cause in accordance with 30 TAC §§ 305.62 and 305.66 and TWC§ 7.302. The filing of a request by the permittee for a permit amendment, suspension and reissuance, or termination, or a notification of planned changes or anticipated noncompliance, does not stay any permit condition.

g.  There shall be no unauthorized discharge of wastewater or any other waste. For the purpose of this permit, an unauthorized discharge is considered to be any discharge of wastewater into or adjacent to water in the state at any location not permitted as an outfall or otherwise defined in the Other Requirements section of this permit.

h.  In accordance with 30 TAC § 305.535(a), the permittee may allow any bypass to occur from a TPDES permitted facility which does not cause permitted effluent limitations to be exceeded or an unauthorized discharge to occur, but only if the bypass is also for essential maintenance to assure efficient operation.

i.  The permittee is subject to administrative, civil, and criminal penalties, as applicable, under TWC §§ 7.051 - 7.075 (relating to Administrative Penalties), 7.101 - 7.111 (relating to Civil Penalties), and 7.141 - 7.202 (relating to Criminal Offenses and Penalties) for violations including, but not limited to, negligently or knowingly violating the federal CWA §§ 301, 302, 306, 307, 308, 318, or 405, or any condition or limitation implementing any sections in a permit issued under the CWA § 402, or any requirement imposed in a pretreatment program approved under the CWA §§ 402 (a)(3) or 402 (b)(8).

3.  Inspections and Entry

a.  Inspection and entry shall be allowed as prescribed in the TWC Chapters 26, 27, and 28, and THSC § 361.

b.  The members of the Commission and employees and agents of the Commission are entitled to enter any public or private property at any reasonable time for the purpose of inspecting and investigating conditions relating to the quality of water in the state or the compliance with any rule, regulation, permit or other order of the Commission. Members, employees, or agents of the Commission and Commission contractors are entitled to enter public or private property at any reasonable time to investigate or monitor or, if the responsible party is not responsive or there is an immediate danger to public health or the environment, to remove or remediate a condition related to the quality of water in the state. Members, employees, Commission contractors, or agents acting under this authority who enter private property shall observe the establishment's rules and regulations concerning safety, internal security, and fire protection, and if the property has management in residence, shall notify management or the person then in charge of his presence and shall exhibit proper credentials. If any member, employee, Commission contractor, or agent is refused the right to enter in or on public or private property under this authority, the Executive Director may invoke the remedies authorized in TWC § 7.002. The statement above, that Commission entry shall occur in accordance with an establishment's rules and regulations concerning safety, internal security, and fire protection, is not grounds for denial or restriction of entry to any part of the facility, but merely describes the Commission's duty to observe appropriate rules and regulations during an inspection.

4. Permit Amendment and/or Renewal

    a. The permittee shall give notice to the Executive Director as soon as possible of any planned physical alterations or additions to the permitted facility if such alterations or additions would require a permit amendment or result in a violation of permit requirements. Notice shall also be required under this paragraph when:

       i. The alteration or addition to a permitted facility may meet one of the criteria for determining whether a facility is a new source in accordance with 30 TAC § 305.534 (relating to New Sources and New Dischargers); or

       ii. The alteration or addition could significantly change the nature or increase the quantity of pollutants discharged. This notification applies to pollutants that are subject neither to effluent limitations in the permit, nor to notification requirements in Monitoring and Reporting Requirements No. 9; or

       iii. The alteration or addition results in a significant change in the permittee's sludge use or disposal practices, and such alteration, addition, or change may justify the application of permit conditions that are different from or absent in the existing permit, including notification of additional use or disposal sites not reported during the permit application process or not reported pursuant to an approved land application plan.

    b. Prior to any facility modifications, additions, or expansions that will increase the plant capacity beyond the permitted flow, the permittee must apply for and obtain proper authorization from the Commission before commencing construction.

    c. The permittee must apply for an amendment or renewal at least 180 days prior to expiration of the existing permit in order to continue a permitted activity after the expiration date of the permit. If an application is submitted prior to the expiration date of the permit, the existing permit shall remain in effect until the application is approved, denied, or returned. If the application is returned or denied, authorization to continue such activity shall terminate upon the effective date of the action. If an application is not submitted prior to the expiration date of the permit, the permit shall expire and authorization to continue such activity shall terminate.

    d. Prior to accepting or generating wastes which are not described in the permit application, or which would result in a significant change in the quantity or quality of the existing discharge, the permittee must report the proposed changes to the Commission. The permittee must apply for a permit amendment reflecting any necessary changes in permit conditions, including effluent limitations for pollutants not identified and limited by this permit.

    e. In accordance with the TWC § 26.029(b), after a public hearing, notice of which shall be given to the permittee, the Commission may require the permittee, from time to time, for good cause, in accordance with applicable laws, to conform to new or additional conditions.

f.  If any toxic effluent standard or prohibition (including any schedule of compliance specified in such effluent standard or prohibition) is promulgated under CWA § 307(a) for a toxic pollutant which is present in the discharge and that standard or prohibition is more stringent than any limitation on the pollutant in this permit, this permit shall be modified or revoked and reissued to conform to the toxic effluent standard or prohibition. The permittee shall comply with effluent standards or prohibitions established under CWA § 307(a) for toxic pollutants within the time provided in the regulations that established those standards or prohibitions, even if the permit has not yet been modified to incorporate the requirement.

5.  Permit Transfer

a.  Prior to any transfer of this permit, Commission approval must be obtained. The Commission shall be notified in writing of any change in control or ownership of facilities authorized by this permit. Such notification should be sent to the Applications Review and Processing Team (MC 148) of the Water Quality Division.

b.  A permit may be transferred only according to the provisions of 30 TAC § 305.64 (relating to Transfer of Permits) and 30 TAC § 50.133 (relating to Executive Director Action on Application or WQMP update).

6.  Relationship to Hazardous Waste Activities

This permit does not authorize any activity of hazardous waste storage, processing, or disposal that requires a permit or other authorization pursuant to the Texas Health and Safety Code.

7.  Relationship to Water Rights

Disposal of treated effluent by any means other than discharge directly to water in the state must be specifically authorized in this permit and may require a permit pursuant to TWC Chapter 11.

8.  Property Rights

A permit does not convey any property rights of any sort, or any exclusive privilege.

9.  Permit Enforceability

The conditions of this permit are severable, and if any provision of this permit, or the application of any provision of this permit to any circumstances, is held invalid, the application of such provision to other circumstances, and the remainder of this permit, shall not be affected thereby.

10. Relationship to Permit Application

The application pursuant to which the permit has been issued is incorporated herein; provided, however, that in the event of a conflict between the provisions of this permit and the application, the provisions of the permit shall control.

11. Notice of Bankruptcy

    a. Each permittee shall notify the Executive Director, in writing, immediately following the filing of a voluntary or involuntary petition for bankruptcy under any chapter of Title 11 (Bankruptcy) of the United States Code (11 USC) by or against:

        i. the permittee;

        ii. an entity (as that term is defined in 11 USC, § 101(14)) controlling the permittee or listing the permit or permittee as property of the estate; or

        iii. an affiliate (as that term is defined in 11 USC, § 101(2)) of the permittee.

    b. This notification must indicate:

        i. the name of the permittee;

        ii. the permit number(s);

        iii. the bankruptcy court in which the petition for bankruptcy was filed; and

        iv. the date of filing of the petition.

## OPERATIONAL REQUIREMENTS

1. The permittee shall at all times ensure that the facility and all of its systems of collection, treatment, and disposal are properly operated and maintained. This includes, but is not limited to, the regular, periodic examination of wastewater solids within the treatment plant by the operator in order to maintain an appropriate quantity and quality of solids inventory as described in the various operator training manuals and according to accepted industry standards for process control. Process control, maintenance, and operations records shall be retained at the facility site, or shall be readily available for review by a TCEQ representative, for a period of three years.

2. Upon request by the Executive Director, the permittee shall take appropriate samples and provide proper analysis in order to demonstrate compliance with Commission rules. Unless otherwise specified in this permit or otherwise ordered by the Commission, the permittee shall comply with all applicable provisions of 30 TAC Chapter 312 concerning sewage sludge or biosolids use and disposal and 30 TAC §§ 319.21 - 319.29 concerning the discharge of certain hazardous metals.

3. Domestic wastewater treatment facilities shall comply with the following provisions:

    a. The permittee shall notify the Municipal Permits Team, Wastewater Permitting Section (MC 148) of the Water Quality Division, in writing, of any facility expansion at least 90 days prior to conducting such activity.

    b. The permittee shall submit a closure plan for review and approval to the Municipal Permits Team, Wastewater Permitting Section (MC 148) of the Water Quality Division, for any closure activity at least 90 days prior to conducting such activity. Closure is the act of permanently taking a waste management unit or treatment facility out of service and includes the permanent removal from service of any pit, tank, pond, lagoon, surface impoundment and/or other treatment unit regulated by this permit.

4. The permittee is responsible for installing prior to plant start-up, and subsequently maintaining, adequate safeguards to prevent the discharge of untreated or inadequately treated wastes during electrical power failures by means of alternate power sources, standby generators, and/or retention of inadequately treated wastewater.

5. Unless otherwise specified, the permittee shall provide a readily accessible sampling point and, where applicable, an effluent flow measuring device or other acceptable means by which effluent flow may be determined.

6. The permittee shall remit an annual water quality fee to the Commission as required by 30 TAC Chapter 21. Failure to pay the fee may result in revocation of this permit under TWC § 7.302(b)(6).

7. Documentation

   For all written notifications to the Commission required of the permittee by this permit, the permittee shall keep and make available a copy of each such notification under the same conditions as self-monitoring data are required to be kept and made available. Except for information required for TPDES permit applications, effluent data, including effluent data in permits, draft permits and permit applications, and other information specified as not confidential in 30 TAC §§ 1.5(d), any information submitted pursuant to this permit may be claimed as confidential by the submitter. Any such claim must be asserted in the manner prescribed in the application form or by stamping the words confidential business information on each page containing such information. If no claim is made at the time of submission, information may be made available to the public without further notice. If the Commission or Executive Director agrees with the designation of confidentiality, the TCEQ will not provide the information for public inspection unless required by the Texas Attorney General or a court pursuant to an open records request. If the Executive Director does not agree with the designation of confidentiality, the person submitting the information will be notified.

8. Facilities that generate domestic wastewater shall comply with the following provisions; domestic wastewater treatment facilities at permitted industrial sites are excluded.

   a. Whenever flow measurements for any domestic sewage treatment facility reach 75% of the permitted daily average or annual average flow for three consecutive months, the permittee must initiate engineering and financial planning for expansion and/or upgrading of the domestic wastewater treatment and/or collection facilities. Whenever the flow reaches 90% of the permitted daily average or annual average flow for three consecutive months, the permittee shall obtain necessary authorization from the Commission to commence construction of the necessary additional treatment and/or collection facilities. In the case of a domestic wastewater treatment facility which reaches 75% of the permitted daily average or annual average flow for three consecutive months, and the planned population to be served or the quantity of waste produced is not expected to exceed the design limitations of the treatment facility, the permittee shall submit an engineering report supporting this claim to the Executive Director of the Commission.

      If in the judgment of the Executive Director the population to be served will not cause permit noncompliance, then the requirement of this section may be waived. To be effective, any waiver must be in writing and signed by the Director of the Enforcement

Division (MC 219) of the Commission, and such waiver of these requirements will be reviewed upon expiration of the existing permit; however, any such waiver shall not be interpreted as condoning or excusing any violation of any permit parameter.

b. The plans and specifications for domestic sewage collection and treatment works associated with any domestic permit must be approved by the Commission and failure to secure approval before commencing construction of such works or making a discharge is a violation of this permit and each day is an additional violation until approval has been secured.

c. Permits for domestic wastewater treatment plants are granted subject to the policy of the Commission to encourage the development of area-wide waste collection, treatment, and disposal systems. The Commission reserves the right to amend any domestic wastewater permit in accordance with applicable procedural requirements to require the system covered by this permit to be integrated into an area-wide system, should such be developed; to require the delivery of the wastes authorized to be collected in, treated by or discharged from said system, to such area-wide system; or to amend this permit in any other particular to effectuate the Commission's policy. Such amendments may be made when the changes required are advisable for water quality control purposes and are feasible on the basis of waste treatment technology, engineering, financial, and related considerations existing at the time the changes are required, exclusive of the loss of investment in or revenues from any then existing or proposed waste collection, treatment or disposal system.

9. Domestic wastewater treatment plants shall be operated and maintained by sewage plant operators holding a valid certificate of competency at the required level as defined in 30 TAC Chapter 30.

10. For Publicly Owned Treatment Works (POTWs), the 30-day average (or monthly average) percent removal for BOD and TSS shall not be less than 85%, unless otherwise authorized by this permit.

11. Facilities that generate industrial solid waste as defined in 30 TAC § 335.1 shall comply with these provisions:

a. Any solid waste, as defined in 30 TAC § 335.1 (including but not limited to such wastes as garbage, refuse, sludge from a waste treatment, water supply treatment plant or air pollution control facility, discarded materials, discarded materials to be recycled, whether the waste is solid, liquid, or semisolid), generated by the permittee during the management and treatment of wastewater, must be managed in accordance with all applicable provisions of 30 TAC Chapter 335, relating to Industrial Solid Waste Management.

b. Industrial wastewater that is being collected, accumulated, stored, or processed before discharge through any final discharge outfall, specified by this permit, is considered to be industrial solid waste until the wastewater passes through the actual point source discharge and must be managed in accordance with all applicable provisions of 30 TAC Chapter 335.

c. The permittee shall provide written notification, pursuant to the requirements of 30 TAC § 335.8(b)(1), to the Corrective Action Section (MC 127) of the Remediation Division informing the Commission of any closure activity involving an Industrial Solid Waste Management Unit, at least 90 days prior to conducting such an activity.

d.  Construction of any industrial solid waste management unit requires the prior written notification of the proposed activity to the Registration and Reporting Section (MC 129) of the Permitting and Registration Support Division. No person shall dispose of industrial solid waste, including sludge or other solids from wastewater treatment processes, prior to fulfilling the deed recordation requirements of 30 TAC § 335.5.

e.  The term "industrial solid waste management unit" means a landfill, surface impoundment, waste-pile, industrial furnace, incinerator, cement kiln, injection well, container, drum, salt dome waste containment cavern, or any other structure vessel, appurtenance, or other improvement on land used to manage industrial solid waste.

f.  The permittee shall keep management records for all sludge (or other waste) removed from any wastewater treatment process. These records shall fulfill all applicable requirements of 30 TAC § 335 and must include the following, as it pertains to wastewater treatment and discharge:

i.    Volume of waste and date(s) generated from treatment process;
ii.   Volume of waste disposed of on-site or shipped off-site;
iii.  Date(s) of disposal;
iv.   Identity of hauler or transporter;
v.    Location of disposal site; and
vi.   Method of final disposal.

The above records shall be maintained on a monthly basis. The records shall be retained at the facility site, or shall be readily available for review by authorized representatives of the TCEQ for at least five years.

12. For industrial facilities to which the requirements of 30 TAC § 335 do not apply, sludge and solid wastes, including tank cleaning and contaminated solids for disposal, shall be disposed of in accordance with THSC § 361.

TCEQ Revision 06/2020

## SLUDGE PROVISIONS

The permittee is authorized to dispose of sludge or biosolids only at a Texas Commission on Environmental Quality (TCEQ) authorized land application site, co-disposal landfill, wastewater treatment facility, or facility that further processes sludge. **The disposal of sludge or biosolids by land application on property owned, leased or under the direct control of the permittee is a violation of the permit unless the site is authorized with the TCEQ. This provision does not authorize Distribution and Marketing of Class A or Class AB Biosolids. This provision does not authorize the permittee to land apply biosolids on property owned, leased or under the direct control of the permittee.**

## SECTION I.      REQUIREMENTS APPLYING TO ALL SEWAGE SLUDGE OR BIOSOLIDS LAND APPLICATION

### A. General Requirements

1.  The permittee shall handle and dispose of sewage sludge or biosolids in accordance with 30 TAC § 312 and all other applicable state and federal regulations in a manner that protects public health and the environment from any reasonably anticipated adverse effects due to any toxic pollutants that may be present in the sludge or biosolids.

2.  In all cases, if the person (permit holder) who prepares the sewage sludge supplies the sewage sludge to another person for land application use or to the owner or lease holder of the land, the permit holder shall provide necessary information to the parties who receive the sludge to assure compliance with these regulations.

3.  The land application of processed or unprocessed chemical toilet waste, grease trap waste, grit trap waste, milk solids, or similar non-hazardous municipal or industrial solid wastes, or any of the wastes listed in this provision combined with biosolids, WTP residuals or domestic septage is prohibited unless the grease trap waste is added at a fats, oil and grease (FOG) receiving facility as part of an anaerobic digestion process.

### B. Testing Requirements

1.  Sewage sludge or biosolids shall be tested once during the term of this permit in accordance with the method specified in both 40 CFR Part 261, Appendix II and 40 CFR Part 268, Appendix I [Toxicity Characteristic Leaching Procedure (TCLP)] or other method that receives the prior approval of the TCEQ for the contaminants listed in 40 CFR Part 261.24, Table 1. Sewage sludge or biosolids failing this test shall be managed according to RCRA standards for generators of hazardous waste, and the waste's disposition must be in accordance with all applicable requirements for hazardous waste processing, storage, or disposal. Following failure of any TCLP test, the management or disposal of sewage sludge or biosolids at a facility other than an authorized hazardous waste processing, storage, or disposal facility shall be prohibited until such time as the permittee can demonstrate the sewage sludge or biosolids no longer exhibits the hazardous waste toxicity characteristics (as demonstrated by the results of the TCLP tests). A written report shall be provided to both the TCEQ Registration and Reporting Section (MC 129) of the Permitting and Registration Support Division and the Regional Director (MC Region 11) within seven (7) days after failing the TCLP Test.

The report shall contain test results, certification that unauthorized waste management has stopped, and a summary of alternative disposal plans that comply with RCRA standards for the management of hazardous waste. The report shall be addressed to: Director, Permitting and Registration Support Division (MC 129), Texas Commission on Environmental Quality, P.O. Box 13087, Austin, Texas 78711-3087. In addition, the permittee shall prepare an annual report on the results of all sludge toxicity testing. This annual report shall be submitted to the TCEQ Regional Office (MC Region 11) and the Compliance Monitoring Team (MC 224) of the Enforcement Division by September 30th of each year. The permittee must submit this annual report using the online electronic reporting system available through the TCEQ website unless the permittee requests and obtains an electronic reporting waiver.

2. Biosolids shall not be applied to the land if the concentration of the pollutants exceeds the pollutant concentration criteria in Table 1. The frequency of testing for pollutants in Table 1 is found in Section I.C. of this permit.

TABLE 1

| Pollutant | Ceiling Concentration (Milligrams per kilogram)* |
|---|---|
| Arsenic | 75 |
| Cadmium | 85 |
| Chromium | 3000 |
| Copper | 4300 |
| Lead | 840 |
| Mercury | 57 |
| Molybdenum | 75 |
| Nickel | 420 |
| PCBs | 49 |
| Selenium | 100 |
| Zinc | 7500 |

* Dry weight basis

3. Pathogen Control

All sewage sludge that is applied to agricultural land, forest, a public contact site, or a reclamation site must be treated by one of the following methods to ensure that the sludge meets either the Class A, Class AB or Class B biosolids pathogen requirements.

a. For sewage sludge to be classified as Class A biosolids with respect to pathogens, the density of fecal coliform in the sewage sludge must be less than 1,000 most probable number (MPN) per gram of total solids (dry weight basis), or the density of Salmonella sp. bacteria in the sewage sludge must be less than three MPN per four grams of total solids (dry weight basis) at the time the sewage sludge is used or disposed. In addition, one of the alternatives listed below must be met:

Alternative 1 - The temperature of the sewage sludge that is used or disposed shall be maintained at or above a specific value for a period of time. See 30 TAC § 312.82(a)(2)(A) for specific information;

Alternative 5 (PFRP) - Sewage sludge that is used or disposed of must be treated in one of the Processes to Further Reduce Pathogens (PFRP) described in 40 CFR Part 503, Appendix B. PFRP include composting, heat drying, heat treatment, and thermophilic aerobic digestion; or

Alternative 6 (PFRP Equivalent) - Sewage sludge that is used or disposed of must be treated in a process that has been approved by the U. S. Environmental Protection Agency as being equivalent to those in Alternative 5.

b.  For sewage sludge to be classified as Class AB biosolids with respect to pathogens, the density of fecal coliform in the sewage sludge must be less than 1,000 MPN per gram of total solids (dry weight basis), or the density of *Salmonella* sp. bacteria in the sewage sludge be less than three MPN per four grams of total solids (dry weight basis) at the time the sewage sludge is used or disposed. In addition, one of the alternatives listed below must be met:

Alternative 2 - The pH of the sewage sludge that is used or disposed shall be raised to above 12 std. units and shall remain above 12 std. units for 72 hours.

The temperature of the sewage sludge shall be above 52° Celsius for 12 hours or longer during the period that the pH of the sewage sludge is above 12 std. units.

At the end of the 72-hour period during which the pH of the sewage sludge is above 12 std. units, the sewage sludge shall be air dried to achieve a percent solids in the sewage sludge greater than 50%; or

Alternative 3 - The sewage sludge shall be analyzed for enteric viruses prior to pathogen treatment. The limit for enteric viruses is less than one Plaque-forming Unit per four grams of total solids (dry weight basis) either before or following pathogen treatment. See 30 TAC § 312.82(a)(2)(C)(i-iii) for specific information. The sewage sludge shall be analyzed for viable helminth ova prior to pathogen treatment. The limit for viable helminth ova is less than one per four grams of total solids (dry weight basis) either before or following pathogen treatment. See 30 TAC § 312.82(a)(2)(C)(iv-vi) for specific information; or

Alternative 4 - The density of enteric viruses in the sewage sludge shall be less than one Plaque-forming Unit per four grams of total solids (dry weight basis) at the time the sewage sludge is used or disposed. The density of viable helminth ova in the sewage sludge shall be less than one per four grams of total solids (dry weight basis) at the time the sewage sludge is used or disposed.

c.  Sewage sludge that meets the requirements of Class AB biosolids may be classified a Class A biosolids if a variance request is submitted in writing that is supported by substantial documentation demonstrating equivalent methods for reducing odors and written approval is granted by the executive director. The executive director may deny the variance request or revoke that approved variance if it is determined that the variance may potentially endanger human health or the environment or create nuisance odor conditions.

d.  Three alternatives are available to demonstrate compliance with Class B biosolids criteria.

Alternative 1

i.   A minimum of seven random samples of the sewage sludge shall be collected within 48 hours of the time the sewage sludge is used or disposed of during each monitoring episode for the sewage sludge.

ii.  The geometric mean of the density of fecal coliform in the samples collected shall be less than either 2,000,000 MPN per gram of total solids (dry weight basis) or 2,000,000 Colony Forming Units per gram of total solids (dry weight basis).

Alternative 2 - Sewage sludge that is used or disposed of shall be treated in one of the Processes to Significantly Reduce Pathogens (PSRP) described in 40 CFR Part 503, Appendix B, so long as all of the following requirements are met by the generator of the sewage sludge.

i.   Prior to use or disposal, all the sewage sludge must have been generated from a single location, except as provided in paragraph v. below;

ii.  An independent Texas Licensed Professional Engineer must make a certification to the generator of a sewage sludge that the wastewater treatment facility generating the sewage sludge is designed to achieve one of the PSRP at the permitted design loading of the facility. The certification need only be repeated if the design loading of the facility is increased. The certification shall include a statement indicating the design meets all the applicable standards specified in Appendix B of 40 CFR Part 503;

iii. Prior to any off-site transportation or on-site use or disposal of any sewage sludge generated at a wastewater treatment facility, the chief certified operator of the wastewater treatment facility or other responsible official who manages the processes to significantly reduce pathogens at the wastewater treatment facility for the permittee, shall certify that the sewage sludge underwent at least the minimum operational requirements necessary in order to meet one of the PSRP. The acceptable processes and the minimum operational and record keeping requirements shall be in accordance with established U.S. Environmental Protection Agency final guidance;

iv.  All certification records and operational records describing how the requirements of this paragraph were met shall be kept by the generator for a minimum of three years and be available for inspection by commission staff for review; and

v.   If the sewage sludge is generated from a mixture of sources, resulting from a person who prepares sewage sludge from more than one wastewater treatment facility, the resulting derived product shall meet one of the PSRP, and shall meet the certification, operation, and record keeping requirements of this paragraph.

Alternative 3 - Sewage sludge shall be treated in an equivalent process that has been approved by the U.S. Environmental Protection Agency, so long as all of the following requirements are met by the generator of the sewage sludge.

i.   Prior to use or disposal, all the sewage sludge must have been generated from a single location, except as provided in paragraph v. below;

ii. Prior to any off-site transportation or on-site use or disposal of any sewage sludge generated at a wastewater treatment facility, the chief certified operator of the wastewater treatment facility or other responsible official who manages the processes to significantly reduce pathogens at the wastewater treatment facility for the permittee, shall certify that the sewage sludge underwent at least the minimum operational requirements necessary in order to meet one of the PSRP. The acceptable processes and the minimum operational and record keeping requirements shall be in accordance with established U.S. Environmental Protection Agency final guidance;

iii. All certification records and operational records describing how the requirements of this paragraph were met shall be kept by the generator for a minimum of three years and be available for inspection by commission staff for review;

iv. The Executive Director will accept from the U.S. Environmental Protection Agency a finding of equivalency to the defined PSRP; and

v. If the sewage sludge is generated from a mixture of sources resulting from a person who prepares sewage sludge from more than one wastewater treatment facility, the resulting derived product shall meet one of the Processes to Significantly Reduce Pathogens, and shall meet the certification, operation, and record keeping requirements of this paragraph.

In addition to the Alternatives 1 – 3, the following site restrictions must be met if Class B biosolids are land applied:

i. Food crops with harvested parts that touch the biosolids /soil mixture and are totally above the land surface shall not be harvested for 14 months after application of biosolids.

ii. Food crops with harvested parts below the surface of the land shall not be harvested for 20 months after application of biosolids when the biosolids remain on the land surface for 4 months or longer prior to incorporation into the soil.

iii. Food crops with harvested parts below the surface of the land shall not be harvested for 38 months after application of biosolids when the biosolids remain on the land surface for less than 4 months prior to incorporation into the soil.

iv. Food crops, feed crops, and fiber crops shall not be harvested for 30 days after application of biosolids.

v. Domestic livestock shall not be allowed to graze on the land for 30 days after application of biosolids.

vi. Turf grown on land where biosolids are applied shall not be harvested for 1 year after application of the biosolids when the harvested turf is placed on either land with a high potential for public exposure or a lawn.

vii. Public access to land with a high potential for public exposure shall be restricted for 1 year after application of biosolids.

viii. Public access to land with a low potential for public exposure shall be restricted for 30 days after application of biosolids.

ix. Land application of biosolids shall be in accordance with the buffer zone requirements found in 30 TAC § 312.44.

4. Vector Attraction Reduction Requirements

All bulk sewage sludge that is applied to agricultural land, forest, a public contact site, or a reclamation site shall be treated by one of the following Alternatives 1 through 10 for vector attraction reduction.

Alternative 1 -    The mass of volatile solids in the sewage sludge shall be reduced by a minimum of 38%.

Alternative 2 -    If Alternative 1 cannot be met for an anaerobically digested sludge, demonstration can be made by digesting a portion of the previously digested sludge anaerobically in the laboratory in a bench-scale unit for 40 additional days at a temperature between 30° and 37° Celsius. Volatile solids must be reduced by less than 17% to demonstrate compliance.

Alternative 3 -    If Alternative 1 cannot be met for an aerobically digested sludge, demonstration can be made by digesting a portion of the previously digested sludge with percent solids of two percent or less aerobically in the laboratory in a bench-scale unit for 30 additional days at 20° Celsius. Volatile solids must be reduced by less than 15% to demonstrate compliance.

Alternative 4 -    The specific oxygen uptake rate (SOUR) for sewage sludge treated in an aerobic process shall be equal to or less than 1.5 milligrams of oxygen per hour per gram of total solids (dry weight basis) at a temperature of 20° Celsius.

Alternative 5 -    Sewage sludge shall be treated in an aerobic process for 14 days or longer. During that time, the temperature of the sewage sludge shall be higher than 40° Celsius and the average temperature of the sewage sludge shall be higher than 45° Celsius.

Alternative 6 -    The pH of sewage sludge shall be raised to 12 or higher by alkali addition and, without the addition of more alkali shall remain at 12 or higher for two hours and then remain at a pH of 11.5 or higher for an additional 22 hours at the time the sewage sludge is prepared for sale or given away in a bag or other container.

Alternative 7 -    The percent solids of sewage sludge that does not contain unstabilized solids generated in a primary wastewater treatment process shall be equal to or greater than 75% based on the moisture content and total solids prior to mixing with other materials. Unstabilized solids are defined as organic materials in sewage sludge that have not been treated in either an aerobic or anaerobic treatment process.

Alternative 8 -    The percent solids of sewage sludge that contains unstabilized solids generated in a primary wastewater treatment process shall be equal to or greater than 90% based on the moisture content and total solids prior to mixing with other materials at the time the sludge is used. Unstabilized solids are defined as organic materials in sewage sludge that have not been treated in either an aerobic or anaerobic treatment process.

Alternative 9 -    i.    Biosolids shall be injected below the surface of the land.

                   ii.   No significant amount of the biosolids shall be present on the land surface within one hour after the biosolids are injected.

                   iii.  When sewage sludge that is injected below the surface of the land is Class A or Class AB with respect to pathogens, the biosolids shall be injected below the land surface within eight hours after being discharged from the pathogen treatment process.

Alternative 10-    i.    Biosolids applied to the land surface or placed on a surface disposal site shall be incorporated into the soil within six hours after application to or placement on the land.

                   ii.   When biosolids that is incorporated into the soil is Class A or Class AB with respect to pathogens, the biosolids shall be applied to or placed on the land within eight hours after being discharged from the pathogen treatment process.

## C. Monitoring Requirements

Toxicity Characteristic Leaching Procedure (TCLP) Test        - once during the term of this permit

PCBs        - once during the term of this permit

All metal constituents and fecal coliform or *Salmonella* sp. bacteria shall be monitored at the appropriate frequency shown below, pursuant to 30 TAC § 312.46(a)(1):

| Amount of biosolids (*) metric tons per 365-day period | Monitoring Frequency |
| --- | --- |
| 0 to less than 290 | Once/Year |
| 290 to less than 1,500 | Once/Quarter |
| 1,500 to less than 15,000 | Once/Two Months |
| 15,000 or greater | Once/Month |

(*) *The amount of bulk biosolids applied to the land (dry wt. basis).*

Representative samples of sewage sludge shall be collected and analyzed in accordance with the methods referenced in 30 TAC § 312.7.

Identify each of the analytic methods used by the facility to analyze enteric viruses, fecal coliforms, helminth ova, *Salmonella* sp., and other regulated parameters.

Identify in the following categories (as applicable) the sewage sludge or biosolids treatment process or processes at the facility: preliminary operations (e.g., sludge or biosolids grinding and degritting), thickening (concentration), stabilization, anaerobic digestion, aerobic digestion, composting, conditioning, disinfection (e.g., beta ray irradiation, gamma ray irradiation, pasteurization), dewatering (e.g., centrifugation, sludge drying beds, sludge lagoons), heat drying, thermal reduction, and methane or biogas capture and recovery.

Identify the nature of material generated by the facility (such as a biosolid for beneficial use or land-farming, or sewage sludge or biosolids for disposal at a monofill) and whether the material is ultimately conveyed off-site in bulk or in bags.

SECTION II.     REQUIREMENTS SPECIFIC TO BULK SEWAGE SLUDGE FOR APPLICATION TO THE LAND MEETING CLASS A, CLASS AB or B BIOSOLIDS PATHOGEN REDUCTION AND THE CUMULATIVE LOADING RATES IN TABLE 2, OR CLASS B PATHOGEN REDUCTION AND THE POLLUTANT CONCENTRATIONS IN TABLE 3

For those permittees meeting Class A, Class AB or B pathogen reduction requirements and that meet the cumulative loading rates in Table 2 below, or the Class B pathogen reduction requirements and contain concentrations of pollutants below listed in Table 3, the following conditions apply:

**A.  Pollutant Limits**

Table 2

| Pollutant | Cumulative Pollutant Loading Rate (pounds per acre)* |
|---|---|
| Arsenic | 36 |
| Cadmium | 35 |
| Chromium | 2677 |
| Copper | 1339 |
| Lead | 268 |
| Mercury | 15 |
| Molybdenum | Report Only |
| Nickel | 375 |
| Selenium | 89 |
| Zinc | 2500 |

Table 3

| Pollutant | Monthly Average Concentration (milligrams per kilogram)* |
|---|---|
| Arsenic | 41 |
| Cadmium | 39 |
| Chromium | 1200 |
| Copper | 1500 |
| Lead | 300 |
| Mercury | 17 |
| Molybdenum | Report Only |
| Nickel | 420 |
| Selenium | 36 |
| Zinc | 2800 |

*Dry weight basis

**B.  Pathogen Control**

All bulk sewage sludge that is applied to agricultural land, forest, a public contact site, a reclamation site, shall be treated by either Class A, Class AB or Class B biosolids pathogen reduction requirements as defined above in Section I.B.3.

## C. Management Practices

1. Bulk biosolids shall not be applied to agricultural land, forest, a public contact site, or a reclamation site that is flooded, frozen, or snow-covered so that the bulk biosolids enters a wetland or other waters in the State.

2. Bulk biosolids not meeting Class A biosolids requirements shall be land applied in a manner which complies with Applicability in accordance with 30 TAC §312.41 and the Management Requirements in accordance with 30 TAC § 312.44.

3. Bulk biosolids shall be applied at or below the agronomic rate of the cover crop.

4. An information sheet shall be provided to the person who receives bulk Class A or AB biosolids sold or given away. The information sheet shall contain the following information:

   a. The name and address of the person who prepared the Class A or AB biosolids that are sold or given away in a bag or other container for application to the land.

   b. A statement that application of the biosolids to the land is prohibited except in accordance with the instruction on the label or information sheet.

   c. The annual whole sludge application rate for the biosolids application rate for the biosolids that does not cause any of the cumulative pollutant loading rates in Table 2 above to be exceeded, unless the pollutant concentrations in Table 3 found in Section II above are met.

## D. Notification Requirements

1. If bulk biosolids is applied to land in a State other than Texas, written notice shall be provided prior to the initial land application to the permitting authority for the State in which the bulk biosolids are proposed to be applied. The notice shall include:

   a. The location, by street address, and specific latitude and longitude, of each land application site.

   b. The approximate time period bulk biosolids will be applied to the site.

   c. The name, address, telephone number, and National Pollutant Discharge Elimination System permit number (if appropriate) for the person who will apply the bulk biosolids.

2. The permittee shall give 180 days prior notice to the Executive Director in care of the Wastewater Permitting Section (MC 148) of the Water Quality Division of any change planned in the biosolids disposal practice.

## E. Record Keeping Requirements

The documents will be retained at the facility site and/or shall be readily available for review by a TCEQ representative. The person who prepares bulk sewage sludge or a biosolids material shall develop the following information and shall retain the information at the facility site and/or shall be readily available for review by a TCEQ representative for a period

of five years. If the permittee supplies the sludge to another person who land applies the sludge, the permittee shall notify the land applier of the requirements for record keeping found in 30 TAC § 312.47 for persons who land apply.

1.  The concentration (mg/kg) in the sludge of each pollutant listed in Table 3 above and the applicable pollutant concentration criteria (mg/kg), or the applicable cumulative pollutant loading rate and the applicable cumulative pollutant loading rate limit (lbs/ac) listed in Table 2 above.

2.  A description of how the pathogen reduction requirements are met (including site restrictions for Class AB and Class B biosolids, if applicable).

3.  A description of how the vector attraction reduction requirements are met.

4.  A description of how the management practices listed above in Section II.C are being met.

5.  The following certification statement:

    "I certify, under penalty of law, that the applicable pathogen requirements in 30 TAC § 312.82(a) or (b) and the vector attraction reduction requirements in 30 TAC § 312.83(b) have been met for each site on which bulk biosolids are applied. This determination has been made under my direction and supervision in accordance with the system designed to ensure that qualified personnel properly gather and evaluate the information used to determine that the management practices have been met. I am aware that there are significant penalties for false certification including fine and imprisonment."

6.  The recommended agronomic loading rate from the references listed in Section II.C.3. above, as well as the actual agronomic loading rate shall be retained. The person who applies bulk biosolids shall develop the following information and shall retain the information at the facility site and/or shall be readily available for review by a TCEQ representative indefinitely. If the permittee supplies the sludge to another person who land applies the sludge, the permittee shall notify the land applier of the requirements for record keeping found in 30 TAC § 312.47 for persons who land apply:

    a.  A certification statement that all applicable requirements (specifically listed) have been met, and that the permittee understands that there are significant penalties for false certification including fine and imprisonment. See 30 TAC § 312.47(a)(4)(A)(ii) or 30 TAC § 312.47(a)(5)(A)(ii), as applicable, and to the permittee's specific sludge treatment activities.

    b.  The location, by street address, and specific latitude and longitude, of each site on which biosolids is applied.

    c.  The number of acres in each site on which bulk biosolids are applied.

    d.  The date and time biosolids are applied to each site.

    e.  The cumulative amount of each pollutant in pounds/acre listed in Table 2 applied to each site.

    f.  The total amount of biosolids applied to each site in dry tons.

The above records shall be maintained on-site on a monthly basis and shall be made available to the Texas Commission on Environmental Quality upon request.

## F. Reporting Requirements

The permittee shall report annually to the TCEQ Regional Office (MC Region 11) and Compliance Monitoring Team (MC 224) of the Enforcement Division, by September 30th of each year the following information. The permittee must submit this annual report using the online electronic reporting system available through the TCEQ website unless the permittee requests and obtains an electronic reporting waiver.

1.  Identify in the following categories (as applicable) the sewage sludge or biosolids treatment process or processes at the facility: preliminary operations (e.g., sludge or biosolids grinding and degritting), thickening (concentration), stabilization, anaerobic digestion, aerobic digestion, composting, conditioning, disinfection (e.g., beta ray irradiation, gamma ray irradiation, pasteurization), dewatering (e.g., centrifugation, sludge drying beds, sludge lagoons), heat drying, thermal reduction, and methane or biogas capture and recovery.

2.  Identify the nature of material generated by the facility (such as a biosolid for beneficial use or land-farming, or sewage sludge for disposal at a monofill) and whether the material is ultimately conveyed off-site in bulk or in bags.

3.  Results of tests performed for pollutants found in either Table 2 or 3 as appropriate for the permittee's land application practices.

4.  The frequency of monitoring listed in Section I.C. that applies to the permittee.

5.  Toxicity Characteristic Leaching Procedure (TCLP) results.

6.  PCB concentration in sludge or biosolids in mg/kg.

7.  Identity of hauler(s) and TCEQ transporter number.

8.  Date(s) of transport.

9.  Texas Commission on Environmental Quality registration number, if applicable.

10. Amount of sludge or biosolids disposal dry weight (lbs/acre) at each disposal site.

11. The concentration (mg/kg) in the sludge of each pollutant listed in Table 1 (defined as a monthly average) as well as the applicable pollutant concentration criteria (mg/kg) listed in Table 3 above, or the applicable pollutant loading rate limit (lbs/acre) listed in Table 2 above if it exceeds 90% of the limit.

12. Level of pathogen reduction achieved (Class A, Class AB or Class B).

13. Alternative used as listed in Section I.B.3.(a. or b.). Alternatives describe how the pathogen reduction requirements are met. If Class B biosolids, include information on how site restrictions were met.

14. Identify each of the analytic methods used by the facility to analyze enteric viruses, fecal coliforms, helminth ova, *Salmonella* sp., and other regulated parameters.

15. Vector attraction reduction alternative used as listed in Section I.B.4.

16. Amount of sludge or biosolids transported in dry tons/year.

17. The certification statement listed in either 30 TAC § 312.47(a)(4)(A)(ii) or 30 TAC § 312.47(a)(5)(A)(ii) as applicable to the permittee's sludge or biosolids treatment activities, shall be attached to the annual reporting form.

18. When the amount of any pollutant applied to the land exceeds 90% of the cumulative pollutant loading rate for that pollutant, as described in Table 2, the permittee shall report the following information as an attachment to the annual reporting form.

    a.  The location, by street address, and specific latitude and longitude.

    b.  The number of acres in each site on which bulk biosolids are applied.

    c.  The date and time bulk biosolids are applied to each site.

    d.  The cumulative amount of each pollutant (i.e., pounds/acre) listed in Table 2 in the bulk biosolids applied to each site.

    e.  The amount of biosolids (i.e., dry tons) applied to each site.

    The above records shall be maintained on a monthly basis and shall be made available to the Texas Commission on Environmental Quality upon request.

**SECTION III.      REQUIREMENTS APPLYING TO ALL SEWAGE SLUDGE OR BIOSOLIDS DISPOSED IN A MUNICIPAL SOLID WASTE LANDFILL**

A.  The permittee shall handle and dispose of sewage sludge or biosolids in accordance with 30 TAC § 330 and all other applicable state and federal regulations to protect public health and the environment from any reasonably anticipated adverse effects due to any toxic pollutants that may be present. The permittee shall ensure that the sewage sludge or biosolids meets the requirements in 30 TAC § 330 concerning the quality of the sludge disposed in a municipal solid waste landfill.

B.  If the permittee generates sewage sludge or biosolids and supplies that sewage sludge or biosolids to the owner or operator of a municipal solid waste landfill (MSWLF) for disposal, the permittee shall provide to the owner or operator of the MSWLF appropriate information needed to be in compliance with the provisions of this permit.

C.  The permittee shall give 180 days prior notice to the Executive Director in care of the Wastewater Permitting Section (MC 148) of the Water Quality Division of any change planned in the sewage sludge or biosolids disposal practice.

D.  Sewage sludge or biosolids shall be tested once during the term of this permit in accordance with the method specified in both 40 CFR Part 261, Appendix II and 40 CFR Part 268, Appendix I (Toxicity Characteristic Leaching Procedure) or other method, which receives the prior approval of the TCEQ for contaminants listed in Table 1 of 40 CFR § 261.24. Sewage sludge or biosolids failing this test shall be managed according to RCRA standards for generators of hazardous waste, and the waste's disposition must be in accordance with all applicable requirements for hazardous waste processing, storage, or disposal.

Following failure of any TCLP test, the management or disposal of sewage sludge or biosolids at a facility other than an authorized hazardous waste processing, storage, or disposal facility shall be prohibited until such time as the permittee can demonstrate the sewage sludge or biosolids no longer exhibits the hazardous waste toxicity characteristics (as demonstrated by the results of the TCLP tests). A written report shall be provided to both the TCEQ Registration and Reporting Section (MC 129) of the Permitting and Registration Support Division and the Regional Director (MC Region 11) of the appropriate TCEQ field office within 7 days after failing the TCLP Test.

The report shall contain test results, certification that unauthorized waste management has stopped, and a summary of alternative disposal plans that comply with RCRA standards for the management of hazardous waste. The report shall be addressed to: Director, Permitting and Registration Support Division (MC 129), Texas Commission on Environmental Quality, P. O. Box 13087, Austin, Texas 78711-3087. In addition, the permittee shall prepare an annual report on the results of all sludge toxicity testing. This annual report shall be submitted to the TCEQ Regional Office (MC Region 11) and the Compliance Monitoring Team (MC 224) of the Enforcement Division by September 30 of each year.

E.  Sewage sludge or biosolids shall be tested as needed, in accordance with the requirements of 30 TAC Chapter 330.

F.  Record Keeping Requirements

The permittee shall develop the following information and shall retain the information for five years.

1.  The description (including procedures followed and the results) of all liquid Paint Filter Tests performed.

2.  The description (including procedures followed and results) of all TCLP tests performed.

The above records shall be maintained on-site on a monthly basis and shall be made available to the Texas Commission on Environmental Quality upon request.

G.  Reporting Requirements

The permittee shall report annually to the TCEQ Regional Office (MC Region 11) and Compliance Monitoring Team (MC 224) of the Enforcement Division by September 30th of each year the following information. The permittee must submit this annual report using the online electronic reporting system available through the TCEQ website unless the permittee requests and obtains an electronic reporting waiver.

1.  Identify in the following categories (as applicable) the sewage sludge or biosolids treatment process or processes at the facility: preliminary operations (e.g., sludge or biosolids grinding and degritting), thickening (concentration), stabilization, anaerobic digestion, aerobic digestion, composting, conditioning, disinfection (e.g., beta ray irradiation, gamma ray irradiation, pasteurization), dewatering (e.g., centrifugation, sludge drying beds, sludge lagoons), heat drying, thermal reduction, and methane or biogas capture and recovery.

2.  Toxicity Characteristic Leaching Procedure (TCLP) results.

3.  Annual sludge or biosolids production in dry tons/year.

4.  Amount of sludge or biosolids disposed in a municipal solid waste landfill in dry tons/year.

5.  Amount of sludge or biosolids transported interstate in dry tons/year.

6.  A certification that the sewage sludge or biosolids meets the requirements of 30 TAC § 330 concerning the quality of the sludge disposed in a municipal solid waste landfill.

7.  Identity of hauler(s) and transporter registration number.

8.  Owner of disposal site(s).

9.  Location of disposal site(s).

10. Date(s) of disposal.

The above records shall be maintained on-site on a monthly basis and shall be made available to the Texas Commission on Environmental Quality upon request.

## SECTION IV.    REQUIREMENTS APPLYING TO SLUDGE OR BIOSOLIDS TRANSPORTED TO ANOTHER FACILITY FOR FURTHER PROCESSING

These provisions apply to sludge or biosolids that is transported to another wastewater treatment facility or facility that further processes sludge or biosolids. These provisions are intended to allow transport of sludge or biosolids to facilities that have been authorized to accept sludge or biosolids. These provisions do not limit the ability of the receiving facility to determine whether to accept the sludge or biosolids, nor do they limit the ability of the receiving facility to request additional testing or documentation.

### A.  General Requirements

1.  The permittee shall handle and dispose of sewage sludge or biosolids in accordance with 30 TAC Chapter 312 and all other applicable state and federal regulations in a manner that protects public health and the environment from any reasonably anticipated adverse effects due to any toxic pollutants that may be present in the sludge.

2.  Sludge or biosolids may only be transported using a registered transporter or using an approved pipeline.

### B.  Record Keeping Requirements

1.  For sludge or biosolids transported by an approved pipeline, the permittee must maintain records of the following:

    a.    the amount of sludge or biosolids transported;

    b.    the date of transport;

    c.    the name and TCEQ permit number of the receiving facility or facilities;

    d.    the location of the receiving facility or facilities;

    e.    the name and TCEQ permit number of the facility that generated the waste; and

    f.    copy of the written agreement between the permittee and the receiving facility to accept sludge or biosolids.

2.  For sludge transported by a registered transporter, the permittee must maintain records of the completed trip tickets in accordance with 30 TAC § 312.145(a)(1)-(7) and amount of sludge or biosolids transported.

3.  The above records shall be maintained on-site on a monthly basis and shall be made available to the TCEQ upon request. These records shall be retained for at least five years.

## C. Reporting Requirements

The permittee shall report the following information annually to the TCEQ Regional Office (MC Region 11) and Compliance Monitoring Team (MC 224) of the Enforcement Division, by September 30th of each year. The permittee must submit this annual report using the online electronic reporting system available through the TCEQ website unless the permittee requests and obtains an electronic reporting waiver.

1.  Identify in the following categories (as applicable) the sewage sludge or biosolids treatment process or processes at the facility: preliminary operations (e.g., sludge or biosolids grinding and degritting), thickening (concentration), stabilization, anaerobic digestion, aerobic digestion, composting, conditioning, disinfection (e.g., beta ray irradiation, gamma ray irradiation, pasteurization), dewatering (e.g., centrifugation, sludge drying beds, sludge lagoons), heat drying, thermal reduction, and methane or biogas capture and recovery.

2.  the annual sludge or biosolids production;

3.  the amount of sludge or biosolids transported;

4.  the owner of each receiving facility;

5.  the location of each receiving facility; and

6.  the date(s) of disposal at each receiving facility.

TCEQ Revision 06/2020

**OTHER REQUIREMENTS**

1.  The permittee shall employ or contract with one or more licensed wastewater treatment facility operators or wastewater system operations companies holding a valid license or registration according to the requirements of 30 TAC Chapter 30, Occupational Licenses and Registrations, and in particular 30 TAC Chapter 30, Subchapter J, Wastewater Operators and Operations Companies.

    This Category C facility must be operated by a chief operator or an operator holding a Class C license or higher. The facility must be operated a minimum of five days per week by the licensed chief operator or an operator holding the required level of license or higher. The licensed chief operator or operator holding the required level of license or higher must be available by telephone or pager seven days per week. Where shift operation of the wastewater treatment facility is necessary, each shift that does not have the on-site supervision of the licensed chief operator must be supervised by an operator in charge who is licensed not less than one level below the category for the facility.

2.  The facility is not located in the Coastal Management Program boundary.

3.  Prior to construction of the Interim I, Interim II, and Final phases, the permittee shall submit sufficient evidence of legal restrictions prohibiting residential structures within the part of the buffer zone not owned by the permittee according to 30 TAC § 309.13(e)(3). The evidence of legal restrictions shall be submitted to the Executive Director in care of the TCEQ Wastewater Permitting Section (MC 148). The permittee shall comply with the requirements of 30 TAC § 309.13(a) through (d). See Attachment A1, A2 and A3.)

4.  The permittee shall provide facilities for the protection of its wastewater treatment facility from a 100-year flood.

5.  In accordance with 30 TAC § 319.9, a permittee that has at least twelve months of uninterrupted compliance with its bacteria limit may notify the commission in writing of its compliance and request a less frequent measurement schedule. To request a less frequent schedule, the permittee shall submit a written request to the TCEQ Wastewater Permitting Section (MC 148) for each phase that includes a different monitoring frequency. The request must contain all of the reported bacteria values (Daily Avg. and Daily Max/Single Grab) for the twelve consecutive months immediately prior to the request. If the Executive Director finds that a less frequent measurement schedule is protective of human health and the environment, the permittee may be given a less frequent measurement schedule. For this permit, 1/month may be reduced to 1/quarter in the Interim I and II phases and 2/month may be reduced to 1/month in the Final phase. **A violation of any bacteria limit by a facility that has been granted a less frequent measurement schedule will require the permittee to return to the standard frequency schedule and submit written notice to the TCEQ Wastewater Permitting Section (MC 148).** The permittee may not apply for another reduction in measurement frequency for at least 24 months from the date of the last violation. The Executive Director may establish a more frequent measurement schedule if necessary to protect human health or the environment.

6.  Prior to construction of the Interim I, Interim II, and Final phase treatment facilities, the permittee shall submit to the TCEQ Wastewater Permitting Section (MC 148) a summary transmittal letter in accordance with the requirements in 30 TAC § 217.6(d). If requested by the Wastewater Permitting Section, the permittee shall submit plans and specifications and a final engineering design report which comply with 30 TAC Chapter 217, Design Criteria for Domestic Wastewater Systems. The permittee shall clearly show how the treatment system will meet the permitted effluent limitations required on Pages 2, 2a, and 2b of this permit. A copy of the summary transmittal letter shall be available at the plant site for inspection by authorized representatives of the TCEQ.

7. Reporting requirements according to 30 TAC §§ 319.1-319.11 and any additional effluent reporting requirements contained in this permit are suspended from the effective date of the permit until plant startup or discharge from the facility described by this permit, whichever occurs first. The permittee shall provide written notice to the TCEQ Regional Office (MC Region 11) and the Applications Review and Processing Team (MC 148) of the Water Quality Division, in writing at least forty-five days prior to plant startup or anticipated discharge, whichever occurs first, and prior to completion of each additional phase on Notification of Completion Form 20007.


INTERIM I PHASE

CLARIFIER 1

AERATION BASIN 1

SLUDGE HOLDING TANK 1

CHLORINE CONTACT TANK 1

FILTER 1

DESIGNATED PLANT & BUFFER TRACT

FENCED PLANT SITE

ALL PROPERTY DEDICATED TO PLANT SITE, NO EXTERNAL PROPERTY OWNERS.

0    33'    65'    132'


INTERIM II PHASE

0  33'  65'  132'

CLARIFIER 1

AERATION
BASIN 1

SLUDGE
HOLDING
TANK 1

CHLORINE
CONTACT
TANK 1

FILTER 1

CLARIFER 2

SLUDGE
HOLDING TANK 2

AERATION
BASIN 2

CHLORINE
CONTACT
TANK 2

FILTER 2

DESIGNATED
PLANT &
BUFFER
TRACT

FENCED
PLANT
SITE

ALL PROPERTY DEDICATED TO
PLANT SITE, NO EXTERNAL
PROPERTY OWNERS.



FINAL PHASE

CLARIFIER 1

AERATION
BASIN 1

SLUDGE
HOLDING
TANK 1

CHLORINE
CONTACT
TANK 1

FILTER 1

CLARIFIER 2

SLUDGE
HOLDING TANK 2

AERATION
BASIN 2

CHLORINE
CONTACT
TANK 2

FILTER 2

SLUDGE
HOLDING
TANK 3

AERATION
BASIN 3

CLARIFIER 3

FILTER 3

CHLORINE
CONTACT
TANK 3

DESIGNATED
PLANT &
BUFFER
TRACT

FENCED
PLANT
SITE

ALL PROPERTY DEDICATED TO
PLANT SITE, NO EXTERNAL
PROPERTY OWNERS.

# Appendix Item 4

**Commissioners Agenda**
**April 26, 2023**
**Item No. 1 Docket No. 2023-0370-0370-MWD**


**Mary Smith:**

Item No. 1 is the application by SWWC Utilities Incorporated for new TPDES permit number WQ 0016022001. The parties have been notified the Commission will not take oral argument but may ask questions and those who have signed in will be noted for the record.

**Chairman Niermann:**

So, colleagues the first five items on our docket this morning are hearing requests on TPDES permits so the same rules and analysis will pertain to our effectiveness determinations.

Chapter 55 of our rules, as you know, provides a two part analysis, first we consider whether the requestors have met both the procedural and substantive requirements to be entitled to a contested case and assuming that at least one requestor has done so we then consider which issues are appropriate to refer for hearing. So part one is about who gets a hearing and part two is about which issues are referred. Requestors who are affected in a manner different from the general public and who make timely comments articulating personal concerns that are relevant and material to the application and who express those concerns in a timely hearing request are entitled to a hearing. Associations can have standing if among other factors, they identify a member who would have standing in their own right. And on this first item, item one, colleagues, we have four requests, this is on the application by SWWC Utilities. Three of those requests are by individuals and one from an association. All three of the individuals are identified as members of the association. On this one I agree with the recommendation of the Executive Director and the Office of Public Interest Counsel that none of the requests have adequately demonstrated effectiveness. At 800,000 gallons per day, this is a relatively moderate discharge rate and none of the requestors own property within two and a half miles of the discharge point, and I do want

to emphasize that proximity is a factor, you know we know it to be an important factor, but it is not dispositive. Cases with different facts could indicate effectiveness even at distances greater than three miles. For example, the City of Liberty Hill application sought authorization for four million gallons per day of discharge, that's five times what SWWC proposes. That case also featured evidence of actual impacts and a history of significant non-compliance, so with that different set of facts we reached a different result and the point that I'm trying to make is that what we're doing here is we're weighing different factors, that there is no bright line test, including none pertaining to distance. So, with that explanation out of the way, that's how I view this particular item. Commissioner Lindley, what are your thoughts ?

**Commissioner Lindley:**

I'm in agreement, all I would add is I believe for some of those in the Liberty Hill case that you brought up, uh for some of the ones that I don't remember if it was a further distance or why exactly off the top of my head, but we referred them for effectiveness, we didn't even, you know, flat out give them party status, so uh, for the reasons you stated, I'm in agreement on denying those hearing requests.

**Chairman Niermann:**

Commissioner Janecka ?

**Commissioner Janecka:**

Well said, I'm also in agreement and nothing different to add.

**Chairman Niermann:**

I think we are ready for a motion.

**Commissioner Lindley:**

Um, did you cover the association as well or just individuals ?

**Chairman Niermann:**

Yeah the association bases its effectiveness demonstration on the individuals and without those individuals…

**Commissioner Lindley:**

Yeah, and I should have clarified, I'm in, I'll make a motion, it's going to be deny all the hearing requests, so that will cover all of them. So, with that, I would move that we deny all hearing requests, issue new Texas Pollutant Discharge Elimination System permit number WQ0016022001 to SWWC Utilities Incorporated as recommended by the Executive Director and adopt the Executive Director's response to comments.

**Commissioner Janecka:**

I second the motion.

**Chairman Niermann:**

The motion has been made and seconded, all those if favor say aye.

**All:**

Aye

**Chairman Niermann:**
Motion carries.

| | | |
|---|---|---|
| **WILBARGER CREEK CONSERVATION ALLIANCE, ET AL.,** *Plaintiffs,* | §<br>§<br>§<br>§<br>§ | **IN THE DISTRICT COURT** |
| **v.** | §<br>§ | **TRAVIS COUNTY, TEXAS** |
| **TEXAS COMMISSION ON ENVIRONMENTAL QUALITY,** *Defendant.* | §<br>§<br>§<br>§<br>§ | **126th JUDICIAL DISTRICT** |

## AFFIDAVIT

BEFORE ME, the undersigned notary public on this day personally appeared Anthony Tatu, known to me to be the person whose name is subscribed below and, who, being by me duly sworn, did depose as follows:

"My name is Anthony Tatu, I am over 18 years of age, of sound mind and capable of making this Affidavit and I am personally acquainted with the facts herein stated.

I hereby certify that the attached document is a true and correct transcription of the portion of Item No. 1 of the Open Meeting on April 26, 2023, which pertains to the matter styled *Cause No. D-l-GN-23-004031; Wilbarger Creek Conservation Alliance; Anne Brockenbrough, Marilyn Kelinske, MD; Jon Beall vs. Texas Commission on Environmental Quality,* before the 126th Judicial District Court of Travis County, Texas. I prepared the transcription from the recording of that Open Meeting which is Item 35 in the certified copy of the Administrative Record.

IN WITNESS WHEREOF, I subscribe my name for the State of Texas, at my office in the city of Austin, on this the 6th day of November, 2024."

_____

Sworn to and subscribed before me this the 6th day of November, 2024.

BRENDA KOURI
NOTARY PUBLIC
ID# 131336446
State of Texas
Comm. Exp. 12-03-2025
NOTARY WITHOUT BOND

_____
Notary Public

# Appendix Item 5



# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

*Protecting Texas by Reducing and Preventing Pollution*

Mr. Jason Baze, P.E.
Murfee Engineering Company, Inc.
1101 South Capital of Texas Highway, Building D
Austin, Texas 87846

Re: SWWC Utilities, Inc. - TPDES Permit No. WQ0016022001, EPA ID No. TX0141569
(CN603264763; RN111305389)

Dear Mr. Baze:

Enclosed for your review and comment is a copy of a draft permit and statement of
basis/technical summary and Executive Director's preliminary decision for the above-
referenced operation. This draft permit is subject to further staff review and
modification; however, we believe it generally includes the terms and conditions that
are appropriate to your discharge. **Please read the entire draft carefully and note the
following:**

1. The draft permit will be issued to expire **five years from the date of issuance**.

2. The draft permit includes all updates based on the 30 TAC § 312 rule change
   effective April 23, 2020.

Also enclosed for your review and comment is a copy of the draft second notice, the
Notice of Application and Preliminary Decision (NAPD), that was prepared for your
application. Please review this notice and provide comments if there are any
inaccuracies or any information that is not consistent with your application. Please do
not publish the notice at this time; after the draft permit is filed with the Office of the
Chief Clerk, you will receive instructions for publishing this notice in a newspaper
from the Office of the Chief Clerk. Please note that these instructions will not be
mailed if the Office of the Chief Clerk has not received the requested proof that the
first notice (Notice of Receipt and Intent to Obtain a Permit) has been published. This
could cause delays in the processing of your application and the final issuance of the
draft permit. When the NAPD notice is received, please publish promptly and submit
proof of publication (affidavit and tearsheet) to the Office of the Chief Clerk. Failure to
publish notice and submit proof of publication in a timely manner may result in
returning of the application and loss of authorization to operate.

It is your responsibility to submit your comments on the draft permit prior to the
deadline that is indicated in the email. Comments can be sent to
krishna.winston@tceq.texas.gov in place of or in addition to a hard copy.

Mr. Jason Baze, P.E.
Page 2

If you have any comments or questions, please contact me at (512) 239-4735 or if by correspondence, include MC 148 in the letterhead address following my name.

Sincerely,

Krishna L. Winston, Permit Coordinator
Municipal Permits Team
Wastewater Permitting Section (MC 148)
Water Quality Division
Texas Commission on Environmental Quality

KLW/SW

Enclosures

cc: Mr. Joe Torralva, SWWC Utilities, Inc., 12535 Reed Road, Sugar Land, Texas 77478

## STATEMENT OF BASIS/TECHNICAL SUMMARY
## AND EXECUTIVE DIRECTOR'S PRELIMINARY DECISION

### DESCRIPTION OF APPLICATION

Applicant:               SWWC Utilities, Inc.;
                         Texas Pollutant Discharge Elimination System (TPDES) Permit No.
                         WQ0016022001, EPA I.D. No. TX0141569

Regulated Activity:      Domestic Wastewater Permit

Type of Application:     New Permit

Request:                 New Permit

Authority:               Federal Clean Water Act (CWA) § 402; Texas Water Code § 26.027; 30
                         Texas Administrative Code (TAC) Chapters 30, 305, 307, 309, 312, and
                         319; Commission policies; and United States Environmental Protection
                         Agency (EPA) guidelines.

### EXECUTIVE DIRECTOR RECOMMENDATION

The Executive Director has made a preliminary decision that this permit, if issued, meets all statutory and regulatory requirements. The draft permit includes an expiration date of **five years from the date of issuance**.

### REASON FOR PROJECT PROPOSED

The applicant has applied to the Texas Commission on Environmental Quality (TCEQ) for a new permit to authorize the discharge of treated domestic wastewater at a daily average flow not to exceed 0.20 million gallons per day (MGD) in the Interim I phase, a daily average flow not to exceed 0.50 MGD in the Interim II phase and a daily average flow not to exceed 0.80 MGD in the Final phase. The proposed wastewater treatment facility will serve Majestic Manor development.

### PROJECT DESCRIPTION AND LOCATION

The Majestic Manor Wastewater Treatment Facility is an activated sludge process plant operated in the complete mix mode. Treatment units in the Interim I phase includes a bar screen, one aeration basin, one final clarifier, one sludge digester/sludge holding tank, effluent filter and one chlorine contact chamber. Treatment units in the Interim II and Final phases include one aeration basin, one final clarifier, one sludge digester/sludge holding tank, effluent filter, one chlorine contact chamber and dechlorination chamber. The facility has not been constructed.

Sludge generated from the treatment facility will be hauled by a registered transporter to Walnut Creek Wastewater Treatment Facility, Permit No. WQ0010543011, to be digested, dewatered, and then disposed of with the bulk of the sludge from the plant accepting the sludge. The draft permit also authorizes the disposal of sludge at a TCEQ-authorized land application site, co-disposal landfill, wastewater treatment facility, or facility that further processes sludge.

The plant site will be located approximately 0.42 miles southwest of the intersection of Bella Parkway and Old Texas Highway 20, in Travis County, Texas 78653.

Outfall Location:

| Outfall Number | Latitude | Longitude |
|---|---|---|
| 001 | 30.333492 N | 97.538169 W |

The treated effluent will be discharged via pipe to Wilbarger Creek, thence to Colorado River Above La Grange in Segment No. 1434 of the Colorado River Basin. The unclassified receiving water use is high aquatic life use for Wilbarger Creek. The designated uses for Segment No. 1434 are primary contact recreation, public water supply, and exceptional aquatic life use. The effluent limitations in the draft permit will maintain and protect the existing instream uses. In accordance with 30 Texas Administrative Code §307.5 and the TCEQ implementation procedures (June 2010) for the Texas Surface Water Quality Standards, an antidegradation review of the receiving waters was performed. A Tier 1 antidegradation review has preliminarily determined that existing water quality uses will not be impaired by this permit action. Numerical and narrative criteria to protect existing uses will be maintained. A Tier 2 review has preliminarily determined that no significant degradation of water quality is expected in Wilbarger Creek and Colorado River Above La Grange, which have been identified as having high and exceptional aquatic life uses, respectively. Existing uses will be maintained and protected. The preliminary determination can be reexamined and may be modified if new information is received.

Effluent limitations for the conventional effluent parameters (i.e., Five-Day Biochemical Oxygen Demand or Five-Day Carbonaceous Biochemical Oxygen Demand, Ammonia Nitrogen, etc.) are based on stream standards and waste load allocations for water-quality limited streams as established in the Texas Surface Water Quality Standards (TSWQS) and the State of Texas Water Quality Management Plan (WQMP).

In a case such as this, end-of-pipe compliance with pH limits between 6.0 and 9.0 standard units reasonably assures instream compliance with the TSWQS for pH when the discharge authorized is from a minor facility. This technology-based approach reasonably assures instream compliance with TSWQS criteria due to the relatively smaller discharge volumes authorized by these permits. This conservative assumption is based on TCEQ sampling conducted throughout the state which indicates that instream buffering quickly restores pH levels to ambient conditions. Similarly, this approach has been historically applied within EPA issued NPDES general permits where technology-based pH limits were established to be protective of water quality criteria.

The effluent limits recommended above have been reviewed for consistency with the WQMP. The proposed limits are not contained in the approved WQMP. However, these limits will be included in the next WQMP update.

No priority watershed of critical concern has been identified in Segment No. 1434. However, the Barton Springs salamander (*Eurycea sosorum*), an endangered species, is known to occur only in Barton and adjacent springs and their outflows in Zilker Park, near downtown Austin, Travis County. This determination is based on the United States Fish and Wildlife Service's (USFWS) biological opinion on the State of Texas authorization of the TPDES (September 14, 1998, October 21, 1998 update). To make this determination for TPDES permits, TCEQ and EPA only consider aquatic or aquatic dependent species occurring in watersheds of critical concern or high priority as listed in Appendix A of the USFWS biological opinion. The determination is subject to reevaluation due to subsequent updates or amendments to the biological opinion. Species distribution information for the Barton Springs salamander is provided by the USFWS and documents the salamander's presence in Barton and adjacent springs and their outflows in Zilker Park, near downtown Austin, Travis County which is a different watershed than the facility associated with this permit action. Based upon this information, it

is determined that the facility's discharge is not expected to impact the Barton Springs salamander. The permit does not require EPA review with respect to the presence of endangered or threatened species.

The Houston toad (*Bufo houstonensis* Sanders), an endangered aquatic-dependent species of critical concern, occurs within the Segment 1434's watershed as well as the 12090301 United States Geological Survey hydrologic unit code. This determination is based on the USFWS biological opinion on the State of Texas authorization of the TPDES (September 14, 1998, October 21, 1998 update). To make this determination for TPDES permits, TCEQ and EPA only consider aquatic or aquatic dependent species occurring in watersheds of critical concern or high priority as listed in Appendix A of the USFWS biological opinion. The determination is subject to reevaluation due to subsequent updates or amendments to the biological opinion. Species distribution information for the Segment 1434 watershed is provided by the USFWS and documents the toad's presence solely in the vicinity of Alum Creek, Copperas Creek, Gills Branch, Piney Creek, Price Creek, and Puss Hollow in Bastrop County, which is farther up the watershed from the facility associated with this permit action. Based upon this information, it is determined that the facility's discharge is not expected to impact the Houston toad. The permit does not require EPA review with respect to the presence of endangered or threatened species.

Segment No. 1434 is not currently listed on the state's inventory of impaired and threatened waters (the 2020 CWA § 303(d) list).

## SUMMARY OF EFFLUENT DATA

Self-reporting data is not available since the facility has not been constructed.

## DRAFT PERMIT CONDITIONS

The draft permit authorizes a discharge of treated domestic wastewater at an Interim I volume not to exceed a daily average flow of 0.20 MGD, an Interim II volume not to exceed a daily average flow of 0.50 MGD, and a Final volume not to exceed a daily average flow of 0.80 MGD.

The effluent limitations in the Interim I phase of the draft permit, based on a 30-day average, are 5 mg/l five-day carbonaceous biochemical oxygen demand ($CBOD_5$), 5 mg/l total suspended solids (TSS), 2 mg/l ammonia-nitrogen ($NH_3$-N), 1 mg/l Total Phosphorus (TP), 126 colony forming units (CFU) or most probable number (MPN) of *E. coli* per 100 ml, and 4.0 mg/l minimum dissolved oxygen (DO). The effluent shall contain a total chlorine residual of at least 1.0 mg/l and shall not exceed a total chlorine residual of 4.0 mg/l after a detention time of at least 20 minutes based on peak flow.

The effluent limitations in the Interim II and Final phases of the draft permit, based on a 30-day average, are 5 mg/l $CBOD_5$, 5 mg/l TSS, 2 mg/l $NH_3$-N, 1 mg/l TP, 126 CFU or MPN of *E. coli* per 100 ml and 4.0 mg/l minimum DO. The effluent shall contain a total chlorine residual of at least 1.0 mg/l after a detention time of at least 20 minutes (based on peak flow). The permittee shall dechlorinate the chlorinated effluent to less than 0.1 mg/l total chlorine residual.

The draft permit includes a requirement for the permittee to obtain legal restrictions prohibiting residential structures within the part of the buffer zone not owned by the permittee according to 30 TAC § 309.13(e)(3).

The draft permit includes Sludge Provisions according to the requirements of 30 TAC Chapter 312, Sludge Use, Disposal, and Transportation. Sludge generated from the treatment facility will be hauled by a registered transporter to Walnut Creek Wastewater Treatment Facility, Permit No. WQ0010543011, to be digested, dewatered, and then disposed of with the bulk of the sludge from the

plant accepting the sludge. The draft permit also authorizes the disposal of sludge at a TCEQ-authorized land application site, co-disposal landfill, wastewater treatment facility, or facility that further processes sludge.

## SUMMARY OF CHANGES FROM APPLICATION

None.

## BASIS FOR DRAFT PERMIT

The following items were considered in developing the draft permit:

1. Application received on July 28, 2021, and additional information received on October 11, 2021 and April 14, 2022.

2. The effluent limitations and conditions in the draft permit comply with EPA-approved portions of the 2018 Texas Surface Water Quality Standards (TSWQS), 30 TAC §§ 307.1 - 307.10, effective March 1, 2018; 2014 TSWQS, effective March 6, 2014; 2010 TSWQS, effective July 22, 2010; and 2000 TSWQS, effective July 26, 2000. The effluent limitations and conditions in the draft permit comply with the requirements in 30 TAC Chapter 311: Watershed Protection; Subchapter E: Colorado River Watershed.

3. The effluent limitations in the draft permit meet the requirements for secondary treatment and the requirements for disinfection according to 30 TAC Chapter 309, Subchapter A: Effluent Limitations.

4. Interoffice Memoranda from the Water Quality Assessment Section of the TCEQ Water Quality Division.

5. Consistency with the Coastal Management Plan: The facility is not located in the Coastal Management Program boundary.

6. *Procedures to Implement the Texas Surface Water Quality Standards* (IP), Texas Commission on Environmental Quality, June 2010, as approved by EPA, and the IP, January 2003, for portions of the 2010 IP not approved by EPA.

7. Texas 2020 Clean Water Act Section 303(d) List, Texas Commission on Environmental Quality, March 25, 2020; approved by the U.S. Environmental Protection Agency on May 12, 2020.

8. Texas Natural Resource Conservation Commission, Guidance Document for Establishing Monitoring Frequencies for Domestic and Industrial Wastewater Discharge Permits, Document No. 98-001.000-OWR-WQ, May 1998.

## PROCEDURES FOR FINAL DECISION

When an application is declared administratively complete, the Chief Clerk sends a letter to the applicant advising the applicant to publish the Notice of Receipt of Application and Intent to Obtain Permit in the newspaper. In addition, the Chief Clerk instructs the applicant to place a copy of the application in a public place for review and copying in the county where the facility is or will be located. This application will be in a public place throughout the comment period. The Chief Clerk also mails this notice to any interested persons and, if required, to landowners identified in the permit application. This notice informs the public about the application and provides that an interested person may file comments on the application or request a contested case hearing or a public meeting.

Once a draft permit is completed, it is sent, along with the Executive Director's preliminary decision, as contained in the technical summary or fact sheet, to the Chief Clerk. At that time, the Notice of Application and Preliminary Decision will be mailed to the same people and published in the same newspaper as the prior notice. This notice sets a deadline for making public comments. The applicant must place a copy of the Executive Director's preliminary decision and draft permit in the public place with the application.

Any interested person may request a public meeting on the application until the deadline for filing public comments. A public meeting is intended for the taking of public comment and is not a contested case proceeding.

After the public comment deadline, the Executive Director prepares a response to all significant public comments on the application or the draft permit raised during the public comment period. The Chief Clerk then mails the Executive Director's response to comments and final decision to people who have filed comments, requested a contested case hearing, or requested to be on the mailing list. This notice provides that if a person is not satisfied with the Executive Director's response and decision, they can request a contested case hearing or file a request to reconsider the Executive Director's decision within 30 days after the notice is mailed.

The Executive Director will issue the permit unless a written hearing request or request for reconsideration is filed within 30 days after the Executive Director's response to comments and final decision is mailed. If a hearing request or request for reconsideration is filed, the Executive Director will not issue the permit and will forward the application and request to the TCEQ Commissioners for their consideration at a scheduled Commission meeting. If a contested case hearing is held, it will be a legal proceeding similar to a civil trial in state district court.

If the Executive Director calls a public meeting or the Commission grants a contested case hearing as described above, the Commission will give notice of the date, time, and place of the meeting or hearing. If a hearing request or request for reconsideration is made, the Commission will consider all public comments in making its decision and shall either adopt the Executive Director's response to public comments or prepare its own response.

For additional information about this application, contact Krishna L. Winston at (512) 239-4735.


_____                        _____May 9, 2022_____
Krishna L. Winston                                                                    Date
Municipal Permits Team
Wastewater Permitting Section (MC 148)

# Appendix Item 6

| APPLICATION BY SWWC UTILITIES, | § | BEFORE THE |
|---|---|---|
| INC. FOR | § | TEXAS COMMISSION ON |
| TPDES PERMIT NO. WQ0016022001 | § | ENVIRONMENTAL QUALITY |

## EXECUTIVE DIRECTOR'S RESPONSE TO PUBLIC COMMENT

The Executive Director (ED) of the Texas Commission on Environmental Quality (the commission or TCEQ) files this Response to Public Comment (RTC) on the application by SWWC Utilities, Inc., for a new Texas Pollutant Discharge Elimination System (TPDES) Permit No. WQ0016022001 and the ED's preliminary decision. As required by Title 30 Texas Administrative Code (30 TAC) Section (§) 55.156, before a permit is issued, the ED prepares a response to all timely, relevant and material, or significant comments. The Office of Chief Clerk received timely comment from Jonathan Beall, representing Wilbarger Creek Conservation Alliance (WCCA), Marilyn Kelinske, and Anne Brockenbrough. This response addresses all timely public comments received, whether or not withdrawn.

If you need more information about this permit application or the wastewater permitting process, please call the TCEQ Public Education Program at 1-800-687-4040. General information about the TCEQ can be found at our website at www.tceq.texas.gov.

## I. BACKGROUND

### A. Description of Facility

SWWC Utilities, Inc., submitted an application to the Texas Commission on Environmental Quality (TCEQ) for a new Texas Pollutant Discharge Elimination System (TPDES) Permit No. WQ0016022001 to authorize the discharge of treated domestic wastewater at a daily average flow not to exceed 200,000 gallons per day (gpd) in the Interim I phase, a daily average flow not to exceed 500,000 gpd in the Interim II phase, and a daily average flow not to exceed 800,000 gpd in the Final phase.

The Majestic Manor Wastewater Treatment Plant (WWTP) will be an activated sludge process plant operated in the complete mix mode. Treatment units in all phases will include a bar screen, one aeration basin, one final clarifier, one sludge digester/sludge holding tank, an effluent filter, and one chlorine contact chamber. Treatment units in the Interim II and Final phases will increase in size and capacity. The facility has not been constructed.

Sludge generated from the treatment facility will be hauled by a registered transporter to Walnut Creek Wastewater Treatment Facility, Permit No. WQ0010543011, to be digested, dewatered, and then disposed of with the bulk of the sludge from the plant accepting the sludge. The draft permit also authorizes the disposal of sludge at a TCEQ-authorized land application site, co-disposal landfill, wastewater treatment facility, or facility that further processes sludge.

The plant site will be located approximately 0.42 miles southwest of the intersection of Bella Parkway and Old Texas Highway 20, in Travis County, Texas 78653.

Outfall Location

| Outfall Number | Latitude | Longitude |
|---|---|---|
| 001 | 30.333492 N | 97.538169 W |

The treated effluent will be discharged via pipe to Wilbarger Creek, thence to Colorado River Above La Grange in Segment No. 1434 of the Colorado River Basin. The unclassified receiving water use is high aquatic life use for Wilbarger Creek. The designated uses for Segment No. 1434 are primary contact recreation, public water supply, and exceptional aquatic life use. The effluent limitations in the draft permit will maintain and protect the existing instream uses. All determinations are preliminary and subject to additional review and/or revisions.

The draft permit includes the following proposed effluent limitations and monitoring requirements. All flows, except the two-hour peak flow are expressed in million gallons per day (MGD). The two-hour (2-hr) peak flow is expressed in gallons per minute (gpm). All pH values are expressed in standard units (SU). Concentration values are expressed in milligrams per liter (mg/L). Mass-based values are expressed as pounds per day (lbs/day). Bacteria values are expressed in colony-forming units (cfu) or most probable number (MPN) per 100 milliliters (cfu or MPN/100 mL).

Interim I Phase: during the period beginning upon the date of issuance and lasting through the completion of expansion to the 0.50 MGD facility.

| Outfall | Pollutant | Draft Permit Effluent Limitations | | | | |
|---------|-----------|------------------|--------|-----------|-----------|-------------|
| | | Daily Avg | | 7-day Avg | Daily Max | Single Grab |
| | | lbs/day | mg/L | mg/L | mg/L | mg/L |
| 001 | Flow | 0.20 MGD | | 556 gpm (2-hr peak) | Report MGD | - |
| | Carbonaceous Biochemical Oxygen Demand, 5-day (CBOD$_5$) | 8.3 | 5 | 10 | 20 | 30 |
| | Total Suspended Solids (TSS) | 8.3 | 5 | 10 | 20 | 30 |
| | Ammonia Nitrogen (NH$_3$-N) | 3.3 | 2 | 5 | 10 | 15 |
| | Total Phosphorus (TP) | 1.7 | 1 | 2 | 4 | 6 |
| | E. coli, CFU or MPN per 100 mL | 126 | | - | - | 399 |
| | Dissolved Oxygen (DO), min | 4.0 mg/L | | - | - | - |
| | Chlorine, Total Residual | 1.0 mg/L, min | | | 4.0 mg/L, max | |
| | pH, standard units (SU) | 6.0, min | | - | 9.0 | - |

Interim II Phase: during the period beginning upon the completion of expansion to the 0.50 MGD facility and lasting through the completion of expansion to the 0.80 MGD facility.

| Outfall | Pollutant | Draft Permit Effluent Limitations | | | | |
|---|---|---|---|---|---|---|
| | | Daily Avg | | 7-day Avg | Daily Max | Single Grab |
| | | lbs/day | mg/L | mg/L | mg/L | mg/L |
| 001 | Flow | 0.50 MGD | | 1,389 gpm (2-hr peak) | Report MGD | - |
| | Carbonaceous Biochemical Oxygen Demand, 5-day (CBOD$_5$) | 21 | 5 | 10 | 20 | 30 |
| | Total Suspended Solids (TSS) | 21 | 5 | 10 | 20 | 30 |
| | Ammonia Nitrogen (NH$_3$-N) | 8.3 | 2 | 5 | 10 | 15 |
| | Total Phosphorus (TP) | 4.2 | 1 | 2 | 4 | 6 |
| | E. coli, CFU or MPN per 100 mL | 126 | | - | 399 | - |
| | Dissolved Oxygen (DO), min | 4.0 mg/L | | - | - | - |
| | Chlorine, Total Residual[1] | 1.0 mg/L, min | | | 4.0 mg/L, max | |
| | pH, standard units (SU) | 6.0, min | | - | 9.0 | - |

Final Phase: During the period beginning upon the completion of expansion to the 0.80 MGD facility and lasting through the date of expiration.

| Outfall | Pollutant | Draft Permit Effluent Limitations | | | | |
|---|---|---|---|---|---|---|
| | | Daily Avg | | 7-day Avg | Daily Max | Single Grab |
| | | lbs/day | mg/L | mg/L | mg/L | mg/L |
| 001 | Flow | 0.80 MGD | | 2,222 gpm (2-hr peak) | Report MGD | - |
| | Carbonaceous Biochemical Oxygen Demand, 5-day (CBOD$_5$) | 33 | 5 | 10 | 20 | 30 |
| | Total Suspended Solids (TSS) | 33 | 5 | 10 | 20 | 30 |
| | Ammonia Nitrogen (NH$_3$-N) | 13 | 2 | 5 | 10 | 15 |
| | Total Phosphorus (TP) | 6.7 | 1 | 2 | 4 | 6 |
| | E. coli, CFU or MPN per 100 mL | 126 | | - | 399 | - |
| | Dissolved Oxygen (DO), min | 4.0 mg/L | | - | - | - |
| | Chlorine, Total Residual[1] | 1.0 mg/L, min | | | 4.0 mg/L, max | |
| | pH, standard units (SU) | 6.0, min | | - | 9.0 | - |

¹ The permittee shall dechlorinate the chlorinated effluent to less than 0.1 mg/l total chlorine residual and shall monitor total chlorine residual daily by grab sample after the dechlorination process.

## B. Procedural Background

The permit application was received on July 28, 2021 and declared administratively complete on November 17, 2021. The Notice of Receipt and Intent to Obtain a Water Quality Permit (NORI) was published in English on December 16, 2021, in the Austin American Statesman newspaper. The Notice of Application and Preliminary Decision (NAPD) was published in English on June 30, 2022, in the Austin American Statesman newspaper. The public comment period ended on August 1, 2022.

This application was filed on or after February 12, 2019; therefore, this application is subject to the procedural requirements adopted pursuant to House Bill (HB) 801, 76th Legislature (1999), and Senate Bill (SB) 709, 84th Legislature (2015), both implemented by the Commission in its rules in 30 TAC Chapter 39, 50, and 55. The Texas Legislature enacted Senate Bill 709, effective September 1, 2015, amending the requirements for comments and contested case hearings. This application is subject to those changes in the law.

## C. Access to Rules, Laws and Records

Please consult the following websites to access the rules and regulations applicable to this permit:

- the Secretary of State website: https://www.sos.state.tx.us;

- TCEQ rules in Title 30 of the Texas Administrative Code (TAC): www.sos.state.tx.us/tac/ (select "View the current Texas Administrative Code" on the right, then "Title 30 Environmental Quality");

- Texas statutes: www.statutes.capitol.texas.gov/;

- the TCEQ website: www.tceq.texas.gov (for downloadable rules in Adobe PDF format, select "Rules" then "Current Rules and Regulations," then "Download TCEQ Rules");

- Federal rules in Title 40 of the Code of Federal Regulations: www.ecfr.gov; and

- Federal environmental laws: http://www2.epa.gov/laws-regulations. Federal environmental laws and executive orders: www2.epa.gov/laws-regulations/laws-and-executive-orders.

Commission records for this application and draft permit are available for viewing and copying at the TCEQ's main office in Austin, 12100 Park 35 Circle, Building F, 1st Floor (Office of the Chief Clerk), until final action is taken.

The permit application for this facility, Statement of Basis/Technical Summary and Executive Director's Preliminary Decision (Statement of Basis), and proposed draft permit are available for viewing and copying at Manor City Hall, 105 East Eggleston Street, Manor, Texas.

### D. Acronyms

$CBOD_5$- 5-day Carbonaceous Biochemical Oxygen Demand

**DO**- Dissolved Oxygen

**ED**- Executive Director

**EPA**- Environmental Protection Agency

**GPM**- Gallons per Minute

**HB**- House Bill

**IPs**- Procedures to Implement the Texas Surface Water Quality Standards

**MGD**- Million Gallons per Day

**mg/L**- Milligrams per Liter

**NAPD**- Notice of Application and Preliminary Decision

**NH$_3$-N**- Ammonia-Nitrogen

**NORI**- Notice of Receipt of Application and Intent to Obtain a Water Quality Permit

**NPDES**- National Pollutant Discharge Elimination System

**pH**- Potential Hydrogen

**RTC**- Response to Comments

**SU**- Standard Units

**SWQM**- Surface Water Quality Monitoring

**TAC**- Texas Administrative Code

**TCEQ**- Texas Commission on Environmental Quality

**TLAP-** Texas Land Application Permit

**TP-** Total Phosphorus

**TSS-** Total Suspended Solids

**TMDL**- Total Maximum Daily Load

**TNR**- Transportation and Natural Resources

**TPDES**- Texas Pollutant Discharge Elimination System

**TPWD**- Texas Parks and Wildlife Department

**TSWQS**- Texas Surface Water Quality Standards

**TWC**- Texas Water Code

**WWTF**- Wastewater Treatment Facility

**WWTP**- Wastewater Treatment Plant

## II. COMMENTS AND RESPONSES

**COMMENT 1:**

Ms. Kelinske commented that Wilbarger Creek and its tributaries run across her property and in recent years the creek has become cloudy many times and clogged with algae. Fish and frogs that earlier were abundant are no longer found. Ms. Brockenbrough is concerned that adding more wastewater to the creek will impair the water quality even more. Mr. Beall asked how the discharge will affect the health of Wilbarger Creek and asked that TCEQ determine the cause of the existing algae bloom before adding more treated effluent.

**RESPONSE 1:**

The draft permit was developed to protect aquatic life and human health in accordance with the TSWQS 30 TAC Chapter 307 and was established to be protective of human health and the environment, provided that the applicant operates and maintains the facility according to TCEQ rules and the requirements in the draft permit. As part of

the permit application process, TCEQ must determine the uses of the receiving water and set effluent limits that are protective of those uses. The effluent limits in the draft permit are set to maintain and protect the existing instream uses. Wilbarger Creek has been assigned a High Aquatic Life Use and corresponding 5.0 mg/L DO criterion in the TSWQS. These criteria are designed to ensure that aquatic life will be protected.

The proposed discharge for the Majestic Manor WWTF is to the perennial portion of Wilbarger Creek, which has high aquatic life use designation. To address potential algal blooms, a nutrient screening was conducted for this permit application, and it was determined that nutrient limits were needed. A TP limit of 1.0 mg/L was recommended for all discharge flow phases and incorporated into the draft permit. This TP limit meets the requirement for the Colorado River Watershed Protection Rule, 30 TAC Chapter 311, Subchapter E and should prevent any further or potential degradation from the proposed discharge. In addition, the draft permit includes a 2.0 mg/L ammonia-nitrogen limit for all discharge flow phases.

In accordance with 30 TAC §307.5 and the TCEQ IPs (June 2010), an antidegradation review of the receiving waters was performed. A Tier 1 antidegradation review has preliminarily determined that existing water quality uses will not be impaired by this permit action. Numerical and narrative criteria to protect existing uses will be maintained. A Tier 2 review has preliminarily determined that no significant degradation of water quality is expected in Wilbarger Creek and Colorado River Above La Grange, which have been identified as having high and exceptional aquatic life uses, respectively. Existing uses will be maintained and protected. The preliminary determination can be reexamined and may be modified if new information is received.

TCEQ staff performed a DO modeling analysis of the proposed discharge using an uncalibrated QUAL-TX model. Based on model results, the effluent limits included in the draft permit for $CBOD_5$, $NH_3$-N, and minimum DO for the three proposed flow phases are predicted to be adequate to ensure that instream DO levels will be maintained consistent with these established criteria. As mentioned above, the effluent limits in the draft permit also comply with the requirements of 30 TAC Chapter 311, Subchapter E that requires effluent limits of 5 mg/L TSS, which helps protect water clarity, and 1.0 mg/L TP to protect against excessive algal growth.

## COMMENT 2:

Ms. Brockenbrough is concerned that adding more wastewater into the creek will cause increased flooding and erosion on her property. Ms. Brockenbrough states that over the past 25 years the creek has changed from being a seasonal intermittent stream to a continuously flowing stream, often with a high flow, due to added effluent from Manor and Shadow Glen wastewater treatment plants both located upstream of her property. The increased flooding has caused fences to blow out and livestock to escape. Ms. Kelinske is concerned about the increased flooding caused by Wilbarger Creek that occurs with modest rains. She also is concerned about its effect on vegetation and animals.

## RESPONSE 2:

TPDES permits establish terms and conditions that are intended to provide water quality pollution control. Therefore, the ED's review of an application for a TPDES permit focuses on controlling the discharge of pollutants into water in the state. TCEQ does not have the authority to regulate flooding in the wastewater permitting process unless there is an associated water quality concern. The draft permit includes effluent limits and other requirements that it must meet even during rainfall events and periods of flooding.

Finally, the draft permit does not authorize any invasion of personal rights nor any violation of federal, state, or local laws or regulations. As stated in subsection C of

the Background Information (Access to Rules, Laws, and Records), the proposed permit does not limit any landowner's ability to seek private action against the applicant.

For flooding concerns, please contact the local floodplain administrator for Travis County (Call Travis County TNR 512-854-9383; Email TNR.Web@TravisCountyTx.gov.

**COMMENT 3:**

Ms. Kelinske expressed concern about negative impact on wildlife living on a conservation easement on her property. She stated that with the population growth around, her property has become a haven for wildlife. Ms. Kelinske further expressed concern about using the creek water for horses and livestock due to the contamination of the water.

**RESPONSE 3:**

The TSWQS in 30 TAC Chapter 307 require that discharges may not degrade the receiving waters and may not result in situations that impair existing, attainable, or designated uses, and that surface waters not be toxic to aquatic life, terrestrial wildlife, livestock, or domestic animals.

As stated in Response 1, the draft permit was developed in accordance with the TSWQS to be protective of water quality, provided that the applicant operates and maintains the proposed WWTF according to TCEQ rules and the draft permit's requirements. The methodology outlined in the IPs (June 2010) is designed to ensure compliance with the TSWQS.

Specifically, the methodology is designed to ensure that no source will be allowed to discharge any wastewater that 1) results in instream aquatic toxicity, 2) causes a violation of an applicable narrative or numerical state water quality standard, 3) results in the endangerment of a drinking water supply, or 4) results in aquatic bioaccumulation that threatens human health. The ED has made a preliminary determination that the draft permit, if issued, meets all statutory and regulatory requirements.

Finally, TPWD is the state agency that oversees and protects wildlife and their habitat. TPWD can be contacted by phone at 1-800-792-1112 or by mail at 4200 Smith School Road, Austin, Texas 78744.

**COMMENT 4:**

Ms. Kelinske opposes any new discharge directly into Wilbarger Creek because the creek already receives discharges from other sources such as Pflugerville and Manor subdivisions. Mr. Beall expressed concern about the capacity of Wilbarger Creek as the creek already receives treated effluent from Shadow Glen and the City of Manor. He stated that Pflugerville's new regional WWTP, which is not online yet, is permitted to discharge 24 MGD. He expressed concern about future negative impacts of Pflugerville's WWTP and stated that TCEQ should err on the side of caution and requested that TCEQ include this effluent discharge in considering the Majestic Manor permit as the stream flow will be predominately treated effluent. Mr. Beall stated that it seems irresponsible to permit additional discharges before the true impacts of Pflugerville's regional plant are clearer. Downstream neighbors, taxpayers, and aquatic environment should not have to suffer so that this wastewater operator can save a little money.

**RESPONSE 4:**

Part of the technical review process is for TCEQ staff to perform a DO modeling analysis to ensure the permit's effluent limits and other requirements will support the DO criterion and, therefore, protect the aquatic life use of the receiving waterbodies (i.e., Wilbarger Creek).

The model for Wilbarger Creek used to assess whether the DO criteria for the stream is met, is a large model that contains multiple TPDES wastewater outfalls (including but not limited to the City of Manor [TPDES permit Nos. WQ0012900001 and WQ001412901] and City of Pflugerville [TPDES permit Nos. WQ0011845005 and WQ0014642001]). When running the model, all contributing dischargers are entered at their full permitted flow. Furthermore, to ensure that DO modeling results and corresponding effluent limit recommendations are conservative and protective under all conditions, Wilbarger Creek was evaluated under what are expected to be the most unfavorable of environmental conditions, specifically hot and dry summertime conditions. This combination of conditions is unlikely to occur for any significant period of time, so it represents a very conservative, worst-case modeling scenario. Even under these conservative model assumptions, instream DO levels were predicted to be maintained above the criterion established for Wilbarger Creek (5.0 mg/L).

The City of Pflugerville currently has two TPDES permits that discharge to Wilbarger Creek (TPDES Permit Nos. WQ0011845005 and WQ0014642001). Permit No. WQ0011845005 (issued July 25, 2022) authorizes a daily average flow of 6.0 MGD for the Interim phase and 15.75 MGD for the final phase. Permit No. WQ0014642001 (issued December 6, 2019) authorizes a daily average flow of 0.15 MGD, 0.475 MGD, and 0.95 MGD for the Interim phases and 3.0 MGD for the final phase.

The Wilbarger Creek Regional WWTF referenced by Mr. Beall (https://www.pflugervilletx.gov/city-government/capital-improvement-program-cip/projects-overview/wilbarger-creek-regional-wastewater-treatment-facility) does not currently hold a TPDES wastewater permit that authorizes the daily average discharge of 24 MGD. If the City does apply for such a permit, the application will undergo a full technical review by TCEQ to determine if the discharge conditions proposed in the application would be sufficient to protect the human health and aquatic life uses of the receiving waterbodies.

**COMMENT 5:**

Ms. Brockenbrough requested that TCEQ test the water in Wilbarger Creek downstream from the proposed Majestic Manor WWTF before approving the permit. She believes a TMDL study is needed. Ms. Kelinske asks if studies have been done to understand the effect on vegetation and animals when increased flooding occurs due to effluent mixed with stormwater overflow over hundreds of acres of land adjacent to the banks of the creek. Ms. Kelinske also asks how long this effect would last. Mr. Beall asks if TCEQ has a good water quality baseline of Wilbarger Creek, and if so, how old is it? Mr. Beall requests a current baseline be taken during the last year. Samples should be taken above and below the discharge points on the 5 existing and proposed WWTP on Wilbarger Creek: Pflugerville, Shadow Glen, Manor, Majestic Manor, and Elgin.

**RESPONSE 5:**

TMDL projects are conducted on water bodies that have been found to be impaired for some specific constituent(s) or other water quality-related parameter(s). Such impairments are documented in the Texas 303(d) list (Category 5) portion of the Texas Integrated Report of Surface Water Quality, which is updated every two years. Wilbarger Creek is not listed as impaired on the 303(d) list and no TMDL projects have been developed for the Wilbarger Creek watershed, nor are any currently underway or planned.

The SWQM program of the TCEQ conducts an updated assessment of water quality in water bodies throughout the state (including Wilbarger Creek) every two years, comparing observed water quality from sampling data against various applicable water quality criteria. TCEQ has water quality information that is collected at an active SWQM Station approximately 2.25 miles downstream of the Majestic Manor WWTF. In addition,

there are other active SWQM stations further upstream and downstream on Wilbarger Creek, in which current water quality data is being collected.

**COMMENT 6:**

Ms. Kelinske, Ms. Brockenbrough, and Mr. Beall request that higher treatment standards be required for facilities discharging into Wilbarger Creek. Mr. Beall asks that TCEQ consider using the highest possible treatment standards to include the most protective and available techniques:

- A limit of total nutrients of 0.1 mg/l phosphorus and 4 mg/l nitrogen.
- Discharge the treated effluent to wet ponds, wetlands, and sheet flow over a vegetated buffer to significantly improve stream inputs and to mitigate negative effects from chlorination of the discharge.
- Use land application permits – or no discharge permits.
- Beneficial reuse – irrigation, wetlands, or other beneficial reuse to preserve potable water resources.

**RESPONSE 6:**

TCEQ does not have the authority to mandate the method of disposal of treated effluent if an applicant adheres to the rules and provisions of TWC Chapter 26 and 30 TAC Chapters 217, 305, 307, and 309.

A TLAP authorizes the disposal of treated effluent by means of surface irrigation, subsurface irrigation, or evaporation. The effluent must be treated to the pollutant concentrations prescribed in 30 TAC § 309.4. If SWWC Utilities Inc. changes the proposed method of disposal this would require further review by the TCEQ and additional public notice.

Treated effluent may also be used for beneficial use pursuant to 30 TAC Chapter 210, relating to "Use of Reclaimed Water," however this authorization requires that either a TPDES or TLAP permit be obtained first.

The current draft permit contains an $NH_3$-N of 2.0 mg/L for all proposed flow phases, which is the minimum required by the Colorado River Watershed Protection Rule (30 TAC Chapter 311, Subchapter E).

**COMMENT 7:**

Mr. Beall expressed concern about malfunctions of treatment plants due to power outages, floods, mechanical failures, etc. resulting in exceedances of permit limits, even in a well-run plant. Mr. Beall stated that it would have a severe impact on Wilbarger Creek because it is so small. Using land application, beneficial reuse etc. will provide a buffer if a plant has problems.

**RESPONSE 7:**

The draft permit prohibits unauthorized discharge of wastewater or any other waste and includes appropriate requirements. For example, a permittee must maintain adequate safeguards to prevent the discharge of untreated or inadequately treated wastes during electrical power failures by means of alternate power sources, standby generators, or retention of inadequately treated wastewater. In addition, the plans and specifications for domestic sewage collection and treatment works associated with any domestic wastewater permit must be approved by TCEQ. All these permit provisions are designed to help prevent unauthorized discharges of raw sewage. Except as allowed by 30 TAC § 305.132, the SWWC Utilities Inc. will be required to report any unauthorized discharge to TCEQ within 24 hours and the SWWC Utilities Inc. will be subject to potential enforcement action for failure to comply with TCEQ rules or the permit.

If you would like to file a complaint about the facility concerning its compliance with provisions of its permit or with TCEQ rules, you may call the TCEQ Environmental Complaints Hot Line at 1-888-777-3186 or the TCEQ Region 11 Office at 512-339-2929. Citizen complaints may also be filed on-line at https://www.tceq.texas.gov/assets/public/compliance/monops/complaints/complaints.html.

**COMMENT 8:**

Mr. Beall stated that the actual discharge point is not clear from the notice and that it seems like an unreasonable burden to require people to obtain and read the application to find the discharge point.

**RESPONSE 8:**

The ED acknowledges the comment.

## III. CHANGES MADE TO THE DRAFT PERMIT IN RESPONSE TO COMMENTS

No changes were made to the draft permit in response to comments.

Respectfully submitted,

Texas Commission on Environmental Quality

Toby Baker
Executive Director

Charmaine Backens, Deputy Director
Environmental Law Division

Anthony Tatu, Staff Attorney
Environmental Law Division
State Bar No. 00792869
P.O. Box 13087, MC 173
Austin, Texas 78711-3087
Phone: (512) 239-5778
Fax: (512) 239-0606

REPRESENTING THE EXECUTIVE DIRECTOR
OF THE TEXAS COMMISSION ON
ENVIRONMENTAL QUALITY

## CERTIFICATE OF SERVICE

I certify that on October 19, 2022, the "Executive Director's Response to Public Comment" for Permit No. WQ0016022001 was filed with the Texas Commission on Environmental Quality's Office of the Chief Clerk.

Anthony Tatu, Staff Attorney
Environmental Law Division
State Bar No. 00792869

# Appendix Item 7

Jon Niermann, *Chairman*
Emily Lindley, *Commissioner*
Bobby Janecka, *Commissioner*
Erin E. Chancellor, *Interim Executive Director*



# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

*Protecting Texas by Reducing and Preventing Pollution*

April 3, 2023

Ms. Laurie Gharis, Chief Clerk
Office of the Chief Clerk
Texas Commission on Environmental Quality
P.O. Box 13087, MC- 105
Austin, Texas 78711-3087

**RE: Application by SWWC Utilities Inc for Permit No. WQ0016022001;
TCEQ Docket No. 2023-0370-MWD**

Dear Ms. Gharis:

Enclosed for filing with the Texas Commission on Environmental Quality (Commission) is the Executive Director's Response to Hearing Requests.

Please do not hesitate to contact me at Anthony.Tatu@tceq.texas.gov or (512) 239-5778 if you have any questions. Thank you for your attention to this matter.

Respectfully submitted,

Anthony Tatu, Staff Attorney
Environmental Law Division

Enclosure

Cc: Mailing List

AR Item 38, Page 001

**TCEQ DOCKET NO. 2023-0370-MWD**

| APPLICATION BY | § | BEFORE THE TEXAS |
|---|---|---|
| SWWC UTILITIES INC. | § | COMMISSION |
| FOR PERMIT NO. | § | ON |
| WQ0016022001 | § | ENVIRONMENTAL QUALITY |

## EXECUTIVE DIRECTOR'S RESPONSE TO HEARING REQUESTS

### I.  Introduction

The Executive Director of the Texas Commission on Environmental Quality (TCEQ or Commission) files this Response to Hearing Requests (Response) on the application of SWWC Utilities for new TPDES Permit No. WQ0016022001. The Office of the Chief Clerk (OCC) received 18 hearing requests filed by 3 individuals and one organization. Anne Brockenbrough, Marilyn Kelinske, and Jonathan Beall all filed individual hearing requests. In addition, they filed a hearing request on behalf of the Wilbarger Creek Conservation Alliance (WCCA).

Attached for Commission consideration is a Geographic Information Systems (GIS) map of requestors in the area of the facility (Attachment A). The Draft Permit, Technical Summary, Executive Director's Preliminary Decision, and the Executive Director's Response to Public Comment can be found in the Agenda backup materials filed for the Commission's consideration.

### II.  Description of the Facility

SWWC Utilities, Inc., submitted an application to the Texas Commission on Environmental Quality (TCEQ) for a new Texas Pollutant Discharge Elimination System (TPDES) Permit No. WQ0016022001 to authorize the discharge of treated domestic wastewater at a daily average flow not to exceed 200,000 gallons per day (gpd) in the Interim I phase, a daily average flow not to exceed 500,000 gpd in the Interim II phase, and a daily average flow not to exceed 800,000 gpd in the Final phase.

The treated effluent will be discharged via pipe to Wilbarger Creek, thence to Colorado River above La Grange in Segment No. 1434 of the Colorado River Basin. The unclassified receiving water use is high aquatic life use for Wilbarger Creek. The designated uses for Segment No. 1434 are primary contact recreation, public water supply, and exceptional aquatic life use. The effluent limitations in the draft permit will maintain and protect the existing instream uses. The plant site will be located approximately 0.42 miles southwest of the intersection of Bella Parkway and Old Texas Highway 20, in Travis County, Texas 78653.

## III. Procedural Background

The permit application was received on July 28, 2021 and declared administratively complete on September 17, 2021. The Notice of Receipt and Intent to Obtain a Water Quality Permit (NORI) was published in English on December 16, 2021, in the *Austin American Statesman* newspaper. The Notice of Application and Preliminary Decision (NAPD) was published in English on June 30, 2022, in the *Austin American Statesman* newspaper. The public comment period ended on August 1, 2022.

This application was filed on or after February 12, 2019; therefore, this application is subject to the procedural requirements adopted pursuant to House Bill (HB) 801, 76th Legislature (1999), and Senate Bill (SB) 709, 84th Legislature (2015), both implemented by the Commission in its rules in 30 TAC Chapter 39, 50, and 55. The Texas Legislature enacted Senate Bill 709, effective September 1, 2015, amending the requirements for comments and contested case hearings. This application is subject to those changes in the law.

## IV. Evaluation of Hearing Requests

House Bill 801 established statutory procedures for public participation in certain environmental permitting proceedings, specifically regarding public notice and public comment and the Commission's consideration of hearing requests. The Commission implemented HB 801 by adopting procedural rules in Title 30 of the Texas Administrative Code (30 TAC) chapters 39, 50, and 55. Senate Bill 709 revised the requirements for submitting public comment and the Commission's consideration of hearing requests. This application was declared administratively complete on September 17, 2021; therefore, it is subject to the procedural requirements adopted pursuant to HB 801 and SB 709.

### A. Legal Authority to Respond to Hearing Requests

"The Executive Director, the public interest counsel, and applicant may submit written responses to [hearing] requests . . . ."[1]

Responses to hearing requests must specifically address:

(a) whether the requestor is an affected person;

(b) whether issues raised in the hearing request are disputed;

(c) whether the dispute involves questions of fact or law;

(d) whether the issues were raised during the public comment period;

(e) whether the hearing request is based on issues raised solely in a public comment withdrawn by the commenter in writing by filing a withdrawal

---

[1] 30 TAC §55.209(d).

letter with the chief clerk prior to the filing of the Executive Director's Response to Comment;

(f) whether the issues are relevant and material to the decision on the application; and

(g) a maximum expected duration for the contested case hearing.[2]

## B. Hearing Request Requirements

In order for the Commission to consider a hearing request, the Commission must first determine whether the request meets certain requirements.

A request for a contested case hearing by an affected person must be in writing, filed with the chief clerk within the time provided . . ., based only on the requestor's timely comments, and not based on an issue that was raised solely in a public comment withdrawn by the commenter in writing by filing a withdrawal letter with the chief clerk prior to the filing of the Executive Director's Response to Comment.[3]

A hearing request must substantially comply with the following:

(1) give the name, address, daytime telephone number, and where possible, fax number of the person who files the request. If the request is made by a group or association, the request must identify one person by name, address, daytime telephone number, and where possible, fax number, who shall be responsible for receiving all official communications and documents for the group;

(2) identify the person's justiciable interest affected by the application, including a brief, but specific, written statement explaining in plain language the requestor's location and distance relative to the proposed facility or activity that is the subject of the application and how and why the requestor believes he or she will be adversely affected by the proposed facility or activity in a manner not common to members of the general public;

(3) request a contested case hearing;

(4) list all relevant and material disputed issues of fact that were raised during the public comment period by the requestor and that are the basis of the hearing request. To facilitate the commission's determination of the number and scope of issues to be referred to hearing, the requestor should, to the extent possible, specify any of the executive director's responses to comments that the requestor disputes and the factual basis of the dispute and list any disputed issues of law; and

(5) provide any other information specified in the public notice of application.[4]

---

[2] 30 TAC §55.209(e).
[3] 30 TAC §55.201(c).
[4] 30 TAC §55.201(d).

AR Item 38, Page 004

### C. Requirement that Requestor be an Affected Person

In order to grant a contested case hearing, the commission must determine that a requestor is an affected person.

(a) For any application, an affected person is one who has a personal justiciable interest related to a legal right, duty, privilege, power, or economic interest affected by the application. An interest common to members of the general public does not qualify as a personal justiciable interest.

(b) Governmental entities, including local governments and public agencies with authority under state law over issues raised by the application may be considered affected persons.

(c) In determining whether a person is an affected person, all factors shall be considered, including, but not limited to, the following:

(1) whether the interest claimed is one protected by the law under which the application will be considered;

(2) distance restrictions or other limitations imposed by law on the affected interest;

(3) whether a reasonable relationship exists between the interest claimed and the activity regulated;

(4) likely impact of the regulated activity on the health and safety of the person, and on the use of property of the person;

(5) likely impact of the regulated activity on use of the impacted natural resource by the person; and

(6) whether the requestor timely submitted comments on the application which were not withdrawn; and

(7) for governmental entities, their statutory authority over or interest in the issues relevant to the application.[5]

(d) In making this determination, the commission may also consider, to the extent consistent with case law:

(1) the merits of the underlying application and supporting documentation in the commission's administrative record, including whether the application meets the requirements for permit issuance;

(2) the analysis and opinions of the executive director; and

(3) any other expert reports, affidavits, opinions, or data submitted by the executive director, the applicant, or hearing requestor.[6]

---

[5] 30 TAC § 55.203.
[6] 30 TAC § 55.203.

Executive Director's Response to Hearing Requests                                    Page 4
SWWC Utilities Inc.
TPDES Permit No. WQ0016022001
TCEQ Docket No. 2023-0370-MWD

### D. Referral to the State Office of Administrative Hearings

"When the commission grants a request for a contested case hearing, the commission shall issue an order specifying the number and scope of the issues to be referred to SOAH for a hearing."[7] "The commission may not refer an issue to SOAH for a contested case hearing unless the commission determines that the issue: (1) involves a disputed question of fact or a mixed question of law and fact; (2) was raised during the public comment period by an affected person; and (3) is relevant and material to the decision on the application."[8]

## V.    Analysis of the Requests

The Executive Director has analyzed the hearing requests to determine whether they comply with Commission rules, who qualifies as an affected person, what issues may be referred for a contested case hearing, and what is the appropriate length of the hearing.

### A. <u>Whether the Individual Requestors Complied with 30 TAC §§ 55.201(c) and (d).</u>

The Executive Director reviewed the factors found in 30 TAC §§ 55.201(c) and (d), and 55.205 for determining if an individual or group meets the requirements for a contested case hearing and recommends the Commission find that Marilyn Kelinske, Anne Brockenbrough, Jonathan Beall and WCCA are not affected persons.

#### 1.   <u>Marilyn Kelinske</u>

The Executive Director reviewed the factors found in 30 TAC §§ 55.201(c) and (d), and 55.203 for determining if a person is an affected person and recommends the Commission find that Marilyn Kelinske is not an affected person.

Ms. Kelinske submitted timely hearing requests in writing, provided the required contact information, and raised issues that are the basis of her hearing requests in her timely comments. Ms. Kelinske states that she owns property on 11561 Littig Road. According to the GIS map prepared by the TCEQ this property is approximately 2.8 miles downstream from the proposed outfall. Ms. Kelinske's concerns are common to the general public, and she failed to prove that she has a personal justiciable interest related to a legal right, duty, privilege, power, or economic interest affected by the application not common to members of the general public and is not an affected person. Based on the available information, the Executive Director recommends finding that Ms. Kelinske is not an affected person.

Ms. Kelinske raised Issues 1, 2, 3, and 4, in her requests.

---

[7] 30 TAC § 50.115(b).
[8] 30 TAC § 50.115(c).

AR Item 38, Page 006

2. Anne Brockenbrough

The Executive Director reviewed the factors found in 30 TAC §§ 55.201(c) and (d), and 55.203 for determining if a person is an affected person and recommends the Commission find that Anne Brockenbrough is not an affected person.

Ms. Brockenbrough submitted timely hearing requests in writing, provided the required contact information, and raised issues that are the basis of her hearing requests in her timely comments. Ms. Brockenbrough states that she owns and lives on a working ranch three miles downstream from the proposed facility, which is reflected in the attached GIS map. Ms. Brockenbrough's concerns are common to the general public, and she failed to prove that she has a personal justiciable interest related to a legal right, duty, privilege, power, or economic interest affected by the application not common to members of the general public. Based on the available information, the Executive Director cannot recommend finding that Ms. Brockenbrough is an affected person.

3. Jonathan Beall

The Executive Director reviewed the factors found in 30 TAC §§ 55.201(c) and (d), and 55.203 for determining if a person is an affected person and recommends the Commission find that Jonathan Beall is not an affected person.

Mr. Beall submitted timely hearing requests in writing, provided the required contact information, and raised issues that are the basis of his hearing requests in timely comments. Mr. Beall states that he owns property 5 miles downstream from the proposed facility but does not provide an address for this property. Mr. Beall's mailing address is reflected on the attached GIS map. Mr. Beall's concerns are common to the general public, and he failed to prove that he has a personal justiciable interest related to a legal right, duty, privilege, power, or economic interest affected by the application not common to members of the general public. Based on the available information, the Executive Director cannot recommend finding that Mr. Beall is an affected person.

4. Wilbarger Creek Conservation Alliance (WCCA)

The Executive Director reviewed the factors found in 30 TAC §§ 55.201(c) and (d), and 55.205 for determining if a group or organization is an affected person and recommends the Commission find that WCCA is not an affected person.

In addition to the requirements in 30 TAC § 55.201 and 30 TAC § 55.203, a request for a contested case hearing by a group or association on an application filed on or after September 1, 2015 must meet the requirements in 30 TAC § 55.205(b).

30 TAC § 55.205(b) requires that the organization identify one or more members of the group or association would otherwise have standing to request a hearing in their own right. In their hearing request, WCCA failed to identify any member of the organization who had a justiciable interest that could be affected by this application.

AR Item 38, Page 007

WCCA submitted a timely hearing request in writing, provided the required contact information, and raised the issues that are the basis of their hearing request in their timely comments. According to the hearing request, the mission of the WCCA is to preserve and protect the water quality of Wilbarger Creek. WCCA identified Marilyn Kelinske, Anne Brockenbrough, and Jonathan Beall as members who own property downstream from the proposed site. The hearing request states their properties are almost 5 miles downstream, but the proposed discharge will affect all of them. The hearing request also raises the issue of cumulative impacts to Wilbarger Creek. Therefore, as WCCA failed to identify any members of the association who would otherwise have standing to request a hearing in their own right, the Executive Director has determined that WCCA has not met this this requirement for associational standing and should not be considered an affected person.

WCCA raised Issues 1, 2, 3, and 4, in its requests.

B. **Whether the Issues Raised May be Referred to SOAH for a Contested Case Hearing.**

The Executive Director has identified issues of disputed questions of fact or mixed questions of law and fact, raised during the comment period, in requests for a contested case hearing, and relevant to the decision on the application that could be referred to SOAH if the commission determines that a requestor is an affected person. The issues discussed were raised during the public comment period and addressed in the RTC. None of the issues were withdrawn. All identified issues in this response are considered disputed, unless otherwise noted.

*A. Referable Issues to SOAH for a Contested Case Hearing*

**Issue 1:** Whether the draft is protective of aquatic life and terrestrial wildlife in and adjacent to Wilbarger Creek. (RTC no. 1 and no. 3) The issue involves a disputed question of mixed fact and law, was raised during the comment period, was not withdrawn, and is relevant and material to the issuance of the draft permit. The Executive Director recommends the Commission refer this issue to SOAH.

**Issue 2:** Whether the draft permit should require higher treatment standards to include the most protective and available techniques. (RTC no. 6) The issue involves a disputed question of fact, was raised during the comment period, was not withdrawn, and is relevant and material to the issuance of the draft permit. The Executive Director recommends the Commission refer this issue to SOAH.

**Issue 3:** Whether the cumulative impacts of the proposed discharge into Wilbarger Creek were properly modeled and evaluated. (RTC No. 4) The issue involves a disputed question of mixed fact and law, was raised during the comment period, was not withdrawn, and is relevant and material to the issuance of the draft permit. The Executive Director recommends the Commission refer this issue to SOAH.

AR Item 38, Page 008

**Issue 4:** Whether the permit application addresses potential malfunctions at the proposed facility. (RTC no. 7) The issue involves a disputed question of fact, was raised during the comment period, was not withdrawn, and is relevant and material to the issuance of the draft permit. <u>The Executive Director recommends the Commission refer this issue to SOAH.</u>

*B. Issues that are not relevant or Material to the Commission's Consideration or that are Matters of Law or Policy.*

**Issue 1:** Whether the proposed discharge will result in increased flooding and erosion in Wilbarger Creek. (RTC No. 2) The issue involves a disputed question of fact, was raised during the comment period and was not withdrawn. However, it is not relevant and material to the issuance of the draft permit as it is not something TCEQ reviews as part of the application process. <u>Therefore, the Executive Director does not recommend the Commission refer this issue to SOAH.</u>

## VI.   Contested Case Hearing Duration

If there is a contested case hearing on this application, the Executive Director recommends that the duration of the hearing be six months from the preliminary hearing to the presentation of a proposal for decision to the Commission.

## VII.   Executive Director's Recommendation

The Executive Director recommends the following actions by the Commission:

1. The Executive Director recommends the Commission deny the Requests for Hearing filed by Marilyn Kelinske, Anne Brockenbrough, Jonathan Beall and the Wilbarger Creek Conservation Alliance.

2. If referred to SOAH, that the duration of the hearing be six months from the preliminary hearing to the presentation of the proposal for decision to the Commission.

3. If referred to SOAH, concurrently refer the matter to Alternative Dispute Resolution.

4. If referred to SOAH, refer the issues 1-4 listed above in part V of this response.

<span style="color:red">AR Item 38, Page 009</span>

Respectfully submitted,

Texas Commission on Environmental Quality

Erin Chancellor
Interim Executive Director

Guy Henry, Acting Deputy Director
Environmental Law Division

Anthony Tatu , Staff Attorney
Environmental Law Division
State Bar No. 00792869
P.O. Box 13087, MC 173
Austin, Texas 78711-3087
Phone (512) 239-5778

REPRESENTING THE EXECUTIVE DIRECTOR OF
THE TEXAS COMMISSION
ON ENVIRONMENTAL QUALITY

AR Item 38, Page 010

## VIII. CERTIFICATE OF SERVICE

  I certify that on, April 3, 2023, the "Executive Director's Response to Hearing Requests" on the application by SWWC Utilities TPDES Permit No. WQ0002659000 was filed with the TCEQ's Office of the Chief Clerk, and a complete copy was served to all persons listed on the attached mailing list via hand delivery, facsimile transmission, inter-agency mail, electronic submittal, or by deposit in the U.S. Mail.

<br>

Anthony Tatu, Staff Attorney
Environmental Law Division
State Bar No. 00792869
P.O. Box 13087, MC 173
Austin, Texas 78711-3087
Phone (512) 239-5778
Fax: (512) 239-0626

<span style="color:red">AR Item 38, Page 011</span>

MAILING LIST
SWWC Utilities, Inc.
TCEQ Docket No. 2023-0370-MWD; TPDES Permit No. WQ0016022001

FOR THE APPLICANT

Jeffrey McIntyre, President
Texas Utilities
SWWC Utilities, Inc.
12535 Reed Road
Sugar Land, Texas 77478

Joe Torralva, Design and Construction
    Manager, Texas Utilities
SWWC Utilities, Inc.
1620 Grand Avenue Parkway, Suite 140
Pflugerville, Texas 78660

Jason Baze, P.E., Project Manager
Murfee Engineering Company, Inc.
1101 Capital of Texas Highway South
D-100
Austin, Texas 78746

FOR THE EXECUTIVE DIRECTOR
via electronic mail:

Anthony Tatu, Staff Attorney
Texas Commission on Environmental
Quality
Environmental Law Division, MC-173
P.O. Box 13087
Austin, Texas 78711
Anthony.tatu@tceq.texas.gov

Melinda Luxemburg, Technical Staff
Texas Commission on Environmental
Quality
Water Quality Division, MC-148
P.O. Box 13087
Austin, Texas 78711
Melinda.luxemburg@tceq.texas.gov

Ryan Vise, Deputy Director
Texas Commission on Environmental
Quality
External Relations Division
Public Education Program, MC-108
P.O. Box 13087
Austin, Texas 78711
Pep@tceq.texas.gov

FOR ALTERNATIVE DISPUTE RESOLUTION
via electronic mail:

Kyle Lucas
Texas Commission on Environmental
Quality
Alternative Dispute Resolution, MC-222
P.O. Box 13087
Austin, Texas 78711
Kyle.lucas@tceq.texas.gov

FOR THE CHIEF CLERK
via eFilings:

Docket Clerk
Texas Commission on Environmental
Quality
Office of Chief Clerk, MC-105
P.O. Box 13087
Austin, Texas 78711

REQUESTER(S)

Jonathan M. Beall
Wilbarger Creek Conservation Alliance
2503 Flora Cove
Austin, Texas 78746

Anne Stewart Brockenbrough
Elm Ridge Ranch
11318 Jones Road
Manor, Texas 78653

Marilyn Kelinske
15611 Littig Road
Manor, Texas 78653

Marilyn Kelinske
6805 Ladera Norte
Austin, Texas 78731

AR Item 38, Page 012

# Attachment A

AR Item 38, Page 013



# SWWC Utilities

Map Requested by TCEQ Office of Legal Services
for Commissioners' Agenda

Texas Commission on Environmental Quality
GIS Team  (Mail Code 197)
P.O. Box 13087
Austin, Texas  78711-3087
Date: 3/24/2023
CRF 0086257
Cartographer: cschrade

N

**Legend**

- ⬤ Requestors
- ▲ Outfall
- ～ 1 mi Discharge Route
- ⟨ ⟩ 0.5 mi Radius
- ⟨ ⟩ 1.0 mi Radius
- ⟨ ⟩ 1.5 mi Radius

**Distances Between Requestors and Outfall:**

1) Anne Stewart Brockenbrough - 3.21 mi

2) Marilyn Kelinske - 2.89 mi

3) Johnathan M Beall - 15.65 mi

Source:  The location of the facility was provided
by the TCEQ Office of Legal Services (OLS).
OLS obtained the site location information from the
applicant and the requestor information from the
requestor.

AR Item 38, Page 014

This map was generated by the Information Resources
Division of the Texas Commission on Environmental
Quality. This product is for informational purposes and
may not have been prepared for or be suitable for legal,
engineering, or surveying purposes. It does not repre-
sent an on-the-ground survey and represents only the
approximate relative location of property boundaries.
For more information concerning this map, contact the
Information Resource Division at (512) 239-0800.

The facility is located in Travis County.  The Circle (green) in
the left inset map represents the approximate location of the facility
The inset map on the right represents the location of Travis
County (red) in the state of Texas.

Travis County

Travis

0     0.4     0.8
Miles

# SWWC Utilities



Map Requested by TCEQ Office of Legal Services
for Commissioners' Agenda

Texas Commission on Environmental Quality
GIS Team  (Mail Code 197)
P.O. Box 13087
Austin, Texas  78711-3087
Date: 3/24/2023
CRF 0086257
Cartographer: cschrade

*Protecting Texas by
Reducing and
Preventing Pollution*

N

## Legend

- ● **Requestors**
- ▲ **Outfall**
- ~ **1 mi Discharge Route**
- ( ) **0.5 mi Radius**
- ( ) **1.0 mi Radius**
- ( ) **1.5 mi Radius**

### Distances Between Requestors and Outfall:

1) Anne Stewart Brockenbrough - 3.21 mi

2) Marilyn Kelinske - 2.89 mi

3) Johnathan M Beall - 15.65 mi

Travis
Bastrop

AR Item 38, Page 015

Source:  The location of the facility was provided
by the TCEQ Office of Legal Services (OLS).
OLS obtained the site location information from the
applicant and the requestor information from the
requestor.

This map was generated by the Information Resources
Division of the Texas Commission on Environmental
Quality. This product is for informational purposes and
may not have been prepared for or be suitable for legal,
engineering, or surveying purposes. It does not repre-
sent an on-the-ground survey and represents only the
approximate relative location of property boundaries.
For more information concerning this map, contact the
Information Resource Division at (512) 239-0800.

Travis

Travis County

The facility is located in Travis County.  The Circle (green) in
the left inset map represents the approximate location of the facility.
The inset map on the right represents the location of Travis
County (red) in the state of Texas.

0      1.5      3
Miles

# Appendix Item 8



SWWC UTILITIES INC
WQ001602001

CID 125840

WQ
125840

## Debbie Zachary

**From:** PUBCOMMENT-OCC
**Sent:** Tuesday, July 5, 2022 1:42 PM
**To:** PUBCOMMENT-OCC2; PUBCOMMENT-OPIC; PUBCOMMENT-ELD; PUBCOMMENT-WQ
**Subject:** FW: Public comment on Permit Number WQ0016022001

**From:** jonbeall1@gmail.com <jonbeall1@gmail.com>
**Sent:** Friday, July 1, 2022 1:29 PM
**To:** PUBCOMMENT-OCC <PUBCOMMENT-OCC@tceq.texas.gov>
**Subject:** Public comment on Permit Number WQ0016022001

**REGULATED ENTY NAME** MAJESTIC MANOR WWTP

**RN NUMBER:** RN111305389

**PERMIT NUMBER:** WQ0016022001

**DOCKET NUMBER:**

**COUNTY:** TRAVIS

**PRINCIPAL NAME:** SWWC UTILITIES INC

**CN NUMBER:** CN603264763

**FROM**

**NAME:** Jonathan Beall

**EMAIL:** jonbeall1@gmail.com

**COMPANY:** Wilbarger Creek Conservation Alliance

**ADDRESS:** 2503 FLORA CV
AUSTIN TX 78746-6902

**PHONE:** 5126321760

**FAX:**

**COMMENTS:** This comment concerns the 30 day deadline to submit comments. We at WCCA had concerns the 30 day period started on May 31st when the Notice was sent. I have just spoken with Mr. Jason Basz (sp?), an engineer with the Applicant, SWWC. He said they only recently published the public notice, and sent the 42 page draft permit to the Manor City Hall. This might extend the 30 day deadline beyond June the 30th giving us time for an evaluation. Please let me know. Thanks, Jon

1

# Debbie Zachary

**From:** PUBCOMMENT-OCC
**Sent:** Tuesday, July 5, 2022 11:28 AM
**To:** PUBCOMMENT-WQ; PUBCOMMENT-ELD; PUBCOMMENT-OCC2; PUBCOMMENT-OPIC
**Subject:** FW: Public comment on Permit Number WQ0016022001

**From:** jonbeall1@gmail.com <jonbeall1@gmail.com>
**Sent:** Thursday, June 30, 2022 12:58 AM
**To:** PUBCOMMENT-OCC <PUBCOMMENT-OCC@tceq.texas.gov>
**Subject:** Public comment on Permit Number WQ0016022001

**REGULATED ENTY NAME** MAJESTIC MANOR WWTP

**RN NUMBER:** RN111305389

**PERMIT NUMBER:** WQ0016022001

**DOCKET NUMBER:**

**COUNTY:** TRAVIS

**PRINCIPAL NAME:** SWWC UTILITIES INC

**CN NUMBER:** CN603264763

**FROM**

**NAME:** Jon Beall

**EMAIL:** jonbeall1@gmail.com

**COMPANY:** Wilbarger Creek Conservation Alliance

**ADDRESS:** 2503 FLORA CV
AUSTIN TX 78746-6902

**PHONE:** 5126321760

**FAX:**

**COMMENTS:** We respectfully request a 30 day extension to the comment period. The draft permit is not available at the Manor City Hall. They have spent a week looking for it unsuccessfully. In addition, I have called the applicant's representative in Austin, Mr. Torralva, who has not yet returned my calls. Finally, after contacting the TCEQ Office of Public Interest Counsel, I received the 42 page draft opinion this morning. This is not enough time for us to have our experts evaluate the draft permit and submit meaningful comments. In addition, I have attached some comments, which

1

are linked here - https://docs.google.com/document/d/1uVOAdnuZZg9YH21IUUb4rojtmbkWhdOmX1gDZPA-_AA/edit?usp=sharing

AR Item 34, Page 004

June 30, 2022

To:     TCEQ
Fm:     Wilbarger Creek Conservation Alliance

Re:     Majestic Manor WWTP Permit WQ0016022001

The WCCA hereby requests standing and submits the following comments concerning the Majestic Manor WWTP Permit Application.

Existing pollution upstream from the Kalinske Ranch on Wilbarger Creek at 15611 Littig Rd is causing a significant algae bloom as it flows east through the Kalinske Ranch.

We respectfully request the following actions by TCEQ -
- Wilbarger Creek already receives discharges from Shadow Glen and the City of Manor upstream of my property and that of 2 other WCCA Board members.
- Determine the cause of the existing algae bloom before adding more treated effluent. How does the TCEQ determine the cause of existing problems, and what effect will this information have on the new Majestic Manor permit?
- Pflugerville's new WWTP is permitted to discharge 24 mgd. Since that plant is not online yet, We really don't know what the upper reaches of the creek are going to look like in terms of stream flow and water quality after that plant goes online. WCCA requests the TCEQ include this effluent discharge in considering the Majestic Manor permit.
- If all of Pflugerville's effluent is going to Wilbarger, it seems irresponsible to permit additional significant volumes of discharges before the true impacts of Pflugerville's regional plant are more clear.
- The city of Pflugerville's EIS says Wilbarger Creek supposedly has 15.75 MGD of capacity. Is all of this already accounted for in Pflugerville's permit? If so, what is left for Majestic Manor?
- How will the additional discharge of Majestic Manor affect the overall health of Wilbarger Creek?
- Pre-existing conditions should determine the performance standards TCEQ requires for this new treatment plant.
- Does TCEQ have a good water quality baseline? If so, how current is it? The algae bloom seems to have appeared in the last 6 months..
- WCCA requests a current baseline using samples taken during the past year. Please establish a current baseline by taking water quality samples above and below the discharge points of the 5 existing and proposed WWTPs on Wilbarger

Creek: Pflugerville, Shadowglen, Manor, Majestic Manor and Elgin. Wouldn't it be prudent to do this now, prior to approval and construction of Majestic Manor?

- Wouldn't such accurate and timely information help establish the necessary treatment standard for Majestic Manor?
- With the Pflugerville plant already permitted, we are looking at a situation where streamflow will be predominately treated effluent. Continuing to permit additional discharges gives the impression that Wilbarger should simply become a conduit for transporting treated wastewater down to the Colorado river.
- Impairment of Wilbarger Creek has been known for years. The out of date historical information contained in the 2012 water quality study linked below demonstrates impairment. We consider this kind of information, updated and current, vital to making the best decision on Majestic Manor. http://www.austintexas.gov/watershed_protection/publications/document.cfm?id=203919

We believe the treatment standards should be set at the highest possible and achievable limits. Wilbarger Creek should be maintained as a healthy, functioning ecosystem. Isn't it easier and less expensive to prevent problems than to fix them in the future? To this end, we request the TCEQ consider requiring the most protective currently available treatment standards and techniques -

- A limit on total nutrient loading of 0.1 mg/liter phosphorus and 4 mg/liter nitrogen. Wastewater treatment technology is remarkable in terms of how well it can be done. This is a permit that requires it.
- Wet ponds, wetlands and sheet flow over a vegetated buffer - We request this technology on treated effluent prior to discharge into Wilbarger Creek. The use of a few acres devoted to these methods would significantly improve stream inputs.
- Land application - No discharge permits and land applications are required in the Highland Lakes and Barton Springs Zone. What justification is there to not have similar requirements in the Wilbarger Creek watershed? If developers can meet those requirements elsewhere, why shouldn't they do the same in the Wilbarger Creek watershed?
- Beneficial reuse - We appear to be entering another severe drought. Some of that water might be better used for irrigation, wetlands or other beneficial reuse. A reuse plan for Majestic Manor would preserve our potable water resources. Maybe now is the time to start including beneficial reuse in all permits?
- Chlorination is necessary to ensure harmful bacteria is killed. Unfortunately, the usual minimum residual levels in discharges is high enough to kill or stress fish and other aquatic life. If a portion of Wilbarger Creek is predominantly treated effluent, that portion of the Creek will not support much life. Irrigation or

discharging first to a pond or wetland prior to entering Wilbarger Creek could help mitigate that.

- Treatment plant malfunctions are unfortunately predictable, and sometimes outside the control of plant operators. Power outages, floods, mechanical failures, etc. can quickly result in exceedances of permit limits, even in a well run plant. Since Wilbarger creek is so small at this point, the impacts of an unauthorized discharge will be much more severe than a similar discharge into a larger river. Consider Round Rock's problems at the Brushy Creek WWTP, which have been well documented over the last several months. Land application, beneficial reuse, etc. would provide a better buffer in the unfortunate event that the plant has problems.
- The unknown future negative impacts of Pflugerville's WWTP and others indicate TCEQ should err on the side of caution. Downstream neighbors, taxpayers and aquatic environments should not have to suffer so that this wastewater operator can save a little money.
- The developers will make a lot of money. We urge the TCEQ to require the highest possible standards. The costs can be recovered in land sale prices.

In addition, WCCA requests -

- Standing for our organization to participate in the TCEQ process for Majestic Manor WWTP.
- Standing as individuals for three of the members of our WCCA Board who own significant stretches of both sides of Wilbarger Creek downstream of Majestic Manor: myself, Marilyn Kelinske, and Anne Brockenbrough. We request they be granted standing as individuals

Finally, the actual discharge point is not clear from the notice. It should be stated with more specificity in the application, but this detail is not in the public notice. It seems like an unreasonable burden to require us to obtain and read the entire application, just to see where this discharge is going to be.

Respectfully submitted,

Jon Beall, President

Wilbarger Creek Conservation Alliance

# Ellie Guerra

**From:** PUBCOMMENT-OCC
**Sent:** Monday, November 28, 2022 10:54 AM
**To:** PUBCOMMENT-WQ; PUBCOMMENT-ELD; PUBCOMMENT-OCC2; PUBCOMMENT-OPIC
**Subject:** FW: Public comment on Permit Number WQ0016022001
**Attachments:** Request For Hearing signed final.pdf

eComment = H
Attachment = H

**From:** jonbeall1@gmail.com <jonbeall1@gmail.com>
**Sent:** Friday, November 25, 2022 5:11 PM
**To:** PUBCOMMENT-OCC <PUBCOMMENT-OCC@tceq.texas.gov>
**Subject:** Public comment on Permit Number WQ0016022001

**REGULATED ENTY NAME** MAJESTIC MANOR WWTP

**RN NUMBER:** RN111305389

**PERMIT NUMBER:** WQ0016022001

**DOCKET NUMBER:**

**COUNTY:** TRAVIS

**PRINCIPAL NAME:** SWWC UTILITIES INC

**CN NUMBER:** CN603264763

**FROM**

**NAME:** Jon Beall

**EMAIL:** jonbeall1@gmail.com

**COMPANY:** Wilbarger Creek Conservation Alliance

**ADDRESS:** 2503 FLORA CV
AUSTIN TX 78746-6902

**PHONE:** 5126321760

**FAX:**

**COMMENTS:** Attached is a file requesting a Contested Case Hearing on Majestic Manor WWTP, which I have also pasted below. We refer to two photos in this request which can be found at - https://photos.google.com/album/AF1QipMpvjVJ_WcxSLWTKfvmMeTixNDRWP1uEVyFayM4 Request for a Contested

1

Case Hearing, Majestic Manor WQ0016022001 November 26, 2022 TO: TCEQ FM: Wilbarger Creek Conservation Alliance (WCCA), Jon Beall, President, WCCA Anne Brockenbrough, VP, WCCA Marilyn Kelinske, M.D., Board Member, WCCA RE: Request for a Contested Case Hearing on the Draft Permit for Majestic Manor WQ0016022001 We as individuals and collectively as WCCA protest the TCEQ's issuance of the Draft Permit, and request a Contested Case Hearing. TCEQ must do more to preserve the water quality of Wilbarger Creek and prevent further degradation.. West of the Travis County line, Wilbarger Creek historically was a small, intermittent stream. It had high flows only periodically, then quickly subsided into stagnant pools that soon evaporated. Now Wilbarger Creek flows through our properties year round at most times a few inches deep and a few feet wide consisting entirely of treated effluent from Manor and Shadowglen WWTPs. Ms. Brockenbrough, Dr. Kelinske and I request and should receive individual standing because we each own property on both sides of Wilbarger Creek. Although our properties are almost 5 miles downstream from the WWTP, most of the year the creek flow is 100% effluent. Thus the discharge will impact our property. WCCA, a 501c organization, should also receive standing. The mission of WCCA includes to preserve and protect the water quality of Wilbarger Creek. Evidence already exists of unacceptable amounts of pollution in the Creek without the additional discharges of the new Pflugerville and proposed Majestic Manor WWTPs. The photos attached of Wilbarger Creek as it flows through the Kelinske property show a significant algae bloom in April 2022. The Response to Comments gives no indication TCEQ took any action to investigate this existing problem. The Response to Comments makes reference to TCEQ Water Quality monitoring stations (SWQM). All reports since 2014 already list nitrates as a source of concern. The Federal Environmental Review EID of the new Pflugerville WWTP, which states the hydraulic capacity to be 24 mgd, examines the Cumulative Impacts only within the Pflugerville city limits, not impacts on the downstream humans, livestock, wildlife and agricultural uses. It seems very strange to examine the impact of sewage effluent only upstream of the discharge. This may be a violation of NEPA. The Response to Comments states modeling used worst case scenarios: the maximum permitted flows during hot, dry summertime conditions. We take issue with the statement that follows: …conditions unlikely to occur for any significant period of time…. We believe the real world impacts already observed by protestants and photo evidence are better indicators of cumulative impacts on the creek than any model. We need an opportunity to evaluate the modeling supporting the draft permit, and an opportunity to discuss with the staff the assumptions in the model and the model itself. Pflugerville's new WWTP is permitted to discharge 15 mgd. Since that plant is under construction, we really cannot know the actual impacts on the creek in terms of stream flow and water quality until after that plant goes online. If all of Pflugerville's effluent is going to WilbargerCreek, it seems irresponsible to permit additional significant volumes of discharges into the Creek before the true impacts of Pflugerville's regional plant are more clear. Pflugerville says their new WWTP will grow to 24 mgd. https://www.pflugervilletx.gov/city-government/capital-improvement-program-cip/projects-overview/wilbarger-creek-regional-wastewater-treatment-facility The city of Pflugerville's EID says Wilbarger Creek supposedly has 15.75 MGD of capacity. Is all of this already accounted for in Pflugerville's permit? If so, what is left for Majestic Manor? How will the additional discharge of Majestic Manor affect the overall health of Wilbarger Creek? Pre-existing conditions and future development pressure should determine the performance standards TCEQ requires for Majestic Manor and all other new treatment plants. The additional remedies referred to in our comments and reiterated below, are already in use in other parts of Travis County. These can have a significant beneficial impact on the future health of Wilbarger Creek for wildlife, agricultural and recreational uses and the Colorado River. Given the pending and recently issued permits, we request TCEQ set the treatment standards at the highest possible and achievable limits. Wilbarger Creek should be maintained as a healthy, functioning ecosystem. A limit on total nutrient loading of 0.1 mg/liter phosphorus. Wastewater treatment technology is remarkable in terms of how well it can function. This is a permit that requires it. Wet ponds, wetlands and sheet flow over a vegetated buffer - We request this technology on treated effluent prior to discharge into Wilbarger Creek. The use of a few acres devoted to these methods would significantly improve stream inputs. Land application - No discharge permits and land applications are required in the Highland Lakes and Barton Springs Zone. What justification is there to not have similar requirements in the Wilbarger Creek watershed? If developers can meet those requirements elsewhere, why not in the Wilbarger Creek watershed? Beneficial reuse - We appear to be entering another severe drought. Some of that water might be better used for irrigation, wetlands or other beneficial reuse. A reuse plan for Majestic Manor would preserve our potable water resources. Maybe now is the time to start including beneficial reuse in all permits? Chlorination is necessary to ensure harmful bacteria is killed. Unfortunately, the usual minimum residual levels in discharges is high enough to kill or stress fish and other aquatic life. If a portion of Wilbarger Creek is predominantly or all treated effluent, that portion of the Creek will not support much life. Irrigation or discharging first to a pond or wetland prior to entering Wilbarger Creek could help mitigate that. Treatment plant malfunctions are unfortunately

2



predictable, and sometimes outside the control of plant operators. Power outages, floods, mechanical failures, etc. can quickly result in exceedances of permit limits, even in a well run plant. Since Wilbarger creek is so small at this point, the impacts of an unauthorized discharge will be much more severe than a similar discharge into a larger river. Consider Round Rock's problems at the Brushy Creek WWTP, which have been well documented over the last several months. Land application, beneficial reuse, wet ponds, vegetative filter strips, etc. would provide a better buffer in the unfortunate event that the plant has problems. The unknown future negative impacts of Pflugerville's WWTP and others indicate TCEQ should err on the side of caution. Downstream neighbors, taxpayers, terrestrial wildlife and aquatic environments should not have to suffer so that this wastewater operator can save a little money. Anne Brockenbrough - I have had the water quality tested several times over the last few years by the Austin Youth River Watchers (AYRW) and each time they have found the water in Wilbarger Creek has extremely low dissolved oxygen levels indicating that the creek is already impaired or dangerously close. With the addition of treated effluent coming from Pflugerville and Majestic Manor, I am afraid the creek will be permanently impaired. I ask that TCEQ do a current test of the water in Wilbarger downstream of the Manor plant before you approve this permit. You are welcome to come on my ranch and test the water any time. Marilyn Kelinske - Wilbarger is a source of water for wildlife. My land has a conservation easement on it for wildlife and with the population growth all around, it has become a haven for it. The animals depend on clean water from the creek for survival. I do have horses and livestock on my property but have restricted their access to the creek water because of the contamination. The creek is also a place for fishing and swimming. The fish are minimal in numbers now but they can rebound if the water is protected. People should be able to enjoy swimming in the creek but all of us would not want to do so if the water was contaminated and full of algae like it was recently.
Respectfully submitted, _____ Jon Beall, President, WCCA 2503 Flora Cove Austin, TX 78746 512-632-1760 _____ Anne Brockenbrough, VP, WCCA 11318 Jones Rd Manor, TX 78653 512-278-8699 _____ Marilyn Kelinske, Board Member, WCCA 15611 Littig Rd Manor, TX 78652 512-796-1196

3

# Request for a Contested Case Hearing, Majestic Manor
## WQ0016022001

November 26, 2022

TO:    TCEQ
FM:    Wilbarger Creek Conservation Alliance (WCCA),
        Jon Beall, President, WCCA
        Anne Brockenbrough, VP, WCCA
        Marilyn Kelinske, M.D., Board Member, WCCA

RE:    Request for a Contested Case Hearing on the Draft Permit for Majestic Manor
WQ0016022001

We as individuals and collectively as WCCA protest the TCEQ's issuance of the Draft Permit, and request a Contested Case Hearing. TCEQ must do more to preserve the water quality of Wilbarger Creek and prevent further degradation..

*West of the Travis County line, Wilbarger Creek historically was a small, intermittent* stream. It had high flows only periodically, then quickly subsided into stagnant pools that soon evaporated. Now Wilbarger Creek flows through our properties year round at most times a few inches deep and a few feet wide consisting entirely of treated effluent from Manor and Shadowglen WWTPs.

- Ms. Brockenbrough, Dr. Kelinske and I request and should receive individual standing because we each own property on both sides of Wilbarger Creek. Although our properties are almost 5 miles downstream from the WWTP, most of the year the creek flow is 100% effluent. Thus the discharge will impact our property.
- WCCA, a 501c organization, should also receive standing. The mission of WCCA includes to preserve and protect the water quality of Wilbarger Creek.
- Evidence already exists of unacceptable amounts of pollution in the Creek without the additional discharges of the new Pflugerville and proposed Majestic Manor WWTPs. The photos attached of Wilbarger Creek as it flows through the Kelinske property show a significant algae bloom in April 2022. The Response to Comments gives no indication TCEQ took any action to investigate this existing problem.
- The Response to Comments makes reference to TCEQ Water Quality monitoring stations (SWQM). All reports since 2014 already list nitrates as a source of concern.

Page 1 of 4

- The Federal Environmental Review EID of the new Pflugerville WWTP, which states the hydraulic capacity to be 24 mgd, examines the Cumulative Impacts only within the Pflugerville city limits, not impacts on the downstream humans, livestock, wildlife and agricultural uses. It seems very strange to examine the impact of sewage effluent only upstream of the discharge. This may be a violation of NEPA.
- The Response to Comments states modeling used worst case scenarios: the maximum permitted flows during hot, dry summertime conditions. We take issue with the statement that follows: …conditions unlikely to occur for any significant period of time…. We believe the real world impacts already observed by protestants and photo evidence are better indicators of cumulative impacts on the creek than any model.
- We need an opportunity to evaluate the modeling supporting the draft permit, and an opportunity to discuss with the staff the assumptions in the model and the model itself.
- Pflugerville's new WWTP is permitted to discharge 15 mgd. Since that plant is under construction, we really cannot know the actual impacts on the creek in terms of stream flow and water quality until after that plant goes online. If all of Pflugerville's effluent is going to WilbargerCreek, it seems irresponsible to permit additional significant volumes of discharges into the Creek before the true impacts of Pflugerville's regional plant are more clear.
- Pflugerville says their new WWTP will grow to 24 mgd. https://www.pflugervilletx.gov/city-government/capital-improvement-program-cip/projects-overview/wilbarger-creek-regional-wastewater-treatment-facility
- The city of Pflugerville's EID says Wilbarger Creek supposedly has 15.75 MGD of capacity. Is all of this already accounted for in Pflugerville's permit? If so, what is left for Majestic Manor?
- How will the additional discharge of Majestic Manor affect the overall health of Wilbarger Creek?
- Pre-existing conditions and future development pressure should determine the performance standards TCEQ requires for Majestic Manor and all other new treatment plants.
- The additional remedies referred to in our comments and reiterated below, are already in use in other parts of Travis County. These can have a significant beneficial impact on the future health of Wilbarger Creek for wildlife, agricultural and recreational uses and the Colorado River.

Given the pending and recently issued permits, we request TCEQ set the treatment standards at the highest possible and achievable limits. Wilbarger Creek should be maintained as a healthy, functioning ecosystem.

Page 2 of 4

- A limit on total nutrient loading of 0.1 mg/liter phosphorus. Wastewater treatment technology is remarkable in terms of how well it can function. This is a permit that requires it.
- Wet ponds, wetlands and sheet flow over a vegetated buffer - We request this technology on treated effluent prior to discharge into Wilbarger Creek. The use of a few acres devoted to these methods would significantly improve stream inputs.
- Land application - No discharge permits and land applications are required in the Highland Lakes and Barton Springs Zone. What justification is there to not have similar requirements in the Wilbarger Creek watershed? If developers can meet those requirements elsewhere, why not in the Wilbarger Creek watershed?
- Beneficial reuse - We appear to be entering another severe drought. Some of that water might be better used for irrigation, wetlands or other beneficial reuse. A reuse plan for Majestic Manor would preserve our potable water resources. Maybe now is the time to start including beneficial reuse in all permits?
- Chlorination is necessary to ensure harmful bacteria is killed. Unfortunately, the usual minimum residual levels in discharges is high enough to kill or stress fish and other aquatic life. If a portion of Wilbarger Creek is predominantly or all treated effluent, that portion of the Creek will not support much life. Irrigation or discharging first to a pond or wetland prior to entering Wilbarger Creek could help mitigate that.
- Treatment plant malfunctions are unfortunately predictable, and sometimes outside the control of plant operators. Power outages, floods, mechanical failures, etc. can quickly result in exceedances of permit limits, even in a well run plant. Since Wilbarger creek is so small at this point, the impacts of an unauthorized discharge will be much more severe than a similar discharge into a larger river. Consider Round Rock's problems at the Brushy Creek WWTP, which have been well documented over the last several months. Land application, beneficial reuse, wet ponds, vegetative filter strips, etc. would provide a better buffer in the unfortunate event that the plant has problems.
- The unknown future negative impacts of Pflugerville's WWTP and others indicate TCEQ should err on the side of caution. Downstream neighbors, taxpayers, terrestrial wildlife and aquatic environments should not have to suffer so that this wastewater operator can save a little money.
- Anne Brockenbrough - I have had the water quality tested several times over the last few years by the Austin Youth River Watchers (AYRW) and each time they have found the water in Wilbarger Creek has extremely low dissolved oxygen levels indicating that the creek is already impaired or dangerously

Page 3 of 14

close. With the addition of treated effluent coming from Pflugerville and Majestic Manor, I am afraid the creek will be permanently impaired. I ask that TCEQ do a current test of the water in Wilbarger downstream of the Manor plant before you approve this permit. You are welcome to come on my ranch and test the water any time.

- Marilyn Kelinske - Wilbarger is a source of water for wildlife. My land has a conservation easement on it for wildlife and with the population growth all around, it has become a haven for it. The animals depend on clean water from the creek for survival. I do have horses and livestock on my property but have restricted their access to the creek water because of the contamination. The creek is also a place for fishing and swimming. The fish are minimal in numbers now but they can rebound if the water is protected. People should be able to enjoy swimming in the creek but all of us would not want to do so if the water was contaminated and full of algae like it was recently.

Respectfully submitted,

Jon Beall, President, WCCA
2503 Flora Cove
Austin, TX 78746
512-632-1760

Anne Brockenbrough, VP, WCCA
11318 Jones Rd
Manor, TX 78653
512-278-8699

Marilyn Kelinske, Board Member, WCCA
15611 Littig Rd
Manor, TX 78652
512-796-1196

# Ellie Guerra

**From:** PUBCOMMENT-OCC
**Sent:** Monday, November 28, 2022 10:55 AM
**To:** PUBCOMMENT-WQ; PUBCOMMENT-ELD; PUBCOMMENT-OCC2; PUBCOMMENT-OPIC
**Subject:** FW: Public comment on Permit Number WQ0016022001
**Attachments:** Request For Hearing signed final.pdf

eComment = H
Attachment = H

**From:** jonbeall1@gmail.com <jonbeall1@gmail.com>
**Sent:** Friday, November 25, 2022 5:04 PM
**To:** PUBCOMMENT-OCC <PUBCOMMENT-OCC@tceq.texas.gov>
**Subject:** Public comment on Permit Number WQ0016022001

**REGULATED ENTY NAME** MAJESTIC MANOR WWTP

**RN NUMBER:** RN111305389

**PERMIT NUMBER:** WQ0016022001

**DOCKET NUMBER:**

**COUNTY:** TRAVIS

**PRINCIPAL NAME:** SWWC UTILITIES INC

**CN NUMBER:** CN603264763

**FROM**

**NAME:** Jon Beall

**EMAIL:** jonbeall1@gmail.com

**COMPANY:** Wilbarger Creek Conservation Alliance

**ADDRESS:** 2503 FLORA CV
AUSTIN TX 78746-6902

**PHONE:** 5126321760

**FAX:**

**COMMENTS:** Attached is a file requesting a Contested Case Hearing on Majestic Manor WWTP, which I have also pasted below. We refer to two photos in this request which can be found at -
https://photos.google.com/album/AF1QipMpvjVJ_WcxSLWTKfvmMeTixNDRWP1uEVyFayM4 Request for a Contested

1

Case Hearing, Majestic Manor WQ0016022001 November 26, 2022 TO: TCEQ FM: Wilbarger Creek Conservation Alliance (WCCA), Jon Beall, President, WCCA Anne Brockenbrough, VP, WCCA Marilyn Kelinske, M.D., Board Member, WCCA RE: Request for a Contested Case Hearing on the Draft Permit for Majestic Manor WQ0016022001 We as individuals and collectively as WCCA protest the TCEQ's issuance of the Draft Permit, and request a Contested Case Hearing. TCEQ must do more to preserve the water quality of Wilbarger Creek and prevent further degradation.. West of the Travis County line, Wilbarger Creek historically was a small, intermittent stream. It had high flows only periodically, then quickly subsided into stagnant pools that soon evaporated. Now Wilbarger Creek flows through our properties year round at most times a few inches deep and a few feet wide consisting entirely of treated effluent from Manor and Shadowglen WWTPs. Ms. Brockenbrough, Dr. Kelinske and I request and should receive individual standing because we each own property on both sides of Wilbarger Creek. Although our properties are almost 5 miles downstream from the WWTP, most of the year the creek flow is 100% effluent. Thus the discharge will impact our property. WCCA, a 501c organization, should also receive standing. The mission of WCCA includes to preserve and protect the water quality of Wilbarger Creek. Evidence already exists of unacceptable amounts of pollution in the Creek without the additional discharges of the new Pflugerville and proposed Majestic Manor WWTPs. The photos attached of Wilbarger Creek as it flows through the Kelinske property show a significant algae bloom in April 2022. The Response to Comments gives no indication TCEQ took any action to investigate this existing problem. The Response to Comments makes reference to TCEQ Water Quality monitoring stations (SWQM). All reports since 2014 already list nitrates as a source of concern. The Federal Environmental Review EID of the new Pflugerville WWTP, which states the hydraulic capacity to be 24 mgd, examines the Cumulative Impacts only within the Pflugerville city limits, not impacts on the downstream humans, livestock, wildlife and agricultural uses. It seems very strange to examine the impact of sewage effluent only upstream of the discharge. This may be a violation of NEPA. The Response to Comments states modeling used worst case scenarios: the maximum permitted flows during hot, dry summertime conditions. We take issue with the statement that follows: …conditions unlikely to occur for any significant period of time…. We believe the real world impacts already observed by protestants and photo evidence are better indicators of cumulative impacts on the creek than any model. We need an opportunity to evaluate the modeling supporting the draft permit, and an opportunity to discuss with the staff the assumptions in the model and the model itself. Pflugerville's new WWTP is permitted to discharge 15 mgd. Since that plant is under construction, we really cannot know the actual impacts on the creek in terms of stream flow and water quality until after that plant goes online. If all of Pflugerville's effluent is going to WilbargerCreek, it seems irresponsible to permit additional significant volumes of discharges into the Creek before the true impacts of Pflugerville's regional plant are more clear. Pflugerville says their new WWTP will grow to 24 mgd. https://www.pflugervilletx.gov/city-government/capital-improvement-program-cip/projects-overview/wilbarger-creek-regional-wastewater-treatment-facility The city of Pflugerville's EID says Wilbarger Creek supposedly has 15.75 MGD of capacity. Is all of this already accounted for in Pflugerville's permit? If so, what is left for Majestic Manor? How will the additional discharge of Majestic Manor affect the overall health of Wilbarger Creek? Pre-existing conditions and future development pressure should determine the performance standards TCEQ requires for Majestic Manor and all other new treatment plants. The additional remedies referred to in our comments and reiterated below, are already in use in other parts of Travis County. These can have a significant beneficial impact on the future health of Wilbarger Creek for wildlife, agricultural and recreational uses and the Colorado River. Given the pending and recently issued permits, we request TCEQ set the treatment standards at the highest possible and achievable limits. Wilbarger Creek should be maintained as a healthy, functioning ecosystem. A limit on total nutrient loading of 0.1 mg/liter phosphorus. Wastewater treatment technology is remarkable in terms of how well it can function. This is a permit that requires it. Wet ponds, wetlands and sheet flow over a vegetated buffer - We request this technology on treated effluent prior to discharge into Wilbarger Creek. The use of a few acres devoted to these methods would significantly improve stream inputs. Land application - No discharge permits and land applications are required in the Highland Lakes and Barton Springs Zone. What justification is there to not have similar requirements in the Wilbarger Creek watershed? If developers can meet those requirements elsewhere, why not in the Wilbarger Creek watershed? Beneficial reuse - We appear to be entering another severe drought. Some of that water might be better used for irrigation, wetlands or other beneficial reuse. A reuse plan for Majestic Manor would preserve our potable water resources. Maybe now is the time to start including beneficial reuse in all permits? Chlorination is necessary to ensure harmful bacteria is killed. Unfortunately, the usual minimum residual levels in discharges is high enough to kill or stress fish and other aquatic life. If a portion of Wilbarger Creek is predominantly or all treated effluent, that portion of the Creek will not support much life. Irrigation or discharging first to a pond or wetland prior to entering Wilbarger Creek could help mitigate that. Treatment plant malfunctions are unfortunately

2



predictable, and sometimes outside the control of plant operators. Power outages, floods, mechanical failures, etc. can quickly result in exceedances of permit limits, even in a well run plant. Since Wilbarger creek is so small at this point, the impacts of an unauthorized discharge will be much more severe than a similar discharge into a larger river. Consider Round Rock's problems at the Brushy Creek WWTP, which have been well documented over the last several months. Land application, beneficial reuse, wet ponds, vegetative filter strips, etc. would provide a better buffer in the unfortunate event that the plant has problems. The unknown future negative impacts of Pflugerville's WWTP and others indicate TCEQ should err on the side of caution. Downstream neighbors, taxpayers, terrestrial wildlife and aquatic environments should not have to suffer so that this wastewater operator can save a little money. Anne Brockenbrough - I have had the water quality tested several times over the last few years by the Austin Youth River Watchers (AYRW) and each time they have found the water in Wilbarger Creek has extremely low dissolved oxygen levels indicating that the creek is already impaired or dangerously close. With the addition of treated effluent coming from Pflugerville and Majestic Manor, I am afraid the creek will be permanently impaired. I ask that TCEQ do a current test of the water in Wilbarger downstream of the Manor plant before you approve this permit. You are welcome to come on my ranch and test the water any time. Marilyn Kelinske - Wilbarger is a source of water for wildlife. My land has a conservation easement on it for wildlife and with the population growth all around, it has become a haven for it. The animals depend on clean water from the creek for survival. I do have horses and livestock on my property but have restricted their access to the creek water because of the contamination. The creek is also a place for fishing and swimming. The fish are minimal in numbers now but they can rebound if the water is protected. People should be able to enjoy swimming in the creek but all of us would not want to do so if the water was contaminated and full of algae like it was recently. Respectfully submitted, _____ Jon Beall, President, WCCA 2503 Flora Cove Austin, TX 78746 512-632-1760 _____ Anne Brockenbrough, VP, WCCA 11318 Jones Rd Manor, TX 78653 512-278-8699 _____ Marilyn Kelinske, Board Member, WCCA 15611 Littig Rd Manor, TX 78652 512-796-1196

3

# Wilbarger Creek Regional Wastewater Treatment Facility

## About this project

Due to the City of Pflugerville's continued economic development, the City is actively working to expand water resources to maintain the highest level of service and quality of life to our residents.

The City owns a 159-acre tract of land on the west side of Wilbarger Creek and the north side of Gregg Lane that was selected to provide wastewater service to the Wilbarger and potentially the Cottonwood Sewer Basins. This land will be the location of the new Wilbarger Creek Regional Wastewater Treatment Facility (RWWTF).



The new facility will maximize the use of existing infrastructure while providing long-term facility expansion opportunities.

Based on updated flow projections, a strategic analysis of the Wilbarger service area has determined the following optimum facility size and expansion schedule for the Wilbarger Creek RWWTF:

- Phase 1 – 6.00 MGD
- Phase 2 – 12.00 MGD
- Phase 3 – 15.75 MGD

**Additional information**

The initial six (6) million gallon per day (MGD) phase of the treatment facility project includes an evaluation of wastewater treatment alternatives for site development.

The project will consist of preliminary engineering, design, bidding, and construction and is funded by the Texas Water Development Board (TWDB) Clean Water State Revolving Fund, which provides low-cost financial assistance for planning, acquisition, design, and construction of wastewater, reuse, and stormwater infrastructure.

TWDB funding was awarded in part due to the City's mission to consider environmentally responsible beneficial use strategies, such as reclaimed water, biosolids composting and potentially energy production in the future.



---

View Bid 🡕

---

Download flyer ⊕

---



Download Map ⬇

## CMAR Engagement Meeting

### Overview

The City of Pflugerville hosted a virtual Construction Manager At-Risk (CMAR) Engagement Meeting on January 11, 2023 from 8:30 - 10:30 a.m. to discuss the project which consists of construction of a greenfield 6.0 MGD wastewater treatment plant on a 158 acre site, including an influent lift station,

headworks, treatment trains for a 6.0 MGD secondary treatment system, tertiary filtration/UV disinfection, solids handling, building facilities, site civil improvements, and utilities.

The CMAR Request for Proposals (RFP) is anticipated for release on January 18, 2023, with receipt of proposals in March 2023 and planned Council Approval April 2023.

**Meeting replay**



**Additional information**

Watch on YouTube     Download Transcript (VTT)

# Virtual Open House

### Overview

In May 2021, the City hosted a virtual open house to share information on the proposed design and construction of the RWWTF.

**Meeting replay**



## Additional information

Watch on YouTube

---

# Related projects

As separate projects, the City has authorized the design of the Wilbarger Creek Wastewater Interceptor (WWI) and the Sorento WWI Phase 2 projects. Once designed and constructed, both interceptors will deliver wastewater flows from the Wilbarger Basin for treatment to the Wilbarger Creek RWWTF. These projects are included in the established funding program with the TWDB.

## Additional information

Visit pflugervilletx.gov/projects and click on "In Design" under Utilities to learn more about these projects.

# Project goals

1. To ensure quality wastewater services for Pflugerville residents.
2. Be an environmental steward with reliable wastewater filtration and best practices to protect Pflugerville creeks and waterways.
3. Produce a clean water discharge that continues to exceed regulatory standards and enhances the area habitat.
4. Operate and responsibly manage a wastewater facility that is sized to accommodate Pflugerville's current and future growth.

## Project updates

- The Wilbarger Creek RWWTF's environmental information document (EID) has been reviewed by the TWDB and has been issued a Finding of no Significant Impact (FNSI).
- All three (3) of the City's Wilbarger Creek Wastewater Improvement Program projects are continuing with design activities in parallel.

AR Item 34, Page 023

# Request for a Contested Case Hearing, Majestic Manor
## WQ0016022001

November 26, 2022

TO:   TCEQ
FM:   Wilbarger Creek Conservation Alliance (WCCA),
       Jon Beall, President, WCCA
       Anne Brockenbrough, VP, WCCA
       Marilyn Kelinske, M.D., Board Member, WCCA

RE:   Request for a Contested Case Hearing on the Draft Permit for Majestic Manor
WQ0016022001

We as individuals and collectively as WCCA protest the TCEQ's issuance of the Draft Permit, and request a Contested Case Hearing. TCEQ must do more to preserve the water quality of Wilbarger Creek and prevent further degradation..

*West of the Travis County line, Wilbarger Creek historically was a small, intermittent* stream. It had high flows only periodically, then quickly subsided into stagnant pools that soon evaporated. Now Wilbarger Creek flows through our properties year round at most times a few inches deep and a few feet wide consisting entirely of treated effluent from Manor and Shadowglen WWTPs.

- Ms. Brockenbrough, Dr. Kelinske and I request and should receive individual standing because we each own property on both sides of Wilbarger Creek. Although our properties are almost 5 miles downstream from the WWTP, most of the year the creek flow is 100% effluent. Thus the discharge will impact our property.
- WCCA, a 501c organization, should also receive standing. The mission of WCCA includes to preserve and protect the water quality of Wilbarger Creek.
- Evidence already exists of unacceptable amounts of pollution in the Creek without the additional discharges of the new Pflugerville and proposed Majestic Manor WWTPs. The photos attached of Wilbarger Creek as it flows through the Kelinske property show a significant algae bloom in April 2022. The Response to Comments gives no indication TCEQ took any action to investigate this existing problem.
- The Response to Comments makes reference to TCEQ Water Quality monitoring stations (SWQM). All reports since 2014 already list nitrates as a source of concern.

*Page 1 of 4*

- The Federal Environmental Review EID of the new Pflugerville WWTP, which states the hydraulic capacity to be 24 mgd, examines the Cumulative Impacts only within the Pflugerville city limits, not impacts on the downstream humans, livestock, wildlife and agricultural uses. It seems very strange to examine the impact of sewage effluent only upstream of the discharge. This may be a violation of NEPA.
- The Response to Comments states modeling used worst case scenarios: the maximum permitted flows during hot, dry summertime conditions. We take issue with the statement that follows: …conditions unlikely to occur for any significant period of time…. We believe the real world impacts already observed by protestants and photo evidence are better indicators of cumulative impacts on the creek than any model.
- We need an opportunity to evaluate the modeling supporting the draft permit, and an opportunity to discuss with the staff the assumptions in the model and the model itself.
- Pflugerville's new WWTP is permitted to discharge 15 mgd. Since that plant is under construction, we really cannot know the actual impacts on the creek in terms of stream flow and water quality until after that plant goes online. If all of Pflugerville's effluent is going to WilbargerCreek, it seems irresponsible to permit additional significant volumes of discharges into the Creek before the true impacts of Pflugerville's regional plant are more clear.
- Pflugerville says their new WWTP will grow to 24 mgd. https://www.pflugervilletx.gov/city-government/capital-improvement-program-cip/projects-overview/wilbarger-creek-regional-wastewater-treatment-facility
- The city of Pflugerville's EID says Wilbarger Creek supposedly has 15.75 MGD of capacity. Is all of this already accounted for in Pflugerville's permit? If so, what is left for Majestic Manor?
- How will the additional discharge of Majestic Manor affect the overall health of Wilbarger Creek?
- Pre-existing conditions and future development pressure should determine the performance standards TCEQ requires for Majestic Manor and all other new treatment plants.
- The additional remedies referred to in our comments and reiterated below, are already in use in other parts of Travis County. These can have a significant beneficial impact on the future health of Wilbarger Creek for wildlife, agricultural and recreational uses and the Colorado River.

Given the pending and recently issued permits, we request TCEQ set the treatment standards at the highest possible and achievable limits. Wilbarger Creek should be maintained as a healthy, functioning ecosystem.

- A limit on total nutrient loading of 0.1 mg/liter phosphorus. Wastewater treatment technology is remarkable in terms of how well it can function. This is a permit that requires it.
- Wet ponds, wetlands and sheet flow over a vegetated buffer - We request this technology on treated effluent prior to discharge into Wilbarger Creek. The use of a few acres devoted to these methods would significantly improve stream inputs.
- Land application - No discharge permits and land applications are required in the Highland Lakes and Barton Springs Zone. What justification is there to not have similar requirements in the Wilbarger Creek watershed? If developers can meet those requirements elsewhere, why not in the Wilbarger Creek watershed?
- Beneficial reuse - We appear to be entering another severe drought. Some of that water might be better used for irrigation, wetlands or other beneficial reuse. A reuse plan for Majestic Manor would preserve our potable water resources. Maybe now is the time to start including beneficial reuse in all permits?
- Chlorination is necessary to ensure harmful bacteria is killed. Unfortunately, the usual minimum residual levels in discharges is high enough to kill or stress fish and other aquatic life. If a portion of Wilbarger Creek is predominantly or all treated effluent, that portion of the Creek will not support much life. Irrigation or discharging first to a pond or wetland prior to entering Wilbarger Creek could help mitigate that.
- Treatment plant malfunctions are unfortunately predictable, and sometimes outside the control of plant operators. Power outages, floods, mechanical failures, etc. can quickly result in exceedances of permit limits, even in a well run plant. Since Wilbarger creek is so small at this point, the impacts of an unauthorized discharge will be much more severe than a similar discharge into a larger river. Consider Round Rock's problems at the Brushy Creek WWTP, which have been well documented over the last several months. Land application, beneficial reuse, wet ponds, vegetative filter strips, etc. would provide a better buffer in the unfortunate event that the plant has problems.
- The unknown future negative impacts of Pflugerville's WWTP and others indicate TCEQ should err on the side of caution. Downstream neighbors, taxpayers, terrestrial wildlife and aquatic environments should not have to suffer so that this wastewater operator can save a little money.
- Anne Brockenbrough - I have had the water quality tested several times over the last few years by the Austin Youth River Watchers (AYRW) and each time they have found the water in Wilbarger Creek has extremely low dissolved oxygen levels indicating that the creek is already impaired or dangerously

Page 3 of 14

close. With the addition of treated effluent coming from Pflugerville and Majestic Manor, I am afraid the creek will be permanently impaired. I ask that TCEQ do a current test of the water in Wilbarger downstream of the Manor plant before you approve this permit. You are welcome to come on my ranch and test the water any time.

- Marilyn Kelinske - Wilbarger is a source of water for wildlife. My land has a conservation easement on it for wildlife and with the population growth all around, it has become a haven for it. The animals depend on clean water from the creek for survival. I do have horses and livestock on my property but have restricted their access to the creek water because of the contamination. The creek is also a place for fishing and swimming. The fish are minimal in numbers now but they can rebound if the water is protected. People should be able to enjoy swimming in the creek but all of us would not want to do so if the water was contaminated and full of algae like it was recently.

Respectfully submitted,

Jon Beall, President, WCCA
2503 Flora Cove
Austin, TX 78746
512-632-1760

Anne Brockenbrough, VP, WCCA
11318 Jones Rd
Manor, TX 78653
512-278-8699

Marilyn Kelinske, Board Member, WCCA
15611 Littig Rd
Manor, TX 78652
512-796-1196

Page 4 of 4

# Ellie Guerra

**From:** PUBCOMMENT-OCC
**Sent:** Tuesday, November 29, 2022 1:12 PM
**To:** PUBCOMMENT-WQ; PUBCOMMENT-ELD; PUBCOMMENT-OCC2; PUBCOMMENT-OPIC
**Subject:** FW: Public comment on Permit Number WQ0016022001

H

**From:** elmridgeranch@yahoo.com <elmridgeranch@yahoo.com>
**Sent:** Tuesday, November 29, 2022 11:57 AM
**To:** PUBCOMMENT-OCC <PUBCOMMENT-OCC@tceq.texas.gov>
**Subject:** Public comment on Permit Number WQ0016022001

**REGULATED ENTY NAME** MAJESTIC MANOR WWTP

**RN NUMBER:** RN111305389

**PERMIT NUMBER:** WQ0016022001

**DOCKET NUMBER:**

**COUNTY:** TRAVIS

**PRINCIPAL NAME:** SWWC UTILITIES INC

**CN NUMBER:** CN603264763

**FROM**

**NAME:** Anne Stewart Brockenbrough

**EMAIL:** elmridgeranch@yahoo.com

**COMPANY:** Elm Ridge Ranch

**ADDRESS:** 11318 JONES RD
MANOR TX 78653-5205

**PHONE:** 5127898699

**FAX:**

**COMMENTS:** My name is Anne Brockenbrough and I am writing to ask for standing and to request a contested case hearing in regards to the SWWC Utilities, Inc's Permit # WQ0016022001. I own a working ranch approximately 3 miles downstream of the proposed Majestic Manor waste water treatment plant. I own land on both sides of Wilbarger Creek and for the past 25 years I have seen what used to be a seasonally intermittent creek—often completely dry—now running very high all the time (just a few feet under the bridge on Jones Road now) due to the constant pumping of

1

 

treated effluent from several waste water treatment plants upstream. This has caused repeated flooding every time there is a big rain, erosion of my land, and severe damage to all my fencing, I am very concerned about the water quality in the creek which my cattle depend on for water. I have had the water tested several times by the Austin Youth River Watchers and each time the results show extremely low dissolved oxygen, indicating that the creek is already impaired or dangerously close. I am concerned that the addition of even more treated effluent from the proposed Majestic Manor Waste Water Treatment Plant will cause the creek to be permanently impaired. I ask that TCEQ do a current test of the water in Wilbarger below the Manor plant before this new plant is approved. I think a TMDL study is needed and I think it will show that TCEQ needs to hold all the waste water treatment plants that are currently discharging into Wilbarger Creek to a higher standard. I believe that plants on the west side discharging into Barton Creek are held to a higher standard and I believe the same should be done for Wilbarger Creek. Again, I ask for standing and I would like to request a contested case hearing. Thank you for your consideration— Anne Brockenbrough

2

# Ellie Guerra

**From:** PUBCOMMENT-OCC
**Sent:** Monday, November 28, 2022 10:51 AM
**To:** PUBCOMMENT-WQ; PUBCOMMENT-ELD; PUBCOMMENT-OCC2; PUBCOMMENT-OPIC
**Subject:** FW: Public comment on Permit Number WQ0016022001

H

**From:** elmridgeranch@yahoo.com <elmridgeranch@yahoo.com>
**Sent:** Friday, November 25, 2022 11:44 PM
**To:** PUBCOMMENT-OCC <PUBCOMMENT-OCC@tceq.texas.gov>
**Subject:** Public comment on Permit Number WQ0016022001

**REGULATED ENTY NAME** MAJESTIC MANOR WWTP

**RN NUMBER:** RN111305389

**PERMIT NUMBER:** WQ0016022001

**DOCKET NUMBER:**

**COUNTY:** TRAVIS

**PRINCIPAL NAME:** SWWC UTILITIES INC

**CN NUMBER:** CN603264763

**FROM**

**NAME:** Anne Stewart Brockenbrough

**EMAIL:** elmridgeranch@yahoo.com

**COMPANY:** Elm Ridge Ranch

**ADDRESS:** 11318 JONES RD
MANOR TX 78653-5205

**PHONE:** 5127898699

**FAX:**

**COMMENTS:** My name is Anne Brockenbrough and I am writing to ask for standing and to request a contested case hearing in regards to the SWWC Utilities, Inc's Permit # WQ0016022001. I own a working ranch approximately 3 miles downstream of the proposed Majestic Manor waste water treatment plant. I own land on both sides of Wilbarger Creek and for the past 25 years I have seen what used to be a seasonally intermittent creek—often completely dry—now running very high all the time (just a few feet under the bridge on Jones Road now) due to the constant pumping of

1

 

treated effluent from several waste water treatment plants upstream. This has caused repeated flooding every time there is a big rain, erosion of my land, and severe damage to all my fencing, I am very concerned about the water quality in the creek which my cattle depend on for water. I have had the water tested several times by the Austin Youth River Watchers and each time the results show extremely low dissolved oxygen, indicating that the creek is already impaired or dangerously close. I am concerned that the addition of even more treated effluent from the proposed Majestic Manor Waste Water Treatment Plant will cause the creek to be permanently impaired. I ask that TCEQ do a current test of the water in Wilbarger below the Manor plant before this new plant is approved. I think a TMDL study is needed and I think it will show that TCEQ needs to hold all the waste water treatment plants that are currently discharging into Wilbarger Creek to a higher standard. I believe that plants on the west side discharging into Barton Creek are held to a higher standard and I believe the same should be done for Wilbarger Creek. Again, I ask for standing and I would like to request a contested case hearing. Thank you for your consideration— Anne Brockenbrough

| | |
|---|---|
| **From:** | PUBCOMMENT-OCC |
| **Sent:** | Tuesday, July 5, 2022 11:27 AM |
| **To:** | PUBCOMMENT-WQ; PUBCOMMENT-ELD; PUBCOMMENT-OCC2; PUBCOMMENT-OPIC |
| **Subject:** | FW: Public comment on Permit Number WQ0016022001 |

PML+

H

**From:** Elmridgeranch@yahoo.com <Elmridgeranch@yahoo.com>
**Sent:** Wednesday, June 29, 2022 11:07 PM
**To:** PUBCOMMENT-OCC <PUBCOMMENT-OCC@tceq.texas.gov>
**Subject:** Public comment on Permit Number WQ0016022001

**REGULATED ENTY NAME** MAJESTIC MANOR WWTP

**RN NUMBER:** RN111305389

**PERMIT NUMBER:** WQ0016022001

**DOCKET NUMBER:**

**COUNTY:** TRAVIS

**PRINCIPAL NAME:** SWWC UTILITIES INC

**CN NUMBER:** CN603264763

**FROM**

**NAME:** Anne Stewart Brockenbrough

**EMAIL:** Elmridgeranch@yahoo.com

**COMPANY:** Elm Ridge Ranch

**ADDRESS:** 11318 JONES RD
MANOR TX 78653-5205

**PHONE:** 5127898699

**FAX:**

**COMMENTS:** My name is Anne Brockenbrough and I am writing in regards to the SWWC Utilities, Inc application for a new Texas Pollutant Discharge Elimination System (TPDES) Permit # WQ0016022001. I would like to request standing, a public hearing, and to be placed on the permanent mailing list for this applicant and for Travis County. I own and live on a working ranch approximately 3 miles down stream of the proposed Majestic Manor waste water treatment plant. I

i



own land on both sides of Wilbarger Creek, and over the past 25 years, I have seen what used to be a seasonally intermittent creek—often completely dry—now running very high all the time due to the treated effluent being pumped in constantly from several waste water treatment plants upstream—including Manor, Shadow Glen and soon Pflugerville. The water is often times right up under the bridge on Jones Road and has caused increased flooding of my land and Jones Road which now has to be repaired every year. Wilbarger Creek now floods several times a year—every time there is a big rain. This causes my fences to blow out and livestock to escape. Last year we lost 17 head of cattle—and many of the surrounding neighbors cattle end up on my place because their cattle either escape or get washed down stream. It is becoming increasingly impossible to run a profitable working ranch. I am concerned that adding even more waste water into Wilbarger Creek will cause further erosion and loss of my land as well as my livestock. It will also impair the water quality even more. I have had the water quality tested several times over the last few years by the Austin Youth River Watchers (AYRW) and each time they have found the water in Wilbarger Creek has extremely low dissolved oxygen levels indicating that the creek is already impaired or dangerously close. With the addition of treated effluent coming from Plugerville and Majestic Manor, I am afraid the creek will be permanently impaired. I ask that TCEQ do a current test of the water in Wilbarger down stream of the Manor plant before you approve this permit. You are welcome to come on my ranch and test the water any time. I think a TMDL study is needed. If this permit application is approved I would hope that you would hold all the plants currently discharging into Wilbarger Creek to much higher standards and investigate the cause of the water impairment before it is too late. Again, I would like to request standing in this case and also request a public hearing. Please put me on the mailing list for this case as well as for Travis County. Thank you for your consideration. Anne Brockenbrough Elm Ridge Ranch 11318 Jones Road Manor, Tx 78653 Elmridgeranch@yahoo.com (512)789-8699

AR Item 34, Page 033

## Ellie Guerra

**From:** PUBCOMMENT-OCC
**Sent:** Tuesday, November 29, 2022 8:13 AM
**To:** PUBCOMMENT-WQ; PUBCOMMENT-ELD; PUBCOMMENT-OCC2; PUBCOMMENT-OPIC
**Subject:** FW: Public comment on Permit Number WQ0016022001

H

**From:** makoph@hotmail.com <makoph@hotmail.com>
**Sent:** Monday, November 28, 2022 10:57 PM
**To:** PUBCOMMENT-OCC <PUBCOMMENT-OCC@tceq.texas.gov>
**Subject:** Public comment on Permit Number WQ0016022001

**REGULATED ENTY NAME** MAJESTIC MANOR WWTP

**RN NUMBER:** RN111305389

**PERMIT NUMBER:** WQ0016022001

**DOCKET NUMBER:**

**COUNTY:** TRAVIS

**PRINCIPAL NAME:** SWWC UTILITIES INC

**CN NUMBER:** CN603264763

**FROM**

**NAME:** Marilyn Kelinske

**EMAIL:** makoph@hotmail.com

**COMPANY:**

**ADDRESS:** 6805 LADERA NORTE
AUSTIN TX 78731-2687

**PHONE:** 5127961196

**FAX:**

**COMMENTS:** I would like to request a contested case hearing and certification of being an affected person. When I first bought my property at 11561 Littig Road, Wilbarger Creek was only a wet weather creek and then it required lots of rain to even have any flow. Now, due to discharges from sewer plants, the creek runs year round with a fairly rapid flow. When rain occurs, like this past weekend, the creek becomes impassable for several days. I cannot access almost 80% of my property due to the inability to cross the creek. With continued proposals to discharge more and more treated

1



effluent into Wilbarger, I believe I will be cut off from accessing the majority of my property. In addition I have observed multiple algae blooms in the water which are evidence of contamination by treatment discharges. I recently received a report from TCEQ in response to a complaint, and it revealed multiple deficiencies of the Manor treatment facility, including sand filtration which was OFFLINE. This contamination, which has occured multiple times as documented by TCEQ, makes the water downstream unsuitable for safe drinking by my animals or any of the wildlife currently living on the property. With increased discharges into the creek from current treatment plants or new ones, there are increased chances for the creek to be further contaminated. I no longer hear or see the frogs in the creek. They used to be prominent and I believe this is due to the lower water quality. It is imperative that this creek be protected. Its water flows into the Colorado, which is a source for drinking water down the line.

# Debbie Zachary

**From:** PUBCOMMENT-OCC
**Sent:** Tuesday, July 5, 2022 11:30 AM
**To:** PUBCOMMENT-WQ; PUBCOMMENT-ELD; PUBCOMMENT-OCC2; PUBCOMMENT-OPIC
**Subject:** FW: Public comment on Permit Number WQ0016022001
**Attachments:** Majestic Marsh WWTP2.pdf

eComment = H
Attachment = H

**From:** makoph@hotmail.com <makoph@hotmail.com>
**Sent:** Thursday, June 30, 2022 10:18 AM
**To:** PUBCOMMENT-OCC <PUBCOMMENT-OCC@tceq.texas.gov>
**Subject:** Public comment on Permit Number WQ0016022001

REGULATED ENTY NAME MAJESTIC MANOR WWTP

RN NUMBER: RN111305389

PERMIT NUMBER: WQ0016022001

DOCKET NUMBER:

COUNTY: TRAVIS

PRINCIPAL NAME: SWWC UTILITIES INC

CN NUMBER: CN603264763

FROM

NAME: MARILYN KELINSKE

EMAIL: makoph@hotmail.com

COMPANY:

ADDRESS: 6805 LADERA NORTE
AUSTIN TX 78731-2687

PHONE: 5127961196

FAX:

COMMENTS: I would like to request individual standing in this matter as a property owner on Wilbarger. I also want to ask for a public hearing.

1

To the Office of Chief Clerk
TCEQ
Re: Draft permit WQ0016022001

I own property on Littig Road and Wilbarger Creek and its tributaries run across my property.
When I purchased the property the creek was clear. In recent years it has become cloudy many times,
clogged with algae, which is a sign of contamination. No longer can the fish and frogs that were
abundant earlier be found. I understand that Pflugerville is discharging effluent directly into Wilbarger .
I hold that this is the reason for the changes I have observed. But what has been done about this? What
changes have been made to prevent this occurrence in the future?
With all the population growth in the area, there is going to be more and more pressure to discharge
effluent into Wilbarger. This does not bode well for Wilbarger or the Colorado River it drains into or
the Edwards Aquifer recharge zone. All these waters will suffer if Wilbarger suffers.
Numerous studies have shown that nitrogen and phosphorus levels are markedly increased when
effluent is discharged into water. This is evidence of clear contamination and poses dangers on many
fronts.
Wilbarger is a source of water for wildlife. My land has a conservation easement on it for wildlife and
with the population growth all around, it has become a haven for it. The animals depend on clean
water from the creek for survival. I do have horses and livestock on my property but have restricted
their access to the creek water because of the contamination. The creek is also a place for fishing and
swimming. The fish are minimal in numbers now but they can rebound if the water is protected.
People should be able to enjoy swimming in the creek but all of us would not want to do so if the water
was contaminated and full of algae like it was recently.

The amount of flow is also a concern for me. When I purchased the property, the creek was dry except
during winter rains. Now it flows year round but often is too deep after rains to allow me access to the
back ¾ of my property. What effect would 800,000 gallons daily have on this?
I am concerned about the increased flooding of Wilbarger that occurs with modest rains now. What
happens when effluent is mixed with stormwater and overflows on hundreds of acres adjacent to the
banks of the creek. What effect on vegetation and the animals does this have? Have studies been done
to know the answer? How long would this effect last?
Add to this that a decision to divert the discharge of treated effluent from existing Manor subdivisions
from Gilleland Creek to Wilbarger has been made recently.
Based on all these concerns, I oppose any new discharge of effluent directly into Wilbarger Creek.
It is imperative that higher treatment standards be required.

I would like to request individual standing in this matter and request a public hearing regarding
Majestic Manor.

Thank you.

Marilyn Kelinske

# Appendix Item 9





# Appendix Item 10

# TCEQ Interoffice Memorandum

**To:**        Municipal Permits Team
Wastewater Permitting Section

**Thru:**     Brad Caston, Standards Implementation Peer Review
Water Quality Assessment Section
Water Quality Division

**From:**    M. A. Wallace, PhD, Standards Implementation Team
Water Quality Assessment Section
Water Quality Division

**Date:**     11/22/2021

**Subject:**  SWWC Utilities, Inc.; No. WQ0016022001
New; Application Received: 7/28/2021

The discharge route for the above referenced permit is via pipe to Wilbarger Creek, thence to Colorado River Above La Grange in Segment 1434 of the Colorado River Basin. The designated uses and dissolved oxygen criterion as stated in Appendix A of the Texas Surface Water Quality Standards (30 Texas Administrative Code §307.10) for Segment 1434 are primary contact recreation, public water supply, exceptional aquatic life use, and 6.0 mg/L dissolved oxygen.

Since the discharge is directly to an unclassified water body, the permit action was reviewed in accordance with 30 Texas Administrative Code §307.4(h) and (I) of the 2018 Texas Surface Water Quality Standards and the TCEQ's implementation procedures for the standards. Based on a receiving water assessment and/or other available information, a preliminary determination of the aquatic life uses in the area of the discharge impact has been performed and the corresponding dissolved oxygen criterion assigned.

Wilbarger Creek; high aquatic life use; 5.0 mg/L dissolved oxygen.

In accordance with 30 Texas Administrative Code §307.5 and the TCEQ implementation procedures (June 2010) for the Texas Surface Water Quality Standards, an antidegradation review of the receiving waters was performed.  A Tier 1 antidegradation review has preliminarily determined that existing water quality uses will not be impaired by this permit action.  Numerical and narrative criteria to protect existing uses will be maintained.  A Tier 2 review has preliminarily determined that no significant degradation of water quality is expected in Wilbarger Creek and Colorado River Above La Grange, which have been identified as having high and exceptional aquatic life uses, respectively.  Existing uses will be maintained and protected.  The preliminary determination can be reexamined and may be modified if new information is received.

No priority watershed of critical concern has been identified in Segment 1434.  However, the Barton Springs salamander (*Eurycea sosorum*), an endangered species, is known to occur only

---

in Barton and adjacent springs and their outflows in Zilker Park, near downtown Austin, Travis County. This determination is based on the United States Fish and Wildlife Service's (USFWS) biological opinion on the State of Texas authorization of the Texas Pollutant Discharge Elimination System (TPDES; September 14, 1998, October 21, 1998 update). To make this determination for TPDES permits, TCEQ and EPA only consider aquatic or aquatic dependent species occurring in watersheds of critical concern or high priority as listed in Appendix A of the USFWS biological opinion. The determination is subject to reevaluation due to subsequent updates or amendments to the biological opinion. Species distribution information for the Barton Springs salamander is provided by the USFWS and documents the salamander's presence in Barton and adjacent springs and their outflows in Zilker Park, near downtown Austin, Travis County which is a different watershed than the facility associated with this permit action. Based upon this information, it is determined that the facility's discharge is not expected to impact the Barton Springs salamander. The permit does not require EPA review with respect to the presence of endangered or threatened species.

The Houston toad (*Bufo houstonensis* Sanders), an endangered aquatic-dependent species of critical concern, occurs within the Segment 1434's watershed as well as the 12090301 United States Geological Survey hydrologic unit code. This determination is based on the United States Fish and Wildlife Service's (USFWS) biological opinion on the State of Texas authorization of the Texas Pollutant Discharge Elimination System (TPDES; September 14, 1998, October 21, 1998 update). To make this determination for TPDES permits, TCEQ and EPA only consider aquatic or aquatic dependent species occurring in watersheds of critical concern or high priority as listed in Appendix A of the USFWS biological opinion. The determination is subject to reevaluation due to subsequent updates or amendments to the biological opinion. Species distribution information for the Segment 1434 watershed is provided by the USFWS and documents the toad's presence solely in the vicinity of Alum Creek, Copperas Creek, Gills Branch, Piney Creek, Price Creek, and Puss Hollow in Bastrop County, which is farther up the watershed from the facility associated with this permit action. Based upon this information, it is determined that the facility's discharge is not expected to impact the Houston toad. The permit does not require EPA review with respect to the presence of endangered or threatened species.

# Appendix Item 11

**New Permit Review for Unclassified Waters by Standards Team**

Name:  SWWC Utilities, Inc. (Majestic Manor WWTP)          Number:  16022001

County:  Travis

Region:  11

Basin:  Colorado River

Date Application Received:  7/28/21

1.      Segment in Which Discharge is Located:  1434 – Colorado River Above La Grange

2.      Designated Uses and Pertinent Criteria:  PCR, PS, E, 6.0 mg/L DO

3.      Unclassified Receiving Water Characteristics: Wilbarger Creek → >10 mi. → 1434

   The discharge is via pipe (~200 ft.) to the perennial portion of Wilbarger Creek per USGS, and previous review of permit #12900-001 and RWA (2005).

   Outfall location: 30.3355, -97.53541

   2020 303(d): 1434D_02 Wilbarger Creek, no impairments
   2020 305(b): 1434D_02 Wilbarger Creek, bacteria and nitrate

4.      Additional Comments: 0.2/0.5/0.8 MGD; proposed 5/5/2/1 limits are consistent with Colorado Watershed Protection Rule.

5.      Recommended Receiving Water Uses and Associated Criteria:

| Stream name | Stream Order | Aq. Life Use | DO | AL Criteria | | HH Criteria | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Acute | Chron | Incid. | Sustain. | HH-PS+ Fish |
| Wilbarger Creek | 3 | H | 5.0 | X | X | | X | |

6.      Antidegradation: The nutrient screening indicates that a TP limit or monitoring may be warranted. The Colorado River Watershed Protection Rule will apply, and a total phosphorus limit of 1.0 mg/L TP will be required. This, combined with the relatively small size of the discharge, should help to preclude the potential for eutrophication.  No significant degradation is expected.

7.      Endangered species:  Houston Toad in segment, but not county. Barton Springs salamander is in county, but not segment.


   Reviewer: M. A. Wallace, PhD; 11/22/21


Peer reviewer, fill in the bold columns.  Standards reviewer, fill in the non-bold columns.

| Date to Peer Reviewer (PR) | **PR initial** | **Date to SR for reevaluation** | Date to PR for Final Review | **Date to SR for Finalization** | Date to Crit Conditions |
|---|---|---|---|---|---|
| 11/22/21 | BC | 12/1/21 | 12/2/21 | 12/3/21 | 12/3/21 |

**Nutrient Screening for Streams and Rivers (see pages 37 - 43 of the draft IPs)**

**Applicant Name** SWWC
**Permit number:** 16022001
**Segment:** 1434

**STEP 1: Determine evaluation distance. This a rough guide (page 37).**

| Permitted flow (MGD) | Evaluation distance (stream miles) |
|---|---|
| <0.25 | <3 |
| 0.25 to <1.0 | <7 |
| ≥ 1.0 | <15 |

**STEP 2: Assess concerns: enter point values in boxes to the right.**

| Level of concern | LOW (1 point) | MOD (3 points) | HIGH (5 points) | | Specific notes on scores for this permit. |
|---|---|---|---|---|---|
| Discharge (MGD) | <0.25 | 0.25 to <1.0 | ≥1.0 | 3 | |
| Instream dilution (percent effluent)* | <10 | 10 to <25 | ≥25 | 3 | |
| Bottom (Sensitivity to growth of attached algae) | Mud or sand | Rocky cobble, gravel, usually with some riffle areas | Larger rocks and boulders, rock slabs | 3 | |
| Depth (Sensitivity to growth of attached vegetation) | Relatively steep banks and deep channels across streams | Gently sloping sides with some shallow areas | Substantial shallow areas near banks and in stream channel | 3 | |
| Water clarity | Turbid or tannic | Some turbidity, not murky | Clear water | 3 | |
| Observation* (Sensitivity to growth of aquatic vegetation) | Little | Limited/some | Heavy patches | 3 | |
| Shading (Sensitivity to growth of aquatic vegetaion) | Extensive canopy cover shades most of stream surface | Substantial canopy cover but only partial shading; not "deep woods" | Canopy cover diffuses light some, but substantial light reaches stream | 3 | |
| Stream type | Intermittent | Intermittent with pools | Perennial | 5 | |
| Impoundments | No impoundments >300' long, not many pools | No impoundments >300', substantial pools over 20% of reach | At least one impoundment >300' | 1 | |
| Consistency | Similar permits do not have TP limits | Some similar permits have TP limits, but applicability is site-specific and not across the board | Discharges w/similar characteristics usually have a TP limit | 5 | |
| Concern 305(b) and 303(d) | No concern for nutrients or aquatic veg in latestet integrated report | Concern for exceedance of 85th percentile | Documented problems | 3 | |

**Sum:** 0
**Average:** 3.18

*Average <2, probably no TP limit needed*

*Average >4, TP limit probably needed*

*Average 2-4, TP monitoring or a limit is possible, depending.*

*If a TP limit is needed, screening factors and levels of concern can be used to determine the TP limit.*

# Appendix Item 12

# Procedures to Implement the Texas Surface Water Quality Standards

Prepared by
Water Quality Division

RG-194
June 2010

1

# Contents

Introduction ................................................................................................. 12

Determining Water Quality Uses and Criteria ........................................ 14

Classified Waters ........................................................................................ 14
Unclassified Waters .................................................................................... 14
Presumed Aquatic Life Uses ...................................................................... 14
    Assigned Aquatic Life Uses .................................................................. 16

Evaluating Impacts on Water Quality ..................................................... 20

General Information .................................................................................... 20
Minimum and Seasonal Criteria for Dissolved Oxygen ............................ 21
Federally Endangered and Threatened Species ......................................... 21
    Screening Process ................................................................................. 22
    Additional Permit Limits ...................................................................... 22
    Edwards Aquifer ................................................................................... 23
Bacteria ...................................................................................................... 24
    Recreational Uses and Criteria ............................................................. 24
    Assigning Recreational Uses ................................................................ 25
    Wastewater Permitting ......................................................................... 26
Nutrients ..................................................................................................... 26
    Introduction .......................................................................................... 26
    General Screening Approach for Nutrient Impacts .............................. 26
    Nutrient Screening for Main Pool Effects in Reservoirs with Numerical Nutrient Criteria ............................................................................................... 30
    Nutrient Screening for Local Effects in Reservoirs ............................. 38
    Nutrient Screening for Streams and Rivers ......................................... 47
    Nutrient Screening for Estuaries ......................................................... 53
Other Applicable Rules .............................................................................. 53

Antidegradation ........................................................................................ 55

Policy .......................................................................................................... 55
General Applicability .................................................................................. 55
Tier 1—Protecting Uses .............................................................................. 56
Protecting Impaired Waters under Tier 1 ................................................... 57
    Definitions ............................................................................................ 57
    General Provisions ................................................................................ 58
    Applicability to Specific Parameters .................................................... 58
    Procedures for Discharges to Listed Water Bodies .............................. 59
    Applicability of Pollution Reduction Programs .................................... 60
    Examples of Permitting to Listed Water Bodies ................................... 60

Tier 2—Protecting High-Quality Waters..................................................................... 61
   Applicability ........................................................................................................ 61
   Evaluating the Potential for Degradation of Water Quality...................................... 63
   Examples Where Degradation Is Unlikely to Occur................................................. 65
   Examples Where Degradation Is Likely to Occur .................................................... 66
   Evaluation of Alternatives and Economic Justification............................................ 66
   Agency Review of Degradation............................................................................... 67
Tier 3—Outstanding National Resource Waters .......................................................... 67
Watershed Protection Rules ....................................................................................... 68
Public Notice............................................................................................................. 69

**Mixing Zones and Critical Conditions........................................................ 70**

General Information.................................................................................................... 70
Mixing Zones and ZIDs for Aquatic Life Protection................................................... 70
Critical Conditions for Aquatic Life Protection........................................................... 72
Determining the 7Q2.................................................................................................. 75
Determining Critical Low-Flows for Streams and Rivers that are Dominated by
Springflow................................................................................................................. 77
Mixing Zones and Critical Conditions for Human Health Protection .......................... 78
Determining the Harmonic Mean Flow ...................................................................... 80
Diffusers.................................................................................................................... 82

**Modeling Dissolved Oxygen........................................................................ 83**

General Information.................................................................................................... 83
Model Selection and Inputs ....................................................................................... 83
Screening Level Methods .......................................................................................... 84
   Nontidal Streams and Rivers ................................................................................. 84
   Tidal Water Bodies, Ponds, and Lakes ................................................................. 87
Critical Low-Flow Values for East and South Texas Streams .................................... 88
   Regression Equation Relating Dissolved Oxygen, Flow, and Bedslope .................. 91
   Calculating Bedslope ............................................................................................ 92
   Guidelines for Adjusting the Regression Equation................................................. 92
   Regression Equation for Establishing Critical Low-Flows in Specific Water Bodies
   in the Cypress Creek Basin ................................................................................... 93
Water Bodies with a Dissolved Oxygen Impairment .................................................. 94

**Whole Effluent Toxicity Testing (Biomonitoring)................................... 102**

Applicability ............................................................................................................ 102
Chronic and 48-Hour Acute Tests ........................................................................... 104
   Test Types........................................................................................................... 104
   Test Acceptability Criteria.................................................................................... 105
   Statistical Interpretation of Test Results............................................................... 107
   Test Frequencies ................................................................................................. 108
   Dilution Series, Dilution Water, and Type of WET Test ........................................ 110
   Reasonable Potential Determination.................................................................... 113

Toxicity Reduction Evaluations (TREs) .................................................................... 115
24-Hour Acute (100% End-of-Pipe) Tests ................................................................... 118
    Test Types .......................................................................................................... 118
    Test Acceptability Criterion ............................................................................... 119
    Test Frequencies ................................................................................................ 119
    Toxicity Reduction Evaluations (TREs) ............................................................ 119
    Toxicity Control Measures ................................................................................. 121
Test Substitution ......................................................................................................... 122
Toxicity Attributable to Dissolved Salts ..................................................................... 122
    TDS Exemption—24-Hour Acute (100% End-of-Pipe) Tests ............................ 125
    TDS Exemption—Chronic and 48-Hour Acute Tests ........................................ 126
Ammonia Toxicity ....................................................................................................... 128
    Controlling Potential Ammonia Toxicity .......................................................... 128
    Toxicity Attributable to Ammonia ..................................................................... 129
Toxicity Attributable to Diazinon ............................................................................... 129

**Toxic Pollutants ............................................................................ 130**

General Provisions ...................................................................................................... 130
Specific Numerical Criteria ........................................................................................ 131
Deriving Permit Limits for Aquatic Life Protection ................................................... 132
    General Approach ............................................................................................... 132
    Water Quality Parameters That Affect Aquatic Life Criteria ............................ 132
    Calculating Effluent Fractions ........................................................................... 133
    Calculating Waste Load Allocations .................................................................. 135
    Calculating the Long-Term Average .................................................................. 136
    Calculating Daily Average and Daily Maximum Permit Limits ........................ 137
Deriving Permit Limits for Human Health Protection ................................................. 140
    General Approach ............................................................................................... 140
    Calculating the Effluent Fraction ...................................................................... 141
    Calculating the Waste Load Allocation .............................................................. 142
    Calculating the Long-Term Average and Permit Limits .................................... 142
Establishing Permit Limits for Toxic Pollutants without Criteria .............................. 143
    Aquatic Life Criteria .......................................................................................... 143
    Human Health Criteria ....................................................................................... 146
Correcting for Background Concentrations ................................................................. 148
    Procedure for Developing Permit Limits ........................................................... 148
    Obtaining Reliable Water Quality Data ............................................................. 152
Once-Through Cooling Water Discharges ................................................................... 153
    Applicability ...................................................................................................... 153
    Permit Action ..................................................................................................... 153
    Statistical Study ................................................................................................. 154
    Source Investigation ........................................................................................... 155
    Exemption Approval or Denial ........................................................................... 155
Collecting Site-Specific Data ..................................................................................... 156
    Hardness, pH, and Chloride ............................................................................... 156
    TSS, Partition Coefficients, and Bioavailable Fractions of Metals ................... 159
Calculating Permit Limits for Specific Toxic Pollutants ............................................ 164

Calculating Permit Limits for Mercury, PCBs, Dioxins/Furans, DDT, DDD, and DDE .................................................................................................. 164
Calculating Permit Limits for Silver .................................................. 166
Calculating Permit Limits for Chromium ........................................... 167
Establishing Permit Limits for Toxic Pollutants ...................................... 168
Application Screening .......................................................................... 168
Analytical Procedures and MALs ....................................................... 169
Alternate Test Procedures ................................................................... 172
Defining Permit Limits ....................................................................... 173

**Screening Procedures and Permit Limits for Total Dissolved Solids .. 174**

Introduction .............................................................................................. 174
Screening Procedures for TDS ................................................................. 175
Determining Site-Specific Ambient TDS Values ..................................... 180
Establishing Permit Limits for TDS ......................................................... 181
Final Evaluation and Additional Considerations for TDS ........................ 184

**TPDES Storm Water Permits ........................................................... 187**

General Provisions .................................................................................... 187
Reviewing Permit Applications ................................................................ 187
Site-Specific Information .......................................................................... 189
Antidegradation Review of Storm Water Permits .................................... 189
Discharges to Impaired Waters ................................................................. 189
Discharges to the Edwards Aquifer Recharge Zone ................................. 190
Discharges to Specific Watersheds and Water Quality Areas .................. 190

**Site-Specific Standards and Variances ............................................ 191**

General Provisions .................................................................................... 191
Interim Permit with a Variance ................................................................ 191
Variance Extensions ................................................................................. 192
Coordinating with EPA ............................................................................ 193
Temporary Standards ................................................................................ 194
Site-Specific Standards for Aquatic Life Use .......................................... 195
Aquatic Life UAA Review and Approval ........................................... 196
Aquatic Life UAAs for Typical Sites .................................................. 197
Site Complications Requiring Additional Justification ........................ 199
Site-Specific Standards for Recreational Use ........................................... 199
Recreational UAA Review and Approval ............................................ 200
How to Conduct Recreational UAAs ................................................... 201
Wildlife Sources of Bacteria ............................................................... 202
Site-Specific Numerical Standards for Aquatic Life ............................... 202
Site-Specific Standards for Total Toxicity .............................................. 207

**Appendix A. Playa Lake Policy Statement**.............................................. **209**

**Appendix B. Locations of Federally Endangered and Threatened Aquatic and Aquatic-Dependent Species in Texas** ................................ **211**

**Appendix C. Critical Low-Flows and Harmonic Mean Flows for Classified Segments**.................................................................................. **217**

**Appendix D. Segment-Specific Values for Total Suspended Solids, pH, Total Hardness, Total Dissolved Solids, Chloride, and Sulfate**............ **228**

**Appendix E. Minimum Analytical Levels and Suggested Analytical Methods**..................................................................................................... **244**

**Appendix F. Nutrient Screening Parameters for Certain Reservoirs.** **270**

**Appendix G. Transfer of Analytes.** ........................................................... **279**

# Figures

Figure 1. Flow chart showing the nutrient screening procedure...................................... 28

Figure 2. Relationship of mean chlorophyll *a* concentration to mean total phosphorous concentration in reservoirs........................................................................................ 35

Figure 3. Headwater flows for streams in area "A" may be adjusted based on Table 4.. 89

Figure 4. Chronic and 48-Hour WET Testing Frequencies............................................. 109

Figure 5. Procedure for Addressing WET Limit Violations........................................... 117

Figure 6. Procedure for Exemption from Total Toxicity Requirements because of Dissolved Salts................................................................................................................ 124

Figure 7. Probability Distribution that Describes Treatment System Performance....... 136

Figure 8. Derivation of Equations Used to Calculate the Long-Term Average ............ 138

Figure 9. Derivation of Equations Used to Calculate Daily Average and Daily Maximum Concentration Limits .................................................................................................... 139

Figure 10. Protocol for Including Background Concentrations in Permit Limit Calculations.................................................................................................................... 151

Figure 11. Establishing Permit Limits for Total Dissolved Solids ............................... 182

# Tables

Table 1.  Aquatic Life Use Subcategories ........................................................................ 15

Table 2.  Estimated Extent of Downstream DO Impact from Discharge ......................... 17

Table 3.  Segments that Cross the Contributing and Recharge Zones
 of the Southern Section of the Edwards Aquifer ............................................................. 23

Table 4.  Critical Low-Flow Values for Dissolved Oxygen
 for East and South Texas ............................................................................................... 90

Table 4a.  Critical Low-Flow Values for Dissolved Oxygen
 for Harrison Bayou, in Segment 0401. ........................................................................... 95

Table 4b.  Critical Low-Flow Values for Dissolved Oxygen
 for Black Bayou, Segment 0406. .................................................................................... 96

Table 4c.  Critical Low-Flow Values for Dissolved Oxygen
 for James Bayou, Segment 0407.................................................................................... 97

Table 4d.  Critical Low-Flow Values for Dissolved Oxygen
 for Little Cypress Creek (Bayou), Segment 0409............................................................ 98

Table 4e.  Critical Low-Flow Values for Dissolved Oxygen
 for Black Cypress Bayou (Creek), Segment 0410
 and Black Cypress  Bayou (Creek) upstream of Segment 0410. ..................................... 99

Table 5.  Background Concentrations of Toxic Metals in Texas Estuaries.................... 150

Table 6.  Slope (m) and Intercept (b) Values Used to Calculate
 Partition Coefficients for Metals in Streams, Lakes, and Estuarine Systems................ 160

Table 7.  Summary of TDS Screening and Limit Calculation Methods......................... 186

# Abbreviations

| Abbreviation | Full Name |
|---|---|
| ACR | acute-to-chronic ratio |
| AU | assessment unit |
| BAF | bioaccumulation factor |
| BAT | best available technology |
| BCF | bioconcentration factor |
| BMP | best management practice |
| BOD | biochemical oxygen demand |
| BPJ | best professional judgment |
| CASRN | Chemical Abstracts Service Registry Number |
| CBOD | carbonaceous biochemical oxygen demand |
| CFR | Code of Federal Regulations |
| CIU | categorical industrial user |
| CPP | Continuing Planning Process |
| CRQL | contract required quantitation level |
| CSTR | continuously stirred tank reactor |
| CV | coefficient of variation |
| CWA | Clean Water Act |
| DO | dissolved oxygen |
| EPA | Environmental Protection Agency |
| FR | Federal Register |
| GIS | geographic information system |
| HM | harmonic mean flow |
| HUC | hydrological unit code |
| IBWC | International Boundary and Water Commission |
| IU | industrial user |
| LTA | long-term average |
| MAL | minimum analytical level |
| MCL | maximum contaminant level |
| MDL | method detection limit |
| MGD | million gallons per day |
| ML | minimum level |
| MOA | memorandum of agreement |

| Abbreviation | Full Name |
|---|---|
| MQL | minimum quantitation level |
| MS4 | municipal separate storm sewer system |
| MSDS | material safety data sheet |
| MZ | mixing zone |
| NCR | noncontact recreation |
| $NH_3$-N | ammonia-nitrogen |
| NOE | Notice of Enforcement |
| NOEC | no observable effects concentration |
| NPDES | National Pollutant Discharge Elimination System |
| 1Q2 | one-day, two-year low-flow |
| ONRW | outstanding national resource water |
| PCR | primary contact recreation |
| PMSD | percent minimum significant difference |
| QSAR | quantitative structure-activity relationship |
| RP | reasonable potential |
| RWA | receiving water assessment |
| SCR | secondary contact recreation |
| 7Q2 | seven-day, two-year low-flow |
| SIU | significant industrial user |
| SM | *Standard Methods* |
| SMAV | species mean acute value |
| SOD | sediment oxygen demand |
| SPIF | supplemental permit information form |
| SWMP | storm water management plan |
| SWP3 | storm water pollution prevention plan |
| SWQM | Surface Water Quality Monitoring |
| SWQMIS | Surface Water Quality Monitoring Information System |
| TAC | Texas Administrative Code |
| TBD | to be determined |
| TCEQ | Texas Commission on Environmental Quality |
| TDS | total dissolved solids |
| TEAC | Texas Environmental Advisory Council |
| TEF | toxic equivalency factor |
| TEQ | toxic equivalence |
| TIE | toxicity identification evaluation |
| TMDL | total maximum daily load |

| Abbreviation | Full Name |
|---|---|
| TN | total nitrogen |
| TNRCC | Texas Natural Resource Conservation Commission |
| TP | total phosphorus |
| TPDES | Texas Pollutant Discharge Elimination System |
| TPWD | Texas Parks and Wildlife Department |
| TRE | toxicity reduction evaluation |
| TSS | total suspended solids |
| TWDB | Texas Water Development Board |
| UAA | use-attainability analysis |
| U.S.C. | United States Code |
| USFWS | United States Fish and Wildlife Service |
| USGS | United States Geological Survey |
| WER | water-effect ratio |
| WET | whole effluent toxicity |
| WLA | waste load allocation |
| WLE | waste load evaluation |
| WQMP | Water Quality Management Plan |
| ZID | zone of initial dilution |

# Introduction

The Texas Commission on Environmental Quality (TCEQ) is responsible for maintaining and enhancing water quality in the state. The Texas Surface Water Quality Standards, which are the legal standards for the quality of surface water in Texas, are described in Title 30 of the Texas Administrative Code (TAC) Chapter 307.[1]

The TCEQ applies these Standards when issuing permits for wastewater discharges or other authorized discharges to the surface waters of the state. Wastewater permits are issued under a program called the Texas Pollutant Discharge Elimination System—TPDES.

***Who should read this document?*** This document explains procedures the TCEQ uses when applying the Standards to permits issued under the TPDES program. This information should be of interest to regulated facilities that discharge wastewater (for example, domestic sewage treatment plants and industrial plants), to environmental professionals who help such facilities obtain their permits, and to other environmental professionals interested in wastewater permitting. The TCEQ will update this guidance document as needed to reflect changes in the Standards and in agency policy and procedures. This document should be interpreted as guidance and not as a replacement to the rules.

***Document approval.*** This document was approved by the TCEQ on [new date]. It was also subject to Environmental Protection Agency (EPA) review and approval in accordance with the memorandum of agreement (MOA) between the TCEQ and EPA concerning the TPDES program. In a letter dated [new date], EPA approved this document.

For more information concerning revisions to the Standards and to this document, visit the Texas Surface Water Quality Standards page **(www.tceq.state.tx.us/nav/eq/eq_swqs.html)** and follow the Link: "Future Revisions of the Texas Surface Water Quality Standards."

***Application review.*** The TCEQ believes that a consistent approach to application review is important. A permit applicant may provide information throughout the technical review to assist TCEQ staff in site-specific assessment and draft permit development. All preliminary determinations by TCEQ staff in the development of a permit (for example, instream uses, impact analysis, antidegradation, effluent limits, and all other specifications of the permit) are subject to additional review

---

[1] On [new date], the TCEQ adopted the most recent revision to Chapter 307, Texas Surface Water Quality Standards.

and revision through the public hearing process. Case-by-case permitting decisions are subject to EPA review and approval in accordance with the MOA between the TCEQ and EPA concerning the TPDES program.

***For more information.*** Implementing the Standards in the TPDES program is just one aspect of the TCEQ's overall program for water quality management. A series of documents, the Continuing Planning Process (CPP), details the agency's policies and procedures to protect and maintain water quality, in fulfillment of the state's responsibilities under federal law. For more information about the overall program, visit the "Continuing Planning Process" page **(www.tceq.state.tx.us/implementation/water/planning/CPPMain.html)**.

A list of abbreviations used throughout this document is provided in the front of this document on page 9.

References in this document to tables or appendices should be understood to mean tables or appendices in this document unless another document is specified, such as the Standards.

# Determining Water Quality Uses and Criteria

## Classified Waters

Classified waters are those water bodies that are designated as segments in Appendix A of the Standards. Classified segments have designated uses (such as recreation, aquatic life, and water supply) and criteria associated with those uses (such as dissolved minerals, dissolved oxygen, pH, bacteria, and temperature). The designated uses and associated criteria are listed in Appendix A of the Standards and are used to evaluate wastewater permit applications.

## Unclassified Waters

Unclassified waters are those smaller water bodies that are not designated as segments in Appendix A of the Standards. Certain unclassified water bodies are listed in Appendix D of the Standards. These are water bodies where sufficient information has been gathered to assign an aquatic life use and associated dissolved oxygen criterion. Water bodies listed in Appendix D are not designated as classified segments. Unclassified water bodies not included in Appendix D are assigned presumed aquatic life uses (as described in § 307.4(h) of the Standards) during reviews of wastewater permit applications.

In addition to aquatic life uses, unclassified waters can be assigned uses for primary, secondary, or noncontact recreation and domestic water supply. Basic uses such as navigation, agricultural water supply, and industrial water supply are normally assumed for all waters. Presumed recreational uses and bacteria criteria for unclassified water bodies, including those in Appendix D, are described in § 307.4(j) of the Standards.

## Presumed Aquatic Life Uses

The characteristics and associated dissolved oxygen criteria for exceptional, high, intermediate, and limited aquatic life use subcategories are contained in Table 1 below. This table also includes associated dissolved oxygen criteria for a minimal aquatic life use subcategory, which applies to intermittent streams without perennial pools.

14

**Table 1.  Aquatic Life Use Subcategories**

| AQUATIC LIFE USE SUBCATEGORY | | Exceptional | High | Intermediate | Limited | Minimal |
|---|---|---|---|---|---|---|
| **DISSOLVED OXYGEN CRITERIA (mg/L)** | Freshwater mean/ minimum | 6.0/4.0 | 5.0/3.0 | 4.0/3.0 | 3.0/2.0 | 2.0/1.5 |
| | Freshwater in Spring mean/ minimum | 6.0/5.0 | 5.5/4.5 | 5.0/4.0 | 4.0/3.0 | — |
| | Saltwater mean/ minimum | 5.0/4.0 | 4.0/3.0 | 3.0/2.0 | — | — |
| **AQUATIC LIFE ATTRIBUTES** | Habitat Characteristics | Outstanding natural variability | Highly diverse | Moderately diverse | Uniform | — |
| | Species Assemblage | Exceptional or unusual | Usual association of regionally expected species | Some expected species | Most regionally expected species absent | — |
| | Sensitive Species | Abundant | Present | Very low in abundance | Absent | — |
| | Diversity | Exceptionally high | High | Moderate | Low | — |
| | Species Richness | Exceptionally high | High | Moderate | Low | — |
| | Trophic Structure | Balanced | Balanced to slightly imbalanced | Moderately imbalanced | Severely imbalanced | — |

**NOTE:**  Information in this table is taken from Table 3 in § 307.7(b)(3)(A) of the Standards.


## *Perennial Waters*

As stated in § 307.4(h)(3) of the Standards, unclassified perennial streams that are not listed in Appendix D of the Standards, rivers, lakes, bays, estuaries, and other appropriate perennial waters are presumed to have a high aquatic life use and corresponding dissolved oxygen criterion. Higher uses will be maintained where they are attainable.


## *Intermittent Streams*

Intermittent streams are defined as having either

- a period of zero flow for at least one week during most years or
- a seven-day, two-year low-flow (7Q2) less than 0.1 ft$^3$/s (where flow records are available).

According to § 307.4(h)(4) of the Standards, unclassified intermittent streams that are not specifically listed in Appendix A or D of the Standards are considered to have a minimal aquatic life use, except as indicated below in this paragraph, and will maintain a 24-hour mean

dissolved oxygen concentration of 2.0 mg/L and an absolute minimum dissolved oxygen concentration of 1.5 mg/L. For intermittent streams with seasonal aquatic life uses, dissolved oxygen concentrations commensurate with those aquatic life uses will be maintained during the seasons in which the aquatic life uses occur.

### *Intermittent Streams with Perennial Pools*

Unclassified intermittent streams with perennial pools are presumed to have a limited aquatic life use and corresponding dissolved oxygen criterion (*See* Table 1). Higher uses will be maintained where they are attainable.

At this time, determination of what constitutes a seasonal aquatic life use and perennial pool designation is done on a case-by-case basis using available data and best professional judgment. The TCEQ will continue to develop improved procedures to address the issues of seasonal aquatic life use and perennial pools.

### *Playa Lakes*

The applicability of the Standards and the appropriate aquatic life use designation for playa lakes is discussed in the Playa Lake Policy Statement that was signed by the agency's executive director on October 20, 1997 (*See* Appendix A on page 209 of this document).

### **Assigned Aquatic Life Uses**

Aquatic life uses and corresponding dissolved oxygen (DO) criteria are assigned to waters that have the potential to be affected by permitted wastewater discharges. The DO criteria are used to evaluate the results of DO modeling performed to determine the effluent limits needed to protect the uses. (For more information, see the chapter of this document entitled "Modeling Dissolved Oxygen" on page 83.)

Staff uses Table 2 below to estimate how far downstream to assign uses for discharges to streams or rivers. The distances in the table are based on default dissolved oxygen modeling of a single discharge and represent twice the distance to the predicted bottom of the dissolved oxygen sag. Uses are assigned farther downstream when site-specific stream data indicate that the impact from a discharge extends a greater distance than indicated in Table 2.

16

**Table 2. Estimated Extent of Downstream DO Impact from Discharge**

| Permitted Flow (MGD) | Estimated Impact Distance (miles) |
|---|---|
| ≤ 0.05 | 0.60 |
| > 0.05 to ≤ 0.10 | 0.75 |
| > 0.10 to ≤ 0.20 | 1.0 |
| > 0.20 to ≤ 0.50 | 1.1 |
| > 0.50 to ≤ 1.0 | 2.0 |
| > 1.0 to ≤ 2.0 | 2.7 |
| > 2.0 to ≤ 3.5 | 2.9 |
| > 3.5 to ≤ 5.0 | 3.2 |
| > 5.0 to ≤ 7.5 | 5.0 |
| > 7.5 to ≤ 10 | 6.0 |
| > 10 to ≤ 15 | 7.7 |
| > 15 to ≤ 20 | 9.2 |
| > 20 to ≤ 40 | 15.3 |

Uses and associated criteria for unclassified waters are either in Appendix D of the Standards or have to be assigned when those waters have the potential to be affected by permitted wastewater discharges (see § 307.4(l) of the Standards). Assignments of aquatic life use categories are based on characteristics shown in Table 1 on page 16. Please note the following:

- Site-specific modification of the aquatic life criteria in Table 1 may be considered when sufficient information is available to justify such modifications. Site-specific modifications are evaluated in accordance with guidance for regional development of criteria or other procedures used by TCEQ (*See* the chapter of this document entitled "Site-Specific Standards and Variances" on page 191).

- The attribute characteristics in Table 1 will be further clarified, modified, and "calibrated" as more region-specific data become available.

All permit applicants are requested to provide information about the receiving water as part of the permit application. Determining general stream flow characteristics (perennial, intermittent, or intermittent with perennial pools) is of major importance in assigning uses to unclassified streams. Permittees with discharges to small unclassified streams are encouraged to develop and submit additional documentation concerning the general stream type and stream flows at their discharge site.

17

TCEQ staff evaluates available information and determine appropriate uses and criteria for each permit action for discharge into surface water in the state. For sites where available information indicates that the presumed uses and criteria in the Standards may be inappropriate, additional data may be obtained by the TCEQ or the applicant in the form of a receiving water assessment (RWA). Guidelines for collecting the additional data and evaluating aquatic life uses for RWAs are described in the most recent versions of the TCEQ's *Surface Water Quality Monitoring Procedures*, RG-415 and RG-416. These documents are available on the agency's Web site (www.tceq.state.tx.us); follow the link for "Publications."

TCEQ staff considers hydrological conditions, appropriate assessment location, and applicability when determining the aquatic life uses for water bodies that receive or may receive a permitted wastewater discharge.

- TCEQ staff determines aquatic life use for the same set of hydrological conditions (normally stream low-flow and high temperatures, or critical conditions) that are used to analyze the impact of permitted discharges. These determinations may consider seasonal uses and associated hydrological conditions other than critical conditions. Permit limits are established as necessary to protect seasonal uses in both intermittent and perennial streams.

- TCEQ staff determines which part of a stream to assess depending on whether the discharge already exists or is not yet occurring.

  ◦ For existing dischargers seeking permit renewals or amendments, TCEQ staff will give more weight to physical, hydrological, chemical, and biological conditions <u>upstream</u> of or in an area unaffected by an existing discharge. Staff will also consider differences in stream morphometry downstream of the discharge when determining appropriate aquatic life uses.

  ◦ For new dischargers or facilities that have not yet discharged, TCEQ staff will give more weight to physical, hydrological, chemical, and biological conditions <u>downstream</u> of the proposed discharge point.

- For freshwater streams, the aquatic life use attributes are evaluated primarily from the use of an index of biotic integrity as described in the most recent version of TCEQ's *Surface Water Quality Monitoring Procedures, Volume 2: Methods for Collecting and Analyzing Biological Assemblage and Habitat Data*, RG-416. Other water body types are evaluated on a case-by-case basis.

- The uses assigned to unclassified waters at a particular discharge site are not automatically assumed to be appropriate for other discharge sites in the same water body.

18

Unclassified waters with sufficient information obtained under these procedures will be considered for inclusion in Appendix D during the triennial review of the Standards.

When an attainable aquatic life use for a particular unclassified water body might be lower than the presumed aquatic life use, a use-attainability analysis (UAA) is conducted (*See* the section of this document entitled "Site-Specific Standards for Aquatic Life Use" on page 195).

TCEQ staff may review the preliminary determinations of use and the criteria associated with those uses throughout the permit application review if, new information becomes available and/or if there are errors in the previous evaluations. The applicant is given an opportunity to discuss the preliminary determinations of use and provide additional information after receiving the draft permit for review. The Notice of Application and Preliminary Decision indicates any preliminary additional uses assigned to the unclassified receiving waters.

# Evaluating Impacts on Water Quality

## General Information

New permit applications, permit renewals, and permit amendments are reviewed to ensure that permitted effluent limits will maintain instream criteria for dissolved oxygen and other parameters such as bacteria, phosphorus, nitrogen, turbidity, dissolved solids, temperature, and toxic pollutants. The assessment of appropriate aquatic life uses and dissolved oxygen criteria is conducted as discussed in the previous chapter, "Determining Water Quality Uses and Criteria" (see page 14).

TCEQ staff review all available information from sources that may include (but are not limited to) the permit application, stream surveys, routine monitoring information, waste load evaluations (WLEs), or total maximum daily loads (TMDLs). Additional information may also be acquired from the TCEQ's regional staff, the applicant, adjacent land owners, river authorities, or governmental entities.

All proposed permit actions that would increase pollution are also evaluated using the procedures discussed in the chapter of this document entitled "Antidegradation" on page 55.

The impact of discharges on endangered and threatened species is considered in accordance with the memorandum of agreement (MOA) between the TCEQ and the EPA and with the biological opinion from the U.S. Fish and Wildlife Service (USFWS). For more information, see the section of this document entitled "Federally Endangered and Threatened Species" on page 21.

Waste load evaluation recommendations and TMDLs are incorporated into permit limits for discharges into segments with completed WLEs or calculated TMDLs. For receiving waters without specific WLEs or TMDLs, oxygen deficit models or other appropriate analyses are conducted to determine permit limits. See the chapter of this document entitled "Modeling Dissolved Oxygen" on page 83.

Throughout any permit hearing process, TCEQ may continue to evaluate water quality impacts of permitted discharges and revise permit effluent limits based on these evaluations. Such evaluations and revisions may also be subject to EPA review and approval.

## Minimum and Seasonal Criteria for Dissolved Oxygen

Instantaneous minimum dissolved oxygen criteria (from Table 1 of this document—see page 16) and seasonal dissolved oxygen criteria are also considered. When determining seasonal permit limits, TCEQ staff generally use either a low-flow frequency or a seasonal 7Q2 and associated temperatures to estimate critical conditions in a particular month or season. For more detailed information, see the discussion on critical conditions used in modeling on page 85 of the "Modeling Dissolved Oxygen" chapter.

## Federally Endangered and Threatened Species

The TCEQ reviews permit applications to determine whether discharges could potentially have any adverse effect on an aquatic or aquatic-dependent federally endangered or threatened species, including proposed species. The TCEQ may also consider potential adverse affects to state-listed species and will coordinate with Texas Parks and Wildlife Department (TPWD) as needed. Information that is considered during the review includes the following:

- the MOA between the TCEQ and the EPA concerning the TPDES program, available on the agency's Web site (www.tceq.state.tx.us);[2]

- the USFWS biological opinion (dated September 14, 1998) associated with assumption of the TPDES program by the State of Texas; and

- an update to that biological opinion (dated October 21, 1998).

The USFWS biological opinion includes a list of the United States Geological Survey (USGS) hydrological unit codes (HUCs) that cover the watersheds that should be considered in determining whether a listed species could be affected. These HUCs have been matched to both the counties and the classified segments into which the watersheds drain. Subsequent information from the USFWS has identified some specific water bodies where species of critical concern are known to occur. USFWS is informally notified, by way of a supplemental permit information form (SPIF), of all permit applications declared administratively complete.

---

[2] Go to the TCEQ Web site and follow these links:
"Permits, Registrations"
"Water Quality Permits"
"Water Quality Permits for Cities and Other Developed Areas"
"Wastewater Pretreatment: Requirements and Options"
"TPDES Permit: Pretreatment Requirements"
"What Is the 'Texas Pollutant Discharge Elimination System (TPDES)'?"
"Authorization"
"Memorandum of Agreement between the TNRCC (TCEQ) and USEPA Region 6"

## Screening Process

After permit applications are declared administratively complete, TCEQ staff screen them as follows:

1. The first classified segment that the discharge enters is determined.

2. The list of segments in Appendix B on page 211 (taken from Appendix A of the USFWS biological opinion and subsequent updates) is consulted to determine whether there is a potential for the listed species to occur anywhere within the watershed of the segment or whether the listed species is known to be only in a particular water body.

3. If the species has a potential of occurring anywhere within the watershed of the segment, TCEQ staff may compare the location of the discharge against the HUCs listed in the biological opinion to more accurately determine whether the discharge may impact listed species.

   Note that TCEQ staff also screen applications from petroleum facilities south of Copano Bay (Segment 2472) to determine whether these discharges could potentially have any adverse effect on the piping plover, a species of high priority.

4. If the application screening indicates that the discharge has a potential to affect a listed species, USFWS is formally notified via either the SPIF or the Notice of Application and Preliminary Decision.

5. TCEQ staff performs further reviews of discharges that are formally reported to USFWS in step 4 to determine whether additional or more stringent permit limits are necessary. In making this determination, the location of the discharge within the county, the distance from the segment or water body in question, the size of the discharge, and the type of species (for example, fish, amphibian, invertebrate, or plant) are all considered.

## Additional Permit Limits

The TCEQ may require additional permit limits for discharges that TCEQ staff determine have a high potential to adversely affect listed species of critical concern. Examples of such discharges include:

- discharges directly to watersheds in which listed species occur.
- discharges whose dissolved oxygen sag extends into watersheds where listed species occur.

These types of discharges are issued permits that, if necessary, require dechlorination and contain a daily average ammonia-nitrogen limit of 3.0

mg/L or less. Additional permit limits may be imposed based on USFWS concerns and other issues as they arise.

## *Edwards Aquifer*

Discharges within and across the contributing and recharge zones of the southern section of the Edwards Aquifer are reviewed to determine whether there will be any effects on threatened and endangered fish, amphibian, invertebrate, or plant species occurring down-gradient from the discharge. The review may include input from TCEQ staff knowledgeable in groundwater and hydrogeology.

Table 3 lists the classified segments that cross the contributing and recharge zones of the southern section of the Edwards Aquifer. This list of segments corresponds to the true geological zones that cover the entire watersheds containing those segments. This list is not identical to the segments covered in 30 TAC Chapter 213 (in Medina, Bexar, Comal, Kinney, Uvalde, Hays, Travis, and Williamson Counties) or to those segments having an assigned aquifer protection use in Appendix A of the Standards.

**Table 3.  Segments that Cross the Contributing and Recharge Zones of the Southern Section of the Edwards Aquifer**

| Segment Number | Segment Name |
|---|---|
| 1427 | Onion Creek |
| 1430 | Barton Creek |
| 1804 | Guadalupe River Below Comal River |
| 1805 | Canyon Lake |
| 1806 | Guadalupe River Above Canyon Lake |
| 1808 | Lower San Marcos River (above City of Martindale) |
| 1809 | Lower Blanco River |
| 1810 | Plum Creek |
| 1811 | Comal River |
| 1812 | Guadalupe River Below Canyon Dam |
| 1813 | Upper Blanco River |
| 1814 | Upper San Marcos River |
| 1815 | Cypress Creek |
| 1816 | Johnson Creek |
| 1817 | North Fork Guadalupe River |
| 1818 | South Fork Guadalupe River |
| 1903 | Medina River Below Medina Diversion Lake |
| 1904 | Medina Lake |

| Segment Number | Segment Name |
|---|---|
| 1905 | Medina River Above Medina Lake |
| 1906 | Lower Leon Creek |
| 1907 | Upper Leon Creek |
| 1908 | Upper Cibolo Creek |
| 1909 | Medina Diversion Lake |
| 1910 | Salado Creek |
| 2111 | Upper Sabinal River |
| 2112 | Upper Nueces River (upper portion) |
| 2113 | Upper Frio River |
| 2114 | Hondo Creek |
| 2115 | Seco Creek |

# Bacteria

## *Recreational Uses and Criteria*

*E. coli* criteria have been established in freshwater as follows for primary contact recreation (PCR), secondary contact recreation (SCR) 1 and 2, and noncontact recreation (NCR).

**E. Coli Criteria for Freshwater**

| Use | Geometric Mean (colonies/100 ml) | Single Sample (colonies/100 ml) |
|---|---|---|
| PCR | 126 | 399 |
| SCR 1 | 630 | — |
| SCR 2 | 1,030 | — |
| NCR | 2,060 | — |

Enterococci criteria have been established in saltwater as shown in the following table.

**Enterococci Criteria for Saltwater**

| Use | Geometric Mean (colonies/100 ml) | Single Sample (colonies/100 ml) |
|---|---|---|
| PCR | 35 | 104 |
| SCR1 | 175 | — |
| NCR | 350 | — |

24

## *Assigning Recreational Uses*

Assigning recreational uses to classified and unclassified water bodies is defined in § 307.4(j) of the Texas Surface Water Quality Standards. The following tables provide a summary of how (1) presumed and designated uses are assigned and applied; (2) how uses less stringent that presumed or designated uses are assigned; and (3) when site-specific information or a RUAA is required.

**Summary of assigning recreational uses to classified water bodies**

| Use | Assigning uses | RUAA Required | Rule Change Required |
|---|---|---|---|
| PCR | Designated use unless otherwise specified in Appendix A of § 307.10 | No | No |
| SCR1 | Standards change is required | Yes | Yes |
| SCR2 | Standards change is required | Yes | Yes |
| NCR | Standards change is required | Yes | Yes |

**Summary of assigning recreational uses to unclassified water bodies**

| Use | Assigning uses | RUAA Required | Rule Change Required |
|---|---|---|---|
| PCR | Presumed use if greater than or equal to 0.5 meter average depth or substantial pools with depths of one meter or greater | No | No |
| SCR1 | Presumed use if less than 0.5 meter average depth, no substantial pools greater than 1 meter, and no existing PCR activities | No. Only a reasonable level of inquiry (equivalent to a Basic RUAA) is required. | No. Public notification will be provided through a regulatory action and the assigned use will be subject to public comment and EPA approval. |
| | If presumed use is PCR, then a standards change is required | Yes | Yes |
| SCR2 | Standards change is required | Yes | Yes |
| NCR | Standards change is required | Yes | Yes |

## Wastewater Permitting

Wastewater discharge permits for Publically Owned Treatment Works (POTWs) will include effluent limits and monitoring requirements in accordance with 30 TAC § 309.3(h). Effluent limits and monitoring requirements for bacteria associated with industrial discharges will be evaluated on a case-by-case basis in order to meet instream water quality standards. Any rules that are approved in the future regarding bacteria limits in wastewater permits will supersede the provisions in this section.

**Freshwater**—*E. coli* is the indicator bacteria in effluent limits for wastewater discharges into freshwater. This includes those freshwaters that are identified in Appendix A of the water quality standards as high saline inland water bodies.

**Saltwater**—Enterococci is used as the indicator bacteria in effluent limits for wastewater discharges into saltwater.

# Nutrients

## Introduction

The TCEQ has included numerical criteria for nutrients in major reservoirs in the Standards. The criteria are based on historical chlorophyll *a* data from the main body of selected reservoirs. The TCEQ plans to develop nutrient criteria for streams and rivers, estuaries, and wetlands and evaluate them for inclusion in a future Standards revision.

In addition to numerical criteria for reservoirs, the following rules also address the issue of controlling nutrients in wastewater discharges:

- General narrative criteria for nutrients in the Standards (§ 307.4)
- Antidegradation provisions of the Standards (§ 307.5)
- Watershed rules (30 TAC Chapter 311)
- Edwards Aquifer rules (30 TAC Chapter 213)

## General Screening Approach for Nutrient Impacts

### Applicability

The TCEQ evaluates applications for new or expanding domestic discharges to reservoirs, streams, and rivers to determine if an effluent limit is needed for total phosphorus (TP) or, in appropriate situations, total nitrogen (TN) to prevent violation of numerical nutrient criteria and/or preclude excessive growth of aquatic vegetation. Permit renewals and industrial discharges may be evaluated for potentially significant concentrations of TP (and if appropriate, TN) on a case-by-case basis.

The nutrient screening procedures in this section constitute the basis for the antidegradation review(s) for nutrients (see the chapter of this document entitled "Antidegradation" on page 55.) Additional factors for the antidegradation review(s) can be considered as appropriate to further address potential nutrient impacts of concern to sensitive water bodies.

## General Procedure

The following general procedure is also shown by flow chart in Figure 1 on page 28. Discharges >0.25 MGD into or near a reservoir that has been assigned numerical nutrient criteria in the Standards are first screened to evaluate main pool effects. Additional screening is performed regardless of flow size to evaluate local effects in the reservoir and in the tributary stream or river under the narrative provisions of the Standards.

Discharges into or near a reservoir that has not been assigned numerical nutrient criteria in the Standards are screened to evaluate local effects in the reservoir and in the tributary stream or river under the narrative provisions of the Standards.

Discharges into a stream or river but outside the distance of concern to a reservoir are screened to evaluate local effects in the stream or river.

## Assessing Numerical Nutrient Criteria—Main Pool Effects

For discharges >0.25 MGD to reservoirs that have numerical nutrient criteria, a detailed evaluation is performed using a completely-mixed, steady-state reservoir model to assess the effect of a proposed discharge on phosphorus levels in the main pool of the reservoir. Additionally, the effect of the TP change on chlorophyll *a* in the reservoir is estimated. Screening procedures are provided to evaluate model results and to determine if an effluent limit on TP is needed. The procedures for this evaluation are in the section entitled "Nutrient Screening for Main Pool Effects in Reservoirs with Numerical Nutrient Criteria" on page 30.

## Assessing Narrative Nutrient Provisions—Local Effects

To assess the local effects of discharges under the narrative nutrient provisions of the Standards, the TCEQ evaluates site-specific screening factors to assess eutrophication potential rated in terms of low, moderate, or high. Qualitative and quantitative guidelines are provided; screening factors may have one or the other or both. In some situations, only some of the suggested factors may be needed for the evaluation; and sufficient data may not always be available to address every factor. The procedures for this evaluation are in the sections entitled "Nutrient Screening for Local Effects in Reservoirs" on page 38 and "Nutrient Screening in Streams and Rivers" on page 44.

The individual screening factors establish the basis for an overall "weight-of-evidence" assessment to identify the need for a nutrient effluent limit. An effluent limit for TP is typically indicated when a significant number of screening factors are rated as moderate and high. However, the importance and weight of individual screening factors can vary from one site to another. If an effluent limit for TP is indicated, then screening factors and levels of concern can also be considered in determining the specific concentration limit for TP. Initial assessments can be improved and reconsidered in light of additional site-specific data and/or more extensive models and evaluations.



**Nutrient Screening Procedure**

**Figure 1. Flow chart showing the nutrient screening procedure.**

## *Effluent Limits for Total Phosphorus*

When screening indicates that a reduction of effluent TP is needed, an effluent limit is recommended based on reasonably achievable technology-based limits, with consideration of the sensitivity of the site. Typical effluent limits for TP, as a daily average concentration, generally fall into the following ranges:

| Permitted Flow (MGD) | Typical TP Limit (mg/L) |
|:---:|:---:|
| < 0.5 | 1.0 |
| 0.5 – 3.0 | 1.0 to 0.5 |
| > 3.0 | 0.5 |

Higher or lower limits may be recommended based on site-specific mitigating factors.

## *Regulatory Factors that Prescribe Nutrient Controls in Discharge Permits*

Additional screening is unnecessary when the following site-specific regulatory factors explicitly establish an effluent limit for TP or other requirements:

- A TP limit, or a prohibition on wastewater discharges, is established in a watershed rule (30 TAC Chapter 311) or in the Edwards Aquifer rules (30 TAC Chapter 213).

- A water body is listed as impaired in the current Texas § 303(d) List due to excessive nutrients such as TP and potential nutrient additions are evaluated using the provisions in the section of this document entitled "Protecting Impaired Water Under Tier 1" (see page 57).

- A TMDL or TMDL Implementation Plan specifies TP limits for wastewater discharges.

## *Focus on Phosphorus Instead of Nitrogen*

Considerations for nutrient impacts focus on TP rather than nitrogen for the following reasons:

- substantially less data on total nitrogen have been collected in Texas reservoirs, streams, and rivers.

- phosphorus is a primary nutrient in freshwaters, although nitrogen can be limiting during parts of the year.

29

- nitrogen can be fixed directly from the atmosphere by most of the noxious forms of blue-green algae.

- available waste treatment technologies make reducing phosphorus more effective than reducing nitrogen as a means of limiting algal production.

Effluent limits for total nitrogen can be considered in certain situations when existing or projected nitrogen levels would result in:

- growth of nuisance aquatic vegetation.

- a substantial increase in nitrate-nitrogen that could adversely affect public drinking water supplies (with a nitrate-nitrogen criterion of 10 mg/L).

- potential eutrophication of unusually sensitive tidal waters, such as around seagrass beds.

## Nutrient Screening for Main Pool Effects in Reservoirs with Numerical Nutrient Criteria

### General Approach

Numerical nutrient criteria in the Standards are expressed as the long-term average concentration of chlorophyll *a* in the main pool of a reservoir. These criteria are based on historical data to ensure that existing reservoir water quality is maintained.

Domestic wastewater discharges >0.25 MGD (and in some cases industrial wastewater discharges) into the watersheds of reservoirs with numerical nutrient criteria are evaluated to ensure that potential increases in nutrients and chlorophyll *a* in the main pool are relatively small and that water quality standards will be attained.

## *Applicability*

Evaluations are conducted for permit applications that propose to increase permitted discharge flow into the watersheds of reservoirs with numerical nutrient criteria. Evaluations are conducted for the following permitted discharge sizes within the listed distance from the normal pool elevation of the reservoir:

| Permitted flow (MGD) | Distance from reservoir (stream miles) |
|---|---|
| >0.25 – < 1 | ≤ 5 |
| 1 – 3 | ≤ 10 |
| > 3 | ≤ 20* |

**\* Very large discharges at greater distances may be evaluated.**

## *Screening Model for TP*

The first screening is based on the relative change in TP concentration in the main pool of the reservoir that would occur solely from the proposed discharge. (The screening could also be applied to TN.) The change in TP is estimated by applying a steady-state, completely-mixed model to the reservoir using long-term estimates of reservoir retention time and reservoir volume at the normal operating pool elevation. The equations used in the following screening procedure represent one example of an appropriate steady-state model.[3]

The TCEQ will consider more sophisticated models if they are submitted for review. If a more sophisticated model is used, predicted changes in chlorophyll *a* may be evaluated directly rather than evaluating predicted changes in TP.

The screening procedure comprises six steps as follows. An example is provided on page 34.

**(1)** For discharges that are over one mile from the normal operating pool elevation of the reservoir, estimate the loss of TP in the tributary stream or river as follows:

**Equation 1:** $$f_{TP,x} = e^{\{-k_p\,[x\,/(11318\,Q_T^{0.5})]\}}$$

---

[3] For a discussion of model formulations and settling velocity, see Kenneth Reckow. 1979. Empirical Lake Models for Phosphorus: Development, Applications, Limitations and Uncertainty. In: *Perspectives in Lake Ecosystem Modeling.* Donald Scavia and Andrew Robertson (eds.). Ann Arbor Science.

31

where:        $f_{TP,x}$ =   fraction of TP **remaining** at a distance $x$ downstream of the discharge

$k_P$ =   TP decay rate at an assumed annual mean temperature of 20°C. Assume to be 0.14/day unless an alternative rate is shown to be more appropriate.

$x$ =   distance along the stream to the normal pool elevation of the reservoir (m)

11318 =   Combination of default velocity coefficient of 0.131 $(1/m \cdot s)^{1/2}$ and conversion factor of 86,400 s/day $(s^{1/2}/(m^{1/2} \cdot day))$

$Q_T$ =   permitted discharge flow **plus** harmonic mean flow upstream of the discharge $(m^3/s)$

For discharge points that are less than or equal to one mile from the normal operating pool elevation of the reservoir, assume no loss of TP in the tributary stream or river (that is, set $f_{TP,x} = 1$).

**(2)** Estimate the concentration of TP that is delivered to the reservoir from the discharge using Equation 2:

**Equation 2:**
$$TP_d = f_{TP,x} \times TP_e$$

where:    $TP_d$ =   concentration of TP delivered to the reservoir from the discharge (mg/L)

$f_{TP,x}$ =   fraction of TP **remaining** at a distance $x$ downstream of the discharge, calculated using Equation 1

$TP_e$ =   concentration of TP in the effluent (mg/L), assumed to be 3.5 mg/L if no effluent data are available.

**(3)** Estimate the annual average loading of TP in the entire reservoir due to the discharge using Equation 3:

**Equation 3:**
$$TP_L = 1,381,525 \times Q_P \times TP_d$$

where:    $TP_L$ =   annual average loading of TP in the entire reservoir due to the discharge (g/yr)

$Q_P$ =   permitted discharge flow (MGD)

$TP_d$ =   concentration of TP from the discharge delivered to the reservoir (mg/L), calculated using Equation 2

**(4)** Estimate the areal loading rate to the reservoir using Equation 4:

**Equation 4:**
$$w' = \frac{TP_L}{4{,}047 \times A_R}$$

where:

$w' =$ TP areal loading rate (g/m²·yr)

$TP_L =$ annual average loading of TP in the entire reservoir due to the discharge (g/yr), calculated using Equation 3

$A_R =$ surface area of reservoir (acres) from Table F-2 in Appendix F

**(5)** Estimate the annual average concentration of TP in the entire reservoir due to the discharge using Equation 5:

**Equation 5:**
$$TP_R = \frac{w'}{v_s + 0.3048\,z/\tau}$$

where:

$TP_R =$ annual average TP in the entire reservoir due to the discharge (mg/L)

$w' =$ TP areal loading rate (g/m²·yr), calculated using Equation 4

$v_s =$ settling velocity (m/yr). For TP, assume 13 m/yr

$z =$ mean depth (ft), see Appendix F, Table F-2 (divide volume by surface area to get mean depth)

$\tau =$ retention time (yrs), see Appendix F, Table F-2

**(6)** Finally, compare the change in TP in the main body of the reservoir to the reservoir's mean TP concentration using Equation 6:

**Equation 6:**
$$\% \ change = \frac{100 \times TP_R}{TP_A}$$

where:

$\% \ change =$ percent change in TP relative to the mean TP of the reservoir

$TP_R =$ annual average TP in the entire reservoir due to the discharge (mg/L), calculated using Equation 5

$TP_A =$ mean TP concentration of the reservoir (see Appendix F, Table F-1; these are long-term means of TP in the main pool of each reservoir)

## *Assessing the Results of Main Pool Screening*

If TP is estimated to change by 10% or less, a TP limit is not needed and chlorophyll *a* screening is not performed. If TP is estimated to change by more than 10 percent, then a TP limit or monitoring may be needed, depending on the results of the chlorophyll *a* screening (see next section).

33

**Example Calculation:**
An applicant proposes to locate a new 2.0 MGD discharge on South Yegua Creek 3 miles upstream of Somerville Lake, Seg. 1212. Would chlorophyll *a* screening be performed, based on the estimated change in TP?

(1) Estimate the fraction of TP from the discharge that reaches Somerville Lake using Equation 1. Assume South Yegua Creek is intermittent with perennial pools with a harmonic mean flow of 0.1 cfs. Watch out for unit conversions!

$$f_{TP,x} = e^{\{-0.14[4827/(11318 \times (0.08764+0.00283)^{0.5})]\}} = 0.82$$

(2) Estimate the concentration of TP from the discharge that reaches Somerville Lake using Equation 2. Assume an effluent TP concentration of 3.5 mg/L.

$$TP_d = 0.82 \times 3.5 = 2.87 \text{ mg/L}$$

(3) Estimate the annual average loading of TP from the discharge to Somerville Lake in its entirety using Equation 3.

$$TP_L = 1,381,525 \times 2.0 \times 2.87 = 7,929,482 \text{ g/yr}$$

(4) Estimate the areal loading rate from the discharge to Somerville Lake using Equation 4. (Reservoir characteristics are in Table F-2 in App. F.)

$$w' = \frac{7,929,482}{4,047 \times 11,555} = 0.17 \text{ g/m}^2 \cdot \text{yr}$$

(5) Estimate the annual average TP concentration from the discharge in Somerville Lake using Equation 5.

$$TP_R = \frac{0.17}{13 + 0.3048 \times (147,104/11,555)/0.65} = 0.0090 \text{ mg/L}$$

(6) Compare the change in TP due to the discharge to the mean TP concentration in Somerville Lake using Equation 6.

$$\% \ change = \frac{100 \times 0.009}{0.082} = 10.9 \%$$

Chlorophyll *a* screening is necessary based on the TP screening. This example is continued with chlorophyll *a* calculations on page 30, local effects screening for Somerville Lake on page 35, and local effects screening for South Yegua Creek on page 42.

## *Estimating Change in Chlorophyll a*

If the projected change in TP over the entire reservoir is greater than 10%, the relative potential increase in chlorophyll *a* that may result from the estimated increase in TP is approximated. This evaluation is approximate because of the high variability in the relationship of TP to chlorophyll *a*. However, the evaluation provides additional information on the need for a TP limit or monitoring.

The potential increase in chlorophyll *a* can be estimated from the projected increase in TP by the following regression equation[4] for Texas reservoirs, as shown in Figure 2 and Equation 7 below:

**Equation 7:**    $\ln(Chl\ a,\ \mu g/L) = 0.9312 \ln(TP,\ mg/L) + 5.14$



**Figure 2. Relationship of mean chlorophyll *a* concentration to mean total phosphorous concentration in reservoirs.**

The relationship of TP to chlorophyll *a* is statistically significant but highly variable from one reservoir to another and the regression may not accurately predict small changes in chlorophyll *a* assimilative capacity. Nevertheless, the screening is useful to ensure that criteria for chlorophyll *a* will be maintained. Alternative evaluations to predict the effect of phosphorus increases on chlorophyll *a* in specific reservoirs can also be considered.

---

[4] The regression is based on the long-term means of TP and chlorophyll *a* for the individual reservoirs in Table F-1 of Appendix F, with selected outliers removed (as noted in a January 23, 2009 letter from Larry Hauck at the Texas Institute for Applied Environmental Research). The r-squared for the regression is 0.47.

For ease of calculation, Equation 7 can be expressed as follows:

**Equation 8:** $Chl\ a\ (\mu g/L) = 170.7\ TP\ (mg/L)^{0.9312}$

The potential change in chlorophyll *a* in the entire reservoir is then evaluated using the following procedure.

**(1)** Use Equation 8 to calculate the reservoir chlorophyll *a* value that corresponds to the mean TP concentration in Table F-1 in Appendix F:

   **Equation 8a:** $Chl_{AP} = 170.7\ TP_A^{0.9312}$

**(2)** Use Equation 8 to calculate the reservoir chlorophyll *a* value that corresponds to the sum of the mean TP concentration (from Table F-1) and the annual average TP in the entire reservoir due to the discharge ($TP_R$, from Equation 5):

   **Equation 8b:** $Chl_{AR} = 170.7\ (TP_A + TP_R)^{0.9312}$

**(3)** Use Equation 9 to estimate the predicted change in chlorophyll *a* in the reservoir due to the discharge:

**Equation 9:** $Chl_R = Chl_{AR} - Chl_{AP}$

where:
   $Chl_R$ = chlorophyll *a* added by the discharge (μg/L)
   $Chl_{AR}$ = chlorophyll *a* (μg/L) predicted in the reservoir due to the discharge at permitted flow, calculated using Equation 8a
   $Chl_{AP}$ = chlorophyll *a* (μg/L) predicted in the reservoir at ambient TP concentration (see Appendix F, Table F-1), calculated using Equation 8b

**(4)** Use Equation 10 to compare the predicted change in chlorophyll *a* in the reservoir (due to the discharge) to the assimilative capacity of the reservoir, which is estimated to be the chlorophyll *a* criterion minus the ambient chlorophyll *a* concentration:

**Equation 10:** $\% \ change = \dfrac{100\,[Chl_R]}{Chl_C - Chl_A}$

where:    % *change* = percent change in chlorophyll *a* relative to the assimilative capacity of the reservoir
   $Chl_R$ = annual average chlorophyll *a* in the entire reservoir due to the discharge (mg/L), calculated using Equation 9
   $Chl_C$ = chlorophyll *a* criterion for the reservoir from Appendix F of the Standards.

36

$Chl_A$ = mean chlorophyll *a* concentration of the reservoir (see Appendix F, Table F-1; these are long-term means of chlorophyll *a* in the main pool of each reservoir)

If the projected decrease in the estimated assimilative capacity of chlorophyll *a* is >20%, then a limit for TP is indicated. If the projected decrease is 10-20%, then monitoring for TP is indicated. If the projected decrease is <10%, then neither a TP limit nor monitoring is indicated.

## *Determining the Appropriate TP Limit*

Use the typical effluent limit for TP based on permitted flow (see the table on page 29) in the screening procedure to estimate how much TP in the reservoir will change due to the discharge. The limit may need to be adjusted if the estimated change in reservoir TP is still >10% and the estimated change in chlorophyll *a* assimilative capacity is still >20%.

---

**Example Calculation:**

This example is a continuation of the scenario presented on page 35. An applicant proposes to locate a new 2.0 MGD discharge on South Yegua Creek 3 miles upstream of Somerville Lake, Seg. 1212. Would a TP limit or monitoring likely be recommended to address main pool effects in Somerville Lake, based on the estimated change in chlorophyll *a*?

**(1)** Use Equation 8a to estimate the concentration of chlorophyll *a* in Somerville Lake based on the ambient TP concentration for Somerville Lake.

$$Chl_{AP} = 170.7 \ TP_A^{0.9312} = 170.7 \times 0.082^{0.9312} = 16.6 \ \mu g/L$$

**(2)** Use Equation 8b to estimate the concentration of chlorophyll *a* in Somerville Lake based on the sum of the ambient TP concentration for Somerville Lake and the increase in TP concentration predicted by the previous screening calculations.

$$Chl_{AR} = 170.7 \ (TP_A + TP_R)^{0.9312} = 170.7 \times (0.082 + 0.0090)^{0.9312} = 18.3 \ \mu g/L$$

**(3)** Use Equation 9 to estimate the change in chlorophyll *a* concentration in Somerville Lake Somerville Lake in its entirety.

$$Chl_R = Chl_{AR} - Chl_{AP} = 18.3 \ \mu g/L - 16.6 \ \mu g/L = 1.7 \ \mu g/L$$

**(4)** Use Equation 10 to compare the estimated increase in chlorophyll *a* to the assimilative capacity of Somerville Lake.

$$\% \ change = \frac{100 \ [Chl_R]}{Chl_C - Chl_A} = \frac{100 \times [1.7 \mu g / L]}{[47.64 - 35.16] \mu g / L} = 13.6\%$$

---

## Nutrient Screening for Local Effects in Reservoirs

### General Approach

To assess local effects in reservoirs from a discharge under the narrative nutrient provisions of the Standards, the TCEQ first evaluates the discharge using the general guidelines in this section. If the general guidelines indicate that a TP limit should be considered, then the TCEQ conducts a more comprehensive review using site-specific screening factors. Eutrophication potential is rated as a low, moderate, or high level of concern for each factor. Some screening factors can be rated on either qualitative or quantitative information, depending on data availability. Not every factor is appropriate or definable at a particular site.

### Applicability

These screening procedures focus on larger reservoirs, such as those used for public water supplies. They can also be applied to smaller perennial impoundments (no smaller than about 10 surface acres in size), but some of the site-specific screening factors might not apply. Smaller impoundments, ponds, and perennial pools are addressed in the nutrient screening procedures for streams and rivers (see page 44). Evaluations are conducted for the following permitted discharge sizes within the listed distance from the normal pool elevation of the reservoir:

| Permitted flow (MGD) | Evaluation Distance (stream miles) |
|---|---|
| < 0.25 | < 5 |
| 0.25 to < 1.0 | < 10 |
| ≥ 1.0* | < 20 |

**\* Very large discharges may be evaluated on a case-by-case basis.**

A separate analysis is conducted to compare the potential impact of the discharge with numerical criteria for nutrients in the main pool of the reservoir (see the previous section of this document entitled "Nutrient Screening for Main Pool Effects in Reservoirs with Numerical Nutrient Criteria" on page 30).

### General Guidelines for Considering TP Limits

TP limits are potentially indicated in the following situations:

- for new or expanding discharges ≥ 1 MGD into or near reservoirs;

- for new or expanding discharges ≥ 0.25 MGD into or near shallow, restricted coves of reservoirs; and

- where explicitly required by watershed rules or other specific regulatory requirements.

Other situations where receiving streams appear to be especially sensitive to nutrient increases can also be considered. Smaller proposed discharges (such as those between 0.1 to 0.25 MGD) can also be of concern and will be evaluated for TP limits if the discharge location is into a sensitive area with very low dispersion.

## *Site-Specific Screening Factors*

For cases where the general guidelines indicate that a limit on TP should be considered further, site-specific screening factors are applied to assess the potential need for a TP limit to control eutrophication. These screening factors include the following:

A. size of discharge
B. distance from reservoir
C. sensitivity to nutrient enrichment—water clarity
D. sensitivity to growth of aquatic vegetation—observations
E. sensitivity to growth of aquatic vegetation—shading and sunlight in narrow backwaters and small coves
F. consistency with similar permits
I. local dispersion and mixing
J. impact on the main pool of the reservoir
K. existence of listed concern for nutrients or aquatic vegetation in the TCEQ's integrated report (§ 305(b))

The level of concern (low, moderate, or high) for each of these factors is described in the following sections.

### A. SIZE OF DISCHARGE

The size of a discharge into or near a reservoir affects phosphorus loading and the concern for potential impacts, as indicated in the following table. A higher level of concern may be assigned to discharges into sensitive areas.

| Level of Concern | Permitted Flow (MGD) |
|------------------|----------------------|
| Low | < 0.25 |
| Moderate | 0.25 to < 1.0 |
| High | ≥ 1.0 |

**B. DISTANCE FROM RESERVOIR**

The level of concern is based on the size of the discharge and its distance from the normal operating pool of the reservoir.

| Size of Discharge (MGD) | Level of Concern (stream miles) | | |
|---|---|---|---|
| | Low | Moderate | High |
| < 0.25 | > 3 | 3 to > 1 | ≤ 1 |
| 0.25 to < 1.0 | > 7 | 7 to > 3 | ≤ 3 |
| ≥ 1.0* | > 15 | 15 to > 7 | ≤ 7 |

**\* Very large discharges may be evaluated on a case-by-case basis.**

**C. SENSITIVITY TO NUTRIENT ENRICHMENT – WATER CLARITY**

Reservoirs with higher transparency allow more light to penetrate, which increases the tendency for algal growth. In addition, the aesthetic impact of phytoplankton algal blooms tends to be greater in reservoirs that generally have low turbidity. A qualitative screening approach is used when other data are not readily available. A quantitative screening approach that uses mean secchi depth as a measure of water clarity may be used if adequate secchi data are available.

*Option 1: Qualitative analysis:* Relative clarity is assessed using general observations and knowledge by individuals who are familiar with the reservoir or similar reservoirs in the area.

| Level of Concern | Discharge Environment |
|---|---|
| Low | Turbid from suspended particles or color (tannins) |
| Moderate | Some visible turbidity but without heavy murkiness |
| High | A "clear water" reservoir with high transparency |

*Option 2: Quantitative analysis:* Relative clarity is assessed using the mean of long-term secchi data (if available) in the main pool of the reservoir or at sampling sites near the proposed discharge. Levels of concern based on clarity are as follows:

| Level of Concern | Secchi (m)* |
|---|---|
| Low | ≤ 0.75 |
| Moderate | 0.76 to 1.27 |
| High | ≥ 1.28 |

**\*Secchi ranges for each impact level are derived by dividing the mean secchi values in Table F-1 of this document into thirds.**

**D. SENSITIVITY TO GROWTH OF AQUATIC VEGETATION—OBSERVATIONS**

When site-specific observations are available with respect to aquatic vegetation in areas of the water body with existing wastewater discharges, the applicable levels of concern are as follows:

| Level of Concern | Observed Aquatic Vegetation |
|---|---|
| Low | Little attached, floating, or suspended aquatic vegetation |
| Moderate | Limited patches of attached, floating, or suspended vegetation |
| High | Heavy patches of vegetation in areas with nutrient input |

**E. SENSITIVITY TO GROWTH OF AQUATIC VEGETATION—SHADING AND SUNLIGHT IN NARROW BACKWATERS AND SMALL COVES**

The sensitivity of narrow backwaters and small coves to various kinds of aquatic vegetation can be affected by the extent to which sunlight reaches the water's surface. The amount of available sunlight is related to the amount of tree canopy cover during warm seasons.

| Level of Concern | Canopy Cover and Shading During Warm Months |
|---|---|
| Low | Extensive canopy cover shades most of water surface |
| Moderate | Substantial canopy cover, but shading is only partial and not equivalent to "deep woods" |
| High | Canopy cover diffuses light to some extent, but substantial light reaches water surface |

**F. CONSISTENCY WITH OTHER PERMITS**

An assessment is conducted to determine whether TP limits have been required for other wastewater permits with similar characteristics and locations in this area.

| Level of Concern | TP Limits in Other Permits in the Area? |
|---|---|
| Low | Similar permits usually do not have effluent limits for TP |
| Moderate | There are some similar permits with TP limits, but applicability is site-specific and not "across-the-board" |
| High | Discharges with similar characteristics usually have a TP limit |

41

**G. LOCAL DISPERSION AND MIXING**

The local impacts of a discharge to a reservoir depend greatly on the extent to which the discharge is dispersed and mixed at the discharge site. Both qualitative and quantitative options for this analysis are described below. The qualitative option is based on the general physical characteristics of the discharge site. The quantitative option uses either a completely-mixed model or a QUAL-TX stream model to determine the extent to which phosphorus concentrations are potentially elevated by the discharge (ΔTP).

*Option 1: Qualitative analysis:* Discharges to the main body of the reservoir or to large, deep open coves are of low potential concern with respect to dispersion and mixing. Discharges into smaller coves, shallow areas, inundated creeks, and canals are of moderate concern. Discharges are of high concern into narrow, slow moving areas of a reservoir, whether riverine transition zones or wetlands.

| Level of Concern | Discharge Environment |
|---|---|
| Low | Large, open coves or main body of reservoirs |
| Moderate | Coves with restricted circulation |
| High | Narrow, backwater transition zones |

Option 2: Quantitative analysis:

**A:** Discharges to the main body of the reservoir or to large deep open coves (relative to the size of the discharge) are assessed as having a low level of concern with respect to dispersion and mixing. For this scenario, the assessment is still qualitative, and no quantitative analysis is performed.

**B:** Discharges into coves with restricted circulation are evaluated to assess the projected increase in **local** TP concentration (ΔTP) that will be added by the discharge at permitted flow. A steady-state, completely-mixed model is used to determine ΔTP as described in the section entitled "Nutrient Screening for Main Pool Effects in Reservoirs with Numerical Nutrient Criteria" on page 30.

Default cell size for the model is 10 acres, although smaller cell sizes may be used to address physical barriers at smaller distances. Surface area and average depth are determined from best available map information. Tributary inflows at 7Q2 are used in the calculation of detention time for the cell volume. (Note: if a completely-mixed, steady-state model for dissolved oxygen is also used at a site, the morphometry for the TP model will correspond to the DO model.)

**C:** Discharges into narrow, backwater transition zones that are within the normal operating pool of the reservoir are screened using the same QUAL-TX model that is used for dissolved oxygen (if available for that site). The QUAL-TX results are evaluated by assessing the instream proportion of effluent at a distance of 300 feet from the point where the discharge enters the transition zone within the normal operating pool.

The $\Delta$TP is calculated by first either assuming an effluent concentration of 3.5 mg/L TP or by using effluent TP data (if available) and then multiplying the effluent TP by the instream proportion of effluent. For discharges that are greater than one stream mile from the normal operating pool, the loss of phosphorus over stream distance can be calculated as described in the section entitled "Nutrient Screening for Main Pool Effects in Reservoirs with Numerical Nutrient Criteria" on page 30.

For discharges to restricted coves and backwater transition zones (cases B and C above), levels of concern for the predicted $\Delta$TP are as follows:

| Level of Concern | Predicted $\Delta$TP (mg/L) |
|---|---|
| Low | < 0.05 |
| Moderate | 0.05 to < 0.25 |
| High | $\geq$ 0.25 |

**H. IMPACT ON THE MAIN POOL OF THE RESERVOIR**

Although this screening factor is not a local effect, it is useful for evaluating discharge impacts to reservoirs with no numeric nutrient criteria when:

• the reservoirs are larger than 100 surface acres; and

• there are major discharges that are large enough to potentially cause a significant change to phosphorus concentrations in the main pool of the reservoir.

43

A steady-state, completely-mixed model is used to determine ΔTP in the main pool, as described in the section entitled "Nutrient Screening for Main Pool Effects in Reservoirs with Numerical Nutrient Criteria" on page 30. (Note that ΔTP is equal to $TP_R$, which is calculated in step 5 of the screening procedure.) Using the results of that modeling procedure, the following levels of concern are assigned to various predicted changes in TP concentration:

| Level of Concern | Predicted ΔTP (mg/L) |
|------------------|----------------------|
| Low | < 0.0001 |
| Moderate | 0.0001 to < 0.001 |
| High | ≥ 0.001 |

**I. EXISTENCE OF LISTED CONCERN FOR NUTRIENTS OR AQUATIC VEGETATION IN THE TCEQ'S INTEGRATED REPORT (§ 305(B))**

The latest TCEQ § 305(b) report (integrated report) is reviewed to see if the water body is listed as a concern for nutrients or aquatic vegetation.

| Level of Concern | Listed as a Concern for Nutrients or Aquatic Vegetation in Integrated Report? |
|------------------|------------------------------------------------------------------------------|
| Low | No concern for nutrients or aquatic vegetation in latest integrated report. |
| Moderate | Concern for nutrients or aquatic vegetation in latest integrated report due to exceedance of the 85th percentile. |
| High | Concern for nutrients or aquatic vegetation in latest integrated report due to documented problem with one or both of these. |

## *Assessing the Results of Site-Specific Screening Factors*

Once the individual screening factors have been rated, they provide the basis for a "weight-of-evidence" assessment to identify the need for a nutrient effluent limit. An effluent limit for TP is probably needed when a substantial number of screening factors are rated moderate and high. If the overall assessment determines that the discharge is at a moderate level of concern, a limit might be indicated if one or more of the factors are particularly elevated. A monitoring requirement may be appropriate if a TP effluent limit is not required.

Alternatively, numeric values can be assigned to each level of concern (for example, Low=1, Moderate=3, High=5) and the values averaged. If the average is <2, a TP limit is probably not needed.  If the average is > 4, a TP limit is probably needed. If the average is 2-4, either TP monitoring or a TP limit is possible depending on the specifics of the case. Note that the importance and weight of the individual screening factors can vary from one site to another.

If an effluent limit for TP is indicated, the screening factors and levels of concern are used to help determine the specific effluent limit for TP. Initial assessments can be improved and reconsidered in light of additional site-specific data and more extensive models and evaluations.

**Example of local effects screening for a reservoir:**
This example is a continuation of the scenario presented on page 25. An applicant proposes to locate a new 2.0 MGD discharge 3 miles upstream of Somerville Lake, Segment 1212, on South Yegua Creek. Would a TP limit likely be needed to address local effects in Somerville Lake?

**A. Size of discharge:** 2.0 MGD – <u>high</u>

**B. Distance from reservoir:** 3 miles – <u>high</u>

**C. Sensitivity to nutrient enrichment – water clarity:**
Option 1, qualitative analysis: Information unavailable
Option 2, quantitative analysis: Mean secchi (see Table F-1) = 0.68 m – <u>low</u>

**D. Sensitivity to growth of aquatic vegetation – observations:**
Small patches of floating algae mats were found along the shoreline and in the cove where South Yegua Creek enters Somerville Lake - <u>moderate</u>

**E. Sensitivity to growth of aquatic vegetation – shading and sunlight in narrow backwaters and small coves:** Based on aerial photos from August 2004, the backwater of South Yegua Creek has minimal canopy cover – <u>high</u>

**F. Consistency with other permits:** No other permits that discharge to Somerville Lake have TP limits – <u>low</u>

**G. Local dispersion and mixing:**
Option 1, qualitative analysis: Narrow, backwater transition zone – <u>high</u>
Option 2, quantitative analysis, case C: Model analysis not performed at this time.

**H. Impact on main pool of the reservoir:** N/A - evaluated separately using screening for reservoirs with numerical criteria.

**I. Existence of concern for nutrients or aquatic vegetation on the 305(b) list:** The South Yegua Creek arm of Somerville Lake is not listed in the 2008 305(b) report as a concern for water quality based on screening levels of nutrients or aquatic vegetation - <u>low</u>

**Final assessment:** The screening values ranked as low (4), moderate (1), and high (4), so the overall ranking is moderate (mean = 3.0). TP monitoring is already being included in the permit based on the previous screening for the entire reservoir. Based on the local effects screening, no additional limitations on TP would likely be recommended.

## Nutrient Screening for Streams and Rivers

### General Approach

To assess local effects in streams and rivers from discharges under the narrative nutrient provisions of the Standards, the TCEQ first evaluates the discharge using the general guidelines. If the general guidelines in this section indicate that a TP limit should be considered, then the TCEQ conducts a more comprehensive review using site-specific screening factors. Eutrophication potential is rated as a low, moderate, or high level of concern for each factor. Some screening factors can be rated on either qualitative or quantitative information, depending on data availability. Not every factor is always appropriate or definable at a particular site.

### Applicability

These screening procedures are primarily intended for freshwater streams and rivers. Perennial impoundments greater than 10 surface acres along streams can be individually evaluated using screening factors for reservoirs, as described in previous sections.

If a stream or river changes characteristics downstream of the discharge such that eutrophication impacts might be greater in downstream areas, then screening procedures are also applicable to those downstream reaches. As a rough guide, nutrient screening procedures are typically applied for the following permitted discharge sizes within the following distance of the discharge point:

| Permitted flow (MGD) | Evaluation Distance (stream miles) |
| --- | --- |
| < 0.25 | < 3 |
| 0.25 to < 1.0 | < 7 |
| ≥ 1.0* | < 15 |

**\* Very large discharges may be evaluated on a case-by-case basis.**

### General Guidelines for Assigning TP Limits

TP limits are potentially indicated in the following situations:

- for new or expanding discharges with permitted flow ≥ 0.25 MGD to perennial, shallow, relatively clear streams with rocky bottoms or other substrates that promote the growth of attached vegetation;

- for new or expanding discharges with permitted flow ≥ 0.25 MGD to streams with long, shallow, relatively clear perennial impoundments; and

47

- where explicitly required by watershed rules or other specific regulatory requirements.

Other situations where receiving streams appear to be especially sensitive to nutrient increases can also be considered. Smaller proposed discharges (such as those between 0.1 to 0.25 MGD) can also be of concern and will be evaluated for TP limits if the discharge location is into a sensitive area with very low dispersion/dilution.

## *Site-Specific Screening Factors*

For cases where a limit on TP should be considered further, site-specific screening factors are applied to assess the potential need for a TP limit to control instream vegetation growth. These screening factors include the following:

A. size of discharge
B. instream dilution
C. sensitivity to growth of attached algae—type of bottom
D. sensitivity to growth of attached vegetation—depth
E. sensitivity to nutrient enrichment—water clarity
F. sensitivity to growth of aquatic vegetation—observations
G. sensitivity to growth of aquatic vegetation—shading and sunlight
H. streamflow sustainability
I. impoundments and pools
J. consistency with other permits
K. existence of listed concern for nutrients or aquatic vegetation in the TCEQ's integrated report (§ 305(b))

The level of concern (low, moderate, or high) for each of these factors is described in the following sections. Calculations are based on 7Q2 stream flows unless otherwise indicated.

### A. SIZE OF DISCHARGE
The permitted size of the discharge affects the downstream extent of impact and the amount of nutrient loading to deeper, slower moving areas such as pools and small impoundments.

| Level of Concern | Permitted Flow (MGD) |
|------------------|----------------------|
| Low | < 0.25 |
| Moderate | 0.25 to < 1.0 |
| High | ≥ 1.0 |

48

**B. INSTREAM DILUTION**

The potential impact of nutrients from discharges to streams and rivers is substantially affected by the dilution and resulting instream concentration during dry-weather flows. The percent effluent instream at the discharge and at downstream points is calculated at permitted discharge flow and 7Q2 streamflow.

| Level of Concern | Percent Effluent |
|---|---|
| Low | < 10 |
| Moderate | 10 to < 25 |
| High | ≥ 25 |

The percent of effluent instream can be obtained either from the effluent percentages calculated for critical conditions or from modeling results for dissolved oxygen.

**C. SENSITIVITY TO GROWTH OF ATTACHED ALGAE – TYPE OF BOTTOM**

In shallow, clear streams, the tendency for the stream to have nuisance levels of attached algae depends in part upon a stable stream bottom upon which attached algae may grow.

| Level of Concern | Bottom Substrate |
|---|---|
| Low | Mud or sand |
| Moderate | Rocky cobble, gravel, usually with riffle areas |
| High | Larger rocks and boulders, rock slabs |

**D. SENSITIVITY TO GROWTH OF ATTACHED VEGETATION – DEPTH**

The growth of attached vegetation tends to be facilitated by the extent of shallow areas. Levels of concern associated with the potential for eutrophication are as follows:

| Level of Concern | Depth Characteristics |
|---|---|
| Low | Relatively steep banks and deep channels across stream |
| Moderate | Gently sloping sides with some shallow areas |
| High | Substantial shallow areas near banks and in stream channel |

**E. SENSITIVITY TO NUTRIENT ENRICHMENT—WATER CLARITY**
Relative clarity is assessed using general observations and knowledge by individuals who are familiar with the stream or river.

| Level of Concern | Discharge Environment |
|---|---|
| Low | Turbid from suspended particles or color (tannins), bottom may not be visible |
| Moderate | Some visible turbidity but without heavy murkiness, bottom sometimes visible |
| High | Relatively clear water, bottom usually visible |

**F. SENSITIVITY TO GROWTH OF AQUATIC VEGETATION—OBSERVATIONS**
When site-specific observations are available with respect to aquatic vegetation in areas of the water body with existing wastewater discharges, the levels of concern for nutrient impacts are as follows:

| Level of Concern | Observed Aquatic Vegetation |
|---|---|
| Low | Little attached, floating, or suspended aquatic vegetation |
| Moderate | Limited patches of attached, floating, or suspended vegetation |
| High | Heavy patches of vegetation in areas with nutrient input |

**G. SENSITIVITY TO GROWTH OF AQUATIC VEGETATION—SHADING AND SUNLIGHT**
The sensitivity of streams to various kinds of aquatic vegetation can be affected by the extent to which sunlight can reach the water's surface. The amount of available sunlight is related to the amount of tree canopy cover during warm seasons.

| Level of Concern | Canopy Cover and Shading During Warm Months |
|---|---|
| Low | Extensive canopy cover shades most of stream surface |
| Moderate | Substantial canopy cover, but shading is only partial and not equivalent to "deep woods" |
| High | Canopy cover diffuses light to some extent, but substantial light reaches stream surface |

## H. Streamflow Sustainability

Growth of aquatic vegetation and the potential impact of nutrients are enhanced by flow characteristics that sustain permanent aquatic environments.

| Level of Concern | Stream Type |
|---|---|
| Low | Intermittent |
| Moderate | Intermittent with perennial pools |
| High | Perennial |

## I. Impoundments and Pools

Perennial impoundments that are greater than 10 surface acres can be individually evaluated with screening factors that are applied to reservoirs (see previous section that starts on page 38). The presence of smaller riverine impoundments and perennial pools can also increase the level of concern for eutrophication impacts.

| Level of Concern | Extent of Pools and Impoundments |
|---|---|
| Low | No impoundments > 300 feet in length and no reach with extensive smaller pools |
| Moderate | No impoundments > 300 feet in length, but substantial smaller pools over > 20% of affected reach |
| High | At least one impoundment > 300 feet in length |

## J. Consistency with Other Permits

An assessment is conducted to determine whether TP limits have been required for other wastewater permits with similar characteristics and locations in this area.

| Level of Concern | TP Limits in Other Permits in the Area? |
|---|---|
| Low | Similar permits usually do not have effluent limits for TP |
| Moderate | There are some similar permits with TP limits, but applicability is site-specific and not "across-the-board" |
| High | Discharges with similar characteristics usually have a TP limit |

**K. EXISTENCE OF LISTED CONCERN FOR NUTRIENTS OR AQUATIC VEGETATION IN THE TCEQ'S INTEGRATED REPORT (§ 305(B))**

The latest TCEQ § 305(b) report ("integrated report") is reviewed to see if the water body is listed as a concern for nutrients or aquatic vegetation.

| Level of Concern | Listed as a Concern for Nutrients or Aquatic Vegetation in Integrated Report? |
|---|---|
| Low | No concern for nutrients or aquatic vegetation in latest integrated report. |
| Moderate | Concern for nutrients or aquatic vegetation in latest integrated report due to exceedance of the 85th percentile. |
| High | Concern for nutrients or aquatic vegetation in latest integrated report due to documented problem with one or both of these. |

## *Assessing the Results of Site-Specific Screening Factors*

Once the individual screening factors have been rated, they provide the basis for a "weight-of-evidence" assessment to identify the need for a nutrient effluent limit. An effluent limit for TP is probably needed when a substantial number of screening factors are rated moderate and high. If the overall assessment determines that the discharge is at a moderate level of concern, a limit might be indicated if one or more of the factors was particularly elevated. A monitoring requirement may be appropriate if a TP effluent limit is not required.

Alternatively, numeric values can be assigned to each level of concern (for example, Low=1, Moderate=3, High=5) and the values averaged. If the average is <2, a TP limit is probably not needed. If the average is > 4, a TP limit is probably needed. If the average is 2-4, either TP monitoring or a TP limit is possible, depending on the specifics of the case. Note that the importance and weight of the individual screening factors can vary from one site to another.

If an effluent limit for TP is indicated, the screening factors and levels of concern are used to help determine the specific effluent limit for TP. Initial assessments can be improved and reconsidered in light of additional site-specific data, more extensive models, and evaluations.

### *Nutrient Screening for Estuaries*

Limits for total phosphorus are generally not considered for discharges to tidal rivers or estuaries because vegetation growth in tidal waters is typically controlled by nitrogen rather than by phosphorus. At sensitive sites such as those with seagrasses nearby, limits on nutrients are considered for new or increased discharges.

## Other Applicable Rules

In addition to effluent limits based on dissolved oxygen, bacteria, nutrients, and other appropriate criteria, the draft permit also includes all treatment requirements of applicable rules such as:

- 30 TAC Chapter 309—"Domestic Wastewater Effluent Limitation and Plant Siting"
- 30 TAC Chapter 311—"Watershed Protection"
- 30 TAC Chapter 213—"Edwards Aquifer"
- 30 TAC Chapter 319—"General Regulations Incorporated Into Permits."

These rules are available on the agency's Web site (www.tceq.state.tx.us); follow the link for "Rules."

**Example of local effects screening for a river:**
This example is a continuation of the scenario presented on page 25. An applicant proposes to locate a new 2.0 MGD discharge 3 miles upstream of Somerville Lake, Segment 1212, on South Yegua Creek. Assume South Yegua Creek is intermittent with perennial pools. Would a TP limit likely be needed to address local effects in the creek?

**A. Size of discharge:** 2.0 MGD – <u>high</u>

**B. Instream dilution:** South Yegua Creek is intermittent with perennial pools, so the percent effluent is 100% - <u>high</u>

**C. Sensitivity to growth of attached algae – type of bottom:**
Mud or sand - <u>low</u>

**D. Sensitivity to growth of attached vegetation – depth:** The banks of South Yegua Creek are not steep in most areas; some shallow areas are present - <u>moderate</u>

**E. Sensitivity to nutrient enrichment – water clarity:** The water is brown in color and highly turbid, and the stream bottom is not visible - <u>low</u>

**F. Sensitivity to growth of aquatic vegetation – observations:** Patches of attached aquatic vegetation are growing in the shallow pool areas; however, such vegetation is absent in the deeper pool areas - <u>moderate</u>

**G. Sensitivity to growth of aquatic vegetation – shading and sunlight:**
Based on aerial photos from August 2004, South Yegua Creek has minimal canopy cover - <u>high</u>

**H. Streamflow sustainability:** South Yegua Creek is intermittent with perennial pools - <u>moderate</u>

**I. Impoundments and pools:** South Yegua Creek is intermittent with perennial pools - <u>moderate</u>

**J. Consistency with other permits:** No other permits that discharge to tributaries of Segment 1212 have TP limits - <u>low</u>

**K. Existence of concern for nutrients or aquatic vegetation on the 305(b) list:** South Yegua Creek is not listed in the 2008 305(b) report as a concern for water quality based on screening levels of nutrients or aquatic vegetation - <u>low</u>

**Final Assessment:** The screening values ranked as low (4), moderate (4), and high (3), so the overall ranking is on the low side of moderate (mean = 2.8). TP monitoring is already being included in the permit based on the previous screening for the entire reservoir. Based on the local effects screening for South Yegua Creek, no additional limitations on TP would likely be recommended.

# Antidegradation

## Policy

The antidegradation policy and framework for the antidegradation implementation procedures are specified in section § 307.5 of the Standards. This chapter provides additional guidance for antidegradation implementation. The antidegradation policy affords three tiers of protection to the water in the state.

- The first level (Tier 1) stipulates that existing uses and water quality sufficient to protect existing uses will be maintained.

- The second level (Tier 2) stipulates that activities subject to regulatory action will not be allowed if they would cause degradation of waters that exceed fishable/swimmable quality. Exceptions to this stipulation can be made if it can be shown to the TCEQ's satisfaction that the lowering of water quality is necessary for important economic or social development.

- The third level (Tier 3) stipulates that the quality of outstanding national resource waters will be maintained and protected.

## General Applicability

The antidegradation policy applies to actions regulated under state and federal authority that would increase pollution of water in the state. The antidegradation implementation procedures in this document apply to any increase in pollution authorized by TPDES wastewater discharge permits or by other state and federal permitting and regulatory activities.

Increases in pollution are determined by: (1) information on effluent characteristics that are provided in the application for the TPDES permit, the draft permit, and/or in other available sources; and (2) final effluent limits for flow, loading, and concentration in the previous permit compared with the proposed permit. Permits that are consistent with an approved WLE or TMDL under the antidegradation policy do not receive a separate antidegradation review for the applicable parameters unless the discharge may cause impacts on the receiving water that were not addressed by the WLE or TMDL.

# Tier 1—Protecting Uses

Antidegradation reviews under Tier 1 ensure that existing water quality uses are not impaired by increases in pollution loading. Numerical and narrative criteria necessary to protect existing uses will be maintained. TPDES permit amendments or new permits that allow increased pollution loading are subject to review under Tier 1 of the antidegradation policy, and all pollution that could cause an impairment of existing uses is included in the evaluation.

Existing uses and criteria for unclassified waters are established as discussed in the section in this document entitled "Assigned Aquatic Life Uses" on page 16. Applicable uses, and the numerical and narrative criteria needed to support those uses, are established in the Standards. Uses that may be applicable to individual water bodies include:

- aquatic life categories
- primary and secondary contact recreation and noncontact recreation
- sustainable and incidental fisheries
- public drinking water supply
- aquifer protection
- oyster waters.

Additional uses may be applicable such as:

- navigation
- agricultural water supply
- industrial water supply
- seagrass propagation
- wetland water quality functions.

Numerical criteria may be applicable to individual water bodies:

- dissolved oxygen
- total dissolved solids
- sulfate
- chloride
- pH
- temperature
- bacterial indicators of recreational suitability
- nutrient indicators (chlorophyll *a*)
- toxic pollutants to protect aquatic life and human health.

Narrative criteria may be applicable to individual water bodies for:

- radioactive materials
- nutrients (phosphorus, nitrogen)
- temperature
- salinity

56

- dissolved oxygen necessary to protect aquatic life
- habitat necessary to protect aquatic life
- aquatic recreation
- toxic pollutants to protect aquatic life, human health, terrestrial wildlife, livestock, and domestic animals.

Narrative criteria may also apply for aesthetic parameters such as:

- taste and odor
- suspended solids
- turbidity
- foam and froth
- oil and grease.

The review of water quality impacts from a proposed permit action is conducted in accordance with the procedures established in other chapters of this document including "Determining Water Quality Uses and Criteria" on page 14, "Evaluating Impacts on Water Quality" on page 20, and "Toxic Pollutants" on page 130.

# Protecting Impaired Waters under Tier 1

The procedures in this section address proposed wastewater discharges to water bodies listed on the Clean Water Act § 303(d) List as not meeting instream water quality standards. The procedures are intended to assist in establishing permit requirements until a TMDL is completed. Provisions in 40 CFR Parts 122, 123, 124, and 131 are also applicable.

## *Definitions*

**Listed water body** refers to a portion of a water body that does not meet water quality standards and is listed in the current § 303(d) List. This portion of a water body is called an assessment unit (AU), and it is the smallest geographic area of a water body that is assessed.

**Listed pollutant** refers to a pollutant or pollutants that cause the failure of a listed water body to attain water quality standards. For a listing due to a failure to attain dissolved oxygen criteria, the pollutants of concern include oxygen-demanding organic substances and ammonia-nitrogen.

An existing or proposed discharge is considered to be a **discharge to a listed water body** if (1) the discharge is directly to a listed water body, or (2) the discharge is in close enough proximity to potentially impact the listed area.

## General Provisions

Permits for discharges to listed water bodies will not allow:

- an increase in the loading of a listed pollutant that will cause or contribute to the violation of water quality standards; and

- other conditions that will cause or contribute to the violation of water quality standards.

Subsequent references to increased loadings of listed pollutants will also include consideration of other conditions that will cause or contribute to the violation of water quality standards.

Permit applications are reviewed by the TCEQ to identify discharges into the watersheds of listed AUs.

## Applicability to Specific Parameters

### Substances that Deplete Instream Dissolved Oxygen

Effluent limits will be established to avoid an increase in BOD loading (carbonaceous or nitrogenous) unless it is demonstrated that: (1) water quality standards for dissolved oxygen will be attained in the area affected by the discharge; or (2) the proposed discharge will not lower instream concentrations of dissolved oxygen in any areas that are not meeting dissolved oxygen standards. Evaluation and modeling of dissolved oxygen impacts are conducted as discussed in the chapter in this document entitled "Modeling Dissolved Oxygen" (see page 83).

### Toxic Pollutants

Effluent limits will be established to avoid an increase in the permitted loading of a listed toxic pollutant unless: (1) it is demonstrated that water quality standards for the listed pollutant will be attained in the area affected by the discharge; or (2) water quality standards for the listed pollutant will be attained at the "end-of-pipe." Demonstrations of standards attainment may include instream monitoring of listed pollutants.

However, no increase in loading will be allowed: (1) for toxic pollutants listed for drinking water concerns; (2) for toxic pollutants that accumulate in bottom sediments, fish tissue, or deep layers of water (typically indicated by a bioconcentration factor (BCF) equal to or greater than 1,000); or (3) where fishing advisories are present.

### *Dissolved Salts—TDS, Chloride, Sulfate*

Effluent limits will continue to be established as discussed in the chapter of this document entitled "Screening Procedures and Permit Limits for Total Dissolved Solids" (see page 174). The current procedures preclude additional TDS loadings when they would cause further increases in ambient TDS concentrations that are already at or above standards.

### *Bacteria*

Effluent limits are established to avoid an increase in permitted loading unless: (1) it can be demonstrated that water quality standards for the listed pollutant will be attained in the area affected by the discharge, or (2) water quality standards for the listed pollutant will be attained at the "end-of-pipe."

### *Listings Based on Narrative Standards*

A proposed increase in loading of a pollutant that would cause or contribute to the existing violation of water quality standards will not be allowed.

## Procedures for Discharges to Listed Water Bodies

Requirements for discharges to listed water bodies apply to:

- discharges that are directly to a listed water body
- discharges to adjacent water bodies that are within a reasonable distance of and may affect a listed water body.

Application procedures, requirements for effluent screening by permittees, and review of the application for administrative completeness are the same as for discharges to unlisted water bodies. Effluent screening for permit applications is conducted in accordance with the sampling requirements in current application forms.

During review of permit applications, the TCEQ identifies discharges to listed water bodies and summarizes the listing in the modeling memo. For discharges that potentially increase the loading of a listed pollutant, the permit is developed in accordance with the requirements discussed beginning on page 57. The Wastewater Permitting Section will determine, when drafting the proposed permit, whether an increase in loading is anticipated.

Information on evaluating storm water discharges is contained in the section of this document entitled "Antidegradation Review of Storm Water Permits" on page 189.

Interim compliance periods and temporary variances will not allow an increase in loading of a listed pollutant that contributes to the violation of water quality standards.

For discharges that withdraw from and discharge to the same listed water body, an increase in permitted flow does not cause an "increase in loading" if it is demonstrated that the facility does not add listed pollutants to the discharge or cause other conditions that contribute to the violation of water quality standards.

Additional permit requirements will be imposed as necessary to address potential water quality impacts from listed pollutants.

The permit's fact sheet or statement of basis/technical summary (which is publicly available) notes that the discharge is to a listed water body and the reasons why the water body is listed.

## Applicability of Pollution Reduction Programs

Pollution prevention programs of the TCEQ may focus on watersheds of listed water bodies where such programs can potentially reduce the loading of listed pollutants.

Additional pretreatment requirements may be considered for discharges from publicly owned treatment works to listed water bodies where industrial users of the wastewater system contribute listed pollutants.

## Examples of Permitting to Listed Water Bodies

- A proposed discharge is projected to increase the concentration of a listed pollutant in the area of the water body that is not attaining standards for that pollutant. The additional loading will not be permitted.

- An increase in discharge flow is proposed, and the discharge contains significant concentrations of a listed pollutant (for example, a listed toxic pollutant is present at a concentration at or above the minimum analytical level—MAL). The additional flow may be permitted if permit limits are established that preclude an increase in loading of the listed pollutant by reducing its concentration.

- For some pollutants, additional loading will not adversely affect water quality if no instream dilution is allowed, so that standards are attained at the "end-of-pipe." This provision does not apply when a listed pollutant accumulates in bottom sediments, fish tissue, or deep layers of water. Such accumulation is typically indicated by a bioconcentration factor (BCF) equal to or greater than 1,000 or by an advisory for fish consumption.

- For discharges that withdraw from and discharge to the same listed water body, an increase in discharge flow can be allowed if it is demonstrated that the facility is simply "passing through" the pollutant of concern, so that it does not add more of the listed pollutant to the discharge effluent or cause other conditions that contribute to the violation of water quality standards.

- For discharges that are well upstream from a listed area, some pollutants, such as BOD, might be shown to completely dissipate by the time the discharge flow reaches the listed area.

# Tier 2—Protecting High-Quality Waters

## *Applicability*

Antidegradation reviews under Tier 2 ensure that where water quality exceeds the normal range of fishable/swimmable criteria, such water quality will be maintained unless lowering it is necessary for important economic or social development. The second tier of the antidegradation policy generally applies to water bodies that have existing, designated, or presumed uses of primary and secondary contact recreation and intermediate, high, or exceptional aquatic life waters. (Note that Tier 1 of the antidegradation policy applies to all water bodies, including those that are eligible for Tier 2 review.) TPDES permit amendments and new permits that allow an increase in loading are subject to review under Tier 2 of the antidegradation policy.

For Tier 2 reviews, the parameters of concern for individual water bodies may include:

- dissolved oxygen
- total dissolved solids
- sulfate
- chloride
- pH
- temperature
- toxic pollutants
- bacterial indicators of recreational suitability
- radioactive materials

61

- nutrients (phosphorus, nitrogen)
- taste and odor
- suspended solids
- turbidity
- foam and froth
- oil and grease
- any other constituents that could lower water quality.

Conditions that are usually not subject to an antidegradation review under Tier 2 include the following:

- Increases in pollutant loading at a specific discharge point that result from consolidating existing wastewater from other discharge points, so that overall loadings to a particular water body are not increased.

- A new or increased loading in an individual discharge that is either:

    ◦ authorized in a waste load evaluation (WLE) or total maximum daily load (TMDL) that has been certified as an update to the Water Quality Management Plan (WQMP); or

    ◦ authorized by a TPDES general permit,

  provided that a Tier 2 review was previously conducted on the WLE, TMDL, or general permit.

- A new or increased discharge authorized by a temporary or emergency order.

- New data on effluent composition indicates that a pollutant that was either (1) not previously tested for or (2) not previously detected above the agency-specified minimum analytical level (MAL) is now detected above the current MAL, and there is no proposal to increase the loading of the pollutant.

### *Evaluating the Potential for Degradation of Water Quality*

The effect of a proposed discharge is compared to baseline water quality conditions in order to assess the potential for degradation of water quality. The applicable date for establishing baseline water quality conditions is November 28, 1975, in accordance with 40 CFR Part 131 (EPA standards regulation). Baseline conditions are estimated from existing conditions, as indicated by the latest edition of the Texas Water Quality Inventory or other available information, unless there is information indicating that degradation in ambient water quality has occurred in the receiving waters since November 28, 1975.

Analyses to assess the impact of a proposed discharge on water quality include procedures that are established in other chapters of this document, such as "Determining Water Quality Uses and Criteria" on page 14, "Evaluating Impacts on Water Quality" on page 20, and "Toxic Pollutants" on page 130.

Proposed increases in loading are initially screened to determine whether sufficient potential for degradation exists to require further analysis. This initial screening procedure does not define degradation. It is intended only as general guidance to indicate when an increase in loading is small enough to preclude the need for additional evaluation. The following guidelines are used for initial screening of existing and new discharges.

### *Existing Discharges*

Increases in permitted loading of less than 10% over the loading allowed by the existing discharge permit are usually not considered to constitute potential degradation if: (1) the increase will attain all water quality standards, (2) the aquatic ecosystem in the area is not unusually sensitive to the pollutant of concern, and (3) the discharge is not relatively large.

The cumulative effect of repeated small increases in successive permit actions or from multiple discharges may require additional screening evaluation, even though the current permit application may be for a less than 10% increase in loading for any constituents of concern.

Increases in permitted loading of 10% or greater are not automatically presumed to constitute degradation, but will receive further evaluation.

## New Discharges

New discharges that use less than 10% of the existing assimilative capacity of the water body at the edge of the mixing zone are usually not considered to constitute potential degradation as long as the aquatic ecosystem in the area is not unusually sensitive to the pollutant of concern. New discharges that use 10% or greater of the existing assimilative capacity are not automatically presumed to constitute potential degradation but will receive further evaluation. For constituents that have numerical criteria in the water quality standards, the following equation may be used to estimate changes in assimilative capacity:

$$\% \; change = \frac{100 \, [C_P - C_A]}{C_C - C_A}$$

where:

$\%\,change =$ the percent change to the assimilative capacity

$C_P =$ the predicted concentration at the edge of the mixing zone

$C_A =$ the ambient concentration at the edge of the mixing zone

$C_C =$ the numerical criterion for the constituent of concern

This screening procedure is not applicable to dissolved oxygen, pH, or temperature. The screening procedure for nutrients is explained in a previous chapter of this document in the section entitled "Nutrients" beginning on page 26. Predicted concentrations at the edge of the mixing zone are calculated at applicable critical conditions using estimated effluent concentrations, which are based on available information, categorical limits, or other information. See the subsection of this document entitled "Procedure for Developing Permit Limits" on page 148 for more information on how the ambient concentration at the edge of the mixing zone is determined.

## Additional Screening

If needed, additional screening is conducted to assess the potential for degradation. If proposed loadings exceed additional screening guidelines, then further evaluation is needed. The additional screening guidelines do not define degradation. The cumulative effect of repeated small increases in successive permit actions may require additional screening evaluation.

### *Examples Where Degradation Is Unlikely to Occur*

The following examples are usually not considered to constitute degradation except where site-specific biological, chemical, or physical conditions in a water body create additional sensitivity or concern, or where background concentrations are adversely elevated:

- Increased **TSS** loading—if effluent concentrations are maintained at 20 mg/L or less.

- Increased **temperature** loading—if the "end-of-pipe" temperatures are not expected to be significantly higher than applicable instream temperature criteria.

- Increased loading of recreational indicator **bacteria**—if the applicable instream criteria are maintained in the effluent at the "end-of-pipe".

- Increased loading of **oxygen-demanding materials**—if the dissolved oxygen in the "sag zone" is lowered by less than 0.5 mg/L from baseline instream concentrations, and if the potentially affected aquatic organisms are not unusually sensitive to changes in dissolved oxygen.

- Increased loading of constituents that affect **pH**—if the instream criteria for pH in the nearest downstream segment are attained in the effluent at the "end-of-pipe".

- Increased loading of **TDS, chloride, or sulfate** in freshwater—if the instream criteria are attained in the effluent at the edge of the mixing zone at critical conditions.

- Increased loading of **total phosphorus, nitrate, or total nitrogen**—if it can be reasonably demonstrated that detrimental increases to the growth of algae or aquatic vegetation will not occur.

- Increased loading of **toxic pollutants** that are:
  - below concentrations that require an effluent limit based on water quality criteria or require monitoring and reporting as a permit condition.

  - not bioaccumulative (that is, the bioconcentration factor is less than 1,000).

  - not a potential cause of concern to a public drinking water supply.

  - not discharged in an area where there are aquatic organisms of unusual sensitivity to the specific toxicant of concern.

## *Examples Where Degradation Is Likely to Occur*

The following examples are intended to provide general guidelines as to when degradation becomes likely. The examples do not define degradation, nor do they address all pollutants and situations that can cause degradation. Final determinations are case-specific and can depend on the characteristics of the water body and local aquatic communities. Lower increases in loading may constitute degradation in some circumstances, and higher loadings may not constitute degradation in other situations. Examples where degradation is likely to occur include:

- Increased loading of **oxygen-demanding substances** that is projected to decrease dissolved oxygen by more than 0.5 mg/L for a substantial distance in a water body that has exceptional quality aquatic life and a relatively unique and potentially sensitive community of aquatic organisms.

- Increased loading of **bioaccumulative pollutants** (that is, the bioconcentration factor is greater than 1,000) that use more than 10% of the assimilative capacity at the edge of the human health mixing zone, or a substantial increase in the loading of a toxic pollutant that would directly affect an important or unusually sensitive aquatic organism.

- Increased loading of **phosphorus and/or nitrogen** into a reservoir that supplies public drinking water, if the loading would result in significant elevations in algae or potentially detrimental aquatic vegetation over a substantial area.

- A new discharge that is made directly into a tidal wetland or estuary and that would be expected to detrimentally affect **emergent or submerged vegetation** over a substantial area.

- Increased loading of **TSS** that would produce a visible turbidity plume extending past the designated aquatic life mixing zone.

## *Evaluation of Alternatives and Economic Justification*

When initial and additional screening under Tier 2 preliminarily indicates that the proposed discharge is expected to degrade water quality, then the applicant is notified so that the following information can be provided to TCEQ by the applicant:

- Any additional information about the nature of the discharge and the receiving waters that could affect the evaluation of whether degradation is expected.

66

- An analysis of alternatives to the proposed discharge that could eliminate or reduce the anticipated degradation, and an assessment of cost and feasibility for reasonable alternatives.

- An evaluation of whether the proposed discharge will provide important economic and social development in the area where the affected waters are located, considering factors such as:

  ◦ Employment
  ◦ Increased production that improves local economy
  ◦ Improved community tax base
  ◦ Housing
  ◦ Correction of an environmental or public health problem.

## *Agency Review of Degradation*

When degradation is anticipated, the TCEQ reviews the preliminary determination of potential degradation, the evaluation of alternatives, and economic and social justification. The TCEQ then determines whether a lowering of water quality is expected from the proposed discharge. If it is, the TCEQ then determines whether the lowering of water quality is necessary for important economic or social development and whether reasonable alternatives to the lowering of water quality are unavailable. The TCEQ may also refer questions concerning an antidegradation review to the State Office of Administrative Hearings for further review and consideration for an administrative hearing. Any proposed TPDES permit that allows degradation is subject to EPA review and approval.

# Tier 3—Outstanding National Resource Waters

Outstanding national resource waters (ONRWs) are defined in § 307.5(b)(3) of the Standards as high-quality waters within or adjacent to national parks and wildlife refuges, state parks, wild and scenic rivers designated by law, and other designated areas of exceptional recreational or ecological significance. In accordance with § 307.5(b)(3) of the Standards, the quality of such waters will be maintained and protected. No increase in pollution that could cause degradation of water quality is allowed into ONRWs.

ONRWs are specifically designated in § 307.5 of the Standards. Any designation of an ONRW should include a geographic description of the ONRW and of the applicable watershed to which the restrictions on increased loadings apply. Currently there are no designated ONRWs in Texas.

# Watershed Protection Rules

Additional protection of specific, sensitive watersheds is provided by requirements for wastewater discharge permits in 30 TAC Chapter 311. Requirements for discharges in specified watersheds can include phosphorus limits, advanced treatment of carbonaceous biochemical oxygen demand (CBOD) and ammonia-nitrogen, and prohibitions of discharge except by irrigation. Water bodies and their adjacent watersheds that are addressed in 30 TAC Chapter 311 include:

| Segment | Water Body/Watershed | Subchapter of 30 TAC 311 |
|---------|----------------------|--------------------------|
| 0807 | Lake Worth | G |
| 0809 | Eagle Mountain Reservoir | G |
| 0811 | Bridgeport Reservoir | G |
| 0818 | Cedar Creek Reservoir | G |
| 0828 | Lake Arlington | G |
| 0830 | Benbrook Lake | G |
| 0836 | Richland-Chambers Reservoir | G |
| 1002 | Lake Houston | D |
| 1403 | Lake Austin | A |
| 1404 | Lake Travis | A |
| 1405 | Marble Falls Lake | F |
| 1406 | Lake Lyndon B. Johnson | F |
| 1407 | Inks Lake | B |
| 1408 | Lake Buchanan | B |
| 1427 | Onion Creek | E |
| 1428 | Colorado River Below Town Lake/ Lady Bird Lake | E |
| 1434 | Colorado River Above La Grange (portion above City of Smithville) | E |
| 2425 | Clear Lake | C |

In addition to the above rules, additional protection is provided to the recharge and contributing zones of the Edwards Aquifer in 30 TAC Chapter 213.

## Public Notice

The Notice of Application and Preliminary Decision (public notice) concerning a proposed permit or permit amendment includes any preliminary additional uses assigned to unclassified receiving waters. If the proposed discharge is to a water body listed as impaired on the current § 303(d) List, this fact is noted in the permit's fact sheet, statement of basis/technical summary, or other publicly available information.

When the proposed permit affects receiving waters whose quality is exceptional, high, or intermediate, the public notice also indicates whether a lowering of water quality is anticipated. Information in the public notice about uses and antidegradation is indicated as preliminary and is subject to additional review and revision before approval of the permit by the TCEQ. A summary of anticipated impacts and the criteria for preliminary determinations of whether degradation will occur is publicly available in the permit file.

The public notice provides opportunity to comment and to submit additional information on the determination of existing uses and criteria, anticipated impacts of the discharge, baseline conditions, the necessity of the discharge for important economic or social development if degradation of water quality is expected under Tier 2, and any other applicable aspects of the antidegradation policy.

# Mixing Zones and Critical Conditions

## General Information

This chapter describes how the TCEQ assigns mixing zones (MZs) and zones of initial dilution (ZIDs) and determines their associated critical mixing conditions for discharges into different types of water bodies.

Mixing zones are defined in permits for:

- domestic discharges with a flow of 1 million gallons per day (MGD) or greater (or with numerical criteria and/or whole effluent toxicity tests specifically expressed as permit limitations).

- industrial discharges (excepting those that consist entirely of storm water runoff).

A mixing zone may not encompass an intake for a domestic drinking water supply that includes an organized treatment system as defined in 30 TAC Chapter 290—Public Drinking Water.

Thermal mixing zones and thermal impacts may be separately considered by the TCEQ in accordance with (1) the general criteria for temperature in the Texas Surface Water Quality Standards in § 307.4(f), or (2) provisions concerning thermal discharges in federal Clean Water Act § 316. Evaluations and permit conditions will ensure that temperature in the state shall be maintained so as to not interfere with the reasonable use of surface waters; or so as to assure the protection and propagation of balanced, indigenous populations of shellfish, fish, and wildlife.

## Mixing Zones and ZIDs for Aquatic Life Protection

Mixing zone size and shape may be varied in individual permits to account for differences in:

- stream flow
- bay, estuary, and reservoir morphometry
- effluent flow
- stream geometry
- ecological sensitivity at the discharge site
- zone of passage concerns
- discharge structures

70

ZIDs are specified for different receiving water types in § 307.8(b)(2) of the Standards and are not usually specified in individual permits. Complete mixing of effluent and receiving waters is assumed at mixing zone boundaries unless available information shows otherwise.

## *Intermittent Streams and Ditches*

No mixing zone is assigned to discharges to intermittent streams or ditches or to intermittent streams with perennial pools.

## *Perennial Streams, Ditches, and Rivers*

Mixing zones for discharges into perennial streams, ditches, or rivers are expressed in the permit in terms of longitudinal stream distance. The typical mixing zone extends 300 feet downstream and 100 feet upstream from the discharge point. Mixing zones may not preclude passage of free swimming or drifting aquatic organisms to the extent that aquatic life use is significantly affected.

ZIDs may not exceed a size of 60 feet downstream and 20 feet upstream from the point of discharge and may not encompass more than 25% of the volume of the stream flow at or above the seven-day, two-year low-flow (7Q2). ZIDs cannot extend across perennial streams, ditches, or rivers or impair migration of aquatic organisms.

## *Lakes and Reservoirs*

Mixing zones for discharges into lakes and reservoirs are normally expressed in the permit as a radius that extends over the receiving water in all directions from the point of discharge. The typical mixing zone radius is no greater than 100 feet but does not exceed one-half the width of the receiving water at the discharge point.

ZIDs may not exceed a 25-foot radius in all directions (or equivalent volume or area for discharges through diffuser systems) from the point of discharge and are normally assigned a value that is one-fourth the radius of the mixing zone. This is generally equivalent to 6.3% of the mixing zone surface area.

### *Bays, Estuaries, and Wide Tidal Rivers*

Mixing zones for discharges into bays, estuaries, and wide tidal rivers ($\geq$ 400 feet across) are expressed in the permit as a radius that extends over the receiving water in all directions. The typical mixing zone radius is no greater than 200 feet but does not exceed one-half the width of the receiving water at the discharge point.

ZIDs may not exceed a 50-foot radius in all directions (or equivalent volume or area for discharges through diffuser systems) from the point of discharge and are normally assigned a value that is one-fourth the radius of the mixing zone.

### *Narrow Tidal Rivers*

Mixing zones and ZIDs for discharges into narrow tidal rivers depend on the availability and use of upstream flow data to calculate effluent percentages. If such flow information is available and used, the mixing zone and ZID are defined as for perennial streams, ditches, and rivers. If flow information is not available or not used, the mixing zone and ZID are defined as for bays, estuaries, and wide tidal rivers.

### *Wetlands and Sand or Mud Flats*

Generally, no mixing zone is assigned to discharges to wetlands or to sand or mud flats. Discharges to permanently inundated wetlands may be assigned a mixing zone. The size of the mixing zone is evaluated on a case-by-case basis.

## Critical Conditions for Aquatic Life Protection

Effluent concentration limits for specific toxic materials are calculated, using critical mixing conditions, to meet numerical standards for chronic toxicity at the edge of the mixing zone and numerical standards for acute toxicity at the edge of the ZID (see the section of this document entitled "Deriving Permit Limits for Aquatic Life Protection" on page 131). The effluent fraction at the edge of the mixing zone, when expressed as a percentage, is also referred to as the critical dilution, and is used as the primary concentration for whole effluent toxicity testing (see the subsection of this document entitled "Dilution Series, Dilution Water, and Type of WET Test" on page 110).

## *Intermittent Streams and Ditches*

For discharges into intermittent streams or ditches with minimal aquatic life uses, acute toxic criteria apply at the point of discharge, and no dilution is assumed (that is, the critical dilution is 100%). If the discharge reaches a perennial water body within three miles, chronic toxic criteria apply at that perennial water body (see subsequent discussions. For discharges into intermittent streams or ditches with limited, intermediate, high, or exceptional aquatic life uses created by perennial pools, acute and chronic toxic criteria apply at the point of discharge, and no dilution is assumed (that is, the critical dilution is 100%).

## *Perennial Streams, Ditches, and Rivers*

For discharges into perennial streams, ditches, and rivers, chronic toxic criteria apply at the edge of the mixing zone in the perennial water body using the effluent percentage that occurs at the 7Q2. For streams and rivers that are dominated by springflow, an alternative critical low-flow value may be calculated (see page 77).

$$\% \textit{ effluent at edge of } MZ = \frac{Q_E}{Q_E + 7Q2} \times 100\%$$

In addition, acute toxic criteria apply at the edge of the ZID in the perennial water body using the effluent percentage that occurs at the one-day, two-year low flow (1Q2), which is estimated as 25% of the 7Q2 (or 25% of the alternative critical low-flow value for streams and rivers that are dominated by springflow). The following equations are used to calculate the effluent percentages:

$$\% \textit{ effluent at edge of } ZID = \frac{Q_E}{Q_E + 0.25(7Q2)} \times 100\%$$

where:  $Q_E =$  effluent flow

For more information about what effluent flow is used in these equations, see the section of this document entitled "Deriving Permit Limits for Aquatic Life Protection" on page 131. For more information on how the 7Q2 is determined, see the section of this document entitled "Determining the 7Q2" on page 75.

73

## *Lakes, Reservoirs, Bays, Estuaries, and Wide Tidal Rivers*

Critical conditions at mixing zone boundaries for discharges into lakes, reservoirs, bays, estuaries, and wide tidal rivers are estimated from appropriate models of discharge plume dispersion. To estimate the percent effluent, TCEQ uses the horizontal Jet Plume equation[5]:

$$\% \, effluent \; = \frac{2.8 \times D \times (3.14)^{1/2}}{R} \; \times 100\%$$

where:    $D =$    pipe diameter (ft) that corresponds to effluent flow (based on Manning's equation, but not less than 3 ft)

$R =$    radius (ft) of mixing zone or ZID

Model results and empirical data indicate that the following initial assumptions are appropriate for discharges of less than or equal to 10 MGD:

- The percentage of effluent at the edge of the mixing zone is 15% for lakes and 8% for bays, estuaries, and wide tidal rivers.

- The percentage of effluent at the edge of the ZID is 60% for lakes and 30% for bays, estuaries, and wide tidal rivers.

These assumed critical dilutions are based on a pipe diameter of 3 feet and the standard mixing zone sizes of 100 feet (lakes and reservoirs) and 200 feet (bays, estuaries, and wide tidal rivers). If it is necessary to assign a smaller mixing zone or larger pipe size, these effluent percentages will increase. TCEQ staff assigns a critical dilution of 100% effluent for discharges equal to or greater than 100 MGD.

Data from appropriately performed effluent dispersion dye studies or effluent mixing models may be used to vary from the conservative initial dilution assumptions.

## *Narrow Tidal Rivers*

Critical conditions at mixing zone boundaries for discharges into narrow tidal rivers (< 400 feet across) are calculated as for perennial streams and rivers if upstream flow data from USGS gages or other sources are available. The typical mixing zone extends 300 feet downstream and 100 feet upstream from the discharge point.

---

[5] The horizontal Jet Plume equation is based on Fischer, H.B., E.J. List, R.C.Y. Koh, J. Imberger, N.H. Brooks, 1979. *Mixing in Inland and Coastal Waters*. Chapter 9: Turbulent Jets and Plumes, p. 328.

In the absence of site-specific data such as dispersion dye studies or nearby flow measurements, minimum effluent percentages of 8% at the edge of the mixing zone and 30% at the edge of the ZID are assumed. Because mixing conditions in tidal rivers with upstream flow are not well understood, these minimum effluent percentages should provide narrow tidal rivers with the same level of protection given to bays, estuaries, and wide tidal rivers.

If upstream flow data from USGS gages or other sources is unavailable, the horizontal Jet Plume equation is used to calculate critical conditions. In these cases, the mixing zone radius is one-half the width of the narrow tidal river at the discharge point, and the critical dilutions are greater than 8% at the edge of the mixing zone and greater than 30% at the edge of the ZID. TCEQ staff may also consider tracer analyses, empirical data, or other models to determine site-specific instream dilution in narrow tidal rivers.

### *Wetlands and Sand or Mud Flats*

For discharges into wetlands or sand or mud flats, very little mixing is likely to occur. Therefore, in the absence of site-specific data (such as dispersion dye studies), acute and chronic toxic criteria apply at the point of discharge, and no dilution is assumed (that is, the critical dilution is 100%).

## Determining the 7Q2

The 7Q2 is defined in the Standards as "the lowest average stream flow for seven consecutive days with a recurrence interval of two years, as statistically determined from historical data." Effluent limits in TPDES wastewater discharge permits are designed to maintain the applicable numerical water quality standards for the protection of aquatic life when instream flows are at or above the 7Q2.

Many of the numerical water quality standards, as established in the Standards, do not apply when stream flow conditions are less than "critical low-flow conditions." Generally, critical low-flow conditions are determined as the 7Q2. The following criteria apply at and above the 7Q2:

- numerical criteria for dissolved oxygen

- numerical criteria for temperature and pH

- numerical criteria for *E. coli*, Enterococci, and fecal coliform

- numerical criteria to protect aquatic life from acute toxicity (apply at and above ¼ of the 7Q2)

- numerical criteria to protect aquatic life from chronic toxicity

- requirements to preclude chronic toxicity in whole effluent toxicity testing

For purposes of water quality regulation, the 7Q2 is calculated from approximately 30 years of flow data at USGS or International and Boundary Water Commission (IBWC) gages. A shorter period of record is used if the longer period of record is unavailable or inappropriate. If a major, permanent hydrologic alteration has occurred, such as upstream reservoir construction, then only the flows recorded after the alteration are used in the 7Q2 calculation. Gage data is also examined for trends and the period of record may be adjusted if a trend is identified.

Appendix C of this document lists 7Q2s for classified segments (see page 217), but the 7Q2 is usually recalculated annually to incorporate new flow data. Values in Appendix C should be verified with the Water Quality Assessment Section to ensure they have not changed since the last date of publication of this document.

If less than five years of continuous daily average flow data is available, the tenth percentile flow is normally used as an estimate of the 7Q2. Otherwise, the following procedure is used in a FORTRAN program to calculate the 7Q2 using daily average flow data from a gage:

1. Determine the minimum seven-day average flow for each year of data.

2. Rank the minimum seven-day average flows from lowest to highest.

3. Calculate the recurrence interval for each minimum seven-day average flow. If N is the total number of years of flow data, then the recurrence interval is (N+1)/rank.

4. The 7Q2 is the minimum seven-day average flow with a recurrence interval of 2. If an even number of years is used, interpolate the 7Q2.

In the absence of USGS or IBWC flow data, other sources of flow information may be used to estimate the 7Q2. These sources include self-reporting data from upstream dischargers, Surface Water Quality Monitoring (SWQM) stations (including Clean Rivers Program targeted monitoring), or other data sources as available. Estimates of the 7Q2 using this kind of data are generally based on the 10th percentile of the available flow data or on comparisons with a nearby USGS or IBWC gage.

In the absence of flow data, a drainage area ratio is used to estimate the 7Q2. The drainage area above the point of discharge or point of interest is determined, a nearby gage is selected for the comparison, and based on work done by the USGS[6], the following equation is used to estimate the 7Q2:

$$7Q2_d = 7Q2_g \times \left[ \frac{DA_d}{DA_g} \right]^{0.89}$$

where:
$7Q2_d =$   7Q2 just above the discharge point or point of interest
$DA_d =$   drainage area above the discharge point or point of interest
$7Q2_g =$   7Q2 of the gage
$DA_g =$   drainage area above the gage

# Determining Critical Low-Flows for Streams and Rivers that are Dominated by Springflow

Streams and rivers that are dominated by springflow typically have 7Q2s that correspond to a much higher percentile of the flow data than streams and rivers that are not dominated by springflow. For example, the 7Q2 of a stream or river that is not dominated by springflow tends to be about a 10th percentile; the 7Q2 of a stream or river that is dominated by spring flow tends to be a 20th percentile or greater. In addition, it is not unusual for spring-fed streams to contain federally listed endangered or threatened species.

In order to avoid providing less protection to spring-fed systems than is afforded to other streams and rivers, the TCEQ employs the following statistical approaches, using all available flow data, to derive the critical low-flow for spring-fed streams and rivers:

- for spring-fed streams that contain federally-listed endangered or threatened species (as listed in Appendix B of this document), the critical low-flow will be the 0.1 percentile of the lognormal fit to the flow data. Where determined to be appropriate, for spring-fed streams that contain state-listed endangered or threatened species, the critical low-flow will be the 0.1 percentile of the lognormal fit to the flow data.

---

[6] Asquith, William H.; Roussel, Meghan C.; Vrabel, Joseph. 2006. Statewide Analysis of the Drainage-Area Ratio Method for 34 Streamflow Percentile Ranges in Texas. United States Geological Survey Scientific Investigations Report 2006-5286.

- for spring-fed streams that do not contain federally-listed endangered or threatened species (as listed in Appendix B of this document), or state-listed endangered or threatened species, the critical low-flow will be the 5th percentile of the flow data.

# Mixing Zones and Critical Conditions for Human Health Protection

## *Intermittent Streams and Ditches*

No human health mixing zone is applied to discharges to intermittent streams with no significant aquatic life uses, since human health toxic criteria do not apply. If the effluent reaches perennial waters or an intermittent stream with perennial pools within three miles of the discharge point, human health criteria apply at those waters.

## *Intermittent Streams with Perennial Pools*

Human health mixing zones for discharges into intermittent streams with perennial pools typically extend 300 feet downstream and 100 feet upstream from the discharge point. Human health criteria apply at the edge of the human health mixing zone using the effluent percentage that occurs at the harmonic mean flow. The equation under "Perennial Streams, Ditches, and Rivers" is used to calculate the human health effluent percentage.

## *Perennial Streams, Ditches, and Rivers*

Human health mixing zones for discharges into perennial streams, ditches, or rivers typically extend 300 feet downstream and 100 feet upstream from the discharge point. Human health criteria apply at the edge of the human health mixing zone using the effluent percentage that occurs at the harmonic mean flow. The following equation is used to calculate the human health effluent percentage:

$$\% \textit{ effluent at edge of } HH \textit{ MZ} = \frac{Q_E}{Q_E + HM} \times 100\%$$

where:      $Q_E =$   effluent flow
               $HM =$   harmonic mean flow

For more information on what effluent flow is used in this equation, see the section of this document entitled "Deriving Permit Limits for Human Health Protection" on page 140. For more information on how the harmonic mean flow is determined, see the section of this document entitled "Determining the Harmonic Mean Flow" on page 80.

## *Lakes, Reservoirs, Bays, Estuaries, and Wide Tidal Rivers*

The typical human health mixing zone radius for lakes and reservoirs extends no greater than 200 feet in all directions over the receiving water from the point of discharge. The typical human health mixing zone radius for bays, estuaries, and wide tidal rivers extends no greater than 400 feet in all directions over the receiving water from the point of discharge.

Critical conditions at human health mixing zone boundaries for discharges into lakes, reservoirs, bays, estuaries, and wide tidal rivers are estimated from appropriate models of discharge plume dispersion. To estimate the effluent percentage, TCEQ uses the horizontal Jet Plume equation[7]:

$$\% \; effluent \; = \frac{2.8 \times D \times (3.14)^{1/2}}{R} \times 100\%$$

where:    $D =$    pipe diameter (ft) that corresponds to effluent flow (based on Manning's equation, but not less than 3 ft)

$R =$    radius (ft) of human health mixing zone

Model results and empirical data indicate that the following initial assumptions are appropriate for discharges of less than or equal to 10 MGD:

- The percentage of effluent at the edge of the human health mixing zone is 8% for lakes and reservoirs.

- The percentage of effluent at the edge of the human health mixing zone is 4% for bays, estuaries, and wide tidal rivers.

These assumed effluent percentages are based on a pipe diameter of 3 feet and the standard human health mixing zone sizes of 200 feet (lakes and reservoirs) and 400 feet (bays, estuaries, and wide tidal rivers). If it is necessary to assign a smaller mixing zone or a larger pipe size, these effluent percentages will increase. TCEQ staff assigns an effluent percentage of 100% for discharges equal to or greater than 100 MGD.

Data from appropriately performed effluent dispersion dye studies or effluent mixing models may be used to vary from the conservative initial dilution assumptions.

---

[7] The horizontal Jet Plume equation is based on Fischer, H.B., E.J. List, R.C.Y. Koh, J. Imberger, N.H. Brooks, 1979. *Mixing in Inland and Coastal Waters*. Chapter 9: Turbulent Jets and Plumes, p. 328.

### *Narrow Tidal Rivers*

In narrow tidal rivers, the critical conditions for human health protection are calculated as for perennial streams and rivers if upstream flow data from USGS or IBWC gages or other sources are available. In this case, the human health mixing zone typically extends 300 feet downstream and 100 feet upstream from the discharge point.

In the absence of site-specific data such as dispersion dye studies or nearby flow measurements, a minimum effluent percentage of 4% at the edge of the human health mixing zone is assumed. Because mixing conditions in tidal rivers with upstream flow are not well understood, this minimum effluent percentage should provide narrow tidal rivers with the same level of protection given to bays, estuaries, and wide tidal rivers.

If upstream flow data from USGS or IBWC gages or other sources is unavailable, the horizontal Jet Plume equation is used to calculate the effluent percentage. In these cases, the mixing zone radius is equal to the width of the river at the discharge point, and the effluent percentage is greater than 4% at the edge of the human health mixing zone.

More protective human health critical conditions may be used where bioaccumulative or persistent pollutants are a concern. TCEQ staff may also consider tracer analyses, empirical data, or other models to determine site-specific instream dilution in narrow tidal rivers.

### *Wetlands and Sand or Mud Flats*

Generally, no human health mixing zone is assigned to discharges to wetlands or sand or mud flats. Discharges to permanently inundated wetlands may be assigned a human health mixing zone whose size is evaluated on a case-by-case basis. Very little mixing is likely to occur in a wetland or on a sand or mud flat, so in the absence of site-specific data (such as dispersion dye studies), human health criteria apply at the point of discharge, and no dilution is assumed (that is, the effluent percentage is 100%).

## Determining the Harmonic Mean Flow

The harmonic mean flow is defined in the Standards as "a measure of mean flow in a water course which is calculated by summing the reciprocals of the individual flow measurements, dividing this sum by the number of measurements, and then calculating the reciprocal of the resulting number." Harmonic mean flows are usually, but not always, greater than 7Q2s. Effluent limits in TPDES wastewater discharge permits are designed to maintain the applicable numerical water quality standards as long-term averages for the protection of human health.

For purposes of water quality regulation, the harmonic mean flow is calculated from approximately 30 years of flow data at USGS or IBWC gages. A shorter period of record is used if the longer period of record is unavailable or inappropriate. If a major, permanent hydrologic alteration has occurred, such as upstream reservoir construction, then only the flows recorded after the alteration are used in the harmonic mean calculation. Gage data is also examined for trends, and the period of record may be adjusted if a trend is identified.

Harmonic mean flows for designated stream segments are listed in Appendix C of this document, but the harmonic mean flow is usually recalculated annually to incorporate new flow data. Values in Appendix C should be verified with the Water Quality Assessment Section to ensure they have not changed since the last date of publication of this document.

The following equation is used to calculate the harmonic mean flow for any set of flow data:

$$HM = \left[ \frac{\sum_{i=1}^{N_T - N_0} \frac{1}{Q_i}}{N_T - N_0} \right]^{-1} \times \left[ \frac{N_T - N_0}{N_T} \right]$$

where:    $HM =$    harmonic mean flow
          $Q_i =$    nonzero flow
          $N_T =$    total number of flow values
          $N_0 =$    number of zero flow values

In order to calculate effluent limits based on water quality criteria for human health protection, a harmonic mean flow is determined for all perennial streams and for streams that are intermittent with perennial pools.

Sometimes these streams have days on which measured flow is zero. Because a zero flow cannot be used in the calculation of harmonic mean flow, the second term in the harmonic mean equation is an adjustment factor used to lower the harmonic mean to compensate for days when the flow was zero. This is the same correction used by the EPA computer program DFLOW. (Note that if there are no days on which the flow was zero, the adjustment term is equal to unity.)

In the absence of USGS or IBWC flow data, other sources of flow information may be used to estimate the harmonic mean. These sources include self-reporting data from upstream dischargers, Surface Water Quality Monitoring stations (including Clean Rivers Program targeted monitoring), or other data sources as available. Estimates of the harmonic

81

mean using this kind of data are generally based on the harmonic mean of the available flow data or on comparisons with a nearby USGS or IBWC gage.

In the absence of flow data, a drainage area ratio is used to estimate the harmonic mean flow. The drainage area above the point of discharge or point of interest is determined, a nearby gage is selected for the comparison, and based on work done by the USGS[8], the following equation is used to estimate the harmonic mean flow:

$$HM_d = HM_g \times \left[ \frac{DA_d}{DA_g} \right]^{0.89}$$

where:  $HM_d =$ harmonic mean flow just above the discharge point or point of interest
$DA_d =$ drainage area above the discharge point or point of interest
$HM_g =$ harmonic mean flow of the gage
$DA_g =$ drainage area above the gage

## Diffusers

Diffusers installed at the end of discharge pipes may increase mixing and lower critical dilutions. The model most commonly used to design diffusers and evaluate the resulting mixing conditions is CORMIX. Mixing is evaluated under both summer and winter temperature conditions and at different combinations of effluent and receiving water densities. The highest effluent percentages at the edge of the mixing zone and ZID are used to determine water quality-based effluent limits for the protection of aquatic life. The highest effluent percentage at the edge of the human health mixing zone is used to determine water quality-based effluent limits for the protection of human health.

---

[8] Asquith, William H.; Roussel, Meghan C.; Vrabel, Joseph. 2006. Statewide Analysis of the Drainage-Area Ratio Method for 34 Streamflow Percentile Ranges in Texas. United States Geological Survey Scientific Investigations Report 2006-5286.

# Modeling Dissolved Oxygen

## General Information

Numerical criteria for dissolved oxygen correspond to specific aquatic life use categories as specified in Table 1 on page 16 of this document. All classified water bodies have numerical dissolved oxygen criteria specified in the Standards. All unclassified water bodies have either assigned or presumed uses, depending on data availability. In cases where data indicate the appropriate use is lower than the presumption, the appropriate use has to be adopted as part of the Standards before it can be used to set permit limits.

All TPDES applications for facilities that may decrease a water body's dissolved oxygen are evaluated to determine what effluent limits are needed to maintain appropriate dissolved oxygen levels. Numerical models or other techniques are used to develop permit limits for oxygen-demanding constituents, in order to ensure the attainment of numerical criteria for dissolved oxygen.

## Model Selection and Inputs

Model selection depends on factors such as:

- the type of water body to be analyzed
- the type and quantity of available site-specific information
- the location of the discharge point
- the availability of previously developed models.

If available, waste load evaluations (WLEs), total maximum daily loads (TMDLs), or models calibrated to site-specific information are used to generate permit limits. In the absence of these, simplified screening level methods are used. These methods can be used with little site-specific information, but substituting site-specific values for default parameters is encouraged when available. The 24-hour mean dissolved oxygen is the principal criterion of concern in these analyses. Effects on dissolved oxygen due to the presence of aquatic plants are usually not considered.

Additional scrutiny is given to applications for discharges that enter water bodies with impaired dissolved oxygen levels. Impaired water bodies are listed on the state's Clean Water Act Section § 303(d) List. The § 303(d) List is developed by the Surface Water Quality Monitoring Program in cooperation with the TMDL Program.

# Screening Level Methods

## *Nontidal Streams and Rivers*

To evaluate discharges into nontidal streams and rivers without specific WLEs, TMDLs, or other calibrated models, the TCEQ uses uncalibrated steady-state models. The preferred model for these analyses is QUAL-TX. Other public domain models may also be used. Using this approach, effluent limits may be derived for the following parameters: biochemical oxygen demand (BOD) or carbonaceous biochemical oxygen demand (CBOD), ammonia-nitrogen ($NH_3$-N), and dissolved oxygen (DO).

Apart from discharge flow and quality, the most important model inputs for this approach can be categorized as follows:

- stream hydraulic characterization
- chemical kinetic rates
- reaeration rates
- critical conditions
- background water quality

Many of these parameters are stipulated in a modeling memorandum of agreement (MOA) between the TCEQ and the EPA (see page 99). The following paragraphs describe these model inputs in more detail.

## *Stream Hydraulic Characterization*

Site-specific hydraulic information is used if it is available and of acceptable quality. In the absence of site-specific hydraulic information, generalized hydraulic equations are adopted for the model analysis. The TCEQ has developed these equations using data collected during studies performed throughout the state, and the coefficients represent the median values from those data.

## *Chemical Kinetic Rates*

The most important kinetic rates for dissolved oxygen analysis are: aerobic CBOD decay rate ($K_d$), ammonia-nitrogen oxidation rate ($K_n$), and sediment oxygen demand (SOD). A statistical analysis of rates used in previous calibrated and approved WLE models was performed to arrive at representative default rates. Normality tests performed on these data sets indicate that they are approximately lognormally distributed. The data used in the statistical analysis were taken from approximately 1,300 calibrated model reaches from water bodies throughout the state. For uncalibrated QUAL-TX modeling, the median value for $K_d$ and $K_n$ is normally used. For SOD, a value equivalent to approximately the 75th percentile is used. These values are:

84

- $K_d$ of 0.10/day
- $K_n$ of 0.30/day
- SOD of 0.35 g/m$^2$-day.

These rates are expressed at a standard temperature of 20ºC and are corrected to the temperature or temperatures used in the modeling analysis.

## *Reaeration Rates*

Reaeration rates account for the oxygen exchange between the atmosphere and the water body. Typically, an equation relating stream hydraulic properties to reaeration rate is used to estimate this parameter. The preferred equation for use in dissolved oxygen models of streams and rivers is the Texas Equation:

$$K_2 \, (\text{at } 20°C) = \frac{1.923 \, V^{0.273}}{D^{0.894}}$$

where:    $K_2 =$ reaeration rate (day$^{-1}$)

$V =$ average stream velocity (m/s)

$D =$ average stream depth (m)

This equation was derived from regression of measured reaeration and hydraulic data collected throughout the state and is considered to be adequate for most Texas streams. The Texas Equation can be reliably applied to streams with depths between 0.2 and 1.0 meters coupled with velocities between 0.01 and 0.30 m/s. In specific cases where stream depth or velocity falls outside these ranges, other reaeration equations may be used. $K_2$ is limited to a maximum value of 10/day at 20ºC, and the minimum value for this parameter is not allowed to go below the value calculated from the following equation:

$$K_{2 \min} \, (\text{at } 20°C) = \frac{0.6}{D}$$

where:    $K_{2min} =$ minimum allowable reaeration rate (day$^{-1}$)

$D =$ average stream depth (m)

85

## *Critical Conditions*

Critical conditions are those combinations of environmental conditions and wastewater inputs that typically result in the lowest dissolved oxygen levels in a water body. Critical conditions are defined by three primary parameters: ambient flow, wastewater flow, and ambient water temperature.

- Simplified modeling of streams and rivers is performed using low **ambient flow** values—either the seven-day, two-year low-flow (7Q2) or flows specified in Table 4 (see page 90) or Tables 4a-4e (see pages 96-99), as appropriate. If base flow information is not available to estimate the 7Q2, then a value of 0.1 ft$^3$/s is usually assumed for perennial streams, and a value of 0.0 ft$^3$/s is used for intermittent streams. For perennial streams, 7Q2 flows may also be estimated using a proportional watershed approach or similar technique. Tenth percentile stream flows may be used to develop seasonal permit limits if measured flow data is readily available. For more information on the flows in Table 4, see the section of this chapter entitled "Critical Low-Flow Values for East and South Texas Streams" on page 88. For more information on the flows in Tables 4a-4e, see the section of this chapter entitled "Regression Equation for Establishing Critical Low-Flows in Specific Water Bodies in the Cypress Creek Basin" on page 92.

- For renewal applications, the **wastewater flow** used in the model is the existing permitted average flow or flows of the facility as reflected in the current permit. For new or amendment applications, the wastewater flow used in the model is the proposed average flow or flows.

- Model analyses for effluent limits are usually performed with summer **temperatures**. The temperature is normally assumed to be 30.5°C unless critical low-flows reliably occur only at other temperatures. Alternative critical temperatures can be used if justifiable based on analysis of measured temperatures.

  For the development of seasonal permit limits, the following temperatures/derivation methodologies are used:

  ○ *Non-Summer Months*:  The ninetieth percentile temperature for each month is used to assess compliance with general dissolved oxygen criteria.

- *Summer Season (three hottest months)*: The mean of the average monthly temperatures for each of the three hottest months of the year plus the average of the standard deviations for these months is used to assess compliance with general dissolved oxygen criteria.

- *Spawning Season*:  A temperature of 22.8°C is used to assess compliance with spawning season DO criteria contained in Table 1 of this document. Monthly average temperatures are used to determine months when spawning criteria apply. Compliance with the general dissolved oxygen criteria during the spawning month(s) is evaluated using appropriate ninetieth percentile temperature(s).

Ninetieth percentile temperatures are developed from data measured on the stream under evaluation if possible. In the absence of these data or if the amount of data is insufficient, the estimated ninetieth percentile values from data measured at USGS or IBWC gaging station(s) from similar water bodies are used.

### Background Water Quality

Simplified modeling normally employs assumptions for background water quality. These assumptions include an ultimate BOD concentration of 3 mg/L, an ammonia-nitrogen concentration of 0.05 mg/L, and a dissolved oxygen value equivalent to approximately 80% saturation at the model temperature. Alternatively, other values may be used based on analysis of measured data.

## Tidal Water Bodies, Ponds, and Lakes

### Tidal Water Bodies

Tidal streams or rivers may be evaluated using an uncalibrated QUAL-TX model or other suitable technique. Bays can be evaluated using previously developed calibrated models, judicious use of a CSTR (continuously stirred tank reactor) model, or best professional judgment. Near-field dilution models may be used to provide supplementary information.

### Ponds

Small impoundments such as ponds may be evaluated using a CSTR model or other suitable technique.

### Lakes and Reservoirs

Due to the highly variable nature of potential discharge locations in large lakes and reservoirs, no single screening level modeling technique is

satisfactory for evaluating these discharges. Therefore, the evaluation method employed by TCEQ staff comprises a variety of techniques. While it is desirable to use mathematical models to determine treatment requirements, in some cases an appropriate model cannot be feasibly developed due to the lack of crucial site-specific information or to the large amount of time needed to develop a model. The following factors are considered in the review of these discharges:

- the size and quality of the proposed discharge;

- its proximity to other dischargers;

- the location of the outfall relative to areas that are likely to be highly limiting (such as small coves, flooded creek channels, or other areas with restricted interaction and water exchange with the main body of the reservoir); and

- suitability of analyzing the discharge using a predictive analytical tool.

Direct discharges to relatively open waters can be evaluated using previously developed calibrated models, judicious use of a CSTR model, or best professional judgment. Near-field dilution models may be used to provide supplementary information. Analyses of discharges to lakes and reservoirs are performed using dimensions that would be present at normal pool elevation.

### *Tributaries of Lakes and Reservoirs*

Discharges to tributaries of lakes and reservoirs are generally evaluated with a model or series of models. An uncalibrated QUAL-TX model is normally used to evaluate streams and rivers upstream of the normal pool elevation of the reservoir. However, other suitable models may also be used. If the model predicts that there would be significant levels of oxygen-demanding pollutants remaining in the stream as it enters the impoundment, then some portion of the impoundment is evaluated. Discharges into small coves may be modeled using a CSTR model or other suitable technique.

## Critical Low-Flow Values for East and South Texas Streams

As specified in § 307.7(b)(3)(A)(ii) of the Standards, streams with limited, intermediate, high, or exceptional aquatic life uses and those listed in Appendix A or D of the Standards in the eastern and southern portions of the state may be evaluated for 24-hour dissolved oxygen attainment at stream flows greater than 7Q2 flows as presented in Table 4 on page 90. Flows in Table 4 apply in the months April through October.



**Figure 3. Headwater flows for streams in area "A" may be adjusted based on Table 4**

**Table 4. Critical Low-Flow Values for Dissolved Oxygen for East and South Texas**

| Bedslope (m/km) | Critical Low-Flow (ft³/s) | | | |
|---|---|---|---|---|
| | DO[a] = 6.0 mg/L | 5.0 mg/L | 4.0 mg/L | 3.0 mg/L |
| 0.1 | —[b] | 18.3 | 3.0 | 0.5 |
| 0.2 | —[b] | 7.7 | 1.3 | 0.2 |
| 0.3 | 28.6 | 4.7 | 0.8 | 0.1 |
| 0.4 | 20.0 | 3.3 | 0.5 | 0.1 |
| 0.5 | 15.2 | 2.5 | 0.4 | 0.1 |
| 0.6 | 12.1 | 2.0 | 0.3 | 0.1 |
| 0.7 | 10.0 | 1.6 | 0.3 | 0.0 |
| 0.8 | 8.4 | 1.4 | 0.2 | 0.0 |
| 0.9 | 7.3 | 1.2 | 0.2 | 0.0 |
| 1.0 | 6.4 | 1.0 | 0.2 | 0.0 |
| 1.1 | 5.7 | 0.9 | 0.2 | 0.0 |
| 1.2 | 5.1 | 0.8 | 0.1 | 0.0 |
| 1.3 | 4.6 | 0.8 | 0.1 | 0.0 |
| 1.4 | 4.2 | 0.7 | 0.1 | 0.0 |
| 1.5 | 3.9 | 0.6 | 0.1 | 0.0 |
| 1.6 | 3.6 | 0.6 | 0.1 | 0.0 |
| 1.7 | 3.3 | 0.5 | 0.1 | 0.0 |
| 1.8 | 3.1 | 0.5 | 0.1 | 0.0 |
| 2.1 | 2.5 | 0.4 | 0.1 | 0.0 |
| 2.4 | 2.2 | 0.4 | 0.1 | 0.0 |

Note:    **Flows in this table apply only to the months April through October.**

[a]    Dissolved oxygen criteria apply as 24-hour averages at all stream flows at or above the indicated stream flow for each category.

[b]    Flows are beyond the observed data used in the regression equation.

Example:    If the bedslope of the stream is 1.1 m/km, and the DO criterion is 5.0 mg/L, then the critical low-flow value is 0.9 ft³/s.

The critical low-flows in Table 4 apply to streams that occur in the portion of the state east of a line defined by Interstate Highway 35 and 35W from the Red River to the community of Moore in Frio County, and by U.S. Highway 57 from the community of Moore to the Rio Grande (area "A" in Figure 3 on page 89). The flows shown in Table 4 may be used to evaluate summertime 24-hour dissolved oxygen criteria (see Table 1 on page 16) for a presumed, designated, or assigned aquatic life use. Certain water bodies in the Cypress Creek Basin should be evaluated using the procedures in the section of this document entitled "Regression Equation for Establishing Critical Low-Flows for Specific Water Bodies in the Cypress Creek Basin" on page 92.

## *Regression Equation Relating Dissolved Oxygen, Flow, and Bedslope*

The flow values in Table 4 were derived from a multiple regression equation using data collected from the TCEQ's study of least impacted streams (Texas Aquatic Ecoregion Project). Results of this study indicate a strong dependent relationship for average summertime dissolved oxygen concentrations and several hydrologic and physical stream characteristics—particularly stream flow and bedslope (stream gradient).

Stream flows and average dissolved oxygen concentrations were measured during steady-state conditions, and bedslopes were estimated from 1:24,000 scale USGS topographic maps. Approximately 72% of the variation in observed average dissolved oxygen concentrations in these minimally impacted streams is explained by the following regression equation:

$$DO = 7.088 + 0.551\ln(Q + 0.01) + 0.686\ln(Bd) - k$$

where:

$DO =$ dissolved oxygen (mg/L)

$Q =$ flow (ft$^3$/s)

$Bd =$ bedslope (m/km)

$k =$ 1.61 (constant for 50[th] percentile of tree canopy cover)

The coefficient of determination ($r^2$) for this equation, adjusted for degrees of freedom, is 0.72 (p < 0.0001). This equation may be used to calculate headwater flows for bedslopes within the range of 0.1 m/km to 2.4 m/km. For streams that have bedslopes greater than 2.4 m/km, a bedslope of 2.4 m/km will be used. For streams that have bedslopes less than 0.1 m/km, a bedslope of 0.1 m/km will be used. The headwater flows are calculated for dissolved oxygen concentrations of 0.5 mg/L greater than the criteria obtained from Table 1.

## *Calculating Bedslope*

Bedslopes are calculated from USGS 1:24,000 scale topographic maps for the portion of stream from the first contour line crossing the stream greater than one-half mile upstream of the point of discharge to the first contour line crossing the stream downstream beyond the estimated distance of discharge impact. The actual stream bedslope is calculated using the following equation:

$$Bd = \frac{(E_u - E_d)}{D}$$

where:    $Bd =$   bedslope (m/km)

   $E_u =$   upstream elevation (m)

   $E_d =$   downstream elevation (m)

   $D =$   linear distance along the streambed between the two elevation contours (km)

(Note: the elevations and linear distance in the formula can be calculated in feet and then multiplied by 1,000 to convert to meters per kilometer.)

## *Guidelines for Adjusting the Regression Equation*

The critical low-flows in Table 4 may be adjusted based on site-specific data. The following guidelines should be followed in order to apply site-specific changes to the regression equation used to calculate the Table 4 flows:

- Collect data on streams in areas that are unaffected by other point source discharges. Data can be collected upstream of a discharger's outfall as long as it is outside the mixing zone **or** on an adjacent stream with similar hydrology, drainage basin size, land use, habitat availability, and canopy cover.

- Collect data during all seasons for at least one year.

- Site-specific flow, temperature, or hydraulic conditions that affect dissolved oxygen can also be used to adjust critical low-flows.

- Site-specific changes in critical low-flows will have to be reviewed and approved by the TCEQ.

- EPA will review any site-specific, critical low-flows that could affect permits or other regulatory actions that are subject to EPA approval.

92

## *Regression Equation for Establishing Critical Low-Flows in Specific Water Bodies in the Cypress Creek Basin*

DO criteria for the following water bodies are based on a regression equation that relates dissolved oxygen, temperature, flow, and watershed size:

- Segments 0406, 0407, 0409, and 0410 as specified in § 307.10, Appendix A, of the Standards.

- Harrison Bayou (in Segment 0401) and Black Cypress Bayou (Creek) upstream of Segment 0410 as specified in § 307.10, Appendix D, of the Standards.

Data to define the DO relationship with these physical and chemical characteristics were collected in the watershed of Black Cypress Bayou (Creek) from 1998 to 2005. About 95% of the variation in observed 24-hour average DO concentrations can be explained by the regression equation.[9] The procedures in this section should be used for these water bodies in lieu of the more general East Texas procedures discussed in the preceding sections.

The critical low-flows for the applicable instream DO concentrations (1.5 mg/L – 5 mg/L) in Tables 4a-4e (see pages 96-99) were derived in order to develop effluent limits that will meet the 24-hour DO criteria. Each table applies at the appropriate critical temperature for each water body. The flows in Tables 4a-4e are based on the following equation:

$$DO = 12.61 - 0.309T + 1.05\log(Q) - 1.02\log(WS)$$

where:
$DO =$ dissolved oxygen criterion + 0.5 (mg/L)
$T =$ temperature (˚C)
$Q =$ flow (ft$^3$/s)
$WS =$ watershed size (km$^2$)

This equation may be used directly to calculate headwater flows for watershed sizes that fall between those included in the table. The equation and tables are applicable for watershed sizes within the range of 50 km$^2$ to 1000 km$^2$. For sites that have watershed sizes greater than 1000 km$^2$, a watershed size of 1000 km$^2$ will be used. For sites that have watershed sizes less than 50 km$^2$, a watershed size of 50 km$^2$ will be used. The headwater flows are calculated for DO concentrations of 0.5 mg/L greater

---

[9] Crowe, Arthur L. and Charles W. Bayer. "A Biological, Physical, and Chemical Survey of a Least-Impacted Watershed : Black Cypress Bayou (Creek), Texas, 1998-2005, AS-197. Texas Commission on Environmental Quality, November 2005 (revised March 2008).

than the calculated criteria. The maximum flow measured during the study was 1,140 ft$^3$/s; this is also the maximum flow to be used in DO modeling.

# Water Bodies with a Dissolved Oxygen Impairment

More comprehensive approaches to setting effluent limits based on water quality criteria are necessary when water bodies receiving the discharge are included on the § 303(d) List as having dissolved oxygen concentrations lower than the criterion. When evaluating discharges to water bodies with existing WLEs or TMDLs, effluent limits are based on the WLE or TMDL model, or report as applicable. WLEs assess the effects of point source waste loading on dissolved oxygen concentrations. TMDLs typically are comprehensive analyses that include both point and nonpoint sources of oxygen-demanding pollutants.

All water bodies contained on the § 303(d) List will be considered for TMDL development. Reviews of TPDES applications received before TMDL development may be conducted with the screening level methodologies discussed previously (see page 84).

For applications that are proposing a new or increased load of oxygen-demanding constituents into the watershed of water bodies on the § 303(d) list for depressed DO, the potential of the additional loading to negatively affect the listed portion of the water body is assessed. If the new or increased flow and resulting loadings of oxygen-demanding substances will cause or further contribute to the depressed DO conditions in the impaired water body, the discharge will not be allowed.

**Table 4a. Critical Low-Flow Values for Dissolved Oxygen for Harrison Bayou, in Segment 0401.**

| Drainage Area (km²) | Critical Low-Flow (ft³/s) | | | | |
|---|---|---|---|---|---|
| | DO[a] = | 5.0 mg/L | 4.0 mg/L | 3.0 mg/L | 2.0 mg/L | 1.5 mg/L |
| 50 | | 273 | 31 | 3.4 | 0.38 | 0.13 |
| 100 | | 536 | 60 | 6.7 | 0.74 | 0.25 |
| 150 | | 795 | 89 | 9.9 | 1.1 | 0.37 |
| 200 | | 1051 | 117 | 13 | 1.5 | 0.49 |
| 250 | | 1140[b] | 146 | 16 | 1.8 | 0.61 |
| 300 | | 1140[b] | 174 | 19 | 2.2 | 0.72 |
| 350 | | 1140[b] | 202 | 23 | 2.5 | 0.84 |
| 400 | | 1140[b] | 230 | 26 | 2.9 | 0.96 |
| 450 | | 1140[b] | 258 | 29 | 3.2 | 1.1 |
| 500 | | 1140[b] | 286 | 32 | 3.6 | 1.2 |
| 550 | | 1140[b] | 313 | 35 | 3.9 | 1.3 |
| 600 | | 1140[b] | 341 | 38 | 4.2 | 1.4 |
| 650 | | 1140[b] | 369 | 41 | 4.6 | 1.5 |
| 700 | | 1140[b] | 396 | 44 | 4.9 | 1.6 |
| 750 | | 1140[b] | 424 | 47 | 5.3 | 1.8 |
| 800 | | 1140[b] | 451 | 50 | 5.6 | 1.9 |
| 850 | | 1140[b] | 478 | 53 | 6.0 | 2.0 |
| 900 | | 1140[b] | 506 | 56 | 6.3 | 2.1 |
| 950 | | 1140[b] | 533 | 59 | 6.6 | 2.2 |
| 1000 | | 1140[b] | 560 | 63 | 7.0 | 2.3 |

**Note:    Flows in this table apply at the critical summer temperature of 27.3°C for Harrison Bayou.**

[a]   Dissolved oxygen criteria apply as 24-hour averages at all stream flows at or above the indicated stream flow for each category.

[b]   Flows are beyond the observed data used in the regression equation. Use the highest flow observed (1140 ft³/s).

Example:   If the drainage area of the stream is 550 km², then the following headwater flows are included in the model to meet the corresponding DO criteria:

1140 ft³/s to meet 5 mg/L DO,
313 ft³/s to meet 4 mg/l DO,
35 ft³/s to meet 3 mg/L DO,
3.9 ft³/s to meet 2 mg/L DO, and
1.3 ft³/s to meet 1.5 mg/L DO.

**Table 4b. Critical Low-Flow Values for Dissolved Oxygen for Black Bayou, Segment 0406.**

| Drainage Area (km²) | Critical Low-Flow (ft³/s) | | | | |
|---|---|---|---|---|---|
| | DOᵃ = | 5.0 mg/L | 4.0 mg/L | 3.0 mg/L | 2.0 mg/L | 1.5 mg/L |
| 50 | | 223 | 25 | 2.8 | 0.31 | 0.10 |
| 100 | | 437 | 49 | 5.4 | 0.61 | 0.20 |
| 150 | | 649 | 72 | 8.1 | 0.90 | 0.30 |
| 200 | | 858 | 96 | 11 | 1.2 | 0.40 |
| 250 | | 1065 | 119 | 13 | 1.5 | 0.49 |
| 300 | | 1140ᵇ | 142 | 16 | 1.8 | 0.59 |
| 350 | | 1140ᵇ | 165 | 18 | 2.1 | 0.69 |
| 400 | | 1140ᵇ | 188 | 21 | 2.3 | 0.78 |
| 450 | | 1140ᵇ | 210 | 23 | 2.6 | 0.88 |
| 500 | | 1140ᵇ | 233 | 26 | 2.9 | 0.97 |
| 550 | | 1140ᵇ | 256 | 29 | 3.2 | 1.1 |
| 600 | | 1140ᵇ | 278 | 31 | 3.5 | 1.2 |
| 650 | | 1140ᵇ | 301 | 34 | 3.7 | 1.3 |
| 700 | | 1140ᵇ | 323 | 36 | 4.0 | 1.3 |
| 750 | | 1140ᵇ | 346 | 39 | 4.3 | 1.4 |
| 800 | | 1140ᵇ | 368 | 41 | 4.6 | 1.5 |
| 850 | | 1140ᵇ | 390 | 44 | 4.9 | 1.6 |
| 900 | | 1140ᵇ | 413 | 46 | 5.1 | 1.7 |
| 950 | | 1140ᵇ | 435 | 49 | 5.4 | 1.8 |
| 1000 | | 1140ᵇ | 457 | 51 | 5.7 | 1.9 |

**Note:** **Flows in this table apply at the critical summer temperature of 27.0°C for Segment 0406.**

[a]  Dissolved oxygen criteria apply as 24-hour averages at all stream flows at or above the indicated stream flow for each category.

[b]  Flows are beyond the observed data used in the regression equation. Use the highest flow observed (1140 ft³/s).

Example:  If the drainage area of the stream is 550 km², then the following headwater flows are included in the model to meet the corresponding DO criteria:

1140 ft³/s to meet 5 mg/L DO,
256 ft³/s to meet 4 mg/l DO,
29 ft³/s to meet 3 mg/L DO,
3.2 ft³/s to meet 2 mg/L DO, and
1.1 ft³/s to meet 1.5 mg/L DO.

**Table 4c. Critical Low-Flow Values for Dissolved Oxygen for James Bayou, Segment 0407.**

| Drainage Area (km²) | Critical Low-Flow (ft³/s) | | | | |
|---|---|---|---|---|---|
| | DOᵃ = | 5.0 mg/L | 4.0 mg/L | 3.0 mg/L | 2.0 mg/L | 1.5 mg/L |
| 50 | | 470 | 52 | 5.9 | 0.65 | 0.22 |
| 100 | | 922 | 103 | 11 | 1.3 | 0.43 |
| 150 | | 1140ᵇ | 153 | 17 | 1.9 | 0.63 |
| 200 | | 1140ᵇ | 202 | 23 | 2.5 | 0.84 |
| 250 | | 1140ᵇ | 251 | 28 | 3.1 | 1.0 |
| 300 | | 1140ᵇ | 299 | 33 | 3.7 | 1.2 |
| 350 | | 1140ᵇ | 347 | 39 | 4.3 | 1.4 |
| 400 | | 1140ᵇ | 395 | 44 | 4.9 | 1.6 |
| 450 | | 1140ᵇ | 443 | 49 | 5.5 | 1.8 |
| 500 | | 1140ᵇ | 491 | 55 | 6.1 | 2.0 |
| 550 | | 1140ᵇ | 539 | 60 | 6.7 | 2.2 |
| 600 | | 1140ᵇ | 586 | 65 | 7.3 | 2.4 |
| 650 | | 1140ᵇ | 634 | 71 | 7.9 | 2.6 |
| 700 | | 1140ᵇ | 681 | 76 | 8.5 | 2.8 |
| 750 | | 1140ᵇ | 728 | 81 | 9.1 | 3.0 |
| 800 | | 1140ᵇ | 775 | 87 | 9.7 | 3.2 |
| 850 | | 1140ᵇ | 823 | 92 | 10 | 3.4 |
| 900 | | 1140ᵇ | 869 | 97 | 11 | 3.6 |
| 950 | | 1140ᵇ | 916 | 102 | 11 | 3.8 |
| 1000 | | 1140ᵇ | 963 | 107 | 12 | 4.0 |

**Note:** **Flows in this table apply at the critical summer temperature of 28.1°C for Segment 0407.**

ᵃ Dissolved oxygen criteria apply as 24-hour averages at all stream flows at or above the indicated stream flow for each category.

ᵇ Flows are beyond the observed data used in the regression equation. Use the highest flow observed (1140 ft³/s).

Example:  If the drainage area of the stream is 550 km², then the following headwater flows are included in the model to meet the corresponding DO criteria:

1140 ft³/s to meet 5 mg/L DO,
539 ft³/s to meet 4 mg/l DO,
60 ft³/s to meet 3 mg/L DO,
6.7 ft³/s to meet 2 mg/L DO, and
2.2 ft³/s to meet 1.5 mg/L DO.

**Table 4d. Critical Low-Flow Values for Dissolved Oxygen for Little Cypress Creek (Bayou), Segment 0409.**

| Drainage Area (km²) | | Critical Low-Flow (ft³/s) | | | | |
|---|---|---|---|---|---|---|
| | DO[a] = | 5.0 mg/L | 4.0 mg/L | 3.0 mg/L | 2.0 mg/L | 1.5 mg/L |
| 50 | | 617 | 69 | 7.7 | 0.86 | 0.29 |
| 100 | | 1140[b] | 135 | 15 | 1.7 | 0.56 |
| 150 | | 1140[b] | 200 | 22 | 2.5 | 0.83 |
| 200 | | 1140[b] | 265 | 30 | 3.3 | 1.1 |
| 250 | | 1140[b] | 329 | 37 | 4.1 | 1.4 |
| 300 | | 1140[b] | 392 | 44 | 4.9 | 1.6 |
| 350 | | 1140[b] | 456 | 51 | 5.7 | 1.9 |
| 400 | | 1140[b] | 519 | 58 | 6.5 | 2.2 |
| 450 | | 1140[b] | 581 | 65 | 7.2 | 2.4 |
| 500 | | 1140[b] | 644 | 72 | 8.0 | 2.7 |
| 550 | | 1140[b] | 707 | 79 | 8.8 | 2.9 |
| 600 | | 1140[b] | 769 | 86 | 9.6 | 3.2 |
| 650 | | 1140[b] | 831 | 93 | 10 | 3.5 |
| 700 | | 1140[b] | 893 | 100 | 11 | 3.7 |
| 750 | | 1140[b] | 955 | 107 | 12 | 4.0 |
| 800 | | 1140[b] | 1017 | 113 | 13 | 4.2 |
| 850 | | 1140[b] | 1079 | 120 | 13 | 4.5 |
| 900 | | 1140[b] | 1140 | 127 | 14 | 4.7 |
| 950 | | 1140[b] | 1140[b] | 134 | 15 | 5.0 |
| 1000 | | 1140[b] | 1140[b] | 141 | 16 | 5.3 |

Note: **Flows in this table apply at the critical summer temperature of 28.5°C for Segment 0409.**

[a] Dissolved oxygen criteria apply as 24-hour averages at all stream flows at or above the indicated stream flow for each category.
[b] Flows are beyond the observed data used in the regression equation. Use the highest flow observed (1140 ft³/s).

Example: If the drainage area of the stream is 550 km², then the following headwater flows are included in the model to meet the corresponding DO criteria:

1140 ft³/s to meet 5 mg/L DO,
707 ft³/s to meet 4 mg/l DO,
79 ft³/s to meet 3 mg/L DO,
8.8 ft³/s to meet 2 mg/L DO, and
2.9 ft³/s to meet 1.5 mg/L DO.

**Table 4e. Critical Low-Flow Values for Dissolved Oxygen for Black Cypress Bayou (Creek), Segment 0410 and Black Cypress Bayou (Creek) upstream of Segment 0410.**

| Drainage Area (km²) | DOª = | Critical Low-Flow (ft³/s) | | | | |
|---|---|---|---|---|---|---|
| | | 5.0 mg/L | 4.0 mg/L | 3.0 mg/L | 2.0 mg/L | 1.5 mg/L |
| 50 | | 503 | 56 | 6.3 | 0.70 | 0.23 |
| 100 | | 986 | 110 | 12 | 1.4 | 0.46 |
| 150 | | 1140[b] | 163 | 18 | 2.0 | 0.68 |
| 200 | | 1140[b] | 216 | 24 | 2.7 | 0.90 |
| 250 | | 1140[b] | 268 | 30 | 3.3 | 1.1 |
| 300 | | 1140[b] | 320 | 36 | 4.0 | 1.3 |
| 350 | | 1140[b] | 372 | 41 | 4.6 | 1.5 |
| 400 | | 1140[b] | 423 | 47 | 5.3 | 1.8 |
| 450 | | 1140[b] | 475 | 53 | 5.9 | 2.0 |
| 500 | | 1140[b] | 526 | 59 | 6.5 | 2.2 |
| 550 | | 1140[b] | 577 | 64 | 7.2 | 2.4 |
| 600 | | 1140[b] | 628 | 70 | 7.8 | 2.6 |
| 650 | | 1140[b] | 678 | 76 | 8.4 | 2.8 |
| 700 | | 1140[b] | 729 | 81 | 9.1 | 3.0 |
| 750 | | 1140[b] | 779 | 87 | 9.7 | 3.2 |
| 800 | | 1140[b] | 830 | 93 | 10 | 3.5 |
| 850 | | 1140[b] | 880 | 98 | 11 | 3.7 |
| 900 | | 1140[b] | 930 | 104 | 12 | 3.9 |
| 950 | | 1140[b] | 981 | 109 | 12 | 4.1 |
| 1000 | | 1140[b] | 1031 | 115 | 13 | 4.3 |

Note:   Flows in this table apply at the critical summer temperature of 28.2°C for Segment 0410.

[a]   Dissolved oxygen criteria apply as 24-hour averages at all stream flows at or above the indicated stream flow for each category.
[b]   Flows are beyond the observed data used in the regression equation. Use the highest flow observed (1140 ft³/s).

Example:   If the drainage area of the stream is 550 km², then the following headwater flows are included in the model to meet the corresponding DO criteria:

1140 ft³/s to meet 5 mg/L DO,
577 ft³/s to meet 4 mg/l DO,
64 ft³/s to meet 3 mg/L DO,
7.2 ft³/s to meet 2 mg/L DO, and
2.4 ft³/s to meet 1.5 mg/L DO.

# Memorandum of Agreement
between the
## Texas Natural Resource Conservation Commission
and the
## Environmental Protection Agency - Region 6

for

# Application of Uncalibrated Water Quality Modeling
for
## Texas Freshwater Streams

The purpose of this Memorandum of Agreement (MOA) is to streamline the processes associated with the review and approval of individual permit waste load allocations (WLAs), water quality management plans (WQMPs), and Texas Pollutant Discharge Elimination System (TPDES) permits while assuring technical acceptability and consistency with the Clean Water Act (CWA).

The Environmental Protection Agency (EPA), Region 6, Water Quality Protection Division and the Texas Natural Resource Conservation Commission (TNRCC), Office of Permitting, Remediation & Registration agree to the following provisions:

1. WLAs for facilities included in a WQMP update with discharge flows less than or equal to 0.2 million gallons per day (MGD), which are developed using uncalibrated QUAL-TX modeling, where appropriate, with the reaction rates outlined below in Number 2, will be considered technically acceptable without EPA Region 6 review. The EPA Region 6 may review these WLAs during the semi-annual evaluations for the Section 106 State Water Pollution Control Program Grant.

2. The TNRCC will use the following reaction rates (expressed at 20ºC) when performing uncalibrated QUAL-TX modeling in freshwater streams:

   a. CBOD decay rate: $K_d = 0.10$/day; and
      CBOD settling rate: $K_s = 0.0$ m/day

   b. Ammonia-Nitrogen oxidation rate: $K_n = 0.30$/day

   c. Sediment Oxygen Demand: $SOD = 0.35$ g/m$^2$/day

   d. Reaeration Rate: $K_2$ will be calculated from equations contained in "<u>Rates, Constants, and Kinetics Formulations in Surface Water Quality Modeling (Second Edition)</u> June 1985, EPA/600/3-85/040." The equation(s) will be chosen consistent with the hydraulic character of the stream and the following minimum and maximum constraints will apply; $0.6/\text{depth(m)} \le K_2 \le 10$/day.

3. The level of algae specified in the model will be set to zero except in cases where site-specific measurements demonstrate appropriate minimum levels.

4.  This agreement does not apply to WLAs for dischargers in the following segments: 1001, 1005, 1006, 1007, 2426, 2427, 2428, 2429, 2430 and 2436.

5.  Treatment limits developed from calibrated models and those contained in approved Waste Load Evaluations and Total Daily Maximum Load (TMDL) reports or implementation plans will supersede those derived from this methodology.

6.  All remaining WLAs (>0.2 MGD) will be submitted for EPA technical review and approval. The EPA will provide a response to these submittals to the TNRCC within 30 days of receipt of modeling documentation.  If a response is not received within 30 days, the WLA will be considered approved as submitted and TPDES permits can be issued without a formal approval on these WLAs from the EPA.

7.  The EPA Region 6 will approve WQMP updates for WLAs prepared in accordance with this MOA after the WQMP updates have undergone public participation in accordance with 40 Code of Federal Regulations 25 and are certified by the TNRCC.

8.  This MOA may be revised upon mutual consent of the TNRCC and the EPA.

9.  The provisions of this MOA will apply to all domestic TPDES applications that are administratively complete on or after the effective date of the "*Procedures to Implement the Texas Surface Water Quality Standards*" which incorporates these modeling parameters.  Prior to this date, the EPA will conditionally or fully approve WLAs submitted that were developed with the existing TNRCC Streeter-Phelps modeling protocols unless pollutants in the effluent from those facilities could cause or contribute to pollutants of concern on 303(d) listed streams.

We agree with the provisions outlined in this MOA and commit our agency to implement them in a spirit of cooperation and mutual support.


_____                    4/04/01
Sam Becker, Acting Director                         Date
Water Quality Protection Division
Environmental Protection Agency, Region 6


_____                    3/22/01
Leigh Ing, Deputy Director                          Date
Office of Permitting, Remediation & Registration
Texas Natural Resource Conservation Commission

# Whole Effluent Toxicity Testing (Biomonitoring)

## Applicability

Whole effluent toxicity (WET) testing, also known as biomonitoring, is required in permits for dischargers whose effluent has a significant potential to exert toxicity in the receiving water (*See* § 307.6(e)(2)(A) of the Standards). WET testing directly measures a discharge's aggregate toxic effect by exposing surrogate sensitive test species to effluent at the critical dilution of the receiving water. Thus, it is an integral tool in the assessment of water quality for the protection of aquatic life and part of EPA's integrated strategy that includes the use of three control approaches (the other two being chemical-specific limits and biological criteria).

### *Domestic Dischargers*

The TCEQ requires WET testing of domestic wastewater dischargers that have **either or both** of the following conditions:

- classification as an EPA major domestic discharger (a design flow of 1 MGD or greater or an interim or final phase design flow of 1 MGD or greater); or
- any individual WWTP with an approved pretreatment program with significant industrial users discharging into its collection system.

Permittees with more than one flow phase in their permit begin WET testing upon expansion to 1 MGD or greater.

### *Industrial Dischargers*

The TCEQ requires WET testing of industrial dischargers that have **any** of the following conditions:

- classification as an EPA major industrial discharger;
- a continuous discharge of process treated wastewater; or
- a discharge with the potential to exert toxicity in the receiving water.

Although the TCEQ generally does not require WET testing of EPA-classified minor industrial dischargers, the TCEQ may require WET testing of such discharges in any of the following situations:

- the permittee applies water treatment chemicals or biocides;

102

- the TCEQ determines that the effluent has the potential to exert toxicity in the receiving water; or

- the permit requires effluent limits based on aquatic life water quality criteria because the effluent analysis exceeds the screening criteria.

## *Chapter Outline*

The rest of this chapter covers the following topics:

- **types of WET tests** (chronic and 48-hour acute—page 104; 24-hour acute—page 118)

- **test acceptability criteria** (chronic and 48-hour acute—page 105; 24-hour acute—page 119)

- **statistical interpretation of test results** (chronic and 48-hour acute only─page 107)

- **test frequencies** (chronic and 48-hour acute—page 108; 24-hour acute—page 119)

- **dilution series, dilution water, and type of WET tests**—page 110

- **reasonable potential determination** (chronic and 48-hour acute only─page 113)

- **toxicity reduction evaluations** (chronic and 48-hour acute—page 115; 24-hour acute—page 121)

- **toxicity control measures** (chronic and 48-hour acute—page 116; 24-hour acute—page 122)

- **toxicity caused by some specific pollutants**—dissolved salts (page 122), ammonia (page 128), and Diazinon (page 129).

# Chronic and 48-Hour Acute Tests

The TCEQ may require permittees to conduct 7-day chronic or 48-hour acute WET tests to measure compliance with the requirements of § 307.6(e) of the Standards. Toxicity in these tests is defined as a statistically significant difference (usually at the 95% confidence level) between the survival, reproduction, or growth of the test organisms at a specified effluent dilution (the critical dilution) compared to the survival, reproduction, or growth of the test organisms in the control (0% effluent).

## *Test Types*

The permit will specify that tests be conducted using the latest version of the appropriate EPA method. These methods can be found in the following publications (or their most recent versions):

- *Short-Term Methods for Estimating the Chronic Toxicity of Effluents and Receiving Waters to Freshwater Organisms, Fourth Edition*, EPA-821-R-02-013, October 2002.

- *Short-Term Methods for Estimating the Chronic Toxicity of Effluents and Receiving Waters to Marine and Estuarine Organisms, Third Edition*, EPA-821-R-02-014, October 2002.

- *Methods for Measuring the Acute Toxicity of Effluents and Receiving Waters to Freshwater and Marine Organisms, Fifth Edition*, EPA-821-R-02-012, October 2002.

In addition, information on interpreting non-monotonic test results and percent minimum significant difference (PMSD) values can be found in the following publications:

- *Understanding and Accounting for Method Variability in Whole Effluent Toxicity Applications Under the National Pollutant Discharge Elimination System Program*, EPA 833-R-00-003, June 2000.

- *Method Guidance and Recommendations for Whole Effluent Toxicity (WET) Testing (40 CFR Part 136)*, EPA 821-R-B-00-004, July 2000.

The permittee must use a revised promulgated method if one becomes available during the term of the permit. Alternate test methods are subject to EPA review and approval. Depending on the type of receiving water, the permit will specify chronic or 48-hour acute tests to assess toxicity to freshwater or saltwater organisms. The test organisms used for each type of test are listed below.

**FRESHWATER STREAMS AND LAKES (SALINITY < 2 PPT)**

CHRONIC  3-brood *Ceriodaphnia dubia* (water flea) survival and reproduction test

7-day *Pimephales promelas* (fathead minnow) larval survival and growth test

ACUTE  48-hour *Daphnia pulex* or *Ceriodaphnia dubia* (water fleas) survival test

48-hour *Pimephales promelas* (fathead minnow) survival test


**MARINE RECEIVING WATER (SALINITY ≥ 2 PPT)**

CHRONIC  7-day *Americamysis bahia* (mysid shrimp, formerly *Mysidopsis bahia*) survival and growth test

7-day *Menidia beryllina* (inland silverside) larval survival and growth test

ACUTE  48-hour *Americamysis bahia* (mysid shrimp) survival test

48-hour *Menidia beryllina* (inland silverside) survival test

Permittees may substitute other EPA approved tests and species if they obtain approval from the TCEQ during the permit application process (see the sections of this document entitled "Toxicity Attributable to Dissolved Salts" on page 122 and "Site-Specific Standards for Total Toxicity" on page 207).

Typically, if the segment criterion for total dissolved solids (TDS) or the site-specific TDS concentration in the receiving water is too high to support *Ceriodaphnia dubia* or *Daphnia pulex*, *Daphnia magna* (another water flea) will be substituted as the invertebrate freshwater test organism after the need to make the substitution is demonstrated. The permittee may submit evidence substantiating the need for an alternative species before or during the application process. However, draft permits with alternate tests, alternate species, or testing requirements that exclude a species are subject to EPA review and approval.


## *Test Acceptability Criteria*

A toxicity test that fails to meet **any** of the following acceptability criteria is considered invalid, and the permittee will have to repeat the test. Other factors may also invalidate a test. All test results, valid or invalid, are to be submitted to the TCEQ.

## Chronic Freshwater

- a mean survival of 80% or greater in the control.

- a mean number of 15 or greater water flea neonates per surviving adult in the control.

- a mean dry weight of 0.25 mg or greater for surviving fathead minnow larvae in the control.

- a coefficient of variation percent (CV%) of 40 or less between replicates in the control and in the critical dilution for:

  ◦ the young of surviving females in the water flea reproduction and survival test; and
  ◦ the growth and survival endpoints in the fathead minnow growth and survival test.

  However, if statistically significant lethal or sublethal effects are exhibited , a CV% greater than 40 does not invalidate the test.

- a PMSD of 47 or less for the water flea and a PMSD of 30 or less for the fathead minnow. However, if statistically significant sublethal effects are exhibited, a PMSD in excess of that specified above does not invalidate the test.

- a test population of < 20% males in a single concentration or < 20% males in a whole test for the water flea reproduction test.


## Chronic Saltwater

- a mean survival of 80% or greater in the control.

- a mean dry weight of 0.20 mg or greater for surviving mysid shrimp in the control.

- a mean dry weight in the control of 0.50 mg or greater for surviving unpreserved inland silverside and 0.43 mg or greater for surviving preserved inland silverside.

- a CV% of 40 or less in the control and in the critical dilution in the growth and survival tests. However, if statistically significant lethal or sublethal effects are exhibited, a CV% greater than 40 does not invalidate the test.

- a PMSD of 37 or less for the mysid shrimp and a PMSD of 28 or less for the inland silverside. However, if statistically significant sublethal effects are exhibited, a PMSD in excess of that specified above does not invalidate the test.

## 48-hour Acute Freshwater and Saltwater

- a mean survival of 90% or greater in the control.

- a CV% of 40 or less in the control and in the critical dilution.

However, if significant lethality is demonstrated, a CV% greater than 40 does not invalidate the test.

## Once-Through Cooling Water Facilities

Once-through cooling water facilities that use intake water as the control do not have to retest and report a valid test for each test species during the reporting period **if** the test is invalid because the control fails to meet acceptability criteria. This exception recognizes that running additional tests is not useful when the source waterbody itself is already toxic to one or both test organisms due to total dissolved solids (TDS), pathogenic bacteria, or toxic algae blooms.

## Statistical Interpretation of Test Results

If significant lethality is demonstrated (that is, if there is a statistically significant difference in survival at the critical dilution when compared to the control), but the conditions of test acceptability are met and the survival endpoint equals or exceeds the acceptability criteria at the critical dilution and all dilutions below that, then the permittee may report a survival NOEC of not less than the critical dilution.

While the nominal error rate (alpha) used for hypothesis testing in WET data is 0.05 (95% confidence interval), the alpha level for sublethal statistical analysis may be modified in accordance with EPA guidelines under appropriate conditions.[10]

While the method manuals list a range for PMSDs, a value below that range does not invalidate the test. If no significant sublethal effects are indicated, the NOEC should be reported as is. However, if the test indicates statistically significant sublethal effects, additional calculations should be performed in order to determine the NOEC.[11]

---

[10] *Method Guidance and Recommendations for Whole effluent Toxicity (WET) Testing (40 CFR Part 136)*, EPA 821-B-00-004, July 2000.
[11] *Understanding and Accounting for Method Variability in Whole Effluent Toxicity Applications Under the National Pollutant Discharge Elimination System Program*, EPA 833-R-00-003, June 2000.

## Test Frequencies

### General

Figure 4 on page 109 illustrates the chronic and 48-hour acute testing frequencies for facilities with WET requirements. Testing is typically performed quarterly for both the vertebrate and the invertebrate test species for the first year of the permit term. EPA requires quarterly testing for at least one year to assess the variability and toxic potential of effluents.

If no significant effects are demonstrated in the first year of quarterly testing, the permittee may request a testing frequency reduction to once per six months for the invertebrate and once per year for the vertebrate for the remainder of the permit term.



**Figure 4. Chronic and 48-Hour WET Testing Frequencies**

109

If significant lethality is demonstrated in the first year of quarterly testing, that species is not eligible for the testing frequency reduction and the permittee must then test quarterly for the permit term. If significant sublethality is demonstrated in the first year of quarterly testing, the permittee will not be eligible for the testing frequency reduction for that species until no significant effects are demonstrated for four consecutive quarterly tests.

If a testing frequency reduction has been granted for a species, but that species subsequently demonstrates significant lethality, the quarterly testing frequency for that species will be resumed for the permit term. If a testing frequency reduction has been granted for a species, but that species subsequently demonstrates significant sublethality, the quarterly testing frequency for that species will be resumed until four consecutive quarterly tests demonstrate no significant effects.

### *With a WET Limit*

Permittees will be required to perform quarterly testing for at least three years when a WET limit is added to the permit. This frequency only applies to the species with the WET limit. Best professional judgment (BPJ) will be used to establish testing frequencies when a chemical-specific limit or best management practice (BMP) is placed in the permit to control effluent toxicity.

## **Dilution Series, Dilution Water, and Type of WET Test**

### *Dilution Series*

Chronic and some 48-hour acute tests are based on the critical dilution in the receiving water. The critical dilution represents the percentage of effluent at the edge of the mixing zone during critical low-flow (that is, the 7Q2 or appropriate critical low-flow for spring-fed streams) or critical mixing conditions. Some 48-hour acute tests are based on the percentage of effluent at the edge of the zone of initial dilution (ZID). The test results at the critical dilution are statistically compared with the test results at the control dilution (0% effluent) to measure compliance. The permit specifies the critical dilution and the dilution series as well as the type of WET tests required.

The dilution series consists of four effluent concentrations in addition to the critical dilution. For domestic dischargers, the design flow is normally used to calculate the critical dilution. For industrial dischargers who are renewing permits, the highest monthly average flow from the preceding two years is normally used to calculate the critical dilution. For new or expanding industrial facilities, the design flow is used to calculate the critical dilution.

110

## *Dilution Water*

As specified in the permit, receiving water unaffected by the discharge should be used as the control and as dilution water for at least the first series of WET tests performed after a new permit is issued.

If the receiving water demonstrates pre-existing instream toxicity (by failing to meet the appropriate test acceptability criteria in the control), the test is considered invalid, and a repeat test has to be performed unless a "performance control" using synthetic dilution water was run at the same time and no toxic effects were demonstrated.

Upon demonstrating that the receiving water is toxic, the permittee may substitute synthetic dilution water for receiving water as the control and as dilution water in all subsequent tests for that permit term. The physical and chemical properties (for example, pH, hardness, TSS, alkalinity) of the synthetic dilution water should be similar to those of the receiving water.

## *Type of Test*

The TCEQ determines what type of WET test (freshwater or marine, acute or chronic) to place in the permit based on the salinity and critical conditions of the receiving waters. In general, TCEQ staff considers salinities at or above 2,000 mg/L (2.0 ppt) to represent saltwater conditions.

If the TCEQ determines that WET testing is required for a storm water discharge, TCEQ staff may use an analysis of the watershed to determine runoff volumes for dilution estimates. In addition, the TCEQ may require WET testing or other methods to protect water bodies with endangered species.

INTERMITTENT STREAMS WITH MINIMAL AQUATIC LIFE USE
Permittees that discharge into intermittent streams with a minimal aquatic life use will conduct 48-hour acute testing with a critical dilution of 100% effluent.

INTERMITTENT STREAMS WITH PERENNIAL POOLS
Permittees that discharge into intermittent streams with perennial pools will conduct chronic testing with a critical dilution of 100% effluent.

INTERMITTENT STREAMS WITH SEASONAL AQUATIC LIFE USES
TCEQ may require dischargers to conduct chronic testing to protect intermittent streams that may have seasonal aquatic life uses. TCEQ determines the critical dilution from the typical flows in the season in which the use occurs.

**INTERMITTENT STREAMS WITHIN THREE MILES OF A PERENNIAL FRESHWATER STREAM**

Permittees that discharge into intermittent streams that flow into a perennial stream within a moderate distance downstream (normally 3 miles) will conduct either a 48-hour acute or a chronic test. The type of test depends on the size of the discharge relative to the flow of the perennial water downstream.

If the effluent flow equals or exceeds 10% of the low-flow of the perennial water, the permittee will conduct chronic testing with a critical dilution representative of the percentage of effluent in the perennial stream during low-flow. If the effluent flow is less than 10% of the low-flow in the perennial stream, the permittee will conduct 48-hour acute toxicity tests with a critical dilution of 100% effluent. The TCEQ generally requires permittees that discharge into intermittent streams within 3 miles of a bay, estuary, or tidal river to conduct chronic marine testing.

**PERENNIAL FRESHWATER STREAMS**

Permittees that discharge directly into perennial freshwater streams or rivers with a designated or limited, intermediate, high, or exceptional aquatic life use will conduct chronic testing; the critical dilution will be based on the effluent flow and critical low-flow of the stream or river. If the critical dilution is less than 5%, the TCEQ requires 48-hour acute testing and uses an acute-to-chronic ratio (ACR) of 10:1 to determine the appropriate critical dilution. The ACR is the ratio of the acute toxicity of an effluent or toxicant to its chronic toxicity. It is used to estimate the chronic toxicity based on acute toxicity results. An ACR of 10 represents the upper 90th percentile of the ACR data available to EPA in 1991.

**LAKES**

Permittees that discharge to a lake will normally conduct chronic WET tests with a critical dilution of 15% if the effluent flow is less than or equal to 10 MGD and the mixing zone is 100 feet wide. If the effluent flow is greater than 10 MGD or if the mixing zone is less than 100 feet wide, the TCEQ typically uses the horizontal Jet Plume equation (see page 74) to determine the percentage of effluent at the edge of the mixing zone. In these cases the critical dilution is generally greater than 15%. The TCEQ assigns a critical dilution of 100% effluent for discharges greater than 100 MGD.

**BAYS, ESTUARIES, AND WIDE TIDAL RIVERS**

Permittees that discharge into bays, estuaries, and wide tidal rivers ($\geq 400$ feet across) will normally conduct chronic WET tests with a critical dilution of 8% if the effluent flow is less than or equal to 10 MGD. If the effluent flow is greater than 10 MGD, the TCEQ uses the horizontal Jet Plume equation (see page 74) to determine the percentage of effluent at the edge of the mixing zone. The TCEQ assigns a critical dilution of 100% effluent for discharges greater than 100 MGD.

Permittees that discharge into narrow tidal rivers (< 400 feet across) will normally conduct chronic WET tests with the critical dilution based on upstream flow whenever flow information is available. In the absence of site-specific data such as dispersion dye studies or nearby flow measurements, the critical dilution typically is not less than 8% to ensure the same level of protection given to other marine waters. If upstream flows are not available, the horizontal Jet Plume equation (see page 74) is used to determine the critical dilution at the edge of the mixing zone. Critical dilutions calculated in this way are greater than 8% because the mixing zone size is less than 200 feet.

## Diffusers

An effluent diffuser installed at the end of a discharge pipe may increase mixing and lower critical dilutions. See the section of this document entitled "Diffusers" on page 82 for more information. The effluent percentage at the edge of the mixing zone for a diffuser discharge is usually determined through modeling. This effluent percentage, if determined to be appropriate, is normally used as the critical dilution for chronic WET testing. If the critical dilution is less than 5%, the TCEQ may instead require 48-hour acute testing using an ACR of 10:1 to determine the appropriate critical dilution.

## Reasonable Potential Determination

Permit applications that meet the applicability criteria for WET testing will be screened to determine if the discharge has a reasonable potential (RP) to cause significant toxicity. A reasonable potential analysis is performed in order to determine whether an effluent can reasonably be expected to cause or contribute to an exceedance of a state water quality standard or criterion within that standard.

For renewed or amended permit applications, screening for RP will be based on representative data from the previous five years of WET testing. New permit applications will not be screened for RP, since there will be no data from previous WET testing. Toxicity for new permits will be assessed by routine, periodic WET testing after the permits are issued.

Toxicity is presumed if a test fails for the lethal or sublethal endpoint. A test is considered to have failed if a statistically significant difference occurs between the control and the critical dilution.

In accordance with federal regulations, the TCEQ will make an RP determination for toxicity. The determination will be based on best professional judgment as well as additional factors, such as duration and magnitude, as agreed upon by the TCEQ and the EPA. Each test species will be evaluated separately.

When a final determination of RP is made, the permit will be issued for a five-year term, including an initial one-year investigative period for the permittee to conduct an initial toxicity investigation. The investigative period will be followed by up to a three-year compliance period to allow for assessment of the cause and/or elimination of toxicity prior to the effective date of the WET limit.

If appropriate, the permittee may apply for a permit amendment to remove the WET limit by replacing it with a chemical-specific limit or a best management practice (BMP) prior to the end of the compliance period (see below). If there are no further demonstrations of toxicity during the compliance period, the WET limit will not become effective. If the WET limit does become effective, the permittee may, after three years of compliance, submit a major amendment application to request removal of the WET limit and resumption of routine WET testing.

## Addressing WET Limit Violations

If the permittee fails a WET test (that is, demonstrates significant toxicity at the critical dilution) while the limit is in effect, the testing frequency for the species increases to monthly until the permittee passes (does not demonstrate significant toxicity at the critical dilution) three consecutive tests, after which the permittee may resume quarterly testing.

However, if the permittee fails two tests during the increased monthly testing period, the permittee will be considered noncompliant with the WET limit, will receive a Notice of Enforcement (NOE), and will be referred to TCEQ's Enforcement Division for formal enforcement action. This process is illustrated in Figure 5 on page 117.

## Chemical-Specific Limit

In order to be eligible for a chemical-specific limit in lieu of a WET limit, the permittee has to demonstrate that one or more known pollutants caused the toxicity and should attempt to determine a specific concentration of the pollutant that will not cause toxicity. A chemical-specific limit may be inadequate to address toxicity in the following situations:

- failure to identify the toxicant or toxicants.
- presence of multiple toxicants.
- lack of a routine test method capable of detecting a pollutant at levels causing persistent significant toxicity.

## *BMP*

In terms of WET testing, BMPs are defined as a practice or combination of practices that remove toxicity from the effluent by eliminating the source of toxicity. In order to be eligible for a BMP in lieu of a WET limit, the permittee has to demonstrate that such a provision can adequately address toxicity. If successful, the BMP becomes an enforceable part of the permit. A BMP does not include making changes to operations or housekeeping practices to reduce toxicity. In these cases, the source of toxicity still remains.

## Toxicity Reduction Evaluations (TREs)

### *When is a TRE Performed?*

The TCEQ suggests that a permittee initiate a TRE when persistent significant toxicity occurs during routine WET testing. A TRE may allow the permittee to avoid a WET limit as the toxicity control measure.

If a permittee fails a WET test, that is, statistically significant toxicity occurs at the critical dilution, the permittee will conduct two retests with that test species. The retests are to be conducted monthly during the next two consecutive months. If persistent significant toxicity is demonstrated by failure of one or both retests, the permittee may wish to perform a TRE. A second retest is not required if the first retest confirms persistent toxicity.

### *TRE Purpose and Content*

The purpose of the TRE is to determine the cause and source of toxicity, and to determine methods to reduce or eliminate the toxicity. Components of a TRE may include, but are not limited to:

- chemical analyses
- effluent characterization tests (physical/chemical properties)
- WET tests on effluent before and after characterization test manipulations
- WET tests on effluent after chemical/physical separations
- source identification evaluation or toxicity source evaluation
- instream WET tests
- chemical identification after chemical/physical separations of toxic phase
- assessment of treatment technology available to remove the toxic substance from the effluent.

For more information on methods used in TREs, see the following documents (or their most recent versions):

- *Toxicity Identification Evaluation: Characterization of Chronically Toxic Effluents, Phase I*, EPA/600/6-91/005F, May 1992.

- *Methods for Aquatic Toxicity Identification Evaluations: Phase I Toxicity Characterization Procedures, Second Edition*, EPA/600/6-91/003, February 1991.

- *Methods for Aquatic Toxicity Identification Evaluations: Phase II Toxicity Identification Procedures for Samples Exhibiting Acute and Chronic Toxicity*, EPA/600/R-92/080, September 1993.

- *Methods for Aquatic Toxicity Identification Evaluations: Phase III Toxicity Confirmation Procedures for Samples Exhibiting Acute and Chronic Toxicity*, EPA/600/R-92/081, September 1993.



**Figure 5. Procedure for Addressing WET Limit Violations**

# 24-Hour Acute (100% End-of-Pipe) Tests

In addition to conducting chronic or 48-hour acute tests, dischargers are required to conduct 24-hour acute tests using 100% effluent. This end-of-pipe test measures compliance with § 307.6(e)(2)(B) of the Standards, which requires that greater than 50% of the test organisms survive exposure to 100% effluent for 24 hours. This provision is designed to ensure that water in the state will not be acutely toxic to aquatic life passing through the ZID.

In addition to facilities mentioned previously in the section "Applicability" (see page 102), the TCEQ may require 24-hour acute testing for intermittent process water outfalls and/or storm water outfalls with the potential for causing toxicity. Dischargers with multiple outfalls will test each outfall that has the potential to cause toxicity. Multiple outfall samples may not be composited for this test.

## Test Types

The permit will specify that the tests be conducted using the latest version of the appropriate EPA method. The 24-hour acute test species and methods are the same as those for 48-hour acute testing and can be found in the manual listed on page 104. Depending on the type of receiving water, the permit will specify 24-hour acute tests to assess toxicity to freshwater or saltwater organisms. The test organisms for each type of test are as follows:

### Freshwater streams and lakes (salinity < 2 ppt):
- 24-hour *Daphnia pulex* or *Ceriodaphnia dubia* (water fleas) survival test
- 24-hour *Pimephales promelas* (fathead minnow) survival test

### Marine receiving water (salinity ≥ 2 ppt):
- 24-hour *Americamysis bahia* (mysid shrimp) survival test
- 24-hour *Menidia beryllina* (inland silverside) survival test

Permittees may substitute other EPA-approved tests and species if they obtain approval from the TCEQ before or during the permit application process (see the sections in this document entitled "Toxicity Attributable to Dissolved Salts" on page 122 and "Site-Specific Standards for Total Toxicity" on page 207).

Typically, if the segment TDS criterion or site-specific TDS concentration in the receiving water is too high to support *Ceriodaphnia dubia* or *Daphnia pulex*, *Daphnia magna* (water flea) is substituted as the invertebrate test organism. However, draft permits with alternate tests, alternate species, or testing requirements that exclude a species are subject to EPA review and approval.

## Test Acceptability Criterion

The permittee will have to repeat any toxicity test if the mean survival of the control is less than 90%. Any toxicity test that fails to meet the acceptability criterion is considered invalid.

## Test Frequencies

The standard frequency for 24-hour acute WET testing is once per six months unless otherwise specified.

## Toxicity Reduction Evaluations (TREs)

Failing a 24-hour acute WET test (demonstrating 50% or greater mortality) necessitates two retests over consecutive weeks (unless retesting concurrently with chronic test failure; in such a case, the permittee may defer to the chronic monthly retest schedule). If both retests pass (demonstrate greater than 50% survival), the permittee continues testing at the original frequency designated in the permit.

If one or both of the retests fail, the permittee has demonstrated persistent significant mortality, and the permittee is required to perform a TRE. From the date that persistent mortality is confirmed, the permittee has three years to comply with 30 TAC § 307.6(e)(2)(B) of the Standards.

### TRE Purpose and Content

The purpose of the TRE is to determine the cause and source of toxicity, and to determine methods to reduce or eliminate the toxicity. Components of a TRE are the same as described in the chronic/48-hour acute section.

### TRE Plan

The permit requires the discharger to submit a general outline for performing a TRE within 45 days of the retest that confirms persistent mortality. The outline should describe the preparations the permittee will take to develop and implement a TRE.

Within 90 days of the retest that confirms persistent mortality, the permit requires the discharger to submit a detailed TRE plan. The TRE plan should describe the specific approach and methodology the permittee will use during the TRE and include schedules for chemical and biological testing, specific activities, a sampling plan, a quality assurance plan, and project organization. The TRE schedule and approach may be modified as necessary during the process.

Toxicity attributable to dissolved salts and ammonia are discussed in the sections of this document entitled:

- "Toxicity Attributable to Dissolved Salts" (see page 122)
- "Ammonia Toxicity" (see page 128)

## *Quarterly Reports*

The permittee must submit quarterly reports to TCEQ that describe TRE progress and results. The permit also requires the permittee to complete the TRE and submit a final report within 18 months of the retest that confirms lethality. Permittees may request an extension to the 18-month time limit. The extension, however, must be warranted, and approval is contingent upon permittees demonstrating (1) due diligence in pursuit of the TRE and (2) the existence of circumstances beyond their ability to control.

## *Ceasing a TRE*

Permittees may cease TRE activities if they demonstrate to the executive director that the effluent no longer causes significant mortality to the test organisms. The permit defines a cessation of significant mortality as no test failures for a period of 12 consecutive weeks with at least weekly testing. This permit language accommodates situations where operational errors and upsets, spills, or sampling errors triggered the TRE, in contrast to a situation where a single toxicant or group of toxicants cause lethality.

When a permittee ceases TRE activities under the cessation of significant mortality provision, that permittee continues WET testing as required in the permit. This provision is not applicable if the significant mortality ceases for 12 consecutive weeks as a result of the permittee taking corrective action. Corrective actions include source reduction or elimination, process changes, housekeeping improvements, changes in chemical use, and/or modification to wastewater treatment.

## *Toxicity Control Measures*

After the TRE, the TCEQ will amend the permit to include a chemical-specific (CS) limit, a best management practice (BMP), or a whole effluent toxicity (WET) limit.

If appropriate, the permittee may apply for a permit amendment to remove the WET limit by replacing it with a chemical-specific limit or a BMP prior to the end of the compliance period (see below). If there are no further demonstrations of mortality during the compliance period, the WET limit does not become effective. If the WET limit does become effective, the permittee may, after three years of compliance, submit a major amendment application to request removal of the WET limit and resumption of routine WET testing.

## *Chemical-Specific Limit*

In order to be eligible for a chemical-specific limit in lieu of a WET limit, the permittee has to demonstrate that one or more known pollutants caused the mortality and should attempt to determine a specific concentration of the pollutant that will not cause mortality. A chemical-specific limit may be inadequate to address mortality in the following situations:

- failure to identify the toxicant or toxicants;
- presence of multiple toxicants; or
- lack of a routine test method capable of detecting a pollutant at levels causing persistent significant mortality.

## *BMP*

In terms of WET testing, BMPs are defined as a practice or combination of practices that remove toxicity from the effluent by eliminating the source of toxicity. In order to be eligible for a BMP in lieu of a WET limit, the permittee has to demonstrate that such a provision can adequately address mortality. If successful, the BMP becomes an enforceable part of the permit. A BMP does not include making changes to operations or housekeeping practices to reduce toxicity. In these cases, the source of toxicity still remains.

## *WET Limit*

Failure to identify the toxicant or toxicants, presence of multiple toxicants, or lack of a routine test method capable of detecting a pollutant at levels causing toxicity, are examples of cases where a CS limit or BMP may be inadequate to address toxicity. In such cases, where no other appropriate toxicity control measure has been identified, the permit will be amended to add a WET limit with a compliance period, if appropriate.

### *WET Limit Violations*

If the permittee fails a WET test while the limit is in effect, the testing frequency for the species increases to monthly until the permittee passes (does not demonstrate significant mortality) three consecutive tests, after which the permittee may resume the specified testing frequency.

## Test Substitution

The TCEQ normally requires permittees to conduct the chronic or 48-hour acute WET tests and the 24-hour acute (100% end-of-pipe) WET tests as separate permit requirements. If the chronic or 48-hour acute WET test includes a test of 100% effluent in the dilution series, the permit allows the results from that test (after 24 hours of exposure) to fulfill the requirements in the 24-hour acute tests. The permittees then report the survival of organisms in the 100% effluent concentrations after 24 hours.

The permit stipulates that the 24-hour acute WET testing provision applies whether the test results submitted are for this requirement, the 48-hour acute requirements, or the chronic requirements. The permittee may add a 100% effluent dilution to chronic or 48-hour acute tests and submit the results after 24 hours to fulfill the 24-hour acute testing requirements.

## Toxicity Attributable to Dissolved Salts

Permittees may be exempt from compliance with the total toxicity provisions in the Standards if they demonstrate that dissolved salts are causing the effluent to be toxic. This exemption is allowed under the definition of toxicity in the Standards and under the 24-hour, 100% end-of-pipe acute toxicity provisions (*See* § 307.6(e)(2)(B) of the Standards).

The definition of toxicity in the Standards excludes adverse effects caused by concentrations of dissolved salts when the salts originate in a permittee's source water. This exemption would affect compliance with the chronic and 48-hour acute WET testing provisions.

According to § 307.3(a)(65) of the Standards, "Source water is defined as surface water or groundwater that is used as a public water supply or industrial water supply (including cooling water supply). Source water does not include brine water that is produced during the extraction of oil and gas, or other sources of brine water that are substantially uncharacteristic of surface waters in the area of the discharge."

Also, dischargers that exhibit 24-hour acute toxicity caused by: (1) concentrations of dissolved salts that originate from the source water or (2) an excess, deficiency, or imbalance of dissolved salts in the effluent are exempted from compliance with the 24-hour, 100% end-of-pipe acute toxicity provision. These exemptions, which are specified in § 307.6(e)(2)(B) of the Standards, do not include instances where individually toxic components (for example, the pollutants listed in Table 1 of the Standards) have formed a salt compound that is causing the effluent to be toxic.

The following two sections further explain the exemptions for dissolved salts.



**Figure 6. Procedure for Exemption from Total Toxicity Requirements because of Dissolved Salts**

124

## TDS Exemption—24-Hour Acute (100% End-of-Pipe) Tests

When a permittee believes failure of the 24-hour acute tests occurred because of dissolved salts and seeks an exemption for that demonstration of toxicity, the permittee will have to demonstrate that dissolved salts are a cause of toxicity in the effluent. Because the effluent may have multiple toxicants, the permittee then has to prove that dissolved salts are the **primary** cause of toxicity. The following paragraphs describe the process in more detail.

## Are Dissolved Salts a Cause of Toxicity?

To confirm that dissolved salts are a cause of toxicity in the effluent, the permittee is required to conduct at least one set of toxicity identification evaluation (TIE) characterization tests including an ion-exchange procedure.

- If the TIE tests fail to prove that dissolved salts are a cause of toxicity, the permittee should continue with the TRE to identify the toxicant or toxicants and to reduce or eliminate the acute toxicity.

- If the TIE tests show that dissolved salts are a cause of toxicity in the effluent, the permittee then has to prove that they are the **primary** cause of acute toxicity.

## Are Dissolved Salts the Primary Cause of Toxicity?

The permittee should use a combination of the following techniques to show that dissolved salts are the primary cause of acute toxicity:

- conduct WET tests using an alternate species that is more tolerant of dissolved salts.

- conduct side-by-side WET tests using the toxic effluent as well as a mock effluent formulated to mimic the ionic composition of the effluent.

- perform measurements of high levels of dissolved salts in the effluent.

- perform an analysis of the ionic components of the dissolved salts.

- use computer models that predict the acute toxicity of saline waters.

- perform WET tests using sea salts that are formulated to correct ionic imbalances.

The permittee may suggest other methods to demonstrate that dissolved salts are the primary cause of toxicity for the TCEQ's review and consideration.

- If these techniques show that dissolved salts are not the primary cause of acute toxicity, the permittee will continue with the TRE to address the toxicity.

- If the techniques prove that dissolved salts are the primary cause of toxicity, the TRE requirements cease.

### *Evaluating the Use of an Alternative Test Species*

When the TRE ceases because dissolved salts are the primary source of acute toxicity, the TCEQ evaluates or requires the permittee to evaluate the use of an alternative test species or modified test protocol.

The permittee may be required to continue conducting the 24-hour acute tests if an alternate test protocol successfully resolves the acute toxicity caused by the dissolved salts in the effluent. The TCEQ then initiates an amendment of the permit to include these measures.

If an alternate species is unavailable, or if test protocol modifications such as ionic adjustments are unsuccessful, the permittee will most likely be required to continue testing with the standard test species that is unaffected by the dissolved salts.

## TDS Exemption—Chronic and 48-Hour Acute Tests

When a permittee believes effluent toxicity evidenced by a chronic or 48-hour acute WET test is caused by dissolved salts and seeks an exemption for that demonstration of toxicity, the permittee should follow an approach similar to that described in the previous subsection. EPA will review any protocol that could affect permits or other regulatory actions that are subject to EPA approval.

First, permittees have to show that dissolved salts are a cause of toxicity in the effluent. Since the effluent may contain multiple toxicants, permittees have to prove that dissolved salts are the **primary** source of toxicity. Next, permittees have to show that the dissolved salts are coming from their source water. Permittees need to complete each step in this process to receive the exemption for dissolved salts. The following paragraphs describe this process in more detail.

### *Are Dissolved Salts a Cause of Toxicity?*

To confirm that dissolved salts are a cause of effluent toxicity, the permittee will conduct at least one set of TIE characterization tests including an ion-exchange procedure. If the TIE tests show that dissolved salts are not a cause of effluent toxicity, the permittee should continue with the TRE to identify the toxicant or toxicants and to reduce or eliminate the toxicity.

If the TIE tests show that dissolved salts are a cause of effluent toxicity, the permittee then has to prove that they are the primary cause of toxicity.

### *Are Dissolved Salts the Primary Cause of Toxicity?*

The permittee may use the techniques described in the previous section "TDS Exemption—24-Hour Acute (100% End-of-Pipe) Tests" on page 125 to prove that dissolved salts are the primary cause of toxicity. If these techniques fail to do so, the permittee should continue with the TRE to address the toxicity. If the techniques prove that dissolved salts are the primary cause of toxicity, the permittee then has to prove that the dissolved salts are coming from the source water.

### *Are Dissolved Salts Coming from Source Water?*

To help prove that dissolved salts originate from the source water, the permittee should sample the facility's intake water and/or raw water source and compare its dissolved salt concentration and ionic composition with those of the effluent. Increases in the dissolved salt content of the effluent due to process evaporation should also be evaluated where appropriate. In any case, if the effluent's TDS concentration is greater than that of the source water or if the effluent's ionic composition varies significantly from that of the source water, effluent limits or control measures may be included in the permit.

- If the dissolved salts are not from the source water, the permittee has to comply with the total toxicity provisions of the Standards. If a protocol for an instream biological survey is approved by EPA, it may be possible for the permittee to attempt to demonstrate that aquatic life in the receiving water is not adversely affected by the TDS levels in the proposed permit.

- If the dissolved salts are from the source water, the permittee may cease the TRE. Upon cessation of the TRE, TCEQ staff will, in conjunction with the permittee, evaluate the use of an alternative test species or a modified test protocol. The permittee may be required to continue testing if modifying the test protocol or using an alternate species resolves the toxic effect of the dissolved salts in the effluent. The TCEQ will then amend the permit to include these measures.

If an alternate species is unavailable or tests using a modified test protocol still demonstrate toxicity due to dissolved salts, the permittee will most likely be required to continue testing with the standard test species that is unaffected by the dissolved salts.

Discharges to marine waters are reviewed on a case-by-case basis and are subject to EPA review and approval in accordance with the MOA between the TCEQ and EPA concerning the TPDES program.

# Ammonia Toxicity

## Controlling Potential Ammonia Toxicity

Ammonia, a common component of domestic wastewater, has been shown to be toxic to aquatic organisms. Models used to determine effluent limits for oxygen-demanding constituents do not account for the toxicity that ammonia can exert. Therefore, to preclude receiving water toxicity, permits for certain types of facilities that have either

• ammonia limits to maintain instream dissolved oxygen criteria; or

• categorical ammonia limits that exceed 4 mg/L at the edge of the mixing zone will now include either modified limits for total ammonia or a chronic WET limit for the more sensitive species with a WET testing frequency of six times a year.

The modified ammonia limit or WET limit applies to the following types of facilities that discharge to perennial waters or within 3 miles of perennial waters:

• major domestic facilities (design flow ≥ 1 MGD)

• minor domestic facilities (design flow < 1 MGD) that discharge to a water body that:
  ◦ contains a threatened or endangered species or
  ◦ is listed for ammonia on an EPA-approved 303(d) list

• industrial facilities that have WET testing requirements
• industrial facilities that discharge to a water body that:
  ◦ contains a threatened or endangered species or
  ◦ is listed for ammonia on an EPA-approved 303(d) list

By following these guidelines, the TCEQ will ensure that it is not authorizing the discharge of toxic amounts of ammonia.

128

### *Toxicity Attributable to Ammonia*

TCEQ recognizes that the technology-based daily average ammonia-nitrogen limit of 3.0 mg/L included in most major domestic discharge permits generally precludes chronic toxicity to test species. Therefore, the TCEQ will implement this limit to address chronic toxicity attributable to ammonia in domestic discharge permits. The ammonia limit will be implemented in domestic discharge permits as follows:

• For those facilities whose permits contain interim or final effluent phases that include a daily average ammonia-nitrogen limit of 3.0 mg/L, the persistent toxicity requirements are suspended until the effective date of the limit.

• For those facilities whose permits do not contain interim or final effluent phase that include a daily average ammonia-nitrogen limit of 3.0 mg/L, TCEQ staff will amend the permits to include this limit.

The 3.0 mg/L ammonia-nitrogen limit is normally implemented in lieu of a chronic WET limit. However, should this limit prove ineffective in precluding toxicity, TCEQ staff will amend the permit to include an alternative limit and/or corrective measures protective of the receiving waters.

For those domestic facilities with seasonal ammonia limits and for industrial facilities with ammonia limits, such limits will not exceed 4.0 mg/L at the edge of the mixing zone (or 10 mg/L at the edge of the ZID for those permittees with 48-hour acute testing) unless the permittee agrees to a WET limit for the more sensitive species and a testing frequency for that species of six times per year (November, December, January, February, March, and July).

## Toxicity Attributable to Diazinon

The Standards previously contained a special provision (§ 307.6(e)(2)(E)) for those domestic wastewater facilities entering TREs due to Diazinon toxicity. However, since Diazinon can no longer be sold to the public, the previous conditions granting the TRE exemption (primary cause of toxicity and ubiquitous within the wastewater collection system) can no longer be met, so the special provision is no longer included in the Standards. Diazinon will now be treated as any other toxicant and will be subject to effluent limits.

# Toxic Pollutants

## General Provisions

The Standards for toxic pollutants include general provisions, specific numerical criteria, and total (whole effluent) toxicity criteria. As stated in § 307.6 of the Standards:

- Water in the state shall not be acutely toxic to aquatic life. Although acute criteria may be exceeded in a zone of initial dilution (ZID), there shall be no lethality to aquatic organisms that move through the ZID.

- Water in the state shall not be chronically toxic to aquatic life except in mixing zones, below critical low-flow, and where there are only minimal aquatic life uses.

- Water in the state shall be maintained to preclude adverse toxic effects on human health resulting from water recreation, consumption of aquatic organisms, or consumption of drinking water after reasonable treatment. Specific human health concentration criteria apply to water in the state with sustainable fisheries and/or designation or use as a public drinking water supply. These criteria do not apply within human health mixing zones.

- Water in the state shall be maintained to preclude adverse toxic effects on aquatic life, terrestrial wildlife, livestock, or domestic animals, resulting from contact, consumption of aquatic organisms, or consumption of water.

Permits for discharges into intermittent streams are designed to protect against acute toxicity at the point of discharge. Permits for discharges into classified segments or unclassified water bodies determined to be perennial, intermittent with perennial pools, or within three miles of any water body that is perennial or intermittent with perennial pools are designed to protect against acute and chronic toxicity and to protect human health. Permits for discharges to the Houston Ship Channel and its tidal tributaries (Segments 1006 and 1007) are also designed to protect against acute and chronic toxicity and to protect human health.

In order to prevent toxicity due to chlorine, domestic dischargers who either: (1) request a new permit or amended permit (for increased flow)with permitted flow ≥ 0.5 MGD or (2) request a new, amended, or renewed permit with permitted flow ≥ 1 MGD will dechlorinate their effluent or use another form of disinfection. Domestic dischargers who renew a permit with a permitted flow ≥ 0.5 MGD but < 1 MGD will not be required to dechlorinate. The TCEQ does not require facilities discharging directly to the Rio Grande to dechlorinate.

## Specific Numerical Criteria

The numerical criteria for the protection of aquatic life (§ 307.6(c) of the Standards) are expressed for freshwater acute, freshwater chronic, saltwater acute, and saltwater chronic conditions. The numerical criteria for the protection of human health (§ 307.6(d) of the Standards) are expressed as receiving water concentrations to prevent contamination of drinking water, fish, and other aquatic life to ensure safe levels for human consumption. The two categories of human health criteria given in the standards are: (1) water and fish and (2) fish only. These standards apply whether or not they are addressed specifically in a wastewater discharge permit.

When submitting a permit application, the following types of facilities are required to include effluent data for those elements and compounds that have established standards and that the TCEQ believes likely to be present in the effluent:

- domestic facilities requesting a permitted average flow equal to or greater than 1.0 million gallons per day (MGD) and/or with an approved pretreatment program.

- domestic facilities requesting a permitted average flow less than 1.0 MGD on a case-by-case basis when facility inspection or other information provides reasonable potential to expect the presence of toxic pollutants in the receiving water or effluent.

- industrial facilities.

# Deriving Permit Limits for Aquatic Life Protection

## *General Approach*

In order to determine the effluent concentration of a toxic pollutant necessary to protect instream water quality criteria, TCEQ staff uses the general approach found in the EPA publication entitled *Technical Support Document for Water Quality-based Toxics Control*, EPA/505/2-90-001.

- TCEQ staff applies acute criteria for discharges into intermittent streams with minimal aquatic life uses and assume a critical low-flow of 0.0 $ft^3$/s.

- Discharges into intermittent streams that flow into perennial waters (including perennial wetlands) within a moderate distance downstream (normally 3 miles) are analyzed using acute criteria in the intermittent stream and acute and chronic criteria; and the critical low-flow of the perennial waters to determine whether more stringent requirements are needed to protect the perennial waters.

- Permit limits are developed to ensure that intermittent streams with seasonal aquatic life uses of limited, intermediate, high, or exceptional will meet chronic toxic criteria during the seasons; and typical flow conditions in which these uses occur.

- TCEQ staff applies chronic criteria at critical mixing conditions for other water bodies with limited, intermediate, high, or exceptional aquatic life uses (lakes, bays, estuaries, tidal rivers, perennial wetlands), unless acute criteria are more protective.

## *Water Quality Parameters That Affect Aquatic Life Criteria*

For certain substances, water quality criteria are a function of one or more of the following receiving water parameters:

- hardness
- pH
- chloride
- total suspended solids.

Fifteenth percentile values of segment hardness, pH, and TSS data are considered critical conditions (see the tables in Appendix D of this document). Basin values are used when there is insufficient segment data.

The fiftieth percentile value of segment chloride data is used to implement the freshwater silver standard for aquatic life protection (see Appendix D). Basin values are used when there is insufficient segment data.

TCEQ staff usually obtains this information from Appendix D, but may also use information in the TCEQ's Surface Water Quality Monitoring (SWQM) database. The permittee may also supply site-specific data. The procedures to collect site-specific data for hardness, pH, chloride, TSS, and partition coefficients are outlined in the section of this document entitled "Collecting Site-Specific Data" on page 155.

The numerical standards for toxic pollutants apply to total recoverable concentrations, except for designated metals. For these metals, the numerical standards apply to dissolved concentrations. Saltwater and freshwater metals criteria listed in Table 1 of the Standards were derived by multiplying the current standard by the appropriate listed conversion factor to obtain a percent dissolved standard. The resultant value is the percent dissolved metal in the tests used by EPA to derive the criteria.

In order to determine instream compliance with the numerical standards for dissolved concentrations, TCEQ staff use partition coefficients based on the information shown in Table 6 (on page 159) and/or on site-specific data. The use of partition coefficients determines how much metal is dissolved in the receiving water. Guidelines for developing a site-specific partition coefficient are given in the section of this document entitled "Collecting Site-Specific Data" on page 155.

The TCEQ evaluates metals not included in Table 6 by assuming the dissolved concentration equals the total recoverable concentration unless sufficient additional information and data are presented that justify a different fraction of dissolved metal.

## Calculating Effluent Fractions

The first step in developing effluent limits based on water quality criteria for aquatic life protection is to calculate the effluent fraction at the edge of the mixing zone and ZID. Unless available information shows otherwise, complete mixing is assumed at the edge of the mixing zone, allowing the fraction of effluent at this location to be calculated.

### *Perennial Freshwater Streams and Rivers and Some Narrow Tidal Rivers*

For discharges to perennial streams and rivers and narrow tidal rivers (that are < 400 feet across and have upstream flow data), 25% of the 7Q2 is used to calculate the effluent fraction ($E_F$) at the edge of the ZID as follows:

$$E_F \text{ at edge of } MZ = \frac{Q_E}{[Q_S + Q_E]}$$

$$E_F \text{ at edge of } ZID = \frac{Q_E}{[(0.25)(Q_S) + Q_E]}$$

where:           $Q_E =$   effluent flow
                            $Q_S =$   7Q2 stream flow

### *Lakes, Bays, Wide Tidal Rivers, and Some Narrow Tidal Rivers*

For discharges to lakes, bays, wide tidal rivers (≥ 400 feet across), and narrow tidal rivers (< 400 feet across) that do not have upstream flow data, the fraction of effluent used in each WLA is the amount of effluent at the edge of the ZID or mixing zone as predicted by empirical models. A more complete discussion of the mixing assumptions and exceptions and corresponding effluent fractions is provided in the section of this document entitled, "Critical Conditions for Aquatic Life Protection" on page 72.

### *Effluent Flow*

The effluent flow that is used for dilution calculations is determined on a case-by-case basis. In general, however:

- Domestic wastewater discharge assessments are based upon the final average permitted flow.

- Industrial wastewater discharge assessments for renewals are based upon the highest monthly average discharge of the preceding two-year period. Other flows may be used if the highest monthly average discharge does not reflect normal operating conditions. For proposed new or increased discharges, the requested average flow is used. The effluent flow used to calculate the WLA is also used to calculate the final mass limits.

## *Calculating Waste Load Allocations*

The next step in developing effluent limits based on water quality criteria for aquatic life protection is to calculate a waste load allocation from the acute criteria (WLAa) and a waste load allocation from the chronic criteria (WLAc).

- The **WLAa** equals the effluent concentration that will not cause instream criteria to be exceeded outside the zone of initial dilution (ZID).

- The **WLAc** equals the effluent concentration that will not cause instream criteria to be exceeded outside the mixing zone (MZ).

This calculation requires the use of the appropriate effluent fraction as well as the bioavailable fraction of the pollutant. (For more information on calculating the bioavailable fraction, see the subsection of this document entitled "TSS, Partition Coefficients, and Bioavailable Fractions of Metals" on page 159.) The proportion of effluent at the edge of the mixing zone is used to calculate the WLAc, and the proportion of effluent at the edge of the ZID is used to calculate the WLAa. The following equations are used to calculate the waste load allocations:

$$WLAc = \frac{Chronic\ Criterion}{(Bioavailable\ Fraction)(E_F\ at\ edge\ of\ MZ)}$$

$$WLAa = \frac{Acute\ Criterion}{(Bioavailable\ Fraction)(E_F\ at\ edge\ of\ ZID)}$$

where:

| | | |
|---|---|---|
| | *WLAa* = | waste load allocation based on acute criterion |
| | *WLAc* = | waste load allocation based on chronic criterion |
| *Acute Criterion* = | | aquatic life acute numerical criterion |
| *Chronic Criterion* = | | aquatic life chronic numerical criterion |
| *Bioavailable Fraction* = | | fraction of the pollutant that is defined to be available to organisms |
| *$E_F$ edge of ZID* = | | proportional contribution of effluent to receiving water at the edge of the ZID |
| *$E_F$ edge of MZ* = | | proportional contribution of effluent to receiving water at the edge of the mixing zone |

## *Calculating the Long-Term Average*

Once the WLAa and the WLAc are calculated, the TCEQ determines the long-term average (LTAa and LTAc) of the treatment system performance that is necessary to meet the respective WLA with a given probability. The TCEQ bases its calculation on a lognormal probability distribution that is known to describe treatment system performance. Figure 7 shows the general shape of a lognormal probability distribution. The LTAa and the LTAc are calculated with equations that describe this function. See the Technical Support Document for Water Quality-based Toxics Control, EPA/505/2-90-001, March 1991, for more information.



**Figure 7.  Probability Distribution that Describes Treatment System Performance**

The final equations used to calculate the LTAa and the LTAc are:

| | | | |
|---|---|---|---|
| $LTAa =$ | 0.32 $WLAa$ | (99% probability) |
| $LTAa =$ | 0.573 $WLAa$ | (90% probability) |
| $LTAc =$ | 0.61 $WLAc$ | (99% probability) |
| $LTAc =$ | 0.770 $WLAc$ | (90% probability) |

While the derivation of these equations is quite complex (see Figure 8 on page 138), the important thing to recognize is that the equations are driven by the values that are assumed for n (averaging period), CV (coefficient of variation), and Z (probability distribution factor). The values that TCEQ assumes for these variables are:

$n =$   7          (7-day average, for chronic criteria)

      1          (24-hour average, for acute criteria)

$Z =$   1.282      (90% probability for discharges to freshwater streams, rivers, and narrow tidal rivers with upstream flow data)

      2.326      (99% probability for discharges to lakes, reservoirs, bays, estuaries, wide tidal rivers, and narrow tidal rivers without upstream flow data)

$CV =$   0.6

## *Calculating Daily Average and Daily Maximum Permit Limits*

The calculated values of LTAa and LTAc are compared. The smaller LTA is limiting and is used to calculate the daily average and daily maximum concentration limits (DLY AVG and DLY MAX, respectively) using the following equations:

| | | | |
|---|---|---|---|
| $DLY\ AVG =$ | 1.47 $LTA$ | (n = 12) |
| $DLY\ MAX =$ | 3.11 $LTA$ | (n = 1) |

These equations are driven by the values for Z (2.326), CV (0.6), and n, where n is now the number of sample events per month. For the daily average concentration limit, the TCEQ assumes n = 12 for consistency, even if the sampling frequency defined in the permit is not 3 per week. For the daily maximum concentration limit, the TCEQ uses n = 1. See Figure 9 on page 139 for detailed derivations of these equations. Once the daily average and daily maximum concentration limits are determined, a mass limit is calculated using the same effluent flow used to calculate the WLA.

137

$$LTA = \exp(u_n + 0.5s_n^2)$$
$$u_n = \ln(WLA) - Zs_n$$
$$s_n^2 = \ln[1 + (CV^2/n)]$$

**Acute Criteria**

$$s_n^2 = \ln[1 + (0.6^2/1)] = 0.307$$
$$s_n = 0.555$$

For Z = 2.326 (99% probability):

$u_n$ $= \ln(WLAa) - (2.326)(0.555)$
$u_n$ $= \ln(WLAa) - 1.291$
$LTAa = \exp[\ln(WLAa) - 1.291 + 0.5(0.307)]$
$LTAa = \exp[\ln(WLAa) - 1.137]$
$LTAa = WLAa/e^{1.137}$
**LTAa = 0.32 × WLAa**

For Z = 1.282 (90% probability):

$u_n$ $= \ln(WLAa) - (1.282)(0.555)$
$u_n$ $= \ln(WLAa) - 0.712$
$LTAa = \exp[\ln(WLAa) - 0.712 + 0.5(0.307)]$
$LTAa = \exp[\ln(WLAa) - 0.558]$
$LTAa = WLAa/e^{0.558}$
**LTAa = 0.573 × WLAa**

**Chronic Criteria**

$$s_n^2 = \ln[1 + (0.6^2/7)] = 0.050$$
$$s_n = 0.224$$

For Z = 2.326 (99% probability):
$u_n$ $= \ln(WLAc) - (2.326)(0.224)$
$u_n$ $= \ln(WLAc) - 0.521$
$LTAc = \exp[\ln(WLAc) - 0.521 + 0.5(0.050)]$
$LTAc = \exp[\ln(WLAc) - 0.496]$
$LTAc = WLAc/e^{0.496}$
**LTAc = 0.61 × WLAc**

For Z = 1.282 (90% probability):
$u_n$ $= \ln(WLAc) - (1.282)(0.224)$
$u_n$ $= \ln(WLAc) - 0.287$
$LTAc = \exp[\ln(WLAc) - 0.287 + 0.5(0.050)]$
$LTAc = \exp[\ln(WLAc) - 0.262]$
$LTAc = WLAc/e^{0.262}$
**LTAc = 0.770 × WLAc**

**Figure 8. Derivation of Equations Used to Calculate the Long-Term Average**

$$\text{LIMIT} = \exp(u_n + Zs_n)$$
$$u_n = \ln(\text{LTA}) - 0.5s_n^2$$
$$s_n^2 = \ln[1 + (CV^2/n)]$$

**Daily Average**

$$s_n^2 = \ln[1 + (0.6^2/12)] = 0.030$$
$$s_n = 0.173$$
$$u_n = \ln(\text{LTA}) - (0.5)(0.030)$$
$$u_n = \ln(\text{LTA}) - 0.015$$
$$\text{DLY AVG} = \exp[\ln(\text{LTA}) - 0.015 + (2.326)(0.173)]$$
$$\text{DLY AVG} = \exp[\ln(\text{LTA}) + 0.387]$$
$$\text{DLY AVG} = \text{LTA} \times e^{0.387}$$
$$\text{DLY AVG} = 1.47 \times \text{LTA}$$

**Daily Maximum**

$$s_n^2 = \ln[1 + (0.6^2/1)] = 0.307$$
$$s_n = 0.555$$
$$u_n = \ln(\text{LTA}) - (0.5)(0.307)$$
$$u_n = \ln(\text{LTA}) - 0.154$$
$$\text{DLY MAX} = \exp[\ln(\text{LTA}) - 0.154 + (2.326)(0.555)]$$
$$\text{DLY MAX} = \exp[\ln(\text{LTA}) + 1.137]$$
$$\text{DLY MAX} = \text{LTA} \times e^{1.137}$$
$$\text{DLY MAX} = 3.11 \times \text{LTA}$$

**Figure 9. Derivation of Equations Used to Calculate Daily Average and Daily Maximum Concentration Limits**

# Deriving Permit Limits for Human Health Protection

## *General Approach*

In order to calculate the effluent concentration of a toxic pollutant necessary to protect instream water quality criteria, TCEQ staff use the general approach found in the EPA publication entitled *Technical Support Document for Water Quality-based Toxics Control*, EPA/505/2-90-001, March 1991.

- The human health criteria in Table 2 of the Standards apply to all water bodies with (1) a designation or use as a public drinking water supply and/or (2) sustainable fisheries, including:

  ◦ all designated segments.

  ◦ perennial streams with a stream order of three or greater.

  ◦ lakes having a volume equal to or greater than 150 acre-feet and/or a surface area equal to or greater than 50 acres.

  ◦ all bays, estuaries, and tidal rivers.

  ◦ permanently inundated wetlands (including tidal wetlands).

  ◦ any other waters that potentially have sufficient fish production or fishing activity to create significant long-term (sustainable) human consumption of fish.

- Human health criteria are applied to any discharge located within three miles upstream of the types of water bodies listed above.

- Waters with a limited, intermediate, high, or exceptional aquatic life use but no sustainable fishery are considered to have an incidental fishery. Numerical criteria applicable to waters with incidental fisheries are ten times higher than for sustainable fisheries because the consumption rates assumed in the Standards for incidental fisheries are ten times lower than those for sustainable fisheries. This level of human health protection applies to discharges directly to or within three miles upstream of waters with an incidental fishery.

- Specific human health criteria are applied as long-term average exposure criteria designed to protect populations over a lifetime.

## Calculating the Effluent Fraction

The first step in developing effluent limits based on water quality for human health protection is to calculate the effluent fraction at the edge of the human health mixing zone. Unless available information shows otherwise, complete mixing is assumed at the edge of the mixing zone, allowing the fraction of effluent at this location to be calculated.

### Perennial Freshwater Streams and Rivers, Intermittent Streams with Perennial Pools, and Some Narrow Tidal Rivers

For discharges to perennial freshwater streams and rivers, intermittent streams with perennial pools, and narrow tidal rivers (that are < 400 feet across and have upstream flow data), the proportion of effluent used in WLAh is calculated as follows:

$$E_F \ at \ edge \ of \ HH \ MZ = \frac{Q_E}{[Q_{HM} + Q_E]}$$

where:  $Q_E$ = effluent flow
$Q_{HM}$ = harmonic mean stream flow

TCEQ staff use data from the nearest stream gaging station or available site-specific information to determine the harmonic mean flow.

### Lakes, Bays, Wide Tidal Rivers, and Some Narrow Tidal Rivers

For discharges to lakes, bays, wide tidal rivers ($\geq$ 400 feet across), and narrow tidal rivers (< 400 feet across) that do not have upstream flow data, the fraction of effluent used in the WLAh is the amount of effluent at the edge of the human health mixing zone as predicted by empirical models. A discussion of the mixing assumptions and exceptions and corresponding effluent fractions is given in the section of this document entitled "Mixing Zones and Critical Conditions for Human Health Protection" on page 78.

### Effluent Flow

The effluent flow that is used for dilution calculations is determined on a case-by-case basis. In general, however:

- Domestic wastewater discharge assessments are based upon the final average permitted flow.

- Industrial wastewater discharge assessments for renewals are based upon the average of monthly average flow values over the preceding two-year period. For proposed new or increased discharges, the requested average flow is used.

### *Calculating the Waste Load Allocation*

The next step in developing effluent limits based on water quality criteria for human health protection is to calculate a waste load allocation (WLAh). The WLAh equals the effluent concentration that will not cause criteria to be exceeded outside the human health mixing zone. This calculation requires the use of the appropriate effluent fraction as well as the bioavailable fraction of the pollutant. (For more information on calculating the bioavailable fraction, see the subsection of this document entitled "TSS, Partition Coefficients, and Bioavailable Fractions of Metals" on page 159.) The proportion of effluent at the edge of the human health mixing zone is used to calculate the WLAh. The following equation is used to calculate the waste load allocation:

$$WLAh = \frac{HH\ Criterion}{(Bioavailable\ Fraction)(E_F\ at\ edge\ of\ HH\ MZ)}$$

where:

| | | |
|---|---|---|
| *HH Criterion* = | appropriate human health numerical criterion |
| *Bioavailable Fraction* = | fraction of the pollutant that is defined to be available to organisms |
| *EF at edge of HH MZ* = | proportional contribution of effluent to receiving water at the edge of the human health mixing zone |

### *Calculating the Long-Term Average and Permit Limits*

The WLAh is considered to be an annual average (n = 365 days). The long-term average (LTAh), daily average concentration (DLY AVG), and daily maximum concentration (DLY MAX) are calculated at 99% probability (Z = 2.326) using the same process that was used for the aquatic life calculations (see Figure 8 on page 138 and Figure 9 on page 139). The final equations are as follows:

$$LTAh = \quad 0.930\ WLAh \quad (n = 365)$$

$$DLY\ AVG = \quad 1.47\ LTAh \quad (n = 12)$$

$$DLY\ MAX = \quad 3.11\ LTAh \quad (n = 1)$$

142

# Establishing Permit Limits for Toxic Pollutants without Criteria

In some instances, potentially toxic materials for which no specific numerical criteria have been developed are used in a treatment process or are present in an effluent. Where necessary, permit limits are developed for these materials using available toxicity data and the method described in this section. For substances without standards that are reported in the permit application, TCEQ staff screen the reported value against the agency-specified minimum analytical level (MAL). Parameters less than the MAL are screened out with no further action necessary. Numerical criteria and permit limits are developed, if appropriate, for parameters exceeding the MAL. For substances that commonly occur naturally at concentrations above the MAL, alternative screening criteria are used.

## Aquatic Life Criteria

The TCEQ develops permits that protect against acute and chronic toxicity in receiving waters at and above critical conditions, as appropriate. Critical conditions in receiving waters are established using methods discussed in the chapter of this document entitled "Mixing Zones and Critical Conditions" beginning on page 70. As stated in § 307.6(c)(7) of the Standards, water quality criteria for the protection of aquatic life are established using the methods described in this subsection.

Specific numerical criteria are calculated using the method outlined in the following documents if toxicity data requirements outlined in these documents are met:

• Guidelines for Deriving Water Quality Criteria for the Protection of Aquatic Life and Its Uses (45 FR 79341-79347 November 28, 1980).

• Summary of Revisions to "Guidelines for Deriving Numerical National Water Quality Criteria for the Protection of Aquatic Organisms and Their Uses" (50 FR 30792-30793, July 29, 1985).

## Acute Criteria

If the data requirements in the documents cited above are not met, acute water quality criteria are calculated as follows:

$ACUTE\ CRITERIA = 0.30 \times LC50$ of most sensitive species

where: $LC50 =$ the concentration of a toxicant that is lethal (fatal) to 50% of the organisms tested in a specified time period

## *Chronic Criteria*

The derivation of chronic water quality criteria for the protection of aquatic life depends on the persistence and bioaccumulative capacity of the material. A pollutant's potential to bioaccumulate can be expressed by any of the following:

- the bioaccumulation factor (BAF)
- the bioconcentration factor (BCF)
- the octanol-water partition coefficient ($K_{ow}$).

The BAF and the BCF measure the concentration of a substance in a living organism relative to the concentration of the substance in the surrounding medium. The BAF accounts for substance intake from both food and the surrounding medium, while the BCF accounts for intake from the surrounding medium only. The $K_{ow}$ estimates the tendency of a substance to partition from water to organic media, such as lipids present in living organisms. The $K_{ow}$ can be used in place of the BCF or BAF when limited experimental data are available.

For the purposes of this section, the TCEQ will use the following criteria to determine whether a chemical is persistent or bioaccumulative:

- A chemical is **persistent** if it has a soil, sediment, or water half-life of 60 days or greater. It is **highly persistent** if it has a soil, sediment, or water half-life of six months or greater. Half-life is defined as the time required for 50% of a chemical to degrade or to be removed from the local environment by some physical process.[12]

- A chemical is **bioaccumulative** if its BAF or BCF is 1,000 or greater. It is **highly bioaccumulative** if either its BAF or BCF is 5,000 or greater.

The following methods for deriving chronic criteria are consistent with § 307.6(c)(7) of the Standards.

Nonpersistent toxic compounds:

*CHRONIC CRITERIA* = 0.10 × *LC50* of most sensitive species

Persistent toxic compounds:

*CHRONIC CRITERIA* = 0.05 × *LC50* of most sensitive species

Bioaccumulative toxic compounds:

*CHRONIC CRITERIA* = 0.01 × *LC50* of most sensitive species

---

[12] Rand, Gary M. (ed.), 1995. *Fundamentals of Aquatic Toxicology (Second Edition)*. CRC Press.

## *Data Considerations*

- Toxicity data used in these equations should be derived from tests using the most sensitive native species.

- If no LC50 data are available for native species, non-native species data may be used.

- LC50s are selected that have appropriate end points (mortality), appropriate duration (96 hours for vertebrates and 48 hours for invertebrates), and appropriate species (freshwater or saltwater).

- LC50 data based on a freshwater species are not appropriate for saltwater criteria development and vice versa.

- Data from flow-through tests is preferred over static renewal tests.

- Where more than one acceptable test endpoint is available for a given species, a geometric mean of the LC50 data should be used for the criteria calculation.

- Toxicity tests using aquatic plants are not considered at this time.

- When evaluating BAFs and BCFs for a persistence determination, lab-derived BAFs/BCFs are preferred over $logK_{ow}$-based regression equations.

- When multiple BAF/BCF data points are available for similar taxa (same genus), the geometric mean of these values should be used as opposed to one single data point.

There may be instances when toxicity data are only available for species not representative of the receiving waters, test durations are varied, or other undesirable circumstances exist. In this instance, it may be more appropriate to rely on a quantitative structure-activity relationship (QSAR) model for LC50 prediction or to use a method that differs from the one described in this section.

If acute or chronic criteria need to be derived for biocides, other water treatment chemicals, or other constituents present in the effluent for which water quality standards are not established, the methods just described are used. The following information is typically needed to determine these criteria:

- product information sheet
- material safety data sheet (MSDS) if available
- product toxicity data
- permitted discharge volume
- expected concentration of product in effluent
- discharge location.

## Human Health Criteria

Water quality criteria for human health protection are derived as stated in § 307.6(d)(8) and (9) of the Standards.

- For known or suspected carcinogens, a cancer risk of $10^{-5}$ (1 in 100,000) is applied to the most recent numerical criteria adopted by EPA and published in the *Federal Register*.

- For toxic materials not defined as carcinogens, the most recent numerical criteria adopted by EPA and published in the *Federal Register* are applicable.

- Criteria calculations for noncarcinogens are based on childhood exposure, and criteria calculations for carcinogens are based on a lifetime of exposure.

- In both cases, if a maximum contaminant level (MCL) applies and is less than the resulting criterion, then the MCL applies to public drinking water supplies as stated in § 307.6(d)(3)(G) of the Standards.

- Numerical criteria for pollutants that bioconcentrate are derived in accordance with the general procedures in the EPA guidance document entitled *Assessment and Control of Bioconcentratable Contaminants in Surface Waters* (March 1991).

In the absence of available criteria, numerical criteria may be derived from available information and calculated using the following formulas:

**WATER AND FISH, CARCINOGENS**

$$HH\ CRITERIA\ (\mu g\,/\,L) = \frac{(RL)(BW)(U)}{CPF\,[WI + (FC)(LC)(BCF)]}$$

**FISH TISSUE ONLY, CARCINOGENS**

$$HH\ CRITERIA\ (\mu g\,/\,L) = \frac{(RL)(BW)(U)}{(CPF\,)(FC)(LC)(BCF)}$$

where:  $RL$ = risk level (1 in 100,000, or $10^{-5}$)

$BW$ = body weight of average adult (70 kg)

$U$ = unit conversion factor to express criteria in μg/L (1000 μg/mg)

$CPF$ = carcinogenic potency factor (oral slope factor, kg-day/mg)

$WI$ = amount of water consumed per day (2 L/day)

$FC$ = amount of fish tissue consumed (0.0175 kg/day)

$LC$ = lipid correction factor to adjust BCFs normalized to 7.6% lipids to represent a 3% lipid content (3% ÷ 7.6%)

$BCF$ = bioconcentration factor (L/kg)

**WATER AND FISH, NONCARCINOGENS**

$$HH\ CRITERIA\ (\mu g\,/\,L) = \frac{(RfD)(BW)(U)}{WI + (FC)(LC)(BCF)}$$

**FISH TISSUE ONLY, NONCARCINOGENS**

$$HH\ CRITERIA\ (\mu g\,/\,L) = \frac{(RfD)(BW)(U)}{(FC)(LC)(BCF)}$$

where:  $RfD$ = reference dose (mg toxicant/kg human body weight/day)

$BW$ = body weight of average child (15 kg)

$U$ = unit conversion factor to express criteria in μg/L (1000 μg/mg)

$WI$ = amount of water consumed per day (0.64 L/day)

$FC$ = amount of fish tissue consumed (0.0056 kg/day)

$LC$ = lipid correction factor to adjust BCFs normalized to 7.6%

$$\qquad \text{lipids to represent a 3\% lipid content } (3\% \div 7.6\%)$$

$$BCF = \text{bioconcentration factor (L/kg)}$$

These formulas convert BCFs that are normalized to 7.6% lipid content to represent a 3% lipid content. The majority of recently developed BCFs have been normalized to represent a 3% lipid content; therefore, it is essential to research the BCF being used in the equation to ascertain what lipid content the BCF represents. When using a BCF that is already normalized to 3% lipid content, the lipid correction factor (LC) equals one.

# Correcting for Background Concentrations

In developing effluent limits based on water quality criteria, the preferred method of accounting for background concentrations of toxic pollutants is through total maximum daily load (TMDL) allocations. However, until TMDLs are approved and available for particular assessment units (AUs) and toxic pollutants of concern, the procedure discussed in this section is used to screen applications and develop permit limits.

For purposes of this section, the following definitions apply:

**Background concentration:** the water quality in a particular water body that would occur if that water body were relatively unaffected by human activities.

**Ambient concentration:** the existing water quality in a particular water body.

## *Procedure for Developing Permit Limits*

The procedure for screening application data and developing permit limits is shown in Figure 10 on page 151. If an approved TMDL exists for a particular pollutant and AU, the permit incorporates a limit as established by the TMDL procedure. In the absence of an approved TMDL, application data is screened using reliable background concentration data, if such data exist.

Table 5 on page 150 lists reliable background concentration data that are used routinely in application screening. Data are added to Table 5 as they become available.

When reliable background concentration data are not available, data are screened with the assumption that the background concentration is zero. The assumption of a zero background concentration may be reconsidered on a case-by-case basis as new information becomes available.

148

When the background concentration is less than the instream criterion, a mass balance approach is used to determine waste load allocations for affected parameters. This approach is applicable for calculating permit limits for both aquatic life and human health protection.

The following equation is used to calculate the waste load allocation (WLA):

$$WLA = \frac{Criterion - [(1 - E_F)(C_B)(Bioavailable\ Fraction)]}{(Bioavailable\ Fraction)(E_F)}$$

where:

| | | |
|---|---|---|
| $WLA$ = | waste load allocation (total concentration) |
| $Criterion$ = | appropriate numerical criterion (dissolved, free ion, or total concentration as specified in Table 1 or 2 of the Standards) |
| $E_F$ = | proportional contribution of effluent to receiving water |
| $C_B$ = | background concentration of pollutant (total concentration) |
| $Bioavailable$ $Fraction$ = | fraction of the pollutant that is defined to be available to organisms |

When the background concentration is assumed to be zero, the equation above reduces to those shown in the sections of this document entitled "Deriving Permit Limits for Aquatic Life Protection" on page 131 and "Deriving Permit Limits for Human Health Protection" on page 140.

When the background concentration is equal to or greater than the instream criterion, then effluent permit limits are developed to ensure that no degradation of water quality will occur, in accordance with the procedures to protect existing uses (see the chapter of this document entitled "Antidegradation" on page 55).

**Table 5.  Background Concentrations of Toxic Metals in Texas Estuaries**

| Segment Number | Water Body | Total Copper (µg/L) | Total Lead (µg/L) | Total Silver (µg/L) | Total Zinc (µg/L) |
|---|---|---|---|---|---|
| 1401 | Colorado Estuary | 0.99 | 0.27 | 0.003 | 1.76 |
| 2412 | Sabine Estuary | 1.00 | 0.19 | 0.004 | 1.20 |
| 2421 | Galveston Estuary | 0.75 | 0.21 | 0.004 | 1.90 |
| 2439 | Galveston Estuary | 0.75 | 0.21 | 0.004 | 1.90 |
| 2451 | Lavaca-Matagorda Estuary | 0.57 | 0.12 | 0.002 | 1.25 |
| 2453 | Lavaca-Matagorda Estuary | 0.57 | 0.12 | 0.002 | 1.25 |
| 2462 | San Antonio Estuary | 1.23 | 0.20 | 0.003 | 2.18 |
| 2481 | Corpus Christi Estuary | 0.70 | 0.14 | 0.003 | 4.04 |

Notes:    Background concentrations represent the geometric mean of the data set.

Data compiled from Benoit, G. and P. H. Santschi, 1991; *Trace Metals in Texas Estuaries*; Prepared for the Texas Chemical Council; Texas A&M University at Galveston, Department of Marine Science.



**Figure 10. Protocol for Including Background Concentrations in Permit Limit Calculations**

151

## *Obtaining Reliable Water Quality Data*

Reliable background concentration data are needed for application screening. Samples should be collected, analyzed, and handled as follows:

1. Collect and preserve samples using techniques that conform with EPA-approved methods. Collect and preserve samples for metals using clean techniques (see item 3a below) or equivalent.

2. Analyze samples using EPA-approved methods. Analyses should meet agency-specified minimum analytical levels (MALs) (see Tables E-1 and E-2 in Appendix E) for the pollutant or pollutants of concern.

3. Sample collection, preservation, handling, storage, analysis, quality assurance, and quality control procedures should be comparable to those specified in the following documents:

   a. *Surface Water Quality Monitoring Procedures, Volume 1: Physical and Chemical Monitoring Methods for Water, Sediment, and Tissue* , RG-415, Texas Commission on Environmental Quality, December 2003 (or latest revision).

   b. Work Plan/Quality Assurance Project Plan for Near Coastal Waters Project, Sec. 104(b)(3), Grant No. X-006559-01-0, *Total Maximum Daily Loads of Selected Heavy Metals in the Houston Ship Channel, San Jacinto River (Tidal) and Upper Galveston Bay*, Texas Water Commission, Environmental Assessment Division, August 1993.

   c. Benoit, G. and P. H. Santschi, 1991; *Trace Metals in Texas Estuaries*; Prepared for the Texas Chemical Council; Texas A&M University at Galveston, Department of Marine Science.

4. Collect freshwater samples during moderate or low stream flow conditions. Collect marine or tidally influenced water samples during low freshwater inflow conditions. Such flow conditions should prevail for at least one week prior to data collection.

5. When gathering data for metals, measure TSS and hardness at each freshwater sample site. When gathering data for silver, measure chloride at each sample site.

# Once-Through Cooling Water Discharges

## *Applicability*

As stated in § 307.8(d) of the Standards, the TCEQ does not require effluent limits based on water quality criteria for those pollutants discharged in once-through cooling water where no measurable increase of the pollutant concentration occurs in the effluent as compared to the intake water.

This exemption applies exclusively to once-through cooling water discharges. It excludes facilities withdrawing from one water body and subsequently discharging the cooling water into a different water body; such facilities have to maintain and protect water quality and applicable water quality standards in the receiving water. Exceptions to this exclusion are considered on a case-by-case basis (for example, intake is in a tidal water body and discharge is to a downstream bay or estuary).

## *Permit Action*

A permittee should request a once-through cooling water exemption during the wastewater permit application process. The terms and conditions of the new permit may vary depending on existing permit conditions and the amount of data available.

- If an existing permit has final effluent limits based on water quality criteria for the pollutant of concern, these limits will remain in the reissued permit until sufficient monitoring has been conducted to support the exemption.

- If an existing permit does not include effluent limits based on water quality criteria for the pollutant of concern, interim effluent limits or monitoring requirements may be included in the permit. The permit will be issued for a term of up to three years to allow time for the permittee to perform a statistical study and source evaluation.

  Language will also be included in the "Other Requirements" section of the permit that outlines what the permittee must do and the time frame (up to three years) in which it must be done. Included in this language will be a statement as follows: "If the permittee does not conduct or complete the study at least 180 days prior to the permit expiration date, the following effluent limits for (pollutant of concern) will become effective immediately in a reissued permit."

The TCEQ will coordinate with the EPA on case-by-case reviews for these situations.

The permit will contain a special provision stating that the exemption will be approved or denied based upon the findings of the statistical study and the findings of the source investigation.

## *Statistical Study*

To demonstrate that no measurable increase in the pollutant of concern occurs through the once-through cooling water outfall, the applicant needs to perform a statistical analysis to determine whether a pollutant's average concentration demonstrates a statistically significant increase at the 95 percent confidence level. All applicants considering an exemption are urged to work with TCEQ staff to determine an acceptable work plan.

## *Data Collection*

The applicant should collect at least 10 paired grab samples, where the term "paired" refers to both intake and discharge samples being collected within one hour of each other. In cases where the hydraulic retention time in the cooling system exceeds one hour, the paired samples may be collected more than one hour apart. Information regarding the hydraulic retention time should be included in the study report.

Each intake sample should be depth integrated from the water surface down to the depth of the intake pipe. For discharges to a marine water body, samples should be collected during slack tide. Samples should be collected at least 10 days apart from each other and be representative of normal operating conditions. Clean techniques for field and analytical procedures should be considered when determining trace metal levels in noncontact cooling water (USEPA Method 1669 - April 1995).

## *Statistical Analysis*

To demonstrate that no measurable increase in a pollutant occurs through the once-through cooling water outfall, the applicant should perform a statistical analysis to determine whether the pollutant's average concentration demonstrates a statistically significant increase at the 95 percent confidence level. The two-tailed Student's t-test should be used to compare the influent concentrations to the effluent concentrations. The applicant should calculate the mean and standard deviation for each paired data set using a lognormal distribution. When portions of a data set are at concentrations less than the MAL, the applicant should adjust the mean and standard deviation calculation with appropriate methodology.

Examples of appropriate methods include the delta lognormal approach as described in the *Technical Support Document for Water Quality-based Toxic Control*, EPA/505/2-90-001, and the Cohen test method described in the *Statistical Analysis of Ground Water Monitoring Data at RCRA Facilities*, NTIS No. PB89-151047.

## *Source Investigation*

A source investigation of the pollutant will also be performed by the applicant requesting the exemption. All applicants performing source investigations are urged to work with TCEQ staff to determine appropriate sampling locations. Potential sources include but are not limited to:

- current and historical sources of the pollutant in question (such as metal cleaning waste)
- cooling tubes
- pollutants in tributaries entering the reservoir
- pollutants in the soils surrounding the reservoir.

This information can be used to support the applicant's contention that the discharge of once-through cooling water does not contribute to the pollutant concentration in the reservoir. Low-volume waste streams are addressed by:

- demonstrating that the pollutant of concern cannot be added by the waste stream; or

- establishing a permit limit to attain water quality standards at the internal outfall.

## *Exemption Approval or Denial*

Based on the results of the statistical analysis and the source investigation, TCEQ staff recommends granting or denying the exemption.

- If the exemption is approved, the permit is issued without effluent limits based on water quality criteria for the pollutant of concern. A statement is included in the "Other Requirements" section of the permit that a once-through cooling water exemption for the pollutant of concern has been approved for the appropriate outfall. Long-term monitoring for the exempted pollutant is also included in the "Other Requirements" section of the permit.

- If the exemption is not approved, the permit is amended to include appropriate effluent limits based on water quality criteria, including any appropriate compliance period.

Note that if the receiving water body does not attain water quality standards for the pollutant in question, the exemption can still be granted, but the applicant may be required to submit additional data.

# Collecting Site-Specific Data

Permittees may collect data on site-specific hardness, pH, chloride, TSS, or metals to support calculation of some water quality criteria and site-specific partition coefficients or bioavailable fractions of metals.

- **Hardness**—water quality criteria for certain metals (cadmium, trivalent chromium, copper, lead, nickel, and zinc) depend on hardness.

- **pH**—water quality criteria for pentachlorophenol depend on pH.

- **Chloride**—the percentage of dissolved silver that is in free ionic form depends on chloride.

- **TSS**—partition coefficients, and hence, bioavailable fractions of metals, depend on TSS.

- **Metals**—the bioavailable fractions of metals can be determined directly by measuring dissolved concentrations and total recoverable concentrations.

The TCEQ usually uses segment or basin values for hardness, pH, chloride, and TSS from the tables in Appendix D of this document. Permittees who think that these default values do not adequately reflect conditions in their receiving water may collect site-specific data and submit it to the TCEQ for review.

Guidelines for collecting hardness, pH, and chloride data are presented in the next subsection, entitled "Hardness, pH, and Chloride." Guidelines for collecting TSS and metals data and for developing site-specific partition coefficients and bioavailable metals fractions are presented in the subsection entitled "TSS, Partition Coefficients, and Bioavailable Fractions of Metals" on page 159.

## Hardness, pH, and Chloride

### Hardness

In general, most metals are more toxic in water that has low hardness values (soft water). Therefore, water quality criteria are more stringent for receiving waters having a low hardness value. The TCEQ uses the 15th percentile of basin or segment hardness data (ranked from lowest to highest value) to calculate hardness-dependent criteria. Before collecting any site-specific data, it is advisable for the permittee to determine what default value was used in the TCEQ's calculations.

The following items outline acceptable procedures for collecting site-specific hardness data:

- Collect samples from the receiving water upstream of the discharge, if available, and outside of the regulatory mixing zone. For more information about mixing zones, see § 307.8(b) of the Standards and the section of this document entitled "Mixing Zones and ZIDs for Aquatic Life Protection" on page 70.

  If no water is present upstream of the discharge, samples may be taken from a nearby perennial stream or from the nearest downstream perennial stream. Samples should occur above the confluence with the receiving stream so that samples are not affected by the effluent hardness.

- Collect a minimum of 30 samples from the receiving water to represent a range of seasonal conditions. The applicant is responsible for providing a minimum of 30 valid data points to obtain a statistically reliable estimate of the 85th percentile value of the dissolved-to-total ratio. Samples should typically be taken a minimum of one week apart from one another.

- Measure hardness as mg/L of $CaCO_3$.

- If the permit includes whole effluent toxicity (WET) testing requirements **and** receiving water is used as the control, control hardness values may also be used to supplement any site-specific data that is collected. Laboratory dilution water may not be used to provide hardness data.

## *pH*

Pentachlorophenol is more toxic in water that has low pH (acidic). Therefore, the permit limit for pentachlorophenol is more stringent for facilities whose receiving water has low pH. The TCEQ uses the 15th percentile of basin or segment pH data (ranked from lowest to highest value) to calculate freshwater criteria for pentachlorophenol. Before collecting any site-specific data, it is advisable for the permittee to determine what default value was used in the TCEQ's calculations.

The following items outline acceptable procedures for collecting site-specific pH data:

- Collect samples from the receiving water upstream of the discharge, if available, and outside of the regulatory mixing zone. For more information about mixing zones, see § 307.8(b) of the Standards and the section of this document entitled, "Mixing Zones and ZIDs for Aquatic Life Protection" on page 70.

  If no water is present upstream of the discharge, samples may be taken from a nearby perennial stream or from the nearest downstream perennial stream. Be sure to sample above the confluence with the receiving stream so that samples are not affected by the effluent pH.

- Collect a minimum of 30 samples from the receiving water to represent a range of seasonal conditions. The applicant is responsible for providing a minimum of 30 valid data points to obtain a statistically reliable estimate of the 85th percentile value of the dissolved-to-total ratio. Samples should typically be taken a minimum of one week apart from one another.

## Chloride

More silver is present in free ionic form (and is therefore more toxic) in water that has low chloride concentrations. Therefore, the permit limit for silver is more stringent for facilities whose receiving water has low chloride concentrations. The TCEQ uses the 50th percentile of basin or segment chloride data to calculate the percentage of dissolved silver that is in free ionic form. Before collecting any site-specific data, it is advisable for the permittee to determine what default value was used in the TCEQ's calculations.

The following items outline acceptable procedures for collecting site-specific chloride data:

- Collect samples from the receiving water upstream of the discharge, if available, and outside of the regulatory mixing zone. For more information about mixing zones, see § 307.8(b) of the Standards and the section of this document entitled, "Mixing Zones and ZIDs for Aquatic Life Protection" on page 70.

  If no water is present upstream of the discharge, samples may be taken from a nearby perennial stream or from the nearest downstream perennial stream. Be sure to sample above the confluence with the receiving stream so that samples are not affected by chloride concentration in the effluent.

- Collect a minimum of 30 samples from the receiving water to represent a range of seasonal conditions. The applicant is responsible for providing a minimum of 30 valid data points to obtain a statistically reliable estimate of the 85th percentile value of the dissolved-to-total ratio. Samples should typically be taken a minimum of one week apart from one another.

## *TSS, Partition Coefficients, and Bioavailable Fractions of Metals*

For most metals, with the exceptions of mercury and selenium, the water quality criteria for aquatic life protection are expressed as dissolved concentrations. The dissolved concentration of a metal is the bioavailable fraction of the total metal concentration. The ratio of the dissolved concentration to the total recoverable concentration is expressed in terms of the partition coefficient ($K_p$) and TSS concentration:

$$\frac{C_d}{C_T} = \frac{1}{1 + (K_p \times TSS \times 10^{-6})}$$

where:
$C_d =$ dissolved metal concentration
$C_T =$ total metal concentration
$K_p =$ partition coefficient (L/kg)
$TSS =$ total suspended solids (mg/L)

The partition coefficient is itself a function of TSS concentration:

$$K_p = 10^b \times (TSS)^m$$

where:
$K_p =$ partition coefficient (L/kg)
$b =$ intercept (found in Table 6)
$TSS =$ total suspended solids (mg/L)
$m =$ slope (found in Table 6)

Table 6 lists the slope (m) and intercept (b) values for the relationship between TSS and the partition coefficient for most metals. The TCEQ typically uses the segment-specific TSS values from the tables in Appendix D of this document along with the values and equations in Table 6 to calculate the bioavailable fraction of a metal. The bioavailable fraction is then used in the waste load allocation (WLA). For more information on WLAs, see the subsection of this document entitled "Calculating Waste Load Allocations" on page 134.

**Table 6. Slope (m) and Intercept (b) Values Used to Calculate Partition Coefficients for Metals in Streams, Lakes, and Estuarine Systems**

| METAL | STREAMS [1] | | LAKES [1] | | ESTUARINE SYSTEMS [2] | |
|---|---|---|---|---|---|---|
| | b | m | b | m | b | m |
| Arsenic | 5.68 | -0.73 | Assumed equal to streams | | — | — |
| Cadmium | 6.60 | -1.13 | 6.55 | -0.92 | — | — |
| Chromium | 6.52 | -0.93 | 6.34 | -0.27 | — | — |
| Copper | 6.02 | -0.74 | 6.45 | -0.90 | 4.85 | -0.72 |
| Lead | 6.45 | -0.80 | 6.31 | -0.53 | 6.06 | -0.85 |
| Mercury | 6.46 | -1.14 | 6.29 | -1.17 | — | — |
| Nickel | 5.69 | -0.57 | 6.34 | -0.76 | — | — |
| Silver [3] | 6.38 | -1.03 | Assumed equal to streams | | 5.86 | -0.74 |
| Zinc | 6.10 | -0.70 | 6.52 | -0.68 | 5.36 | -0.52 |

[1]  Attachment I in *Technical Guidance Manual for Performing Waste Load Allocations. Book II: Streams and Rivers. Chapter 3: Toxic Substances*, EPA-440/4-84-022, June 1984.

[2]  Benoit, G., S.D. Oktay-Marshall, A. Cantu II, E.M. Hood, C.H. Coleman, M.O. Corapcioglu, and P.H. Santschi.1994. Partitioning of Cu, Pb, Ag, Zn, Fe, Al, and Mn Between Filter-Retaining Particles, Colloids, and Solution in Six Texas Estuaries. *Marine Chemistry*, 45:307-336.

[3]  Wen, L., P.H. Santschi, G.A. Gill, C.L. Paternostro, and R.D. Lehman. 1997. Colloidal and Particulate Silver in River and Estuarine Waters of Texas. *Environmental Science & Technology*, 31:723-731.

Permittees have some options available to them for modifying the calculation of bioavailable fractions:

- Collect site-specific TSS data—this allows the partition coefficient to be calculated using a site-specific TSS value in place of the 15th percentile of the basin or segment values. The resulting bioavailable fraction will also be modified.

- Collect site-specific total and dissolved metals concentrations—this allows the ratio of $C_d$ to $C_T$ to be measured directly without calculating a revised partition coefficient.

Both of these options are discussed in more detail below.

## *Collect Site-Specific TSS Data*

The TCEQ uses the 15th percentile of basin or segment TSS data (ranked from lowest to highest value) to calculate partition coefficients. Before collecting any site-specific data, it is advisable for the permittee to

determine what default value was used in the TCEQ's calculations. The following items outline acceptable procedures for collecting site-specific TSS data:

- Collect samples from the receiving water upstream of the discharge, if available, and outside of the regulatory mixing zone. For more information about mixing zones, see § 307.8(b) of the Standards and the section of this document entitled, "Mixing Zones and ZIDs for Aquatic Life Protection" on page 70.

  If no water is present upstream of the discharge, samples may be taken from a nearby perennial stream or from the nearest downstream perennial stream. Be sure to sample above the confluence with the receiving stream so that samples do not include TSS from the effluent.

- Collect a minimum of 30 samples from the receiving water to represent a range of seasonal conditions. The applicant is responsible for providing a minimum of 30 valid data points to obtain a statistically reliable estimate of the 85th percentile value of the dissolved-to-total ratio. Samples should typically be taken a minimum of one week apart from one another.

- If the permit includes whole effluent toxicity testing requirements **and** receiving water is used as the control, control TSS values may also be used to supplement any site-specific data that is collected. Laboratory dilution water may not be used to provide TSS data.

### *Collect Site-Specific Total and Dissolved Metals Concentrations*

Where slopes and intercepts to calculate a partition coefficient are not available in Table 6, or where a permittee wishes to develop a site-specific bioavailable fraction for a metal (but not a site-specific TSS value), the TCEQ has established the following guidelines:

- Collect samples from the receiving water **upstream of the discharge** and outside the regulatory mixing zone. These samples should be mixed with the effluent at the proportion representative of the critical dilution. The critical dilution can be obtained from the TCEQ. If upstream water is not available, the critical dilution is 100%.

- Collect a minimum of 30 valid samples from the receiving water to represent a range of seasonal conditions. The applicant is responsible for providing a minimum of 30 valid data points to obtain a statistically reliable estimate of the 85th percentile value of the dissolved-to-total ratio. Samples should typically be taken a minimum of one week apart from one another.

- Collect samples to reflect different receiving water characteristics that exist at various times of the day and week. This may require collecting samples for a full year. If a shorter study duration is acceptable, there should be a minimum of one week between each sampling event.

- Measure both dissolved and total recoverable metal concentrations.

- Use clean techniques for all metals sampling and analytical procedures to avoid contamination.

- Collect site-specific TSS data according to the procedures outlined previously.

- Collect effluent TSS data. If effluent TSS exceeds ambient conditions, a correction factor will be applied to remove the influence of the effluent TSS on the dissolved metal concentration.

- Once the data are collected and the ratios of the dissolved concentration to the total recoverable concentration are calculated, the ratios are ranked from lowest to highest, and the 85th percentile value is used as the bioavailable fraction when calculating the waste load allocation. (For more information on WLAs, see the subsection of this document entitled "Calculating Waste Load Allocations" on page 134.)

## *Aluminum*

The total amount of aluminum reported in a facility's effluent is assumed to be 100% bioavailable (*i.e.*, the partition coefficient is assumed to be 1.0) unless a permittee conducts a site-specific partition coefficient study that demonstrates otherwise. Many site-specific studies have demonstrated that aluminum in effluent is not all bioavailable (*i.e.*, toxic to aquatic life).

To demonstrate that aluminum in the effluent is not all bioavailable, the permittee should determine the no observable effects concentration (NOEC) for total aluminum-spiked effluent using, at a minimum, three standard 48-hour acute toxicity tests employing an appropriately sensitive test species (a species from one of the three genera in the family *Daphnidae*, preferably *Ceriodaphnia dubia*).

Once a mean total-aluminum NOEC is determined, it will be compared to the proposed effluent limits calculated by using the site-specific partition coefficient in the WLA acute criteria equation. A mean NOEC significantly greater than the proposed effluent limits meets the requirement to demonstrate that the proposed aluminum effluent limits will not cause instream effects.

### *Aluminum in Storm Water Discharges*

Facilities that commingle storm water with their effluent prior to discharge or that discharge only storm water may have elevated levels of aluminum due solely to their location. The following procedure for evaluating aluminum in storm water discharges is not used for other metals because: (1) no partition coefficient is used when screening a facility's effluent for aluminum for permitting purposes and (2) aluminum often occurs naturally in storm water discharges. If a facility experiences elevated concentrations of other metals in storm water, the permittee may pursue either a partition coefficient study or water-effect ratio study to address the issue.

If storm water is believed to be the only source of aluminum in a discharge, permittees may, after providing all of the following information, request the TCEQ to reconsider the need for aluminum limits.

- Clearly demonstrate that aluminum is not used in the facility's processes or added to the facility's waste streams.

- If storm water is commingled with facility wastewater, collect samples of storm water alone to demonstrate that aluminum levels in the storm water are directly responsible for aluminum levels reported in the commingled discharge. The number of data points needed for this demonstration will be determined on a case-by-case basis.

- Determine the ratio of the dissolved aluminum concentration to the total recoverable aluminum concentration for the facility. If the dissolved portion of the metal is greater than 50%, the permittee may need to pursue a more traditional method (*i.e.*, partition coefficient study or water-effect ratio study) to address the potential toxicity of aluminum in the discharge. For further information on determining dissolved-to-total ratios for metals, see the section of this document entitled "TSS, Partition Coefficients, and Bioavailable Fractions of Metals" on page 159. The number of data points necessary will be determined on a case-by-case basis.

If the information provided indicates: (1) that process water is not the source of aluminum in the storm water and (2) that the aluminum in the storm water is primarily particulate, an aluminum limit is not needed. Best management practices may be included in the permit. Permittees that prefer not to provide the information outlined above still retain the option to pursue a site-specific partition coefficient study or water-effect ratio study to determine the bioavailability of aluminum in their discharge.

# Calculating Permit Limits for Specific Toxic Pollutants

## Calculating Permit Limits for Mercury, PCBs, Dioxins/Furans, DDT, DDD, and DDE

### Converting Tissue Criteria to Water Column Criteria

The water quality criteria for the protection of human health for highly bioaccumulative pollutants such as mercury, PCB, and DDT (including metabolites) are expressed as fish tissue concentrations (µg/kg) rather than as water column concentrations. In order to determine if a facility needs effluent monitoring or limits for these pollutants, the tissue criteria must be converted to water column values. This is accomplished by first converting the tissue criterion from µg/kg to mg/kg (by dividing by 1,000) and then dividing by either a BAF or BCF.

$$\text{Water Column Criterion (mg/L)} = \frac{\text{Tissue Criterion (mg/kg)}}{BAF \text{ or } BCF \text{ (L/kg)}}$$

In accordance with EPA's 2000 guidance for developing human health criteria,[13] a BAF is preferred over a BCF because the BAF includes an organism's exposure from both diet and water, whereas the BCF includes only the organism's exposure to water. However, EPA has used the BAF in only a few current national criteria calculations. Therefore, a BCF value may be used if no scientifically accepted BAF value is available. The table that follows lists pollutants and their assumed BCFs that will be used to translate tissue criteria to water column criteria for purposes of TPDES permitting.

| Pollutant | BCF (L/kg) |
|---|---|
| DDT | $5.36 \times 10^4$ |
| DDD | $5.36 \times 10^4$ |
| DDE | $5.36 \times 10^4$ |
| Dioxin | $5.0 \times 10^3$ |
| Mercury | $3.3 \times 10^4$ |
| PCB | $3.12 \times 10^4$ |

While the 2001 final EPA methylmercury criteria document[14] does develop a national BAF, Appendix A of that document explains that the scientific community did not have confidence in the BAF. The BCF of $3.3 \times 10^4$, which is also discussed in the final EPA criteria document, will

---

[13] *Methodology for Deriving Ambient Water Quality Criteria for the Protection of Human Health*, U.S. Environmental Protection Agency, Office of Science and Technology, EPA-822-B-00-004, October 2000.
[14] *Water Quality Criterion for the Protection of Human Health: Methylmercury*, U.S. Environmental Protection Agency, Office of Science and Technology, EPA-823-R-01-001, January 2001.

be used in place of the BAF until a more reliably developed BAF can be determined.

Permittees may pursue a site-specific BAF study for any of the pollutants discussed in this section in order to better reflect conditions specific to their discharge location. Upon EPA approval, a site-specific BAF will be added to Appendix E of the Water Quality Standards. Because Texas is a very diverse state with varying geology, water chemistry, and water body types, each site-specific study would need to be discussed in detail with the TCEQ before the study is begun.

Once the tissue-based criterion has been translated to a water-column based criterion, permit limits are calculated according to the method outlined previously in the section of this document entitled "Deriving Permit Limits for Human Health Protection" on page 140.

## *Dioxin/Furan Congeners*

The TCEQ addresses the differences in the relative toxicity of dioxin/furan congeners in comparison to 2,3,7,8 TCDD and 1,2,3,7,8 PeCDD (most toxic dioxin/furan congeners) with the use of toxic equivalency factors (TEFs). The World Health Organization updated TEFs for dioxin/furans in 2005 and also included TEF values for dioxin-like PCBs. The Standards contain TEFs for fifteen congeners. The compounds and their TEFs as adopted by the TCEQ are given in the table that follows.

| Compound | TEF |
|---|---|
| 2378 TCDD | 1 |
| 12378 PeCDD | 1 |
| 2378 HxCDDs | 0.1 |
| 1234678 HpCDD | 0.01 |
| OCDD | 0.0003 |
| 2378 TCDF | 0.1 |
| 12378 PeCDF | 0.03 |
| 23478 PeCDF | 0.3 |
| 2378 HxCDFs | 0.1 |
| 23478 HpCDFs | 0.01 |
| OCDF | 0.0003 |
| PCB 77 | 0.0001 |
| PCB 81 | 0.0003 |
| PCB 126 | 0.1 |
| PCB 169 | 0.03 |

The concentration of each dioxin/furan compound in an effluent analysis is multiplied by the compound's TEF. The sum of these products of concentrations and TEFs is the toxic equivalence (TEQ) of the mixture, expressed as if the toxicity were due entirely to a congener with a TEF equal to 1.0 such as 2,3,7,8 TCDD. The potential additive effects of various forms of dioxin/furans with different relative toxicities are thereby taken into account. The TCEQ evaluates compliance with appropriate dioxin/furan permit limits based on this TEQ method. Permittees that are required to monitor their effluent for dioxin/furans may also be required to sample receiving water fish tissue and/or sediments for dioxin/furans.

## Calculating Permit Limits for Silver

The Standards express the freshwater criterion for silver in terms of the free ionic form, which is considered to be the most biologically toxic component of dissolved silver. This section describes how the free ionic criterion is translated into a total recoverable permit limit.

Before applying the translation method, the fraction of total silver that is in the dissolved form is calculated using a partition coefficient. (For more information on calculating and using partition coefficients, see the subsection of this document entitled "TSS, Partition Coefficients, and Bioavailable Fractions of Metals" on page 159.)

For silver, the TCEQ uses partition coefficient slopes and intercepts (see Table 6 on page 159) derived from data collected by the Texas Environmental Advisory Council. In 1994, the TEAC conducted statewide sampling of various water bodies and analyzed for both total and dissolved silver concentrations and total suspended solids (TSS). This information has since been published.[15]

Once the partition coefficient has been calculated, the percentage of dissolved silver in free ionic form is calculated. Data collected from a variety of water bodies throughout the United States show that a correlation exists between the dissolved chloride concentration and the percent free ionic silver.[16] Using this data, the following regression equation ($r^2$ of 0.87) was developed to calculate the percentage of dissolved silver in free ionic form:

$$Y = e^{e^{\left(\frac{1}{0.6659 + 0.0044\,Cl}\right)}}$$

[15] Wen, L., P.H. Santschi, G.A. Gill, C.L. Paternostro, and R.D. Lehman. 1997. Colloidal and Particulate Silver in River and Estuarine Waters of Texas. *Environmental Science & Technology*, 31:723-731.
[16] *Water Quality Assessment: A Screening Procedure for Toxic and Conventional Pollutants in Surface and Ground Water - Part 1*, U.S. Environmental Protection Agency, EPA 600/6-85-002a, 1985.

where:    $Y =$  % of dissolved silver in free ionic form

   $e =$  the base of natural logarithms

   $Cl =$  dissolved chloride concentration (mg/L)

In this equation, the TCEQ uses the 50th percentile value of dissolved chloride concentrations for each segment (shown in Appendix D) or for each basin if there is insufficient segment data. Site-specific data may also be used (see the subsection of this document entitled "Hardness, pH, and Chloride" on page 156).

When the 50th percentile chloride value exceeds 140 mg/L (the upper extent of the regression's data range), the percentage of silver in the free ionic form is set at 8.98%.

Finally, the proportion of dissolved silver that is in the free ionic form is multiplied by the proportion of total silver that is dissolved to obtain the fraction available as follows (see page 159 for definitions of $C_d$ and $C_T$):

$$Fraction\ Available = \frac{C_d}{C_T} \times \frac{Y}{100}$$

The fraction available is used in the waste load allocation equation. For example, if 30% of the silver is dissolved and 50% of the dissolved silver is in free ionic form, the fraction available used in the WLA equation is 0.15 (0.3 multiplied by 0.5).

## Calculating Permit Limits for Chromium

The Standards for the protection of aquatic life are expressed as dissolved concentrations for hexavalent chromium ($Cr^{+6}$) and trivalent chromium ($Cr^{+3}$). The method to calculate permit limits for total recoverable concentrations of $Cr^{+3}$ and dissolved concentrations for $Cr^{+6}$ is described in this section.

As part of the permit application, permittees analyze their effluent for dissolved $Cr^{+6}$ and total recoverable chromium. Total recoverable chromium is the sum of dissolved $Cr^{+6}$, adsorbed $Cr^{+6}$, dissolved $Cr^{+3}$, and adsorbed $Cr^{+3}$:

$$total\ recoverable\ Cr = dissolved\ Cr^{+6} + adsorbed\ Cr^{+6}$$
$$+ dissolved\ Cr^{+3} + adsorbed\ Cr^{+3}$$

The analytical method for $Cr^{+6}$ measures only for the dissolved form. The TCEQ assumes that the amount of adsorbed $Cr^{+6}$ is negligible. Therefore, total $Cr^{+3}$ is calculated by subtracting dissolved $Cr^{+6}$ from the total recoverable chromium:

167

$$\text{total } Cr^{+3} = \text{total recoverable } Cr - \text{dissolved } Cr^{+6}$$

The slope and intercept values for chromium, listed in Table 6 on page 159, are not applicable to $Cr^{+6}$ because dissolved concentrations alone are measured. Therefore, the $Cr^{+6}$ permit limit is calculated using standard procedures and assuming 100% of $Cr^{+6}$ is dissolved. The effluent concentration is compared to the calculated permit limit to determine whether monitoring or permit limits are needed.

The slope and intercept values in Table 6 and standard procedures are used to calculate $Cr^{+3}$ permit limits. The calculated permit limit is compared to the total $Cr^{+3}$ concentration in the effluent to determine whether monitoring requirements or permit limits are needed.

The slope and intercept values in Table 6 and standard procedures are used to calculate chromium limits for the protection of human health. The permit limit is expressed as total recoverable chromium.

# Establishing Permit Limits for Toxic Pollutants

## *Application Screening*

TCEQ staff calculate daily average and daily maximum effluent limits required to maintain the surface water quality standards based upon the instream criteria established in § 307.6 (c) and (d) of the Standards. During the application review, the effluent data provided in the application are compared to the calculated daily average effluent limits.

- If the effluent data are based on one sample and the effluent concentration for a pollutant equals or exceeds 70% of the calculated daily average effluent limit, the TCEQ may request the applicant to either: (1) submit historical data or; (2) resample and conduct additional analysis for that particular pollutant using four effluent samples. Samples should either be all composites or all grabs, as appropriate.

- If the effluent data submitted with the application are based on four samples, additional sampling is not typically requested.

Sometimes the effluent analysis contains one or more samples that have reported nondetectable levels of a pollutant. (Nondetectable levels are the "<" values in laboratory reports.) When this occurs in all four resamples and the reported nondetectable levels are equal to or less than the TCEQ's minimum analytical level (MAL), the TCEQ will use a zero for each value. If the four retests have both detectable and nondetectable concentrations at or below the TCEQ's MAL, then the nondetectable

168

concentrations are averaged as one-half the reported nondetectable levels, and the detectable concentrations are averaged as their reported values.

The average concentration of the effluent data is then compared to the daily average effluent limit.

- If the average of the effluent data equals or exceeds 70%, but is less than 85% of the calculated daily average limit, monitoring for the toxic pollutant will usually be included as a condition in the permit.

- If the average of the effluent data is equal to or greater than 85% of the calculated daily average limit, the permit will generally contain effluent limits for the toxic pollutant. The permit may specify a compliance period to achieve this limit if necessary.

If a toxic pollutant is quantified below the MAL and equals or exceeds 70% of the calculated daily average permit limit, the applicant may be required to submit historical data or to retest as described above. The applicant may also be required to establish a site-specific MAL for the effluent.

## Analytical Procedures and MALs

As required by 30 TAC § 319.11, all analyses of effluents must meet the requirements specified in the regulations published in 40 CFR Part 136 or the latest edition of *Standard Methods for the Examination of Water and Wastewater* (Standard Methods). If any regulated pollutant is not included in 40 CFR Part 136 or Standard Methods, the permittee may use a TCEQ-recommended analytical method or a method approved for the specific compound in water or wastewater by the EPA. All quality assurance/quality control practices must strictly adhere to those outlined in each EPA-approved analytical method.

Applicants and Permittees may transfer an analyte from one EPA-approved method to another EPA-approved method as described on pages 6-2 and 6-3 of the EPA document Analytical Method Guidance for the Pharmaceutical Manufacturing Point Source Category, EPA 821-B-99-003 (August 1999) (See Appendix G). Such authorization is not intended to be limited to pharmaceutical manufacturing and may be undertaken by any applicant or permittee for any analyte as long as applicable NELAC accreditation for the analyte is obtained.

The following terms are used to quantify sensitivity of analytical test procedures:

In 40 CFR Part 136 Appendix B, the **method detection limit (MDL)** is defined as the minimum concentration of a substance that can be measured and reported with 99% confidence that the analyte concentration is greater

than zero; it is determined from the analysis of a sample in a given matrix containing the analyte.

In the Standards, the **minimum analytical level (MAL)** is defined as the lowest concentration at which a particular substance can be quantitatively measured with a defined accuracy and precision level, using approved analytical methods. The MAL is not the published MDL for an EPA-approved analytical method, which is based on a single laboratory analysis of the substance in reagent (distilled) water. The MAL is based on analyses of the analyte in the matrix of concern (that is, wastewater effluents).

The TCEQ will establish general MALs that are applicable when information on matrix-specific MALs are unavailable. General MALs are established in this document for use in effluent testing. See Table E-1 in Appendix E for general MALs for permit application screening. See Table E-2 in Appendix E for MALs and analytical methods for the determination of pollutants regulated by § 307.6 of the Standards.

The MALs were developed by the TCEQ to establish a benchmark for analytical procedures for measuring the toxic pollutants regulated by § 307.6 of the Standards. One of the goals of establishing the MALs is to provide consistent analytical data for industrial and domestic wastewater permit applicants and compliance monitoring of their discharges. The MALs serve as a measure of the analytical sensitivity of each laboratory procedure performed on standard laboratory equipment by qualified personnel.

The MALs developed in Tables E-1 and E-2 were derived by evaluating all of the 40 CFR Part 136 EPA-approved methods and selecting the most stringent detection level achievable from each approved method in reagent water. The purpose of establishing TCEQ-approved MALs is to identify the minimum detectable concentration for which an analytical method exists. The methods identified in Tables E-1 and E-2 are the methods used to develop the corresponding MAL.

By establishing MALs, TCEQ is not requiring use of the corresponding analytical test method, nor is TCEQ requiring analytical results to be submitted where the laboratory test was run to achieve this MAL. For permitting and compliance purposes, MALs are used to allow an applicant or permittee to submit analytical results as nondetect. Nondetect analytical results are assumed to represent a concentration of zero (0) mg/L (or μg/L as appropriate).

170

When an MAL in Table E-1 or E-2 cannot be achieved with the analytical method identified in Table E-1 or E-2 for that analyte due to matrix interferences that are documented by the laboratory and identified as limitations in the analytical method (for example, when a metals sample must be diluted because the inorganic TDS concentration exceeds 2,000 mg/L), the TCEQ may approve use of the higher MAL as the lowest achievable MAL for that effluent matrix. In such cases, a permit would allow reporting nondetect analytical results as zero (0).

Applicants and permittees may apply for a matrix-specific MAL when they cannot achieve the MAL in Table E-1 or E-2 and the specific matrix interference is not identified in the approved analytical method (see page 172). An example of when a matrix-specific MAL may be requested is for one or all of the cyanide methods identified in Table E-1 or E-2. Cyanide species are a method-defined analyte, and as such, may be subject to unidentifiable interferences which elevate the MAL above the applicable Table E-1 or E-2 concentrations. When a matrix-specific MAL that is greater than the MAL in Table E-1 or E-2 is approved by the TCEQ for an analyte, the permit will allow the permittee to report nondetect analytical results as zero (0). A permittee may apply for a matrix-specific MAL when it files its application or at any time during the life of the permit.

The MALs in Tables E-1 and E-2 are not applicable to untreated, or partially treated, municipal and industrial wastewaters. Untreated and partially treated process-type wastewaters often have high concentrations of pollutants that require dilution of samples prior to analysis.

For various pollutants in the Standards, the hazardous metals limits at 30 TAC 319, Subchapter B, and in the EPA's national categorical effluent limitations guidelines and pretreatment standards, permitting and compliance decisions may not require submittal of analytical results at the MALs identified in Tables E-1 and E-2. Applicants and permittees may use any analytical method approved in 40 CFR Part 136 that is sufficiently sensitive to demonstrate compliance with their numeric permit limits (mass and concentration). Analytical test results that are submitted as nondetect at a laboratory reporting level higher than the MAL in Tables E-1 or E-2 will be treated and evaluated as if the analyte was detected at one-half the reported LOQ value.

The following example discusses a typical situation where using an analytical test method that does not achieve the MAL identified in Tables E-1 or E-2 would be acceptable and result in no adverse permitting or compliance issues for an applicant/permittee.

Example:

For aluminum, the TCEQ has established a freshwater acute criterion of 991 µg/L. Assuming no instream dilution and using procedures previously discussed in this chapter, the permit writer calculates a daily average effluent limit of 834.73 µg/L. The TCEQ screening procedures (see page 163) evaluate the need for monitoring a pollutant at 70% of the calculated daily average effluent limit, resulting in a screening level of 584.31 µg/L.

The test method established for aluminum in Table E-1 or E-2, EPA Method 200.8, has an associated MAL of 5 µg/L. However, test method SM3113B* exists and can achieve a Level of Quantitation (LOQ) of 20 µg/L. Test method SM3113B is used and the laboratory reports nondetect at the associated LOQ of 20 µg/L. The TCEQ will evaluate this analytical result as a detection at one-half the LOQ, 10 µg/L. Comparing the 10 µg/L reported result against the 584.31 µg/L screening level would result in no monitoring requirement or effluent limit for aluminum in this permit.

*SM = Standard Methods for the Examination of Water and Wastewater

## *Effective Date of Revised MALs*

MALs and Suggested Analytical Methods listed in Appendix E, will be implemented on the 365th day following commission approval of this document for reissuance of any TPDES permit, wastewater application screening, or pretreatment program monitoring.

## *Alternate Test Procedures*

Because of interferences and matrix problems associated with the analysis of toxic pollutants in wastewater, the TCEQ has received requests for the use of alternate analytical test method procedures. The procedures may range from an alteration of an EPA-approved reference method to a completely new or "candidate" method. Guidelines are given below for accepting or rejecting those alternate test procedures for compliance monitoring of TPDES permits.

If a permittee wishes to initiate the evaluation process for an alternate analytical test method procedure, the permittee may send a written request for authorization to the Quality Assurance Manager and/or the Section Manager of the Wastewater Permitting Section. The request must include details required by 30 TAC § 319.12 and may be subject to accreditation requirements in 30 TAC Chapter 25, Subchapters A and B, as amended. The information required in 40 CFR Part 136.4(c) (Application for Alternate Test Procedures) should also be submitted. All candidate methods should undergo a comparability study. A comparability study should compare the performance of the alternate or candidate analytical method to an EPA-approved reference method.

If the permittee cannot attain the MAL for a specific pollutant and has exhausted all available techniques to solve interference and matrix problems, the permittee may apply for an alternate MAL through the same procedure used to request an alternate analytical test method, provided that all documentation of attempted solutions to the interference/matrix problems is included with the application. This documentation needs to include all quality assurance/quality control data. Alternate test procedures are subject to review and approval by EPA.

## Defining Permit Limits

Permit limits are normally developed from total recoverable concentrations. The permit limit is expressed as the calculated daily average and daily maximum concentration and/or the daily average and daily maximum mass loading.

If the permit limit is lower than the MAL, it is still included in the permit, but a level of compliance based on the MAL is also included except where a substance is of particular concern (for example, if the toxicant has a high bioconcentration factor). If the TCEQ believes it is necessary to establish a permit level of compliance below the MAL, the permittee will be required to develop an effluent-specific MDL.

When necessary, the permit applicant may request an opportunity to demonstrate an alternative site-specific MAL for the effluent to account for interfering factors associated with the wastewater in question. See the discussion for requesting an alternate MAL through the alternate analytical test method procedure in the previous subsection of this document entitled "Alternate Test Procedures" (see page 172).

When establishing monitoring frequencies, TCEQ staff use 30 TAC 319 and TCEQ guidance established in document number 98-001.000-OWR-WQ, "Guidance Document for Establishing Monitoring Frequencies for Domestic and Industrial Wastewater Discharge Permits," May 1998.

# Screening Procedures and Permit Limits for Total Dissolved Solids

## Introduction

Concentrations and relative ratios of dissolved minerals such as chloride and sulfate that compose total dissolved solids (TDS) will be maintained to protect existing and attainable uses. The aquatic life attributes in § 307.7(b)(3)(A) of the Standards are used to assign the aquatic life use categories.

### Applicability

The screening procedure will be applied to all domestic dischargers that have an average permitted flow of $\geq$ 1 MGD, all industrial majors, and industrial minors on a case-by-case basis.

### Discharges to Freshwater

For discharges to freshwater, a screening procedure is used to determine whether either a TDS permit limit or further study of the receiving water is required. Screening may also be performed for individual components of TDS, including chloride and sulfate, since these anions have specific numerical criteria in the Standards. If screening demonstrates elevated levels of TDS, then appropriate permit limits are calculated.

### Discharges to Saltwater

For discharges to saltwater, TDS is evaluated on a case-by-case basis. Even though salinity criteria have not been established, the absence of numerical criteria does not preclude evaluations and regulatory actions based on estuarine salinity. Careful consideration is given to all activities that may detrimentally affect estuarine salinity gradients.

### Wastewater Recycling

Certain facilities reduce water consumption by recycling their wastewater before discharge, which may increase the effluent TDS concentration. The procedures in this chapter will be applied to such facilities to ensure protection of water quality.

174

## *Overview of Procedures*

The general procedure for screening TDS concentrations in permit applications and then developing permit limits is as follows:

1. Select the appropriate screening procedure for the receiving water type. A detailed discussion begins on page 175 in the section entitled "Screening Procedures for TDS."

2. Perform the screening calculation or calculations.

3. If the screening criteria are exceeded, calculate effluent TDS concentrations using the appropriate method for the receiving water type. A detailed discussion begins on page 182 in the section entitled "Establishing Permit Limits for TDS."

4. Compare the effluent TDS concentrations obtained in step 3 with the calculated effluent limits using the 70%, 85% procedure (see the section of this document entitled "Application Screening" on page 168) to determine whether a monitoring requirement or effluent limit is needed in the permit.

5. If necessary, place monitoring or effluent limits in the permit.

# Screening Procedures for TDS

The following screening procedures are typically used by TCEQ staff to assess TDS in wastewater discharges to various water body types. See Table 7 on page 185 for a summary of screening methods as they apply to different types of water bodies. Screening using TDS will normally be sufficient to address dissolved minerals. In unusual situations where ionic ratios are substantially skewed, screening can also be conducted for chloride or sulfate.

## *1a. Unclassified Intermittent Stream—TDS*

Use Equation 1a (below) to determine the TDS screening value, $C_{SV}$, for a discharge to an unclassified intermittent stream without perennial pools. The effluent TDS concentration, $C_E$, as reported in the permit application, will be compared to the screening value to determine whether a TDS permit limit is needed.

**Equation 1a**

where:  $C_{TDS}=$  TDS concentration (mg/L) used to determine the TDS screening value

$C_C=$  TDS criterion (mg/L) at the first downstream segment

500 mg/L =  median concentration of TDS in Texas streams

2,500 mg/L =  minimum TDS screening value

If the value of $C_{TDS}$ in Equation 1a is less than 2,500 mg/L, then 2,500 mg/L is used as the screening value. If $C_{TDS}$ is between 2,500 mg/L and 6,000 mg/L, then $C_{TDS}$ is used as the screening value. If $C_{TDS}$ is greater than 6,000 mg/L, then 6,000 mg/L is used as the screening value unless the applicant demonstrates that a higher TDS value is more representative of the receiving stream. The following table summarizes the conditions in this paragraph.

| If $C_{TDS}$ | then $C_{SV}=$ |
|---|---|
| $\leq$ 2,500 mg/L | 2,500 mg/L |
| > 2,500 mg/L but $\leq$ 6,000 mg/L | $C_{TDS}$ |
| > 6,000 mg/L | 6,000 mg/L |

In addition, some specific types of intermittent streams have alternative default screening values. These stream types and screening values are summarized in the following table:

| Other Specific Types of Intermittent Streams | If $C_{TDS}$ | then $C_{SV}=$ |
|---|---|---|
| Intermittent streams that are demonstrated to be dry except for very short-term flow in immediate response to rainfall | < 4,000 mg/L<br>$\geq$ 4,000 mg/L | 4,000 mg/L<br>$C_{TDS}$ |
| Constructed ditches that convey storm water and/or wastewater effluent that are considered water in the state | < 4,000 mg/L<br>$\geq$ 4,000 mg/L | 4,000 mg/L<br>$C_{TDS}$ |
| Intermittent streams that enter tidal waters within three miles of the discharge point | — | 6,000 mg/L |

TDS screening guidelines for intermittent streams are intended to protect livestock, wildlife, shoreline vegetation, and aquatic life during periods when the stream is flowing; the screening is also intended to preclude excessive TDS loading in watersheds that could eventually impact distant downstream perennial waters.

176

### *1b. Unclassified Intermittent Stream—Chloride and Sulfate*

Chloride (Cl) and sulfate ($SO_4$) will not typically be screened for discharges to intermittent streams because the TDS screening should be adequately protective. However, for situations where TDS screening alone may not provide adequate protection, similar screening may be performed for chloride and sulfate. After determining the TDS screening value as discussed in 1a, use Equation 1b (below) to determine the chloride and sulfate screening values ($C_{SV}$). The effluent chloride and sulfate concentrations reported in the permit application will be compared to the screening values to determine whether a chloride or sulfate permit limit or monitoring is needed.

**Equation 1b**
$$Cl \text{ or } SO_4 \ C_{SV} = \frac{TDS \ C_{SV}}{TDS \ Criterion} \times Cl \text{ or } SO_4 \ Criterion$$

### *2. Unclassified Perennial Stream or River*

Screen for TDS using Equation 2 (below), which compares the concentration of TDS at the edge of the human health mixing zone downstream of the discharge (right side of equation) with the TDS criterion ($C_C$) for the first downstream segment (left side of equation). A permit limit is usually not required when Equation 2 is satisfied (that is, $C_C \geq$ right side of equation).

**Equation 2**
$$C_C = \frac{Q_S C_A + Q_E C_E}{Q_E + Q_S}$$

where:
$\quad C_C =$ segment TDS criterion (mg/L)
$\quad Q_S =$ harmonic mean flow ($ft^3$/s) of the perennial stream or river
$\quad C_A =$ ambient TDS concentration (mg/L)
$\quad Q_E =$ effluent flow ($ft^3$/s)
$\quad C_E =$ effluent TDS concentration (mg/L)

The following items explain the variables used in Equation 2:

**$C_C$**      The TDS criterion for the first downstream segment is found in Appendix A of the Standards. If the permittee wishes to change the segment TDS criterion, an intensive study is needed. Such a study involves sampling the entire classified segment during different seasons. A site-specific amendment to the Standards is then needed to change the TDS segment criterion.

**$Q_S$**      The harmonic mean flow is determined as described in the section of this document entitled "Determining the Harmonic Mean Flow" on page 80.

**$C_A$**    The ambient TDS concentration is the median (50th percentile) concentration of TDS for the first downstream segment. Sources for determining the median TDS concentration include: (1) the tables in Appendix D of this document; (2) the most recent five years of TDS data in the Surface Water Quality Monitoring Information System (SWQMIS) database; or (3) other available data. The permittee may supply site-specific data if the median TDS concentration for the first downstream segment does not appear to be representative of the TDS concentration in the receiving water.

**$Q_E$**    The effluent flow used is generally the average permitted flow for domestic discharges and the average of the monthly average flows for the last two years for industrial discharges.

**$C_E$**    The effluent TDS concentration is based on the average effluent data provided in the permit application.

## 3. Classified Stream or River

Screen for TDS using Equation 2. Use the harmonic mean flow ($Q_S$) of the classified segment, and use the median TDS value for the classified segment as the ambient concentration ($C_A$). A permit limit is usually not required when Equation 2 is satisfied (that is, $C_C \geq$ right side of equation).

## 4. Unclassified Intermittent Stream within 3 Miles of a Perennial Freshwater Body

a.  Screen for TDS at the intermittent stream as described in item 1.
b.  Screen for TDS at the perennial freshwater body using the appropriate protocol described in item 2, 3, 6, or 7.
c.  Compare the screening values from (a) and (b) and use the more stringent one.

Freshwater bodies more than 3 miles downstream of the discharge may be evaluated if they contain a drinking water supply or aquatic life that is particularly sensitive to increases in TDS.

## 5. Unclassified Intermittent Stream with Perennial Pools

a.  Screen for TDS as described in item 1.
b.  Screen for TDS using Equation 2 using the harmonic mean flow ($Q_S$) for the intermittent stream with perennial pools.
c.  Compare the screening values from (a) and (b) and use the more stringent one.

## *6. Classified Lake*

Screen for TDS using Equation 3 (below), which compares the concentration of TDS at the edge of the human health mixing zone (right side of equation) with the TDS criterion ($C_C$) for the segment (left side of equation). A permit limit is usually not required when Equation 3 is satisfied (that is, $C_C \geq$ right side of equation).

**Equation 3**
$$C_C \geq (E_F)(C_E) + (1 - E_F)(C_A)$$

where:

$C_C =$ segment TDS criterion (mg/L)

$E_F =$ effluent fraction at the edge of the human health mixing zone

$C_E =$ effluent TDS concentration (mg/L)

$C_A =$ ambient TDS concentration (mg/L)

The following items explain the variables used in Equation 3:

**$C_C$** The TDS criterion for the segment is found in Appendix A of the Standards. If the permittee wishes to change the segment TDS criterion, an intensive study is needed. Such a study involves sampling the entire classified lake during different seasons. A site-specific amendment to the Standards is then needed to change the TDS segment criterion.

**$E_F$** The effluent fraction at the edge of the human health mixing zone is calculated as described in the section of this document entitled "Mixing Zones and Critical Conditions for Human Health Protection" on page 78.

**$C_E$** The effluent TDS concentration is based on the average effluent data provided in the permit application.

**$C_A$** The ambient TDS concentration is the median (50th percentile) concentration of TDS for the segment. Sources for determining the median TDS concentration include (1) the tables in Appendix D of this document; (2) the most recent five years of TDS data in the Surface Water Quality Monitoring Information System (SWQMIS) database; or (3) other available data. The permittee may supply site-specific data if the median TDS concentration for the entire segment does not appear to be representative of the TDS concentration in the vicinity of the discharge.

The secondary maximum contaminant levels for drinking water (given at 30 TAC §§ 290.101 - 290.119) are considered for use as $C_C$ if the lake is a public water supply.

179

## 7. Unclassified Lake

Screen for TDS using Equation 3. Differences between screening procedures for unclassified lakes compared to classified lakes are as follows:

$C_C$    The criterion for TDS from the nearest **appropriate** segment is used.

$C_A$    TDS or converted conductivity data (using a conversion factor of 0.65) from the unclassified lake may be used to determine $C_A$. If such data are unavailable, use the ambient TDS concentration (median) from the nearest appropriate segment. Sources for determining the median TDS concentration include (1) the tables in Appendix D of this document; (2) the most recent five years of TDS data in the Surface Water Quality Monitoring Information System (SWQMIS) database; or (3) other available data. The permittee may supply site-specific data if the median TDS concentration from the nearest appropriate segment does not appear to be representative of the TDS concentration in the receiving water.

The secondary maximum contaminant levels for drinking water (given at 30 TAC 290.101 - 290.119) are considered for use as $C_C$ if the lake is a public water supply.

## 8. Bay or Wide Tidal River

Compare the effluent TDS concentration to the segment TDS median and maximum. Sources for determining the median and maximum TDS concentrations include: (1) the tables in Appendix D of this document; (2) the most recent five years of TDS data in the Surface Water Quality Monitoring Information System (SWQMIS) database; or (3) other available data. Tidal waters will be protected from the adverse effects of excessively high or excessively low salinities (compared to the normal salinity range of the receiving water). The absence of numerical criteria will not preclude evaluations and regulatory actions to protect estuarine salinity.

# Determining Site-Specific Ambient TDS Values

High levels of TDS in an **existing** discharge may be justified occasionally due to elevated levels of TDS in the receiving water. In this case, the permittee has the option to submit information demonstrating that higher ambient levels of TDS exist in the receiving water and/or segment. This information can then be used to derive a site-specific ambient TDS concentration ($C_A$).

180

In order to satisfy the statistical requirements for site-specific data collection, 50 TDS values should be collected over the course of one year. TCEQ staff may allow applicants to monitor conductivity and convert it to TDS using a factor of 0.65. In streams and rivers, samples should be collected upstream of an existing discharge or in a separate, nearby reference stream. In lakes and reservoirs, samples should be collected at least 500 feet from any discharge point. Equation 2 or 3 is re-evaluated if a site-specific ambient TDS concentration ($C_A$) is approved (see Figure 11 on page 182).

If the permittee wishes to change the segment TDS criterion, a more intensive study is needed. Such a study involves sampling the entire segment under various flow regimes and seasons. A site-specific amendment to the Standards is then needed to change the TDS segment criterion.

# Establishing Permit Limits for TDS

If the screening criteria are exceeded and site-specific data are either not proposed or not justified, a TDS permit limit is calculated for the discharge. Similar procedures may be followed for individual constituents of TDS (that is, sulfate and chloride) if they are determined to be of concern. See Table 7 on page 185 for a summary of permit limit calculation methods as they apply to different types of water bodies.

## *Unclassified Intermittent Streams*

For discharges to unclassified intermittent streams, if the average effluent concentration of TDS in the permit application (or other available effluent data) is greater than the screening value determined using Equation 1a, then TCEQ staff considers effluent control measures for TDS.

When a limit is appropriate, the screening value or other appropriate site-specific value may be used as the daily average effluent limit for TDS. The daily maximum effluent limit for TDS is generally 2.12 times the daily average limit. The 2.12 multiplier is the ratio of the multipliers used to convert the human health LTA to daily maximum and daily average permit limits. *See* the section of this document entitled "Deriving Permit Limits for Human Health Protection" on page 140.



**Figure 11. Establishing Permit Limits for Total Dissolved Solids**

## Perennial Streams and Rivers and Intermittent Streams with Perennial Pools

For discharges to perennial streams and rivers or to intermittent streams that have perennial pools, Equation 4 is used to calculate the effluent TDS concentration that is used to determine TDS permit limits:

**Equation 4**
$$C_E = \frac{(C_C)(Q_E + Q_S) - (Q_S)(C_A)}{Q_E}$$

where:

$C_E =$ calculated effluent TDS concentration (mg/L)

$C_C =$ segment TDS criterion (mg/L)

$Q_E =$ effluent flow (ft$^3$/s)

$Q_S =$ harmonic mean flow (ft$^3$/s) of the receiving water or first perennial water body downstream of the discharge

$C_A =$ ambient TDS concentration (mg/L)

## Lakes

For discharges to lakes, Equation 5 is used to calculate the effluent TDS concentration that is used to determine TDS permit limits:

**Equation 5**
$$C_E = \frac{C_C - (1 - E_F)(C_A)}{E_F}$$

where:

$C_E =$ calculated effluent TDS concentration (mg/L)

$C_C =$ segment TDS criterion (mg/L)

$E_F =$ effluent fraction at the edge of the human health mixing zone

$C_A =$ ambient TDS concentration (mg/L)

If either Equation 4 or 5 produces a negative value for $C_E$, then $C_E$ is set equal to the segment TDS criterion ($C_C$) in the absence of additional information.

## Final Calculations for Lakes, Perennial Streams and Rivers, and Intermittent Streams with Perennial Pools

The calculated effluent TDS concentration ($C_E$) from Equation 4 or 5 is the annual average TDS concentration from which daily average and daily maximum permit limits may be determined. These limits are calculated by considering $C_E$ to be a waste load allocation (WLA) averaged over 365 days and calculating a long-term average (LTA) effluent concentration. This procedure is outlined in the section of this document entitled "Deriving Permit Limits for Human Health Protection" on page 140.

In cases where the TDS concentration can be controlled by the process, such as in cooling tower operations, the usual permitting assumption that the coefficient of variation (CV) equals 0.6 may be evaluated and adjusted as appropriate.

# Final Evaluation and Additional Considerations for TDS

Preliminary effluent limits are evaluated to determine whether monitoring requirements, specific effluent limits, or other permit conditions are needed to address TDS (or sulfate or chloride).

Measured effluent concentrations are compared to the calculated daily average effluent limit as described in the section of this document entitled "Establishing Permit Limits for Toxic Pollutants" on page 168. Monitoring requirements are established if the measured effluent concentration exceeds 70% of the calculated daily average limit. Effluent limits are established if the measured effluent concentration exceeds 85% of the calculated daily average limit, unless **all** of the following conditions are met:

- The effluent concentration of TDS is comparable to the water supply source; or, for domestic discharges, any elevations of salinity are small and typical of such discharges.

- The water supply source is typical of TDS concentrations of surface waters in the area but does not include brine water that is produced during the extraction of oil and gas, or other sources of brine water that are substantially uncharacteristic of surface waters in the area of discharge.

- For industrial discharges, there are no internal discharges of process water that result in a significant elevation of TDS in the external discharge compared to source water. For domestic discharges, there are no identifiable industrial discharges to the sewerage system that cause a significant elevation of TDS compared to source water.

- The discharge will not result in significant increases in instream concentrations of chloride that would exceed EPA's aquatic life toxic criteria for chloride (as of December 1, 1999), which are 860 mg/L acute criteria and 230 mg/L chronic criteria. This condition does not apply when EPA's criteria are lower than: (1) applicable numerical criteria in the Standards or (2) typical concentrations of surface waters in the area.

If the above conditions are met, the permit will require instream monitoring if the discharge at permitted discharge flow is predicted to cause numerical criteria for TDS, chloride, or sulfate to be exceeded in a classified segment listed in Appendix A of the Standards. Instream

monitoring will typically consist of monthly sampling at: (1) a site in the receiving water body that is not affected by the discharge (for example, upstream of the discharge); and (2) a site in the receiving water that is affected by discharge (for example, downstream of the designated mixing zone).

If the above conditions are met for a domestic discharge, but the elevation in TDS in the effluent (compared to source water) is greater than "typical," then the permit will contain a requirement for the permittee to develop and implement a plan to identify and reduce sources of TDS to the extent practical consistent with a sound environmental management program. However, the resolution may not cause or contribute to a violation of the TCEQ narrative criteria for the protection of aquatic life.

Additional general considerations that might indicate an effluent limit for TDS is not required include (but are not limited to) the following:

- For a water body that does not attain numerical criteria for TDS, the discharge does not contribute to the nonattainment. For example, the source water for the discharge is from the same water body, and the discharge does not increase the source water concentration.

- The discharge is intermittent (such as a wet-weather discharge), and the anticipated instream impacts may be evaluated using more applicable screening calculations.

- Reductions in TDS are not economically attainable, and the discharge does not result in a violation of numerical criteria for TDS for the appropriate classified segment in Appendix A of the Standards.

- The discharge is demonstrated to not adversely affect aquatic life and other applicable uses. This provision is only applicable if a protocol for this demonstration is approved by the TCEQ. EPA will review any protocol for this demonstration that could affect permits or other regulatory actions that are subject to EPA approval.

When a discharge exceeds the screening criteria, the general considerations in this subsection that preclude an effluent limit are noted in the permit's fact sheet, statement of basis/technical summary, or other publicly available information. More stringent TDS limits may be required to protect unclassified spring-fed streams, streams with unique uses, or other unclassified water bodies where the aquatic life is particularly sensitive to increases in TDS. The antidegradation provisions in § 307.5 of the Standards and in the chapter of this document entitled "Antidegradation" (see page 55) are also applicable.

**Table 7. Summary of TDS Screening and Limit Calculation Methods**

| Water Body Type | Screening Method | Limit Calculation Method |
|---|---|---|
| **Intermittent stream** (see page 175) | If $C_E < C_{SV}$, a TDS limit is usually not required, where:<br><br>$C_{SV} = 2{,}500$ mg/L if $C_{TDS} \leq 2{,}500$ mg/L,<br>$C_{SV} = C_{TDS}$ if $2{,}500$ mg/L $< C_{TDS} \leq 6{,}000$ mg/L,<br>$C_{SV} = 6{,}000$ mg/L if $C_{TDS} > 6{,}000$ mg/L.<br><br>$C_{TDS} = \dfrac{(C_C)\,(2{,}500 \text{ mg/L})}{500 \text{ mg/L}}$<br><br>See page 176 for exceptions to these values. | $C_E = C_{SV}$, or<br><br>$C_E$ = other appropriate site-specific value. |
| **Perennial stream** (see page 177 and page 178) | If $C_C \geq \dfrac{Q_S C_A + Q_E C_E}{Q_E + Q_S}$,<br><br>a TDS limit is usually not required. | $C_E = \dfrac{(C_C)(Q_E + Q_S) - (Q_S)(C_A)}{Q_E}$ |
| **Intermittent stream within three miles of a perennial stream** (see page 178)<br><br>or<br><br>**Intermittent stream with perennial pools** (see page 178) | If $C_E < C_{SV}$ and $C_C \geq \dfrac{Q_S C_A + Q_E C_E}{Q_E + Q_S}$,<br><br>a TDS limit is usually not required, where:<br><br>$C_{SV} = 2{,}500$ mg/L if $C_{TDS} \leq 2{,}500$ mg/L,<br>$C_{SV} = C_{TDS}$ if $2{,}500$ mg/L $< C_{TDS} \leq 6{,}000$ mg/L,<br>$C_{SV} = 6{,}000$ mg/L if $C_{TDS} > 6{,}000$ mg/L.<br><br>$C_{TDS} = \dfrac{(C_C)\,(2{,}500 \text{ mg/L})}{500 \text{ mg/L}}$<br><br>See page 176 for exceptions to these values. | $C_E = C_{SV}$, or<br><br>$C_E = \dfrac{(C_C)(Q_E + Q_S) - (Q_S)(C_A)}{Q_E}$<br><br>or<br><br>$C_E$ = other appropriate site-specific value, whichever is smaller. |
| **Lake** (see page 179 and page 180) | If $C_C \geq (E_F)(C_E) + (1 - E_F)(C_A)$,<br><br>a TDS limit is usually not required. | $C_E = \dfrac{C_C - (1 - E_F)(C_A)}{E_F}$ |
| **Bay or wide tidal river** (see page 180) | Compare $C_E$ to median and maximum segment TDS concentrations. | Avoid adverse effects of excessively high or excessively low effluent TDS concentrations. |

# TPDES Storm Water Permits

## General Provisions

This chapter describes storm water discharges subject to TPDES permit requirements, which include discharges associated with industrial activities, discharges from construction activities, and discharges from municipal separate storm sewer systems (MS4s). These types of discharges are identified by state and federal regulation (30 TAC § 281.25(4) and 40 CFR Part 122).

Currently, the TCEQ has not developed routine procedures for setting chemical-specific effluent limits on storm water discharges, based upon the Standards. In certain circumstances such as industrial storm water discharges, technology-based effluent limits for storm water discharges will be applied in individual permits and general permits. The TCEQ may require an operator of an industrial facility, authorized by a general permit, to apply for an individual TPDES permit because of:

- a total maximum daily load (TMDL) and TMDL implementation plan;
- the anti-backsliding policy—see 40 CFR Part 122.44(l);
- a history of substantive noncompliance; or
- other site-specific considerations.

## Reviewing Permit Applications

Permit application review procedures for storm water discharge activities are described in this section. These procedures are different from the permit application review procedures associated with wastewater discharges (discussed in the subsection of this document entitled "Application Screening" on page 168) because storm water discharges are normally intermittent and occur during wet weather conditions.

As stated in § 307.8(e) of the Standards, controls on the quality of permitted storm water discharges are largely based on implementing best management practices and/or technology-based limits in combination with instream monitoring to assess standards attainment and to determine whether additional controls on storm water are needed. Consistent with the approach described in the EPA's Interim Permitting Approach guidance (61 FR 43761, November 6, 1996), incorporation of effluent limits based on water quality criteria in storm water permits is based on the following items:

187

- Specific conditions or limitations are incorporated as conditions of the discharger's TPDES permit, as necessary and appropriate, based upon surface water quality data or other acceptable information.

- Where data are not available to characterize the quality of storm water and the receiving water, the TPDES permit may include specific conditions for instream and outfall monitoring. In this situation, data collection will supplement the implementation of necessary controls. This data will be used to make any necessary permit modifications. Additionally, the data will be used to consider necessary permit revisions at the time of permit renewal. In subsequent permit actions, the TCEQ may continue to require instream and monitoring requirements, as appropriate.

Special circumstances may warrant a review similar to that applied to wastewater discharges. Some examples include:

- Storm water management systems designed to retain water and to discharge during static or low-flow conditions.

- Storm water management systems designed to commingle storm water with other waste streams, such as process, utility, or sanitary wastewater.

The Clean Water Act (CWA) §§ 301, 304, and 401 (33 United States Code (U.S.C.) 1331, 1314 and 1341) provide that National Pollutant Discharge Elimination System (NPDES) permits must include effluent limitations requiring authorized discharges to:

- meet standards reflecting levels of technological capability;

- comply with EPA-approved state water quality standards; or

- comply with other state requirements adopted under authority retained by states under CWA § 510, 33 U.S.C. § 1370.

In general, TPDES storm water permits do not contain numerical effluent limits based on water quality criteria. Instead, they emphasize requirements that facilities must prevent or effectively reduce exposure of storm water to pollution (for example, by building shelters that protect materials and activities in general from exposure to the elements, including rainfall and rainfall runoff). Such permit requirements are similar to those of previously issued NPDES storm water permits that are based on a strategy of reducing pollution at the source, as opposed to treatment before discharge. However, nothing in this document precludes the TCEQ from assigning effluent limits based on water quality criteria to a storm water discharge.

# Site-Specific Information

Site-specific information may be used to develop unique storm water management practices associated with a storm water drainage system. Conditions and effluent limits may be based on, but are not limited to, the following considerations:

- the existing storm water system design;

- local climatic conditions;

- the water body being listed on the state's Clean Water Act Section § 303(d) List;

- assessments of habitat and biological integrity of receiving waters;

- extent of success already achieved in preventing and minimizing storm water pollution;

- preferences and alternatives provided by the permit applicant; and

- economically achievable and feasible measures for pollution reduction, including application of structural controls, treatment facilities, management practices and operational methods, and similar considerations.

Such information may be found in a storm water pollution prevention plan (SWP3), a storm water management plan, or a storm water management program (SWMP) for TPDES applicants. These plans or programs are documents prepared by the permit applicant describing how the site will be managed to prevent or significantly reduce discharge of pollutants from the site. These plans will be updated when necessary and made readily available to TCEQ personnel upon request.

# Antidegradation Review of Storm Water Permits

Antidegradation reviews of TPDES permit applications for storm water discharges are conducted in accordance with § 307.5 of the Standards. Antidegradation reviews are conducted both for individual permits (such as MS4s and specific industrial facilities) and for general permits developed to address storm water discharges from small MS4s and categories of industrial activity (including construction activity).

# Discharges to Impaired Waters

New sources or new discharges of the constituent or constituents of concern to impaired waters may not be authorized by a general storm water permit unless otherwise allowable under 30 TAC Chapter 305

("Consolidated Permits") and applicable state law. For discharges not eligible for coverage under a general storm water permit, the discharger must apply for and receive an individual or other applicable general TPDES permit authorization prior to discharging.

**Impaired waters** are those that do not meet one or more of the applicable water quality standards and that are listed on the state's § 303(d) List.

**Constituents of concern** are those for which the water body is listed as impaired.

A discharge of the constituent or constituents of concern to impaired water bodies for which there is a TMDL or TMDL implementation plan is only eligible for coverage under a general storm water permit if:

- it is consistent with the approved TMDL or TMDL implementation plan; **and**

- the discharger incorporates the limitations, conditions, and requirements applicable to its discharge, including monitoring frequency and reporting required by TCEQ rules, into its SWP3 or storm water management plan unless these limitations, conditions, and requirements are already reflected directly in the general permit itself.

Even if a TMDL has not yet been developed and implemented for the constituent or constituents of concern, discharges to impaired water bodies must not cause or contribute to the impairment (*See* 30 TAC Chapter 305 Consolidated Permits).

# Discharges to the Edwards Aquifer Recharge Zone

Discharges of storm water associated with industrial activity, and other non-storm water discharges, cannot be authorized where those discharges are prohibited by 30 TAC Chapter 213 (Edwards Aquifer). New discharges located within the Edwards Aquifer Recharge Zone, or within that area upstream from the recharge zone and defined as the Contributing Zone, must meet all applicable requirements of, and operate according to, 30 TAC Chapter 213.

# Discharges to Specific Watersheds and Water Quality Areas

Discharges of storm water associated with industrial activity, and other non-storm water discharges, cannot be authorized where prohibited by provisions of 30 TAC Chapter 311 (Watershed Protection) for water quality areas and watersheds.

# Site-Specific Standards and Variances

## General Provisions

As stated in § 307.2(d)(3) of the Standards, the narrative provisions, the designated uses, the presumed uses, and the numerical criteria of the Standards may be amended to account for local conditions. Adoption of a site-specific standard is an explicit amendment to the Standards that requires EPA approval and an opportunity for public hearing.

In cases where site complications require substantial additional time to justify, review, and approve a site-specific standard, a temporary variance (variance) for an **existing** facility may be requested before or during the permit application process to allow the permittee time to gather information to support a site-specific standard. A variance is not equivalent to a site-specific standard, which is a rule change. Variance procedures are defined in § 307.2(d)(5) of the Standards. **Preliminary evidence indicating that a site-specific standard may be appropriate should be submitted to the TCEQ to show that a variance is warranted.**

The information necessary to justify a variance is only a part of the process of justifying a site-specific standard. The applicant should continue to develop more comprehensive information to support the site-specific standard. Technical guidance to support a site-specific standard is given in the following sections of this document: "Site-Specific Standards for Aquatic Life Use" (see page 195), "Site-Specific Standards for Recreational Use" (see page 199), "Site-Specific Numerical Standards for Aquatic Life" (see page 202), and "Site-Specific Standards for Total Toxicity" (see page 207).

## Interim Permit with a Variance

A variance may be requested before or during the permit application process. The TCEQ includes all variance requests in the Notice of Application and Preliminary Decision, and the public is given the opportunity to request a hearing on both the variance and the TPDES permit. A variance for a TPDES permit also requires EPA approval. The TCEQ's approval of a variance along with the TPDES permit formally recognizes that a site-specific standard may be justified based on preliminary evidence provided by the applicant. The variance is approved by the TCEQ as conditions in the permit that provide interim effluent

limits or monitoring requirements. Permit conditions for the pollutant or pollutants of concern are normally the same as in the previous permit. However, the application of a variance cannot impair an existing, attainable, or designated use. As stated in § 307.2(d)(5)(D) of the Standards, the permit must preclude degradation. A TPDES permit that contains an approved variance is issued for up to a three-year term.

The variance consists of special provisions in the TPDES permits, which establish a schedule for the permittee to submit a work plan to study the stream characteristics, aquatic life uses, or other site-specific information about the receiving water. Upon approval of the work plan, the permittee performs the study in accordance with the approved work plan. Final effluent limits based upon the existing standard are not applied in the permit, since the appropriateness of the existing standard is in question and under study. However, the permit will specify the effluent limits that would be applied in the next permit if the permittee does not comply with the requirements of the variance or if the existing standard is not revised.

The variance provisions in the short-term permit allow the permittee time to gather information necessary to fully support a site-specific standard. With this information, the applicant should request the site-specific standard in writing and submit the approved study to the TCEQ at least 180 days before the expiration date of the permit.

A permittee may also request a variance where an **existing** permit already includes a compliance period to meet the Standards. In this case, the existing permit (which includes a compliance period for the pollutant of concern) is amended to recognize the variance request. If granted, the variance will expire no later than three years following the issue date for the permit that previously specified a compliance period.

# Variance Extensions

When the TCEQ receives the permit renewal application and the study of stream characteristics, aquatic life uses, or other site-specific information about the receiving water, a technical review of this information is conducted. A recommendation on the effluent limits for the succeeding permit is made, based upon the permittee's fulfillment of the variance requirements and whether the TCEQ agrees the site-specific standard is warranted.

### *Recommend that the Standard be Revised*

In this situation, the TCEQ determines that the proposed site-specific standard is appropriate, and EPA determines that it is technically approvable. If the revision to the Standards can be processed and completed before the TPDES permit is renewed, then the permit is issued

with final effluent limits based upon the revised standard. Otherwise, the succeeding permit is renewed with a variance extension. The interim effluent limits will be extended from the previous permit to allow additional time for a site-specific standard to be adopted into the Standards and approved by EPA.

Once the site-specific standard is adopted and approved by EPA, the permittee can seek to have the TPDES permit amended to include or remove effluent limits to reflect the new standard. If this new standard requires an upgrade in treatment, the permit may include a compliance schedule to achieve the effluent limits needed to meet the final standard. As described in § 307.2(f) of the Standards, up to three years from the effective date of the permit's issuance is provided to allow sufficient time for the permittee to modify the effluent quality.

### *Recommend that the Standard <u>not</u> be Revised*

In this situation, the TCEQ (or the EPA) does not believe the study supports the site-specific standard. The succeeding permit may include a compliance schedule to achieve the effluent limits needed to meet the existing standard. As described in § 307.2(f) of the Standards, up to three years from the effective date of the permit's issuance is provided to allow sufficient time for the permittee to modify the effluent quality.

When the permittee has not complied with the conditions in the variance, then the succeeding permit is issued with final effluent limits based upon the existing standard, effective immediately. The TCEQ does not grant a compliance period with interim effluent limits in this situation, since the permittee did not perform the required study or otherwise fulfill the requirements of the variance.

## Coordinating with EPA

In the memorandum of agreement (MOA) with EPA delegating the NPDES program to the state, the TCEQ agreed that EPA would review all draft TPDES permits that include a recommendation of a variance. The TCEQ routes draft permits with a variance or variance extension to EPA, along with the technical information that the permittee provides to support the variance request. EPA reviews the variance request within 45 days and may confer with the USFWS on endangered species issues during this review period. By the end of the 45-day review, EPA either (1) approves the variance and draft permit or (2) specifies any interim objections. Any interim objections have to be resolved before the TCEQ can proceed.

Further details of procedures for federal review of TPDES permits can be found in the TPDES MOA, which is available on the agency's Web site (see footnote 2 on page 21).

# Temporary Standards

Where a criterion is not attained and cannot be reasonably attained for one or more of the reasons listed in 40 CFR Part 131.10(g), then a temporary standard for a specific water body may be adopted as part of § 307.10 of the Standards as an alternative to downgrading uses. Reasons for a temporary standard are as follows:

- Naturally occurring pollutant concentrations prevent the attainment of a use;

- Natural, ephemeral, intermittent, or low-flow conditions or water levels prevent the attainment of the use;

- Human-caused conditions or sources of pollution prevent the attainment of the use and cannot be remedied or would cause more environmental damage to correct than to leave in place;

- Dams, diversions, or other types of hydrological modifications preclude the attainment of the use, and it is not feasible to restore the water body to its original condition or operate such modification in a way that would result in the attainment of a use;

- Physical conditions related to the natural features of the water body, such as the lack of a proper substrate, cover, flow, depth, pools, riffles, and the like, unrelated to water quality, preclude attainment of aquatic life protection uses; or

- Controls more stringent than those required by §§ 301(b) and 306 of the federal Clean Water Act would result in substantial and widespread economic and social impact.

In accordance with § 307.2(g) of the Standards, the following provisions apply to temporary standards:

- A criterion that is established as a temporary standard must be adopted as stated in the provisions of § 307.2(d)(3) of the Standards.

- A temporary standard must identify the water body or water bodies where the criterion applies.

194

- A temporary standard will identify the numerical criteria that will apply during the existence of the temporary standard, and a remediation plan to address compliance with designated uses and criteria will be provided for approval by the EPA.

- A temporary standard does not exempt any discharge from compliance with applicable technology-based effluent limits.

- A temporary standard must expire no later than the completion of the next triennial revision of the Standards.

- When a temporary standard expires, subsequent discharge permits will be issued to meet the applicable existing water quality standards.

- If sufficiently justified as stated in the provisions of § 307.2(d)(3) of the Standards, a temporary standard can be renewed during revision of the Standards.

- A temporary standard cannot be established that would impair an existing use.

Permits including a limit based on a temporary standard typically: (1) are issued for three years, (2) are amended by staff after three years, or (3) include another option that precludes allowing limits to be based on the temporary standard for an extended (five-year) period if the temporary standard is removed from the Standards.

## Site-Specific Standards for Aquatic Life Use

For unclassified water bodies, aquatic life uses are assessed as described in the chapter of this document entitled "Determining Water Quality Uses and Criteria" on page 14. In cases where the preliminary assessment indicates that the attainable aquatic life use for a particular unclassified water body might be lower than the presumed aquatic life use, an aquatic life use-attainability analysis (UAA) is conducted as discussed in this section. UAAs are also conducted on classified streams where the attainable aquatic life use has become lower than the designated use.

The rest of this section explains:

- the procedures used to review and approve UAAs;

- how to conduct UAAs for typical sites on unclassified streams; and

- the kinds of site complications that require additional analysis.

## Aquatic Life UAA Review and Approval

TCEQ staff review each UAA in order to ensure conformance with the basic protocol. If the UAA indicates that the attainable use is lower than the designated use for a classified stream or if the TCEQ decides a lower aquatic life use designation is justified for an unclassified stream, then the TCEQ sends the UAA to EPA Region 6 for review and preliminary approval. The TCEQ sends the results of the UAA to the EPA as a summary report with the presentation of results in the appropriate format as described in Appendix C of TCEQ's *Surface Water Quality Monitoring Procedures, Volume 2: Methods for Collecting and Analyzing Biological Assemblage and Habitat Data*, RG-416. After reviewing the UAA, the EPA sends a response to the TCEQ.

## Aquatic Life UAAs for Unclassified Streams

Within 30 days after receiving a UAA for a "typical site" on an unclassified stream, the EPA reviews the UAA in accordance with the protocol entitled "UAA for Typical Sites" on page 197 and provides a response to the TCEQ. Additional time may be needed for EPA review of streams with "site complications" (see page 199 for more information). Preliminary approval of a UAA for an unclassified stream by the EPA constitutes a finding that the requested aquatic life uses and criteria for the stream are "approvable" for a site-specific designation in the Standards.

The TCEQ will designate site-specific aquatic life uses in Appendix D of the Standards. To the extent possible, the public notification and public hearing requirements for adopting a site-specific standard may be conducted in conjunction with the public participation procedures for any permit actions that affect the particular site.

After the TCEQ and EPA final approval of the revised Standards, TPDES discharge permits are issued with effluent limits based upon the new site-specific standard designation. The new site-specific standard is also included in the TCEQ's Water Quality Management Plan (WQMP).

## Aquatic Life UAAs for Classified Streams

For classified streams, the EPA may need more than 30 days to review the UAA. Lowering a designated aquatic life use on a classified water body takes a more extensive study than for lowering the presumed aquatic life use of an unclassified stream. A UAA for a classified stream requires that representative sites throughout the segment be evaluated rather than one typical site as for an unclassified stream.

Preliminary approval of a UAA by the EPA for classified streams constitutes a finding that the lowered aquatic life use is "approvable" as the new designated use for the classified stream. The change in the designated use is placed in the next revision of the Standards.

## Aquatic Life UAAs for Typical Sites

Data collection, compilation, and analysis may be conducted by the TCEQ, an applicant, river authorities, or governmental or other entities. Any person or entity planning to conduct a UAA should coordinate with the TCEQ. In addition, regional staff of the Texas Parks and Wildlife Department and the TCEQ, the Texas State Soil and Water Conservation Board, and local stakeholders in the watershed should be notified about the proposed UAA project.

## Classified Streams

Procedures to conduct a UAA on a classified stream are described in the most recent version of the TCEQ's Surface Water Quality Monitoring Procedures, Volume 2: Methods for Collecting and Analyzing Biological Assemblage and Habitat Data, RG-416. In addition, procedures for conducting instantaneous field measurements, 24-hour dissolved oxygen monitoring, and conventional water chemistry sampling for a UAA are contained in the most recent version of the TCEQ's Surface Water Quality Monitoring Procedures, Volume 1: Physical and Chemical Monitoring Methods for Water, Sediment, and Tissue, RG-415. Results of a UAA for a classified stream should be submitted in the appropriate format (described in Appendix C of RG-416) to the TCEQ for review.

## Unclassified Streams—Applicability

The aquatic life UAA procedures in this section may be used under the following conditions:

- A sample site unimpacted by a pollutant source is available (or data already exists for a reference area), such as in the projected area of impact for a new permit, or upstream of an existing permit.

- The attainable use is not impaired by other sources of pollution at critical conditions.

- The characteristic aquatic life use in unimpacted reference areas is lower than the statewide or region-wide presumed use. This corresponds to one or more of the following reasons for lowering a designated use listed in 40 CFR Part 131:

197

◦ Naturally occurring poor water quality prevents the attainment of the use.

◦ Natural stream flow conditions prevent the attainment of the use.

◦ Physical characteristics of the stream channel (morphometry) preclude attainment of aquatic life uses.

◦ Hydrologic modifications (dams, spillways, intake structures, etc.) preclude the attainment of the use, and the impacts cannot be reasonably mitigated.

## *Unclassified Streams—Summary of Aquatic Life UAA Procedures*

The following items summarize the aquatic life UAA procedures for typical sites:

- Conduct the UAA in accordance with the appropriate biological fact sheet in the most recent version of the TCEQ's *Surface Water Quality Monitoring Procedures, Volume 2: Methods for Collecting and Analyzing Biological Assemblage and Habitat Data*, RG-416.

- Identify reference areas and define stream reach or reaches to be included in the assessment.

- Summarize stream morphometry, flow characteristics, and habitat characteristics in the reference area in accordance with:

  ◦ a standardized stream characteristics form (from a TCEQ wastewater permit application), which also contains a description of the proposed or existing discharge; or

  ◦ the most recent version of the TCEQ's *Surface Water Quality Monitoring Procedures, Volumes 1 and 2*, RG-415 and RG-416. This document is available on the agency's Web site (www.tceq.state.tx.us); follow the link for "Publications."

- Conduct fish sampling (or in some cases macroinvertebrate sampling) in the reference area in accordance with the RG-416 (see preceding bulleted item).

- Apply quantitative indices in accordance with the RG-416, cited above.

- Conduct instantaneous field measurements, 24-hour dissolved oxygen monitoring, and conventional water chemistry sampling in accordance with RG-415 and the appropriate biological fact sheet in RG-416.

198

- Submit the results of the UAA in the appropriate format, as described in Appendix C of RG-416, to the TCEQ's Water Quality Standards Group in the Water Quality Planning Division for review.

### *Site Complications Requiring Additional Justification*

In unusual situations, there may be site-specific complications that indicate more information is needed to justify an aquatic life use that is less than the presumed use for an unclassified water body. Examples of such situations and the types of additional information that may be appropriate are listed below.

### *Examples of Site-Specific Complications*

- The reasonably attainable uses in the receiving waters are impacted by an existing discharge and are considered to be lower than the naturally occurring uses in an appropriate reference area (for example, upstream).

- No suitable reference areas are available for sampling.

- Dissolved oxygen criteria for a particular aquatic life use are inappropriate for the site.

### *Examples of Additional Analyses*

- Water quality modeling simulations to evaluate treatment options.

- Additional investigation of pollutant sources and instream impacts.

- Sampling and evaluation of additional parameters, such as diel measurements of dissolved oxygen.

- Technical and economic feasibility of attaining the presumed use.

## Site-Specific Standards for Recreational Use

Categories of recreational uses and applicable criteria are established in §§ 307.4(j) and 307.7(b)(1) of the Standards. In cases where site- specific information indicates that the attainable recreational use for a particular unclassified water body might be lower than the presumed recreational use, a Basic Recreational UAA Survey or Comprehensive Recreational UAA can be conducted as discussed in this section. Comprehensive Recreational UAAs can also be conducted on classified water bodies where there is an indication that the attainable recreational use is lower than the designated use.

The remainder of this section explains:

- the procedures used to review and approve recreational UAAs.
- how to conduct Basic Recreational UAA Surveys and Comprehensive Recreational UAAs.

## Recreational UAA Review and Approval

The TCEQ reviews each UAA in order to ensure conformance with the TCEQ recreational UAA procedures and to determine if a lower recreational use is justified. If the UAA indicates that the recreational use is less stringent than the designated or presumed use, the TCEQ submits the UAA to EPA Region 6 for review and preliminary approval. The TCEQ sends the results of the UAA to the EPA as a summary report with a copy of the recreational UAA report attached. After reviewing the UAA, the EPA sends a response to the TCEQ.

## Recreational UAAs for Unclassified Water Bodies

Within 30 days after receiving a UAA for an unclassified water body, the EPA reviews the UAA in accordance with the TCEQ recreational UAA procedures and provides a response to the TCEQ. Additional time may be needed for EPA review of complex recreational UAAs. Preliminary approval of a recreational UAA by the EPA constitutes a finding that the requested recreational uses and criteria for a water body are "approvable" for a site-specific designation in the Standards. The change in the presumed use will be proposed for adoption in the next revision of the Standards.

## Recreational UAAs for Classified Water Bodies

For classified water bodies, the EPA may need more than 30 days to review the UAA. Lowering a designated recreational use on a classified water body takes a more extensive study than for lowering the recreational use of an unclassified water body. Preliminary approval of a UAA by the EPA for classified water bodies constitutes a finding that the lowered recreational use is "approvable" as the new designated use for the classified water body. The change in the designated use is placed in the next revision of the Standards.

## *How to Conduct Recreational UAAs*

### *Applicability*

Data collection, compilation, and analysis may be conducted by the TCEQ, river authorities, or governmental or other entities. The recreational UAA procedures summarized in this section may be used under the following conditions:

- The attainable use is not impaired by sources of pollution.

- The attainable recreational use is lower than the presumed or designated use. This corresponds to one or more of the following reasons for lowering a designated use listed in 40 CFR Part 131:

  ◦ Naturally occurring poor water quality prevents the attainment of the use. Sources of pollution cannot be reasonably controlled by existing regulations.

  ◦ Natural, ephemeral, intermittent, or low stream flow conditions prevent the attainment of the use.

  ◦ Physical characteristics of the stream channel (morphometry) preclude attainment of aquatic life uses.

  ◦ Hydrologic modifications (dams, spillways, intake structures, etc.) preclude the attainment of the use, and the impacts cannot be reasonably mitigated.

### *Summary of Recreational UAA Procedures*

Basic Recreational UAA Surveys and Comprehensive Recreational UAAs should be conducted in accordance with the TCEQ's Recreational UAA procedures. These procedures are available upon request from the TCEQ's Water Quality Standards Group in the Water Quality Planning Division. The following items summarize the UAA procedures for typical sites:

- Coordinate with local entities and the TCEQ.

- Identify the water body and select sites.

- Conduct the UAA during a normal dry/warm season (March-October) when water body recreation is most likely to occur.

- Summarize the following information in accordance with the TCEQ's *Recreational Use Attainability Analysis Procedures*:

201

- ◦ water body and flow characteristics
- ◦ watershed characteristics
- ◦ stream channel and substantial pool measurements
- ◦ weather conditions
- ◦ historical information
- ◦ observed uses
- ◦ indications of human use
- ◦ water quality data (air and water temperature)

Persons performing a recreational UAA are to complete the associated contact information form, field data sheets, Comprehensive Recreational UAA interview form, and Recreational UAA summary sheet included in the procedures.

- • Submit Basic Recreational UAA Surveys or Comprehensive Recreational UAA reports as described in the recreational UAA procedures to the TCEQ for review.

### Wildlife Sources of Bacteria

In situations where the weight of evidence obtained from sanitary surveys, bacteria source tracking, UAAs, or similar studies demonstrate that sources of bacteria are unavoidably high (e.g. in wildlife preserves with very large waterfowl populations and limited aquatic recreational potential), site-specific uses, such as secondary contact recreation, may be designated for individual water bodies in the Standards.

## Site-Specific Numerical Standards for Aquatic Life

A permittee may pursue a standards modification where local site-specific factors suggest that the numerical criteria are inappropriate for a particular water body. These factors are defined in § 307.6(c)(10) of the Standards.

The following paragraphs discuss these factors in more detail. Information that may establish the presence of these factors should be submitted as part of a permit application. Based on the existence of these factors, a permittee may seek a permit amendment to modify final effluent limits. An application to amend a permit does not delay the effective date of final effluent limits as established in an existing permit; therefore, an amendment application should be submitted well in advance of the effective date of the final effluent limits to allow full TCEQ consideration and final decision. The remainder of this section discusses each factor and how TCEQ staff evaluates information submitted by a permit applicant.

Where an applicant believes that a metal standard is inappropriate, the applicant should carefully evaluate recent effluent analytical data to ensure that effluent metals concentrations do in fact exceed levels necessary to comply with existing standards. The applicant should employ clean techniques for all sample-handling and analytical procedures to avoid sample contamination.

## *Background Concentrations of Specific Toxics*

Through sampling of the receiving water in an area unimpacted by dischargers, the applicant should demonstrate that toxic pollutants exist naturally at concentrations higher than the instream criteria. *See* § 307.6(c)(10)(A) of the Standards. Where the background concentration is greater than the instream criteria, the TCEQ establishes effluent limits that will preclude further increase in the background concentration.

## *Persistence and Degradation Rate of Specific Toxics*

The applicant may demonstrate that a specific toxic pollutant in the effluent has a short half-life within the defined mixing zone of the receiving water due to chemical reactions with naturally occurring compounds, degradation in ultraviolet light, and so forth. *See* § 307.6(c)(10)(B) of the Standards. This demonstration should be made using receiving water while simulating natural conditions as much as possible. The applicant may also use instream studies of existing discharges.

The applicant should provide proof of degradation and determine that receiving water concentrations of the toxic pollutants of concern do not exceed appropriate criteria. In addition, the applicant should determine the worst-case scenario or demonstrate that the degradation rate is independent of seasonal fluctuations in water chemistry (for example, temperature, pH, dissolved oxygen, and hardness).

## *Interactions of Toxic Substances with Other Toxic or Nontoxic Materials*

A synergistic interaction is a situation in which the combined effect of two or more chemicals is greater than the sum of the effect of each substance alone. *See* § 307.6(c)(10)(C) of the Standards. An additive interaction is a situation in which the toxicity of a mixture of chemicals is approximately the same as that expected from a simple summation of the known toxicity of each of the individual chemicals in the mixture. An antagonistic interaction is a situation in which a mixture of toxicants exhibits a less-than-additive toxic effect.

The applicant may demonstrate that toxicity in an effluent is caused by a synergistic, antagonistic, or related interaction. By modifying the concentration of a certain chemical in the effluent, the applicant may be able to show that a reduction of effluent toxicity will result without the removal of other suspected toxicants. This demonstration should be made by performing whole effluent toxicity (WET) tests on effluent or in-situ, either from a working wastewater treatment system or a pilot project, using receiving waters. However, a synergistic interaction may necessitate stricter permit limits to protect the receiving waters.

## *Measurements of Total Effluent Toxicity*

To demonstrate that a site-specific standard may be appropriate, an applicant may perform WET tests using indigenous receiving water species. *See* § 307.6(c)(10)(D) of the Standards. The WET tests should be conducted before submitting the permit application. The applicant should conduct an assessment of the receiving water to determine the species present. A diverse, representative, and sensitive group of species should be tested for short- and long-term impacts. The permittee should also demonstrate that sensitive, indigenous species will not be adversely affected, and aquatic life and other uses will not be impaired.

Effluent limits based on specific numerical criteria may not be raised if bioaccumulation or persistence in the food chain or the environment may produce long-term impacts that cannot be measured by WET tests. All alternate site-specific conditions related to chronic or 48-hour acute WET testing are subject to EPA review and approval.

## *Indigenous Aquatic Organisms*

An applicant may demonstrate that indigenous aquatic organisms are not affected by the effluent at the same concentration as species used to develop the criteria in the standards. *See* § 307.6(c)(10)(E) of the Standards. This demonstration may be accomplished by performing a detailed survey of aquatic organisms in the water body in areas in and out of the effluent plume. The applicant should also prepare a statistical analysis of the impacts to the receiving water. In addition, the applicant should evaluate the relative sensitivities of indigenous organisms to particular toxicants of concern.

The permittee may calculate a site-specific criterion if the assemblage of indigenous aquatic organisms satisfies the minimum family and genus totals defined in *Guidelines for Deriving Numerical National Water Quality Criteria for the Protection of Aquatic Organisms and Their Uses* by the U.S. Environmental Protection Agency, Office of Research and Development, NTIS Accession Number PB85-227049, (Stephan et al.), 1985.

## Technological or Economic Limits of Treatability for Specific Toxic Materials

If the permittee cannot achieve the required effluent limits (normally no lower than the MAL) by best available technology (BAT), then the permittee may apply for a modification of the effluent limit. *See* § 307.6(c)(10)(F) of the Standards. An applicant seeking an effluent limit modification due to treatment technology limitations should demonstrate, through the use of pilot tests, the level to which the specific toxic pollutant of concern can be treated using state-of-the-art treatment.

The permittee should submit an evaluation of the costs of treatment required to meet the water-quality based effluent limit and include a comparison of BAT or existing costs with estimated costs of state-of-the-art treatment. In this evaluation, the applicant should outline the incremental changes to the existing wastewater treatment facility to achieve state-of-the-art treatment. These changes might include alterations in raw materials, manufacturing processes, products produced, and energy requirements. Also, the applicant should demonstrate that improvements in best management practices or a simple raw material substitution would not achieve the treatment level required to meet effluent limits based on water quality criteria.

The applicant should show that existing or designated receiving water quality uses are not impaired due to the modified permit limits.

## Bioavailability of Specific Toxic Substances

The applicant may demonstrate that the chemical species of a particular substance in the effluent does not induce toxic effects or has a much less toxic effect than another species of that substance. *See* § 307.6(c)(10)(G) of the Standards. The applicant should prove that the species present in the effluent does not convert chemically or biologically to a more toxic form upon entering and mixing with receiving waters. If the demonstration does not induce toxic effects, the permit limit may be established based on the combined toxicity of the chemical species in the effluent.

If, however, a toxic substance in an effluent converts chemically or biologically to a more toxic species upon entering or mixing with receiving waters, then the permit limit may be established based upon the toxicity of the more toxic chemical species.

When a permit limit based on an aquatic life criterion is proposed, the applicant may wish to develop a water-effect ratio (WER) to adjust the criterion. A WER accounts for the difference in the toxicity of a metal in laboratory water from the toxicity of metals in the permittee's receiving water. Permittees should follow the EPA's guidance document, *Interim Guidance on Determination and Use of Water-Effect Ratios for Metals*,

EPA-823-B-94-001, 1994 (or most recent revision), when conducting these studies.

WERs obtained using the methods described in this EPA guidance document cannot be used to adjust aquatic life criteria that were derived for metals in other ways. Therefore, WERs using these methods cannot be used to adjust the residue-based chronic criterion for mercury, or the field-based selenium freshwater criteria.

Permit applicants may also develop WERs using the EPA's *Streamlined Water-Effect Ratio Procedure for Discharges of Copper*, EPA-822-R-01-005, March 2001. The streamlined procedure does not supersede the 1994 interim guidance; rather it provides an alternative approach for discharges of copper into a freshwater environment. Permittees in this situation may choose between using the 1994 interim guidance or the streamlined procedure. Some of the features of the streamlined procedure are as follows:

- The procedure applies to continuous discharges of copper into freshwater.

- A minimum of two sampling events should be performed at least one month apart.

- The site water should be prepared by mixing effluent and upstream receiving water to achieve the critical dilution.

- The WER for a single sampling event is calculated by dividing the site water LC50 by the greater of

  ◦ the lab water LC50; or

  ◦ the species mean acute value. The SMAV, which is usually found in EPA criteria documents, is the mean LC50 or EC50 from a group of published toxicity tests with laboratory water.

- A minimum of two WERs should be used to calculate the final WER.

- The final WER is the geometric mean of the two (or more) sampling event WERs.


## New Information Concerning the Toxicity of a Substance

An applicant or other interested party may provide new or updated information that indicates that the toxicity of a substance is significantly different from the numerical criteria in the Standards. *See* § 307.6(c)(10)(H) of the Standards. This information will typically consist of additional or revised toxicity exposure testing. This testing should be

conducted in accordance with *Guidelines for Deriving Numerical National Water Quality Criteria for the Protection of Aquatic Organisms and Their Uses* by the U.S. Environmental Protection Agency, Office of Research and Development (Stephan, et al.), 1985.

# Site-Specific Standards for Total Toxicity

Additional chemical-specific or whole effluent toxicity limits may be established in a permit as a result of confirming whole effluent toxicity at the critical dilution. These chemical-specific or whole effluent toxicity limits may be adjusted based on site-specific factors discussed in the following paragraphs. However, any discharge limit that fails to prevent significant toxicity to a test species at the designated critical dilution requires a demonstration that instream uses will not be impaired. *See* § 307.6(e)(2)(F) of the Standards. An effluent limit that could exceed the total toxicity requirements of the Standards requires a site-specific amendment to the rule.

The remainder of this section discusses each factor to be considered in establishing permit limits and how TCEQ staff evaluates information submitted by an applicant. All alternate site-specific conditions related to chronic or 48-hour acute WET testing are subject to EPA review and approval.

## *Background Toxicity of Unimpacted Receiving Waters*

Where background instream toxicity exists, the TCEQ may establish whole effluent or chemical-specific limits that preclude further increase in the background receiving water toxicity. *See* § 307.6(e)(2)(F)(i) of the Standards. The applicant should demonstrate background toxicity by assessing toxicity in an area unimpacted by the discharge.

## *Persistence and Degradation Rate of Principal Toxic Materials*

The applicant may demonstrate that chemicals responsible for toxicity in the effluent have a short half-life within the defined mixing zone of the receiving water due to chemical reactions with naturally occurring compounds, degradation in ultraviolet light, and so forth. *See* § 307.6(e)(2)(F)(ii) of the Standards. This demonstration should be made using receiving water while simulating natural conditions as much as possible. The applicant may also use instream studies of existing discharges. The applicant should provide proof of chemical degradation and determine that the receiving water's total toxicity measurements do not violate appropriate criteria.

### Site-Specific Variables that may Alter the Impact of Toxicity

An applicant may demonstrate that existing receiving-water-specific variables alter the toxic impacts of an effluent. *See* § 307.6(e)(2)(F)(iii) of the Standards. The applicant should use receiving water biological studies or should perform whole effluent toxicity tests at critical conditions on receiving water samples collected immediately within the discharge plume to the end of the mixing zone.

### Indigenous Aquatic Organisms

An applicant may demonstrate that indigenous aquatic organisms are not affected by the effluent at the same exposure concentration as the standard WET test species defined in the permit. *See* § 307.6(e)(2)(F)(iv) of the Standards. This may be accomplished by performing a detailed survey of aquatic organisms in the water body in areas in and out of the effluent plume coupled with a statistical analysis of the data. In addition, the applicant should evaluate the relative sensitivities of indigenous organisms to particular toxicants of concern using literature information or WET tests.

### Technological, Economic, or Legal Limits of Treatability or Control for Specific Toxic Materials

If the permittee cannot achieve the required total toxicity or chemical-specific permit limits with best available technology, then the permittee may apply for a modification of the effluent limit. *See* § 307.6(e)(2)(F)(v) of the Standards. An applicant seeking an effluent limit modification because of the limitations of treatment technology should demonstrate, through the use of pilot tests, the level to which the specific toxic pollutant of concern can be treated using state-of-the-art treatment.

The permittee should submit an evaluation of the costs of treatment required to meet the effluent limit and include a comparison of BAT or existing costs with estimated costs of state-of-the-art treatment. In this evaluation, the applicant should outline the incremental changes to the existing wastewater treatment facility to achieve state-of-the-art treatment. These changes might include alterations in raw materials, manufacturing processes, products produced, and energy requirements.

Also, the applicant should demonstrate that improvements in best management practices, such as source control, public education, housekeeping, a simple raw material substitution, or a water treatment chemical substitution, would not achieve the treatment level required to meet effluent limits based on water quality criteria. The applicant should show that existing or designated receiving water quality uses are not impaired due to the modified permit limits.

# Appendix A. Playa Lake Policy Statement

# Playa Lake Policy Statement

Except as otherwise provided in this policy, a permit or order of the Commission, the discharge from any existing industrial or domestic wastewater treatment facility that is authorized to use and has used a playa lake, which does not feed into any surface water of the state, as a wastewater retention facility before July 10, 1991, the effective date of TNRCC adoption of related revisions to the Texas Surface Water Quality Standards, 30 TAC Chapter 307, shall not be subject to meeting such standards or other requirements for discharges to waters in the state. However, additional requirements may be imposed in existing permits so that such discharges shall not create a nuisance or otherwise impair public health, nor cause contamination of groundwater. Such requirements include, but are not limited to, the prohibition of the discharge of raw, untreated wastewater into a playa.

Accordingly, public access to the playa lake shall be limited (e.g., by fencing and/or "no trespassing" signs) and applicable buffer zones shall be required. Additionally, because of the uncertainty of the impermeability and durability of the natural clay liner found on the bottom of a playa lake, as well as the exact location and depth of the underlying water table, groundwater quality monitoring and reporting shall be a condition of the permit or permit renewal. If groundwater contamination from the discharge is detected, a corrective action plan shall be developed and remediation measures shall be required.

If the wastewater is used for irrigation, the discharge must also meet applicable treatment levels and application rates based upon soil depth and characteristics, topography, whether the land has been plowed, crop uptake rates, and other relevant factors.

New discharges to playa lakes not previously authorized to be used as wastewater treatment or retention facilities before July 10, 1991, shall meet applicable surface water quality standards in addition to the groundwater protection requirements above. Additionally, if a finding is made that a waste discharge into a playa of industrial or municipal waste (authorized before July 10, 1991) is subject to the TPDES program, any existing permit will be amended to include a reasonable compliance period, consistent with other agency rules. Such discharges are subject to the TPDES program if the playa is considered as waters of the United States. Unclassified playa shall be presumed to have the same standards as that for an unclassified intermittent water body until more specific standards are established for this water in the state.

Dan Pearson, Executive Director
TNRCC

10/20/97
Date

210

# Appendix B. Locations of Federally Endangered and Threatened Aquatic and Aquatic-Dependent Species in Texas

**Table B. Locations of Federally Endangered and Threatened Aquatic and Aquatic-Dependent Species in Texas**

| Segment No. | Common Name | County | Water Body |
|---|---|---|---|
| 0101 | Arkansas River shiner | Hemphill Hutchinson Roberts | Canadian River Below Lake Meredith |
| 0103 | Arkansas River shiner | Oldham Potter | Canadian River Above Lake Meredith |
| 1202 | Houston toad | Austin | Deep Creek |
| 1209 | Houston toad | Leon | Running Creek |
| 1211 | Houston toad | Burleson | Second Davidson Creek |
| 1212 | Houston toad | Bastrop | Marshy Branch |
| | | Lee | Blue Branch |
| | | Milam | Hills Branch |
| 1242 | Houston toad | Burleson | Sweet Gum Branch |
| 1302 | Houston toad | Colorado | Hayes Creek |
| 1402 | Houston toad | Colorado | Redgate Creek |
| 1409 | Concho water snake | Lampasas San Saba | Colorado River Above Lake Buchanan |
| 1410 | Concho water snake | Brown Coleman McCulloch Mills San Saba | Colorado River Below O. H. Ivie Reservoir |
| 1411 | Concho water snake | Coke | E. V. Spence Reservoir |
| 1412 | Concho water snake | Coke Mitchell | Colorado River Below Lake J. B. Thomas |
| 1416 | Clear Creek gambusia | Menard | Clear Creek Wilkinson Spring (headspring of Clear Creek) |
| 1421 | Concho water snake | Concho | Concho River Dry Hollow Kickapoo Creek |
| | | Tom Green | Concho River |
| 1426 | Concho water snake | Coke | Colorado River Below E. V. Spence Reservoir |
| | | Runnels | Colorado River Below E. V. Spence Reservoir Ballinger Municipal Lake Bluff Creek Coyote Creek Elm Creek |
| 1427 | Barton Springs salamander [1] | Blanco | Onion Creek |
| | | Hays | Bear Creek Little Bear Creek Onion Creek |

| Segment No. | Common Name | County | Water Body |
|---|---|---|---|
| | | Travis | Bear Creek<br>Onion Creek<br>Slaughter Creek<br>Williamson Creek |
| 1430 | Barton Springs salamander [1] | Hays | Barton Creek |
| | | Travis | Barton Creek<br>Upper Barton Spring above Barton Springs Municipal Pool<br>Barton Springs outflows in Travis County<br>Eliza Springs<br>Parthenia (= Main) Springs<br>Sunken Garden Springs |
| 1433 | Concho water snake | Coleman<br>Concho<br>Runnels | O. H. Ivie Reservoir |
| 1434 | Houston Toad | Bastrop | Alum Creek<br>Copperas Creek<br>Gills Branch<br>Piney Creek<br>Price Creek<br>Puss Hollow |
| 1605 | Houston toad | Lavaca | Laughlins Sandy Creek |
| 1809 | Comal Springs dryopid beetle[1] | Hays | Fern Bank Springs |
| 1811 | Peck's Cave amphipod [1] | Comal | Comal Springs |
| 1811 | Comal Springs dryopid beetle [1] | Comal | Comal Springs |
| 1811 | Comal Springs riffle beetle [1] | Comal | Comal Springs |
| 1811 | Fountain darter [1] | Comal | Comal River<br>Landa Lake |
| 1812 | Peck's Cave amphipod [1] | Comal | Hueco Springs |
| 1814 | Comal Springs riffle beetle [1] | Hays | San Marcos Springs<br>Spring Lake |
| 1814 | Fountain darter [1] | Hays | Upper San Marcos River<br>Purgatory Creek<br>San Marcos National Fish Hatchery refugium<br>Sessom Creek<br>Spring Lake<br>Willow Spring Creek |
| 1814 | San Marcos gambusia [1] | Hays | Upper San Marcos River<br>Spring Lake |
| 1814 | San Marcos salamander [1] | Hays | Upper San Marcos River<br>San Marcos National Fish Hatchery refugium<br>San Marcos Springs outflows<br>San Marcos Springs<br>Spring Lake |

| Segment No. | Common Name | County | Water Body |
|---|---|---|---|
| 1814 | Texas blind salamander [1] | Hays | Upper San Marcos River<br>Ezell's Cave pool<br>F. Johnson's fissure pool<br>Primer's fissure pool<br>Rattlesnake Cave pool<br>San Marcos National Fish Hatchery refugium<br>San Marcos Springs<br>San Marcos Springs outflows<br>SWTSU artesian well outlet |
| 1814 | Texas wild-rice [1] | Hays | Upper San Marcos River<br>San Marcos National Fish Hatchery refugium<br>Spring Lake |
| 2109 | Fountain darter [1] | Uvalde | Uvalde National Fish Hatchery refugium |
| 2109 | Comanche Springs pupfish | Uvalde | Uvalde National Fish Hatchery refugium |
| 2109 | Texas wild-rice [1] | Uvalde | Uvalde National Fish Hatchery refugium |
| 2304 | Devil's River minnow | Kinney | Las Moras Creek<br>Las Moras Spring<br>Pinto Creek<br>Pinto Spring<br>Sycamore Creek |
|  |  | Val Verde | Sycamore Creek |
| 2306 | Big Bend gambusia | Brewster | Spring 1 (Rio Grande Village, Big Bend NP)<br>Big Bend National Park refugium |
| 2309 | Devil's River minnow | Val Verde | Devils River<br>Dolan Creek<br>Finegan Spring<br>Pecan Springs<br>Phillips Creek |
| 2311 | Pecos gambusia | Jeff Davis | Phantom Lake Spring and canal system |
|  |  | Pecos | Diamond Y Draw<br>Diamond Y Spring<br>Leon Creek |
|  |  | Reeves | Balmorhea irrigation canals<br>East Sandia Spring<br>Giffin Spring and canal system<br>San Solomon Spring (Balmorhea State Park)<br>Toyah Creek |
| 2311 | Little Aguja pondweed | Jeff Davis | Little Aguja Creek |
| 2311 | Comanche Springs pupfish | Jeff Davis | Phantom Lake Spring and canal system |
|  |  | Reeves | Balmorhea irrigation canals<br>Giffin Spring and canal system<br>San Solomon Spring (Balmorhea State Park)Toyah Creek |
| 2311 | Leon Springs pupfish | Pecos | Diamond Y Draw<br>Diamond Y Spring<br>Leon Creek |

| Segment No. | Common Name | County | Water Body |
|---|---|---|---|
| 2311 | Pecos assiminea snail | Pecos | Upper Pecos River<br>Diamond Y Draw<br>East Sandia Spring |
| 2311 | Puzzle sunflower | Pecos | Diamond Y Spring |
| 2313 | Devil's River minnow | Val Verde | San Felipe Creek |
| 2411 | Piping plover [2] | Jefferson | Sabine Pass |
| 2421 | Piping plover [2] | Chambers<br>Galveston | Upper Galveston Bay |
| 2422 | Piping plover [2] | Chambers<br>Galveston | Trinity Bay |
| 2423 | Piping plover [2] | Galveston | East Bay |
| 2424 | Piping plover [2] | Brazoria<br>Galveston | West Bay |
| 2432 | Piping plover [2] | Brazoria | Chocolate Bay |
| 2433 | Piping plover [2] | Brazoria | Bastrop Bay/Oyster Lake |
| 2434 | Piping plover [2] | Brazoria | Christmas Bay |
| 2435 | Piping plover [2] | Brazoria | Drum Bay |
| 2439 | Piping plover [2] | Galveston | Lower Galveston Bay |
| 2441 | Piping plover [2] | Matagorda | East Matagorda Bay |
| 2442 | Piping plover [2] | Brazoria<br>Matagorda | Cedar Lakes |
| 2451 | Piping plover [2] | Calhoun<br>Matagorda | Matagorda Bay/Powderhorn Lakes |
| 2452 | Piping plover [2] | Matagorda | Tres Palacios Bay/Turtle Bay |
| 2461 | Piping plover [2] | Calhoun | Espiritu Santo Bay |
| 2461 | Whooping crane | Calhoun | Espiritu Santo Bay |
| 2462 | Piping plover [2] | Calhoun | San Antonio Bay/Hynes Bay/Guadalupe Bay |
| 2462 | Whooping crane | Calhoun | San Antonio Bay/Hynes Bay/Guadalupe Bay |
| 2463 | Piping plover [2] | Aransas | Mesquite Bay/Carlos Bay/Ayres Bay |
| 2463 | Whooping crane | Aransas | Mesquite Bay/Carlos Bay/Ayres Bay |
| 2471 | Piping plover [2] | Aransas | Aransas Bay |
| 2471 | Whooping crane | Aransas | Aransas Bay |
| 2472 | Piping plover [2] | Aransas<br>Refugio | Copano Bay/Port Bay/Mission Bay |
| 2472 | Whooping crane | Aransas<br>Refugio | Copano Bay/Port Bay/Mission Bay |
| 2473 | Whooping crane | Aransas | St. Charles Bay |
| 2481 | Piping plover [2] | Nueces | Corpus Christi Bay |

| Segment No. | Common Name | County | Water Body |
|---|---|---|---|
| 2483 | Piping plover [2] | Nueces | Redfish Bay |
| 2485 | Piping plover [2] | Nueces | Oso Bay |
| 2491 | Piping plover [2] | Cameron Kenedy Kleberg Nueces Willacy | Laguna Madre |
| 2492 | Piping plover [2] | Kenedy Kleberg | Baffin Bay/Alazan Bay/Cayo del Grullo/Laguna Salada |
| 2493 | Piping plover [2] | Cameron | South Bay |
| 2494 | Piping plover [2] | Cameron | Brownsville Ship Channel |
| 2501 | Piping plover [2] | Cameron | Gulf of Mexico |

[1]   Includes segments that cross the contributing and recharge zones of the southern section of the Edwards Aquifer (see Table 3 on page 23) as well as the Comal River (Segment 1811) and Lower San Marcos River (Segment 1808).

[2]   Discharges from petroleum facilities are evaluated to determine if there is an affect on Piping Plovers. No other types of facilities are reviewed for potential affects to Piping Plovers.

# Appendix C. Critical Low-Flows and Harmonic Mean Flows for Classified Segments

**Table C. Critical Low-Flows and Harmonic Mean Flows for Classified Segments**

**Notes on table:**
1) This table contains seven-day, two-year low-flow (7Q2) values, alternative critical low-flow values for streams/rivers that are dominated by springflow (footnoted in the crit. low-flow column), and harmonic mean flow values for USGS and IBWC gages.

2) Flows are listed in TCEQ stream segment order. If there is more than one gage within a stream segment, the flows are listed from downstream to upstream order. The listed county names provide the general location of the gaging stations. Specific gage locations can be found in USGS publications.

3) If there is a gap in the data record, multiple periods of record are indicated.

4) The flow values presented here are intended as guidelines and may be recalculated as additional data become available. Critical low-flows and harmonic mean flows used in conjunction with TCEQ regulatory actions (such as discharge permits) may be adjusted based on the relative location of a discharge to a gage. Flows may also be derived from data obtained at other USGS or IBWC gaging stations not presented in the table, TCEQ monitoring stations, drainage basin comparisons, interpolations, or best available information.

| Seg-ment | Stream/River | Gage | County | Period of Record Starts | Ends | Crit. Low-Flow ($ft^3$/s) | Harmonic Mean Flow ($ft^3$/s) |
|---|---|---|---|---|---|---|---|
| 0101 | Canadian River | 07228000 | Hemphill | 1980 | 2007 | 5.8 | 2.0 |
| 0103 | Canadian River | 07227500 | Potter | 1978 | 2007 | 0.23 | 1.3 |
| 0104 | Wolf Creek | 07235000 | Lipscomb | 1979 | 2007 | 0.38 | 1.1 |
| 0201 | Red River | 07337000 | Bowie | 1979 | 2007 | 1714 | 5017 |
| 0202 | Red River | 07336820 | Bowie | 1974 2005 | 1998 2008 | 1108 | 4431 |
| | | 07335500 | Lamar | 1980 | 2008 | 817 | 2895 |
| | | 07331600 | Grayson | 1973 1997 | 1989 2008 | 143 | 479 |
| 0204 | Red River | 07316000 | Cooke | 1980 | 2008 | 268 | 672 |
| | | 07315500 | Montague | 1979 | 2007 | 160 | 497 |
| 0205 | Red River | 07308500 | Wichita | 1979 | 2007 | 61 | 46 |
| 0206 | Red River | 07299570 | Hardeman | 1960 | 1982 | 0.11 | 0.57 |
| 0207 | Prairie Dog Town Fork Red River | 07299540 | Childress | 1979 | 2007 | 0.75 | 2.2 |
| | | 07298500 | Hall | 2003 | 2007 | 0.10[*] | 0.21 |
| 0211 | Little Wichita River | 07314900 | Clay | 1979 | 2007 | 0.10[*] | 0.19 |
| 0214 | Wichita River | 07312700 | Clay | 1979 | 2007 | 43 | 110 |
| | | 07312500 | Wichita | 1979 | 2007 | 18 | 53 |
| | | 07312130 | Wichita | 1996 | 2002 | 2.4 | 5.1 |
| 0216 | Wichita River | 07312100 | Baylor | 1979 | 2007 | 0.44 | 1.4 |
| 0218 | Wichita River | 07311900 | Baylor | 1962 1997 | 1979 2007 | 1.6 | 6.2 |
| 0218 | North Fork Wichita River | 07311700 | Knox | 1979 | 2007 | 6.4 | 14 |
| | | 07311600 | Cottle | 1961 1995 | 1982 2007 | 4.3[***] | 8.8 |
| 0220 | Pease River | 07307800 | Cottle | 1979 | 2007 | 1.0 | 3.3 |

218

| Seg-ment | Stream/River | Gage | County | Period of Record Starts | Ends | Crit. Low-Flow (ft³/s) | Harmonic Mean Flow (ft³/s) |
|---|---|---|---|---|---|---|---|
| 0222 | Salt Fork Red River | 07300000 | Collingsworth | 1979 | 2007 | 2.3 | 9.6 |
| 0224 | North Fork Red River | 07301300 | Wheeler | 1970 2001 | 1991 2007 | 0.10* | 0.17 |
| 0226 | South Fork Wichita River | 07311800 | Knox | 1979 | 2007 | 0.10* | 0.86 |
| | | 07311783 | King | 1986 | 2005 | 0.10* | 0.10* |
| | | 07311782 | King | 1985 1987 | 1986 2005 | 0.10* | 2.5 |
| 0229 | Prairie Dog Town Fork Red River | 07297910 | Armstrong | 1979 | 2007 | 0.10* | 0.61 |
| 0230 | Pease River | 07308200 | Wilbarger | 1970 1992 | 1982 2007 | 0.10* | 0.67 |
| 0301 | Sulphur River | 07344200[a] | Bowie | 1980 1982 | 1980 2008 | 57 | 82 |
| 0303 | Sulphur River | 07343200 | Franklin | 1993 | 2007 | 7.3 | 1.8 |
| | South Sulphur River | 07342500 | Delta | 1993 | 2007 | 1.8 | 2.6 |
| 0305 | North Sulphur River | 07343000 | Delta | 1979 | 2007 | 0.00 | 0.45 |
| 0306 | South Sulphur River | 07342465 | Hunt | 1992 | 2007 | 0.10* | 0.17 |
| 0402 | Big Cypress Creek | 07346000 | Marion | 1980 | 2007 | 18 | 23 |
| 0404 | Big Cypress Creek | 07344493[b] | Camp | 1968 2005 | 1989 2007 | 3.7 | 12 |
| 0409 | Little Cypress Bayou (Creek) | 07346070 | Marion | 1979 | 2007 | 0.53 | 0.95 |
| | | 07346050 | Upshur | 1971 | 1999 | 0.10* | 1.1 |
| 0410 | Black Cypress Bayou (Creek) | 07346045 | Marion | 1979 | 2007 | 0.10* | 0.57 |
| 0502 | Sabine River | 08030500 | Newton | 1980 | 2008 | 1138 | 3298 |
| 0503 | Sabine River | 08028500 | Newton | 1980 | 2008 | 788 | 2323 |
| | | 08026000 | Newton | 1980 | 2008 | 352 | 1226 |
| | | 08025360 | Newton | 1980 | 2008 | 181 | 537 |
| 0505 | Sabine River | 08022040 | Panola | 1979 | 2007 | 79 | 262 |
| | | 08020900 | Gregg | 1996 | 2007 | 89 | 207 |
| 0506 | Sabine River | 08020000 | Gregg | 1979 | 2007 | 59 | 190 |
| | | 08019200 | Wood | 1998 | 2007 | 55 | 128 |
| | | 08018500 | Wood | 1979 | 2007 | 6.2 | 8.3 |
| | | 08017410 | Van Zandt | 1979 | 2007 | 0.30 | 0.89 |
| 0513 | Big Cow Creek | 08029500 | Newton | 1980 | 2008 | 34 | 65 |
| 0514 | Big Sandy Creek | 08019500 | Upshur | 1979 | 2007 | 12 | 31 |
| 0515 | Lake Fork Creek | 08019000 | Wood | 1986 | 2007 | 11 | 32 |
| 0602 | Neches River | 08041000 | Jasper | 1979 | 2007 | 2084 | 3387 |
| | | 08040600[c] | Jasper | 1979 | 2007 | 1854 | 2822 |
| 0604 | Neches River | 08033500 | Tyler | 1979 | 2007 | 123 | 415 |
| | | 08032000 | Anderson | 1979 | 2007 | 82 | 179 |
| 0607 | Pine Island Bayou | 08041700 | Hardin | 1979 | 2007 | 3.7 | 18 |
| 0608 | Village Creek | 08041500 | Hardin | 1979 | 2007 | 79 | 253 |

| Seg-ment | Stream/River | Gage | County | Period of Record Starts | Ends | Crit. Low-Flow ($ft^3/s$) | Harmonic Mean Flow ($ft^3/s$) |
|---|---|---|---|---|---|---|---|
| 0611 | Angelina River | 08036500 | Cherokee | 1979 | 2007 | 41 | 104 |
| 0612 | Attoyac Bayou | 08038000 | Nacogdoches | 1960 | 1985 | 26 | 67 |
| 0802 | Trinity River | 08066500 | Liberty | 1979 | 2007 | 775 | 2416 |
| | | 08066250 | Polk | 1979 | 2007 | 728 | 2133 |
| 0804 | Trinity River | 08065350 | Leon | 1981 | 2008 | 825 | 2152 |
| | | 08065000 | Anderson | 1982 | 2008 | 748 | 1812 |
| | | 08062700 | Henderson | 1982 | 2007 | 722 | 1554 |
| 0805 | Trinity River | 08062500 | Kaufman | 1982 | 2007 | 678 | 1440 |
| | | 08057410 | Dallas | 1975 2003 | 1998 2007 | 503 | 953 |
| | | 08057000 | Dallas | 1989 | 2007 | 396 | 768 |
| 0806 | West Fork Trinity River | 08048543 | Tarrant | 1979 | 2007 | 13 | 38 |
| | | 08048000 | Tarrant | 1979 | 2007 | 12 | 24 |
| 0810 | West Fork Trinity River | 08044500 | Wise | 1979 | 2007 | 7.0 | 3.9 |
| 0812 | West Fork Trinity River | 08042800 | Jack | 1979 | 2007 | 0.10* | 0.14 |
| 0814 | Chambers Creek | 08064100 | Navarro | 1984 | 2007 | 0.10* | 0.71 |
| 0819 | East Fork Trinity River | 08062000 | Kaufman | 1993 | 2007 | 64 | 138 |
| | | 08061750 | Kaufman | 2003 | 2007 | 25 | 55 |
| 0822 | Elm Fork Trinity River | 08055500 | Dallas | 1979 | 2007 | 15 | 15 |
| | | 08053000 | Denton | 1979 | 2007 | 61 | 98 |
| 0824 | Elm Fork Trinity River | 08050400 | Cooke | 1998 | 2007 | 0.10* | 0.23 |
| 0825 | Denton Creek | 08055000 | Denton | 1966 2004 | 1990 2007 | 11 | 21 |
| 0829 | Clear Fork Trinity River | 08047500 | Tarrant | 1979 | 2007 | 4.4 | 5.6 |
| | | 08047000 | Tarrant | 1979 | 2007 | 1.6 | 2.7 |
| 0831 | Clear Fork Trinity River | 08045850 | Parker | 1980 1991 1993 1998 2001 | 1985 1992 1996 1999 2005 | 0.20 | 0.90 |
| 0835 | Richland Creek | 08064550[d] | Freestone | 1994 | 2008 | 5.0 | 6.5 |
| 0837 | Richland Creek | 08063100 | Navarro | 1979 | 2007 | 0.10* | 0.25 |
| 0839 | Elm Fork Trinity River | 08051100[e] | Denton | 1988 | 2008 | 2.0 | 5.9 |
| 0841 | West Fork Trinity River | 08049500 | Dallas | 1979 | 2007 | 140 | 270 |
| 0902 | Cedar Bayou | 08067500 | Harris | 1972 2002 | 1991 2007 | 0.27 | 1.1 |
| 1003 | East Fork San Jacinto River | 08070200 | Montgomery | 1984 | 2007 | 23 | 57 |
| | | 08070000 | Liberty | 1979 | 2007 | 18 | 47 |
| 1004 | West Fork San Jacinto River | 08068090 | Montgomery | 1984 | 2007 | 26 | 77 |
| | | 08068000 | Montgomery | 1979 | 2007 | 21 | 58 |
| | | 08067650 | Montgomery | 1975 1998 | 1989 2000 | 0.10* | 1.5 |
| 1008 | Spring Creek | 08068500[f] | Montgomery | 1979 | 2007 | 18 | 48 |

220

| Seg-ment | Stream/River | Gage | County | Period of Record | | Crit. Low-Flow (ft³/s) | Harmonic Mean Flow (ft³/s) |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Starts | Ends | | |
| | | 08068275 | Montgomery | 2000 | 2007 | 1.1 | 0.93 |
| 1009 | Cypress Creek | 08069000 | Harris | 1996 | 2007 | 27 | 57 |
| | | 08068800 | Harris | 2002 | 2008 | 5.4 | 16 |
| | | 08068740 | Harris | 1979 | 2007 | 0.33 | 0.85 |
| | | 08068720 | Harris | 1979 1984 | 1983 2007 | 0.10* | 0.31 |
| 1010 | Caney Creek | 08070500 | Montgomery | 1979 | 2007 | 14 | 30 |
| 1011 | Peach Creek | 08071000 | Montgomery | 1960 1999 | 1977 2007 | 11 | 21 |
| 1014 | Buffalo Bayou | 08073700 | Harris | 1985 | 2007 | 51 | 124 |
| | | 08073600 | Harris | 1979 | 2007 | 44 | 106 |
| | | 08073500 | Harris | 1979 | 2007 | 23 | 66 |
| 1016 | Greens Bayou | 08076000 | Harris | 1979 | 2007 | 22 | 39 |
| | | 08075900 | Harris | 1984 2007 | 1992 2008 | 12 | 21 |
| 1017 | Whiteoak Bayou | 08074500 | Harris | 1980 | 2007 | 31 | 53 |
| | | 08074020 | Harris | 2002 | 2007 | 14 | 26 |
| 1102 | Clear Creek | 08076997[g] | Harris | 1965 2007 | 1992 2008 | 0.53 | 2.2 |
| 1108 | Chocolate Bayou | 08078000 | Brazoria | 1979 | 2007 | 1.7 | 5.7 |
| 1202 | Brazos River | 08116650 | Fort Bend | 1976 1984 | 1980 2007 | 689 | 1608 |
| | | 08114000 | Fort Bend | 1979 | 2007 | 753 | 2041 |
| | | 08111500 | Waller | 1979 | 2007 | 841 | 1863 |
| 1204 | Brazos River | 08091000 | Somervell | 1979 | 2007 | 16 | 50 |
| 1206 | Brazos River | 08090800 | Parker | 1979 | 2007 | 37 | 129 |
| | | 08089000 | Palo Pinto | 1979 | 2007 | 32 | 96 |
| | | 08088610[h] | Palo Pinto | 1979 | 2007 | 25 | 62 |
| 1208 | Brazos River | 08088000 | Young | 1979 | 2007 | 4.6 | 5.8 |
| | | 08082500 | Baylor | 1979 | 2007 | 0.16 | 2.0 |
| 1209 | Navasota River | 08110800 | Robertson | 1997 | 2007 | 12 | 47 |
| | | 08110500 | Leon | 1980 | 2007 | 7.6 | 12 |
| 1211 | Yegua Creek | 08110000 | Burleson | 1969 | 1991 | 0.10* | 0.33 |
| 1213 | Little River | 08106500 | Milam | 1979 | 2007 | 70 | 226 |
| | | 08104500 | Bell | 1979 | 2007 | 68 | 169 |
| 1214 | San Gabriel River | 08106310 | Milam | 1981 | 1992 | 4.7 | 13 |
| | | 08105700 | Williamson | 1981 | 2007 | 3.6 | 3.6 |
| 1215 | Lampasas River | 08104100 | Bell | 1970 1999 | 1989 2007 | 4.8 | 11 |
| 1217 | Lampasas River | 08103800 | Lampasas | 1979 | 2007 | 12 | 27 |
| 1219 | Leon River | 08102500 | Bell | 1980 | 2008 | 3.4 | 6.2 |
| 1221 | Leon River | 08100500 | Coryell | 1979 | 2007 | 4.7 | 3.2 |

| Seg-ment | Stream/River | Gage | County | Period of Record Starts | Ends | Crit. Low-Flow (ft³/s) | Harmonic Mean Flow (ft³/s) |
|---|---|---|---|---|---|---|---|
| | | 08100000 | Hamilton | 1973 | 2001 | 0.10* | 1.1 |
| 1223 | Leon River | 08099100 | Comanche | 1961 | 1986 | 0.10* | 0.28 |
| 1226 | North Bosque River | 08095200 | Bosque | 1977 | 2005 | 7.4 | 3.3 |
| | | 08095000 | Bosque | 1979 | 2007 | 2.6 | 1.9 |
| | | 08094800 | Hamilton | 1969 | 1999 | 0.45 | 1.5 |
| 1227 | Nolan River | 08092000 | Hill | 1963 1993 1998 | 1985 1996 1999 | 1.2 | 2.5 |
| 1229 | Paluxy River | 08091500 | Somervell | 1979 | 2007 | 1.6 | 1.3 |
| 1232 | Clear Fork Brazos River | 08085500 | Shackelford | 1993 | 2008 | 1.5 | 2.7 |
| | | 08084000 | Jones | 1994 | 2008 | 0.10* | 0.35 |
| | | 08083230 | Jones | 2002 | 2008 | 0.10* | 0.10* |
| | | 08083100 | Fisher | 1994 | 2008 | 0.10* | 0.10* |
| 1238 | Salt Fork Brazos River | 08082000 | Stonewall | 1980 | 2008 | 0.10* | 0.31 |
| 1241 | Double Mountain Fork Brazos River | 08080500 | Stonewall | 1980 | 2008 | 0.10* | 0.62 |
| 1242 | Brazos River | 08110200 | Washington | 1966 | 1983 | 526 | 1536 |
| | | 08108700[i] | Brazos | 1979 | 2007 | 489 | 1129 |
| | | 08098290 | Falls | 1979 | 2007 | 167 | 459 |
| | | 08096500 | McLennan | 1979 | 2007 | 52 | 128 |
| 1243 | Salado Creek | 08104310 | Bell | 1984 | 1996 | 16*** | 32 |
| | | 08104290 | Bell | 1984 | 1996 | 2.5† | 2.6 |
| 1244 | Brushy Creek | 08106300 | Milam | 1968 | 1980 | 3.4 | 6.2 |
| 1246 | Middle Bosque River | 08095300 | McLennan | 1960 | 1985 | 0.10* | 0.46 |
| 1248 | San Gabriel River | 08104700, 08104900[j] | Williamson | 1981 | 2007 | 3.5 | 7.6 |
| | North Fork San Gabriel River | 08104700 | Williamson | 1981 | 2007 | 1.1 | 1.9 |
| 1250 | South Fork San Gabriel River | 08104900 | Williamson | 1979 | 2007 | 0.25 | 0.67 |
| 1253 | Navasota River | 08110325 | Limestone | 1979 | 2007 | 0.10* | 0.23 |
| 1255 | North Bosque River | 08093700 | Erath | 1960 | 1979 | 0.10* | 0.10* |
| 1257 | Brazos River | 08093100 | Hill | 1979 | 2007 | 26 | 84 |
| 1302 | San Bernard River | 08117500 | Fort Bend | 1979 | 2007 | 14 | 59 |
| 1402 | Colorado River | 08162500 | Matagorda | 1980 | 2008 | 206 | 471 |
| | | 08162000 | Wharton | 1980 | 2008 | 419 | 950 |
| | | 08161000 | Colorado | 1980 | 2008 | 378 | 1005 |
| | | 08160400 | Fayette | 1988 | 2008 | 341 | 919 |
| 1409 | Colorado River | 08147000 | San Saba | 1980 | 2008 | 34 | 27 |
| 1410 | Colorado River | 08138000 | Brown | 1998 | 2007 | 0.10* | 1.5 |
| | | 08136700 | Coleman | 1990 | 2008 | 3.9 | 7.7 |
| 1412 | Colorado River | 08123850 | Coke | 1993 | 2008 | 0.10* | 0.38 |

| Seg-ment | Stream/River | Gage | County | Period of Record Starts | Ends | Crit. Low-Flow (ft³/s) | Harmonic Mean Flow (ft³/s) |
|---|---|---|---|---|---|---|---|
| | | 08121000 | Mitchell | 1980 | 2008 | 0.10[*] | 0.14 |
| | | 08119500 | Scurry | 1960 | 1989 | 0.10[*] | 0.13 |
| 1414 | Pedernales River | 08153500 | Blanco | 1980 | 2008 | 4.2 | 6.6 |
| | | 08152900 | Gillespie | 1980 1998 | 1992 2008 | 2.9 | 5.3 |
| 1415 | Llano River | 08151500 | Llano | 1980 | 2008 | 55 | 85 |
| | | 08150700 | Mason | 1974 1998 | 1992 2007 | 82 | 149 |
| | | 08150000 | Kimble | 1974 1998 | 1992 2007 | 80 | 124 |
| | South Llano River | 08149400 | Edwards | 1959 | 2008 | 13[***] | 22 |
| | North Llano River | 08148500 | Kimble | 1960 2002 | 1977 2007 | 2.7 | 4.2 |
| 1416 | San Saba River | 08146000 | San Saba | 1975 1998 | 1993 2008 | 21 | 29 |
| | | 08144600 | McCulloch | 1980 1998 | 1993 2008 | 1.3 | 2.0 |
| | | 08144500 | Menard | 1975 1998 | 1993 2007 | 9.7 | 18 |
| 1417 | Pecan Bayou | 08143600 | Mills | 1979 | 2007 | 1.6 | 2.4 |
| 1420 | Pecan Bayou | 08140700 | Brown | 1968 | 1978 | 0.10[*] | 0.10[*] |
| 1421 | Concho River | 08136500 | Concho | 1980 | 2008 | 0.10[*] | 0.61 |
| | | 08136000 | Tom Green | 1980 | 2008 | 0.10 | 0.24 |
| | North Concho River | 08135000 | Tom Green | 1960 | 1990 | 0.12 | 0.32 |
| 1424 | Middle Concho River | 08128400 | Irion | 1975 2001 | 1995 2008 | 0.10[*] | 0.55 |
| | South Concho River | 08128000 | Tom Green | 1930 2001 | 1995 2008 | 2.4[***] | 6.9 |
| 1426 | Colorado River | 08126380 | Runnels | 1979 | 2007 | 0.89 | 1.8 |
| | | 08124000 | Coke | 1980 | 2008 | 0.41 | 0.26 |
| 1427 | Onion Creek | 08159000 | Travis | 1979 | 2007 | 0.10[*] | 0.79 |
| | | 08158827 | Travis | 2003 2005 | 2003 2008 | 0.10[*] | 0.24 |
| | | 08158800 | Hays | 1980 1992 | 1983 1995 | 0.10[*] | 0.10[*] |
| | | 08158700 | Hays | 1980 | 2008 | 0.19 | 0.61 |
| 1428 | Colorado River | 08158000 | Travis | 1980 | 2008 | 105 | 300 |
| 1430 | Barton Springs | 08155500 | Travis | 1978 | 2007 | 11[**] | 49 |
| | Barton Creek | 08155400 | Travis | 1999 | 2007 | 0.10[*] | 0.32 |
| | | 08155300 | Travis | 1979 | 2007 | 0.10[*] | 0.19 |
| | | 08155240 | Travis | 1989 | 2007 | 0.13 | 0.54 |
| | | 08155200 | Travis | 1978 1989 | 1982 2007 | 0.10[*] | 0.37 |
| 1432 | Pecan Bayou | 08143500 | Brown | 1960 | 1983 | 0.10[*] | 0.43 |
| 1434 | Colorado River | 08159500 | Bastrop | 1998 | 2008 | 355 | 969 |

223

| Seg-ment | Stream/River | Gage | County | Period of Record Starts | Ends | Crit. Low-Flow ($ft^3$/s) | Harmonic Mean Flow ($ft^3$/s) |
|---|---|---|---|---|---|---|---|
| | | 08159200 | Bastrop | 1980 | 2008 | 305 | 787 |
| 1502 | Tres Palacios River | 08162600 | Matagorda | 1979 | 2007 | 7.3 | 16 |
| 1602 | Lavaca River | 08164000 | Jackson | 1979 | 2007 | 16 | 1.4 |
| | | 08163500 | Lavaca | 1964 | 1992 | 0.74 | 1.6 |
| 1605 | Navidad River | 08164390 | Jackson | 1997 | 2007 | 4.3 | 1.2 |
| | | 08164300 | Lavaca | 1979 | 2007 | 1.5 | 1.6 |
| 1802 | Guadalupe River | 08188800 | Calhoun | 2001 | 2007 | 930 | 1690 |
| 1803 | Guadalupe River | 08176500 | Victoria | 1979 | 2007 | 525 | 850 |
| | | 08175800 | De Witt | 1979 | 2007 | 525 | 804 |
| | | 08173900 | Gonzales | 1997 | 2007 | 489 | 902 |
| 1806 | Guadalupe River | 08167500 | Comal | 1980 | 2008 | 74 | 115 |
| | | 08167000 | Kendall | 1980 | 2008 | 55 | 100 |
| | | 08166200 | Kerr | 1987 | 2007 | 47 | 84 |
| | | 08166140 | Kerr | 1978 1999 | 1985 2007 | 52 | 78 |
| | | 08165500 | Kerr | 1979 | 2007 | 30 | 47 |
| 1807 | Coleto Creek | 08177500 | Victoria | 1980 | 2007 | 2.2 | 2.2 |
| | | 08176900 | Victoria | 1980 | 2007 | 1.2 | 0.90 |
| 1808 | San Marcos River | 08172000 | Caldwell | 1939 | 2007 | 81[***] | 185 |
| 1809 | Blanco River | 08171300 | Hays | 1980 | 2008 | 6.0 | 3.6 |
| 1810 | Plum Creek | 08173000 | Caldwell | 1971 2002 | 1993 2007 | 2.3 | 7.2 |
| | | 08172400 | Caldwell | 1979 | 2007 | 0.10[*] | 0.23 |
| 1811 | Comal River | 08169000 | Comal | 1928 | 2008 | 64[**] | 226 |
| | | 08168710 | Comal | 1928 | 2008 | 13[**] | 241 |
| 1812 | Guadalupe River | 08168500 | Comal | 1980 | 2008 | 112 | 178 |
| | | 08167800 | Comal | 1980 | 2008 | 96 | 137 |
| 1813 | Blanco River | 08171000 | Hays | 1928 | 2008 | 9.4[***] | 31 |
| 1814 | San Marcos River | 08170000 | Hays | 1957 | 2008 | 55[**] | 155 |
| 1816 | Johnson Creek | 08166000 | Kerr | 1974 1999 | 1993 2007 | 11 | 20 |
| 1817 | North Fork Guadalupe River | 08165300 | Kerr | 1967 | 2007 | 13[***] | 24 |
| 1901 | San Antonio River | 08188500 | Goliad | 1979 | 2007 | 205 | 403 |
| 1902 | Cibolo Creek | 08186000 | Karnes | 1979 | 2007 | 15 | 28 |
| 1903 | Medina River | 08181500 | Bexar | 1979 | 2007 | 78 | 137 |
| | | 08180800 | Bexar | 1973 1998 | 1995 2003 | 42 | 78 |
| | | 08180700 | Bexar | 1981 1997 | 1995 2007 | 34 | 61 |
| | | 08180640 | Medina | 1987 | 2000 | 29 | 42 |
| | | 08180500 | Medina | 1960 2001 | 1973 2007 | 20 | 31 |

| Seg-ment | Stream/River | Gage | County | Period of Record Starts | Ends | Crit. Low-Flow (ft³/s) | Harmonic Mean Flow (ft³/s) |
|---|---|---|---|---|---|---|---|
| 1905 | Medina River | 08178880 | Bandera | 1983 | 2008 | 8.2*** | 12 |
| 1906 | Leon Creek | 08181480 | Bexar | 1985 | 2007 | 2.5 | 5.7 |
| 1908 | Cibolo Creek | 08183900 | Kendall | 1965 | 1995 | 1.1 | 1.8 |
| | | 08183850 | Kendall | 1997 | 2006 | 0.15 | 0.41 |
| 1910 | Salado Creek | 08178800 | Bexar | 1980 | 2008 | 3.9 | 5.4 |
| | | 08178700 | Bexar | 1978 | 2006 | 0.10* | 0.10 |
| 1911 | San Antonio River | 08183500 | Karnes | 1980 | 2008 | 144 | 321 |
| | | 08181800 | Bexar | 1980 | 2008 | 136 | 299 |
| | | 08178565 | Bexar | 1987 | 2007 | 13 | 36 |
| | | 08178050 | Bexar | 1993 | 2007 | 8.7 | 20 |
| 1912 | Medio Creek | 08180750 | Bexar | 1987 | 1995 | 4.0 | 5.8 |
| 1913 | Cibolo Creek | 08185000 | Bexar | 1980 | 2008 | 0.10* | 0.10* |
| 2002 | Mission River | 08189500 | Refugio | 1979 | 2007 | 4.7 | 1.2 |
| 2004 | Aransas River | 08189700 | Bee | 1979 | 2007 | 1.5 | 2.3 |
| 2102 | Nueces River | 08211500 | San Patricio | 1990 | 2007 | 0.10* | 1.1 |
| | | 08211200 | San Patricio | 2000 | 2007 | 66 | 137 |
| | | 08211000 | San Patricio | 2000 | 2007 | 53 | 121 |
| 2104 | Nueces River | 08194600 | Live Oak | 1965 | 1977 | 0.10* | 0.37 |
| | | 08194500 | McMullen | 1979 | 2007 | 0.10* | 0.29 |
| 2105 | Nueces River | 08194000 | La Salle | 1979 | 2007 | 0.10* | 0.32 |
| | | 08193000 | Dimmit | 1979 | 2007 | 0.10* | 0.12 |
| 2106 | Nueces River | 08210000 | Live Oak | 1984 | 2007 | 35 | 36 |
| | | 08206910 | Live Oak | 1992 | 2008 | 29 | 35 |
| 2107 | Atascosa River | 08208000 | Live Oak | 1979 | 2007 | 0.44 | 1.0 |
| | | 08207500 | Atascosa | 2003 | 2008 | 2.0 | 2.4 |
| 2108 | San Miguel Creek | 08206700 | McMullen | 1979 | 2007 | 0.10* | 0.16 |
| 2109 | Leona River | 08204005 | Uvalde | 2003 | 2008 | 9.7*** | 27 |
| 2110 | Sabinal River | 08198500 | Uvalde | 1980 | 2008 | 0.63 | 1.2 |
| 2111 | Sabinal River | 08198000 | Uvalde | 1980 | 2008 | 8.8 | 1.8 |
| 2112 | Nueces River | 08192000 | Uvalde | 1980 | 2008 | 15 | 25 |
| | | 08190000 | Uvalde | 1980 | 2008 | 41 | 74 |
| 2113 | Frio River | 08195000 | Uvalde | 1924 | 2008 | 13*** | 31 |
| 2114 | Hondo Creek | 08200720k | Medina | 1978 2007 | 2005 2008 | 0.10* | 0.10* |
| | | 08200000 | Medina | 1980 | 2008 | 1.0 | 1.0 |
| 2115 | Seco Creek | 08202700 | Medina | 1980 | 2008 | 0.10* | 0.10* |
| | | 08201500 | Medina | 1980 | 2008 | 0.71 | 0.56 |
| 2117 | Frio River | 08206600 | McMullen | 1979 | 2007 | 0.11 | 0.67 |
| | | 08205500 | Frio | 1979 | 2007 | 0.10* | 1.0 |
| | | 08197500 | Uvalde | 1980 | 2008 | 0.10* | 0.10* |

225

| Seg-ment | Stream/River | Gage | County | Period of Record Starts | Period of Record Ends | Crit. Low-Flow (ft³/s) | Harmonic Mean Flow (ft³/s) |
|---|---|---|---|---|---|---|---|
| 2302 | Rio Grande | 08473700 | Cameron | 1980 | 2008 | 51 | 173 |
|  |  | 08469200 | Hidalgo | 1980 | 2008 | 260 | 796 |
|  |  | 08464700 | Starr | 1980 | 2008 | 346 | 1228 |
|  |  | 08461300 | Zapata | 1980 | 2008 | 175 | 538 |
| 2304 | Rio Grande | 08459200 | Webb | 1998 | 2007 | 615 | 1320 |
|  |  | 08459000 | Webb | 1980 | 2008 | 853 | 1771 |
|  |  | 08458700 | Maverick | 1980 | 2008 | 970 | 1805 |
|  |  | 08458000 | Maverick | 1980 1989 | 1988 2008 | 929 | 1741 |
|  |  | 08455700 | Maverick | 1980 | 2008 | 119 | 359 |
|  |  | 08451800 | Val Verde | 1980 | 2008 | 732 | 1373 |
|  |  | 08450900 | Val Verde | 1980 | 2008 | 660 | 1207 |
| 2306 | Rio Grande | 08377200 | Val Verde | 1995 | 2008 | 224 | 468 |
|  |  | 08375000 | Brewster | 1995 | 2008 | 26 | 97 |
|  |  | 08374200 | Presidio | 1995 | 2008 | 37 | 115 |
| 2307 | Rio Grande | 08371500 | Presidio | 1980 | 2008 | 13 | 23 |
|  |  | 08371200 | Presidio | 1980 | 2008 | 12 | 24 |
|  |  | 08370500 | Hudspeth | 1980 | 2008 | 31 | 66 |
| 2309 | Devils River | 08449400 | Val Verde | 1960 | 2008 | 37[**] | 209 |
| 2310 | Pecos River | 08447410 | Val Verde | 1980 | 2008 | 83 | 148 |
| 2311 | Pecos River | 08446500 | Pecos | 1980 | 2008 | 6.9 | 18 |
|  |  | 08412500 | Reeves | 1980 | 2008 | 5.9 | 13 |
| 2313 | San Felipe Creek | 08453000 | Val Verde | 1931 | 2008 | 8.1[**] | 50 |
| 2314 | Rio Grande | 08365000 | El Paso | 1980 | 2008 | 2.1 | 6.9 |
|  |  | 08364000 | El Paso | 2003 | 2008 | 13 | 35 |

[*]    Calculated flow is less than 0.10 ft³/s.

[**]   Critical low-flow value is the 0.1% probability value derived from a lognormal distribution for the given period of record at the USGS gage.

[***]  Critical low-flow value is the 5th percentile of the data for the given period of record at the USGS gage.

[†]    7Q2 is estimated as the 10th percentile value of the available flow data.

[a]    Data from U.S. Army Corp of Engineers – gated releases from Lake Wright Patman.

[b]    1968-1989 data from discontinued USGS gage 07344500.

[c]    1978-1989 data from discontinued USGS gage 08040500.

[d]    Data from U.S. Army Corp of Engineers – gated releases from Richland-Chambers Reservoir.

[e]    Data from U.S. Army Corp of Engineers – gated releases from Ray Roberts Lake.

[f]    1978-1995 data from discontinued USGS gage 08068520.

[g]    1965-1992 data from discontinued USGS gage 08077000.

[h]    1978-1989 data from discontinued USGS gage 08088600.

[i]    1978-1996 data from discontinued USGS gage 08109000.

[j]    Daily average flows from each gage were added together, then the 7Q2 and harmonic mean flows were determined using the combined flows.

[k]    1978-2005 data from discontinued USGS gage 08200700.

# Appendix D.  Segment-Specific Values for Total Suspended Solids, pH, Total Hardness, Total Dissolved Solids, Chloride, and Sulfate.

**Tables D-1 – D-25    Segment-Specific Values for Total Suspended Solids, pH,
Total Hardness, Total Dissolved Solids, Chloride, and Sulfate.**

**Notes on tables:**

1) Total suspended solids (TSS), pH, and total hardness are 15th percentile values.
2) Total dissolved solids (TDS), chloride, and sulfate are 50th percentile values.
3) Unless otherwise noted, only data from the segment itself has been used in the calculation. If less than 30 data values are available for a particular parameter for the segment, data from tributaries, other segments, the basin, or other basins may be used. These cases are footnoted for each table. The two cases that arise most often are footnoted throughout the tables as follows:
   [a]    Basin-specific value
   [b]    Calculated as $(0.65) \times (50^{th}$ percentile conductivity for segment)

**Table D-1 Segment-Specific Values for Basin 1, Canadian River**

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO₃) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 0101 | 6.0 | 7.6 | 233 [a] | 2640 | 830 | 376 |
| 0102 | 2.0 | 8.2 | 223 | 1260 | 360 | 289 |
| 0103 | 13 | 7.9 | 246 | 2535 | 740 | 389 |
| 0104 | 2.0 | 7.8 | 233 [a] | 676 | 242 | 62 |
| 0105 | 28 | 8.1 | 209 [a] | 816 | 60 | 51 |

**Table D-2 Segment-Specific Values for Basin 2, Red River**

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO₃) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 0201 | 27 | 7.1 | 175 [c] | 610 | 147 | 117 |
| 0202 | 19 | 7.3 | 175 [c] | 784 | 197 | 150 |
| 0203 | 3.0 | 7.9 | 175 [c] | 1070 | 345 | 228 |
| 0204 | 31 | 7.8 | 552 [a] | 2880 | 1080 | 605 |
| 0205 | 29 | 7.8 | 937 | 4510 | 1800 | 1095 |
| 0206 | 11 | 7.6 | 1100 [d] | 12900 | 6290 | 2355 |
| 0207 | 16 | 7.6 | 1925 | 15900 | 15000 | 3000 |
| 0208 | 10 | 6.9 | 44 [e] | 72 [b] | 5.0 | 14 |
| 0209 | 4.0 | 7.1 | 44 [e] | 101 | 7.0 | 14 |
| 0210 | 3.0 | 7.9 | 44 [e] | 462 [b] | 143 | 41 |
| 0211 | 16 | 7.3 | 44 [e] | 364 | 70 | 12 |
| 0212 | 4.9 | 8.0 | 44 [e] | 494 [b] | 127 | 13 |
| 0213 | 5.0 | 8.1 | 44 [e] | 289 [b] | 49 | 14 |
| 0214 | 19 | 7.6 | 780 [f] | 2951 | 1200 | 573 |
| 0215 | 5.0 | 7.7 | 780 [f] | 3042 [b] | 1103 | 714 |
| 0216 | 5.0 | 7.6 | 770 | 3088 [b] | 1130 | 744 |

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO$_3$) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 0217 | 3.0 | 7.8 | 780 [f] | 2940 | 1100 | 751 |
| 0218 | 6.0 | 7.7 | 1100 | 8060 | 4365 | 2195 |
| 0219 | 23 | 7.6 | 168 [g] | 1002 [b] | 390 | 118 |
| 0220 | 5.0 | 7.6 | 1120 [h] | 18200 | 9255 | 2630 |
| 0221 | 8.0 | 7.5 | 1120 [h] | 2616 [b] | 735 | 1070 |
| 0222 | 4.0 | 7.7 | 1300 | 2760 | 270 | 1380 |
| 0223 | 2.0 | 7.9 | 168 [g] | 416 | 46 | 88 |
| 0224 | 5.0 | 7.6 | 330 [i] | 1650 | 439 | 481 |
| 0225 | 12 | 6.5 | 44 [e] | 96 [b] | 15 | 6.0 |
| 0226 | 9.0 | 7.5 | 2300 | 16250 [b] | 9500 | 2800 |
| 0227 | 7.9 [j] | 7.5 [j] | 1120 [h] | 2398 [b, j] | 640 [j] | 1020 [j] |
| 0228 | 2.0 | 8.1 | 168 [g] | 416 | 11 | 94 |
| 0229 | 5.0 | 7.6 | 330 [i] | 1280 | 290 | 292 |
| 0230 | 8.0 | 7.5 | 1120 [h] | 7600 | 3510 | 1690 |

[c]    Data from Segments 0201, 0202, and 0203
[d]    Data from Segments 0205 and 0207
[e]    Data from Segments 0208, 0209, 0210, 0211, 0212, and 0213
[f]    Data from Segments 0214, 0215, 0216, and 0217
[g]    Data from Segments 0207 (tributary lake only), 0210, 0212, 0213, 0219, 0223, and 0228
[h]    Data from Segments 0218, 0220, 0221, 0227, and 0230
[i]    Data from Segments 0224 and 0229
[j]    Data from Segments 0221 and 0227

**Table D-3 Segment-Specific Values for Basin 3, Sulphur River**

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO$_3$) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 0301 | 10 | 6.9 | 54 [a] | 150 | 11 | 18 |
| 0302 | 8.6 | 7.2 | 54 [a] | 137 | 10 | 17 |
| 0303 | 22 | 7.1 | 54 [a] | 219 | 15 | 34 |
| 0304 | 2.5 | 6.5 | 54 [a] | 262 | 60 | 32 |
| 0305 | 5.6 | 7.5 | 54 [a] | 490 | 30 | 150 |
| 0306 | 24 | 7.5 | 54 [a] | 326 | 29 | 54 |
| 0307 | 9.0 | 7.5 | 54 [a] | 143 | 5.7 | 12 |

**Table D-4 Segment-Specific Values for Basin 4, Cypress Creek**

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO$_3$) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 0401 | 3.0 | 6.0 | 19 | 84 | 13 | 12 |
| 0402 | 3.0 | 6.1 | 22 | 86 | 13 | 16 |
| 0403 | 2.5 | 6.5 | 25 | 99 | 14 | 23 |
| 0404 | 6.0 | 6.5 | 42 | 220 | 32 | 42 |
| 0405 | 3.0 | 6.6 | 29 | 86 | 15 | 16 |
| 0406 | 4.5 | 6.0 | 19 [a] | 82 | 9.0 | 6.0 |
| 0407 | 5.0 | 5.9 | 12 | 72 | 15 | 5.0 |
| 0408 | 2.0 | 7.1 | 24 [a] | 91 | 15 | 22 |
| 0409 | 5.0 | 6.2 | 19 [a] | 116 | 16 | 14 |
| 0410 | 3.8 | 5.9 | 19 [a] | 80 | 6 | 6 |

**Table D-5 Segment-Specific Values for Basin 5, Sabine River**

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO$_3$) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 0501 | 6.0 | 6.7 | 28 | 618 [b] | 179 | 44 |
| 0502 | 13 | 6.5 | 24 | 107 | 15 | 15 |
| 0503 | 5.0 | 6.7 | 29 | 117 | 16 | 16 |
| 0504 | 1.5 | 6.7 | 28 | 126 | 17 | 16 |
| 0505 | 16 | 6.7 | 42 | 237 | 39 | 26 |
| 0506 | 18 | 6.8 | 49 | 201 | 32 | 27 |
| 0507 | 5.0 | 7.6 | 64 | 130 | 5.0 | 11 |
| 0508 | 11 | 6.4 | 42 | 378 | 86 | 28 |
| 0509 | 5.0 | 6.9 | 32 [a] | 123 | 21 | 22 |
| 0510 | 2.0 | 6.3 | 28 | 90 | 15 | 15 |
| 0511 | 8.0 | 6.2 | 31 | 704 | 185 | 26 |
| 0512 | 1.5 | 7.0 | 40 | 128 | 15 | 17 |
| 0513 | 5.0 | 6.1 | 12 | 31 [b] | 5.0 | 3.0 |
| 0514 | 3.3 | 6.4 | 24 | 120 | 19 | 15 |
| 0515 | 12 | 6.7 | 45 | 230 | 40 | 32 |

**Table D-6 Segment-Specific Values for Basin 6, Neches River**

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO3) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 0601 | 8.0 | 6.6 | 38 [a] | 2240 | 600 | 101 |
| 0602 | 17 | 6.5 | 27 | 112 | 18 | 19 |
| 0603 | 8.0 | 6.5 | 27 [a] | 115 | 17 | 19 |
| 0604 | 10 | 6.5 | 36 | 92 | 24 | 20 |
| 0605 | 4.0 | 6.8 | 27 [a] | 143 | 25 | 24 |
| 0606 | 5.0 | 6.4 | 42 [c] | 232 | 34 | 36 |
| 0607 | 10 | 6.5 | 26 | 168 | 22 | 8.0 |
| 0608 | 6.0 | 6.0 | 14 | 83 | 14 | 5.0 |
| 0609 | 2.0 | 6.4 | 22 | 91 [b] | 15 | 18 |
| 0610 | 2.0 | 6.9 | 27 [a] | 90 | 16 | 20 |
| 0611 | 8.0 | 6.4 | 38 [c] | 134 | 19 | 22 |
| 0612 | 9.3 | 6.5 | 20 [a] | 100 | 10 | 16 |
| 0613 | 2.0 | 6.8 | 27 [a] | 71 | 11 | 8.8 |
| 0614 | 1.0 | 7.1 | 27 [a] | 61 | 7.0 | 6.0 |
| 0615 | 8.0 | 6.6 | 27 [a] | 193 | 30 | 35 |

[c]  Data from tributaries included.

**Table D-7 Segment-Specific Values for Basin 7, Neches-Trinity Coastal**

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO3) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 0701 | 12 | 6.7 | 56 | 246 | 54 | 32 |
| 0702 | 14 | 6.8 | 288 [c] | 10872 | 4700 | 690 |
| 0703 | 11 | 6.6 | 288 [c] | 9000 | 4780 | 650 |
| 0704 | 12 | 6.7 | 74 | 249 | 56 | 33 |

[c]  Data from Segments 0702 (including tributaries), 0703, 2411, and 2412

**Table D-8 Segment-Specific Values for Basin 8, Trinity River**

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO3) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 0801 | 18 | 7.3 | 84 | 224 | 36 | 33 |
| 0802 | 9.0 | 7.4 | 94 | 205 | 26 | 35 |
| 0803 | 7.3 | 7.4 | 94 | 240 | 29 | 43 |
| 0804 | 41 | 7.2 | 122 | 338 | 42 | 60 |
| 0805 | 23 | 7.2 | 148 | 408 | 52 | 77 |

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO₃) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 0806 | 10 | 7.5 | 136 | 287 | 35 | 38 |
| 0807 | 6.9 | 7.9 | 96 [a] | 231 | 34 | 26 |
| 0808 | 5.0 | 7.5 | 98 [a] | 260 [b] | 36 | 23 |
| 0809 | 5.0 | 7.9 | 96 [a] | 249 | 34 | 26 |
| 0810 | 16 | 7.5 | 98 [a] | 425 | 53 | 39 |
| 0811 | 2.0 | 7.9 | 96 [a] | 212 | 28 | 20 |
| 0812 | 28 | 7.2 | 98 [a] | 490 | 59 | 36 |
| 0813 | 1.5 | 6.8 | 96 [a] | 73 | 11 | 9.0 |
| 0814 | 18 | 7.5 | 120 [c] | 349 | 23 | 70 |
| 0815 | 6.1 | 7.9 | 96 [a] | 202 [b] | 14 | 35 |
| 0816 | 4.7 | 7.8 | 96 [a] | 179 [b] | 8.0 | 17 |
| 0817 | 6.1 | 7.9 | 110 | 208 [b] | 11 | 31 |
| 0818 | 5.4 | 7.5 | 96 [a] | 121 | 14 | 24 |
| 0819 | 16 | 7.3 | 119 | 372 | 45 | 47 |
| 0820 | 5.0 | 7.8 | 98 | 190 | 15 | 26 |
| 0821 | 5.0 | 7.8 | 96 [a] | 216 | 8.0 | 23 |
| 0822 | 13 | 7.5 | 116 | 259 | 24 | 41 |
| 0823 | 6.0 | 7.8 | 106 | 208 | 19 | 30 |
| 0824 | 7.0 | 7.6 | 77 | 422 | 49 | 49 |
| 0825 | 5.0 | 7.5 | 118 [d] | 231 | 25 | 35 |
| 0826 | 5.0 | 7.9 | 118 | 208 | 24 | 30 |
| 0827 | 8.7 | 7.5 | 96 [a] | 188 [b] | 13 | 31 |
| 0828 | 6.0 | 7.9 | 100 | 187 | 18 | 28 |
| 0829 | 8.0 | 7.5 | 98 [a] | 289 | 22 | 33 |
| 0830 | 6.0 | 7.9 | 96 [a] | 205 | 22 | 27 |
| 0831 | 5.0 | 7.5 | 160 | 408 | 42 | 45 |
| 0832 | 5.0 | 8.0 | 96 [a] | 283 [b] | 41 | 31 |
| 0833 | 6.7 | 7.5 | 98 [a] | 561 | 92 | 67 |
| 0834 | 2.0 | 7.7 | 96 [a] | 182 [b] | 27 | 12 |
| 0835 | 10 [e] | 7.3 [e] | 120 [c] | 232 [e] | 28 [e] | 40 [e] |
| 0836 | 2.0 | 7.7 | 96 [a] | 170 | 11 | 33 |
| 0837 | 10 [e] | 7.3 [e] | 120 [c] | 232 [e] | 28 [e] | 40 [e] |
| 0838 | 4.0 | 7.9 | 153 | 342 | 21 | 102 |
| 0839 | 9.0 | 7.6 | 98 [a] | 188 [b] | 20 | 22 |

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO$_3$) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 0840 | 4.0 | 7.7 | 95 | 179 | 18 | 16 |
| 0841 | 16 | 7.3 | 160 | 467 | 74 | 68 |

[c] Data from Segments 0814 (including tributaries), 0835, and 0837
[d] Data from Segments 0825 and 0826
[e] Data from Segments 0835 and 0837

**Table D-9 Segment-Specific Values for Basin 9, Trinity-San Jacinto Coastal**

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO$_3$) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 0901 | 18 | 7.4 | 930 [c] | 8400 | 2875 | 261 |
| 0902 | 3.0 | 7.1 | 40 [d] | 373 | 83 | 17 |

[c] Data from Segment 2426
[d] Data from Basin 10

**Table D-10 Segment-Specific Values for Basin 10, San Jacinto River**

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO$_3$) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 1001 | 8.0 | 7.5 | 44 | 940 | 2765 | 246 |
| 1002 | 10 | 7.0 | 46 | 186 | 25 | 9.0 |
| 1003 | 7.0 | 6.6 | 37 | 144 | 32 | 5.0 |
| 1004 | 11 | 6.9 | 65 | 187 | 38 | 10 |
| 1005 | 11 | 7.5 | 620 | 10800 | 6190 | 838 |
| 1006 | 10 | 7.2 | 412 | 2920 | 2090 | 215 |
| 1007 | 8.0 | 7.1 | 108 | 1100 | 482 | 94 |
| 1008 | 10 | 6.8 | 48 | 241 | 47 | 10 |
| 1009 | 13 | 7.0 | 44 | 388 | 57 | 19 |
| 1010 | 5.0 | 6.6 | 28 | 99 | 15 | 5.0 |
| 1011 | 3.0 | 6.4 | 21 | 88 | 17 | 4.0 |
| 1012 | 3.0 | 7.3 | 65 | 131 | 17 | 6.0 |
| 1013 | 14 | 7.2 | 78[a] | 381 | 60 | 24 |
| 1014 | 17 | 7.1 | 40[a] | 368 | 64 | 23 |
| 1015 | 10 | 6.6 | 40[a] | 168 [b] | 43 | 9.7 |
| 1016 | 12 | 7.5 | 40[a] | 456 | 82 | 38 |
| 1017 | 10 | 7.6 | 40[a] | 463 | 86 | 33 |

234

**Table D-11 Segment-Specific Values for Basin 11, San Jacinto-Brazos Coastal**

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO$_3$) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 1101 | 15 | 7.5 | 134 | 1720 | 460 | 92 |
| 1102 | 15 | 7.4 | 126 | 568 | 125 | 38 |
| 1103 | 9.6 | 7.3 | 125 | 3142 | 1550 | 234 |
| 1104 | 12 | 7.3 | 116 [a] | 493 | 99 | 58 |
| 1105 | 15 | 7.3 | 118 [a] | 3149 | 2065 | 289 |
| 1107 | 19 | 7.6 | 118 [a] | 10650 | 5327 | 705 |
| 1108 | 11 | 7.4 | 116 [a] | 474 | 116 | 46 |
| 1109 | 15 | 7.5 | 118 [a] | 7405 | 2590 | 411 |
| 1110 | 15 | 7.3 | 116 [a] | 346 | 71 | 30 |
| 1111 | 9.0 | 7.9 | 3697 | 27700 | 14161 | 2020 |
| 1113 | 18 | 7.4 | 118 [a] | 1913 | 902 | 120 |

**Table D-12 Segment-Specific Values for Basin 12, Brazos River**

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO$_3$) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 1201 | 10 | 7.7 | 232 [c] | 5150 | 3220 | 412 |
| 1202 | 36 | 7.6 | 160 | 438 | 88 | 60 |
| 1203 | 3.0 | 7.9 | 230 [d] | 888 | 371 | 180 |
| 1204 | 4.3 | 7.8 | 230 [d] | 1294 | 485 | 234 |
| 1205 | 4.0 | 7.9 | 230 [d] | 1418 | 893 | 311 |
| 1206 | 7.0 | 7.8 | 230 [d] | 1724 | 692 | 348 |
| 1207 | 2.0 | 8.1 | 230 [d] | 1870 | 893 | 371 |
| 1208 | 17 | 7.7 | 473 [e] | 4267 | 2000 | 900 |
| 1209 | 17 | 7.1 | 68 [f] | 235 | 44 | 42 |
| 1210 | 19 | 7.6 | 68 [f] | 182 | 10 | 14 |
| 1211 | 22 | 7.3 | 160 [a] | 275 | 53 | 64 |
| 1212 | 7.0 | 7.6 | 120 [a] | 256 | 46 | 59 |
| 1213 | 23 | 7.7 | 171 [g] | 332 | 42 | 36 |
| 1214 | 17 | 7.5 | 170 [h] | 392 | 25 | 30 |
| 1215 | 2.0 | 7.7 | 171 [g] | 284 | 39 | 19 |
| 1216 | 2.0 | 8.1 | 171 [g] | 257 | 55 | 22 |
| 1217 | 2.0 | 7.9 | 171 [g] | 372 | 70 | 24 |
| 1218 | 4.0 | 7.2 | 171 [g] | 390 | 53 | 46 |
| 1219 | 6.8 | 7.2 | 171 [g] | 340 | 38 | 33 |

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO₃) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 1220 | 2.0 | 8.0 | 120 [a] | 223 | 31 | 27 |
| 1221 | 11 | 7.6 | 160 [a] | 396 | 70 | 48 |
| 1222 | 7.0 | 7.9 | 120 [a] | 410 | 100 | 54 |
| 1223 | 4.0 | 7.6 | 160 [a] | 639 | 232 | 75 |
| 1224 | 4.0 | 7.9 | 120 [a] | 296 | 73 | 46 |
| 1225 | 5.0 | 7.9 | 124 | 217 | 16 | 25 |
| 1226 | 3.0 | 7.7 | 160 [a] | 282 | 23 | 26 |
| 1227 | 4.4 | 7.4 | 160 [a] | 386 | 42 | 52 |
| 1228 | 8.0 | 7.9 | 120 [a] | 202 [b] | 13 | 16 |
| 1229 | 2.0 | 7.9 | 160 [a] | 336 | 24 | 45 |
| 1230 | 5.0 | 8.0 | 230 [d] | 298 [b] | 39 | 37 |
| 1231 | 5.0 | 8.0 | 230 [d] | 416 [b] | 123 | 24 |
| 1232 | 16 | 7.6 | 584 | 1800 | 520 | 778 |
| 1233 | 3.0 | 7.9 | 218 | 715 [b] | 244 | 61 |
| 1234 | 2.0 | 7.9 | 120 [a] | 263 [b] | 29 | 36 |
| 1235 | 10 | 7.9 | 120 [a] | 716 [b] | 162 | 182 |
| 1236 | 5.0 | 8.0 | 203 | 458 [b] | 94 | 78 |
| 1237 | 5.0 | 7.9 | 120 [a] | 699 [b] | 186 | 125 |
| 1238 | 8.7 | 7.5 | 1525 [i] | 37367 | 16000 | 2505 |
| 1239 | 4 [j] | 8.1 [j] | 160 [a] | 606 [j] | 111 [j] | 48 [j] |
| 1240 | 4.0 | 8.1 | 120 [a] | 606 | 111 | 47 |
| 1241 | 9.9 | 7.7 | 473 [e] | 4325 | 1400 | 1340 |
| 1242 | 11 | 7.7 | 221 [k] | 693 | 179 | 103 |
| 1243 | 0.5 | 7.3 | 160 [a] | 296 | 12 | 16 |
| 1244 | 2.0 | 7.6 | 160 [a] | 369 | 53 | 38 |
| 1245 | 12 | 7.4 | 140 | 352 | 70 | 46 |
| 1246 | 3.0 | 7.7 | 160 [a] | 327 | 16 | 52 |
| 1247 | 8.0 | 7.9 | 120 [a] | 229 | 20 | 24 |
| 1248 | 3.0 | 7.7 | 170 [h] | 291 | 18 | 20 |
| 1249 | 2.0 | 7.9 | 120 [a] | 202 | 12 | 16 |
| 1250 | 0.5 | 7.7 | 170 [h] | 270 | 17 | 21 |
| 1251 | 1.0 | 7.8 | 170 [h] | 270 | 13 | 21 |
| 1252 | 4.0 | 7.4 | 68 [f] | 132 | 20 | 16 |
| 1253 | 10 | 7.4 | 68 [f] | 208 | 20 | 14 |

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO₃) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 1254 | 5.0 | 7.9 | 120 [a] | 228 | 12 | 54 |
| 1255 | 3.5 | 7.6 | 160 [a] | 501 | 111 | 44 |
| 1256 | 5.0 | 7.7 | 177 | 574 | 219 | 91 |
| 1257 | 3.7 | 7.6 | 251 [l] | 780 | 312 | 144 |

[c] Data from Segments 1201 and 1401
[d] Data from Segments 1203, 1204, 1205, 1206, 1207, 1230, and 1231
[e] Data from Segments 1208 and 1241
[f] Data from Segments 1209, 1210, 1252, and 1253
[g] Data from Segments 1213, 1215, 1216, 1217, 1218, 1219, and tributaries to these segments
[h] Data from Segments 1214, 1248, 1250, 1251, and tributaries to Segments 1247 and 1249
[i] Data from Segment 1238 and its tributaries
[j] Data from Segments 1239 and 1240
[k] Data from Segment 1242 and from stations 12039, 12040, 12041, and 14226 in Segment 1256
[l] Data from Segment 1257 and from station 12042 in Segment 1256

**Table D-13 Segment-Specific Values for Basin 13, Brazos-Colorado Coastal**

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO₃) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 1301 | 13 | 7.3 | 135 [a] | 2300 | 2745 | 215 |
| 1302 | 19 | 7.0 | 96 [a] | 267 | 48 | 16 |
| 1304 | 13 | 7.4 | 135 [a] | 1080 | 190 | 62 |
| 1305 | 13 | 7.3 | 96 [a] | 329 | 41 | 12 |

**Table D-14 Segment-Specific Values for Basin 14, Colorado River**

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO₃) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 1401 | 12 | 7.7 | 232 [c] | 7584 | 473 | 110 |
| 1402 | 12 | 7.8 | 200 | 336 | 51 | 41 |
| 1403 | 1.0 | 7.7 | 180 [d] | 298 | 55 | 36 |
| 1404 | 1.0 | 8.0 | 180 [d] | 300 | 57 | 36 |
| 1405 | 2.0 | 7.8 | 180 [d] | 332 | 66 | 40 |
| 1406 | 3.0 | 7.9 | 180 [d] | 332 | 67 | 41 |
| 1407 | 2.0 | 7.8 | 180 [d] | 418 | 100 | 67 |
| 1408 | 2.0 | 8.1 | 180 [d] | 422 | 100 | 64 |
| 1409 | 15 | 7.8 | 237 [e] | 434 | 84 | 56 |
| 1410 | 14 | 7.7 | 320 [f] | 788 [g] | 260 [g] | 177 [g] |
| 1411 | 5.0 | 7.9 | 318 [h] | 2473 | 740 | 465 |
| 1412 | 16 | 7.6 | 310 | 4600 | 1635 | 961 |
| 1413 | 7.0 | 7.8 | 188 [a] | 367 [b] | 47 | 63 |
| 1414 | 5.0 | 8.0 | 188 | 362 | 52 | 32 |

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO$_3$) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 1415 | 2.0 | 7.9 | 163 [i] | 222 | 21 | 13 |
| 1416 | 8.0 | 7.8 | 163 [i] | 307 | 24 | 17 |
| 1417 | 13 | 7.8 | 190 [a] | 524 [b] | 109 | 68 |
| 1418 | 5.0 | 7.9 | 188 [a] | 296 | 71 | 38 |
| 1419 | 2.8 | 8.0 | 188 [a] | 317 | 72 | 47 |
| 1420 | 9.4 | 7.6 | 190 [a] | 462 | 91 | 81 |
| 1421 | 12 | 7.7 | 317 | 1080 | 447 | 243 |
| 1422 | 10 | 8.0 | 312 | 896 | 290 | 103 |
| 1423 | 5.0 | 8.0 | 188 [a] | 434 | 102 | 47 |
| 1424 | 2.5 | 7.6 | 240 | 362 | 48 | 15 |
| 1425 | 5.0 | 8.0 | 217 [j] | 474 [b] | 120 | 54 |
| 1426 | 14 | 7.8 | 315 [k] | 2190 [g] | 776 [g] | 720 [g] |
| 1427 | 1.0 | 7.4 | 163 [i] | 300 | 24 | 37 |
| 1428 | 3.0 | 7.4 | 190 [l] | 334 | 55 | 41 |
| 1429 | 1.2 | 7.4 | 188 [a] | 315 | 49 | 37 |
| 1430 | 0.5 | 7.2 | 194 | 306 | 23 | 30 |
| 1431 | 5.0 | 7.3 | 190 [a] | 652 | 186 | 88 |
| 1432 | 5.0 | 7.6 | 190 [a] | 464 | 96 | 68 |
| 1433 | 3.0 | 8.1 | 321 [m] | 1165 | 371 | 287 |
| 1434 | 5.0 | 7.8 | 190 [l] | 340 | 56 | 44 |

[c] Data from Segments 1201 and 1401
[d] Data from Segments 1403, 1404, 1405, 1406, 1407, and 1408
[e] Data from Segments 1409, 1410, and 1417
[f] Data from Segments 1410, 1426, and 1433
[g] Data from 1995 to present to reflect changes in the watershed
[h] Data from Segments 1411 and 1412
[i] Data from Segments 1415, 1416, and 1427
[j] Data from Segment 1425 and its tributaries
[k] Data from Segments 1411, 1412, and 1426
[l] Data from Segments 1428 and 1434
[m] Data from Segments 1421, 1426, and 1433

**Table D-15 Segment-Specific Values for Basin 15, Colorado-Lavaca Coastal**

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO$_3$) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 1501 | 15 | 7.3 | 85 [c] | 706 | 384 | 65 |
| 1502 | 16 | 7.3 | 95 [c] | 495 | 114 | 22 |

[c] Data from Basins 15 and 16

**Table D-16 Segment-Specific Values for Basin 16, Lavaca River**

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO₃) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 1601 | 10 | 7.8 | 85 [a] | 1108 [b] | 123 | 29 |
| 1602 | 6.0 | 7.7 | 177 | 441 | 68 | 23 |
| 1603 | 8.0 | 7.9 | 82 | 454 [b] | 69 | 16 |
| 1604 | 7.4 | 7.4 | 57 | 148 [b] | 19 | 7.4 |
| 1605 | 5.3 | 7.6 | 141 | 480 | 72 | 15 |

**Table D-17 Segment-Specific Values for Basin 17, Lavaca-Guadalupe Coastal**

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO₃) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 1701 | 27 | 7.8 | 85 [c] | 3700 | 974 | 164 |

[c]    Data from Basin 16

**Table D-18 Segment-Specific Values for Basin 18, Guadalupe River**

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO₃) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 1801 | 44 | 7.6 | 167 [a] | 434 | 70 | 52 |
| 1802 | 40 | 7.7 | 212 | 460 [b] | 63 | 52 |
| 1803 | 12 | 7.7 | 206 | 325 | 33 | 30 |
| 1804 | 4.8 | 7.7 | 213 | 297 | 18 | 24 |
| 1805 | 2.0 | 8.0 | 161 | 217 | 15 | 19 |
| 1806 | 3.0 | 7.7 | 204 | 290 | 18 | 16 |
| 1807 | 3.9 | 7.7 | 100 | 456 | 78 | 22 |
| 1808 | 8.0 | 7.7 | 225 | 332 | 25 | 28 |
| 1809 | 2.0 | 7.6 | 189 [c] | 247 | 13 | 23 |
| 1810 | 12 | 7.6 | 215 | 673 | 135 | 85 |
| 1811 | 1.0 | 7.4 | 254 | 311 | 17 | 24 |
| 1812 | 2.0 | 7.7 | 184 | 248 | 14 | 19 |
| 1813 | 0.5 | 7.7 | 189 | 266 | 12 | 26 |
| 1814 | 2.0 | 7.5 | 265 | 388 [b] | 19 | 24 |
| 1815 | 0.5 | 7.1 | 228 | 299 | 13 | 16 |
| 1816 | 2.8 | 7.7 | 185 [d] | 292 [b] | 23 | 12 |
| 1817 | 0.5 | 7.4 | 185 [d] | 259 [b] | 10 | 5.0 |
| 1818 | 0.5 | 7.6 | 185 [d] | 266 [b] | 10 | 5.0 |

[c]    Data from Segment 1813
[d]    Data from Segments 1816, 1817, and 1818

**Table D-19 Segment-Specific Values for Basin 19, San Antonio River**

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO₃) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 1901 | 30 | 7.7 | 312 | 616 | 100 | 97 |
| 1902 | 8.8 | 7.6 | 257 | 606 | 100 | 149 |
| 1903 | 6.0 | 7.4 | 240 | 372 | 41 | 60 |
| 1904 | 2.7 | 7.9 | 204 [a] | 262 | 13 | 45 |
| 1905 | 2.0 | 7.6 | 240 | 339 | 13 | 76 |
| 1906 | 5.0 | 7.3 | 253 | 465 | 63 | 68 |
| 1907 | 0.5 | 7.4 | 204 [a] | 402 [b] | 21 | 43 |
| 1908 | 1.0 | 7.4 | 204 [a] | 302 | 18 | 27 |
| 1909 | 1.2 | 7.3 | 204 [a] | 258 | 14 | 44 |
| 1910 | 2.2 | 7.2 | 204 | 374 | 45 | 53 |
| 1911 | 5.0 | 7.4 | 202 | 477 | 54 | 54 |
| 1912 | 12 | 7.9 | 204 [a] | 420 | 68 | 66 |
| 1913 | 5.0 | 7.2 | 256 | 500 | 60 | 45 |

**Table D-20 Segment-Specific Values for Basin 20, San Antonio-Nueces Coastal**

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO₃) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 2001 | 14 | 7.6 | 241 [a] | 1780 | 1080 | 82 |
| 2002 | 10 | 7.5 | 243 | 1060 | 530 | 40 |
| 2003 | 12 | 7.6 | 241 [a] | 810 | 193 | 40 |
| 2004 | 8.1 | 7.4 | 240 [a] | 889 | 279 | 54 |

**Table D-21 Segment-Specific Values for Basin 21, Nueces River**

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO₃) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 2101 | 23 | 7.9 | 160 [a] | 12150 | 2250 | 350 |
| 2102 | 10 | 7.8 | 164 | 431 | 132 | 49 |
| 2103 | 6.0 | 7.8 | 149 | 568 | 111 | 53 |
| 2104 | 8.0 | 7.6 | 137 | 452 | 105 | 42 |
| 2105 | 5.0 | 7.6 | 160 [a] | 316 | 49 | 40 |
| 2106 | 15 | 7.6 | 158 | 498 | 128 | 75 |
| 2107 | 13 | 7.5 | 130 | 1080 | 242 | 225 |
| 2108 | 11 | 7.4 | 201 | 840 | 218 | 277 |
| 2109 | 10 | 7.5 | 226 [c] | 508 | 73 | 128 |
| 2110 | 2.0 | 7.2 | 226 [c] | 560 | 100 | 40 |

240

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO$_3$) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 2111 | 0.5 | 7.6 | 226 [c] | 276 | 12 | 27 |
| 2112 | 0.5 | 7.6 | 190 | 242 | 16 | 15 |
| 2113 | 0.5 | 7.7 | 160 [a] | 238 | 11 | 14 |
| 2114 | 0.5 | 7.7 | 160 [a] | 252 | 12 | 34 |
| 2115 | 0.5 | 7.7 | 160 [a] | 248 | 12 | 41 |
| 2116 | 4.0 | 7.8 | 167 | 494 | 146 | 73 |
| 2117 | 7.0 | 7.5 | 185 | 935 | 259 | 167 |

[c]   Data from Segments 2109, 2110, and 2111

### Table D-22 Segment-Specific Values for Basin 22, Nueces-Rio Grande Coastal

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO$_3$) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 2201 | 12 | 7.7 | 675 [a] | 7950 | 3778 | 1150 |
| 2202 | 72 | 7.4 | 713 | 2780 | 860 | 770 |
| 2203 | 36 | 7.9 | 675 [a] | 14200 | 10605 | 984 |
| 2204 | 15 | 7.3 | 653 [a] | 13900 [c] | 3300 [c] | 598 [c] |

[c]   Data from 1995 to present to reflect changes in the watershed

### Table D-23 Segment-Specific Values for Basin 23, Rio Grande

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO$_3$) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 2301 | 15 | 7.7 | 255 | 880 | 210 | 283 |
| 2302 | 5.9 | 7.6 | 240 | 712 | 146 | 247 |
| 2303 | 5.0 | 7.9 | 230 [a] | 561 | 114 | 221 |
| 2304 | 5.0 | 7.7 | 237 | 650 | 117 | 212 |
| 2305 | 2.0 | 7.9 | 230 [a] | 650 | 115 | 215 |
| 2306 | 47 | 7.4 | 251 | 1125 | 142 | 403 |
| 2307 | 39 | 7.5 | 229 | 1453 | 411 | 460 |
| 2308 | 20 | 7.7 | 224 | 775 | 126 | 223 |
| 2309 | 1.0 | 7.7 | 230 [a] | 224 | 14 | 9.0 |
| 2310 | 4.0 | 7.7 | 510 | 2236 | 853 | 494 |
| 2311 | 6.0 | 7.6 | 2203 | 9840 | 4030 | 2381 |
| 2312 | 6.0 | 7.8 | 1973 [c] | 5455 | 1954 | 1550 |
| 2313 | 4.0 | 7.5 | 230 [a] | 285 | 18 | 20 |
| 2314 | 24 | 7.8 | 240 | 718 | 110 | 224 |

[c]   Data from Segment 2312 and from station 13265 in Segment 2311

241

**Table D-24 Segment-Specific Values for Basin 24, Bays and Estuaries**

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO₃) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 2411 | 11 | 6.8 | 950 [a] | 12800 | 7150 | 1010 |
| 2412 | 8.3 | 6.8 | 950 [a] | 6790 | 3598 | 496 |
| 2421 | 11 | 7.8 | 787 | 13400 | 7842 | 1060 |
| 2422 | 8.0 | 7.8 | 148 | 7785 | 3290 | 460 |
| 2423 | 13 | 7.8 | 950 [a] | 12800 | 7170 | 960 |
| 2424 | 13 | 7.8 | 3112 | 26099 | 13100 | 1789 |
| 2425 | 16 | 7.9 | 700 | 12846 | 6000 | 778 |
| 2426 | 16 | 7.6 | 930 | 12459 | 5970 | 814 |
| 2427 | 12 | 7.6 | 730 | 11915 | 5675 | 810 |
| 2428 | 16 | 7.9 | 1037 | 12870 | 6400 | 838 |
| 2429 | 9.0 | 7.5 | 644 | 10501 | 5625 | 815 |
| 2430 | 9.0 | 7.6 | 603 | 9670 | 4979 | 712 |
| 2431 | 15 | 7.7 | 1727 [c] | 19412 | 8350 | 1171 |
| 2432 | 13 | 7.7 | 3163 [d] | 21600 | 9759 | 1378 |
| 2433 | 10 | 7.8 | 3163 [d] | 24862 [b] | 13200 | 1860 |
| 2434 | 14 | 7.9 | 3163 [d] | 27100 | 14240 | 1940 |
| 2435 | 27 | 7.8 | 3163 [d] | 25415 [b] | 13825 | 1880 |
| 2436 | 11 | 7.7 | 1002 | 13960 | 6545 | 900 |
| 2437 | 11 | 7.9 | 2867 | 24250 | 12200 | 1670 |
| 2438 | 10 | 7.7 | 1466 [e] | 14000 | 6980 | 1025 |
| 2439 | 12 | 7.9 | 1606 | 19300 | 10500 | 1430 |
| 2441 | 25 | 7.8 | 1185 [f] | 23600 | 11150 | 1465 |
| 2442 | 20 | 7.7 | 1185 [f] | 20215 [b] | 11800 | 1295 |
| 2451 | 11 | 7.9 | 1185 [f] | 26000 | 13400 | 1850 |
| 2452 | 12 | 7.8 | 1185 [f] | 22150 | 11500 | 1600 |
| 2453 | 11 | 7.9 | 980 | 19200 | 9860 | 1340 |
| 2454 | 12 | 7.9 | 1185 [f] | 22700 | 11780 | 1630 |
| 2455 | 11 | 8.0 | 1185 [f] | 24450 | 12025 | 1597 |
| 2456 | 28 | 7.9 | 950 [a] | 4260 | 2518 | 393 |
| 2461 | 10 | 7.9 | 950 [a] | 26200 | 14100 | 1950 |
| 2462 | 16 | 8.0 | 950 [a] | 10450 | 6970 | 960 |
| 2463 | 17 | 7.9 | 950 [a] | 19800 | 10200 | 1365 |
| 2471 | 9.0 | 7.9 | 950 [a] | 28600 | 14500 | 2000 |
| 2472 | 15 | 7.9 | 950 [a] | 15500 | 7500 | 1012 |

242

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO$_3$) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 2473 | 16 | 7.8 | 950 [a] | 19725 | 10000 | 1400 |
| 2481 | 10 | 7.9 | 5011 [g] | 34850 | 17100 | 2400 |
| 2482 | 17 | 7.8 | 5011 [g] | 30900 | 15800 | 2150 |
| 2483 | 13 | 7.9 | 5011 [g] | 29650 | 15873 | 2220 |
| 2484 | 10 | 7.9 | 5011 [g] | 33800 | 16800 | 2380 |
| 2485 | 33 | 7.7 | 5011 [g] | 30850 | 17400 | 2400 |
| 2491 | 12 | 8.0 | 5011 [g] | 36925 | 18700 | 2666 |
| 2492 | 17 | 7.9 | 5011 [g] | 40050 | 21100 | 3095 |
| 2493 | 13 | 7.9 | 5011 [g] | 37350 | 19250 | 2650 |
| 2494 | 10 | 7.9 | 5011 [g] | 35950 | 18335 | 2565 |

[c] Data from Segments 2431 and 2439
[d] Data from Segments 2424, 2432, 2433, 2434, and 2435
[e] Data from Segment 2438 and from stations 13303 and 13304 in Segment 2421
[f] Data from Segments 2441, 2442, 2451, 2452, 2453, 2454, and 2455
[g] Data from Segments 2481, 2482, 2483, 2484, 2485, 2491, 2492, 2493, and 2494

**Table D-25 Segment-Specific Values for Basin 25, Gulf of Mexico**

| Segment Number | TSS (mg/L) | pH (s.u.) | Total Hardness (mg/L as CaCO$_3$) | TDS (mg/L) | Chloride (mg/L) | Sulfate (mg/L) |
|---|---|---|---|---|---|---|
| 2501 | 12 | 7.0 | 4613 | 28700 | 15500 | 2170 |

# Appendix E. Minimum Analytical Levels and Suggested Analytical Methods.

**Table E-1. Minimum Analytical Levels (MALs) and Suggested Methods for Permit Application Screening**

**Notes on table:**

1) MALs, screening levels, and suggested methods in this table may be used for effluent screening.

2) This table includes pollutants in § 307.6 of the Standards, all 126 priority pollutants, and those pollutants listed in 40 CFR Part 122, Appendix D, Table 5.

3) Suggested analytical methods have traditionally been EPA-approved analytical methods either in the 40 CFR Part 136, as amended, or in EPA-published documents pertaining to wastewater matrices, or methods developed and published by the TCEQ or other government agencies for wastewater. Applicants and permittees may use any analytical method approved in 40 CFR Part 136 that is sufficiently sensitive to demonstrate compliance with permit application screening requirements.

| Pollutant | CASRN [1] | MAL (µg/L) | Screening Level [2] (µg/L) | Suggested Method |
|---|---|---|---|---|
| Acenaphthene | 83-32-9 | 10 | | 625 |
| Acenaphthylene | 208-96-8 | 10 | | 625 |
| Acetaldehyde | 75-07-0 | 50 | | 1667 |
| Acrolein | 107-02-8 | 50 | | 624 |
| Acrylonitrile | 107-13-1 | 50 | | 1624B[3] |
| Aldrin | 309-00-2 | 0.01 | | 608 |
| Allyl alcohol | 107-18-6 | 50 | | 1624[3] |
| Allyl chloride | 107-05-1 | 10 | | 1624[3] |
| Aluminum, total | 7429-90-5 | 2.5 | | 200.8 [4] |
| Amyl acetate | 628-63-7 | 5 | | 1666 [3] |
| Aniline | 62-53-3 | 10 | | 625 [11] |
| Anthracene | 120-12-7 | 10 | | 625 |
| Antimony, total | 7440-36-0 | 5 | | 200.8 [4] |
| Arsenic, total | 7440-38-2 | 0.5 | | 200.8 [4] |
| Asbestos | 1332-21-4 | Not Specified [12] | | 100.1 and 100.2 [13] |
| Barium, total | 7440-39-3 | 3 | | 200.8 [4] |
| Benzene | 71-43-2 | 10 | | 624 |
| Benzidine | 92-87-5 | 50 | | 625 |
| Benzo(a)anthracene | 56-55-3 | 5 | | 625 |
| Benzo(a)pyrene | 50-32-8 | 5 | | 625 |
| Benzo(b)fluoranthene | 205-99-2 | 10 | | 625 |

| Pollutant | CASRN [1] | MAL (µg/L) | Screening Level [2] (µg/L) | Suggested Method |
|---|---|---|---|---|
| Benzo(*g,h,i*)perylene | 191-24-2 | 20 | | 625 |
| Benzo(*k*)fluoranthene | 207-08-9 | 5 | | 625 |
| Benzonitrile | 100-47-0 | 1 mg/L | | ASTM D3371 |
| Benzyl chloride | 100-44-7 | Not Specified [12] | | TBD [5] |
| Beryllium, total | 7440-41-7 | 0.5 | | 200.8 [4] |
| Bis(2-chloroethoxy)methane | 111-91-1 | 10 | | 625 |
| Bis(2-chloroethyl)ether | 111-44-4 | 10 | | 625 |
| Bis(2-chloroisopropyl)ether | 108-60-1 | 10 | | 625 |
| Bis(chloromethyl)ether | 542-88-1 | —[5] | | —[5] |
| Bis(2-ethylhexyl)phthalate [Di(2-ethylhexyl)phthalate] | 117-81-7 | 10 | | 625 |
| Boron, total | 7440-42-8 | 20 | 100 | 200.7 |
| Bromide | — | 400 | | 300.0, Rev. 2.1 300.1, Rev. 1.0 |
| Bromodichloromethane [Dichlorobromomethane] | 75-27-4 | 10 | | 624 |
| Bromoform | 75-25-2 | 10 | | 624 |
| 4-Bromophenyl phenyl ether | 101-55-3 | 10 | | 625 |
| Butyl acetate | 540-88-5 | 5 | | 1666 [3] |
| *n*-Butylamine | 109-73-9 | Not Specified [11] | | TBD [12] |
| *sec*-Butylamine | 13952-84-6 | Not Specified [11] | | TBD [12] |
| *tert*-Butylamine | 75-64-9 | Not Specified [11] | | TBD [12] |
| Butylbenzyl phthalate | 85-68-7 | 10 | | 625 |
| Cadmium, total | 7440-43-9 | 1 | | 200.8 [4] |
| Captan | 133-06-2 | 0.4[14] | | SM6630B |
| Carbaryl | 63-25-2 | 5 | | 632 |
| Carbazole | 86-74-8 | 20 | | 1625 [3] |
| Carbofuran | 1563-66-2 | 3 | | 632 |
| Carbon disulfide | 75-15-0 | 10 | | 1624 [3] |
| Carbon tetrachloride | 56-23-5 | 2 | | 624 |
| Chlordane | 57-74-9 | 0.2 | | 608 |
| Chlorine | 7782-50-5 | 33 | | 4500-Cl E or G |
| Chlorobenzene | 108-90-7 | 10 | | 624 |
| Chlorodibromomethane | 124-48-1 | 10 | | 624 |

| Pollutant | CASRN [1] | MAL (µg/L) | Screening Level [2] (µg/L) | Suggested Method |
|---|---|---|---|---|
| Chloroethane | 75-00-3 | 50 | | 624 |
| 2-chloroethylvinyl ether | 110-75-8 | 10 | | 624 |
| Chloroform | 67-66-3 | 10 | | 624 |
| 2-Chloronaphthalene | 91-58-7 | 10 | | 625 |
| 2-Chlorophenol | 95-57-8 | 10 | | 625 |
| 4-Chlorophenyl phenyl ether | 7005-72-3 | 10 | | 625 |
| Chlorpyrifos | 2921-88-2 | 0.05 | | 1657 |
| Chromium, total | 7440-47-3 | 3 | | 200.8 [4] |
| Chromium, hexavalent | 18540-29-9 | 3 | | 218.6, rev. 3.3 |
| Chromium, trivalent | 16065-83-1 | —[7] | | —[7] |
| Chrysene | 218-01-9 | 5 | | 625 |
| Cobalt, total | 7440-48-4 | 0.3 | 1500 | 200.8 [4] |
| Copper, total | 7440-50-8 | 2 | | 200.8 [4] |
| Coumaphos | 56-72-4 | 0.025 | | 1657 |
| Cresols (all isomers) | 1319-77-3 | 10 | | 625 [11] |
| m-Cresol | 108-39-4 | 10 | | 625 [11] |
| o-Cresol | 95-48-7 | 10 | | 625 [11] |
| p-Cresol [4-Methylphenol] | 106-44-5 | 10 | | 625 [11] |
| Crotonaldehyde | 4170-30-3 | 10 | | 1624[3] |
| Cyanide, total | 57-12-5 | 10 | | 335.4 or 4500-CN D or 4500-CN E |
| Cyanide, available | 57-12-5 | 10 | | 4500-CN G |
| | | 2 | | OIA-1677 |
| Cyclohexane | 110-82-7 | 5 | | 1666 [3] |
| 4,4'-DDD | 72-54-8 | 0.1 | | 608 |
| 4,4'-DDE | 72-55-9 | 0.1 | | 608 |
| 4,4'-DDT | 50-29-3 | 0.02 | | 608 |
| 2,4-D [17] | 94-75-7 | 0.7 | | 615 or SM6640B |
| Danitol [Fenpropathrin] | 39515-41-8 | —[8] | | —[8] |

| Pollutant | CASRN [1] | MAL (µg/L) | Screening Level [2] (µg/L) | Suggested Method |
|---|---|---|---|---|
| *n*-Decane | 124-18-5 | 30 | | 625 [11] |
| Demeton | 8065-48-3 | 0.20 | | 1657 [15, 16] |
| Diazinon | 333-41-5 | 0.5 | | 1657 |
| | | 0.1 | | 614 |
| Dibenzo(*a,h*)anthracene | 53-70-3 | 5 | | 625 |
| 1,2-Dibromoethane | 106-93-4 | 10 | | 1624 [3, 11] |
| Dicamba | 1918-00-9 | 0.110 | | 1658 [15] |
| Dichlobenil | 1194-65-6 | Not Specified [12] | | TBD [12] |
| Dichlone | 117-80-6 | Not Specified [12] | | 1656 [13] |
| *m*-Dichlorobenzene [1,3-Dichlorobenzene] | 541-73-1 | 10 | | 624 |
| *o*-Dichlorobenzene [1,2-Dichlorobenzene] | 95-50-1 | 10 | | 624 |
| *p*-Dichlorobenzene [1,4-Dichlorobenzene] | 106-46-7 | 10 | | 624 |
| 3,3'-Dichlorobenzidine | 91-94-1 | 5 | | 625 |
| 1,1-Dichloroethane | 75-34-3 | 10 | | 624 |
| 1,2-Dichloroethane | 107-06-2 | 10 | | 624 |
| 1,1-Dichloroethene [1,1-Dichloroethylene] | 75-35-4 | 10 | | 624 |
| Dichloromethane [Methylene choride] | 75-09-2 | 20 | | 624 |
| 2,4-Dichlorophenol | 120-83-2 | 10 | | 625 |
| 1,2-Dichloropropane | 78-87-5 | 10 | | 624 |
| 1,3-Dichloropropene | 542-75-6 | 10 | | 624 |
| 2,2-Dichloropropionic acid [Dalapon] | 75-99-0 | 2 | | 615 |
| Dichlorvos | 62-73-7 | 0.004 | | 1657 |
| Dicofol [Kelthane] | 115-32-2 | 1 | | ASTM D5812-96(02) |
| Dieldrin | 60-57-1 | 0.02 | | 608 |
| Diethyl amine | 109-89-7 | 50 mg/L | | 1671 |
| Diethyl phthalate | 84-66-2 | 10 | | 625 |
| Dimethyl amine | 124-40-3 | 50 mg/L | | 1671 |
| 2,4-Dimethylphenol | 105-67-9 | 10 | | 625 |
| Dimethyl phthalate | 131-11-3 | 10 | | 625 |
| Di-*n*-butyl phthalate | 84-74-2 | 10 | | 625 |
| Dinitrobenzene | 25154-54-5 | 10 | | 1625 [3] |

248

| Pollutant | CASRN [1] | MAL (µg/L) | Screening Level [2] (µg/L) | Suggested Method |
|---|---|---|---|---|
| 2,4-Dinitrophenol | 51-28-5 | 50 | | 625 |
| 2,4-Dinitrotoluene | 121-14-2 | 10 | | 625 |
| 2,6-Dinitrotoluene | 606-20-2 | 10 | | 625 |
| Di-*n*-octyl phthalate | 117-84-0 | 10 | | 625 |
| **Dioxins/Furans [TCDD Equivalents]**<br>  2,3,7,8-TCDD<br>  1,2,3,7,8-PeCDD<br>  **2,3,7,8-HxCDDs**<br>    1,2,3,4,7,8-HxCDD<br>    1,2,3,6,7,8-HxCDD<br>    1,2,3,7,8,9-HxCDD<br>  1,2,3,4,6,7,8-HpCDD<br>  OCDD<br>  2,3,7,8-TCDF<br>  1,2,3,7,8-PeCDF<br>  2,3,4,7,8-PeCDF<br>  **2,3,7,8-HxCDFs**<br>    1,2,3,4,7,8-HxCDF<br>    1,2,3,6,7,8-HxCDF<br>    1,2,3,7,8,9-HxCDF<br>    2,3,4,6,7,8-HxCDF<br>  **2,3,4,7,8-HpCDFs**<br>    1,2,3,4,6,7,8-HpCDF<br>    1,2,3,4,7,8,9-HpCDF<br>  OCDF | <br>1746-01-6<br>40321-76-4<br><br>39227-28-6<br>57653-85-7<br>19408-74-3<br>35822-46-9<br>3268-87-9<br>51207-31-9<br>57117-41-6<br>57117-31-4<br><br>70648-26-9<br>57117-44-9<br>72918-21-9<br>60851-34-5<br>38998-75-3<br>67562-39-4<br>55673-89-7<br>39001-02-0 | (ppq)<br>10<br>50<br><br>50<br>50<br>50<br>50<br>100<br>10<br>50<br>50<br><br>50<br>50<br>50<br>50<br><br>50<br>50<br>100 | | 1613B |
| 1,2-Diphenylhydrazine (as Azobenzene) | 122-66-7 | 20 | | 1625 [3] |
| Diquat | 2764-72-9 | 1.5 | | 549, 549.1 |
| Disulfoton | 298-04-4 | 0.032 | | 1657 |
| Diuron | 330-54-1 | 0.090 | | 632 |
| Endosulfan I (*alpha*) | 959-98-8 | 0.01 | | 608 |
| Endosulfan II (*beta*) | 33213-65-9 | 0.02 | | 608 |
| Endosulfan sulfate | 1031-07-8 | 0.1 | | 608 |
| Endrin | 72-20-8 | 0.02 | | 608 |
| Endrin aldehyde | 7421-93-4 | 0.1 | | 608 |
| Epichlorohydrin | 106-89-8 | 1 mg/L | | ASTM D-3695 [15] |
| Ethion | 563-12-2 | 0.02 | | 1657 |
| Ethylbenzene | 100-41-4 | 10 | | 624 |
| Ethylene diamine | 107-15-3 | Not Specified [12] | | TBD [12] |
| Ethylene dibromide | 106-93-4 | 10 | | 1624 [3] |
| Formaldehyde | 50-00-0 | 50 | | 1667 |
| Fluoranthene | 206-44-0 | 10 | | 625 |
| Fluorene | 86-73-7 | 10 | | 625 |

| Pollutant | CASRN [1] | MAL (µg/L) | Screening Level [2] (µg/L) | Suggested Method |
|---|---|---|---|---|
| Fluoride | 16984-48-8 | 500 | | 300.0, 300.1 |
| Furfural | 98-01-1 | 50 mg/L | | 1667 |
| Guthion [Azinphos Methyl] | 86-50-0 | 0.1 | | 1657 |
| Heptachlor | 76-44-8 | 0.01 | | 608 |
| Heptachlor epoxide | 1024-57-3 | 0.01 | | 608 |
| Hexachlorobenzene | 118-74-1 | 5 | | 625 |
| Hexachlorobutadiene | 87-68-3 | 10 | | 625 |
| *alpha*-Hexachlorocyclohexane | 319-84-6 | 0.05 | | 608 |
| *beta*-Hexachlorocyclohexane | 319-85-7 | 0.05 | | 608 |
| *gamma*-Hexachlorocyclohexane [Lindane] | 58-89-9 | 0.05 | | 608 |
| *delta*-Hexachlorocyclohexane | 319-86-8 | 0.05 | | 608 |
| Hexachlorocyclopentadiene | 77-47-4 | 10 | | 625 or 1625B [3, 17] |
| Hexachloroethane | 67-72-1 | 20 | | 625 |
| Hexachlorophene | 70-30-4 | 10 | | 604.1 |
| Indeno(1,2,3-*cd*)pyrene | 193-39-5 | 5 | | 625 |
| Iron, total | 7439-89-6 | 7 | 300 | 200.7 |
| Isophorone | 78-59-1 | 10 | | 625 |
| Isopropanolamine dodecylbenzenesulfonate | 42504-46-1 | Not Specified [12] | | TBD [12] |
| Kepone | 143-50-0 | 0.3 | | 1656 |
| Lead, total | 7439-92-1 | 0.5 | | 200.8 [4] |
| Malathion [17] | 121-75-5 | 0.1 | | 1657 or SM6630C |
| Magnesium, total | 7439-95-4 | 20 | | 200.7 |
| Manganese, total | 7439-96-5 | 0.5 | 50 | 200.8 [4] |
| Mercaptodimethur [Methiocarb] | 2032-65-7 | 0.06 | | 632 [15] |
| Mercury, total [9, 10] | 7439-97-6 | 0.005 | | 245.7, Rev. 2.0 |
| | | 0.0005 | | 1631E |
| Methoxychlor [18] | 72-43-5 | 2.0 | | 617 or SM6630B and C |
| Methyl bromide [Bromomethane] | 74-83-9 | 50 | | 624 |
| Methyl chloride [Chloromethane] | 74-87-3 | 50 | | 624 |

| Pollutant | CASRN [1] | MAL (µg/L) | Screening Level [2] (µg/L) | Suggested Method |
|---|---|---|---|---|
| Methyl ethyl ketone | 78-93-3 | 50 | | 624 |
| Methyl mercaptan | 74-93-1 | Not Specified [12] | | TBD [12] |
| Methyl methacrylate | 80-62-6 | 10 | | 1624 |
| Methyl parathion [17] | 298-00-0 | 0.05 | | 1657 or SM6630C |
| Mevinphos | 7786-34-7 | 0.2 | | 1657 |
| Mexacarbate | 315-18-4 | 1.5 | | 632 |
| Mirex | 2385-85-5 | 0.02 | | SM6630B and C [17] |
| Molybdenum, total | 7439-98-7 | 1 | 500 | 200.8 [3] |
| Monoethyl amine | 75-04-7 | Not Specified [12] | | TBD [12] |
| Monomethylamine | 74-89-5 | 50 mg/L | | 1667 |
| Naled | 300-76-5 | 0.05 | | 1657 |
| Napthalene | 91-20-3 | 10 | | 625 |
| Napthenic acid | 1338-24-5 | Not Specified [12] | | TBD [12] |
| Nickel, total | 7440-02-0 | 2 | | 200.8 [4] |
| Nitrate-nitrogen | 14797-55-8 | 100 | | 300.0, Rev. 2.1 300.1, Rev. 1.0 |
| Nitrobenzene | 98-95-3 | 10 | | 625 |
| 2-Nitrophenol | 88-75-5 | 20 | | 625 |
| 4-Nitrophenol | 100-02-7 | 50 | | 625 |
| N-Nitrosodiethylamine | 55-18-5 | 20 | | 625 |
| N-Nitrosodimethylamine | 62-75-9 | 50 | | 625 or 1625B [3] |
| N-Nitroso-di-n-butylamine | 924-16-3 | 20 | | 625 |
| N-Nitroso-di-n-propylamine | 621-64-7 | 20 | | 625 or 1625B [3] |
| N-Nitrosodiphenylamine | 86-30-6 | 20 | | 625 or 1625B [3] |
| Nitrotoluene | 1321-12-6 | Not Specified [12] | | TBD [12] |
| Nonylphenol | 104-40-5 | 333 | | 1625 |
| para-Nonylphenol | 84852-15-3 | 333 | | 1625 |
| Nonylphenol | 25154-52-3 | 333 | | 1625 |
| n-Octadecane | 593-45-3 | 30 | | 625 [11] |
| Parathion (ethyl) [17] | 56-38-2 | 0.1 | | 1657 or SM6630C |
| Pentachlorobenzene | 608-93-5 | 20 | | 625 |
| Pentachlorophenol | 87-86-5 | 5 | | 625 |

| Pollutant | CASRN [1] | MAL (µg/L) | Screening Level [2] (µg/L) | Suggested Method |
|---|---|---|---|---|
| Phenanthrene | 85-01-8 | 10 | | 625 |
| Phenol, total | 108-95-2 | 10 | | 625 |
| *p*-Phenolsulfonate | 127-82-2 | Not Specified [12] | | TBD [12] |
| Phosgene | 75-44-5 | — [8, 12] | | Degrades in water[8] |
| **Polychlorinated biphenyls (PCBs)**<br>PCB-77<br>PCB-81<br>PCB-126<br>PCB-169<br>PCB-1016<br>PCB-1221<br>PCB-1232<br>PCB-1242<br>PCB-1248<br>PCB-1254<br>PCB-1260 | 1336-36-3<br>32598-13-3<br>70362-50-4<br>57465-28-8<br>32774-16-6<br>12674-11-2<br>11104-28-2<br>11141-16-5<br>53469-21-9<br>12672-29-6<br>11097-69-1<br>11096-82-5 | <br>0.0005<br>0.0005<br>0.0005<br>0.0005<br>0.2<br>0.2<br>0.2<br>0.2<br>0.2<br>0.2<br>0.2 | | <br>1668B [19]<br>1668B [19]<br>1668B [19]<br>1668B [19]<br>608<br>608<br>608<br>608<br>608<br>608<br>608 |
| Propargite | 2312-35-8 | 0.02 | | GCMS |
| Propylene oxide | 75-56-9 | 25 | | 624 Heated Purge |
| Pyrene | 129-00-0 | 10 | | 625 |
| Pyrethrin I | 121-21-1 | 3.1 | | 1660 |
| Pyrethrin II | 121-29-9 | 3.3 | | 1660 |
| Pyridine | 110-86-1 | 20 | | 625 [11] |
| Quinoline | 91-22-5 | 1 mg/L | | ASTM D-4763 |
| Resorcinol | 108-46-3 | 100 | | 1625 [3] |
| Selenium, total | 7782-49-2 | 5 | | 200.8 [4] |
| Silver, total | 7440-22-4 | 0.5 | | 200.8 [4] |
| Strontium | 7440-24-6 | 1.0 | | 200.7 |
| Strychnine | 57-24-9 | 40 | | 1625 [3] |
| Styrene | 100-42-5 | 10 | | 1625 [3] |
| 1,2,4,5-Tetrachlorobenzene | 95-94-3 | 20 | | 1625 [3] |
| 1,1,2,2-Tetrachloroethane | 79-34-5 | 10 | | 624 |
| Tetrachloroethene [Tetrachloroethylene] | 127-18-4 | 10 | | 624 |
| Thallium, total | 7440-28-0 | 0.5 | | 200.8 [4] |
| Tin, total | 7440-31-5 | 5 | | 200.7, 200.9 [4] |
| Titanium, total | 7440-32-6 | 30 | 40 | 283.2 |
| Toluene | 108-88-3 | 10 | | 624 |

| Pollutant | CASRN [1] | MAL (μg/L) | Screening Level [2] (μg/L) | Suggested Method |
|---|---|---|---|---|
| Toxaphene | 8001-35-2 | 0.3 | | 608 |
| 2,4,5-TP [Silvex] | 93-72-1 | 0.3 | | SM6640B |
| 1,2-Trans-dichloroethene 1,2-Trans-dichloroethylene | 156-60-5 | 10 | | 624 |
| Tributyltin [TBT] | 688-73-3 | 0.01 | | TNRCC 1001 |
| 1,2,4-Trichlorobenzene | 120-82-1 | 10 | | 625 |
| 1,1,1-Trichloroethane | 71-55-6 | 10 | | 624 |
| 1,1,2-Trichloroethane | 79-00-5 | 10 | | 624 |
| Trichloroethene [Trichloroethylene] | 79-01-6 | 10 | | 624 |
| Trichlorofon | 52-68-6 | 0.45 | | 1657 |
| 2,4,5-Trichlorophenol | 95-95-4 | 50 | | 1625 [3] |
| 2,4,6-Trichlorophenol | 88-06-2 | 10 | | 625 |
| Triethanolmine dodecylbenzenesulfonate | 27323-41-7 | Not Specified [12] | | TBD [12] |
| Triethylamine | 121-44-8 | 50 mg/L | | 1667 |
| **TTHM (Total Trihalomethanes)** Bromodichloromethane Dibromochloromethane Tribromomethane [Bromoform] Trichloromethane [Chloroform] | 75-27-4 124-48-1 75-25-2 67-66-3 | 10 10 10 10 | | 624 |
| Trimethylamine | 75-50-3 | Not Specified [12] | | 1666 [13] |
| Uranium, total | 7440-61-1 | 0.5 | | 200.8 [4] |
| Vanadium, total | 7440-62-2 | 5 | | 200.8 [4] |
| Vinyl acetate | 108-05-4 | 50 | | 1624 [3] |
| Vinyl chloride | 75-01-4 | 10 | | 624 |
| Xylenes, total | 1330-20-7 | 10 | | 1624C [3] |
| Xylenol | 1300-71-6 | 30 | | 625 |
| Zinc, total | 7440-66-6 | 5.0 | | 200.8 [4] |
| Zirconium | 7440-67-7 | 100 | | 1620 |

[1]  Chemical Abstracts Service Registry Number.

[2]  Screening levels are noted for toxic pollutants that (1) do not have numerical criteria in the Standards and (2) are of potential concern only at concentrations substantially higher than the MAL.

[3]  EPA Methods 624 and 625 may be utilized in lieu of Methods 1624 and 1625, respectively, as provided in the protocol for Transfer of an Analyte Between Methods as described in *Analytical Method Guidance for the Pharmaceutical Manufacturing Point Source Category, U. S. Environmental Protection Agency, EPA 821-B-00-003, August 1999.* See Appendix G.

4   EPA Methods 200.8 and 200.9 are approved for use in the NPDES program (40 CFR Part 136, revised March 12, 2007).

5   40 CFR Part 136, Table IC refers to the *Methods for Benzene: Chlorinated Organic Compounds, Pentachlorophenol and Pesticides in Water and Wastewater*, U.S. Environmental Protection Agency, September 1978. However, no analytical method number is specified in 40 CFR Part 136.

6   Hydrolyzes in water. Will not require applicant to analyze at this time.

7   Trivalent chromium (Cr) determined by subtracting hexavalent Cr from total Cr.

8   EPA procedure not approved. Will not require applicant to analyze at this time.

9   Either method listed for mercury may be used.

10  Although EPA Methods 245.1 Revision 3.0 and 245.2 are included as approved analytical methods for mercury in the 40 CFR Part 136 (*Federal Register/ Vol. 72, No. 47/ Monday, March 12, 2007/ Rules and Regulations, page 11220*), the Director of the EPA Office of Wastewater Management published a policy memo, dated August 23, 2007, clarifying and explaining that based on the existing regulatory requirements for NPDES permitting, only the most sensitive analytical methods for mercury, such as EPA Methods 1631E and 245.7, are appropriate in most instances for use in deciding whether to set a permit limit for mercury and for sampling and analysis of mercury pursuant to monitoring requirements within a permit.

11  Pollutant analyzed by the EPA as published in the *Centralized Waste Treatment Final Development Document*, Chapter 7, and *Federal Register* Vol. 65, No. 247, Friday, December 22, 2000, pp. 81295-81300, using Method 625.

12  The TCEQ has requested the EPA to provide MALs and/or suggested methods.

13  Method is draft and has not yet been approved by EPA.

14  The MAL is 3.3 times the MDL and lowest calibration point for Captan of 0.1 μg/L as given in Method 1656.

15  *Methods for Benzene: Chlorinated Organic Compounds, Pentachlorophenol and Pesticides in Water And Wastewater.* U.S. Environmental Protection Agency, September 1978,

16  *Selected Analytical Methods Approved and Cited by the USEPA.* Supplement to the Fifteenth Edition of *Standard Methods for the Examination of Water and Wastewater*, 1981.

17  EPA Methods 605, 607, and 612 may also be used.

18  Except as provided in 40 CFR Part 136.5, pesticide manufacturers must determine the discharge parameter values required under the Clean Water Act by one of the methods described in Table 1G of 40 CFR Part 136.3(a). *See* 40 CFR Part 455.50.

19  Method 1668B is not currently listed as an approved method at 40 CFR Part 136.

**Table E-2. Analytical Methods and MALs for the Determination of Pollutants Regulated by § 307.6 of the Standards**

**Notes on table:**

1) Suggested analytical methods have traditionally been EPA-approved analytical methods either in the 40 CFR Part 136, as amended, or in EPA-published documents pertaining to wastewater matrices, or methods developed and published by the TCEQ or other government agencies for wastewater. Applicants and permittees may use any analytical method approved in 40 CFR Part 136 that is sufficiently sensitive to demonstrate compliance with their numeric permit limits (mass and concentration).

| Pollutant | Suggested Method | MAL (µg/L) | MDL (µg/L) | MAL Source Documentation |
|---|---|---|---|---|
| Acrylonitrile | 1624B | 50 | 50 | The MAL is based on the MDL published in 40 CFR Part 136, Method 1624B. The MAL is equal to the minimum level at which the analytical system shall give acceptable calibration points documented in 40 CFR Part 136, Method 1624B. |
| Aldrin | 608 | 0.01 | 0.004 | The MAL is based on the MQL approved by EPA Region 6 on February 8, 2008. The MAL is 2.5 times the MDL documented in 40 CFR Part 136, Method 608. |
| Aluminum, total | 200.8 | 2.5 | 1.0 | The MAL is based on the MQL approved by EPA Region 6 on February 8, 2008. The MAL is 2.5 times the MDL based on EPA Method 200.8.[1] |
| Anthracene | 625 | 10 | —[4] | The MAL is based on the MQL developed by EPA Region 6, July 1992. |
| Antimony, total | 200.8 | 5 | 0.4 | The MAL is 12.5 times the MDL based on EPA Method 200.8.[1] |
| Arsenic, total | 200.8 | 0.5 | 0.4 | The MAL is based on the MQL approved by EPA Region 6 on February 8, 2008. The MDL is published in EPA Method 200.8.[1] |
| Barium, total | 200.8 | 3 | 0.8 | The MAL is approximately 3.8 times the MDL based on EPA Method 200.8.[1] |

255

| Pollutant | Suggested Method | MAL (µg/L) | MDL (µg/L) | MAL Source Documentation |
|---|---|---|---|---|
| Benzene | 624 | 10 | 4.4 | The MAL is based on the MQL developed by EPA Region 6, July 1992. The MDL is documented in 40 CFR Part 136, Method 624. |
| Benzidine | 625 | 50 | 44 | The MAL is based on the MQL approved by EPA Region 6 on February 8, 2008. The MDL is documented in 40 CFR Part 136, Method 625. |
| Benzo(*a*)anthracene | 625 | 5 | —[11] | The MAL is based on the CERCLA National Contract Laboratory Program's CRQL referred to by EPA Region 6 MQL guidance dated February 8, 2008. |
| Benzo(*a*)pyrene | 625 | 5 | 2.5 | The MAL is based on the MQL approved by EPA Region 6 on February 8, 2008. The MDL is documented in 40 CFR Part 136, Method 625. |
| Bis(2-chloroethyl)ether | 625 | 10 | 5.7 | The MAL is based on the MQL developed by EPA Region 6, July 1992. The MDL is documented in 40 CFR Part 136, Method 625. |
| Bis(chloromethyl)ether | —[4] | —[4] | —[4] | Analytical method undetermined. |
| Bis(2-ethylhexyl)phthalate [Di(2-ethylhexyl)phthalate] | 625 | 10 | 2.5 | The MAL is based on the MQL developed by EPA Region 6, July 1992. The MDL is documented in 40 CFR Part 136, Method 625. |
| Bromodichloromethane [Dichlorobromomethane] | 624 | 10 | 2.2 | The MAL is based on the MQL developed by EPA Region6, July 1992. The MDL is documented in 40 CFR Part 136, Method 624. |
| Cadmium, total | 200.8 | 1 | 0.5 | The MAL is two times the MDL based on EPA Method 200.8.[1] |
| Carbaryl | 632 | 5.0 | 0.02 | The MAL is based on laboratory consensus taken October 1992. The MDL is given by EPA Method 632.[6] |

| Pollutant | Suggested Method | MAL (µg/L) | MDL (µg/L) | MAL Source Documentation |
|---|---|---|---|---|
| Carbon tetrachloride | 624 | 2 | —[11] | The MAL is four times the CERCLA National Contract Laboratory Program's CRQL of 0.5 µg/L referred to by EPA Region 6 MQL guidance dated February 8, 2008. |
| Chlordane | 608 | 0.2 | 0.014 | The MAL is based on the MQL approved by EPA Region 6 on February 8, 2008. The MDL is documented in 40 CFR Part 136, Method 608. |
| Chlorine | 4500-Cl E 4500-Cl G | 33 | 10 | The MAL is based on the MQL developed by EPA Region 6, February 8, 2008. The MDL is documented in SM 4500-Cl E and 4500-Cl G. |
| Chlorobenzene | 624 | 10 | 6.0 | The MAL is based on the MQL developed by EPA Region 6, July 1992. The MDL is documented in 40 CFR Part 136, Method 624. |
| Chlorodibromomethane | 624 | 10 | 3.1 | The MAL is based on the MQL developed by EPA Region 6, July 1992. The MDL is documented in 40 CFR Part 136, Method 624. |
| Chloroform | 624 | 10 | 1.6 | The MAL is based on the MQL developed by EPA Region 6, July 1992. The MDL is documented in 40 CFR Part 136, Method 624. |
| Chlorpyrifos | 1657 | 0.05 | 0.004 | The MAL is 12.5 times the MDL given by EPA, Method 1657.[6] |
| Chromium, total | 200.8 | 3 | 0.9 | The MAL is 3.3 times the MDL based on EPA Method 200.8.[1] |
| Chromium, hexavalent | 218.6, Rev. 3.3 | 3.0 | 0.3 | The MAL is ten times the MDL given by EPA Method 218.6, Revision 3.3.[3] |

| Pollutant | Suggested Method | MAL (µg/L) | MDL (µg/L) | MAL Source Documentation |
|---|---|---|---|---|
| Chromium, trivalent | See documentation note. | — | — | Trivalent chromium is determined by subtracting the concentration of hexavalent chromium (dissolved) from the dissolved total chromium concentration. |
| Chrysene | 625 | 5 | 2.5 | The MAL is based on the MQL approved by EPA Region 6 on February 8, 2008. The MDL is documented in 40 CFR Part 136, Method 625. |
| Copper, total | 200.8 | 2 | 0.5 | The MAL is 3.3 times the MDL from Method 200.8 rounded |
| *m*-cresol | 625 | 10 | 3 | The MDL is documented in 40 CFR Part 136, Method 625.[2,15] |
| *o*-cresol | 625 | 10 | 4.7 | The MDL is documented in 40 CFR Part 136, Method 625.[2,15] |
| *p*-Cresol [4-Methylphenol] | 625 | 10 | 7.8 | The MDL is documented in 40 CFR Part 136, Method 625.[2,15] |
| Cyanide, total | 335.4, 4500-CN D, 4500-CN E, | 10 | —[4] | The MAL is based on the MQL approved by EPA Region 6 on February 8, 2008. |
| Cyanide, available [16] | 4500-CN G | 10 | —[5] | The MAL is based on the MQL approved by EPA Region 6 on February 8, 2008. There is no MDL documented in Standard Methods (20th Edition).[5] |
| | OIA-1677 | 2 | 0.5 | The MAL and MDL are documented in EPA Method OIA-1677 dated August 1999. |

| Pollutant | Suggested Method | MAL (µg/L) | MDL (µg/L) | MAL Source Documentation |
|---|---|---|---|---|
| 4,4'-DDD | 608 | 0.1 | 0.011 | The MAL is approximately 9.1 times the detection limit documented in 40 CFR Part 136, Method 608. The MAL is based on the MQL developed by EPA Region 6, July 1992. |
| 4,4'-DDE | 608 | 0.1 | 0.004 | The MAL is based on the MQL Developed by EPA Region 6, July 1992. The MDL is documented in 40 CFR Part 136, Method 608. |
| 4,4'-DDT | 608 | 0.02 | 0.012 | The MAL is based on the MQL approved by EPA Region 6 on February 8, 2008. The MDL is documented in 40 CFR Part 136, Method 608. |
| 2,4-D | 615 or SM6640B | 0.7 | 0.07 | The MAL is ten times the detection limit given by SM6640B.[5] |
| Danitol [Fenpropathrin] | No published EPA method available | —[4] | —[4] | No published EPA method available. |
| Demeton | 1657 [12, 13] | 0.20 | 0.020 | The MAL is ten times the detection limit given by EPA Method 1657.[6] |
| Diazinon | 1657 | 0.5 | 0.038 | The MAL is approximately 13.2 times the detection limit given by EPA Method 1657.[6] |
| | 614 | 0.1 | 0.01 | The MAL is 10 times the detection limit given by EPA Method 614.[6] |
| Dibenzo(*a,h*)anthracene | 625 | 5 | —[4] | The MAL is based on the MQL approved by EPA Region 6 on February 8, 2008. |
| 1,2-Dibromoethane | 1624 | 10 | —[4] | The MAL is based on the baseline value documented in Attachment 15-1, page 5-17 of the EPA *Development Document for Effluent Limitations Guidelines and Standards for the Centralized Waste Treatment Industry - Final*, August 2000. |

| Pollutant | Suggested Method | MAL (µg/L) | MDL (µg/L) | MAL Source Documentation |
|---|---|---|---|---|
| *m*-Dichlorobenzene [1,3-Dichlorobenzene] | 624 | 10 | 1.9 | The MAL is based on the MQL developed by EPA Region 6, July 1992. The MDL is documented in 40 CFR Part 136, Method 624. |
| *o*-Dichlorobenzene [1,2-Dichlorobenzene] | 624 | 10 | 1.9 | The MAL is based on the MQL developed by EPA Region 6, July 1992. The MDL is documented in 40 CFR Part 136, Method 624. |
| *p*-Dichlorobenzene [1,4-Dichlorobenzene] | 624 | 10 | 4.4 | The MAL is based on the MQL developed by EPA Region 6, July 1992. The MDL is documented in 40 CFR Part 136, Method 624. |
| 3,3'-Dichlorobenzidine | 625 | 5 | —[11] | The MAL is based on the CERCLA National Contract Laboratory Program's CRQL referred to by EPA Region 6 MQL guidance dated February 8, 2008. |
| 1,2-Dichloroethane | 624 | 10 | 2.8 | The MAL is based on the MQL developed by EPA Region 6, July 1992. The MDL is documented in 40 CFR Part 136, Method 624. |
| 1,1-Dichloroethene [1,1-Dichloroethylene] | 624 | 10 | 2.8 | The MAL is based on the MQL developed by EPA Region 6, July 1992. The MDL is documented in 40 CFR Part 136, Method 624. |
| Dichloromethane [Methylene choride] | 624 | 20 | 2.8 | The MAL is based on the MQL developed by EPA Region 6, July 1992. The MDL is documented in 40 CFR Part 136, Method 624. |
| 1,2-Dichloropropane | 624 | 10 | 6.0 | The MAL is based on the MQL developed by EPA Region 6, July 1992. The MDL is documented in 40 CFR Part 136, Method 624. |
| 1,3-Dichloropropene | 624 | 10 | 5.0 | The MAL is based on the MQL developed by EPA Region 6, July 1992. The MDL is documented in 40 CFR Part 136, Method 624 for cis-1,3-Dichloropropene. |

260

| Pollutant | Suggested Method | MAL (µg/L) | MDL (µg/L) | MAL Source Documentation |
|---|---|---|---|---|
| Dicofol [Kelthane] | ASTM D5812-96(02) | 1 | —[4] | The MAL is 3.3 times the lowest calibration point for Dicofol of 0.3 µg/L given in Method 1656. |
| Dieldrin | 608 | 0.02 | 0.002 | The MAL is based on the MQL approved by EPA Region 6 on February 8, 2008. The MDL is documented in 40 CFR Part 136, Method 608. |
| 2,4-Dimethylphenol | 625 | 10 | 2.7 | The MAL is based on the MQL developed by EPA Region 6, July 1992. The MDL is documented in 40 CFR Part 136, Method 625. |
| Di-*n*-butyl phthalate | 625 | 10 | —[4] | The MAL is based on the MQL developed by EPA Region 6, July 1992. |
| **Dioxins/Furans (TCDD Equivalents)**<br>2,3,7,8-TCDD<br>1,2,3,7,8-PeCDD<br>**2,3,7,8-HxCDDs**<br>1,2,3,4,7,8-HxCDD<br>1,2,3,6,7,8-HxCDD<br>1,2,3,7,8,9-HxCDD<br>1,2,3,4,6,7,8-HpCDD<br>OCDD<br>2,3,7,8-TCDF<br>1,2,3,7,8-PeCDF[10]<br>2,3,4,7,8-PeCDF<br>**2,3,7,8-HxCDFs**<br>1,2,3,4,7,8-HxCDF<br>1,2,3,6,7,8-HxCDF<br>1,2,3,7,8,9-HxCDF<br>2,3,4,6,7,8-HxCDF<br>**2,3,4,7,8-HpCDFs**<br>1,2,3,4,6,7,8-HpCDF<br>1,2,3,4,7,8,9-HpCDF<br>OCDF | 1613B | (ppq)<br>10<br>50<br><br>50<br>50<br>50<br>100<br>10<br>50<br><br>50<br>50<br>50<br><br>50<br>50<br>100 | (ppq)<br>See documentation note | The MAL is based on the Minimum Level (ML) published in 40 CFR Part 136, Method 1613B. The ML for each analyte is defined as the level at which the entire analytical system must give a recognizable signal and acceptable calibration point. It is equivalent to the concentration of the lowest calibration standard, assuming that all method-specified sample weights, volumes, and cleanup procedures have been employed. |
| Diuron | 632 | 0.09 | 0.009 | The MAL is ten times the detection limit given by EPA Method 632.[6] |

| Pollutant | Suggested Method | MAL (µg/L) | MDL (µg/L) | MAL Source Documentation |
|---|---|---|---|---|
| Endosulfan I (*alpha*) | 608 | 0.01 | —[11] | The MAL is based on the MQL approved by EPA Region 6 on February 8, 2008. The MDL is documented in 40 CFR Part 136, Method 608. |
| Endosulfan II (*beta*) | 608 | 0.02 | 0.004 | The MAL is based on the MQL approved by EPA Region 6 on February 8, 2008. The MDL is documented in 40 CFR Part 136, Method 608. |
| Endosulfan sulfate | 608 | 0.1 | 0.066 | The MAL is based on the MQL developed by EPA Region 6, July 1992. The MDL is documented in 40 CFR Part 136, Method 608. |
| Endrin | 608 | 0.02 | 0.006 | The MAL is based on the MQL approved by EPA Region 6 on February 8, 2008. The MDL is documented in 40 CFR Part 136, Method 608. |
| Ethylbenzene | 624 | 10 | 7.2 | The MAL is based on the MQL developed by EPA Region 6 July 1992. The MDL is documented in 40 CFR Part 136, Method 624. |
| Fluoride | 300.0 or 300.1 | 500 | 50 | The MAL is ten times the lowest concentration of the applicable working range given by EPA Method 300.0. |
| Guthion [Azinphos Methyl] | 1657 | 0.1 | 0.009 | The MAL is 11.1 times the detection limit given by EPA Method 1657.[6] |
| Heptachlor | 608 | 0.01 | 0.003 | The MAL is based on the MQL approved by EPA Region 6 on February 8, 2008. The MAL is 3.3 times the detection limit documented in 40 CFR Part 136, Method 608. |
| Heptachlor epoxide | 608 | 0.01 | —[11] | The MAL is based on the CERCLA National Contract Laboratory Program's CRQL referred to by EPA Region 6 MQL guidance dated February 8, 2008. |

| Pollutant | Suggested Method | MAL (µg/L) | MDL (µg/L) | MAL Source Documentation |
|---|---|---|---|---|
| Hexachlorobenzene | 625 | 5 | 1.9 | The MAL is based on the CERCLA National Contract Laboratory Program's CRQL referred to by EPA Region 6 MQL guidance dated February 8, 2008. The MDL is documented in 40 CFR Part 136, Method 625. |
| Hexachlorobutadiene | 625 | 10 | 0.9 | The MAL is 11.1 times the detection limit documented in 40 CFR Part 136, Method 625 and corresponds to the MQL developed by EPA Region 6, July 1992. |
| *Alpha-*Hexachlorocyclohexane | 608 | 0.05 | 0.003 | The MAL is 16.7 times the detection limit documented in 40 CFR Part 136, Method 608. The MAL is based on the MQL developed by EPA Region 6, July 1992. |
| *Beta-*Hexachlorocyclohexane | 608 | 0.05 | 0.006 | The MAL is 8.3 times the detection limit documented in 40 CFR Part 136, Method 608. The MAL is based on the MQL developed by EPA Region 6, July 1992. |
| *Gamma-*Hexachlorocyclohexane [Lindane] | 608 | 0.05 | 0.004 | The MAL is 12.5 times the detection limit documented in 40 CFR Part 136, Method 608. The MAL is based on the MQL developed by EPA Region 6, July 1992. |
| Hexachlorocyclopentadiene | 625 or 1625B [14] | 10 | —[4] | The MAL is based on the MQL developed by EPA Region 6, July 1992. |
| Hexachloroethane | 625 | 20 | 1.6 | The MAL is based on the MQL developed by EPA Region 6, July 1992. The MDL is documented in 40 CFR Part 136, Method 625. |
| Hexachlorophene | 604.1 | 10 | 1.2 | The MAL is 8.3 times the detection limit given in EPA Method 604.1.[6] |

| Pollutant | Suggested Method | MAL (µg/L) | MDL (µg/L) | MAL Source Documentation |
|---|---|---|---|---|
| Lead, total | 200.8 | 0.5 | 0.05 | The MAL is based on the MQL approved by EPA Region 6 on February 8, 2008. The MDL is published in EPA Method 200.8.[1] |
| Malathion | 1657 or SM6630C | 0.1 | 0.011 | The MAL is 9.1 times the detection limit given in EPA Method 1657.[6] |
| Mercury[7, 8, 9] | 245.7, Rev. 2.0 | 0.005 | 0.0018 | The MAL is based on the MQL published in the EPA national policy memorandum dated August 23, 2007 and in the Method 245.7 published in February 2005. |
| Mercury[7, 8, 9] | 1631E | 0.0005 | 0.0002 | The MAL is based on the MQL published in the EPA national policy memorandum dated August 23, 2007 and in the Method 1631E published in August 2002. |
| Methoxychlor | 617 or SM6630B and C | 2 | 0.176 | The MAL is 11.4 times the detection limit given in EPA Method 617.[6] |
| Methyl ethyl ketone | 624 | 50 | 50 | The MAL is the minimum level at which the analytical system shall give acceptable calibration points documented in 40 CFR 136, Method 1624. MAL is five times the CRQL for water analysis using Method 624 from the EPA Region 6, Target Compound List acquired January 14, 1993. |
| Mirex | SM6630B and C | 0.02 | 0.004 | The MAL is 3.75 times the MDL and lowest calibration point for Mirex of 0.004 µg/L as given in Method 1656. |
| Nickel, total | 200.8 | 2 | 0.5 | The MAL is less than or equal to 3.3 times the MDL for EPA Method 200.8 [1] rounded. |
| Nitrate-nitrogen | 300.1 | 100 | 10 | The MAL is ten times the lowest concentration of the applicable range given by EPA Method 300.1, Rev. 1.0. |

| Pollutant | Suggested Method | MAL (µg/L) | MDL (µg/L) | MAL Source Documentation |
|---|---|---|---|---|
| Nitrobenzene | 625 | 10 | 1.9 | The MAL is based on the MQL developed by EPA Region 6, July 1992. The MDL is documented in 40 CFR Part 136, Method 625. |
| *N*-Nitrosodiethylamine | 625 | 20 | 5 | The suggested method, MAL and MDL are based on laboratory consensus taken October 1992. |
| *N*-Nitroso-di-*n*-butylamine | 625 | 20 | 5 | The suggested method, MAL and MDL are based on laboratory consensus taken October 1992. |
| para-Nonylphenol (CASRN 84852-15-3) | 1625 | 333 | 111 | The MAL is three times the MDL published in Method 1625. |
| Nonylphenol (CASRN 25154-52-3) | 1625 | 333 | 111 | The MAL is three times the MDL published in Method 1625. |
| Parathion (ethyl) | 1657 or SM6630C | 0.1 | 0.010 | The MAL is ten times the detection limit given in EPA Method 1657.[6] |
| Pentachlorobenzene | 625 | 20 | 5 | The suggested method, MAL and MDL are based on laboratory consensus taken October 1992. |
| Pentachlorophenol | 625 | 5 | 3.6 | The MAL is based on the MQL approved by EPA Region 6 on February 8, 2008. |
| Phenanthrene | 625 | 10 | 5.4 | The MAL is based on the MQL developed by EPA Region 6, July 1992. The MDL is documented in 40 CFR Part 136, Method 625. |
| **Polychlorinated biphenyls (PCBs)** | | | | |
| PCB-77 | 1668B | 0.0005 | 0.000169 | The MALs are based on estimated minimum levels as published in Method 1668B. |
| PCB-81 | 1668B | 0.0005 | 0.000177 | |
| PCB-126 | 1668B | 0.0005 | 0.000136 | |
| PCB-169 | 1668B | 0.0005 | 0.000161 | |
| PCB-1016 | 608 | 0.2 | ND[4] | The MALs are based on the MQLs approved by EPA Region 6 on February 8, 2008. The MDL is documented in 40 CFR Part 136, Method 608. |
| PCB-1221 | 608 | 0.2 | ND[4] | |
| PCB-1232 | 608 | 0.2 | ND[4] | |
| PCB-1242 | 608 | 0.2 | 0.065 | |
| PCB-1248 | 608 | 0.2 | ND[4] | |
| PCB-1254 | 608 | 0.2 | ND[4] | |
| PCB-1260 | 608 | 0.2 | ND[4] | |

| Pollutant | Suggested Method | MAL (µg/L) | MDL (µg/L) | MAL Source Documentation |
|---|---|---|---|---|
| Pyridine | 625[2] | 20 | 10 | The MAL is two times the MDL published in the *List of Lists: A Catalog of Analytes and Methods*, U.S. Environmental Protection Agency, Office of Water Regulations and Standards, Industrial Technology Division, September 1990. |
| Selenium, total | 200.8 | 5 | 2.1 | The MAL is based on the MQL approved by EPA Region 6 on February 8, 2008. The MDL is published in EPA Method 200.8.[1] |
| Silver, total | 200.8 | 1 | 0.1 | The MAL is based on the MQL approved by EPA Region 6 on February 8, 2008. The MAL is five times the MDL in EPA Method 200.8.[1] |
| 1,2,4,5-Tetrachlorobenzene | 1625 | 20 | 10 | The MAL is 2 times the MDL published in the *List of Lists: A Catalog of Analytes and Methods*, U.S. Environmental Protection Agency, Office of Water Regulations and Standards, Industrial Technology Division, September 1990. |
| 1,1,2,2-Tetrachloroethane | 624 | 10 | 6.9 | The MAL is based on the MQL developed by EPA Region 6, July 1992. The MDL is documented in 40 CFR Part 136, Method 624. |
| Tetrachloroethene [Tetrachloroethylene] | 624 | 10 | 4.1 | The MAL is based on the MQL developed by EPA Region 6, July 1992. The MDL is documented in 40 CFR Part 136, Method 624. |
| Thallium, total | 200.8 | 1 | 0.3 | The MAL is based on the MQL approved by EPA Region 6 on February 8, 2008. The MAL is approximately 1.7 times the MDL in EPA Method 200.8.[1] |

| Pollutant | Suggested Method | MAL (µg/L) | MDL (µg/L) | MAL Source Documentation |
|---|---|---|---|---|
| Toluene | 624 | 10 | 6.0 | The MAL is based on the MQL developed by EPA Region 6, July 1992. The MDL is documented in 40 CFR Part 136, Method 624. |
| Toxaphene | 608 | 1 | 0.24 | The MAL is based on the MQL approved by EPA Region 6 in February 8, 2008. The MDL is documented in 40 CFR Part 136, Method 608. |
| 2,4,5-TP [Silvex] | SM6640B | 0.3 | 0.03 | The MAL is ten times the detection limit given by SM6640B.[5] |
| Tributyltin [TBT] | TNRCC 1001 | 0.01 | $3.2 \times 10^{-3}$ | The method is entitled "Measurement of Butyltin Species in Water by n-Pentyl Derivatization with Gas Chromatography/Flame Photometric Detection (GC/FPD) and Gas Chromatography/Mass Spectrometry (GC/MS)." The MAL is equal to EPA tributyltin advisory level. |
| 1,1,1-Trichloroethane | 624 | 10 | 3.8 | The MAL is based on the MQL developed by EPA Region 6, July 1992. The MDL is documented in 40 CFR Part 136, Method 624. |
| 1,1,2-Trichloroethane | 624 | 10 | 5.0 | The MAL is based on the MQL developed by EPA Region 6, July 1992. The MDL is documented in 40 CFR Part 136, Method 624. |
| Trichloroethene [Trichloroethylene] | 624 | 10 | 1.9 | The MAL is based on the MQL developed by EPA Region 6, July 1992. The MDL is documented in 40 CFR Part 136, Method 624. |
| 2,4,5-Trichlorophenol | 1625 | 50 | 10 | The MAL is five times the minimum level at which the analytical system shall give acceptable calibration points documented in 40 CFR Part 136, Method 1625. |

| Pollutant | Suggested Method | MAL (µg/L) | MDL (µg/L) | MAL Source Documentation |
|---|---|---|---|---|
| **TTHM (Total Trihalomethanes)**<br>  Bromodichloromethane<br>  Dibromochloromethane<br>  Tribromomethane [Bromoform]<br>  Trichloromethane [Chloroform] | 624 | 10<br>10<br>10<br>10 | 2.2<br>3.1<br>4.7<br>1.6 | The MAL is based on the CRQL for water analysis using Method 624 from the EPA Region 6, Target Compound List acquired January 14, 1993. Method detection limits are documented in 40 CFR Part 136, Method 624. |
| Vinyl chloride | 624 | 10 | —[4] | The MAL is based on the MQL developed by EPA Region 6, July 1992. The MDL is given as "nd" in 40 CFR Part 136, Method 624. |
| Zinc, total | 200.8 | 5 | 1.8 | The MAL is approximately 2.8 times the MDL based on EPA Method 200.8.[1] |

[1]  Method 200.8 is approved for use in the NPDES program [40 CFR Part 136, revised March 12, 2007]. *Method 200.8. Determination of Trace Elements in Waters and Wastes by Inductively Coupled-Plasma - Mass Spectrometry*, U.S. Environmental Protection Agency, EPA 600-R-94-111, May 1994. Method 200.8 contains accuracy and precision data generated using determination of trace elements in waters and wastes by inductively coupled plasma-mass spectrometry techniques for the following metals: aluminum, arsenic, barium, cadmium, chromium, copper, lead, nickel, selenium, silver, thallium, and zinc.

[2]  Pollutant analyzed by the EPA as published in the *Centralized Waste Treatment Final Development Document*, Chapter 7, and *Federal Register* Vol. 65, No. 247, Friday, December 22, 2000, pp. 81295-81300, using Method 625.

[3]  *Methods for the Chemical Analysis of Water and Wastes*, U.S. Environmental Protection Agency, Environmental Monitoring Systems Laboratory-Cincinnati (EMSL-Cl), EPA-600/4-79-020, Revised March 1983 and 1979 where applicable.

[4]  Not determined or not published by the EPA.

[5]  *Standard Methods Online*, American Public Health Association, American Water Works Association, and Water Environment Federation, 2005. URL: http://www.standardmethods.org/applications/Login/index.cfm?test=no&forwardto=

[6]  *EPA Methods for the Determination of Nonconventional Pesticides in Municipal and Industrial Wastewater*, U.S. Environmental Protection Agency, EPA-821-R-93-010-A & B, August 1993.

[7]  Either method listed for mercury may be used.

[8]  *Method 1631, Revision E. Mercury in Water by Oxidation, Purge and Trap, and Cold Vapor Atomic Fluorescence Spectrometry*, U.S. Environmental Protection Agency, Office of Water, EPA 821-R-02-019, August 2002.

[9]  Although EPA Methods 245.1 Revision 3.0 and 245.2 are included as approved analytical methods for mercury in the 40 CFR Part 136 (*Federal Register/ Vol. 72, No. 47/ Monday, March 12, 2007/ Rules and Regulations, page 11220*), the Director of the EPA Office of Wastewater Management published a policy memo, dated August 23, 2007, clarifying and explaining that based on the existing regulatory requirements for NPDES permitting, only the most sensitive analytical methods for mercury, such as EPA Methods 1631E and 245.7, are appropriate in most instances for use in deciding whether to set a permit limit for mercury and for sampling and analysis of mercury pursuant to monitoring requirements within a permit.

[10]   The ML is not published in 40 CFR Part 136, Method 1613B.

[11]   The MDL is published in 40 CFR Part 136.

[12]   *Methods for Benzene: Chlorinated Organic Compounds, Pentachlorophenol and Pesticides in Water And Wastewater.* U.S. Environmental Protection Agency, September 1978,

[13]   *Selected Analytical Methods Approved and Cited by the USEPA.* Supplement to the Fifteenth Edition of *Standard Methods for the Examination of Water and Wastewater*, 1981.

[14]   EPA Methods 605, 607, and 612 may also be used.

[15]   *Product and Product Group Discharges Subject to Effluent Limitations and Standards for the Organic Chemicals, Plastics, and Synthetic Fibers Point Source Category – 40 CFR Part  414*, U.S. Environmental Protection Agency, Office of Water. April 2005.

[16]   The EPA has published Method OIA-1677 for the analysis of available cyanide as a method that tends to overcome matrix interferences present with other methods and includes a lower MAL. Permit writers may determine the appropriate method for permittees on a case-by-case basis in situations where a lower MAL is needed for permit compliance or for eliminating interferences and matrix problems.

# Appendix F. Nutrient Screening Parameters for Certain Reservoirs.

**Table F-1: Total Phosphorus and Chlorophyll *a* Means for Certain Reservoirs**

**Notes on table:**

1) Segment numbers in parentheses refer to the segment in whose watershed the lake is located.

2) Data used to calculate the TP, chlorophyll *a*, and secchi depth means were collected at the SWQM monitoring site(s) listed in the Site ID column for each reservoir.

3) The mean values for TP, chlorophyll *a*, and secchi depth are arithmetic means. The means are calculated from the same data sets used to calculate TP and transparency screening levels and chlorophyll *a* criteria in the Standards.

| Segment No. | Lake/Reservoir Name | Site ID | TP Mean (mg/L) | Chlorophyll *a* Mean (µg/L) | Secchi Mean (m) |
|---|---|---|---|---|---|
| (0100) | Palo Duro Reservoir | 10005 | 0.171 | 12.95 | 0.40 |
| 0102 | Lake Meredith | 10036 | 0.022 | 3.10 | 1.98 |
| 0208 | Lake Crook | 10137 | 0.165 | 4.77 | 0.23 |
| 0209 | Pat Mayse Lake | 10138 | 0.029 | 7.64 | 1.34 |
| 0210 | Farmers Creek Reservoir (also known as Lake Nocona) | 10139 | 0.026 | 4.06 | 1.18 |
| 0212 | Lake Arrowhead | 10142 | 0.130 | 6.99 | 0.69 |
| 0213 | Lake Kickapoo | 10143 | 0.066 | 3.81 | 0.35 |
| 0215 | Diversion Lake | 10157 | 0.026 | 6.21 | 0.96 |
| 0217 | Lake Kemp | 10159 | 0.023 | 5.78 | 1.33 |
| 0223 | Greenbelt Lake | 10173 | 0.022 | 3.14 | 2.03 |
| 0228 | Mackenzie Reservoir | 10188 | 0.021 | 3.74 | 1.37 |
| 0229 | Lake Tanglewood | 10192 | 1.022 | 24.75 | 0.70 |
| 0302 | Wright Patman Lake | 10213 | 0.087 | 12.46 | 0.64 |
| 0403 | Lake O' the Pines | 10296 | 0.027 | 9.31 | 1.17 |
| 0405 | Lake Cypress Springs | 10312 | 0.027 | 11.21 | 1.28 |
| 0507 | Lake Tawakoni | 10434 | 0.045 | 23.95 | 1.00 |
| 0509 | Murvaul Lake | 10444 | 0.057 | 37.46 | 0.61 |
| 0510 | Lake Cherokee | 10445 | 0.019 | 5.69 | 1.41 |
| 0512 | Lake Fork Reservoir | 10458 | 0.036 | 9.78 | 1.59 |
| 0603 | B. A. Steinhagen Lake | 10582 | 0.068 | 8.04 | 0.43 |
| 0605 | Lake Palestine | 16159 | 0.027 | 17.37 | 0.90 |
| 0610 | Sam Rayburn Reservoir | 14906 | 0.028 | 4.52 | 1.97 |
| 0613 | Lake Tyler | 10637 | 0.026 | 8.27 | 1.16 |
| 0613 | Lake Tyler East | 10638 | 0.027 | 7.00 | 1.16 |
| 0614 | Lake Jacksonville | 10639 | 0.026 | 4.05 | 1.63 |

| Seg-ment No. | Lake/Reservoir Name | Site ID | TP Mean (mg/L) | Chlorophyll *a* Mean (µg/L) | Secchi Mean (m) |
|---|---|---|---|---|---|
| 0803 | Lake Livingston | 10899 | 0.136 | 15.15 | 0.79 |
| 0807 | Lake Worth | 10942 | 0.073 | 23.51 | 0.79 |
| 0809 | Eagle Mountain Reservoir | 10944 10945 | 0.062 | 17.25 | 0.92 |
| 0811 | Bridgeport Reservoir | 10970 | 0.045 | 3.73 | 1.23 |
| 0813 | Houston County Lake | 10973 | 0.026 | 7.35 | 1.43 |
| 0815 | Bardwell Reservoir | 10979 | 0.043 | 15.05 | 0.64 |
| 0816 | Lake Waxahachie | 10980 | 0.027 | 11.84 | 0.78 |
| 0817 | Navarro Mills Lake | 10981 | 0.062 | 9.74 | 0.45 |
| 0818 | Cedar Creek Reservoir | 10982 16749 | 0.067 | 21.88 | 0.86 |
| 0823 | Lewisville Lake | 11027 | 0.046 | 11.67 | 0.76 |
| 0826 | Grapevine Lake | 11035 16113 | 0.063 | 7.21 | 1.01 |
| 0827 | White Rock Lake | 11038 | 0.086 | 20.89 | 0.51 |
| 0828 | Lake Arlington | 11040 13904 | 0.033 | 15.99 | 0.86 |
| 0830 | Benbrook Lake | 11046 15151 | 0.057 | 18.01 | 0.84 |
| 0832 | Lake Weatherford | 11061 | 0.045 | 8.31 | 0.70 |
| 0834 | Lake Amon G. Carter | 11063 | 0.030 | 3.91 | 1.45 |
| 0836 | Richland-Chambers Reservoir | 15168 | 0.031 | 10.58 | 1.27 |
| 1002 | Lake Houston | 11204 | 0.165 | 7.18 | 0.34 |
| 1012 | Lake Conroe | 11342 | 0.042 | 16.05 | 0.94 |
| 1203 | Whitney Lake | 11851 | 0.027 | 11.21 | 1.49 |
| 1205 | Lake Granbury | 11860 | 0.054 | 15.53 | 1.14 |
| 1207 | Possum Kingdom Lake | 11865 | 0.041 | 6.84 | 2.64 |
| (1208) | Millers Creek Reservoir | 11679 | 0.062 | 10.34 | 0.31 |
| 1212 | Somerville Lake | 11881 | 0.082 | 35.16 | 0.68 |
| 1216 | Stillhouse Hollow Lake | 11894 | 0.029 | 1.71 | 3.22 |
| 1220 | Belton Lake | 11921 | 0.028 | 4.11 | 2.05 |
| 1222 | Proctor Lake | 11935 | 0.079 | 18.48 | 0.60 |
| 1224 | Leon Reservoir | 11939 | 0.023 | 6.17 | 1.22 |
| 1225 | Waco Lake | 11942 | 0.068 | 16.11 | 0.88 |
| 1228 | Lake Pat Cleburne | 11974 | 0.059 | 11.93 | 0.56 |
| 1230 | Lake Palo Pinto | 11977 | 0.050 | 3.81 | 0.69 |
| 1231 | Lake Graham | 11979 | 0.039 | 4.37 | 0.73 |

| Seg-ment No. | Lake/Reservoir Name | Site ID | TP Mean (mg/L) | Chlorophyll *a* Mean (µg/L) | Secchi Mean (m) |
|---|---|---|---|---|---|
| 1233 | Hubbard Creek Reservoir | 12002 | 0.030 | 3.68 | 1.34 |
| 1234 | Lake Cisco | 12005 | 0.017 | 3.07 | 1.58 |
| 1235 | Lake Stamford | 12006 | 0.056 | 11.02 | 0.47 |
| 1236 | Fort Phantom Hill Reservoir | 12010 | 0.044 | 6.12 | 0.59 |
| 1237 | Lake Sweetwater | 12021 | 0.033 | 8.49 | 0.88 |
| 1240 | White River Lake | 12027 | 0.046 | 8.02 | 0.54 |
| (1241) | Buffalo Springs Lake | 11529 | 0.081 | 38.20 | 0.65 |
| 1247 | Granger Lake | 12095 | 0.044 | 7.43 | 0.47 |
| 1249 | Lake Georgetown | 12111 | 0.032 | 2.61 | 2.15 |
| 1252 | Lake Limestone | 12123 | 0.065 | 13.08 | 0.83 |
| 1254 | Aquilla Reservoir | 12127 | 0.037 | 8.73 | 0.69 |
| 1403 | Lake Austin | 12294 | 0.023 | 2.45 | 2.12 |
| 1404 | Lake Travis | 12302 | 0.021 | 2.46 | 3.68 |
| 1405 | Marble Falls Lake | 12319 | 0.023 | 6.87 | 1.44 |
| 1406 | Lake Lyndon B. Johnson | 12324 | 0.022 | 6.72 | 1.44 |
| 1407 | Inks Lake | 12336 | 0.026 | 9.66 | 1.62 |
| 1408 | Lake Buchanan | 12344 | 0.022 | 6.41 | 1.97 |
| 1411 | E. V. Spence Reservoir | 12359 | 0.022 | 8.97 | 1.27 |
| (1412) | Lake Colorado City | 12167 | 0.039 | 10.11 | 0.77 |
| (1416) | Brady Reservoir | 12179 | 0.030 | 17.02 | 0.69 |
| 1418 | Lake Brownwood | 12395 | 0.019 | 3.49 | 1.24 |
| 1419 | Lake Coleman | 12398 | 0.018 | 4.02 | 1.29 |
| 1422 | Lake Nasworthy | 12418 | 0.045 | 11.12 | 0.52 |
| 1423 | Twin Buttes Reservoir | 12422 | 0.066 | 8.81 | 0.87 |
| 1425 | O.C. Fisher Lake | 12429 | 0.112 | 23.60 | 0.36 |
| (1426) | Oak Creek Reservoir | 12180 | 0.025 | 4.62 | 0.78 |
| 1429 | Lady Bird Lake (formerly Town Lake) | 12476 | 0.031 | 4.51 | 1.94 |
| 1433 | O. H. Ivie Reservoir | 12511 | 0.024 | 4.14 | 2.11 |
| 1805 | Canyon Lake | 12598 | 0.025 | 2.64 | 2.72 |
| 1904 | Medina Lake | 12826 | 0.011 | 1.86 | 2.84 |
| 2103 | Lake Corpus Christi | 12967 | 0.148 | 10.08 | 0.49 |
| 2116 | Choke Canyon Reservoir | 13019 | 0.044 | 7.77 | 1.16 |
| 2303 | International Falcon Reservoir | 13189 | 0.047 | 9.56 | 0.79 |
| 2305 | International Amistad Reservoir | 13211 | 0.015 | 1.44 | 3.55 |

| Seg-ment No. | Lake/Reservoir Name | Site ID | TP Mean (mg/L) | Chlorophyll *a* Mean (µg/L) | Secchi Mean (m) |
|---|---|---|---|---|---|
| 2312 | Red Bluff Reservoir | 13267 | 0.030 | 14.81 | 0.85 |
| (2454) | Cox Creek Lake | 12514 | 0.268 | 8.10 | 0.16 |

**Table F-2:  Size Characteristics and Retention Times for Certain Reservoirs**

**Notes on table:**

1)  Segment numbers in parentheses refer to the segment in whose watershed the lake is located.

2)  Surface areas are at normal pool elevation as defined in Appendix C of the Standards. Surface areas were obtained from the Texas Water Development Board unless noted otherwise.

3)  Volumes are at normal pool elevation as defined in Appendix C of the Standards. Volumes include the dead pool and were obtained from the Texas Water Development Board (TWDB) unless noted otherwise.

4)  The volumetric survey year is the year in which the actual survey was performed (not the report year).

5)  Retention times are calculated as noted in the source documentation but may be recalculated as reservoir capacities or flows are updated or as the TCEQ becomes aware of significant water transfers in or out of these reservoirs.

| Segment No. | Lake/Reservoir Name | Surface Area (acres) | Volume (acre-ft.) | Volumetric Survey Year | Retention Time (yrs) | Retention Time Source* |
|---|---|---|---|---|---|---|
| (0100) | Palo Duro Reservoir | 2,397 | 61,239 | 1986 | — | — |
| 0102 | Lake Meredith | 16,411 | 817,970 | 1995 | 15.1 | Ground |
| 0208 | Lake Crook | 1,060 | 9,210 | 2003 | 0.22 | Ground |
| 0209 | Pat Mayse Lake | 5,940 | 118,100 | 2008 | 1.3 | Ground |
| 0210 | Farmers Creek Reservoir (also known as Lake Nocona) | 1,362 | 21,749 | 2001 | 3.0 | Ground |
| 0212 | Lake Arrowhead | 14,969 | 235,997 | 2001 | 4.7 | TCEQ |
| 0213 | Lake Kickapoo | 6,028 | 85,825 | 2001 | 2.2 | TCEQ |
| 0215 | Diversion Lake | 3,133 | 33,420 | 1958 | 0.36 | TCEQ |
| 0217 | Lake Kemp | 15,357 | 245,434 | 2006 | 3.0 | Ground |
| 0223 | Greenbelt Lake | 2,025 | 60,400 | — | 6.4 | Ground |
| 0228 | Mackenzie Reservoir | 896 | 46,454 | 1973 | 38.1 | Ground |
| 0229 | Lake Tanglewood | 258 [(a)] | — | — | — | — |
| 0302 | Wright Patman Lake | 24,438 | 167,300 | 1997 | 0.06 | Ground |
| 0403 | Lake O' the Pines | 16,919 | 241,081 | 1998 | 0.56 | Ground |
| 0405 | Lake Cypress Springs | 3,461 | 67,690 | 2007 | 1.7 | Ground |
| 0507 | Lake Tawakoni | 37,879 | 888,140 | 1997 | 2.5 | Ground |
| 0509 | Murvaul Lake | 3,529 | 38,284 | 1998 | 0.85 | Ground |
| 0510 | Lake Cherokee | 3,467 | 43,737 | 2003 | 0.68 | Ground |
| 0512 | Lake Fork Reservoir | 27,264 | 636,133 | 2001 | 3.9 | Ground |
| 0603 | B. A. Steinhagen Lake | 10,687 | 66,972 | 2003 | 0.03 | Ground |
| 0605 | Lake Palestine | 22,656 | 373,202 | 2003 | 1.2 | Ground |
| 0610 | Sam Rayburn Reservoir | 112,590 | 2,876,033 | 2004 | 1.8 | Ground |

| Segment No. | Lake/Reservoir Name | Surface Area (acres) | Volume (acre-ft.) | Volumetric Survey Year | Retention Time (yrs) | Retention Time Source* |
|---|---|---|---|---|---|---|
| 0613 | Lake Tyler | 2,341 [b] | 43,500 [c] | 2003 | — | — |
| 0613 | Lake Tyler East | 2,396 [b] | 36,698 [d] | 2003 | 0.84 | Ground |
| 0614 | Lake Jacksonville | 1,165 | 25,732 | 2006 | 1.8 | Ground |
| 0803 | Lake Livingston | 83,277 | 1,741,867 | 1991 | 0.35 | Ground |
| 0807 | Lake Worth | 3,458 | 33,495 | 2001 | — | — |
| 0809 | Eagle Mountain Reservoir | 8,702 | 182,505 | 2008 | 0.95 | Ground |
| 0811 | Bridgeport Reservoir | 11,954 | 366,236 | 2000 | 3.1 | Ground |
| 0813 | Houston County Lake | 1,330 | 17,665 | 1999 | 1.3 | Ground |
| 0815 | Bardwell Reservoir | 3,138 | 46,472 | 1999 | 1.0 | Ground |
| 0816 | Lake Waxahachie | 656 | 11,386 | 2000 | — | — |
| 0817 | Navarro Mills Lake | 4,736 | 49,827 | 2008 | 0.64 | Ground |
| 0818 | Cedar Creek Reservoir | 32,873 | 644,785 | 2005 | 1.7 | Ground |
| 0823 | Lewisville Lake | 29,170 | 571,926 | 2007 | 0.99 | Ground |
| 0826 | Grapevine Lake | 6,893 | 164,703 | 2002 | 1.5 | Ground |
| 0827 | White Rock Lake | 1,088 | 9,004 | 1993 | — | — |
| 0828 | Lake Arlington | 1,926 | 40,188 | 2007 | 2.4 | Ground |
| 0830 | Benbrook Lake | 3,635 | 85,648 | 1998 | 1.7 | Ground |
| 0832 | Lake Weatherford | 1,112 | 17,812 | 2008 | 1.3 | TCEQ |
| 0834 | Lake Amon G. Carter | 1,540 | 20,050 | — | — | — |
| 0836 | Richland-Chambers Reservoir | 41,356 | 1,136,600 | 2007 | 1.8 | TCEQ |
| 1002 | Lake Houston | 11,854 | 133,990 | 1994 | 0.11 | Ground |
| 1012 | Lake Conroe | 20,118 | 416,228 | 1996 | 2.7 | Ground |
| 1203 | Whitney Lake | 23,220 | 554,203 | 2005 | 0.61 | Ground |
| 1205 | Lake Granbury | 7,945 | 129,011 | 2003 | 0.21 | Ground |
| 1207 | Possum Kingdom Lake | 16,716 | 540,340 | 2005 | 1.1 | Ground |
| (1208) | Millers Creek Reservoir | 2,268 | 29,171 | 1993 | — | — |
| 1212 | Somerville Lake | 11,555 | 147,104 | 2003 | 0.65 | TCEQ |
| 1216 | Stillhouse Hollow Lake | 6,484 | 227,825 | 2005 | 1.5 | Ground |
| 1220 | Belton Lake | 12,135 | 435,225 | 2003 | 1.3 | Ground |
| 1222 | Proctor Lake | 4,537 | 55,457 | 2002 | 0.86 | Ground |
| 1224 | Leon Reservoir | 1,590 | 27,290 | — | 1.2 | Ground |
| 1225 | Waco Lake | 7,913 | 199,405 | 1995 | 0.73 | Ground |
| 1228 | Lake Pat Cleburne | 1,558 | 25,730 | 2008 | — | — |
| 1230 | Lake Palo Pinto | 2,498 | 27,650 | 2007 | 0.98 | Ground |

| Segment No. | Lake/Reservoir Name | Surface Area (acres) | Volume (acre-ft.) | Volumetric Survey Year | Retention Time (yrs) | Retention Time Source* |
|---|---|---|---|---|---|---|
| 1231 | Lake Graham | 2,444 | 45,302 | 1998 | 1.9 | Ground |
| 1233 | Hubbard Creek Reservoir | 14,922 | 324,983 | 1997 | 4.1 | Ground |
| 1234 | Lake Cisco | 10,450 | 26,000 | — | — | — |
| 1235 | Lake Stamford | 5,124 | 51,573 | 1999 | — | — |
| 1236 | Fort Phantom Hill Reservoir | 4,213 | 70,036 | 1993 | — | — |
| 1237 | Lake Sweetwater | 630 | 11,900 | — | 3.8 | Ground |
| 1240 | White River Lake | 2,020 | 44,300 | 1993 | 16.3 | Ground |
| (1241) | Buffalo Springs Lake | 200 | 4,200 | — | — | — |
| 1247 | Granger Lake | 4,064 | 52,525 | 2002 | 0.42 | Ground |
| 1249 | Lake Georgetown | 1,287 | 36,904 | 2005 | 0.76 | Ground |
| 1252 | Lake Limestone | 12,553 | 208,017 | 2002 | 0.93 | Ground |
| 1254 | Aquilla Reservoir | 3,066 | 44,566 | 2008 | 1.3 | Ground |
| 1403 | Lake Austin | 1,599 | 21,804 | 1999 | 0.02 | Ground |
| 1404 | Lake Travis | 19,199 | 1,134,863 | 2008 | 1.1 | Ground |
| 1405 | Marble Falls Lake | 608 | 7,486 | 2007 | 0.01 | Ground |
| 1406 | Lake Lyndon B. Johnson | 6,273 | 133,090 | 2007 | 0.14 | Ground |
| 1407 | Inks Lake | 788 | 14,074 | 2007 | 0.02 | Ground |
| 1408 | Lake Buchanan | 22,019 | 875,610 | 2006 | 1.2 | Ground |
| 1411 | E. V. Spence Reservoir | 14,640 | 517,272 | 1999 | 33.3 | Ground |
| (1412) | Lake Colorado City | 1,612 | 31,805 | — | 1.3 | Ground |
| (1416) | Brady Reservoir | 2,020 | 30,430 | — | 2.3 | Ground |
| 1418 | Lake Brownwood | 6,587 | 131,429 | 1997 | 1.2 | Ground |
| 1419 | Lake Coleman | 1,811 | 38,094 | 2006 | 2.1 | Ground |
| 1422 | Lake Nasworthy | 1,380 | 10,108 | 1993 | 1.2 | Ground |
| 1423 | Twin Buttes Reservoir | 9,080 | 186,200 | — | 18.7 | Ground |
| 1425 | O. C. Fisher Lake | 5,440 | 115,743 | — | 6.2 | Ground |
| (1426) | Oak Creek Reservoir | 2,375 | 39,360 | — | 2.1 | Ground |
| 1429 | Lady Bird Lake (formerly Town Lake) | 468 | 6,409 | 1999 | 0.01 | Ground |
| 1433 | O. H. Ivie Reservoir | 19,149 | 554,340 | — | 11.9 | Ground |
| 1805 | Canyon Lake | 8,308 | 378,852 | 2000 | 1.3 | Ground |
| 1904 | Medina Lake | 6,066 | 254,823 | 1995 | 1.6 | Ground |
| 2103 | Lake Corpus Christi | 18,256 | 257,260 | 2002 | 0.53 | Ground |
| 2116 | Choke Canyon Reservoir | 25,989 | 695,271 | 1993 | 3.7 | Ground |
| 2303 | International Falcon | 85,195 | 2,646,817 | — | 1.2 | Ground |

| Segment No. | Lake/Reservoir Name | Surface Area (acres) | Volume (acre-ft.) | Volumetric Survey Year | Retention Time (yrs) | Retention Time Source* |
|---|---|---|---|---|---|---|
| | Reservoir | | | | | |
| 2305 | International Amistad Reservoir | 65,597 | 3,275,532 | 1994 | 2.1 | Ground |
| 2312 | Red Bluff Reservoir | 11,193 | 289,670 | — | 2.8 | Ground |
| (2454) | Cox Creek Lake | 541 | 5,034 | — | — | — |

(a) Dimensions obtained from http://findlakes.com

(b) Surface area proportions derived from http://www.tpwd.state.tx.us and then adjusted to the surface area at normal pool elevation

(c) Capacity from http://www.cityoftyler.org

(d) Calculated as the difference between the TWDB total capacity for both lakes (80,198 acre-ft) and the City of Tyler's capacity for Lake Tyler (http://www.cityoftyler.org).

\* Ground: Ground, T. A. 1992. Relationships of Watershed Climate and Geochemical Processes to Trophic Characteristics in Texas Reservoirs. Master of Science thesis. Retention time was calculated using the mean annual discharge from the nearest downstream USGS gage and the mean annual reservoir volume as published by USGS.

TCEQ: Calculated using capacity at conservation pool from TWDB and annual average flow calculated either from the nearest downstream USGS gage or from US Army Corps of Engineers gated flow data.

# Appendix G. Transfer of Analytes.

Applicants and Permittees may transfer an analyte from one EPA-approved method to another EPA-approved method as described below. The section below is an excerpt from pages 6-2 and 6-3 of the EPA document *Analytical Method Guidance for the Pharmaceutical Manufacturing Point Source Category*, EPA 821-B-99-003 (August 1999). Use of this guidance is not intended to be limited to pharmaceutical manufacturing and may be undertaken by any applicant or permittee for any analyte as long as applicable NELAC accreditation for the analyte is obtained.

## Transfer of an Analyte Between Methods

Some laboratories asked whether a target analyte from one EPA-approved method could be transferred to another EPA-approved method, thereby reducing the number of methods required for monitoring. During development of the Pharmaceuticals Industry final rule, EPA did not evaluate the effect of transferring analytes between methods. On March 28, 1997, when EPA proposed the Streamlining Initiative (now referred to as the performance-based measurement system or "PBMS"), the Agency included a procedure to allow the addition of an analyte to an existing method. This procedure centered on meeting the quality control (QC) acceptance criteria for performance tests for the analyte.

Using PBMS as the basis for transfer of an analyte from one method to another, EPA recommends allowance of a transfer, provided the following conditions are met:

1) The QC tests in the method from which the analyte is transferred must be run as an integral part of the method to which the analyte is transferred,

2) The QC acceptance criteria in the method from which the analyte is transferred must be met when the QC tests are run as an integral part of the method to which the analyte is transferred, and

3) The MDL obtained for the analyte in the method to which the analyte is transferred must be equal to or less than MDL in the method from which the analyte is transferred or less than one third the regulatory compliance limit specified in the permit, whichever is greater.

QC tests in the 600- and 1600-series EPA methods include calibration, calibration verification, initial and ongoing precision and recovery, analysis of blanks, and matrix spike/matrix spike duplicates. EPA recommends that these QC tests be performed and the QC acceptance criteria be met, as follows:

1) When the analyte is transferred to a method, the added analyte must be included in the initial calibration and ongoing calibration checks, and the QC acceptance criteria in the method from which the analyte is transferred must be met for both initial calibration and calibration verification.

2) All initial and ongoing performance tests in the method from which the analyte is transferred must be performed as an integral part of the method to which the analyte is transferred, and the QC acceptance criteria in the method from which the analyte is transferred must be met. The initial and ongoing tests must include a blank with the initial demonstration of performance and with each sample batch.

3)     The quality control check or matrix spike/matrix spike duplicate test (whichever is applicable) in the method from which the analyte is transferred must be performed as an integral part of the method to which the analyte is transferred, and the QC acceptance criteria in the method from which the analyte is transferred must be met.

4)     An MDL study must be performed for the analyte as an integral part of the method to which the analyte is transferred, and the MDL obtained must be equal to or less than either a) the MDL in the method from which the analyte is transferred or b) one-third the regulatory compliance limit specified in the permit, whichever is greater.

Notes:

1.     A possible conflict could arise if the methods are chromatographic (i.e., GC or GC/MS). Some EPA chromatographic methods contain QC tests and QC acceptance criteria for absolute and/or relative retention time. When transferring an analyte between methods, it is unlikely that the two methods would require use of the same chromatographic column and it is therefore unlikely that the retention time criteria in the method from which the analyte is transferred could be met in the method to which the analyte is transferred. To resolve this issue, the absolute and/or relative retention time requirements are waived for the transferred analyte only. If there are absolute and/or relative retention time requirements for the target analytes in the method to which the analyte is transferred, those requirements must continue to be met.

2.     Some methods do not contain an MDL, but contain a minimum level of quantitation (ML) for each analyte. MLs were created by multiplying the MDL by 3.18 and rounding.  Therefore, for the purpose of establishing that the MDL for a transferred analyte is less than or equal to the MDL in the method from which the analyte is transferred, divide the ML by 3.18 to establish the MDL.

Examples:

Example 1: The final rule requires that certain volatile analytes be determined by EPA Method 524.2. These analytes may be added to EPA Method 1666 or any other approved method provided the three conditions specified above are met.

Example 2: The final rule requires that tert-butyl alcohol, diethylamine, dimethyl sulfoxide, isobutyraldehyde, methyl cellosolve, methyl formate, and triethyl amine be analyzed by EPA Method 1666 or 1671. These analytes may be added to EPA Method 624, 625, or any other approved method provided that the three conditions specified above are met.

# Appendix Item 13

# TCEQ Interoffice Memorandum

**To:**       Municipal Permits Team
Wastewater Permitting Section

**From:**    Josi Robertson
Water Quality Assessment Team
Water Quality Assessment Section

**Date:**      April 1, 2022

**Subject:**  SWWC Utilities, Inc.
New Permit (WQ0016022001, TX0141569)
Discharge to a tributary of Colorado River above La Grange (Segment No. 1434)

The referenced applicant is seeking a permit authorizing the discharge of treated domestic wastewater into the watershed of the Colorado River above La Grange (Segment No. 1434). A dissolved oxygen analysis of the referenced discharge was conducted using an uncalibrated QUAL-TX model for the proposed Interim I flow phase of 0.20 MGD, Interim II flow phase of 0.5 MGD, and Final flow phase of 0.8 MGD. The facility is located in Travis County.

Based on model results, the proposed effluent limits of **5.0 mg/L CBOD$_5$, 2.0 mg/L NH$_3$-N, and 4.0 mg/L DO for all flow phases** are predicted to be adequate to maintain dissolved oxygen levels above the criteria stipulated by the Standards Implementation Team for Wilbarger Creek (5.0 mg/L).

These effluent limits also comply with the requirements of the Colorado River Watershed Protection Rule (30 TAC 311, Subchapter E), which also requires effluent limits of 5 mg/L TSS and 1.0 mg/L total phosphorus, at a minimum.

Coefficients and kinetics used in the model are a combination of estimated and standardized default values. The results of this evaluation can be re-examined upon receipt of information that conflicts with the assumptions employed in this analysis.

Segment 1434 is not currently listed on the State's inventory of impaired and threatened waters (the 2020 Clean Water Act Section 303(d) list).

The effluent limits recommended above have been reviewed for consistency with the State of Texas Water Quality Management Plan (WQMP). The proposed limits are not contained in the approved WQMP. However, these limits will be included in the next WQMP update.

# Appendix Item 14

# DISSOLVED OXYGEN MODELING
## PERMIT REVIEW CHECKLIST
### TCEQ WATER QUALITY ASSESSMENT TEAM
### WATER QUALITY ASSESSMENT SECTION
### WATER QUALITY DIVISION

Owner: SWWC Utilities, Inc.

TPDES Permit Number: WQ0016022001 (TX0141569)

Permit Action: ☐ Renewal ☒ New ☐ New/Replace Expired ☐ Amendment

Other Review: ☐ Preliminary Review ☐ SRF Review

County: Travis

Segment Number: 1434

Received Date: 7/28/2022

Completion Date: 4/1/2022

Discharge Route: Wilbarger Creek -> Colorado River Above La Grange (Segment No. 1434)

1. **Previous analysis**: ☒ No ☐ Yes Date:

2. **Segment 303(d)-listed**: ☒ No ☐ Yes List Date: 2020
   Dissolved Oxygen Impairment? ☒ No ☐ Yes

3. **Approved TMDL**: ☒ No ☐ Yes- Include language in memo if for DO

4. **Waste Load Evaluation (WLE)**: ☒ No ☐ Yes

5. **Tidal:**
   Is initial receiving water tidal? ☒ No ☐ Yes Is the Segment tidal? ☒ No ☐ Yes

6. **Discharge Directly to a Lake**: ☒ No ☐ Yes

7. **Watershed Protection rules apply:** ☐ No ☒ Yes ☐ N/A
   ☒ 30 TAC CHAPTER 311 Watershed Protection rules *(Colorado River Seg. No. 1434 and its tributaries (Seg. 1428 and portion of 1434 upstream of Smithville))*
   ☐ 30 TAC §§309.3(c)

8. **Edwards Aquifer Rules apply:** ☒ No ☐ Yes
   Within or near: ☐ Recharge Zone ☐ Contributing Zone ☐ Transition Zone

9. **DO criteria from Standards Implementation Team Worksheet**:
   Wilbarger Creek = 5.0 mg/L
   Segment 1434 = 6.0 mg/L

10. **Existing effluent limits**: NA, New permit

11. **Effluent analysis** oxygen demanding and related constituent concentrations: NA, new permit

12. **Proposed wastewater flow and quality**:

    Phase: Interim I Interim II Final

| Q | = 0.2 | MGD | = 0.5 | MGD | = 0.8 | MGD |
|---|---|---|---|---|---|---|
| CBOD$_5$ | = 5 | mg/L | = 5 | mg/L | = 5 | mg/L |
| TSS | = 5 | mg/L | = 5 | mg/L | = 5 | mg/L |
| NH$_3$-N | = 2 | mg/L | = 2 | mg/L | = 2 | mg/L |
| DO | = 4.0 | mg/L | = 4.0 | mg/L | = 4.0 | mg/L |
| TP | = 1 | mg/L | = 1.0 | mg/L | = 1.0 | mg/L |

13. **Other dischargers** to consider: See model for list of other dischargers

14. **Effluent flow path and distances for modeling**:
Wilbarger Creek (element 164 in model) >10 miles to Segment No. 1434

15. **Headwater flow** (≥ 7Q2): Table 4 applies? ☒ Yes (Freshwater streams, Apr – Oct only) ☐ No
0.4 cfs headwater flow assigned to Wilbarger Creek in SS, May, Sum, and Oct seasonal models
0.1 cfs headwater flow assigned to Wilbarger Creek in March seasonal model

16. **Basis for analysis**:
☐ QUAL-TX model DOS BOX
☒ QUAL-TX for Windows model
☐ QUAL-TX model from WLE
☐ CSTR model
☐ LA-QUAL model
☐ WASP model
☐ QUAL2K model
☐ Best Professional Judgment (BPJ)
☐ None

17. **Hydraulics**: See model for previously developed Wilbarger Creek hydraulics

18. **Modeling Results**:

DO Criteria (mg/L): Wilbarger Creek
5.0 / 5.5 (SS)

| Model | Flow | Effluent Set | Minimum DO (mg/L) |
|---|---|---|---|
| March | 0.2 MGD | 5/2/4.0 | 6.66 OK |
| SS | 0.2 MGD | 5/2/4.0 | 6.45 OK |
| May | 0.2 MGD | 5/2/4.0 | 5.90 OK |
| Sum | 0.2 MGD | 5/2/4.0 | 5.58 OK |
| Oct | 0.2 MGD | 5/2/4.0 | 6.19 OK |
| | | | |
| March | 0.5 MGD | 5/2/4.0 | 6.62 OK |
| SS | 0.5 MGD | 5/2/4.0 | 6.42 OK |
| May | 0.5 MGD | 5/2/4.0 | 5.88 OK |
| Sum | 0.5 MGD | 5/2/4.0 | 5.56 OK |
| Oct | 0.5 MGD | 5/2/4.0 | 6.16 OK |
| | | | |
| March | 0.5 MGD | 5/2/4.0 | 6.60 OK |
| SS | 0.5 MGD | 5/2/4.0 | 6.38 OK |
| May | 0.5 MGD | 5/2/4.0 | 5.86 OK |
| Sum | 0.5 MGD | 5/2/4.0 | 5.54 OK |
| Oct | 0.5 MGD | 5/2/4.0 | 6.13 OK |

Note: Up to 0.2 mg/L below the DO criterion is considered consistent

19. **Recommended limits**:
Phase: Interim I Interim II Final

| Q | = 0.2 | MGD | = 0.5 | MGD | = 0.8 | MGD |
|---|---|---|---|---|---|---|
| $CBOD_5$ | = 5 | mg/L | = 5 | mg/L | = 5 | mg/L |
| $NH_3$-N | = 2 | mg/L | = 2 | mg/L | = 2 | mg/L |
| DO | = 4.0 | mg/L | = 4.0 | mg/L | = 4.0 | mg/L |
| TP | = 1 | mg/L | = 1.0 | mg/L | = 1.0 | mg/L |

20. **WQMP status**: ☐ Consistent With  ☒ Update required  ☐ N/A

21. **Files saved as**:
F:/MODELING/1434/WILB.March.UP8    .../WILB.SS.UP*    .../WILB.May.UP8
    .../WILB.SUM.UP8    .../WILB.Oct.UP8

22. **Documentation**:
☒ Modeling file with memo (*include standards worksheet*)
**WQMP Coordinator**: (any permit that requires modification of WLAs in WQMP or TMDL database; include flow information for all outfalls and all phases)
    ☒ *Municipals: for WQMP new and amend, name change, add monitoring req, segment change)*
    ☐ Municipals: *TMDL completed for any constituent, renewal with change in name (paper copy only) new or amend permits (paper and electronic copies)*
    ☐ Industrials: *TMDL completed for any constituent, renewal with change in flow or name (paper copy only;) new or amend permits (paper and electronic copies)*
☒ **WQMP packet**: *some municipal permits; provide electronic copy (memo and model input) and hard copy (memo, worksheet, map); not for more stringent effluent limits or <0.2 MGD with uncalibrated (default) QUAL-TX model; see memowqmp.doc for memo language)*
**TMDL team**
    ☐ *TMDL underway for DO only, new or amend permits; email memo)*
    ☐ *TMDL completed for any constituent, new or amend permits; email memo)*
☒ **Copy memo** to H:\Permrev\WWTP\Section Permit Memos\Modeling
**Notify Team Leader** if:
    ☐ <5/2/6 limits for municipal
    ☐ NH3-N limit < 2 mg/L
    ☐ No effluent limits can be recommended
    ☐ Recommend addition of DO monitoring for an industrial permit
☒ **Update the Water Quality Application Tracking Database** with modeling review assigned date, memo date, modeling review end date, modeling review comments if any, reviewer begin date for the next reviewer and peer review assigned date if any. Enter a new record for Supersedes memo.
☐ **Update the WQMP** tab in the Water Quality Application Tracking Database (*municipal renewals only or amend with no changes in loadings; also for new replacing expired if consistent with expired permit – include note to that effect*)
☒ Permit file with memo to biomonitoring reviewer or municipal/industrial permits team leader as appropriate (*sign/date blue sheet*)

23. **Permit Review by**:


_____
Josi Robertson                       Date

AR Item 36, Page 003



Applicant Property Boundary

Proposed Plant Site

1 Mile Radius From Treatment Facility

1 Mile Downstream

Outfall 001

MANOR

AR Item 36, Page 004

```
CNTROL01     WILBARGER CREEK - FROM 'WILB_SUM.UP6'
CNTROL02     MARCH (INCL MAR SPRING SPAWNING RUN); UPDATED 1/12/17
CNTROL03 YES ECHO DATA INPUT
CNTROL04  NO INTERMEDIATE SUMMARY
CNTROL05  NO FINAL REPORT
CNTROL06 YES SPECIAL REPORT
CNTROL07  NO LINE PRINTER PLOT
CNTROL08  NO GRAPHICS CAPABILITY
CNTROL09  NO SEQUENCING OUTPUT
CNTROL10 YES METRIC UNITS
CNTROL11 YES OXYGEN DEPENDENT RATES
CNTROL12  NO SENSITIVITY ANALYSIS
CNTROL13  NO FLOW AUGMENTATION
ENDATA01
MODOPT01  NO TEMPERATURE
MODOPT02  NO SALINITY
MODOPT03  NO CONSERVATIVE MATERIAL  I = CHLORIDES
MODOPT04  NO CONSERVATIVE MATERIAL II =
MODOPT05 YES DISSOLVED OXYGEN
MODOPT06 YES BIOCHEMICAL OXYGEN DEMAND
MODOPT07 YES NITROGEN
MODOPT08  NO PHOSPHORUS
MODOPT09  NO CHLOROPHYLL A
MODOPT10  NO MACROPHYTES
MODOPT11  NO COLIFORM
MODOPT12  NO NONCONSERVATIVE MATERIAL =
ENDATA02
PROGRAM  MAXIMUM ITERATION LIMIT           = 300.
PROGRAM  PLOT TYPE                         = 8.
PROGRAM  FINAL REPORT TYPE                 = 3.
PROGRAM  BOD OXYGEN UPTAKE RATE            = 2.3
ENDATA03
ENDATA04
ENDATA05
ENDATA06
ENDATA07
REACH ID    1. WC 13019-001 TO FM 685          69.4      66.7      0.3
REACH ID    2. WC FM 685 TO PFLUGER LANE        66.7      66.5      0.2
REACH ID    3. WC PFLUGER LANE TO TIMMERMAN PROP. 66.5    63.5      0.3
REACH ID    4. WC TIMMERMAN PROP. TO SH 130     63.5      61.4      0.3
```

```
REACH ID      5. WC SH 130 TO WEISS LANE              61.4     59.2      0.2
REACH ID      6. WC WEISS LANE TO UN TRIB             59.2     53.4      0.2
REACH ID      7. T1 14548-001 TO WILBARGER CR          1.9      0.0      0.1
REACH ID      8. WC UN TRIB TO CAMERON RD             53.4     51.0      0.3
REACH ID      9. WC CAMERON RD TO 11845-005           51.0     47.7      0.3
REACH ID     10. WC 11845-005 TO GREGG RD             47.7     46.8      0.3
REACH ID     11. WC GREGG RD TO UN TRIB               46.8     43.0      0.2
REACH ID     12. T2 13987-001 TO WILBARGER CR          0.4      0.0      0.1
REACH ID     13. WC UN TRIB TO US 290                 43.0     39.6      0.2
REACH ID     14. WC US 290 TO 300M ABOVE 12900        39.6     39.2      0.2
REACH ID     15. WC 300 M ABOVE 12900 TO 12900        39.2     38.9      0.3
REACH ID     16. WC 12900-001 TO UN TRIB              38.9     37.4      0.3
REACH ID     17. T3 14189 TO WILBARGER CR              0.4      0.0      0.1
REACH ID     18. WC UN TRIB TO DITCH                  37.4     34.9      0.25
REACH ID     19. T4 14061 TO WILBARGER CR              0.1      0.0      0.1
REACH ID     20. WC DITCH TO PARSON RD                34.9     32.9      0.2
REACH ID     21. WC PARSON RD TO JONES RD             32.9     28.4      0.3
REACH ID     22. WC JONES RD TO COTTONWOOD CR         28.4     25.6      0.2
REACH ID     23. CC IMMED UPSTR OF UNND TRIB 5         6.91     6.9      0.01
REACH ID     24. T5 14642-001 TO COTTONWOOD CR         7.5      0.0      0.1
REACH ID     25. CC UNND TRIB 5 TO WILBARGER CR        6.9      0.0      0.1
REACH ID     26. WC COTTONWOOD CR TO BITTINGS..RD     25.6     23.8      0.3
REACH ID     27. WC BITTINGS TO UPPER ELGIN RIV RD    23.8     19.6      0.3
REACH ID     28. WC UPPER ELGIN RIV RD TO FM 1704     19.6     10.6      0.3
REACH ID     29. WC FM 1704 TO LOWER ELGIN RD         10.6      7.4      0.2
REACH ID     30. WC LOWER ELGIN RD TO COLORADO RIV     7.4      0.0      0.2
ENDATA08
HYDR-1        1.    0.124    0.5      1.917    0.4              0.035
HYDR-1        2.    0.121    0.5      1.612    0.4              0.035
HYDR-1        3.    0.121    0.5      1.612    0.4              0.035
HYDR-1        4.    0.121    0.5      1.612    0.4              0.035
HYDR-1        5.    0.121    0.5      1.612    0.4              0.035
HYDR-1        6.    0.121    0.5      1.612    0.4              0.035
HYDR-1        7.    0.416    0.5      0.591    0.4              0.035
HYDR-1        8.    0.118    0.5      1.308    0.4              0.035
HYDR-1        9.    0.118    0.5      1.308    0.4              0.035
HYDR-1       10.    0.2917   0.5      0.640    0.4              0.035
HYDR-1       11.    0.2917   0.5      0.640    0.4              0.035
HYDR-1       12.    0.131    0.5      0.720    0.4              0.035
HYDR-1       13.    0.2917   0.5      0.640    0.4              0.035
```

```
HYDR-1     14.    0.2917   0.5        0.640      0.4                    0.035
HYDR-1     15.    0.2917   0.5        0.640      0.4                    0.035
HYDR-1     16.    0.2917   0.5        0.640      0.4                    0.035
HYDR-1     17.    0.131    0.5        0.720      0.4                    0.035
HYDR-1     18.    0.2917   0.5        0.640      0.4                    0.035
HYDR-1     19.    0.131    0.5        0.720      0.4                    0.035
HYDR-1     20.    0.2917   0.5        0.640      0.4                    0.035
HYDR-1     21.    0.2917   0.5        0.640      0.4                    0.035
HYDR-1     22.    0.2917   0.5        0.640      0.4                    0.035
HYDR-1     23.    0.131    0.5        0.720      0.4                    0.035
HYDR-1     24.    0.131    0.5        0.720      0.4                    0.035
HYDR-1     25.    0.131    0.5        0.720      0.4                    0.035
HYDR-1     26.    0.2917   0.5        0.640      0.4                    0.035
HYDR-1     27.    0.2917   0.5        0.640      0.4                    0.035
HYDR-1     28.    0.2917   0.5        0.640      0.4                    0.035
HYDR-1     29.    0.2917   0.5        0.640      0.4                    0.035
HYDR-1     30.    0.2917   0.5        0.640      0.4                    0.035
ENDATA09
ENDATA10
INITIAL     1.    0.0              6.0      0.05    1.              0.
INITIAL     2.    0.0              6.0      0.05    1.              0.
INITIAL     3.    0.0              6.0      0.05    1.              0.
INITIAL     4.    0.0              6.0      0.05    1.              0.
INITIAL     5.    0.0              6.0      0.05    1.              0.
INITIAL     6.    0.0              6.0      0.05    1.              0.
INITIAL     7.    0.0              6.0      0.05    1.              0.
INITIAL     8.    0.0              6.0      0.05    1.              0.
INITIAL     9.    0.0              6.0      0.05    1.              0.
INITIAL    10.    21.3             6.0      0.05    1.              0.
INITIAL    11.    21.3             6.0      0.05    1.              0.
INITIAL    12.    21.3             6.0      0.05    1.              0.
INITIAL    13.    21.3             6.0      0.05    1.              0.
INITIAL    14.    21.3             6.0      0.05    1.              0.
INITIAL    15.    21.3             6.0      0.05    1.              0.
INITIAL    16.    21.3             6.0      0.05    1.              0.
INITIAL    17.    21.3             6.0      0.05    1.              0.
INITIAL    18.    21.3             6.0      0.05    1.              0.
INITIAL    19.    21.3             6.0      0.05    1.              0.
INITIAL    20.    21.3             6.0      0.05    1.              0.
INITIAL    21.    21.3             6.0      0.05    1.              0.
```

```
INITIAL    22.  21.3           6.0     0.05   1.            0.
INITIAL    23.   0.0           6.0     0.05   1.            0.
INITIAL    24.  21.3           6.0     0.05   1.            0.
INITIAL    25.  21.3           6.0     0.05   1.            0.
INITIAL    26.  21.3           6.0     0.05   1.            0.
INITIAL    27.  21.3           6.0     0.05   1.            0.
INITIAL    28.  21.3           6.0     0.05   1.            0.
INITIAL    29.  21.3           6.0     0.05   1.            0.
INITIAL    30.  21.3           6.0     0.05   1.            0.
ENDATA11
COEF-1      1.  11.                    .35    .1    .0    1.0    .0
COEF-1      2.  11.                    .35    .1    .0    1.0    .0
COEF-1      3.  11.                    .35    .1    .0    1.0    .0
COEF-1      4.  11.                    .35    .1    .0    1.0    .0
COEF-1      5.  11.                    .35    .1    .0    1.0    .0
COEF-1      6.  11.                    .35    .1    .0    1.0    .0
COEF-1      7.  11.                    .35    .1    .0    1.0    .0
COEF-1      8.  11.                    .35    .1    .0    1.0    .0
COEF-1      9.  11.                    .35    .1    .0    1.0    .0
COEF-1     10.  11.                    .35    .1    .0    1.0    .0
COEF-1     11.  11.                    .35    .1    .0    1.0    .0
COEF-1     12.  11.                    .35    .1    .0    1.0    .0
COEF-1     13.  11.                    .35    .1    .0    1.0    .0
COEF-1     14.  11.                    .35    .1    .0    1.0    .0
COEF-1     15.  11.                    .35    .1    .0    1.0    .0
COEF-1     16.  11.                    .35    .1    .0    1.0    .0
COEF-1     17.  11.                    .35    .1    .0    1.0    .0
COEF-1     18.  11.                    .35    .1    .0    1.0    .0
COEF-1     19.  11.                    .35    .1    .0    1.0    .0
COEF-1     20.  11.                    .35    .1    .0    1.0    .0
COEF-1     21.  11.                    .35    .1    .0    1.0    .0
COEF-1     22.  11.                    .35    .1    .0    1.0    .0
COEF-1     23.  11.                    .35    .1    .0    1.0    .0
COEF-1     24.  11.                    .35    .1    .0    1.0    .0
COEF-1     25.  11.                    .35    .1    .0    1.0    .0
COEF-1     26.  11.                    .35    .1    .0    1.0    .0
COEF-1     27.  11.                    .35    .1    .0    1.0    .0
COEF-1     28.  11.                    .35    .1    .0    1.0    .0
COEF-1     29.  11.                    .35    .1    .0    1.0    .0
COEF-1     30.  11.                    .35    .1    .0    1.0    .0
```

```
ENDATA12
COEF-2      1.   0.00   0.00    1.0    0.3                    0.0
COEF-2      2.   0.00   0.00    1.0    0.3                    0.0
COEF-2      3.   0.00   0.00    1.0    0.3                    0.0
COEF-2      4.   0.00   0.00    1.0    0.3                    0.0
COEF-2      5.   0.00   0.00    1.0    0.3                    0.0
COEF-2      6.   0.00   0.00    1.0    0.3                    0.0
COEF-2      7.   0.00   0.00    1.0    0.3                    0.0
COEF-2      8.   0.00   0.00    1.0    0.3                    0.0
COEF-2      9.   0.00   0.00    1.0    0.3                    0.0
COEF-2     10.   0.00   0.00    1.0    0.3                    0.0
COEF-2     11.   0.00   0.00    1.0    0.3                    0.0
COEF-2     12.   0.00   0.00    1.0    0.3                    0.0
COEF-2     13.   0.00   0.00    1.0    0.3                    0.0
COEF-2     14.   0.00   0.00    1.0    0.3                    0.0
COEF-2     15.   0.00   0.00    1.0    0.3                    0.0
COEF-2     16.   0.00   0.00    1.0    0.3                    0.0
COEF-2     17.   0.00   0.00    1.0    0.3                    0.0
COEF-2     18.   0.00   0.00    1.0    0.3                    0.0
COEF-2     19.   0.00   0.00    1.0    0.3                    0.0
COEF-2     20.   0.00   0.00    1.0    0.3                    0.0
COEF-2     21.   0.00   0.00    1.0    0.3                    0.0
COEF-2     22.   0.00   0.00    1.0    0.3                    0.0
COEF-2     23.   0.00   0.00    1.0    0.3                    0.0
COEF-2     24.   0.00   0.00    1.0    0.3                    0.0
COEF-2     25.   0.00   0.00    1.0    0.3                    0.0
COEF-2     26.   0.00   0.00    1.0    0.3                    0.0
COEF-2     27.   0.00   0.00    1.0    0.3                    0.0
COEF-2     28.   0.00   0.00    1.0    0.3                    0.0
COEF-2     29.   0.00   0.00    1.0    0.3                    0.0
COEF-2     30.   0.00   0.00    1.0    0.3                    0.0
ENDATA13
ENDATA14
ENDATA15
INCR-1     29.             .00340
INCR-1     30.             .01614
ENDATA16
INCR-2     29.   7.07    1.3        0.50      0.05      0.20
INCR-2     30.   7.07    1.3        0.50      0.05      0.20
ENDATA17
```

```
ENDATA18
ENDATA19
HDWTR-1     1. WILBARGER CREEK         0.00000
HDWTR-1    68. UN TRIB 1               0.00000
HDWTR-1   128. UN TRIB 2               0.00000
HDWTR-1   157. UN TRIB 3               0.00000
HDWTR-1   171. UN TRIB 4/DITCH         0.00000
HDWTR-1   211. COTTONWOOD CR           0.00000
HDWTR-1   212. UN TRIB 5               0.00000
ENDATA20
HDWTR-2     1.   7.07    1.3    0.50    0.05    0.20
HDWTR-2    68.   7.07    1.3    0.50    0.05    0.20
HDWTR-2   128.   7.07    1.3    0.50    0.05    0.20
HDWTR-2   157.   7.07    1.3    0.50    0.05    0.20
HDWTR-2   171.   7.07    1.3    0.50    0.05    0.20
HDWTR-2   211.   7.07    1.3    0.50    0.05    0.20
HDWTR-2   212.   7.07    1.3    0.50    0.05    0.20
ENDATA21
ENDATA22
JUNCTION    87   67   CONFLUENCE OF UN TRIB 1 WITH WILBARGER CREEK
JUNCTION   132  127   CONFLUENCE OF UN TRIB 2 WITH WILBARGER CREEK
JUNCTION   161  156   CONFLUENCE OF UN TRIB 3 WITH WILBARGER CREEK
JUNCTION   172  170   CONFLUENCE OF UN TRIB 4 (DITCH) WITH WILBARGER CREEK
JUNCTION   287  211   CONFLUENCE OF UN TRIB 5 WITH COTTONWOOD CREEK
JUNCTION   356  210   CONFLUENCE OF COTTONWOOD CREEK WITH WILBARGER CREEK
ENDATA23
WSTLD-1     1. PFLUGERVIL 13019-001   .00000
WSTLD-1    22. TRANSITION TO 5 DO     .00000
WSTLD-1    68. 130 CACTUS 14548-001   .00000
WSTLD-1   106. PERENNIAL HDWATER Q    .00283
WSTLD-1   106. PFLUGERVIL 11845-005   .69017
WSTLD-1   128. PRELIM ANALYSIS WWTP   .00000
WSTLD-1   128. SG LANDHLD 13987-001   .00592
WSTLD-1   152. MANOR      12900-001   .08764
WSTLD-1   157. WILB MUD 2 14189-001   .08764
WSTLD-1   164. SWWC UTLTS 16022-001   .02191
WSTLD-1   171. AQUASOURCE 14061-001   .03506
WSTLD-1   212. PFLUG/COTT 14642-001   .13146
WSTLD-1   301. MANOR/COTT 14129-002   .02191
ENDATA24
```

```
WSTLD-2     1.      6.0     5.0                    1.8
WSTLD-2    22.      7.07    1.3                    0.05
WSTLD-2    68.      5.0     5.0                    2.0
WSTLD-2   106.      7.07    1.3                    0.05
WSTLD-2   106.      6.0     5.0                    1.6
WSTLD-2   128.      7.07    1.3                    0.05
WSTLD-2   128.      3.0     5.0                    2.0
WSTLD-2   152.      6.0     5.0                    2.0
WSTLD-2   157.      6.0     5.0                    1.7
WSTLD-2   164.      4.0     5.0                    2.0
WSTLD-2   171.      4.0     5.0                    2.0
WSTLD-2   212.      4.0     5.0                    2.0
WSTLD-2   301.      5.0     5.0                    2.0
ENDATA25
ENDATA26
ENDATA27
ENDATA28
ENDATA29
ENDATA30
ENDATA31
```

```
CNTROL01     WILBARGER CREEK - FROM 'WILB_SUM.UP7'
CNTROL02     SPRING SPAWNING (APR & MAY); UPDATED 7/24/19
CNTROL03 YES ECHO DATA INPUT
CNTROL04  NO INTERMEDIATE SUMMARY
CNTROL05  NO FINAL REPORT
CNTROL06 YES SPECIAL REPORT
CNTROL07  NO LINE PRINTER PLOT
CNTROL08  NO GRAPHICS CAPABILITY
CNTROL09  NO SEQUENCING OUTPUT
CNTROL10 YES METRIC UNITS
CNTROL11 YES OXYGEN DEPENDENT RATES
CNTROL12  NO SENSITIVITY ANALYSIS
CNTROL13  NO FLOW AUGMENTATION
ENDATA01
MODOPT01  NO TEMPERATURE
MODOPT02  NO SALINITY
MODOPT03  NO CONSERVATIVE MATERIAL  I = CHLORIDES
MODOPT04  NO CONSERVATIVE MATERIAL II =
MODOPT05 YES DISSOLVED OXYGEN
MODOPT06 YES BIOCHEMICAL OXYGEN DEMAND
MODOPT07 YES NITROGEN
MODOPT08  NO PHOSPHORUS
MODOPT09  NO CHLOROPHYLL A
MODOPT10  NO MACROPHYTES
MODOPT11  NO COLIFORM
MODOPT12  NO NONCONSERVATIVE MATERIAL =
ENDATA02
PROGRAM  MAXIMUM ITERATION LIMIT          = 300.
PROGRAM  PLOT TYPE                        = 8.
PROGRAM  FINAL REPORT TYPE                = 3.
PROGRAM  BOD OXYGEN UPTAKE RATE           = 2.3
ENDATA03
ENDATA04
ENDATA05
ENDATA06
ENDATA07
REACH ID    1. WC 13019-001 TO FM 685            69.4     66.7      0.3
REACH ID    2. WC FM 685 TO PFLUGER LANE         66.7     66.5      0.2
REACH ID    3. WC PFLUGER LANE TO TIMMERMAN PROP. 66.5    63.5      0.3
REACH ID    4. WC TIMMERMAN PROP. TO SH 130      63.5     61.4      0.3
```

```
REACH ID      5. WC SH 130 TO WEISS LANE                    61.4       59.2        0.2
REACH ID      6. WC WEISS LANE TO UN TRIB                   59.2       53.4        0.2
REACH ID      7. T1 14548-001 TO WILBARGER CR                1.9        0.0        0.1
REACH ID      8. WC UN TRIB TO CAMERON RD                   53.4       51.0        0.3
REACH ID      9. WC CAMERON RD TO 11845-005                 51.0       47.7        0.3
REACH ID     10. WC 11845-005 TO GREGG RD                   47.7       46.8        0.3
REACH ID     11. WC GREGG RD TO UN TRIB                     46.8       43.0        0.2
REACH ID     12. T2 13987-001 TO WILBARGER CR                0.4        0.0        0.1
REACH ID     13. WC UN TRIB TO US 290                       43.0       39.6        0.2
REACH ID     14. WC US 290 TO 300M ABOVE 12900              39.6       39.2        0.2
REACH ID     15. WC 300 M ABOVE 12900 TO 12900              39.2       38.9        0.3
REACH ID     16. WC 12900-001 TO UN TRIB                    38.9       37.4        0.3
REACH ID     17. T3 14189 TO WILBARGER CR                    0.4        0.0        0.1
REACH ID     18. WC UN TRIB TO DITCH                        37.4       34.9        0.25
REACH ID     19. T4 14061 TO WILBARGER CR                    0.1        0.0        0.1
REACH ID     20. WC DITCH TO PARSON RD                      34.9       32.9        0.2
REACH ID     21. WC PARSON RD TO JONES RD                   32.9       28.4        0.3
REACH ID     22. WC JONES RD TO COTTONWOOD CR               28.4       25.6        0.2
REACH ID     23. CC IMMED UPSTR OF UNND TRIB 5               6.91       6.9        0.01
REACH ID     24. T5 14642-001 TO COTTONWOOD CR               7.5        0.0        0.1
REACH ID     25. CC UNND TRIB 5 TO WILBARGER CR              6.9        0.0        0.1
REACH ID     26. WC COTTONWOOD CR TO BITTINGS..RD           25.6       23.8        0.3
REACH ID     27. WC BITTINGS TO UPPER ELGIN RIV RD          23.8       19.6        0.3
REACH ID     28. WC UPPER ELGIN RIV RD TO FM 1704           19.6       10.6        0.3
REACH ID     29. WC FM 1704 TO LOWER ELGIN RD               10.6        7.4        0.2
REACH ID     30. WC LOWER ELGIN RD TO COLORADO RIV           7.4        0.0        0.2
ENDATA08
HYDR-1        1.   0.124      0.5       1.917     0.4                 0.035
HYDR-1        2.   0.121      0.5       1.612     0.4                 0.035
HYDR-1        3.   0.121      0.5       1.612     0.4                 0.035
HYDR-1        4.   0.121      0.5       1.612     0.4                 0.035
HYDR-1        5.   0.121      0.5       1.612     0.4                 0.035
HYDR-1        6.   0.121      0.5       1.612     0.4                 0.035
HYDR-1        7.   0.416      0.5       0.591     0.4                 0.035
HYDR-1        8.   0.118      0.5       1.308     0.4                 0.035
HYDR-1        9.   0.118      0.5       1.308     0.4                 0.035
HYDR-1       10.   0.2917     0.5       0.640     0.4                 0.035
HYDR-1       11.   0.2917     0.5       0.640     0.4                 0.035
HYDR-1       12.   0.131      0.5       0.720     0.4                 0.035
HYDR-1       13.   0.2917     0.5       0.640     0.4                 0.035
```

```
HYDR-1    14.   0.2917   0.5      0.640    0.4            0.035
HYDR-1    15.   0.2917   0.5      0.640    0.4            0.035
HYDR-1    16.   0.2917   0.5      0.640    0.4            0.035
HYDR-1    17.   0.131    0.5      0.720    0.4            0.035
HYDR-1    18.   0.2917   0.5      0.640    0.4            0.035
HYDR-1    19.   0.131    0.5      0.720    0.4            0.035
HYDR-1    20.   0.2917   0.5      0.640    0.4            0.035
HYDR-1    21.   0.2917   0.5      0.640    0.4            0.035
HYDR-1    22.   0.2917   0.5      0.640    0.4            0.035
HYDR-1    23.   0.131    0.5      0.720    0.4            0.035
HYDR-1    24.   0.131    0.5      0.720    0.4            0.035
HYDR-1    25.   0.131    0.5      0.720    0.4            0.035
HYDR-1    26.   0.2917   0.5      0.640    0.4            0.035
HYDR-1    27.   0.2917   0.5      0.640    0.4            0.035
HYDR-1    28.   0.2917   0.5      0.640    0.4            0.035
HYDR-1    29.   0.2917   0.5      0.640    0.4            0.035
HYDR-1    30.   0.2917   0.5      0.640    0.4            0.035
ENDATA09
ENDATA10
INITIAL    1.   0.0           6.0      0.05     1.        0.
INITIAL    2.   0.0           6.0      0.05     1.        0.
INITIAL    3.   0.0           6.0      0.05     1.        0.
INITIAL    4.   0.0           6.0      0.05     1.        0.
INITIAL    5.   0.0           6.0      0.05     1.        0.
INITIAL    6.   0.0           6.0      0.05     1.        0.
INITIAL    7.   0.0           6.0      0.05     1.        0.
INITIAL    8.   0.0           6.0      0.05     1.        0.
INITIAL    9.   0.0           6.0      0.05     1.        0.
INITIAL   10.  22.8           6.0      0.05     1.        0.
INITIAL   11.  22.8           6.0      0.05     1.        0.
INITIAL   12.  22.8           6.0      0.05     1.        0.
INITIAL   13.  22.8           6.0      0.05     1.        0.
INITIAL   14.  22.8           6.0      0.05     1.        0.
INITIAL   15.  22.8           6.0      0.05     1.        0.
INITIAL   16.  22.8           6.0      0.05     1.        0.
INITIAL   17.  22.8           6.0      0.05     1.        0.
INITIAL   18.  22.8           6.0      0.05     1.        0.
INITIAL   19.  22.8           6.0      0.05     1.        0.
INITIAL   20.  22.8           6.0      0.05     1.        0.
INITIAL   21.  22.8           6.0      0.05     1.        0.
```

```
INITIAL   22.  22.8          6.0    0.05   1.            0.
INITIAL   23.   0.0          6.0    0.05   1.            0.
INITIAL   24.  22.8          6.0    0.05   1.            0.
INITIAL   25.  22.8          6.0    0.05   1.            0.
INITIAL   26.  22.8          6.0    0.05   1.            0.
INITIAL   27.  22.8          6.0    0.05   1.            0.
INITIAL   28.  22.8          6.0    0.05   1.            0.
INITIAL   29.  22.8          6.0    0.05   1.            0.
INITIAL   30.  22.8          6.0    0.05   1.            0.
ENDATA11
COEF-1     1.  11.                  .35   .1    .0    1.0    .0
COEF-1     2.  11.                  .35   .1    .0    1.0    .0
COEF-1     3.  11.                  .35   .1    .0    1.0    .0
COEF-1     4.  11.                  .35   .1    .0    1.0    .0
COEF-1     5.  11.                  .35   .1    .0    1.0    .0
COEF-1     6.  11.                  .35   .1    .0    1.0    .0
COEF-1     7.  11.                  .35   .1    .0    1.0    .0
COEF-1     8.  11.                  .35   .1    .0    1.0    .0
COEF-1     9.  11.                  .35   .1    .0    1.0    .0
COEF-1    10.  11.                  .35   .1    .0    1.0    .0
COEF-1    11.  11.                  .35   .1    .0    1.0    .0
COEF-1    12.  11.                  .35   .1    .0    1.0    .0
COEF-1    13.  11.                  .35   .1    .0    1.0    .0
COEF-1    14.  11.                  .35   .1    .0    1.0    .0
COEF-1    15.  11.                  .35   .1    .0    1.0    .0
COEF-1    16.  11.                  .35   .1    .0    1.0    .0
COEF-1    17.  11.                  .35   .1    .0    1.0    .0
COEF-1    18.  11.                  .35   .1    .0    1.0    .0
COEF-1    19.  11.                  .35   .1    .0    1.0    .0
COEF-1    20.  11.                  .35   .1    .0    1.0    .0
COEF-1    21.  11.                  .35   .1    .0    1.0    .0
COEF-1    22.  11.                  .35   .1    .0    1.0    .0
COEF-1    23.  11.                  .35   .1    .0    1.0    .0
COEF-1    24.  11.                  .35   .1    .0    1.0    .0
COEF-1    25.  11.                  .35   .1    .0    1.0    .0
COEF-1    26.  11.                  .35   .1    .0    1.0    .0
COEF-1    27.  11.                  .35   .1    .0    1.0    .0
COEF-1    28.  11.                  .35   .1    .0    1.0    .0
COEF-1    29.  11.                  .35   .1    .0    1.0    .0
COEF-1    30.  11.                  .35   .1    .0    1.0    .0
```

```
ENDATA12
COEF-2      1.    0.00    0.00    1.0    0.3                    0.0
COEF-2      2.    0.00    0.00    1.0    0.3                    0.0
COEF-2      3.    0.00    0.00    1.0    0.3                    0.0
COEF-2      4.    0.00    0.00    1.0    0.3                    0.0
COEF-2      5.    0.00    0.00    1.0    0.3                    0.0
COEF-2      6.    0.00    0.00    1.0    0.3                    0.0
COEF-2      7.    0.00    0.00    1.0    0.3                    0.0
COEF-2      8.    0.00    0.00    1.0    0.3                    0.0
COEF-2      9.    0.00    0.00    1.0    0.3                    0.0
COEF-2     10.    0.00    0.00    1.0    0.3                    0.0
COEF-2     11.    0.00    0.00    1.0    0.3                    0.0
COEF-2     12.    0.00    0.00    1.0    0.3                    0.0
COEF-2     13.    0.00    0.00    1.0    0.3                    0.0
COEF-2     14.    0.00    0.00    1.0    0.3                    0.0
COEF-2     15.    0.00    0.00    1.0    0.3                    0.0
COEF-2     16.    0.00    0.00    1.0    0.3                    0.0
COEF-2     17.    0.00    0.00    1.0    0.3                    0.0
COEF-2     18.    0.00    0.00    1.0    0.3                    0.0
COEF-2     19.    0.00    0.00    1.0    0.3                    0.0
COEF-2     20.    0.00    0.00    1.0    0.3                    0.0
COEF-2     21.    0.00    0.00    1.0    0.3                    0.0
COEF-2     22.    0.00    0.00    1.0    0.3                    0.0
COEF-2     23.    0.00    0.00    1.0    0.3                    0.0
COEF-2     24.    0.00    0.00    1.0    0.3                    0.0
COEF-2     25.    0.00    0.00    1.0    0.3                    0.0
COEF-2     26.    0.00    0.00    1.0    0.3                    0.0
COEF-2     27.    0.00    0.00    1.0    0.3                    0.0
COEF-2     28.    0.00    0.00    1.0    0.3                    0.0
COEF-2     29.    0.00    0.00    1.0    0.3                    0.0
COEF-2     30.    0.00    0.00    1.0    0.3                    0.0
ENDATA13
ENDATA14
ENDATA15
INCR-1     29.             .00340
INCR-1     30.             .01614
ENDATA16
INCR-2     29.    6.87    1.3      0.50     0.05     0.20
INCR-2     30.    6.87    1.3      0.50     0.05     0.20
ENDATA17
```

```
ENDATA18
ENDATA19
HDWTR-1     1. WILBARGER CREEK          0.00000
HDWTR-1    68. UN TRIB 1                0.00000
HDWTR-1   128. UN TRIB 2                0.00000
HDWTR-1   157. UN TRIB 3                0.00000
HDWTR-1   171. UN TRIB 4/DITCH          0.00000
HDWTR-1   211. COTTONWOOD CR            0.00000
HDWTR-1   212. UN TRIB 5                0.00000
ENDATA20
HDWTR-2     1.   6.87    1.3    0.50    0.05    0.20
HDWTR-2    68.   6.87    1.3    0.50    0.05    0.20
HDWTR-2   128.   6.87    1.3    0.50    0.05    0.20
HDWTR-2   157.   6.87    1.3    0.50    0.05    0.20
HDWTR-2   171.   6.87    1.3    0.50    0.05    0.20
HDWTR-2   211.   6.87    1.3    0.50    0.05    0.20
HDWTR-2   212.   6.87    1.3    0.50    0.05    0.20
ENDATA21
ENDATA22
JUNCTION   87   67   CONFLUENCE OF UN TRIB 1 WITH WILBARGER CREEK
JUNCTION  132  127   CONFLUENCE OF UN TRIB 2 WITH WILBARGER CREEK
JUNCTION  161  156   CONFLUENCE OF UN TRIB 3 WITH WILBARGER CREEK
JUNCTION  172  170   CONFLUENCE OF UN TRIB 4 (DITCH) WITH WILBARGER CREEK
JUNCTION  287  211   CONFLUENCE OF UN TRIB 5 WITH COTTONWOOD CREEK
JUNCTION  356  210   CONFLUENCE OF COTTONWOOD CREEK WITH WILBARGER CREEK
ENDATA23
WSTLD-1     1. PFLUGERVIL 13019-001   .00000
WSTLD-1    22. TRANSITION TO 5 DO     .00000
WSTLD-1    68. 130 CACTUS 14548-001   .00000
WSTLD-1   106. TABLE 4 HEADWATER Q    .01133
WSTLD-1   106. PFLUGERVIL 11845-005   .69017
WSTLD-1   128. PRELIM ANALYSIS WWTP   .00000
WSTLD-1   128. SG LANDHLD 13987-001   .00592
WSTLD-1   152. MANOR      12900-001   .08764
WSTLD-1   157. WILB MUD 2 14189-001   .08764
WSTLD-1   164. SWWC UTLTS 16022-001   .03506
WSTLD-1   171. AQUASOURCE 14061-001   .02147
WSTLD-1   212. PFLUG/COTT 14642-001   .13146
WSTLD-1   301. MANOR/COTT 14129-002   .02191
ENDATA24
```

```
WSTLD-2     1.      6.0      5.0                      1.8
WSTLD-2    22.      6.87     1.3                      0.05
WSTLD-2    68.      5.0      5.0                      2.0
WSTLD-2   106.      6.87     1.3                      0.05
WSTLD-2   106.      6.0      5.0                      1.6
WSTLD-2   128.      6.87     1.3                      0.05
WSTLD-2   128.      3.0      5.0                      2.0
WSTLD-2   152.      6.0      5.0                      2.0
WSTLD-2   157.      6.0      5.0                      1.7
WSTLD-2   164.      4.0      5.0                      2.0
WSTLD-2   171.      4.0      5.0                      2.0
WSTLD-2   212.      4.0      5.0                      2.0
WSTLD-2   301.      5.0      5.0                      2.0
ENDATA25
ENDATA26
ENDATA27
ENDATA28
ENDATA29
ENDATA30
ENDATA31
```

```
CNTROL01     WILBARGER CREEK - FROM 'WILB_SUM.UP7'
CNTROL02      MAY; UPDATED 7/24/19
CNTROL03 YES ECHO DATA INPUT
CNTROL04  NO INTERMEDIATE SUMMARY
CNTROL05  NO FINAL REPORT
CNTROL06 YES SPECIAL REPORT
CNTROL07  NO LINE PRINTER PLOT
CNTROL08  NO GRAPHICS CAPABILITY
CNTROL09  NO SEQUENCING OUTPUT
CNTROL10 YES METRIC UNITS
CNTROL11 YES OXYGEN DEPENDENT RATES
CNTROL12  NO SENSITIVITY ANALYSIS
CNTROL13  NO FLOW AUGMENTATION
ENDATA01
MODOPT01  NO TEMPERATURE
MODOPT02  NO SALINITY
MODOPT03  NO CONSERVATIVE MATERIAL  I = CHLORIDES
MODOPT04  NO CONSERVATIVE MATERIAL II =
MODOPT05 YES DISSOLVED OXYGEN
MODOPT06 YES BIOCHEMICAL OXYGEN DEMAND
MODOPT07 YES NITROGEN
MODOPT08  NO PHOSPHORUS
MODOPT09  NO CHLOROPHYLL A
MODOPT10  NO MACROPHYTES
MODOPT11  NO COLIFORM
MODOPT12  NO NONCONSERVATIVE MATERIAL =
ENDATA02
PROGRAM  MAXIMUM ITERATION LIMIT           = 300.
PROGRAM  PLOT TYPE                         = 8.
PROGRAM  FINAL REPORT TYPE                 = 3.
PROGRAM  BOD OXYGEN UPTAKE RATE            = 2.3
ENDATA03
ENDATA04
ENDATA05
ENDATA06
ENDATA07
REACH ID    1. WC 13019-001 TO FM 685          69.4     66.7      0.3
REACH ID    2. WC FM 685 TO PFLUGER LANE        66.7     66.5      0.2
REACH ID    3. WC PFLUGER LANE TO TIMMERMAN PROP. 66.5   63.5      0.3
REACH ID    4. WC TIMMERMAN PROP. TO SH 130     63.5     61.4      0.3
```

```
REACH ID     5. WC SH 130 TO WEISS LANE                    61.4      59.2      0.2
REACH ID     6. WC WEISS LANE TO UN TRIB                   59.2      53.4      0.2
REACH ID     7. T1 14548-001 TO WILBARGER CR                1.9       0.0      0.1
REACH ID     8. WC UN TRIB TO CAMERON RD                   53.4      51.0      0.3
REACH ID     9. WC CAMERON RD TO 11845-005                 51.0      47.7      0.3
REACH ID    10. WC 11845-005 TO GREGG RD                   47.7      46.8      0.3
REACH ID    11. WC GREGG RD TO UN TRIB                     46.8      43.0      0.2
REACH ID    12. T2 13987-001 TO WILBARGER CR                0.4       0.0      0.1
REACH ID    13. WC UN TRIB TO US 290                       43.0      39.6      0.2
REACH ID    14. WC US 290 TO 300M ABOVE 12900              39.6      39.2      0.2
REACH ID    15. WC 300 M ABOVE 12900 TO 12900              39.2      38.9      0.3
REACH ID    16. WC 12900-001 TO UN TRIB                    38.9      37.4      0.3
REACH ID    17. T3 14189 TO WILBARGER CR                    0.4       0.0      0.1
REACH ID    18. WC UN TRIB TO DITCH                        37.4      34.9      0.25
REACH ID    19. T4 14061 TO WILBARGER CR                    0.1       0.0      0.1
REACH ID    20. WC DITCH TO PARSON RD                      34.9      32.9      0.2
REACH ID    21. WC PARSON RD TO JONES RD                   32.9      28.4      0.3
REACH ID    22. WC JONES RD TO COTTONWOOD CR               28.4      25.6      0.2
REACH ID    23. CC IMMED UPSTR OF UNNND TRIB 5              6.91      6.9      0.01
REACH ID    24. T5 14642-001 TO COTTONWOOD CR               7.5       0.0      0.1
REACH ID    25. CC UNND TRIB 5 TO WILBARGER CR              6.9       0.0      0.1
REACH ID    26. WC COTTONWOOD CR TO BITTINGS..RD           25.6      23.8      0.3
REACH ID    27. WC BITTINGS TO UPPER ELGIN RIV RD          23.8      19.6      0.3
REACH ID    28. WC UPPER ELGIN RIV RD TO FM 1704           19.6      10.6      0.3
REACH ID    29. WC FM 1704 TO LOWER ELGIN RD               10.6       7.4      0.2
REACH ID    30. WC LOWER ELGIN RD TO COLORADO RIV           7.4       0.0      0.2
ENDATA08
HYDR-1       1.    0.124     0.5       1.917     0.4                 0.035
HYDR-1       2.    0.121     0.5       1.612     0.4                 0.035
HYDR-1       3.    0.121     0.5       1.612     0.4                 0.035
HYDR-1       4.    0.121     0.5       1.612     0.4                 0.035
HYDR-1       5.    0.121     0.5       1.612     0.4                 0.035
HYDR-1       6.    0.121     0.5       1.612     0.4                 0.035
HYDR-1       7.    0.416     0.5       0.591     0.4                 0.035
HYDR-1       8.    0.118     0.5       1.308     0.4                 0.035
HYDR-1       9.    0.118     0.5       1.308     0.4                 0.035
HYDR-1      10.    0.2917    0.5       0.640     0.4                 0.035
HYDR-1      11.    0.2917    0.5       0.640     0.4                 0.035
HYDR-1      12.    0.131     0.5       0.720     0.4                 0.035
HYDR-1      13.    0.2917    0.5       0.640     0.4                 0.035
```

```
HYDR-1      14.    0.2917    0.5         0.640     0.4                 0.035
HYDR-1      15.    0.2917    0.5         0.640     0.4                 0.035
HYDR-1      16.    0.2917    0.5         0.640     0.4                 0.035
HYDR-1      17.    0.131     0.5         0.720     0.4                 0.035
HYDR-1      18.    0.2917    0.5         0.640     0.4                 0.035
HYDR-1      19.    0.131     0.5         0.720     0.4                 0.035
HYDR-1      20.    0.2917    0.5         0.640     0.4                 0.035
HYDR-1      21.    0.2917    0.5         0.640     0.4                 0.035
HYDR-1      22.    0.2917    0.5         0.640     0.4                 0.035
HYDR-1      23.    0.131     0.5         0.720     0.4                 0.035
HYDR-1      24.    0.131     0.5         0.720     0.4                 0.035
HYDR-1      25.    0.131     0.5         0.720     0.4                 0.035
HYDR-1      26.    0.2917    0.5         0.640     0.4                 0.035
HYDR-1      27.    0.2917    0.5         0.640     0.4                 0.035
HYDR-1      28.    0.2917    0.5         0.640     0.4                 0.035
HYDR-1      29.    0.2917    0.5         0.640     0.4                 0.035
HYDR-1      30.    0.2917    0.5         0.640     0.4                 0.035
ENDATA09
ENDATA10
INITIAL      1.    0.0             6.0      0.05     1.         0.
INITIAL      2.    0.0             6.0      0.05     1.         0.
INITIAL      3.    0.0             6.0      0.05     1.         0.
INITIAL      4.    0.0             6.0      0.05     1.         0.
INITIAL      5.    0.0             6.0      0.05     1.         0.
INITIAL      6.    0.0             6.0      0.05     1.         0.
INITIAL      7.    0.0             6.0      0.05     1.         0.
INITIAL      8.    0.0             6.0      0.05     1.         0.
INITIAL      9.    0.0             6.0      0.05     1.         0.
INITIAL     10.    26.3            6.0      0.05     1.         0.
INITIAL     11.    26.3            6.0      0.05     1.         0.
INITIAL     12.    26.3            6.0      0.05     1.         0.
INITIAL     13.    26.3            6.0      0.05     1.         0.
INITIAL     14.    26.3            6.0      0.05     1.         0.
INITIAL     15.    26.3            6.0      0.05     1.         0.
INITIAL     16.    26.3            6.0      0.05     1.         0.
INITIAL     17.    26.3            6.0      0.05     1.         0.
INITIAL     18.    26.3            6.0      0.05     1.         0.
INITIAL     19.    26.3            6.0      0.05     1.         0.
INITIAL     20.    26.3            6.0      0.05     1.         0.
INITIAL     21.    26.3            6.0      0.05     1.         0.
```

```
INITIAL    22.  26.3          6.0    0.05   1.           0.
INITIAL    23.   0.0          6.0    0.05   1.           0.
INITIAL    24.  26.3          6.0    0.05   1.           0.
INITIAL    25.  26.3          6.0    0.05   1.           0.
INITIAL    26.  26.3          6.0    0.05   1.           0.
INITIAL    27.  26.3          6.0    0.05   1.           0.
INITIAL    28.  26.3          6.0    0.05   1.           0.
INITIAL    29.  26.3          6.0    0.05   1.           0.
INITIAL    30.  26.3          6.0    0.05   1.           0.
ENDATA11
COEF-1     1.  11.                    .35   .1    .0   1.0    .0
COEF-1     2.  11.                    .35   .1    .0   1.0    .0
COEF-1     3.  11.                    .35   .1    .0   1.0    .0
COEF-1     4.  11.                    .35   .1    .0   1.0    .0
COEF-1     5.  11.                    .35   .1    .0   1.0    .0
COEF-1     6.  11.                    .35   .1    .0   1.0    .0
COEF-1     7.  11.                    .35   .1    .0   1.0    .0
COEF-1     8.  11.                    .35   .1    .0   1.0    .0
COEF-1     9.  11.                    .35   .1    .0   1.0    .0
COEF-1    10.  11.                    .35   .1    .0   1.0    .0
COEF-1    11.  11.                    .35   .1    .0   1.0    .0
COEF-1    12.  11.                    .35   .1    .0   1.0    .0
COEF-1    13.  11.                    .35   .1    .0   1.0    .0
COEF-1    14.  11.                    .35   .1    .0   1.0    .0
COEF-1    15.  11.                    .35   .1    .0   1.0    .0
COEF-1    16.  11.                    .35   .1    .0   1.0    .0
COEF-1    17.  11.                    .35   .1    .0   1.0    .0
COEF-1    18.  11.                    .35   .1    .0   1.0    .0
COEF-1    19.  11.                    .35   .1    .0   1.0    .0
COEF-1    20.  11.                    .35   .1    .0   1.0    .0
COEF-1    21.  11.                    .35   .1    .0   1.0    .0
COEF-1    22.  11.                    .35   .1    .0   1.0    .0
COEF-1    23.  11.                    .35   .1    .0   1.0    .0
COEF-1    24.  11.                    .35   .1    .0   1.0    .0
COEF-1    25.  11.                    .35   .1    .0   1.0    .0
COEF-1    26.  11.                    .35   .1    .0   1.0    .0
COEF-1    27.  11.                    .35   .1    .0   1.0    .0
COEF-1    28.  11.                    .35   .1    .0   1.0    .0
COEF-1    29.  11.                    .35   .1    .0   1.0    .0
COEF-1    30.  11.                    .35   .1    .0   1.0    .0
```

```
ENDATA12
COEF-2    1.   0.00   0.00    1.0    0.3                      0.0
COEF-2    2.   0.00   0.00    1.0    0.3                      0.0
COEF-2    3.   0.00   0.00    1.0    0.3                      0.0
COEF-2    4.   0.00   0.00    1.0    0.3                      0.0
COEF-2    5.   0.00   0.00    1.0    0.3                      0.0
COEF-2    6.   0.00   0.00    1.0    0.3                      0.0
COEF-2    7.   0.00   0.00    1.0    0.3                      0.0
COEF-2    8.   0.00   0.00    1.0    0.3                      0.0
COEF-2    9.   0.00   0.00    1.0    0.3                      0.0
COEF-2   10.   0.00   0.00    1.0    0.3                      0.0
COEF-2   11.   0.00   0.00    1.0    0.3                      0.0
COEF-2   12.   0.00   0.00    1.0    0.3                      0.0
COEF-2   13.   0.00   0.00    1.0    0.3                      0.0
COEF-2   14.   0.00   0.00    1.0    0.3                      0.0
COEF-2   15.   0.00   0.00    1.0    0.3                      0.0
COEF-2   16.   0.00   0.00    1.0    0.3                      0.0
COEF-2   17.   0.00   0.00    1.0    0.3                      0.0
COEF-2   18.   0.00   0.00    1.0    0.3                      0.0
COEF-2   19.   0.00   0.00    1.0    0.3                      0.0
COEF-2   20.   0.00   0.00    1.0    0.3                      0.0
COEF-2   21.   0.00   0.00    1.0    0.3                      0.0
COEF-2   22.   0.00   0.00    1.0    0.3                      0.0
COEF-2   23.   0.00   0.00    1.0    0.3                      0.0
COEF-2   24.   0.00   0.00    1.0    0.3                      0.0
COEF-2   25.   0.00   0.00    1.0    0.3                      0.0
COEF-2   26.   0.00   0.00    1.0    0.3                      0.0
COEF-2   27.   0.00   0.00    1.0    0.3                      0.0
COEF-2   28.   0.00   0.00    1.0    0.3                      0.0
COEF-2   29.   0.00   0.00    1.0    0.3                      0.0
COEF-2   30.   0.00   0.00    1.0    0.3                      0.0
ENDATA13
ENDATA14
ENDATA15
INCR-1   29.              .00340
INCR-1   30.              .01614
ENDATA16
INCR-2   29.   6.44    1.3     0.50     0.05     0.20
INCR-2   30.   6.44    1.3     0.50     0.05     0.20
ENDATA17
```

```
ENDATA18
ENDATA19
HDWTR-1     1. WILBARGER CREEK          0.00000
HDWTR-1    68. UN TRIB 1                0.00000
HDWTR-1   128. UN TRIB 2                0.00000
HDWTR-1   157. UN TRIB 3                0.00000
HDWTR-1   171. UN TRIB 4/DITCH          0.00000
HDWTR-1   211. COTTONWOOD CR            0.00000
HDWTR-1   212. UN TRIB 5                0.00000
ENDATA20
HDWTR-2     1.   6.44    1.3    0.50    0.05    0.20
HDWTR-2    68.   6.44    1.3    0.50    0.05    0.20
HDWTR-2   128.   6.44    1.3    0.50    0.05    0.20
HDWTR-2   157.   6.44    1.3    0.50    0.05    0.20
HDWTR-2   171.   6.44    1.3    0.50    0.05    0.20
HDWTR-2   211.   6.44    1.3    0.50    0.05    0.20
HDWTR-2   212.   6.44    1.3    0.50    0.05    0.20
ENDATA21
ENDATA22
JUNCTION   87   67   CONFLUENCE OF UN TRIB 1 WITH WILBARGER CREEK
JUNCTION  132  127   CONFLUENCE OF UN TRIB 2 WITH WILBARGER CREEK
JUNCTION  161  156   CONFLUENCE OF UN TRIB 3 WITH WILBARGER CREEK
JUNCTION  172  170   CONFLUENCE OF UN TRIB 4 (DITCH) WITH WILBARGER CREEK
JUNCTION  287  211   CONFLUENCE OF UN TRIB 5 WITH COTTONWOOD CREEK
JUNCTION  356  210   CONFLUENCE OF COTTONWOOD CREEK WITH WILBARGER CREEK
ENDATA23
WSTLD-1     1. PFLUGERVIL 13019-001   .00000
WSTLD-1    22. TRANSITION TO 5 DO     .00000
WSTLD-1    68. 130 CACTUS 14548-001   .00000
WSTLD-1   106. TABLE 4 HEADWATER Q    .01133
WSTLD-1   106. PFLUGERVIL 11845-005   .69017
WSTLD-1   128. PRELIM ANALYSIS WWTP   .00000
WSTLD-1   128. SG LANDHLD 13987-001   .00592
WSTLD-1   152. MANOR      12900-001   .08764
WSTLD-1   157. WILB MUD 2 14189-001   .08764
WSTLD-1   164. SWWC UTLTS 16022-001   .03506
WSTLD-1   171. AQUASOURCE 14061-001   .02147
WSTLD-1   212. PFLUG/COTT 14642-001   .13146
WSTLD-1   301. MANOR/COTT 14129-002   .02191
ENDATA24
```

```
WSTLD-2      1.      6.0      5.0                    1.8
WSTLD-2     22.      6.44     1.3                    0.05
WSTLD-2     68.      5.0      5.0                    2.0
WSTLD-2    106.      6.44     1.3                    0.05
WSTLD-2    106.      6.0      5.0                    1.6
WSTLD-2    128.      6.44     1.3                    0.05
WSTLD-2    128.      3.0      5.0                    2.0
WSTLD-2    152.      6.0      5.0                    2.0
WSTLD-2    157.      6.0      5.0                    1.7
WSTLD-2    164.      4.0      5.0                    2.0
WSTLD-2    171.      4.0      5.0                    2.0
WSTLD-2    212.      4.0      5.0                    2.0
WSTLD-2    301.      5.0      5.0                    2.0
ENDATA25
ENDATA26
ENDATA27
ENDATA28
ENDATA29
ENDATA30
ENDATA31
```

```
CNTROL01     WILBARGER CREEK (7/24/19 VERSION); INCR FLOW CITY OF MANOR
CNTROL02      (#14129-002) IN ELEM 301 (COTTONWOOD CREEK)
CNTROL03 YES ECHO DATA INPUT
CNTROL04  NO INTERMEDIATE SUMMARY
CNTROL05  NO FINAL REPORT
CNTROL06 YES SPECIAL REPORT
CNTROL07  NO LINE PRINTER PLOT
CNTROL08  NO GRAPHICS CAPABILITY
CNTROL09  NO SEQUENCING OUTPUT
CNTROL10 YES METRIC UNITS
CNTROL11 YES OXYGEN DEPENDENT RATES
CNTROL12  NO SENSITIVITY ANALYSIS
CNTROL13  NO FLOW AUGMENTATION
ENDATA01
MODOPT01  NO TEMPERATURE
MODOPT02  NO SALINITY
MODOPT03  NO CONSERVATIVE MATERIAL  I = CHLORIDES
MODOPT04  NO CONSERVATIVE MATERIAL II =
MODOPT05 YES DISSOLVED OXYGEN
MODOPT06 YES BIOCHEMICAL OXYGEN DEMAND
MODOPT07 YES NITROGEN
MODOPT08  NO PHOSPHORUS
MODOPT09  NO CHLOROPHYLL A
MODOPT10  NO MACROPHYTES
MODOPT11  NO COLIFORM
MODOPT12  NO NONCONSERVATIVE MATERIAL =
ENDATA02
PROGRAM  MAXIMUM ITERATION LIMIT           = 300.
PROGRAM  PLOT TYPE                         = 8.
PROGRAM  BOD OXYGEN UPTAKE RATE            = 2.3
ENDATA03
ENDATA04
ENDATA05
ENDATA06
ENDATA07
REACH ID   1. WC 13019-001 TO FM 685            69.4      66.7       0.3
REACH ID   2. WC FM 685 TO PFLUGER LANE         66.7      66.5       0.2
REACH ID   3. WC PFLUGER LANE TO TIMMERMAN PROP. 66.5     63.5       0.3
REACH ID   4. WC TIMMERMAN PROP. TO SH 130      63.5      61.4       0.3
REACH ID   5. WC SH 130 TO WEISS LANE           61.4      59.2       0.2
```

```
REACH ID      6. WC WEISS LANE TO UN TRIB               59.2     53.4     0.2
REACH ID      7. T1 14548-001 TO WILBARGER CR            1.9      0.0     0.1
REACH ID      8. WC UN TRIB TO CAMERON RD               53.4     51.0     0.3
REACH ID      9. WC CAMERON RD TO 11845-005             51.0     47.7     0.3
REACH ID     10. WC 11845-005 TO GREGG RD               47.7     46.8     0.3
REACH ID     11. WC GREGG RD TO UN TRIB                 46.8     43.0     0.2
REACH ID     12. T2 13987-001 TO WILBARGER CR            0.4      0.0     0.1
REACH ID     13. WC UN TRIB TO US 290                   43.0     39.6     0.2
REACH ID     14. WC US 290 TO 300M ABOVE 12900          39.6     39.2     0.2
REACH ID     15. WC 300 M ABOVE 12900 TO 12900          39.2     38.9     0.3
REACH ID     16. WC 12900-001 TO UN TRIB                38.9     37.4     0.3
REACH ID     17. T3 14189 TO WILBARGER CR                0.4      0.0     0.1
REACH ID     18. WC UN TRIB TO DITCH                    37.4     34.9     0.25
REACH ID     19. T4 14061 TO WILBARGER CR                0.1      0.0     0.1
REACH ID     20. WC DITCH TO PARSON RD                  34.9     32.9     0.2
REACH ID     21. WC PARSON RD TO JONES RD               32.9     28.4     0.3
REACH ID     22. WC JONES RD TO COTTONWOOD CR           28.4     25.6     0.2
REACH ID     23. CC IMMED UPSTR OF UNND TRIB 5           6.91     6.9     0.01
REACH ID     24. T5 14642-001 TO COTTONWOOD CR           7.5      0.0     0.1
REACH ID     25. CC UNND TRIB 5 TO WILBARGER CR          6.9      0.0     0.1
REACH ID     26. WC COTTONWOOD CR TO BITTINGS..RD       25.6     23.8     0.3
REACH ID     27. WC BITTINGS TO UPPER ELGIN RIV RD      23.8     19.6     0.3
REACH ID     28. WC UPPER ELGIN RIV RD TO FM 1704       19.6     10.6     0.3
REACH ID     29. WC FM 1704 TO LOWER ELGIN RD           10.6      7.4     0.2
REACH ID     30. WC LOWER ELGIN RD TO COLORADO RIV       7.4      0.0     0.2
ENDATA08
HYDR-1        1.    0.124    0.5     1.917    0.4                0.035
HYDR-1        2.    0.121    0.5     1.612    0.4                0.035
HYDR-1        3.    0.121    0.5     1.612    0.4                0.035
HYDR-1        4.    0.121    0.5     1.612    0.4                0.035
HYDR-1        5.    0.121    0.5     1.612    0.4                0.035
HYDR-1        6.    0.121    0.5     1.612    0.4                0.035
HYDR-1        7.    0.416    0.5     0.591    0.4                0.035
HYDR-1        8.    0.118    0.5     1.308    0.4                0.035
HYDR-1        9.    0.118    0.5     1.308    0.4                0.035
HYDR-1       10.    0.2917   0.5     0.640    0.4                0.035
HYDR-1       11.    0.2917   0.5     0.640    0.4                0.035
HYDR-1       12.    0.131    0.5     0.720    0.4                0.035
HYDR-1       13.    0.2917   0.5     0.640    0.4                0.035
HYDR-1       14.    0.2917   0.5     0.640    0.4                0.035
```

```
HYDR-1     15.   0.2917   0.5        0.640     0.4              0.035
HYDR-1     16.   0.2917   0.5        0.640     0.4              0.035
HYDR-1     17.   0.131    0.5        0.720     0.4              0.035
HYDR-1     18.   0.2917   0.5        0.640     0.4              0.035
HYDR-1     19.   0.131    0.5        0.720     0.4              0.035
HYDR-1     20.   0.2917   0.5        0.640     0.4              0.035
HYDR-1     21.   0.2917   0.5        0.640     0.4              0.035
HYDR-1     22.   0.2917   0.5        0.640     0.4              0.035
HYDR-1     23.   0.131    0.5        0.720     0.4              0.035
HYDR-1     24.   0.131    0.5        0.720     0.4              0.035
HYDR-1     25.   0.131    0.5        0.720     0.4              0.035
HYDR-1     26.   0.2917   0.5        0.640     0.4              0.035
HYDR-1     27.   0.2917   0.5        0.640     0.4              0.035
HYDR-1     28.   0.2917   0.5        0.640     0.4              0.035
HYDR-1     29.   0.2917   0.5        0.640     0.4              0.035
HYDR-1     30.   0.2917   0.5        0.640     0.4              0.035
ENDATA09
ENDATA10
INITIAL     1.   0.0           6.0    0.05    1.        0.
INITIAL     2.   0.0           6.0    0.05    1.        0.
INITIAL     3.   0.0           6.0    0.05    1.        0.
INITIAL     4.   0.0           6.0    0.05    1.        0.
INITIAL     5.   0.0           6.0    0.05    1.        0.
INITIAL     6.   0.0           6.0    0.05    1.        0.
INITIAL     7.   0.0           6.0    0.05    1.        0.
INITIAL     8.   0.0           6.0    0.05    1.        0.
INITIAL     9.   0.0           6.0    0.05    1.        0.
INITIAL    10.  28.5           6.0    0.05    1.        0.
INITIAL    11.  28.5           6.0    0.05    1.        0.
INITIAL    12.  28.5           6.0    0.05    1.        0.
INITIAL    13.  28.5           6.0    0.05    1.        0.
INITIAL    14.  28.5           6.0    0.05    1.        0.
INITIAL    15.  28.5           6.0    0.05    1.        0.
INITIAL    16.  28.5           6.0    0.05    1.        0.
INITIAL    17.  28.5           6.0    0.05    1.        0.
INITIAL    18.  28.5           6.0    0.05    1.        0.
INITIAL    19.  28.5           6.0    0.05    1.        0.
INITIAL    20.  28.5           6.0    0.05    1.        0.
INITIAL    21.  28.5           6.0    0.05    1.        0.
INITIAL    22.  28.5           6.0    0.05    1.        0.
```

```
INITIAL    23.   0.0           6.0    0.05   1.              0.
INITIAL    24.  28.5           6.0    0.05   1.              0.
INITIAL    25.  28.5           6.0    0.05   1.              0.
INITIAL    26.  28.5           6.0    0.05   1.              0.
INITIAL    27.  28.5           6.0    0.05   1.              0.
INITIAL    28.  28.5           6.0    0.05   1.              0.
INITIAL    29.  28.5           6.0    0.05   1.              0.
INITIAL    30.  28.5           6.0    0.05   1.              0.
ENDATA11
COEF-1      1.  11.                   .35    .1     .0    1.0    .0
COEF-1      2.  11.                   .35    .1     .0    1.0    .0
COEF-1      3.  11.                   .35    .1     .0    1.0    .0
COEF-1      4.  11.                   .35    .1     .0    1.0    .0
COEF-1      5.  11.                   .35    .1     .0    1.0    .0
COEF-1      6.  11.                   .35    .1     .0    1.0    .0
COEF-1      7.  11.                   .35    .1     .0    1.0    .0
COEF-1      8.  11.                   .35    .1     .0    1.0    .0
COEF-1      9.  11.                   .35    .1     .0    1.0    .0
COEF-1     10.  11.                   .35    .1     .0    1.0    .0
COEF-1     11.  11.                   .35    .1     .0    1.0    .0
COEF-1     12.  11.                   .35    .1     .0    1.0    .0
COEF-1     13.  11.                   .35    .1     .0    1.0    .0
COEF-1     14.  11.                   .35    .1     .0    1.0    .0
COEF-1     15.  11.                   .35    .1     .0    1.0    .0
COEF-1     16.  11.                   .35    .1     .0    1.0    .0
COEF-1     17.  11.                   .35    .1     .0    1.0    .0
COEF-1     18.  11.                   .35    .1     .0    1.0    .0
COEF-1     19.  11.                   .35    .1     .0    1.0    .0
COEF-1     20.  11.                   .35    .1     .0    1.0    .0
COEF-1     21.  11.                   .35    .1     .0    1.0    .0
COEF-1     22.  11.                   .35    .1     .0    1.0    .0
COEF-1     23.  11.                   .35    .1     .0    1.0    .0
COEF-1     24.  11.                   .35    .1     .0    1.0    .0
COEF-1     25.  11.                   .35    .1     .0    1.0    .0
COEF-1     26.  11.                   .35    .1     .0    1.0    .0
COEF-1     27.  11.                   .35    .1     .0    1.0    .0
COEF-1     28.  11.                   .35    .1     .0    1.0    .0
COEF-1     29.  11.                   .35    .1     .0    1.0    .0
COEF-1     30.  11.                   .35    .1     .0    1.0    .0
ENDATA12
```

```
COEF-2      1.   0.00    0.00     1.0    0.3                        0.0
COEF-2      2.   0.00    0.00     1.0    0.3                        0.0
COEF-2      3.   0.00    0.00     1.0    0.3                        0.0
COEF-2      4.   0.00    0.00     1.0    0.3                        0.0
COEF-2      5.   0.00    0.00     1.0    0.3                        0.0
COEF-2      6.   0.00    0.00     1.0    0.3                        0.0
COEF-2      7.   0.00    0.00     1.0    0.3                        0.0
COEF-2      8.   0.00    0.00     1.0    0.3                        0.0
COEF-2      9.   0.00    0.00     1.0    0.3                        0.0
COEF-2     10.   0.00    0.00     1.0    0.3                        0.0
COEF-2     11.   0.00    0.00     1.0    0.3                        0.0
COEF-2     12.   0.00    0.00     1.0    0.3                        0.0
COEF-2     13.   0.00    0.00     1.0    0.3                        0.0
COEF-2     14.   0.00    0.00     1.0    0.3                        0.0
COEF-2     15.   0.00    0.00     1.0    0.3                        0.0
COEF-2     16.   0.00    0.00     1.0    0.3                        0.0
COEF-2     17.   0.00    0.00     1.0    0.3                        0.0
COEF-2     18.   0.00    0.00     1.0    0.3                        0.0
COEF-2     19.   0.00    0.00     1.0    0.3                        0.0
COEF-2     20.   0.00    0.00     1.0    0.3                        0.0
COEF-2     21.   0.00    0.00     1.0    0.3                        0.0
COEF-2     22.   0.00    0.00     1.0    0.3                        0.0
COEF-2     23.   0.00    0.00     1.0    0.3                        0.0
COEF-2     24.   0.00    0.00     1.0    0.3                        0.0
COEF-2     25.   0.00    0.00     1.0    0.3                        0.0
COEF-2     26.   0.00    0.00     1.0    0.3                        0.0
COEF-2     27.   0.00    0.00     1.0    0.3                        0.0
COEF-2     28.   0.00    0.00     1.0    0.3                        0.0
COEF-2     29.   0.00    0.00     1.0    0.3                        0.0
COEF-2     30.   0.00    0.00     1.0    0.3                        0.0
ENDATA13
ENDATA14
ENDATA15
INCR-1     29.               .00340
INCR-1     30.               .01614
ENDATA16
INCR-2     29.   6.19    1.3      0.50   0.05    0.20
INCR-2     30.   6.19    1.3      0.50   0.05    0.20
ENDATA17
ENDATA18
```

```
ENDATA19
HDWTR-1     1. WILBARGER CREEK        0.00000
HDWTR-1    68. UN TRIB 1              0.00000
HDWTR-1   128. UN TRIB 2              0.00000
HDWTR-1   157. UN TRIB 3              0.00000
HDWTR-1   171. UN TRIB 4/DITCH        0.00000
HDWTR-1   211. COTTONWOOD CR          0.00000
HDWTR-1   212. UN TRIB 5              0.00000
ENDATA20
HDWTR-2     1.   6.19    1.3     0.50     0.05     0.20
HDWTR-2    68.   6.19    1.3     0.50     0.05     0.20
HDWTR-2   128.   6.19    1.3     0.50     0.05     0.20
HDWTR-2   157.   6.19    1.3     0.50     0.05     0.20
HDWTR-2   171.   6.19    1.3     0.50     0.05     0.20
HDWTR-2   211.   6.19    1.3     0.50     0.05     0.20
HDWTR-2   212.   6.19    1.3     0.50     0.05     0.20
ENDATA21
ENDATA22
JUNCTION   87   67   CONFLUENCE OF UN TRIB 1 WITH WILBARGER CREEK
JUNCTION  132  127   CONFLUENCE OF UN TRIB 2 WITH WILBARGER CREEK
JUNCTION  161  156   CONFLUENCE OF UN TRIB 3 WITH WILBARGER CREEK
JUNCTION  172  170   CONFLUENCE OF UN TRIB 4 (DITCH) WITH WILBARGER CREEK
JUNCTION  287  211   CONFLUENCE OF UN TRIB 5 WITH COTTONWOOD CREEK
JUNCTION  356  210   CONFLUENCE OF COTTONWOOD CREEK WITH WILBARGER CREEK
ENDATA23
WSTLD-1     1. PFLUGERVIL 13019-001   .00000
WSTLD-1    22. TRANSITION TO 5 DO     .00000
WSTLD-1    68. 130 CACTUS 14548-001   .00000
WSTLD-1   106. TABLE 4 HEADWATER Q    .01133
WSTLD-1   106. PFLUGERVIL 11845-005   .69017
WSTLD-1   106. PRE-APP WWTP(APPROX)   .00000
WSTLD-1   128. PRELIM ANALYSIS WWTP   .00000
WSTLD-1   128. SG LANDHLD 13987-001   .00592
WSTLD-1   152. MANOR      12900-001   .08764
WSTLD-1   157. WILB MUD 2 14189-001   .08764
WSTLD-1   164. SWWC UTLTS 16022-001   .03506
WSTLD-1   171. AQUASOURCE 14061-001   .02147
WSTLD-1   212. PFLUG/COTT 14642-001   .13146
WSTLD-1   301. MANOR/COTT 14129-002   .02191
ENDATA24
```

```
WSTLD-2      1.        6.0        5.0                      1.8
WSTLD-2     22.        6.19       1.3                      0.05
WSTLD-2     68.        5.0        5.0                      2.0
WSTLD-2    106.        6.19       1.3                      0.05
WSTLD-2    106.        6.0        5.0                      1.6
WSTLD-2    106.        6.0        5.0                      2.0
WSTLD-2    128.        6.16       2.43                     0.15
WSTLD-2    128.        3.0        5.0                      2.0
WSTLD-2    152.        6.0        5.0                      2.0
WSTLD-2    157.        6.0        5.0                      0.7
WSTLD-2    164.        4.0        5.0                      2.0
WSTLD-2    171.        4.0        5.0                      2.0
WSTLD-2    212.        4.0        5.0                      2.0
WSTLD-2    301.        5.0        5.0                      2.0
ENDATA25
ENDATA26
ENDATA27
ENDATA28
ENDATA29
ENDATA30
ENDATA31
```

```
CNTROL01      WILBARGER CR; FROM 'WILB_SUM.UP7'; OCT; BACK TO SEQUENCING # FOR
CNTROL02      DOS QUALTX; OUTPUT FILE SEQUENCES TO OCT COLORADO MAINSTEM MODEL
CNTROL03 YES ECHO DATA INPUT
CNTROL04  NO INTERMEDIATE SUMMARY
CNTROL05  NO FINAL REPORT
CNTROL06 YES SPECIAL REPORT
CNTROL07  NO LINE PRINTER PLOT
CNTROL08  NO GRAPHICS CAPABILITY
CNTROL09 YES SEQUENCING OUTPUT
CNTROL10 YES METRIC UNITS
CNTROL11 YES OXYGEN DEPENDENT RATES
CNTROL12  NO SENSITIVITY ANALYSIS
CNTROL13  NO FLOW AUGMENTATION
ENDATA01
MODOPT01  NO TEMPERATURE
MODOPT02  NO SALINITY
MODOPT03  NO CONSERVATIVE MATERIAL  I = CHLORIDES
MODOPT04  NO CONSERVATIVE MATERIAL II =
MODOPT05 YES DISSOLVED OXYGEN
MODOPT06 YES BIOCHEMICAL OXYGEN DEMAND
MODOPT07 YES NITROGEN
MODOPT08  NO PHOSPHORUS
MODOPT09  NO CHLOROPHYLL A
MODOPT10  NO MACROPHYTES
MODOPT11  NO COLIFORM
MODOPT12  NO NONCONSERVATIVE MATERIAL =
ENDATA02
!PROGRAM  LOGICAL UNIT NUMBER FOR SEQUENCING = 19.
PROGRAM  MAXIMUM ITERATION LIMIT          = 300.
PROGRAM  PLOT TYPE                        = 8.
PROGRAM  FINAL REPORT TYPE                = 3.
PROGRAM  BOD OXYGEN UPTAKE RATE           = 2.3
ENDATA03
ENDATA04
ENDATA05
ENDATA06
ENDATA07
REACH ID    1. WC 13019-001 TO FM 685              69.4      66.7      0.3
REACH ID    2. WC FM 685 TO PFLUGER LANE           66.7      66.5      0.2
REACH ID    3. WC PFLUGER LANE TO TIMMERMAN PROP.  66.5      63.5      0.3
```

```
REACH ID      4. WC TIMMERMAN PROP. TO SH 130        63.5      61.4      0.3
REACH ID      5. WC SH 130 TO WEISS LANE             61.4      59.2      0.2
REACH ID      6. WC WEISS LANE TO UN TRIB            59.2      53.4      0.2
REACH ID      7. T1 14548-001 TO WILBARGER CR         1.9       0.0      0.1
REACH ID      8. WC UN TRIB TO CAMERON RD            53.4      51.0      0.3
REACH ID      9. WC CAMERON RD TO 11845-005          51.0      47.7      0.3
REACH ID     10. WC 11845-005 TO GREGG RD            47.7      46.8      0.3
REACH ID     11. WC GREGG RD TO UN TRIB              46.8      43.0      0.2
REACH ID     12. T2 13987-001 TO WILBARGER CR         0.4       0.0      0.1
REACH ID     13. WC UN TRIB TO US 290                43.0      39.6      0.2
REACH ID     14. WC US 290 TO 300M ABOVE 12900       39.6      39.2      0.2
REACH ID     15. WC 300 M ABOVE 12900 TO 12900       39.2      38.9      0.3
REACH ID     16. WC 12900-001 TO UN TRIB             38.9      37.4      0.3
REACH ID     17. T3 14189 TO WILBARGER CR             0.4       0.0      0.1
REACH ID     18. WC UN TRIB TO DITCH                 37.4      34.9      0.25
REACH ID     19. T4 14061 TO WILBARGER CR             0.1       0.0      0.1
REACH ID     20. WC DITCH TO PARSON RD               34.9      32.9      0.2
REACH ID     21. WC PARSON RD TO JONES RD            32.9      28.4      0.3
REACH ID     22. WC JONES RD TO COTTONWOOD CR        28.4      25.6      0.2
REACH ID     23. CC IMMED UPSTR OF UNND TRIB 5        6.91      6.9      0.01
REACH ID     24. T5 14642-001 TO COTTONWOOD CR        7.5       0.0      0.1
REACH ID     25. CC UNND TRIB 5 TO WILBARGER CR       6.9       0.0      0.1
REACH ID     26. WC COTTONWOOD CR TO BITTINGS..RD    25.6      23.8      0.3
REACH ID     27. WC BITTINGS TO UPPER ELGIN RIV RD   23.8      19.6      0.3
REACH ID     28. WC UPPER ELGIN RIV RD TO FM 1704    19.6      10.6      0.3
REACH ID     29. WC FM 1704 TO LOWER ELGIN RD        10.6       7.4      0.2
REACH ID     30. WC LOWER ELGIN RD TO COLORADO RIV    7.4       0.0      0.2
ENDATA08
HYDR-1      1.    0.124    0.5       1.917     0.4                 0.035
HYDR-1      2.    0.121    0.5       1.612     0.4                 0.035
HYDR-1      3.    0.121    0.5       1.612     0.4                 0.035
HYDR-1      4.    0.121    0.5       1.612     0.4                 0.035
HYDR-1      5.    0.121    0.5       1.612     0.4                 0.035
HYDR-1      6.    0.121    0.5       1.612     0.4                 0.035
HYDR-1      7.    0.416    0.5       0.591     0.4                 0.035
HYDR-1      8.    0.118    0.5       1.308     0.4                 0.035
HYDR-1      9.    0.118    0.5       1.308     0.4                 0.035
HYDR-1     10.    0.2917   0.5       0.640     0.4                 0.035
HYDR-1     11.    0.2917   0.5       0.640     0.4                 0.035
HYDR-1     12.    0.131    0.5       0.720     0.4                 0.035
```

```
HYDR-1      13.   0.2917   0.5      0.640     0.4            0.035
HYDR-1      14.   0.2917   0.5      0.640     0.4            0.035
HYDR-1      15.   0.2917   0.5      0.640     0.4            0.035
HYDR-1      16.   0.2917   0.5      0.640     0.4            0.035
HYDR-1      17.   0.131    0.5      0.720     0.4            0.035
HYDR-1      18.   0.2917   0.5      0.640     0.4            0.035
HYDR-1      19.   0.131    0.5      0.720     0.4            0.035
HYDR-1      20.   0.2917   0.5      0.640     0.4            0.035
HYDR-1      21.   0.2917   0.5      0.640     0.4            0.035
HYDR-1      22.   0.2917   0.5      0.640     0.4            0.035
HYDR-1      23.   0.131    0.5      0.720     0.4            0.035
HYDR-1      24.   0.131    0.5      0.720     0.4            0.035
HYDR-1      25.   0.131    0.5      0.720     0.4            0.035
HYDR-1      26.   0.2917   0.5      0.640     0.4            0.035
HYDR-1      27.   0.2917   0.5      0.640     0.4            0.035
HYDR-1      28.   0.2917   0.5      0.640     0.4            0.035
HYDR-1      29.   0.2917   0.5      0.640     0.4            0.035
HYDR-1      30.   0.2917   0.5      0.640     0.4            0.035
ENDATA09
ENDATA10
INITIAL      1.   0.0            6.0    0.05    1.        0.
INITIAL      2.   0.0            6.0    0.05    1.        0.
INITIAL      3.   0.0            6.0    0.05    1.        0.
INITIAL      4.   0.0            6.0    0.05    1.        0.
INITIAL      5.   0.0            6.0    0.05    1.        0.
INITIAL      6.   0.0            6.0    0.05    1.        0.
INITIAL      7.   0.0            6.0    0.05    1.        0.
INITIAL      8.   0.0            6.0    0.05    1.        0.
INITIAL      9.   0.0            6.0    0.05    1.        0.
INITIAL     10.   24.5           6.0    0.05    1.        0.
INITIAL     11.   24.5           6.0    0.05    1.        0.
INITIAL     12.   24.5           6.0    0.05    1.        0.
INITIAL     13.   24.5           6.0    0.05    1.        0.
INITIAL     14.   24.5           6.0    0.05    1.        0.
INITIAL     15.   24.5           6.0    0.05    1.        0.
INITIAL     16.   24.5           6.0    0.05    1.        0.
INITIAL     17.   24.5           6.0    0.05    1.        0.
INITIAL     18.   24.5           6.0    0.05    1.        0.
INITIAL     19.   24.5           6.0    0.05    1.        0.
INITIAL     20.   24.5           6.0    0.05    1.        0.
```

```
INITIAL    21.  24.5           6.0    0.05    1.              0.
INITIAL    22.  24.5           6.0    0.05    1.              0.
INITIAL    23.   0.0           6.0    0.05    1.              0.
INITIAL    24.  24.5           6.0    0.05    1.              0.
INITIAL    25.  24.5           6.0    0.05    1.              0.
INITIAL    26.  24.5           6.0    0.05    1.              0.
INITIAL    27.  24.5           6.0    0.05    1.              0.
INITIAL    28.  24.5           6.0    0.05    1.              0.
INITIAL    29.  24.5           6.0    0.05    1.              0.
INITIAL    30.  24.5           6.0    0.05    1.              0.
ENDATA11
COEF-1      1.  11.                   .35    .1     .0    1.0     .0
COEF-1      2.  11.                   .35    .1     .0    1.0     .0
COEF-1      3.  11.                   .35    .1     .0    1.0     .0
COEF-1      4.  11.                   .35    .1     .0    1.0     .0
COEF-1      5.  11.                   .35    .1     .0    1.0     .0
COEF-1      6.  11.                   .35    .1     .0    1.0     .0
COEF-1      7.  11.                   .35    .1     .0    1.0     .0
COEF-1      8.  11.                   .35    .1     .0    1.0     .0
COEF-1      9.  11.                   .35    .1     .0    1.0     .0
COEF-1     10.  11.                   .35    .1     .0    1.0     .0
COEF-1     11.  11.                   .35    .1     .0    1.0     .0
COEF-1     12.  11.                   .35    .1     .0    1.0     .0
COEF-1     13.  11.                   .35    .1     .0    1.0     .0
COEF-1     14.  11.                   .35    .1     .0    1.0     .0
COEF-1     15.  11.                   .35    .1     .0    1.0     .0
COEF-1     16.  11.                   .35    .1     .0    1.0     .0
COEF-1     17.  11.                   .35    .1     .0    1.0     .0
COEF-1     18.  11.                   .35    .1     .0    1.0     .0
COEF-1     19.  11.                   .35    .1     .0    1.0     .0
COEF-1     20.  11.                   .35    .1     .0    1.0     .0
COEF-1     21.  11.                   .35    .1     .0    1.0     .0
COEF-1     22.  11.                   .35    .1     .0    1.0     .0
COEF-1     23.  11.                   .35    .1     .0    1.0     .0
COEF-1     24.  11.                   .35    .1     .0    1.0     .0
COEF-1     25.  11.                   .35    .1     .0    1.0     .0
COEF-1     26.  11.                   .35    .1     .0    1.0     .0
COEF-1     27.  11.                   .35    .1     .0    1.0     .0
COEF-1     28.  11.                   .35    .1     .0    1.0     .0
COEF-1     29.  11.                   .35    .1     .0    1.0     .0
```

```
COEF-1      30.   11.                         .35    .1     .0    1.0     .0
ENDATA12
COEF-2       1.   0.00   0.00   1.0    0.3                    0.0
COEF-2       2.   0.00   0.00   1.0    0.3                    0.0
COEF-2       3.   0.00   0.00   1.0    0.3                    0.0
COEF-2       4.   0.00   0.00   1.0    0.3                    0.0
COEF-2       5.   0.00   0.00   1.0    0.3                    0.0
COEF-2       6.   0.00   0.00   1.0    0.3                    0.0
COEF-2       7.   0.00   0.00   1.0    0.3                    0.0
COEF-2       8.   0.00   0.00   1.0    0.3                    0.0
COEF-2       9.   0.00   0.00   1.0    0.3                    0.0
COEF-2      10.   0.00   0.00   1.0    0.3                    0.0
COEF-2      11.   0.00   0.00   1.0    0.3                    0.0
COEF-2      12.   0.00   0.00   1.0    0.3                    0.0
COEF-2      13.   0.00   0.00   1.0    0.3                    0.0
COEF-2      14.   0.00   0.00   1.0    0.3                    0.0
COEF-2      15.   0.00   0.00   1.0    0.3                    0.0
COEF-2      16.   0.00   0.00   1.0    0.3                    0.0
COEF-2      17.   0.00   0.00   1.0    0.3                    0.0
COEF-2      18.   0.00   0.00   1.0    0.3                    0.0
COEF-2      19.   0.00   0.00   1.0    0.3                    0.0
COEF-2      20.   0.00   0.00   1.0    0.3                    0.0
COEF-2      21.   0.00   0.00   1.0    0.3                    0.0
COEF-2      22.   0.00   0.00   1.0    0.3                    0.0
COEF-2      23.   0.00   0.00   1.0    0.3                    0.0
COEF-2      24.   0.00   0.00   1.0    0.3                    0.0
COEF-2      25.   0.00   0.00   1.0    0.3                    0.0
COEF-2      26.   0.00   0.00   1.0    0.3                    0.0
COEF-2      27.   0.00   0.00   1.0    0.3                    0.0
COEF-2      28.   0.00   0.00   1.0    0.3                    0.0
COEF-2      29.   0.00   0.00   1.0    0.3                    0.0
COEF-2      30.   0.00   0.00   1.0    0.3                    0.0
ENDATA13
ENDATA14
ENDATA15
INCR-1      29.              .00340
INCR-1      30.              .01614
ENDATA16
INCR-2      29.   6.66    1.3       0.50      0.05      0.20
INCR-2      30.   6.66    1.3       0.50      0.05      0.20
```

```
ENDATA17
ENDATA18
ENDATA19
HDWTR-1     1. WILBARGER CREEK        0.00000
HDWTR-1    68. UN TRIB 1              0.00000
HDWTR-1   128. UN TRIB 2              0.00000
HDWTR-1   157. UN TRIB 3              0.00000
HDWTR-1   171. UN TRIB 4/DITCH        0.00000
HDWTR-1   211. COTTONWOOD CR          0.00000
HDWTR-1   212. UN TRIB 5              0.00000
ENDATA20
HDWTR-2     1.   6.66    1.3     0.50     0.05     0.20
HDWTR-2    68.   6.66    1.3     0.50     0.05     0.20
HDWTR-2   128.   6.66    1.3     0.50     0.05     0.20
HDWTR-2   157.   6.66    1.3     0.50     0.05     0.20
HDWTR-2   171.   6.66    1.3     0.50     0.05     0.20
HDWTR-2   211.   6.66    1.3     0.50     0.05     0.20
HDWTR-2   212.   6.66    1.3     0.50     0.05     0.20
ENDATA21
ENDATA22
JUNCTION   87   67  CONFLUENCE OF UN TRIB 1 WITH WILBARGER CREEK
JUNCTION  132  127  CONFLUENCE OF UN TRIB 2 WITH WILBARGER CREEK
JUNCTION  161  156  CONFLUENCE OF UN TRIB 3 WITH WILBARGER CREEK
JUNCTION  172  170  CONFLUENCE OF UN TRIB 4 (DITCH) WITH WILBARGER CREEK
JUNCTION  287  211  CONFLUENCE OF UN TRIB 5 WITH COTTONWOOD CREEK
JUNCTION  356  210  CONFLUENCE OF COTTONWOOD CREEK WITH WILBARGER CREEK
ENDATA23
WSTLD-1     1. PFLUGERVIL 13019-001   .00000
WSTLD-1    22. TRANSITION TO 5 DO     .00000
WSTLD-1    68. 130 CACTUS 14548-001   .00000
WSTLD-1   106. TABLE 4 HEADWATER Q    .01133
WSTLD-1   106. PFLUGERVIL 11845-005   .69017
WSTLD-1   128. PRELIM ANALYSIS WWTP   .00000
WSTLD-1   128. SG LANDHLD 13987-001   .00592
WSTLD-1   152. MANOR      12900-001   .08764
WSTLD-1   157. WILB MUD 2 14189-001   .08764
WSTLD-1   164. SWWC UTLTS 16022-001   .03506
WSTLD-1   171. AQUASOURCE 14061-001   .02147
WSTLD-1   212. PFLUG/COTT 14642-001   .13146
WSTLD-1   301. MANOR/COTT 14129-002   .02191
```

```
ENDATA24
WSTLD-2     1.      6.0      5.0                     1.8
WSTLD-2    22.      6.66     1.3                     0.05
WSTLD-2    68.      5.0      5.0                     2.0
WSTLD-2   106.      6.66     1.3                     0.05
WSTLD-2   106.      6.0      5.0                     1.6
WSTLD-2   128.      6.66     1.3                     0.05
WSTLD-2   128.      3.0      5.0                     2.0
WSTLD-2   152.      6.0      5.0                     2.0
WSTLD-2   157.      6.0      5.0                     1.7
WSTLD-2   164.      4.0      5.0                     2.0
WSTLD-2   171.      4.0      5.0                     2.0
WSTLD-2   212.      4.0      5.0                     2.0
WSTLD-2   301.      5.0      5.0                     2.0
ENDATA25
ENDATA26
ENDATA27
ENDATA28
ENDATA29
ENDATA30
ENDATA31
```

# Appendix Item 15

Surface Water Quality Viewer

version 4.0        Texas Commission on Environmental

WIlbarger Creek

Show search results for WIlbarger Cr...

Pflugerville

1434H

1403A
1403F
1403C
1403B
1403D
1429A
1428G
Walnut Creek
1428J
1434D

1403M
1403R
Manor
290
Elgin

1403P    1403K
1428D
1428C
1434E

1429H    1429B    1429C    1428E    1428B
1428I

1430B
1429E    1429D    Austin    1428A
1428
Webberville

71-290    1430    1429F
1428H
Del Valle

1427B
1428L

1427D    Austin-Bergstrom Int'l Airport
1427
71

Shadow    1427A
1428L

1427C    Manchaca    1427E    Circuit of the America    1434F
TRAVIS    1427F

Buda
Cedar Creek    1434B
W-Hwy 2

TCEQ | Austin Community College, City of A

4mi

-97.204 30.291 Degrees



Killeen
Hood
Bryan
Austin
San Antonio

# Appendix Item 16

| Report Abbreviations | Description: |
|---|---|
| **SEGID:** | Unique Segment identification alpha-numeric code; can be stream, reservoir, estuary, oyster waters, beach watch, etc. |
| **AUID:** | Unique Assessment Unit code; this is a portion of the segment the AUID begins with and ends with _01, _02, etc. Some AUIDs are special units ending in "SA," or oyster water AUIDs are indicated by "OW" and beach watch AUIDs are indicated by abbreviations for name of beach in AUID. |
| **ASMT Start Date:** | The start date of the period of record data for this method was selected; the official 2020 period of record is from 12/1/2011 to 11/30/2018. Assessors have the option of going back 10 years (12/1/2008) to select more data, according to assessment guidance. |
| **ASMT End Date:** | The end date of the period of record data for this method was selected; the official 2020 period of record dates are 12/1/2011 to 11/30/2018. Assessors have the option of including more recently collected data than 12/01/2018, if available. |
| **# Assd:** | Number of samples assessed; some data are averaged, as with profile data, some are eliminated because criteria do not apply during certain conditions such as low flow. |
| **Mean Assd:** | Mean of samples assessed; includes averaged methods like chronic criteria as well as geometric mean calculations for bacteria. |
| **# Exceed:** | The number of samples that exceed criteria for single sample, or binomial, methods (not averaged data). |
| **Mean Exceed:** | This is the mean of the samples that exceeded criteria for the single sample, or binomial, methods (not averaged data). |
| **Criteria:** | Value that the data is compared against to determine level of support; Note: for acute metals in water, each value is compared to a calculated criterion and not all criteria could be reported here, only the minimum in the range of criteria calculated are included. |
| **DS Qual:** | *Dataset Qualifier - indicates sample sizes:*<br>**AD** = Adequate Data (10 or more samples)　　**TR** = Temporally Not Representative, used with NA<br>**LD** = Limited Data (less than 9, greater than 3)　　**SR** = Spatially Not Representative, used with NA<br>**ID** = Inadequate Data (less than 4)　　**OE** = Other information than ambient samples evaluated<br>**JQ** = Level of support is based on judgment of the assessor　　**OS** = Assessment area outside state boundaries<br>**SM** = This assessment method is superseded by another method |
| **LOS:** | *Level of support for this use, method, assessment parameter:*<br>**FS** = Fully Supporting　　**NS** = Nonsupport<br>**NC** = No Concern　　**CS** = Screening Level Concern<br>**NA** = Not Assessed　　**CN** = Use Concern |
| **CF:** | Carry forward indicator check box: indicates that the Integrated level of support of CS, CN, or NS was carried forward from a previous assessment due to inadequate data for this method in this assessment. |
| **Int LOS:** | Integrated level of support. This is the overall level of support for this use, method, parameter group, which could be different from the LOS (described above) due to carry forward information or other types of changes. New Code added in 2010: PI = Pending Issue |
| **TCEQ Cause:** | This is the impairment description (e.g., bacteria, depressed dissolved oxygen, etc.) |
| **Cat:** | **Category 3**: Insufficient or no data and information to determine if standard is attained<br>**Category 4**: Standard is not attained or nonattainment is predicted in the near future due to one or more parameters, but no TMDLs are required.<br>　　**4a** - All TMDLs have been completed and approved by EPA.<br>　　**4b** - Other pollution control requirements are reasonably expected to result in the attainment of the water quality standard in the near future.<br>　　**4c** - Nonattainment of the standard for one or more parameters is shown to be caused by pollution, not by pollutants and that the water quality conditions cannot be changed by the allocation and control of pollutants through the TMDL process.<br>**Category 5**: Standard is not attained or nonattainment is predicted in the near future for one or more parameters.<br>　　**5a** - TMDLs are underway, scheduled, or may be scheduled for one or more parameters.<br>　　**5b** - review of the standards for one or more parameters will be conducted before a management strategy is selected, including a possible revision to the water quality standards.<br>　　**5c** - Additional data or information will be collected and/or evaluated for one or more parameters before a management strategy is selected. |

AR Item 42, Page 001

| SEGID: | 1434 | Colorado River above La Grange |
|---|---|---|

| AUID: | 1434_01 | From a point 100 m downstream of SH 71 upstream to the Southern Pacific Railroad crossing |
|---|---|---|

**Aquatic Life Use**

| Method | Parameter | Period of Record | Criteria | Data Assessed # | Data Assessed Value | Exceedances # | Exceedances Value | Data Qual | LOS | CF | Int LOS | TCEQ Cause | Cat |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dissolved Oxygen grab minimum | Dissolved Oxygen Grab | 12/01/11 - 11/30/18 | 4 | 40 | | 0 | | AD | FS | ☐ | FS | | |
| Dissolved Oxygen grab screening level | Dissolved Oxygen Grab | 12/01/11 - 11/30/18 | 6 | 40 | | 0 | | AD | NC | ☐ | NC | | |

**Recreation Use**

| Method | Parameter | Period of Record | Criteria | Data Assessed # | Data Assessed Value | Exceedances # | Exceedances Value | Data Qual | LOS | CF | Int LOS | TCEQ Cause | Cat |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bacteria Geomean | E. coli | 12/01/11 - 11/30/18 | 126 | 40 | 60.01 | 0 | | AD | FS | ☐ | FS | | |

**General Use**

| Method | Parameter | Period of Record | Criteria | Data Assessed # | Data Assessed Value | Exceedances # | Exceedances Value | Data Qual | LOS | CF | Int LOS | TCEQ Cause | Cat |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dissolved Solids | Chloride | 12/01/11 - 11/30/18 | 100 | 118 | 53.67 | 0 | | AD | FS | ☐ | FS | | |
| Dissolved Solids | Sulfate | 12/01/11 - 11/30/18 | 100 | 117 | 66.62 | 0 | | AD | FS | ☐ | FS | | |
| Dissolved Solids | Total Dissolved Solids | 12/01/11 - 11/30/18 | 500 | 119 | 423.96 | 0 | | AD | FS | ☐ | FS | | |
| High pH | pH | 12/01/11 - 11/30/18 | 9 | 40 | | 1 | 9.20 | AD | FS | ☐ | FS | | |
| Low pH | pH | 12/01/11 - 11/30/18 | 6.50 | 40 | | 0 | | AD | FS | ☐ | FS | | |
| Nutrient Screening Levels | Ammonia | 12/01/11 - 11/30/18 | 0.33 | 40 | | 0 | | AD | NC | ☐ | NC | | |
| Nutrient Screening Levels | Chlorophyll-a | 12/01/11 - 11/30/18 | 14.10 | 39 | | 6 | 65.28 | AD | NC | ☐ | NC | | |
| Nutrient Screening Levels | Nitrate | 12/01/11 - 11/30/18 | 1.95 | 40 | | 35 | 3.61 | AD | CS | ☐ | CS | Nitrate in water | |
| Nutrient Screening Levels | Total Phosphorus | 12/01/11 - 11/30/18 | 0.69 | 40 | | 13 | 0.93 | AD | CS | ☐ | CS | Total Phosphorus in water | |
| Water Temperature | Water temperature | 12/01/11 - 11/30/18 | 35 | 40 | | 0 | | AD | FS | ☐ | FS | | |

**Domestic Water Supply Use**

| Method | Parameter | Period of Record | Criteria | Data Assessed # | Data Assessed Value | Exceedances # | Exceedances Value | Data Qual | LOS | CF | Int LOS | TCEQ Cause | Cat |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Surface Water HH criteria for DWS average | Nitrate | 12/01/11 - 11/30/18 | 10 | 117 | 4.30 | 0 | | AD | FS | ☐ | FS | | |

AR Item 42, Page 002

| SEGID: 1434D | Wilbarger Creek |
|---|---|

| AUID: 1434D_01 | From the confluence with the Colorado River at Hemphill Bend in Bastrop County upstream to the confluence with Cottonwood Creek |
|---|---|

**Aquatic Life Use**

| Method | Parameter | Period of Record | Criteria | Data Assessed # | Value | Exceedances # | Value | Data Qual | LOS | CF | Int LOS | TCEQ Cause | Cat |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dissolved Oxygen grab minimum | Dissolved Oxygen Grab | 12/01/11 - 11/30/18 | 3 | 16 | | 0 | | AD | FS | ☐ | FS | | |
| Dissolved Oxygen grab screening level | Dissolved Oxygen Grab | 12/01/11 - 11/30/18 | 5 | 16 | | 1 | 4.70 | AD | NC | ☐ | NC | | |

**Recreation Use**

| Method | Parameter | Period of Record | Criteria | Data Assessed # | Value | Exceedances # | Value | Data Qual | LOS | CF | Int LOS | TCEQ Cause | Cat |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bacteria Geomean | E. coli | 12/01/11 - 11/30/18 | 126 | 11 | 157.42 | 1 | | LD | CN | ☐ | CN | Bacteria in water | |

**General Use**

| Method | Parameter | Period of Record | Criteria | Data Assessed # | Value | Exceedances # | Value | Data Qual | LOS | CF | Int LOS | TCEQ Cause | Cat |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Nutrient Screening Levels | Ammonia | 12/01/11 - 11/30/18 | 0.33 | 18 | | 0 | | AD | NC | ☐ | NC | | |
| Nutrient Screening Levels | Chlorophyll-a | 12/01/11 - 11/30/18 | 14.10 | 18 | | 5 | 69.78 | AD | NC | ☐ | NC | | |
| Nutrient Screening Levels | Nitrate | 12/01/11 - 11/30/18 | 1.95 | 17 | | 3 | 2.84 | AD | NC | ☐ | NC | | |
| Nutrient Screening Levels | Total Phosphorus | 12/01/11 - 11/30/18 | 0.69 | 16 | | 0 | | AD | NC | ☐ | NC | | |

AR Item 42, Page 003

## Explanation of Column Headings

**SegID and Name:**  The unique identifier (SegID), segment name, and location of the water body. Items may be one of three types of numbers for SegID. The first type is a classified segment number (4 digits, e.g. 0218), as defined in the Texas Surface Water Quality Standards (TSWQS). The second type is an unclassified water body (e.g. 0218A), not defined in the Standards and associated with a classified water body because it is in the same watershed. The third type includes special Segments for Oyster Water Use (e.g. 2421OW) and Beach Watch Use (e.g. 2481CB) special areas. The segment name and description follow SegID.

**AU_ID:**  Identifies the assessment unit (AU_ID, six or seven digits, *e.g.*, 0101A_01) and describes the location of the specific area within a classified or unclassified water body for which one or more water quality standards are not met.

**Parameter(s):**  Pollutants or water quality conditions that assessment procedures indicate do not meet assigned water quality standards or screening levels

**Level of Concern:**  **CN** - Concern for near-nonattainment of the TSWQS based on numeric criteria
**CS** - Concern for water quality based on screening levels

---

**SEG ID: 0101  Canadian River Below Lake Meredith**
From the Oklahoma State Line in Hemphill County to Sanford Dam in Hutchinson County

| *Parameter(s)* | *Level of Concern* |
|---|---|
| **Ammonia in water** | **CS** |

| 0101_03 | From the confluence with White Deer Creek upstream to the confluence with Dixon Creek east of Borger |
|---|---|
| 0101_04 | From the confluence with Dixon Creek upstream to Sanford Dam in Hutchinson County |

| *Parameter(s)* | *Level of Concern* |
|---|---|
| **Chlorophyll-a in water** | **CS** |
| 0101_04 | From the confluence with Dixon Creek upstream to Sanford Dam in Hutchinson County |

| *Parameter(s)* | *Level of Concern* |
|---|---|
| **Depressed dissolved oxygen in water** | **CS** |
| 0101_04 | From the confluence with Dixon Creek upstream to Sanford Dam in Hutchinson County |

| *Parameter(s)* | *Level of Concern* |
|---|---|
| **Nitrate in water** | **CS** |
| 0101_03 | From the confluence with White Deer Creek upstream to the confluence with Dixon Creek east of Borger |

**SEG ID: 1434  Colorado River above La Grange**
From a point 100 meters (110 yards) downstream of SH 71 at La Grange in Fayette County to a point 100 meters (110 yards) upstream of FM 969 near Utley in Bastrop County

| Parameter(s) | | Level of Concern |
|---|---|---|
| **Nitrate in water** | | **CS** |
| 1434_01 | From a point 100 m downstream of SH 71 upstream to the Southern Pacific Railroad crossing | |
| 1434_02 | Southern-Pacific RR  upstream to the confluence of Reeds Creek west of Smithville | |
| 1434_03 | From the confluence of Reeds Creek west of Smithville upstream to the end of segment | |

| Parameter(s) | | Level of Concern |
|---|---|---|
| **Total Phosphorus in water** | | **CS** |
| 1434_01 | From a point 100 m downstream of SH 71 upstream to the Southern Pacific Railroad crossing | |
| 1434_02 | Southern-Pacific RR  upstream to the confluence of Reeds Creek west of Smithville | |
| 1434_03 | From the confluence of Reeds Creek west of Smithville upstream to the end of segment | |

**SEG ID: 1434B Cedar Creek**
Perennial stream from the confluence with the Colorado River upstream to the confluence of an unnamed tributary at FM 525 in Bastrop County

| Parameter(s) | | Level of Concern |
|---|---|---|
| **Bacteria in water   (Recreation Use)** | | **CN** |
| 1434B_01 | Perennial stream from the confluence with the Colorado River upstream to the confluence of an unnamed tributary at FM 525 in Bastrop County | |

| Parameter(s) | | Level of Concern |
|---|---|---|
| **Depressed dissolved oxygen in water** | | **CS** |
| 1434B_01 | Perennial stream from the confluence with the Colorado River upstream to the confluence of an unnamed tributary at FM 525 in Bastrop County | |

**SEG ID: 1434D Wilbarger Creek**
Wilbarger Creek from the confluence of the Colorado River at Hemphill Bend in Bastrop County upstream to Schultz lane east of Pflugerville Heights in Travis County

| Parameter(s) | | Level of Concern |
|---|---|---|
| **Bacteria in water   (Recreation Use)** | | **CN** |
| 1434D_01 | From the confluence with the Colorado River at Hemphill Bend in Bastrop County upstream to the confluence with Cottonwood Creek | |
| 1434D_02 | From the confluence with Cottonwood Creek upstream to Schultz lane east of Pflugerville Heights in Travis County | |

| Parameter(s) | | Level of Concern |
|---|---|---|
| **Nitrate in water** | | **CS** |
| 1434D_02 | From the confluence with Cottonwood Creek upstream to Schultz lane east of Pflugerville Heights in Travis County | |

# 2020 Texas Integrated Report - Texas 303(d) List (Category 5)

As required under Sections 303(d) and 305(b) of the federal Clean Water Act, this list identifies the water bodies in or bordering Texas for which effluent limitations are not stringent enough to implement water quality standards, and for which the associated pollutants are suitable for measurement by maximum daily load.

In addition, the TCEQ also develops a schedule identifying Total Maximum Daily Loads (TMDLs) that will be initiated in the next two years for priority impaired waters. Issuance of permits to discharge into 303(d)-listed water bodies is described in the TCEQ regulatory guidance document *Procedures to Implement the Texas Surface Water Quality Standards* (June 2010, RG-194).

Impairments are limited to the geographic area described by the Assessment Unit and identified with a six or seven-digit AU_ID. A management strategy will be assigned to each impairment. Specific strategies may inlcude TMDL development, water quality standards evaluation, or additional monitoring.

## Explanation of Column Headings

| | |
|---|---|
| SegID and Name: | The unique identifier (SegID), segment name, and location of the water body. Items may be one of three types of numbers for SegID. The first type is a classified segment number (4 digits, e.g. 0218), as defined in the Texas Surface Water Quality Standards. The second type is an unclassified water body (e.g. 0218A), not defined in the Standards and associated with a classified water body because it is in the same watershed. The third type includes special Segments for Oyster Water Use (e.g. 2421OW) and Beach Watch Use (e.g. 2481CB) special areas. The segment name and description follow SegID. |
| AU_ID: | Identifies the assessment unit (AU_ID, six or seven digits, *e.g.*, 0101A_01) and describes the location of the specific area within a classified or unclassified water body for which one or more water quality standards are not met. |
| Parameter(s): | Pollutants or water quality conditions that assessment procedures indicate do not meet assigned water quality standards. |
| Category: | One of three subcategories assigned to each impaired parameter to provide information about water quality status and management activities on that water body. The categories are defined below: |

Category 5: The water body does not meet applicable water quality standards or is threatened for one or more designated uses by one or more pollutants.
- *Category 5a* - TMDLs are underway, scheduled, or will be scheduled for one or more parameters.
- *Category 5b* - A review of the standards for one or more parameters will be conducted before a management strategy is selected, including the possible revision to the TSWQS.
- *Category 5c* - Additional data or information will be collected and/or evaluated for one or more parameters before a management strategy is selected.

| | |
|---|---|
| Year Segment First Listed | The initial assessment year the pollutant or water quality condition in this water body (Segment, not specifically the year for each AU_ID) did not meet water quality standards. |

AR Item 42, Page 006

**SegID: 1425    O. C. Fisher Lake**
From San Angelo Dam in Tom Green County up to normal pool elevation of 1908 feet (impounds North Concho River)

| Impairment Description(s) | Category | Year Segment First Listed |
|---|---|---|
| **Chloride in water** | **5c** | **2002** |

1425_01    From San Angelo Dam in Tom Green County up to normal pool elevation of 1908 feet (impounds North Concho River)

| Impairment Description(s) | Category | Year Segment First Listed |
|---|---|---|
| **Total dissolved solids in water** | **5c** | **2014** |

1425_01    From San Angelo Dam in Tom Green County up to normal pool elevation of 1908 feet (impounds North Concho River)

---

**SegID: 1427A    Slaughter Creek**
Intermittent stream with perennial pools from the confluence with Onion Creek to above US 290 west of Austin

| Impairment Description(s) | Category | Year Segment First Listed |
|---|---|---|
| **Impaired macrobenthic community in water** | **5b** | **2002** |

1427A_01    Intermittent stream with perennial pools from the confluence with Onion Creek to above US 290 west of Austin

---

**SegID: 1429C    Waller Creek**
From the confluence of Town Lake in central Austin in Travis County to the upstream portion of the stream in north Austin in Travis County

| Impairment Description(s) | Category | Year Segment First Listed |
|---|---|---|
| **Bacteria in water   (Recreation Use)** | **5c** | **2004** |

1429C_01    From the confluence with Town Lake to East MLK Blvd.

| Impairment Description(s) | Category | Year Segment First Listed |
|---|---|---|
| **Impaired macrobenthic community in water** | **5c** | **2002** |

1429C_01    From the confluence with Town Lake to East MLK Blvd.

---

**SegID: 1433    O. H. Ivie Reservoir**
From S. W. Freese Dam to a point 3.7 km (2.3 mi) downstream of the confluence of Mustang Creek on the Colorado River Arm and to a point 2.0 km (1.2 mi) upstream of the confluence of Fuzzy Creek on the Concho River Arm, up to the conservation pool level of

| Impairment Description(s) | Category | Year Segment First Listed |
|---|---|---|
| **Excessive algal growth in water** | **5c** | **2020** |

1433_01    Main pool near dam

1433_02    Concho River arm

1433_03    Colorado River arm

1433_04    Remainder of reservoir

AR Item 42, Page 007

**SegID: 1434G  Alum Creek**
From the confluence with the Colorado River in Bastrop County upstream to the
headwaters near US 290 approximately 3.5 km southwest of McDade in Bastrop County

| *Impairment Description(s)* | *Category* | *Year Segment First Listed* |
|---|---|---|
| **Bacteria in water   (Recreation Use)** | **5c** | **2020** |

1434G_01     From the confluence with the Colorado River in Bastrop County upstream to the headwaters near US 290 approximately 3.5 km southwest of McDade in Bastrop County

---

**SegID: 1501  Tres Palacios Creek Tidal**
From the confluence with Tres Palacios Bay in Matagorda County to a point 1.6 km (1.0
mi) upstream of the confluence of Wilson Creek in Matagorda County

| *Impairment Description(s)* | *Category* | *Year Segment First Listed* |
|---|---|---|
| **Depressed dissolved oxygen in water** | **5b** | **1999** |

1501_01     From the confluence with Willow Dam Creek at Tres Palacios Bay/Turtle Bay upstream to a point 1.6 km (1.0 mi) upstream of the confluence of Wilson Creek in Matagorda County

---

**SegID: 1602  Lavaca River Above Tidal**
From a point 8.6 km (5.3 mi) downstream of US 59 in Jackson County to the confluence of
Campbell Branch west of Hallettsville in Lavaca County

| *Impairment Description(s)* | *Category* | *Year Segment First Listed* |
|---|---|---|
| **Bacteria in water   (Recreation Use)** | **5a** | **2008** |

1602_02     From the confluence of Beard Branch upstream to the upper end of segment at the confluence of Campbell Branch in Hallettsville.

1602_03     Lower portion of segment from confluence with NHD RC 12100101002463  south of Edna in Jackson County upstream to confluence with Beard Branch

---

**SegID: 1602B  Rocky Creek**
Perennial stream from the confluence with the Lavaca River upstream to 2.9 km upstream
of County Rd 364 north west of the City of Shiner

| *Impairment Description(s)* | *Category* | *Year Segment First Listed* |
|---|---|---|
| **Bacteria in water   (Recreation Use)** | **5a** | **2014** |

1602B_01     From the confluence of Lavaca River upstream to confluence of Ponton Creek

---

**SegID: 1602C  Lavaca River Above Campbell Branch**
From the confluence of Campbell Branch in Hallettsville to approximately 3.4 mi upstream
of SH 95 in Lavaca Co.

| *Impairment Description(s)* | *Category* | *Year Segment First Listed* |
|---|---|---|
| **Depressed dissolved oxygen in water** | **5b** | **2004** |

1602C_01     From confluence of Campbell Branch in Hallettsville upstream to the confluence of West Prong Lavaca River

1602C_02     From confluence of West Prong Lavaca River to the headwaters approximately 6.5 km upstream of TX Hwy 95 in the City of Moulton

AR Item 42, Page 008

# Appendix Item 17

**Explanation of Column Headings**

**SEGID:** *The unique identifier (SegID), segment name, and location of the water body. Items may be one of three types of numbers for SegID. The first type is a classified segment number (4 digits, e.g., 0218), as defined in the Texas Surface Water Quality Standards. The second type is an unclassified water body (e.g., 0218A), not defined in the Standards and associated with a classified water body because it is in the same watershed. The third type includes special Segments for Oyster Water Use (e.g., 2421OW) and Beach Watch Use (e.g., 2481CB) special areas. The segment name and description follow SegID.*

**AU ID:** *Identifies the assessment unit (AU_ID, six or seven digits, e.g., 0101A_01) and describes the location of the specific area within a classified or unclassified water body for which one or more water quality standards are not met.*

**Start Date:** *The start date of the period of record data for this method was selected; the official 2022 period of record is from 12/1/2013 to 11/30/2020. In some cases it may be necessary to extend the period of record back 10 years (12/1/2010) to select more data, according to assessment guidance.*

**End Date:** *The end date of the period of record data for this method was selected; the official 2022 period of record dates are 12/1/2013 to 11/30/2020. In some cases more recently collected data than 12/01/2020 can be included, if available*

**#Data Assessed:** *Number of samples assessed some data are averaged, as with profile data, some are eliminated because criteria do not apply during certain conditions such a s low flow.*

**Mean Data Assessed:** *Mean of samples assessed includes averaged methods like chronic criteria as well as geometric mean calculations for bacteria.*

**# Exceedances:** *Number of samples that exceed criteria for single sample, or binomial, methods (not averaged data).*

**Mean Exceedances:** *Mean of the samples that exceeded criteria for the single sample, or binomial, methods (not averaged data).*

**Criteria:** *Value that the data is compared to determine the level of support; Note: for acute metals in water, each value is compared to a calculated criterion and not all criteria could be reported here, only the minimum in the range of criteria calculated are included.*

**DS Qual:** *Dataset Qualifier - indicates characteristics of the methods or dataset used in the assessment:*

- **AD:** Adequate Data (10 or more samples).
- **LD:** Limited Data (less than 9, greater than 3).
- **ID:** Inadequate Data (less than 4).
- **JQ:** Level of support is based on judgment of the assessor.
- **SM:** This assessment method is superseded by another method.
- **TR:** Temporally Not Representative, used with NA.
- **SR:** Spatially Not Representative, used with NA.
- **OE:** Other information than ambient samples evaluated.
- **OS:** Assessment area outside state boundaries.

**LOS:** *Level of support for this use, method, assessment parameter:*

- **FS:** Fully Supporting.
- **NC:** No Concern.
- **NA:** Not Assessed.
- **NS:** Nonsupport.
- **CS:** Screening Level Concern.
- **CN:** Use Concern.

**CF:** *Carry Forward indicates that the Integrated level of support of CS, CN, or NS was carried forward from a previous assessment due to inadequate data for this method in this assessment.*

*Int LOS: Integrated level of support. This is the overall level of support for this use, method, parameter group, which could be different from the LOS (described above) due to carry forward information or other types of changes. New Code added in 2010: PI = Pending Issue*

*TCEQ Cause: This is the impairment description (e.g., bacteria, depressed dissolved oxygen, etc.).*

*Cat:*

<u>**Category 3:**</u>  There is insufficient or unreliable available data and/or information to make a use support determination.

<u>**Category 4:**</u>  Available data and/or information indicate that at least one designated use is not being supported or is threatened, but a TMDL is not needed.
    **Category 4a:**  A state-developed TMDL has been approved by EPA or a TMDL has been established by EPA for any water-pollutant combination.
    **Category 4b:**  Other required control measures are expected to result in the attainment of an applicable water quality standard in a reasonable period of time.
    **Category 4c:**  The impairment or threat is not caused by a pollutant.

<u>**Category 5:**</u>  Available data and/or information indicate that at least one designated use is not being supported or is threatened, and a TMDL is needed.
    **Category 5a:**  A TMDL is underway, scheduled, or will be scheduled.
    **Category 5b:**  A review of the standards for the water body will be conducted before a management strategy is selected.
    **Category 5c:**  Additional data and information will be collected or evaluated before a management strategy is selected.
    **Category 5n:**  Water body does not meet its applicable Chl a criterion, but additional study is needed to verify whether exceedance is associated with causal nutrient parameters or impacts to response variables.

### Seg ID: 1433 - O. H. Ivie Reservoir
### AU ID: 1433_02

| Use | Method | Parameter | Start Date | End Date | Criteria | #Data Assessed | Mean Data Assessed | #Exceedances | Mean Exceedances | DS Qualifier | LOS | CF | Int LOS | TCEQ Cause | Cat |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| General Use | High pH | pH | 12/01/13 | 11/30/20 | 9 | 12 | . | 0 | . | AD | FS | N | FS | | |
| | Low pH | pH | 12/01/13 | 11/30/20 | 6.5 | 12 | . | 0 | . | AD | FS | N | FS | | |
| | Nutrient Reservoir Criteria | Nutrients | 12/01/13 | 11/30/20 | . | 0 | . | . | . | AD | FS | N | FS | | |
| | Water Temperature | Water temperature | 12/01/13 | 11/30/20 | 33.9 | 13 | . | 0 | . | AD | FS | N | FS | | |
| Recreation Use | Bacteria Geomean | E. coli | 12/01/13 | 11/30/20 | 126 | 12 | 2.47 | 0 | . | LD | NC | N | NC | | |

### Seg ID: 1433 - O. H. Ivie Reservoir
### AU ID: 1433_03

| Use | Method | Parameter | Start Date | End Date | Criteria | #Data Assessed | Mean Data Assessed | #Exceedances | Mean Exceedances | DS Qualifier | LOS | CF | Int LOS | TCEQ Cause | Cat |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aquatic Life Use | Dissolved Oxygen grab minimum | Dissolved oxygen Grab | 12/01/13 | 11/30/20 | 3 | 13 | . | 0 | . | AD | FS | N | FS | | |
| | Dissolved Oxygen grab screening level | Dissolved oxygen Grab | 12/01/13 | 11/30/20 | 5 | 13 | . | 3 | 4.85 | AD | CS | N | CS | Depressed dissolved oxygen in water | |
| Domestic Water Supply Use | Surface Water HH criteria for PWS average | Nitrate | 12/01/13 | 11/30/20 | 10 | 38 | 0.32 | 0 | . | AD | FS | N | FS | | |
| General Use | High pH | pH | 12/01/13 | 11/30/20 | 9 | 12 | . | 0 | . | AD | FS | N | FS | | |
| | Low pH | pH | 12/01/13 | 11/30/20 | 6.5 | 12 | . | 0 | . | AD | FS | N | FS | | |
| | Nutrient Reservoir Criteria | Nutrients | 12/01/13 | 11/30/20 | . | 0 | . | . | . | AD | FS | N | FS | | |
| | Water Temperature | Water temperature | 12/01/13 | 11/30/20 | 33.9 | 13 | . | 0 | . | AD | FS | N | FS | | |
| Recreation Use | Bacteria Geomean | E. coli | 12/01/13 | 11/30/20 | 126 | 12 | 1.24 | 0 | . | LD | NC | N | NC | | |

### Seg ID: 1433 - O. H. Ivie Reservoir
### AU ID: 1433_04

| Use | Method | Parameter | Start Date | End Date | Criteria | #Data Assessed | Mean Data Assessed | #Exceedances | Mean Exceedances | DS Qualifier | LOS | CF | Int LOS | TCEQ Cause | Cat |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Domestic Water Supply Use | Surface Water HH criteria for PWS average | Nitrate | 12/01/13 | 11/30/20 | 10 | 38 | 0.32 | 0 | . | AD | FS | N | FS | | |
| General Use | Nutrient Reservoir Criteria | Nutrients | 12/01/13 | 11/30/20 | . | 0 | . | . | . | AD | FS | N | FS | | |

### Seg ID: 1434 - Colorado River above La Grange
### AU ID: 1434_01

| Use | Method | Parameter | Start Date | End Date | Criteria | #Data Assessed | Mean Data Assessed | #Exceedances | Mean Exceedances | DS Qualifier | LOS | CF | Int LOS | TCEQ Cause | Cat |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aquatic Life Use | Dissolved Oxygen grab minimum | Dissolved oxygen Grab | 12/01/13 | 11/30/20 | 4 | 40 | . | 0 | . | AD | FS | N | FS | | |
| | Dissolved Oxygen grab screening level | Dissolved oxygen Grab | 12/01/13 | 11/30/20 | 6 | 40 | . | 0 | . | AD | NC | N | NC | | |
| Domestic Water Supply Use | Surface Water HH criteria for PWS average | Nitrate | 12/01/13 | 11/30/20 | 10 | 113 | 4.24 | 0 | . | AD | FS | N | FS | | |
| General Use | Dissolved Solids | Total dissolved solids | 12/01/13 | 11/30/20 | 500 | 119 | 416.56 | 0 | . | AD | FS | N | FS | | |
| | | Sulfate | 12/01/13 | 11/30/20 | 100 | 117 | 62.44 | 0 | . | AD | FS | N | FS | | |
| | | Chloride | 12/01/13 | 11/30/20 | 100 | 118 | 49.32 | 0 | . | AD | FS | N | FS | | |
| | High pH | pH | 12/01/13 | 11/30/20 | 9 | 40 | . | 0 | . | AD | FS | N | FS | | |
| | Low pH | pH | 12/01/13 | 11/30/20 | 6.5 | 40 | . | 0 | . | AD | FS | N | FS | | |
| | Nutrient Screening Levels | Total phosphorus | 12/01/13 | 11/30/20 | 0.69 | 40 | . | 12 | 0.9 | AD | CS | N | CS | Total Phosphorus in water | |
| | | Nitrate | 12/01/13 | 11/30/20 | 1.95 | 38 | . | 34 | 3.7 | AD | CS | N | CS | Nitrate in water | |
| | | Chlorophyll-a | 12/01/13 | 11/30/20 | 14.1 | 39 | . | 7 | 79.26 | AD | NC | N | NC | | |
| | | Ammonia | 12/01/13 | 11/30/20 | 0.33 | 40 | . | 0 | . | AD | NC | N | NC | | |
| | Water Temperature | Water temperature | 12/01/13 | 11/30/20 | 35 | 40 | . | 0 | . | AD | FS | N | FS | | |

AR Item 43, Page 003

### Seg ID: 1434 - Colorado River above La Grange
### AU ID: 1434_01

| Use | Method | Parameter | Start Date | End Date | Criteria | #Data Assessed | Mean Data Assessed | #Exceedances | Mean Exceedances | DS Qualifier | LOS | CF | Int LOS | TCEQ Cause | Cat |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Recreation Use | Bacteria Geomean | E. coli | 12/01/13 | 11/30/20 | 126 | 40 | 61.26 | 0 | . | AD | FS | N | FS | | |

### Seg ID: 1434 - Colorado River above La Grange
### AU ID: 1434_02

| Use | Method | Parameter | Start Date | End Date | Criteria | #Data Assessed | Mean Data Assessed | #Exceedances | Mean Exceedances | DS Qualifier | LOS | CF | Int LOS | TCEQ Cause | Cat |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aquatic Life Use | Dissolved Oxygen grab minimum | Dissolved oxygen Grab | 12/01/13 | 11/30/20 | 4 | 40 | . | 0 | . | AD | FS | N | FS | | |
| | Dissolved Oxygen grab screening level | Dissolved oxygen Grab | 12/01/13 | 11/30/20 | 6 | 40 | . | 0 | . | AD | NC | N | NC | | |
| Domestic Water Supply Use | Surface Water HH criteria for PWS average | Nitrate | 12/01/13 | 11/30/20 | 10 | 113 | 4.24 | 0 | . | AD | FS | N | FS | | |
| General Use | Dissolved Solids | Total dissolved solids | 12/01/13 | 11/30/20 | 500 | 119 | 416.56 | 0 | . | AD | FS | N | FS | | |
| | | Sulfate | 12/01/13 | 11/30/20 | 100 | 117 | 62.44 | 0 | . | AD | FS | N | FS | | |
| | | Chloride | 12/01/13 | 11/30/20 | 100 | 118 | 49.32 | 0 | . | AD | FS | N | FS | | |
| | High pH | pH | 12/01/13 | 11/30/20 | 9 | 40 | . | 0 | . | AD | FS | N | FS | | |
| | Low pH | pH | 12/01/13 | 11/30/20 | 6.5 | 40 | . | 0 | . | AD | FS | N | FS | | |
| | Nutrient Screening Levels | Total phosphorus | 12/01/13 | 11/30/20 | 0.69 | 40 | . | 17 | 1.01 | AD | CS | N | CS | Total Phosphorus in water | |
| | | Nitrate | 12/01/13 | 11/30/20 | 1.95 | 38 | . | 34 | 4.57 | AD | CS | N | CS | Nitrate in water | |
| | | Chlorophyll-a | 12/01/13 | 11/30/20 | 14.1 | 40 | . | 2 | 51.1 | AD | NC | N | NC | | |
| | | Ammonia | 12/01/13 | 11/30/20 | 0.33 | 39 | . | 0 | . | AD | NC | N | NC | | |
| | Water Temperature | Water temperature | 12/01/13 | 11/30/20 | 35 | 40 | . | 0 | . | AD | FS | N | FS | | |
| Recreation Use | Bacteria Geomean | E. coli | 12/01/13 | 11/30/20 | 126 | 40 | 60.78 | 0 | . | AD | FS | N | FS | | |

### Seg ID: 1434 - Colorado River above La Grange
### AU ID: 1434_03

| Use | Method | Parameter | Start Date | End Date | Criteria | #Data Assessed | Mean Data Assessed | #Exceedances | Mean Exceedances | DS Qualifier | LOS | CF | Int LOS | TCEQ Cause | Cat |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aquatic Life Use | Dissolved Oxygen grab minimum | Dissolved oxygen Grab | 12/01/13 | 11/30/20 | 4 | 39 | . | 0 | . | AD | FS | N | FS | | |
| | Dissolved Oxygen grab screening level | Dissolved oxygen Grab | 12/01/13 | 11/30/20 | 6 | 39 | . | 0 | . | AD | NC | N | NC | | |
| Domestic Water Supply Use | Surface Water HH criteria for PWS average | Nitrate | 12/01/13 | 11/30/20 | 10 | 113 | 4.24 | 0 | . | AD | FS | N | FS | | |
| General Use | Dissolved Solids | Total dissolved solids | 12/01/13 | 11/30/20 | 500 | 119 | 416.56 | 0 | . | AD | FS | N | FS | | |
| | | Sulfate | 12/01/13 | 11/30/20 | 100 | 117 | 62.44 | 0 | . | AD | FS | N | FS | | |
| | | Chloride | 12/01/13 | 11/30/20 | 100 | 118 | 49.32 | 0 | . | AD | FS | N | FS | | |
| | High pH | pH | 12/01/13 | 11/30/20 | 9 | 39 | . | 0 | . | AD | FS | N | FS | | |
| | Low pH | pH | 12/01/13 | 11/30/20 | 6.5 | 39 | . | 0 | . | AD | FS | N | FS | | |
| | Nutrient Screening Levels | Total phosphorus | 12/01/13 | 11/30/20 | 0.69 | 39 | . | 19 | 1.13 | AD | CS | N | CS | Total Phosphorus in water | |
| | | Nitrate | 12/01/13 | 11/30/20 | 1.95 | 37 | . | 34 | 5.4 | AD | CS | N | CS | Nitrate in water | |
| | | Chlorophyll-a | 12/01/13 | 11/30/20 | 14.1 | 39 | . | 2 | 19.4 | AD | NC | N | NC | | |
| | | Ammonia | 12/01/13 | 11/30/20 | 0.33 | 39 | . | 0 | . | AD | NC | N | NC | | |
| | Water Temperature | Water temperature | 12/01/13 | 11/30/20 | 35 | 39 | . | 0 | . | AD | FS | N | FS | | |
| Recreation Use | Bacteria Geomean | E. coli | 12/01/13 | 11/30/20 | 126 | 39 | 72.79 | 0 | . | AD | FS | N | FS | | |

AR Item 43, Page 004

### Seg ID: 1434B - Cedar Creek
### AU ID: 1434B_01

| Use | Method | Parameter | Start Date | End Date | Criteria | #Data Assessed | Mean Data Assessed | #Exceedances | Mean Exceedances | DS Qualifier | LOS | CF | Int LOS | TCEQ Cause | Cat |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aquatic Life Use | Dissolved Oxygen grab screening level | Dissolved oxygen Grab | 12/01/13 | 11/30/20 | 5 | 0 | . | . | . | ID | NA | Y | CS | Depressed dissolved oxygen in water | |
| Recreation Use | Bacteria Geomean | E. coli | 12/01/13 | 11/30/20 | 126 | 0 | . | . | . | ID | NA | Y | CN | Bacteria in water | |

### Seg ID: 1434C - Lake Bastrop
### AU ID: 1434C_02

| Use | Method | Parameter | Start Date | End Date | Criteria | #Data Assessed | Mean Data Assessed | #Exceedances | Mean Exceedances | DS Qualifier | LOS | CF | Int LOS | TCEQ Cause | Cat |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aquatic Life Use | Dissolved Oxygen grab minimum | Dissolved oxygen Grab | 12/01/13 | 11/30/20 | 3 | 42 | . | 0 | . | AD | FS | N | FS | | |
| | Dissolved Oxygen grab screening level | Dissolved oxygen Grab | 12/01/13 | 11/30/20 | 5 | 42 | . | 1 | 4.49 | AD | NC | N | NC | | |
| General Use | Nutrient Screening Levels | Total phosphorus | 12/01/13 | 11/30/20 | 0.2 | 42 | . | 3 | 0.85 | JQ | NA | N | NA | | |
| | | Nitrate | 12/01/13 | 11/30/20 | 0.37 | 41 | . | 0 | . | JQ | NA | N | NA | | |
| | | Chlorophyll-a | 12/01/13 | 11/30/20 | 26.7 | 42 | . | 7 | 41.11 | JQ | NA | N | NA | | |
| | | Ammonia | 12/01/13 | 11/30/20 | 0.11 | 41 | . | 2 | 0.45 | JQ | NA | N | NA | | |
| Recreation Use | Bacteria Geomean | E. coli | 12/01/13 | 11/30/20 | 126 | 41 | 2.95 | 0 | . | AD | FS | N | FS | | |

### Seg ID: 1434D - Wilbarger Creek
### AU ID: 1434D_01

| Use | Method | Parameter | Start Date | End Date | Criteria | #Data Assessed | Mean Data Assessed | #Exceedances | Mean Exceedances | DS Qualifier | LOS | CF | Int LOS | TCEQ Cause | Cat |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aquatic Life Use | Dissolved Oxygen grab minimum | Dissolved oxygen Grab | 12/01/13 | 11/30/20 | 3 | 13 | . | 0 | . | AD | FS | N | FS | | |
| | Dissolved Oxygen grab screening level | Dissolved oxygen Grab | 12/01/13 | 11/30/20 | 5 | 13 | . | 1 | 4.7 | AD | NC | N | NC | | |
| General Use | Nutrient Screening Levels | Total phosphorus | 12/01/13 | 11/30/20 | 0.69 | 14 | . | 0 | . | AD | NC | N | NC | | |
| | | Nitrate | 12/01/13 | 11/30/20 | 1.95 | 13 | . | 2 | 3.16 | AD | NC | N | NC | | |
| | | Chlorophyll-a | 12/01/13 | 11/30/20 | 14.1 | 14 | . | 3 | 105.33 | AD | NC | N | NC | | |
| | | Ammonia | 12/01/13 | 11/30/20 | 0.33 | 14 | . | 0 | . | AD | NC | N | NC | | |
| Recreation Use | Bacteria Geomean | E. coli | 12/01/13 | 11/30/20 | 126 | 8 | 210.4 | 1 | . | LD | CN | N | CN | Bacteria in water | |

### Seg ID: 1434D - Wilbarger Creek
### AU ID: 1434D_02

| Use | Method | Parameter | Start Date | End Date | Criteria | #Data Assessed | Mean Data Assessed | #Exceedances | Mean Exceedances | DS Qualifier | LOS | CF | Int LOS | TCEQ Cause | Cat |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aquatic Life Use | Dissolved Oxygen grab minimum | Dissolved oxygen Grab | 12/01/13 | 11/30/20 | 3 | 8 | . | 0 | . | LD | NC | N | NC | | |
| | Dissolved Oxygen grab screening level | Dissolved oxygen Grab | 12/01/13 | 11/30/20 | 5 | 8 | . | 0 | . | LD | NC | N | NC | | |
| General Use | Nutrient Screening Levels | Total phosphorus | 12/01/13 | 11/30/20 | 0.69 | 10 | . | 1 | 0.72 | AD | NC | N | NC | | |
| | | Nitrate | 12/01/13 | 11/30/20 | 1.95 | 11 | . | 3 | 5.4 | AD | NC | N | NC | | |
| | | Chlorophyll-a | 12/01/13 | 11/30/20 | 14.1 | 11 | . | 2 | 23.1 | AD | NC | N | NC | | |
| | | Ammonia | 12/01/13 | 11/30/20 | 0.33 | 11 | . | 2 | 0.6 | AD | NC | N | NC | | |
| Recreation Use | Bacteria Geomean | E. coli | 12/01/13 | 11/30/20 | 126 | 11 | 157.2 | 1 | . | LD | CN | N | CN | Bacteria in water | |

### Seg ID: 1434E - Big Sandy Creek
### AU ID: 1434E_01

| Use | Method | Parameter | Start Date | End Date | Criteria | #Data Assessed | Mean Data Assessed | #Exceedances | Mean Exceedances | DS Qualifier | LOS | CF | Int LOS | TCEQ Cause | Cat |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| General Use | Nutrient Screening Levels | Chlorophyll-a | 12/01/13 | 11/30/20 | 14.1 | 0 | . | . | . | ID | NA | Y | CS | Chlorophyll-a in water | |

AR Item 43, Page 005

# 2022 Texas Integrated Report - Water Bodies with Concerns for Use Attainment and Screening Levels

**Explanation of Column Headings**

**SegID and Name:** *The unique identifier (SegID) and name of the water body. Items may be one of three types of numbers for SegID. The first type is a classified segment number (4 digits, e.g., 0218), as defined in the Texas Surface Water Quality Standards (TSWQS). The second type is an unclassified water body (e.g., 0218A), not defined in the Standards and associated with a classified water body because it is in the same watershed. The third type includes special Segments for Oyster Water Use (e.g., 2421OW) and Beach Watch Use (e.g., 2481CB) special areas.*

**AU ID:** *Identifies the assessment unit (AU_ID, six or seven digits, e.g., 0101A_01) and describes the location of the specific area within a classified or unclassified water body for which one or more water quality standards are not met.*

**Parameter(s):** *Pollutants or water quality conditions that assessment procedures indicate do not meet assigned water quality standards.*

**Level Of Concern:**

- **CN** - Concern for near-nonattainment of the TSWQS based on numeric criteria.
- **CS** - Concern for water quality based on screening levels.

AR Item 43, Page 006

| Segment ID | Segment Name | AU ID | Parameters | Level of Concern |
|---|---|---|---|---|
| 1428C | Gilleland Creek | 1428C_01 | Nitrate in water | CS |
| | | 1428C_02 | | CS |
| | | 1428C_03 | | CS |
| | | 1428C_04 | | CS |
| 1429C | Waller Creek | 1429C_02 | Benzo(a)anthracene in sediment | CS |
| | | 1429C_02 | Benzo(a)pyrene in sediment | CS |
| | | 1429C_02 | Chrysene in sediment | CS |
| | | 1429C_02 | Dibenz(a,h)anthracene in sediment | CS |
| | | 1429C_02 | Fish kill in water | CN |
| | | 1429C_02 | Fluoranthene in sediment | CS |
| | | 1429C_02 | Lead in sediment | CS |
| | | 1429C_02 | Nitrate in water | CS |
| | | 1429C_02 | Phenanthrene in sediment | CS |
| | | 1429C_02 | Pyrene in sediment | CS |
| 1429D | East Bouldin Creek | 1429D_01 | Benzo(a)anthracene in sediment | CS |
| | | 1429D_01 | Cadmium in sediment | CS |
| | | 1429D_01 | Chrysene in sediment | CS |
| | | 1429D_01 | Dibenz(a,h)anthracene in sediment | CS |
| | | 1429D_01 | Fluoranthene in sediment | CS |
| | | 1429D_01 | Lead in sediment | CS |
| | | 1429D_01 | Phenanthrene in sediment | CS |
| | | 1429D_01 | Pyrene in sediment | CS |
| 1430 | Barton Creek | 1430_02 | Toxicity in sediment | CN |
| 1430A | Barton Springs | 1430A_01 | Toxicity in sediment | CN |
| 1431 | Mid Pecan Bayou | 1431_01 | Chlorophyll-a in water | CS |
| | | 1431_01 | Nitrate in water | CS |
| | | 1431_01 | Total Phosphorus in water | CS |
| 1432 | Upper Pecan Bayou | 1432_01 | Chlorophyll-a in water | CS |
| 1433 | O. H. Ivie Reservoir | 1433_02 | Depressed dissolved oxygen in water | CS |
| | | 1433_03 | | CS |
| 1434 | Colorado River above La Grange | 1434_01 | Nitrate in water | CS |
| | | 1434_02 | | CS |
| | | 1434_03 | | CS |

AR Item 43, Page 007

| Segment ID | Segment Name | AU ID | Parameters | Level of Concern |
|---|---|---|---|---|
| 1434 | Colorado River above La Grange | 1434_01 | Total Phosphorus in water | CS |
| | | 1434_02 | | CS |
| | | 1434_03 | | CS |
| 1434B | Cedar Creek | 1434B_01 | Bacteria in water (Recreation Use) | CN |
| | | 1434B_01 | Depressed dissolved oxygen in water | CS |
| 1434D | Wilbarger Creek | 1434D_01 | Bacteria in water (Recreation Use) | CN |
| | | 1434D_02 | | CN |
| 1434E | Big Sandy Creek | 1434E_01 | Chlorophyll-a in water | CS |
| 1501 | Tres Palacios Creek Tidal | 1501_01 | Chlorophyll-a in water | CS |
| | | 1501_01 | Nitrate in water | CS |
| 1502 | Tres Palacios Creek Above Tidal | 1502_03 | Depressed dissolved oxygen in water | CS |
| 1601C | Dry Creek | 1601C_01 | Depressed dissolved oxygen in water | CS |
| 1602B | Rocky Creek | 1602B_01 | Total Phosphorus in water | CS |
| 1701 | Victoria Barge Canal | 1701_01 | Chlorophyll-a in water | CS |
| 1801 | Guadalupe River Tidal | 1801_01 | Nitrate in water | CS |
| 1802 | Guadalupe River Below San Antonio River | 1802_01 | Nitrate in water | CS |
| 1803 | Guadalupe River Below San Marcos River | 1803_01 | Nitrate in water | CS |
| 1803A | Elm Creek | 1803A_01 | Chlorophyll-a in water | CS |
| | | 1803A_01 | Depressed dissolved oxygen in water | CS |
| 1803B | Sandies Creek | 1803B_02 | Depressed dissolved oxygen in water | CS |
| 1803C | Peach Creek | 1803C_03 | Chlorophyll-a in water | CS |
| | | 1803C_03 | Impaired macrobenthic community in water | CN |
| | | 1803C_03 | Total Phosphorus in water | CS |
| 1804A | Geronimo Creek | 1804A_01 | Nitrate in water | CS |
| 1804D | Bear Creek | 1804D_01 | Bacteria in water (Recreation Use) | CN |
| 1806 | Guadalupe River Above Canyon Lake | 1806_02 | Impaired fish community in water | CN |
| | | 1806_12 | | CN |
| | | 1806_02 | Impaired habitat in water | CS |
| | | 1806_12 | | CS |
| 1806A | Camp Meeting Creek | 1806A_01 | Depressed dissolved oxygen in water | CS |
| 1807 | Coleto Creek | 1807_01 | Chlorophyll-a in water | CS |
| | | 1807_02 | | CS |
| 1808 | Lower San Marcos River | 1808_01 | Bacteria in water (Recreation Use) | CN |
| 1810 | Plum Creek | 1810_03 | Ammonia in water | CS |
| | | 1810_03 | Fish kill in water | CN |

## 2022 Texas Integrated Report - Index of Water Quality Impairments

**General Information:**

**Category 4:** *Impairments that are not suitable for a TMDL or for which a TMDL has already been approved.*
**Category 5:** *Impairments which may be suitable for development of a TMDL (303(d) List).*

**Explanation of Column Headings:**

**SegID and Name:** *The unique identifier (SegID) and name of the water body. Items may be one of three types of numbers for SegID. The first type is a classified segment number (4 digits, e.g., 0218), as defined in the Texas Surface Water Quality Standards (TSWQS). The second type is an unclassified water body (e.g., 0218A), not defined in the Standards and associated with a classified water body because it is in the same watershed. The third type includes special Segments for Oyster Water Use (e.g., 2421OW) and Beach Watch Use (e.g., 2481CB) special areas.*

**AU ID:** *Identifies the assessment unit (AU_ID, six or seven digits, e.g., 0101A_01) and describes the location of the specific area within a classified or unclassified water body for which one or more water quality standards are not met.*

**Parameter(s):** *Pollutants or water quality conditions that assessment procedures indicate do not meet assigned water quality standards.*

**Category:** *One of seven subcategories assigned to each impaired parameter to provide information about water quality status and management activities on that water body. The categories are defined below:*

    <u>**Category 4:**</u>  Available data and/or information indicate that at least one designated use is not being supported or is threatened, but a TMDL is not needed.

        **Category 4a:**  A state-developed TMDL has been approved by EPA or a TMDL has been established by EPA for any water-pollutant combination.

        **Category 4b:**  Other required control measures are expected to result in the attainment of an applicable water quality standard in a reasonable period of time.

        **Category 4c:**  The impairment or threat is not caused by a pollutant.

    <u>**Category 5:**</u>  Available data and/or information indicate that at least one designated use is not being supported or is threatened, and a TMDL is needed.

        **Category 5a:**  A TMDL is underway, scheduled, or will be scheduled.

        **Category 5b:**  A review of the standards for the water body will be conducted before a management strategy is selected.

        **Category 5c:**  Additional data and information will be collected or evaluated before a management strategy is selected.

        **Category 5n:**  Water body does not meet its applicable Chl a criterion, but additional study is needed to verify whether exceedance is associated with causal nutrient parameters or impacts to response variables.

**Carry Forward:** *Some previously listed impairments did not have adequate data to re-assess in 2022 and were carried forward from 2020 and remain impaired.*

| Segment ID | Segment Name | AU ID | Parameter | Category | Carry Forward |
|---|---|---|---|---|---|
| 1428B | Walnut Creek | 1428B_05 | Bacteria in water (Recreation Use) | 4a | N |
| 1428C | Gilleland Creek | 1428C_01 | Bacteria in water (Recreation Use) | 4a | N |
| | | 1428C_03 | Bacteria in water (Recreation Use) | 4a | N |
| | | 1428C_04 | Bacteria in water (Recreation Use) | 4a | N |
| 1429 | Lady Bird Lake (formerly Town Lake) | 1429_01 | Excessive algal growth in water | 5c | N |
| | | 1429_02 | Excessive algal growth in water | 5c | N |
| 1429C | Waller Creek | 1429C_01 | Bacteria in water (Recreation Use) | 5c | N |
| | | | Impaired macrobenthic community in water | 5c | Y |
| | | 1429C_02 | Bacteria in water (Recreation Use) | 4a | N |
| | | 1429C_03 | Bacteria in water (Recreation Use) | 4a | N |
| 1501 | Tres Palacios Creek Tidal | 1501_01 | Bacteria in water (Recreation Use) | 4a | Y |
| | | | Depressed dissolved oxygen in water | 5b | Y |
| 1602 | Lavaca River Above Tidal | 1602_02 | Bacteria in water (Recreation Use) | 5a | N |
| | | 1602_03 | Bacteria in water (Recreation Use) | 4a | N |
| 1602B | Rocky Creek | 1602B_01 | Bacteria in water (Recreation Use) | 4a | N |
| 1602C | Lavaca River Above Campbell Branch | 1602C_01 | Depressed dissolved oxygen in water | 5c | Y |
| | | 1602C_02 | Depressed dissolved oxygen in water | 5c | Y |
| 1801 | Guadalupe River Tidal | 1801_01 | Bacteria in water (Recreation Use) | 5c | N |
| 1803A | Elm Creek | 1803A_01 | Depressed dissolved oxygen in water | 5b | Y |
| 1803B | Sandies Creek | 1803B_01 | Bacteria in water (Recreation Use) | 5b | N |
| | | | Depressed dissolved oxygen in water | 5b | Y |
| | | 1803B_02 | Bacteria in water (Recreation Use) | 5b | Y |
| | | | Depressed dissolved oxygen in water | 5b | Y |
| 1803C | Peach Creek | 1803C_01 | Bacteria in water (Recreation Use) | 5b | N |
| | | | Depressed dissolved oxygen in water | 5c | Y |
| | | 1803C_03 | Bacteria in water (Recreation Use) | 5b | Y |
| | | | Depressed dissolved oxygen in water | 5c | Y |
| 1804A | Geronimo Creek | 1804A_01 | Bacteria in water (Recreation Use) | 5c | N |
| 1805 | Canyon Lake | 1805_01 | Mercury in edible tissue | 5c | N |
| | | 1805_02 | Mercury in edible tissue | 5c | N |
| | | 1805_03 | Mercury in edible tissue | 5c | N |
| | | 1805_04 | Mercury in edible tissue | 5c | N |
| 1806 | Guadalupe River Above Canyon Lake | 1806_08 | Bacteria in water (Recreation Use) | 5c | N |
| 1806A | Camp Meeting Creek | 1806A_01 | Bacteria in water (Recreation Use) | 5a | N |
| 1806D | Quinlan Creek | 1806D_01 | Bacteria in water (Recreation Use) | 4a | N |
| 1806E | Town Creek | 1806E_01 | Bacteria in water (Recreation Use) | 4a | N |

AR Item 43, Page 010

# Appendix Item 18

KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

Texas Administrative Code
  Title 30. Environmental Quality
    Part 1. Texas Commission on Environmental Quality
      Chapter 307. Texas Surface Water Quality Standards

30 TAC § 307.10

§ 307.10. Appendices A-G

Effective: September 29, 2022
Currentness

The following appendices are integral components of this chapter of the Texas Surface Water Quality Standards.

(1) Appendix A--Site-specific Uses and Criteria for Classified Segments:

Figure: 30 TAC § 307.10(1)

Figure: 30 TAC §307.10(1)

## Appendix A - Site-specific Uses and Criteria for Classified Segments

The following tables identify the water uses and supporting numerical criteria for each of the state's classified segments. The tables are ordered by basin with the segment number and segment name given for each classified segment. Marine segments are those that are specifically titled as "tidal" in the segment name, plus all bays, estuaries and the Gulf of Mexico. The following descriptions denote how each numerical criterion is used subject to the provisions in §307.7 of this title (relating to Site-Specific Uses and Criteria), §307.8 of this title (relating to Application of Standards), and §307.9 of this title (relating to Determination of Standards Attainment).

Segments that include reaches that are dominated by springflow are footnoted in this appendix and have critical low-flows calculated according to §307.8(a)(2) of this title. These critical low-flows apply at or downstream of the spring(s) providing the flows. Critical low-flows upstream of these springs may be considerably smaller. Critical low-flows used in conjunction with TCEQ regulatory actions (such as discharge permits) may be adjusted based on the relative location of a discharge to a gauging station.

The criteria for $Cl^{-1}$ (chloride), $SO_4^{-2}$ (sulfate), and TDS (total dissolved solids) are listed in this appendix as maximum annual averages for the segment.

Dissolved oxygen criteria are listed as minimum 24-hour means at any site within the segment. Absolute minima and seasonal criteria are listed in §307.7 of this title unless otherwise specified in this appendix. Dissolved oxygen criteria of 1.0 mg/L in this appendix will be considered minimum values at any time.

The pH criteria are listed as minimum and maximum values expressed in standard units at any site within the segment.

The freshwater indicator bacteria for recreation is *E. coli*. Enterococci is the indicator bacteria for recreation in saltwater and certain high saline inland water bodies with typical high conductivity values. The appropriate bacterial criteria are listed in the appendix under the Indicator Bacteria column and are applied as specified in §307.7(b)(1) of this title. The indicator bacteria for suitability for oyster waters is fecal coliform. The fecal coliform criteria for oyster waters is 14 colonies per 100 mL as specified in §307.7(b)(3)(B) of this title.

The criteria for temperature are listed as maximum values at any site within the segment except as noted in §307.4(h) of this title (relating to General Criteria) and §307.8(b) of this title.

| Segment No. | Colorado River Basin Segment Names | Recreation Use | Aquatic Life Use | Domestic Water Supply Use | Other Uses | Cl[1] (mg/L) | SO₄[5] (mg/L) | TDS (mg/L) | Dissolved Oxygen (mg/L) | pH Range (SU) | Indicator Bacteria[1] #/100 mL | Temperature (degrees F) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1433 | O. H. Ivie Reservoir | PCR1 | H | PS | | 430 | 330 | 1,520 | 5.0 | 6.5-9.0 | 126 | 93 |
| 1434 | Colorado River Above La Grange | PCR1 | E | PS | | 100 | 100 | 500 | 6.0 | 6.5-9.0 | 126 | 95 |

1  The indicator bacteria for freshwater is *E. coli* and for saltwater is Enterococci. The indicator bacteria for Segment 1412 is Enterococci.

2  The critical low-flow for the South Llano River portion of the segment is calculated according to §307.8(a)(2)(B) of this title.

3  The critical low-flow for the South Concho River portion of the segment is calculated according to §307.8(a)(2)(B) of this title.

4  The aquifer protection use applies to the contributing, recharge, and transition zones of the Edwards Aquifer.

5  The aquifer protection reach is assigned the following criteria: 50 mg/L for Cl[1], 50 mg/L for SO₄[2], 400 mg/L for TDS.

6  Dissolved oxygen criterion of 6.0 mg/L only applies at stream flows greater than or equal to 150 cfs as measured at USGS Gauging Station 08158000 located in Travis County upstream from US Highway 183. A dissolved oxygen criterion of 5.0 mg/L applies to stream flows less than 150 cfs and greater than or equal to the 7Q2 for the segment.

7  While the segment exhibits quality characteristics that would make it suitable for primary recreation, the use is prohibited by local regulation for reasons unrelated to water quality.

8  The critical low-flow is calculated according to §307.8(a)(2)(A) of this title.

### Colorado-Lavaca Coastal Basin Designated Uses and Numeric Criteria

| Segment No. | Colorado-Lavaca Coastal Basin Segment Names | Recreation Use | Aquatic Life Use | Domestic Water Supply Use | Other Uses | Cl[1] (mg/L) | SO₄[2] (mg/L) | TDS (mg/L) | Dissolved Oxygen (mg/L) | pH Range (SU) | Indicator Bacteria[1] #/100 mL | Temperature (degrees F) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1501 | Tres Palacios Creek Tidal | PCR1 | E | | | | | | 5.0 | 6.5-9.0 | 35 | 95 |
| 1502 | Tres Palacios Creek Above Tidal | PCR1 | H | | | 250 | 100 | 800 | 5.0 | 6.5-9.0 | 126 | 90 |

1  The indicator bacteria for freshwater is *E. coli* and for saltwater is Enterococci.

### Lavaca River Basin Designated Uses and Numeric Criteria

| Segment No. | Lavaca River Basin Segment Names | Recreation Use | Aquatic Life Use | Domestic Water Supply Use | Other Uses | Cl[1] (mg/L) | SO₄[2] (mg/L) | TDS (mg/L) | Dissolved Oxygen (mg/L) | pH Range (SU) | Indicator Bacteria[1] #/100 mL | Temperature (degrees F) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1601 | Lavaca River Tidal | PCR1 | H | | | | | | 4.0 | 6.5-9.0 | 35 | 95 |
| 1602 | Lavaca River Above Tidal | PCR1 | H | PS | | 200 | 100 | 700 | 5.0 | 6.5-9.0 | 126 | 91 |
| 1603 | Navidad River Tidal | PCR1 | H | | | | | | 4.0 | 6.5-9.0 | 35 | 91 |
| 1604 | Lake Texana | PCR1 | H | PS | | 100 | 50 | 500 | 5.0 | 6.5-9.0 | 126 | 93 |
| 1605 | Navidad River Above Lake Texana | PCR1 | H | PS | | 100 | 50 | 550 | 5.0 | 6.5-9.0 | 126 | 91 |

1  The indicator bacteria for freshwater is *E. coli* and for saltwater is Enterococci.

### Lavaca-Guadalupe Coastal Basin Designated Uses and Numeric Criteria

| Segment No. | Lavaca-Guadalupe Coastal Basin Segment Names | Recreation Use | Aquatic Life Use | Domestic Water Supply Use | Other Uses | Cl[1] (mg/L) | SO₄[2] (mg/L) | TDS (mg/L) | Dissolved Oxygen (mg/L) | pH Range (SU) | Indicator Bacteria[1] #/100 mL | Temperature (degrees F) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1701 | Victoria Barge Canal Tidal | NCR | H | | | | | | 4.0 | 6.5-9.0 | 35 | 95 |

1  The indicator bacteria for freshwater is *E. coli* and for saltwater is Enterococci.

| Water Body Name | County | Segment No. |
|---|---|---|
| Lake Lyndon B. Johnson | Burnet, Llano | 1406 |
| Inks Lake | Burnet, Llano | 1407 |
| Lake Buchanan | Llano | 1408 |
| Pedernales River | Blanco | 1414 |
| South Llano River (part of Llano River) | Kimble | 1415 |
| Llano City Lake (part of Llano River) | Llano | 1415 |
| Lake Coleman | Coleman | 1419 |
| Lake Dunlap (part of Guadalupe River Below Comal River) | Guadalupe | 1804 |
| Canyon Lake | Comal | 1805 |
| San Marcos River | Caldwell, Gonzales, Guadalupe, Hays | 1808 |
| Guadalupe River Below Canyon Dam | Comal | 1812 |
| Lake Corpus Christi | San Patricio, Live Oak | 2103 |
| Choke Canyon Reservoir | Live Oak, McMullen | 2116 |

| Water Body Name | County | Segment No. |
|---|---|---|
| Rio Grande Below Falcon Reservoir | Starr | 2302 |
| International Falcon Reservoir | Starr, Zapata | 2303 |
| Rio Grande Below Amistad Reservoir | Maverick, Webb | 2304 |

(3) Appendix C--Segment Descriptions:

Figure: 30 TAC §307.10(3)

1434    Colorado River Above La Grange - from a point 100 meters (110 yards) downstream of Business SH 71 at La Grange in Fayette County to a point 100 meters (110 yards) upstream of FM 969 near Utley in Bastrop County

1501    Tres Palacios Creek Tidal - from the confluence with Tres Palacios Bay in Matagorda County to a point 1.6 km (1.0 mi) upstream of the confluence of Wilson Creek in Matagorda County

1502    Tres Palacios Creek Above Tidal - from a point 1.6 km (1.0 mi) upstream of the confluence of Wilson Creek in Matagorda County to State Route 525 (Old US 59) in Wharton County

1601    Lavaca River Tidal - from the confluence with Lavaca Bay in Calhoun/Jackson County to a point 8.6 km (5.3 mi) downstream of US 59 in Jackson County

1602    Lavaca River Above Tidal - from a point 8.6 km (5.3 mi) downstream of US 59 in Jackson County to the confluence of Campbell Branch west of Hallettsville in Lavaca County

1603    Navidad River Tidal - from the confluence with the Lavaca River in Jackson County to Palmetto Bend Dam in Jackson County

1604    Lake Texana - from Palmetto Bend Dam in Jackson County to a point 100 meters (110 yards) downstream of FM 530 in Jackson County, up to the normal pool elevation of 44 feet (impounds Navidad River)

1605    Navidad River Above Lake Texana - from a point 100 meters (110 yards) downstream of FM 530 in Jackson County to the confluence of the East Navidad River and the West Navidad River in Colorado/Lavaca County

1701    Victoria Barge Canal Tidal - from the confluence with San Antonio Bay in Calhoun County to Victoria Turning Basin in Victoria County

1801    Guadalupe River Tidal - from the confluence with Guadalupe Bay in Calhoun/Refugio County to the Guadalupe-Blanco River Authority Salt Water Barrier 0.7 km (0.4 mi) downstream of the confluence of the San Antonio River in Calhoun/Refugio County

1802    Guadalupe River Below San Antonio River - from the Guadalupe-Blanco River Authority Salt Water Barrier 0.7 km (0.4 mi) downstream of the confluence of the San Antonio River in Calhoun/Refugio County to a

| 2452 | Tres Palacios Bay/Turtle Bay ^ |
| 2453 | Lavaca Bay/Chocolate Bay ^ |
| 2454 | Cox Bay ^ |
| 2455 | Keller Bay ^ |
| 2456 | Carancahua Bay ^ |
| 2461 | Espiritu Santo Bay ^ |
| 2462 | San Antonio Bay/Hynes Bay/Guadalupe Bay/Mission Lake ^ |
| 2463 | Mesquite Bay/Carlos Bay/Ayres Bay ^ |
| 2471 | Aransas Bay ^ |
| 2472 | Copano Bay/Port Bay/Mission Bay ^ |
| 2473 | St. Charles Bay ^ |
| 2481 | Corpus Christi Bay ^ |
| 2482 | Nueces Bay ^ |
| 2483 | Redfish Bay ^ |
| 2484 | Corpus Christi Inner Harbor ^ - from US 181 to Viola Turning Basin |
| 2485 | Oso Bay ^ - portion of the bay southeast of a line drawn from a point 550 meters west-northwest of the mouth of Oso Bay to the northern terminus of Shangrila Lane |
| 2486 | Blind Oso Bay ^ - portion of the bay northwest of a line drawn from a point 550 meters west-northwest of the mouth of Oso Bay to the northern terminus of Shangrila Lane |
| 2490 | Upper Laguna Madre ^ - upper portion of bay north of the Saltillo Flats |
| 2491 | Lower Laguna Madre ^ - lower portion of the bay south of the Saltillo Flats |
| 2492 | Baffin Bay/Alazan Bay/Cayo del Grullo/Laguna Salada ^ |
| 2493 | South Bay ^ |
| 2494 | Brownsville Ship Channel ^ |
| 2501 | Gulf of Mexico ^ - from the Gulf shoreline to the limit of Texas' jurisdiction between Sabine Pass and the mouth of the Rio Grande |

^ The segment boundaries are considered to be the mean high tide line.

(4) Appendix D--Site-specific Uses and Criteria for Unclassified Water Bodies:

Figure: 30 TAC §307.10(4)

| Segment | County | Water Body | ALU | DO | Description | Additional Site-Specific Factors |
|---|---|---|---|---|---|---|
| 1434 | Travis | Wilbarger Creek | H | 5.0 | Perennial stream from the confluence of an unnamed tributary approximately 2.3 km (1.4 mi) upstream of US 290 upstream to the confluence of an unnamed tributary 2.3 km (1.4 mi) upstream of Cameron Road | |
| 1434 | Travis | Wilbarger Creek | H | 5.0 | Intermittent stream with perennial pools from the confluence of an unnamed tributary approximately 2.3 km (1.4 mi) upstream of Cameron Road upstream to the confluence of an unnamed tributary approximately 3.7 km (2.3 mi) downstream of FM 685 | |
| 1434 | Travis | Unnamed tributary of Wilbarger Creek | H | 5.0 | Perennial stream from the confluence with Wilbarger Creek approximately 2.3 km (1.4 mi) upstream of the Cameron Road crossing of Wilbarger Creek upstream to the confluence of two forks of the tributary downstream of Jesse Bohls Road | |
| 1434 | Bastrop | Cedar Creek | H | 5.0 | Perennial stream from the confluence with the Colorado River upstream to the confluence of an unnamed tributary at FM 535 | |
| 1434 | Bastrop | Gazley Creek | I | 4.0 | Perennial stream from the confluence with the Colorado River above the City of La Grange upstream to the confluence with an unnamed tributary approximately 3.25 km upstream of the southern-most crossing of the Missouri-Kansas-Texas Railroad south of the City of Smithville | |

| Segment | County | Water Body | ALU | DO | Description | Additional Site-Specific Factors |
|---|---|---|---|---|---|---|
| 1434 | Bastrop, Travis | Maha Creek | I | 4.0 | Intermittent stream with perennial pools from the confluence with Cedar Creek in Bastrop County upstream to the confluence with an unnamed tributary approximately 0.25 km upstream of US 183 in Travis County | |
| 1501 | Matagorda | Wilson Creek | H | 5.0 | Perennial stream from the confluence with the Tres Palacios River upstream to the confluence with the first tributary south of SH 35 | |
| 1602 | Lavaca, DeWitt | Big Brushy Creek | H | 5.0 | Perennial stream from the confluence with Clarks Creek in Lavaca County upstream to the confluence with an unnamed tributary just downstream of the Loop 51 (US Highway B77) bridge crossing in DeWitt County south of the City of Yoakum | |
| 1602 | Lavaca | Rocky Creek | H | 5.0 | Perennial stream from the confluence with the Lavaca River upstream to 1.0 km above FM 531 west of the City of Shiner | |
| 1602 | Lavaca | Lavaca River | H | 5.0 | Intermittent stream with perennial pools from the confluence of Campbells Creek west of the City of Hallettsville upstream to the confluence with West Prong Lavaca River downstream of the City of Moulton | A 24-hour average DO criterion of 3.0 mg/L and a 24-hour minimum DO criterion of 2.0 mg/L apply from March 15 through October 15. |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Laura Courtney on behalf of Amanda Cagle
Bar No. 783569
laura.courtney@oag.texas.gov
Envelope ID: 106432859
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Brief of Appellant TCEQ
Status as of 10/3/2025 3:11 PM CST

Associated Case Party: Wilbarger Creek Conservation Alliance

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Christopher Smith | 24051349 | Chris.Smith@smithjolin.com | 10/3/2025 3:01:36 PM | SENT |
| Becky Jolin | 10856200 | Becky.Jolin@smithjolin.com | 10/3/2025 3:01:36 PM | SENT |

Associated Case Party: Texas Commission on Environmental Quality

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Laura Courtney | | laura.courtney@oag.texas.gov | 10/3/2025 3:01:36 PM | SENT |
| Sara Ferris | | sara.ferris@oag.texas.gov | 10/3/2025 3:01:36 PM | SENT |
| Amanda Cagle | | amanda.cagle@oag.texas.gov | 10/3/2025 3:01:36 PM | SENT |
| Colton Halter | | colton.halter@oag.texas.gov | 10/3/2025 3:01:36 PM | SENT |